**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREMS POLICY COALITION, INC. | |
|         Plaintiffs, | |
|       v. | C.A. No. |
| JOHN CARNEY, Governor of Delaware; KATHY JENNINGS, Attorney General of Delaware; | |
|         Defendants. | |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
AND ATTORNEYS' FEES (42 U.S.C. § 1983)**

Plaintiffs John Rigby ("Rigby"), Alan Knight ("Knight") and Firearms Policy Coalition, Inc. ("FPC"), by and through their attorneys, bring this action against Defendants John Carney, Governor of Delaware ("Carney") and Kathy Jennings, Attorney General of Delaware ("Jennings"), and allege as follows:

## INTRODUCTION

1.       In spite of the unambiguous text of the Constitution and binding Supreme Court precedents, on October 20, 2021, Defendant Carney signed into law House Bill 125 ("HB 125" or the "Bill"). HB 125 radically expands the State of Delaware's statutes (the Delaware Code—cited herein as "Del. C.") to ban, unconstitutionally and categorically, and under pain of severe criminal sanctions, (a) the possession, transportation, shipping, transfer, or sale of non-firearm objects ("NFOs")—*i.e.*, various components, parts, or predecessor materials, that, while not themselves firearms, could conceivably be used to construct a firearm (the "NFO Ban"), (b) the possession of self-manufactured firearms ("SMFs")—self-made firearms that do not bear a federally licensed firearm manufacturer's serial number, commonly referred to as so-called "ghost guns"—as well as, prospectively, any further self-manufacturing of firearms, including the assembly, manufacture,

sale, or transfer of firearms and major firearm components with the use of three-dimensional printers ("3D Printers") (the "SMF Ban"), and (c) the distribution by the Internet or any other means of any instructions in the form of computer files or code that may be used to program a 3D Printer to manufacture or produce a firearm, firearm receiver, or major component of a firearm (the "Instructions Ban") (the NFO Ban, SMF Ban, and Instructions Ban collectively referred to as "Delaware's Bans" or the "Bans").

2.      Indeed, under the new provisions of the Delaware Code established by HB 125, Defendants are enforcing, and will enforce, laws that:

a.      Completely prohibit ordinary individuals who are not federally licensed gun dealers or manufacturers from possessing, transporting, shipping, transferring, or selling NFOs (pursuant to the NFO Ban) (Del. C. Title 11, Chapter 5, § 1459A);

b.      Completely prohibit all individuals from possessing, manufacturing, assembling, causing to be manufactured or assembled, selling, or transferring any so-called "untraceable firearm" for which the sale or distribution chain from a licensed retailer to the point of its first retail sale cannot be traced by law enforcement officials, including, but not limited to firearms self-manufactured using a 3D Printer (pursuant to the SMF Ban) (Del. C. Title 11, Chapter 5, §§ 1463(a), (b), (c)(1));

c.      Completely prohibit all individuals from distributing, by the internet or any other means, any instructions in the form of computer files or code that may be used to program a 3D Printer to manufacture or produce a firearm, firearm receiver, or major component of a firearm, thereby overtly and expressly banning and chilling constitutionally protected speech in an overbroad manner (pursuant to the Instructions Ban) (Del. C. Title 11, Chapter 5, § 1463(c)(2)); and,

      d.     Establish an unconstitutionally expansive definition of an "[u]finished firearm frame or receiver," encompassing virtually all conceivable forms and types of NFOs and which will sweep into its net ordinary citizens in possession of a wide variety of items or materials that are not functional firearms or functional components of firearms (Del. C. Title 11, Chapter 2, § 222).

3.     Delaware's Bans are nothing less than a broad and unconstitutional attack on protected conduct, instruments, and speech, in direct violation of the fundamental individual right to keep and bear arms, to just compensation for the taking of property, and to the fundamental right to free speech.

4.     The SMF Ban and the Instructions Ban took effect immediately when Defendant Carney signed HB 125 into law (including Section 1463's ban on so-called "untraceable firearms"). Section 1459A—the NFO Ban—which addressed only the possession of unfinished frames and receivers with no serial numbers, becomes effective 90 days after the adoption of HB 125—January 18, 2022—leaving thousands of individuals and countless local businesses little time to dispossess themselves of all lawfully owned property in Delaware affected by the NFO Ban (without any expectation or possibility of due process or just compensation for the deprivation of this property).  Furthermore, on and after January 18, 2022, all residents of Delaware will be at risk of enforcement and prosecution under not only the NFO Ban, but under the SMF Ban and the Instructions Ban as well.

5.     Defendants have made no showing that any of the numerous law-abiding citizens directly targeted by HB 125 have ever misused, much less committed any crime of violence with, any items or materials covered by Delaware's Bans, so as to justify this radical broadside against multiple constitutional rights.

6.      Rather than tailor its laws as the Constitution requires, the State of Delaware enacted, and Defendants are enforcing, overbroad, categorical Bans that unquestionably infringe on the rights of law-abiding Delaware residents, businesses, and visitors, and empowers Defendants to use criminal sanctions and the force of the criminal justice system to impose the Defendants' misguided policy preferences on these law-abiding persons and entities, denying them access to and the exercise of their right to keep and bear protected arms, taking their property without just compensation, and abridging their freedom of speech.

7.      Plaintiffs therefore bring this challenge to vindicate their rights, and to immediately and permanently enjoin enforcement of Delaware's Bans as required to conform HB 125 to the Constitution's text as informed by our Nation's history and tradition.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

9.      This action, based on a violation of Plaintiffs' constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the District of Delaware.

## PARTIES

11.      Plaintiff Rigby is a natural person and a citizen of the State of Delaware, residing in Sussex County, Delaware.

12.      Plaintiff Knight is a natural person and a citizen of the State of Delaware, residing

in New Castle County, Delaware.

13.    Plaintiff FPC is a 501(c)(4) non-profit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada.

14.    Defendant Carney is Governor of the State of Delaware and vested with the "supreme executive power" of the State.  As the governor, DEL. CONST., Art. 3, Sec. 1, Defendant Carney is required under the Delaware Constitution to "take care that the laws are faithfully executed," *id*. Sec. 17, and is thus wholly or partially responsible for overseeing, implementing, and enforcing Delaware's Bans, regulatory programs, and related policies, practices, and customs designed to propagate the same.  Defendant Carney is sued in his official capacity as Governor of the State of Delaware.

15.    Defendant Jennings is the Attorney General of the State of Delaware, "the State's chief law enforcement officer."[1]  As Attorney General, Defendant Jennings supervises, directs, and controls the Department of Justice of the State of Delaware.  Del. C. Title 29, Chapter 25, § 2502.  Thus, Defendant Jennings is wholly or partially responsible for overseeing, implementing, and enforcing Delaware's Bans, regulatory programs, and related policies, practices, and customs designed to propagate the same.  Among the powers conferred by the Delaware General Assembly upon the Attorney General is the authority "to have charge of all criminal proceedings."  Del. C. Title 29, Chapter 25, § 2504(6).  Defendant Jennings is sued in her official capacity as Attorney General of the State of Delaware.

## **THE RIGHTS AT STAKE**

### *The Right to Keep and Bear Arms*

16.    The enactment of HB 125 puts the fundamental right to keep and bear arms at risk

---

[1] *See* https://attorneygeneral.delaware.gov/about/.

in light of Delaware's mandates—the NFO Ban and the SMF Ban—that effectively end the practice of self-manufacturing firearms within the State.  These mandates are antithetical to the text of the Second Amendment as informed by the undeniably rich American history and tradition of self-manufacturing firearms in the United States and its predecessor Colonies, and defy the Supreme Court's binding decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

17.     The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms *shall not* be infringed."  U.S. CONST. amend. II (emphasis added).

18.     Incorporated against the states through the due process clause of the Fourteenth Amendment (*McDonald*, 561 U.S. at 750), the Second Amendment guarantees "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595.  It is "a fundamental constitutional right guaranteed to the people," *id.*, which is and always has been key to "our scheme of ordered liberty." *McDonald*, 561 U.S. at 767-68.

19.     Under *Heller*, the State of Delaware cannot narrow the channels for exercising the right to keep and bear arms by limiting one's access to the essential instruments of that right to only State-approved manufacturers of firearms and firearms predecessor materials, because the Second Amendment right necessarily includes and thus guarantees the ability of ordinary law-abiding citizens to self-manufacture firearms "typically possessed by law-abiding citizens for lawful purposes . . . ."  554 U.S. at 625; *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 ("A weapon may not be banned unless it is *both* dangerous *and* unusual.") (emphasis in original); *see also Miller v. Bonta*, 2021 U.S. Dist. LEXIS 105640, at *16 (S.D. Cal. June 4, 2021) ("*Heller* asks whether a law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes.

It is a hardware test.").

20.     SMFs, and their predecessor materials—NFOs—are typically possessed and commonly owned by law-abiding citizens, and are therefore not unusual; thus, their "relative dangerousness . . . is irrelevant" because they "belong[] to a class of commonly of arms commonly used for lawful purposes." *Caetano*, 136 S. Ct. at 1031.

21.     Therefore, ownership and possession of SMFs and NFOs by law-abiding individuals are protected by the Constitution, full stop.

22.     But Delaware's Bans completely and categorically prohibit law-abiding individuals not otherwise prohibited from exercising their Second Amendment rights from possessing, acquiring, selling, transferring, and self-manufacturing firearms that are of types, functions, and designs similar to industrially-manufactured firearms, and are themselves commonly owned and possessed firearms.

23.     Throughout American history, rich with traditions of citizens robustly exercising the cherished right to keep and bear arms, people have been free to personally manufacture, construct, and/or assemble arms for lawful purposes, including self-defense in the home.

24.     The colonists in the first permanent English settlements had the express right to import arms and the items and materials necessary to make them. Binding his "Heirs and Successors," King James I in 1606 granted the "Southern Colony" (Virginia) the right to import from Great Britain "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise." 7 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3787–88 (Francis Thorpe ed., 1909).

25.     Along the same lines, the 1620 Charter of New England granted colonists the right "to take, load, carry, and transport in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there."  3 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 1834–35 (Francis Thorpe ed., 1909).

26.     Moreover, "[f]rom the earliest periods American gunsmiths had made and repaired military firearms."  HAROLD L. PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA 178 (1956).

27.     "The influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era."  M. L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980).

28.     As historian Charles Winthrop Sawyer explained, "in the smaller shops which formed the great majority—mere cabins on the outskirts of the wilderness—one man with or without an apprentice did every part of the work."  1 CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY 145 (1910).  As well, many gunsmiths worked primarily in other trades and built or repaired firearms as a hobby.  See JAMES WHISKER, THE GUNSMITH'S TRADE 145–63 (1992).

29.     During the Revolutionary War, many colonies relied on and incentivized people outside of the firearms industry to produce firearms.  For example, on August 2, 1775, a Committee appointed by Maryland's Provincial Convention "to enquire into the practicability of establishing a manufactory of Arms within this Province" determined that "Arms may be furnished sooner, and

at less expense by engaging immediately all Gun Smiths, *and others concerned in carrying on that business*." JOURNAL OF THE MARYLAND CONVENTION JULY 26 – AUGUST 14, 1775, at 64–65 (William Hand Browne ed., 1892) (emphasis added).

30.     In January 1776, the New Hampshire House of Representatives passed a resolution to pay each person who "made" a firearm to certain specifications.  "[E]very good firearm Manufactured in this Colony" was rewarded with "three pounds for each."  8 DOCUMENTS AND RECORDS RELATING TO THE STATE OF NEW-HAMPSHIRE DURING THE PERIOD OF THE AMERICAN REVOLUTION, FROM 1776 TO 1783, at 15–16 (Nathaniel Bouton ed., 1874).

31.     In March 1776, a committee of New York's Provincial Congress published notice "in all the publick Newspapers in this Colony" that "this Committee are ready to receive proposals from & treat with any Person or Persons who are willing to engage in manufacturing good Muskets, or the Locks, Barrels, or any necessary parts thereof."  5 AMERICAN ARCHIVES, FOURTH SERIES, 1418 (Peter Force ed., 1844).  The Provincial Congress offered rewards for the manufacturers who could produce the greatest number of arms for the colony, but excluded "any person with whom the Congress or Committee of Safety have already contracted"—thus incentivizing those capable of manufacturing arms but not necessarily in the firearms business.

32.     A month later, the North Carolina Provincial Congress called for "all Gunsmiths, and other mechanicks, who have been accustomed to make, or assist in making Muskets" to be recruited to manufacture arms for the colony.  5 AMERICAN ARCHIVES, FOURTH SERIES, 1338 (Peter Force ed. 1844).  And further, "that they be furnished, at the expense of this Colony, with tools, implements and utensils, and materials for carrying on the said work." *Id.*

33.     Certainly, the ratifiers of the Bill of Rights remembered that the young country depended on the manufacture of firearms by those outside of the firearms industry for survival and

intended to protect such activity through the Second Amendment.  Indeed, building firearms was entirely unregulated during the colonial and founding eras in America, and there were no restrictions on who could be a gunsmith or make guns.

34.     "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."  Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904).

35.     Thus, no history or precedent exists for extinguishing citizens' ability to self-manufacture firearms for self-defense or other lawful purposes—as Defendants mandate pursuant to the authority vested in them by HB 125—and rightly so, because the Second Amendment, through its text and as it is informed by history and tradition, is intended to guarantee this right as part of the fundamental liberty it secures.

36.     Today, consistent with these traditions and history, federal laws permit the manufacture of a firearm for personal use.  *See What is ATF doing in regards to people making their own firearms*, Bureau of Alcohol, Tobacco, Firearms and Explosives (June 16, 2021), https://www.atf.gov/firearms/qa/what-atf-doing-regards-people-making-their-own-firearms ("An individual may generally make a firearm for personal use."); William J. Krouse, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018), https://fas.org/sgp/crs/misc/IN10957.pdf ("In short, unfinished receivers and the components needed to build fully functional AR-15s and other firearms are legally available on the U.S. civilian gun market and can be purchased without a background check under federal law."); *see also, e.g.*, 18 U.S.C. § 922(a)(1)(a).

37.     Even the State of California—hardly reticent when it comes to regulating

firearms—took a different approach to regulating SMFs.  A person can (and is required to) "[a]pply to the Department of Justice for a unique serial number or other mark of identification" prior to constructing a firearm. Cal. Penal Code § 29180(b)(1).  Before the Department issues the serial number to an applicant, it conducts a background check.  *Id*. at § 29182(b)(1).  And if the applicant is not disqualified, the Department "shall grant" such an application "in the form of serial numbers pursuant to Section 23910 to, persons who wish to manufacture or assemble firearms pursuant to subdivision (b) of Section 29180."  *Id*. at § 29182(a)(1).

### *The Rights to Due Process of Law and Just Compensation*

38.     The fundamental protection against deprivation of property without due process of law and companion fundamental right to receive just compensation for takings of property are also at stake in light of Delaware's NFO Ban that requires all ordinary, law-abiding citizens of Delaware to dispossess themselves of all unfinished frames or receivers with no serial number (and the many other NFOs that fall within the NFO Ban's sweepingly broad definition of "[u]nfinished frame or receiver"), as well as Delaware's SMF Ban that requires all ordinary, law-abiding citizens of Delaware to dispossess themselves of unserialized firearms, all without due process of law or any compensation for the destruction of their valuable property rights.

39.     The Fifth Amendment to the United States Constitution states, in pertinent part, "No person shall . . . be deprived of life, liberty, or property, without due process of law [the Due Process Clause of the Fifth Amendment]; nor shall private property be taken for public use, without just compensation [the Takings Clause of the Fifth Amendment]."   U.S. CONST. amend. V.

40.     The Fourteenth Amendment to United States Constitution states, in pertinent part, ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law [the Due Process Clause of the Fourteenth Amendment]."  U.S. CONST. amend. XIV, § 1.

41.     "[W]here government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005).  "A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Id.* (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)) (emphasis in original).

### The Right to Free Speech

42.     The fundamental right to free speech is also at stake in light of Delaware's Instructions Ban prohibiting the distribution of, by the internet or any other means of any instructions in the form of computer files or code that may be used to program a 3D Printer to manufacture or produce a firearm, firearm receiver, or major component of a firearm.

43.     Indeed, consistent with the American history and tradition of self-manufacturing firearms, people have been just as free to share their knowledge of these various aspects of firearms production with other interested individuals.

44.     The First Amendment to the United States Constitution states, in pertinent part: "Congress shall make no law . . . .abridging the freedom of speech . . . ." U.S. CONST. amend. I. The First Amendment, as incorporated through the Fourteenth Amendment, prohibits a state or any political subdivision thereof, or any official of a state or any political subdivision thereof, from prohibiting the free exercise of speech and expression.  U.S. CONST. amend. XIV, § 1.

45.     "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011).

46.     Information within the meaning of the First Amendment includes computer source code. *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we

hold that it is protected by the First Amendment."); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."), *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("For the purposes of First Amendment analysis, this court finds that source code is speech.").

52.     Yet, under threat of felony criminal prosecution, Defendants are conducting a censorship campaign that expressly targets Plaintiffs' publication of digital firearms information and expressly targets their audience.  If anyone dares to share the information deemed illicit, Defendants' enforcement of HB 125 threatens them with serious criminal penalties, including incarceration and the lifetime loss of Second Amendment rights.  But the speech-chilling impact of the Instructions Ban extends well beyond actual or contemplated dissemination of firearms information by Plaintiffs—it also affects the persons with whom the Plaintiffs have communicated, the persons who desire to communicate with the Plaintiffs, and other persons wishing to engage in similar communications.

53.     Defendant state officials are infringing the Second Amendment's right to bear arms by blatantly abridging the First Amendment's right to freedom of speech.  Defendants are effectuating this attack on the constitutional rights of Plaintiffs, and all citizens of Delaware, through a highly coercive form of censorship—the threat of felony criminal prosecution.

## THE CHALLENGED BANS

47.     Through HB 125, the Delaware General Assembly amended Chapter 2 of Title 11, and Chapter 5 of Title 11 of the Delaware Code, by adding the following provisions, categorized as Sections 1 and 2 of the Bill.

48.     Section I of the Bill amends Chapter 2 of Title 11, in pertinent part, by adding new

statutory definitions for the terms "firearm frame or receiver," "major component of a firearm,"

"three-dimensional printer," "unfinished firearm frame or receiver," and "untraceable firearm."

50.     Section 2 of the Bill amends Chapter 5 of Title 11 to create, in pertinent part, Section 1459A (Possession of an unfinished firearm frame or receiver with no serial number), a violation of which is a Class D felony, and Section 1463 (Untraceable firearms), a violation of which is a Class E or D felony.

51.     Section 4 of the Bill states that the criminal prohibition proscribing the possession of "unfinished firearm frame[s] or receivers" under Section 1459A, which forces ordinary law-abiding citizens to dispossess themselves of all such items (and the many other NFOs that fall within this sweepingly broad definition), takes effect 90 days following the Bill's enactment into law.  The Bill was signed by Defendant Carney on October 20, 2021, thereby giving Delaware residents until January 18, 2022 to dispossess themselves of their lawfully acquired property.

54.     The criminal prohibitions found in the newly created Section 1463, which criminalize possession and manufacture of so-called "untraceable firearms" as well as expressly banning the manufacture of same using 3D printers *and* the distribution of computer files—speech—from which firearms or firearm components or firearm precursor materials *could* be manufactured, take effect immediately upon the enactment of the Bill, rendering numerous Delaware residents at risk of felony prosecution for the constitutionally protected acts of manufacturing firearms and distributing computer files or code regarding same.

## The New Definitions Created by HB 125

55.     Section 1 of the Bill amends Section 222 of Title 11 of the Delaware Code, by creating, in pertinent part, the following definitions.

56.     "'Firearm frame or receiver' means the part of the firearm that provides housing

for the firearm's internal components, and includes the hammer, bolt or breechblock, action, and firing mechanism."

57.     "'Major component of a firearm' means the slide, barrel, cylinder, trigger group, or receiver of a firearm."

58.     "'Three-dimensional printer' means a computer or computer-driven machine of [sic] device capable of producing a three-dimensional object from a digital model."

59.     "'Unfinished firearm frame or receiver' means a firearm frame or receiver that requires further machining or molding in order to be used as part of a functional firearm, and which is designed and intended to be used in the assembly of a functional firearm."

60.     "'Untraceable firearm' means a firearm for which the sale or distribution chain from a licensed retailer to the point of its first retail sale cannot be traced by law enforcement officials. 'Untraceable firearm' does not include any of the following:

    a.  Firearms manufactured prior to 1968.

    b.  Muzzle-loading firearms designed to use black power [sic] or its equivalent.

    c.  Firearms which are designed as replicas of antique firearms originally manufactured prior to 1898."

### Section 1459A
### *The NFO Ban*

61.     Effective January 18, 2022, it is a Class D felony for anyone in Delaware to "knowingly transport, ship, transfer, or sell an unfinished frame or receiver unless . . . . "[t]he person is a federally licensed gun dealer or manufacturer," "[t]he name of the manufacturer and an individual serial number are conspicuously placed on the unfinished firearm frame or receiver in accordance with the procedures for the serialization of a firearm in 18 U.S.C. § 923(i)," *and* "[t]he person maintains records for the unfinished firearm frame or receiver in accordance with

the requirements for maintenance of records in 18 U.S.C. § 923(g)."  HB 125 Section 2, § 1459A(a).  In addition, also effective January 18, 2022, it is a class D felony for anyone in Delaware to "knowingly possess an unfinished firearm frame or receiver that does not have the name of the manufacturer and serial number conspicuously placed on it or on a major component of the firearm into which the unfinished firearm frame or receiver will be housed."  HB 125 Section 2, § 1459A(b).

62.     "Unfinished frame or receiver" is broadly and vaguely defined, so as to sweep into its net virtually all conceivable forms and types of NFOs and non-firearm predecessor materials.

63.     Under federal law, serializing components such as unfinished frames or receivers is not required at all, nor is the serialization of firearms required of ordinary citizens who are not licensed manufacturers or licensed importers of firearms.  The law only requires that "a *licensed manufacturer or licensed importer* of firearms, must legibly identify each firearm manufactured or imported . . . [b]y engraving, casting, stamping . . . or otherwise conspicuously placing or causing to be engraved, cast, stamped . . . impressed or placed on the frame or receiver thereof an individual serial number . . . .," (27 C.F.R. § 478.92(a)(1)(i)) (emphasis added) and "certain additional information." (27 C.F.R. § 478.92(a)(1)(ii)).  Similarly, "[a] firearm frame or receiver that is not a component of a complete weapon at the time it was sold, shipped, or otherwise disposed of by [a licensed manufacturer or licensed importer of firearms] must be identified as required by this section."  27 C.F.R. § 478.92(a)(2).  Indeed, *"[l]icensed importers and licensed manufacturers* shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon . . . each firearm imported or manufactured by such importer or manufacturer."  18 U.S.C. § 923(i) (emphasis added); *see also* 18 U.S.C. § 921(a)(3) (defining "firearm").

64.     Additionally, even licensed manufacturers, importers, and dealers are not required

to maintain records for unfinished frames or receivers.  18 U.S.C. § 923(g) (stating "[e]ach licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of *firearms*…") (emphasis added).

65.     The result, then, of the NFO Ban, contrary to the Constitution and federal law, is that all ordinary law-abiding citizens (*i.e.*, everyone except federally licensed gun dealers and manufacturers) must dispossess themselves of all unserialized "unfinished frames or receivers" and other NFOs that fall within this definition by no later than January 18, 2022; and further, no ordinary law-abiding citizen may ever again lawfully possess, transport, ship, transfer, or sell any such unserialized frames, receivers, or NFOs on or after January 18, 2022, which effectively ends the constitutional and longstanding practice of self-manufacturing firearms in Delaware.

66.     A Class D felony is punishable by up to 8 years in prison (11 Del. C. § 4205(b)(4)), and a conviction would result in the lifetime disqualification of an individual's right to own and possess firearms and ammunition. *See* 18 U.S.C. 922(g)(1).

### Section 1463
### *The SMF Ban and the Instructions Ban*

67.     Effective immediately, any person is guilty of a class E felony when that person "knowingly possesses an untraceable firearm" (HB 125, §§ 1463(a), (d)); guilty of a class D felony when that person "knowingly manufactures, assembles, causes to be manufactured or assembled, sells, or transfers an untraceable firearm" (HB 125, §§ 1463(b), (e)); guilty of a class D felony when that person "[u]ses a three-dimensional printer or similar device to manufacture or produce a firearm, firearm receiver, or major firearm component when not licensed as a manufacturer" (HB 125, §§ 1463(c)(1), (e)); and guilty of a class D Felony when that person "[d]istributes by any means, including the internet, to a person who is not licensed as a manufacturer, instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic

format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver or major component of a firearm." (HB 125, §§ 1463(c)(2), (e)).

68.     Because this section requires all firearms to have record of their first sale or distribution from a licensed retailer that is traceable by law enforcement officials, as per the definition of "untraceable firearm," it categorically bans ordinary law-abiding Delawareans from self-manufacturing every and all designs and types of modern, operable firearms protected under the Constitution.

69.     A Class D felony is punishable by up to 8 years in prison (11 Del. C. § 4205(b)(4), *supra*), and a Class E felony is punishable by up to 5 years in prison (11 Del. C. § 4205(b)(5), and a conviction of either would result in the lifetime disqualification of an individual's right to own and possess firearms and ammunition. *See* 18 U.S.C. § 922(g)(1).

## FACTS AS TO THE PLAINTIFFS
## AND THE IMPACT OF DELAWARE'S BANS ON THEM

### *Facts Relating to All Plaintiffs*

70.     Unless and until enjoined, Defendants' active administration, implementation, and enforcement of Delaware's Bans, and the related regulations, policies, practices, and customs designed to implement and enforce the same, has violated and will continue to violate: (i) the fundamental individual right to keep and bear arms guaranteed under the Second Amendment to Rigby, Knight, and all similarly situated Delaware residents and FPC members, as a result of the enactment and enforcement of NFO Ban and the SMF Ban; (ii) the fundamental right of Rigby, Knight, and all similarly situated Delaware residents and FPC members to receive just compensation guaranteed under the Due Process Clause of the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Takings Clause of the Fifth Amendment, as a result

of the destruction of their property interests being exacted by the dispossession mandates of the NFO Ban and the SMF Ban; and (iii) the fundamental right of Rigby, Knight, and all similarly situated Delaware residents and FPC members to freedom of speech guaranteed under the First Amendment, as a result of the enactment and enforcement of the Instructions Ban.

### *Facts Relating to Plaintiff Rigby*

71.     Rigby is a resident of Sussex County, Delaware.

72.     Rigby is a peaceable citizen not disqualified from exercising his Second Amendment right to possess firearms and ammunition.

73.     Rigby holds concealed carry permits for Delaware and Pennsylvania.

74.     Rigby is not a licensed firearms manufacturer, importer, or dealer.

75.     Rigby is a member of Plaintiff FPC.

76.     Rigby lawfully owns a self-manufactured Glock-compatible[2] handgun, which he completed from a Polymer80[3] NFO before enactment of Delaware's Bans.  Because this firearm was self-manufactured, it is necessarily "a firearm for which the sale or distribution chain from a licensed retailer to the point of its first retail sale cannot be traced by law enforcement officials," thus falling within the SMF Ban's prohibition against all modern, operable "untraceable firearms." (HB 125, § 1463(a).)  Due to Rigby's reasonable fear of criminal sanction under the SMF Ban, Rigby has removed his self-manufactured handgun to a location outside of Delaware in a legal

---

[2] *See, e.g.*, https://www.polymer80.com/PF940v2-80-Full-Size-Frame-Kit-_2 ("The PF940v2™ is compatible with components for 3-pin 9mm [Glock®] G17, 34, 17L; .40S&W G22, 35, 24; and .357Sig G31.") (last accessed Oct. 26, 2021).  These Glock-platform handguns are some of the most common in the United States, and *Heller*'s "hardware test" is not limited to the original designer or a specific manufacturer.

[3] "About Polymer80," online at https://www.polymer80.com/about-us: "Polymer80, Inc. designs and develops innovative firearms and after-market accessories that provide ways for our customer to participate in the build process, while expressing their right to bear arms.  This provides a fun learning experience and a greater sense of pride in their completed firearm, strengthening our brand loyalty.  We summarize this with our motto of 'Engage Your Freedom.'" (last accessed Oct. 26, 2021).  Polymer80, Inc., is presently located in Dayton, Nevada.

manner.  Consequently, Rigby is now unable to possess his SMF in Delaware for self-defense in the home and other lawful purposes.

77.    Rigby's heretofore lawfully possessed SMF is of a type commonly possessed by law-abiding citizens for lawful purposes today; specifically, a semiautomatic handgun.  Indeed, handguns are recognized as "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629.

78.    Rigby also owns and possesses an uncompleted NFO and associated components, which he lawfully acquired before enactment of the NFO Ban.  One or more of these components would fall within the new definition of and prohibition against possessing unserialized "unfinished frames or receivers" under the NFO Ban (HB 125, §§ 1459A(b)), which now mandates dispossession of such components by January 18, 2022.

79.    Rigby's lawfully possessed, unserialized NFO is of a type used to complete a firearm commonly possessed by law-abiding citizens for lawful purposes today; specifically, the AR-15 design rifle.  These unserialized NFOs are also commonly possessed by law-abiding citizens in the exercise of their right to self-manufacture such firearms for self-defense and other lawful purposes.

80.    However, Rigby is mandated to dispossess himself of the unserialized NFO by January 18, 2022, or face felony prosecution under Section 1459A, and *immediately* on October 20, 2021 (when Defendant Carney signed the Bill) dispossess or permanently disable his SMF, or face felony prosecution under Section 1463.

81.    Rigby desires to continue to own and possess his SMF and his NFO for self-defense and other lawful purposes in Delaware, and not sell or otherwise dispose of either of them, but he reasonably fears criminal sanction in light of the statutorily mandated dispossession established

under Delaware's Bans.   But for the SMF Ban, Rigby would not have removed his self-manufactured handgun to a location outside of Delaware, and would be able to use his self-manufactured handgun for self-defense and other lawful purposes; and, but for the NFO Ban, Rigby would continue to possess his NFO in Delaware for the self-manufacturing of a firearm for self-defense in the home and other lawful purposes beyond the January 18, 2022 dispossession deadline.

82.     As well, Rigby desires and intends to acquire additional NFOs commonly used in the self-manufacturing of types of firearms in common use for self-defense and other lawful purposes—two examples of which are semiautomatic handguns and rifles—including those that fall within the definition of "unfinished frames or receivers" under the NFO Ban, and he desires and intends to self-manufacture operable firearms for self-defense and other lawful purposes, now prohibited under the SMF Ban.   However, in light of the NFO Ban and Defendants' active enforcement of same, he is prohibited from purchasing or otherwise acquiring any such NFOs and is prohibited from ever again possessing, transporting, shipping, transferring or selling any such NFOs any time on or after January 18, 2022; and, in light of the SMF Ban and Defendants' active enforcement of same, he is prohibited from self-manufacturing any operable unserialized firearms.

83.     Rigby also owns and possesses a 3D Printer.

84.     Rigby desires and intends to "manufacture or produce a firearm, firearm receiver, and major firearm components" using his 3D Printer, and would do so but for his reasonable fear of felony prosecution as a result of Defendants' active enforcement of the SMF Ban, and is prohibited from doing so as a result of the SMF Ban and Defendants' active enforcement of same.

85.     Rigby also desires and intends to possess and "distribute by any means, including the Internet, to a person who is not licensed as a manufacturer, instructions in the form of

computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver or major component of a firearm," (*see* Del C. Title 11, Chapter 5, § 1463(c)(2)) to other ordinary, law-abiding Delaware residents, and would do so but for his reasonable fear of felony prosecution as a result of Defendants' active enforcement of the Instructions Ban, and is prohibited from doing so as a result of the Instructions Ban and Defendants' active enforcement of same.

### *Facts Relating to Plaintiff Knight*

86.    Knight is a resident of New Castle County, Delaware.

87.    Knight is a peaceable citizen not disqualified from exercising his Second Amendment right to possess firearms and ammunition.

88.    Knight holds concealed carry permits for Delaware, Pennsylvania, Florida, and Utah.

89.    Knight is an 11-year veteran of the United States Army, the Army Reserve, and the Delaware National Guard.

90.    Knight is not a licensed firearms manufacturer, importer, or dealer.

91.    Knight is a member of Plaintiff FPC.

92.    Knight owns and possesses two uncompleted NFOs and associated components, which he lawfully acquired before enactment of the NFO Ban. One or more of these components would fall within the new definition of and prohibition against possessing unserialized "unfinished frames or receivers" under the NFO Ban (HB 125, §§ 1459A(b)), which now mandates dispossession of such components by January 18, 2022.

93.    Knight's lawfully possessed NFOs are of a type used to complete a firearm

commonly possessed by law-abiding citizens for lawful purposes today; specifically, the AR-15 design rifle.  These unserialized NFOs are also commonly possessed by law-abiding citizens in the exercise of their right to self-manufacture such firearms for self-defense and other lawful purposes.

94.     However, Knight is mandated to dispossess himself of the unserialized NFOs by January 18, 2022, or face felony prosecution under Section 1459A.

95.     Knight desires to continue to own and possess his NFOs for the self-manufacturing of firearms for self-defense in the home and other lawful purposes, and not sell or otherwise dispose of either of them, but he reasonably fears criminal sanction in light of the statutorily mandated dispossession established under Delaware's Bans.  But for the NFO Ban, Knight would continue to possess his NFOs in Delaware for self-defense and other lawful purposes beyond the January 18, 2022, dispossession deadline.

96.     As well, Knight desires and intends to acquire additional NFOs commonly used in the self-manufacturing of types of firearms in common use for self-defense and other lawful purposes—two examples of which are semiautomatic handguns and rifles—including those that fall within the definition of "unfinished frames or receivers" under the NFO Ban.  He also desires and intends to self-manufacture operable firearms for self-defense and other lawful purposes, now prohibited under the SMF Ban; and but for the SMF Ban, Knight would possess one or more SMFs in Delaware for self-defense and other lawful purposes.  However, in light of the NFO Ban and Defendants' active enforcement of same, he is currently prohibited from purchasing or otherwise acquiring any such NFOs and is prohibited from ever again possessing, transporting, shipping, transferring or selling any such NFOs any time on or after January 18, 2022; and, in light of the SMF Ban and Defendants' active enforcement of same, he is currently prohibited from self-

manufacturing any operable firearms.

### *Facts Relating to Plaintiff FPC*

97.     Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

98.     The purposes of FPC include defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing individual liberty, and restoring freedom.

99.     FPC has members in Delaware, including Plaintiffs Rigby and Knight.

100.    FPC represents its members—who include gun owners, prospective gun owners and self-manufacturers, retailers of NFOs, parts, and firearms, and others—and brings this action on behalf of them, including Plaintiffs Rigby and Knight.

101.    FPC's Delaware resident members, including Plaintiffs Rigby and Knight, have been and will continue to be adversely and directly harmed by Defendants' administration, implementation, and enforcement of the laws, and related regulations, policies, practices, and customs challenged herein and will otherwise remain so adversely and directly affected under Delaware's Bans.

102.    Many of FPC's Delaware resident members lawfully acquired unserialized NFOs that are commonly possessed by law-abiding citizens in the exercise of their right to self-manufacture such firearms for self-defense and other lawful purposes.

103.    However, those Delaware resident members are required to dispossess themselves of the unserialized NFOs by January 18, 2022, or face felony prosecution under Section 1459A, and reasonably fear criminal sanction in light of the statutorily mandated dispossession established under Section 1459A of HB 125.

104.    Many of Plaintiff FPC's Delaware resident members also desire to acquire additional NFOs otherwise commonly available for purchase and commonly used in the self-manufacturing of firearms for self-defense and other lawful purposes, including those that fall within the definition of "unfinished frames or receivers" under Delaware's Bans, and further desire to self-manufacture additional operable firearms for self-defense or other lawful purposes. However, they are prohibited, as of January 18, 2022, from possessing, transporting, shipping, transferring or selling any such unfinished receivers or frames under Section 1459A of HB 125, and are *currently* prohibited from possessing, manufacturing, assembling, or causing to be manufactured or assembled any operable SMFs, under Section 1463 of HB 125.

105.    Some of FPC's members own and possess a 3D Printer.

106.    Some of FPC's members have, and desire to continue to "manufacture or produce a firearm, firearm receiver, and major firearm components" using their 3D Printers.

107.    Some of FPC's members have, and desire to continue to possess and "[d]istribute by any means, including the internet, to a person who is not licensed as a manufacturer, instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver or major component of a firearm." *See* HB 125, §§ 1463(c)(2).

108.    Based on this threat of felony prosecution by and through Delaware's Bans that Defendants are actively enforcing, FPC's Delaware resident members have been prevented from acquiring, possessing, transporting, or receiving NFOs and SMFs through self-manufacturing, including through the use of 3D Printers, for self-defense and other lawful purposes, and from distributing the computer files and code from which NFOs and SMFs can be 3D-printed.

25

109.   FPC reasonably fears the prosecution of its Delaware resident members by and through Defendants' administration, implementation, and enforcement of the laws, regulations, policies, practices, and customs challenged herein.

110.   As to all claims made in a representative capacity herein, there are common questions of law and fact that substantially affect the rights, duties, and liabilities of numerous FPC Delaware resident members who knowingly or unknowingly are subject to Delaware's Bans.  The relief sought in this action is declaratory and injunctive in nature, and is a matter of substantial public interest.

**<u>COUNT ONE</u>**

**Violation of the United States Constitution
Second and Fourteenth Amendments
(42 U.S.C. § 1983)
Facial and As-Applied to Plaintiffs
(All Plaintiffs v. All Defendants)**

111.   The foregoing paragraphs are hereby incorporated herein as if set forth in full.

112.   The Second Amendment to the Constitution of the United States forbids government actions infringing the right to keep and bear arms.  It applies to Defendants by virtue of the Fourteenth Amendment to the Constitution of the United States.

113.   Under federal law, "[a]n individual may generally make a firearm for personal use." *See supra, What is ATF doing in regards to people making their own firearms*.  That is true even if the firearm is built using an NFO, a 3D-printed unserialized frame or receiver, machined from a block of raw materials, or stamped from a piece of sheet metal.

114.    Moreover, under federal law, serializing components such as unfinished frames or receivers is not required at all, and the serialization of firearms is not required of ordinary citizens who are not licensed manufacturers or licensed importers of firearms.  27 C.F.R. §§ 478.92(a)(1),

478.92(a)(2); *see also* 18 U.S.C. § 923(i).  Further, no records for unfinished frames or receivers are required, even for licensed manufacturers, importers, or dealers.  18 U.S.C. § 923(g) ("[e]ach licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of *firearms*…") (emphasis added).

115.   Ordinary citizens who are not licensed manufacturers, importers, or dealers are not required to maintain records for unfinished frames or receivers.  18 U.S.C. § 923(g).

116.   Delaware's NFO and SMF Bans impose blanket prohibitions against broad classes of protected firearms and firearms predecessor materials in common use for self-defense and other lawful purposes by ordinary law-abiding citizens like the named Plaintiffs and other members of FPC, to wit: all self-manufactured modern operable firearms of any type (all handguns and all long guns) *in addition* to component parts integral to their manufacture, which lack a serial number issued by a firearms importer or manufacturer.  Delaware's Bans mandate that all ordinary law-abiding citizens *dispossess* themselves of all NFOs on or before January 18, 2022, totally bans all such individuals from possessing or using them on and after that date, and *immediately* bans the possession, manufacture or assembly of all SMFs, including, but not limited to those made using 3D Printers.

117.   The Second Amendment guarantees ordinary law-abiding citizens the right to acquire, possess, use, and self-manufacture *all* firearms and firearms predecessor materials in common use for self-defense and other lawful purposes.  Because Delaware's Bans outlaw numerous such firearms and firearms predecessor materials by deeming their possession, use, and manufacture, to be a crime for any ordinary law-abiding person, the NFO Ban and the SMF Ban are categorically unconstitutional and must be enjoined as such.

118.    Indeed, the answers to the questions of law in this case require a textual and historical inquiry into original meaning of the Second Amendment because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634-35.

119.    The Ninth Circuit "and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Indeed, the Third Circuit has acknowledged that its "sister circuits have conducted such an analysis and their opinions are illustrative." *Drummond v. Twp. of Robinson*, 784 F. App'x 82, 84 n.8 (3d Cir. 2019)(citing *Teixeira*, 873 F.3d at 677). "[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira*, 873 F.3d at 677 (*quoting Ezell*, 651 F.3d at 704).

120.    Plaintiffs, and other law-abiding Delaware residents, have a right to acquire, possess, use, and self-manufacture firearms and firearms predecessor materials for protection and all other lawful purposes, including the NFOs and SMFs prohibited under Delaware's Bans.

121.    The NFO Ban prohibits law-abiding citizens from acquiring materials and supplies necessary to self-manufacture, construct, and/or assemble constitutionally protected arms of designs and functions—including but not limited to Glock-compatible designs such as Rigby's SMF and other common semi-automatic handguns—that are commonly possessed and used for self-defense and other lawful purposes in the vast majority of states.

122.    Along the same lines, the SMF Ban prohibits law-abiding Delaware citizens from self-manufacturing, constructing, and/or assembling constitutionally protected arms of designs and

functions, including but not limited to Glock-compatible designs such as Rigby's SMF and other common semi-automatic handguns, that are commonly possessed and used for self-defense and other lawful purposes in the vast majority of states.

123.    Even, *arguendo*, if any tiered scrutiny analysis were to apply, only the highest level, strict scrutiny, could be applied since the NFO Ban and the SMF Ban unquestionably implicate the core of the Second Amendment right and severely burden that right.

124.    Indeed, Delaware's Bans do not merely prohibit dangerous convicted felons from the conduct of keeping and making firearms, nor do they impose a pre-possession or pre-construction requirement that persons seeking to acquire NFOs and materials, or self-manufacture firearms, must pass a background check.  Rather than attempt to regulate the channel in a targeted manner, Delaware simply bans all conduct and possession *in toto*, forcing all law-abiding citizens to purchase pre-manufactured commercial firearms, often more expensive than what can be constructed with a 3D Printer or small computer numerical control (CNC) machine at home.

125.    Regardless of any public safety interest the State may claim justifies enacting the Bans, there has been no effort to tailor them so as to minimize imposing unnecessary or overly broad restraints—much less to establish "the least restrictive means" of achieving any purportedly "compelling" interests—which is the essence of the strict scrutiny test.  *Miller v. Johnson*, 515 U.S. 900, 920 (1995).

126.    There has been no showing that *any* of the countless law-abiding Delawareans targeted under these Bans has had any involvement in any crime associated with any unserialized firearm or any unserialized firearm component, much less any significant number of these individuals, so as to somehow justify dispossessing them of all such firearms and NFOs, and prohibiting them from exercising their fundamental right to possess, use, and self-manufacture

protected arms in common use for self-defense and lawful purposes.

127.    The lack of meaningful tailoring in this broad prohibition renders the NFO Ban and the SMF Ban unconstitutional even under intermediate scrutiny, because that test requires at least "a means narrowly tailored to achieve the desired objective." *Bd. of Trs .v. Fox*, 492 U.S. 469, 480 (1989).

128.    The NFO Ban and the SMF Ban inflict irreparable harm on Plaintiffs by prohibiting possession of property and conduct protected under the Second Amendment individual right to keep and bear arms.  Plaintiffs lack an adequate remedy at law for this burden on their core Second Amendment right, and the harm Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendants.  The public interest favors enjoining unconstitutional statutes such as the NFO Ban and the SMF Ban.

129.    Therefore, as a direct and proximate result of the above infringement of and impermissible burden on the rights of Plaintiffs protected under the Second Amendment, Plaintiffs and all similarly situated Delaware resident members of FPC, and all similarly situated residents of Delaware generally, have suffered an unlawful deprivation of their fundamental constitutional right to keep and bear arms, and they will continue to suffer such injury unless and until granted the relief they seek herein.  Thus, injunctive relief is appropriate to protect against the irreparable harm of the ongoing deprivation of their Second Amendment rights.

130.    Defendants, having acted under color of law, policy, custom or practice to subject Plaintiffs to the deprivation of their right to keep and bear arms, are liable under 42 U.S.C. § 1983 "in an action at law, suit in equity, or other proper proceeding for redress[.]"

**COUNT TWO**

**Violation of the United States Constitution**
**Fifth and Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**Facial and As-Applied to Plaintiffs**
**(All Plaintiffs v. All Defendants)**

131.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

132.    The Fifth Amendment to the Constitution of the United States forbids government actions violating the right to due process of law, and also guarantees just compensation for property taken by the government.  It applies to Defendants by virtue of the Fourteenth Amendment to the Constitution of the United States.

133.    The numerous unserialized modern operable firearms, and the unserialized unfinished frames, receivers, and NFOs possessed as constituent parts of the same, which were previously owned, possessed, used, and manufactured for self-defense and other lawful purposes, but which are subject to dispossession or permanent disabling by no later than January 18, 2022, under the NFO Ban, and, in the case of SMFs, which are immediately subject to dispossession or permanent disabling under the SMF Ban, have substantial value as property interests to all the ordinary, law-abiding Delaware citizens forced to comply with this mandate, including Plaintiffs and all similarly situated Delaware resident FPC members who have relied on them for such constitutionally-protected purposes, including for defense of hearth and home.

134.    Indeed, while Delaware has suspended the criminal sanctions for possessing "unfinished frames or receivers" until January 18, 2022, to permit an opportunity for ordinary law-abiding citizens to dispossess themselves of them before that date, HB 125 makes no such allowance for the criminal prohibitions on possession, manufacture, assembly, sale, or distribution

of "untraceable firearms"—which took immediate effect upon the enactment of the Bill (the SMF Ban). HB 125 provides no avenue for Delawareans to continue to lawfully possess their lawfully owned property, presents them with a legal impossibility to cure the "untraceable" nature of their SMFs, and threatens them with felony prosecution should they attempt to sell them.

135.    At the least, fair compensation from the State for this forced dispossession of protected arms and their constituent parts is required to ensure the minimum that due process requires. In fact, such compensation is absolutely required because, unquestionably, Delaware's Bans completely deprive the property owners of *all* economically beneficial use of their property and causes them to suffer a permanent physical invasion of their property interests.

136.    Yet, Delaware's Bans provide no form of compensation whatsoever. Such compensation was never even considered. Instead, it is clear that all ordinary law-abiding citizens swept up into these Bans are expected to simply surrender their property in response to a mandate of a government that not only pays them nothing for their property but threatens to incarcerate them for failing to comply.

137.    Thus, the State has not created or established, nor has there ever been any established process, remedy, or administrative body through which one may seek compensation for the forced dispossession this property. Accordingly, Plaintiffs are not required to exhaust any administrative remedies, as no such administrative remedies even exist.

138.    The NFO Ban and the SMF Ban inflict irreparable harm on Plaintiffs by mandating forfeiture to law enforcement, destruction, or forced dispossession of constitutionally protected, and lawfully acquired and possessed property, with no just compensation. Plaintiffs lack an adequate remedy at law for this confiscatory scheme, and the harm Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon

Defendants.  The public interest favors enjoining unconstitutional statutes such as the NFO Ban and the SMF Ban.

139.    Therefore, as a direct and proximate result of the above infringement of and impermissible burden on the rights of Plaintiffs protected under the Fifth and Fourteenth Amendments, Plaintiffs and all similarly situated Delaware resident members of FPC, and all similarly situated residents of Delaware generally, have suffered an unlawful deprivation of their constitutionally protected interests in their property, and they will continue to suffer such injury unless and until granted the relief they seek herein.  Thus, injunctive relief is appropriate to protect against the irreparable harm of the ongoing deprivation of their Fifth and Fourteenth Amendment rights.

140.    Defendants, having acted under color of law, policy, custom or practice to subject the plaintiffs to the deprivation of their right to due process and just compensation, are liable under 42 U.S.C. § 1983 "in an action at law, suit in equity, or other proper proceeding for redress[.]"

## COUNT THREE

**Violation of the United States Constitution**
**First and Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**Facial and As-Applied to Plaintiffs**
**(All Plaintiffs v. All Defendants)**

141.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

142.    The First Amendment to the Constitution of the United States forbids government actions abridging freedom of speech.  It applies to Defendants by virtue of the Fourteenth Amendment to the Constitution of the United States.

143.    Del. C. Title 11, Chapter 5, § 1463(c)(2)—the Instructions Ban—is a content-based speech restriction.  Defendants' enactment and ongoing enforcement of the Instructions Ban imposes content based speech restrictions; as such, the restrictions are an unconstitutional

abridgement of the First Amendment freedoms of Plaintiffs, all similarly situated Delaware resident members of FPC, and all similarly situated residents of Delaware generally, because these restrictions do not serve a compelling governmental interest and are not narrowly drawn to serve any such interest.

144.    Even if Defendants' enactment and ongoing enforcement of the Instructions Ban were deemed to impose content *neutral* speech restrictions, this would still be an unconstitutional abridgement of the First Amendments freedoms of Plaintiffs, all similarly situated Delaware resident members of FPC, and all similarly situated residents of Delaware generally, because these restrictions do not serve a significant governmental interest and are not narrowly drawn to serve any such interest.

145.    "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Facially, the law is content based because it criminalizes "digital instructions" that "may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, or major component of a firearm." *Id.*; *see Reed,* 576 U.S. at 163 ("Content-based laws—those that target speech based on its communicative intent—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."); *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (*quoting Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("This stringent standard reflects the fundamental principle that governments have 'no power to restrict expression because of its messages, ideas, its subject matter, or its content.' "). The law's justification also makes it content based because its enactors created the crime to punish the *idea* being conveyed—digital firearm information. *See Ward v. Rock Against Racism*, 491

U.S. 781, 791 (1989); *Boos v. Barry*, 485 U.S. 312, 320-21 (1988).

146.    In addition, Defendants' enactment and ongoing enforcement of the Instructions Ban violates the First Amendment doctrine regarding overbreadth.  Defendants' conduct forbids a substantial amount of constitutionally protected speech and is not narrowly tailored to prohibit only constitutionally unprotected speech; as such, it is an unconstitutional abridgement of the rights guaranteed by the First Amendment.

147.    Even, *arguendo*, where some speech may be unprotected, the overbreadth doctrine "prohibits the Government from banning [the] unprotected speech" where, as is the case with Section 1463(c)(2), "a substantial amount of protected speech is prohibited or chilled in the process."  *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002); *see also City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987).  The Instructions Ban violates this doctrine in a litany of ways.

148.    As well, Defendants' enactment and ongoing enforcement of the Instructions Ban further violates the First Amendment doctrine regarding prior restraints.  *See, e.g.*, *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58 (1963).  Defendants' conduct constitutes a prior restraint of expression; as such, it is an unconstitutional abridgement of First Amendment freedoms of Plaintiffs, all similarly situated Delaware resident members of FPC, and all similarly situated residents of Delaware generally, because Defendants cannot carry the heavy burden of justifying a prior restraint and because the prior restraint does not operate under sufficient judicial superintendence.

149.    Constitutionally, the "government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.'"  *Id.* at 253 (*quoting Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam).  The government may "suppress speech for advocating the use of force or a violation of law only if 'such advocacy is directed to inciting

or producing imminent lawless action and is likely to incite or produce such action.'"  *Ashcroft*, 535 U.S. at 253 (*quoting Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)).

150.    States can only prohibit speech to prevent illegal conduct when the speech is "*integral* to criminal conduct."  *United States v. Stevens*, 559 U.S. 460, 468 (2010) (emphasis added).  Indeed, the Supreme Court has recognized that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law abiding third party."  *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001).

151.    The Instructions Ban inflicts irreparable harm on Plaintiffs by unconstitutionally abridging their First Amendment freedoms.  Plaintiffs lack an adequate remedy at law for this attack on their right to freedom of speech, and the harm Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendants.  The public interest favors enjoining unconstitutional statutes such as the Instructions Ban.

152.    Therefore, as a direct and proximate result of the above infringement of and impermissible burden on the rights of Plaintiffs protected under the First Amendment, Plaintiffs and all similarly situated Delaware resident members of FPC, and all similarly situated residents of Delaware generally, have suffered an unlawful deprivation of their right to freedom of speech, and they will continue to suffer such injury unless and until granted the relief they seek herein.  Thus, injunctive relief is appropriate to protect against the irreparable harm of the ongoing deprivation of their First Amendment rights.

153.    Defendants, having acted under color of law, policy, custom or practice to subject the plaintiffs to the deprivation of their right to free speech, are liable under 42 U.S.C. § 1983 "in an action at law, suit in equity, or other proper proceeding for redress[.]"

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants, as follows:

a)      Declare that the Del. C. Title 11, Chapter 5, § 1459A (the NFO Ban) and Del. C. Title 11, Chapter 5, §§ 1463(a), (b), (c)(1) (the SMF Ban), as enacted in HB 125, and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs violate the right to keep and bear arms as guaranteed by the Second and Fourteenth Amendments to the United States Constitution;

b)      Declare that Del. C. Title 11, Chapter 5, § 1459A (the NFO Ban) and Del. C. Title 11, Chapter 5, §§ 1463(a), (b), (c)(1) (the SMF Ban), as enacted in HB 125, and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs violate the right to just compensation for the taking of property and/or due process of the law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution;

c)      Declare that Del. C. Title 11, Chapter 5, § 1463(c)(2) (the Instructions Ban), as enacted in HB 125, and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs violate the right to free speech as guaranteed by the First and Fourteenth Amendments to the United States Constitution;

d)      Preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, and all persons who have notice of the injunction, from enforcing Del. C. Title 11, Chapter 5, § 1459A (the NFO Ban), Del. C. Title 11, Chapter 5, §§ 1463(a), (b), (c)(1) (the SMF Ban), and Del. C. Title 11, Chapter 5, § 1463(c)(2) (the Instructions Ban), as enacted in HB 125 and Defendants' derivative laws,

regulations, policies, procedures, enforcement practices, and customs that impede or would impede

the exercise of their rights guaranteed under the First, Second, Fifth, and Fourteenth Amendments

to the United States Constitution;

e)   Award Plaintiffs' costs, attorney fees, and all other allowable expenses pursuant to

42 U.S.C. § 1988 and all applicable laws; and,

f)   Grant any and all other equitable and/or legal remedies this Court may see fit.

Dated: October 27, 2021                    GELLERT SCALI BUSENKELL & BROWN LLC

                                           */s/ Bradley P. Lehman*
                                           Bradley P. Lehman (No. 5921)
                                           1201 N. Orange Street, Suite 300
                                           Wilmington, DE 19801
                                           P: (302) 425-5800
                                           E: blehman@gsbblaw.com

                                           *Attorneys for Plaintiffs*

OF COUNSEL:

JOSHPE MOONEY PALTZIK LLP
Edward Paltzik
1407 Broadway, Suite 4002
New York, NY 10018
P: (212) 344-8211
E: epaltzik@jmpllp.com
*Application for Pro Hac Vice Forthcoming*