## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREARMS POLICY COALITION, INC.,<br><br>    Plaintiffs,<br><br>  v.<br><br>JOHN CARNEY, Governor of Delaware; KATHY JENNINGS, Attorney General of Delaware,<br>    Defendants. | C.A. No. 1:21-cv-01523 |

**OPENING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION**

Bradley P. Lehman (No. 5921)
GELLERT SCALI BUSENKELL &
BROWN LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
P: (302) 425-5800
E: blehman@gsbblaw.com

*Of Counsel*
Edward Paltzik, Esq.
JOSHPE MOONEY PALTZIK LLP
1407 Broadway, Suite 4002
New York, NY 10018
P: (212) 344-8211
E: epaltzik@jmpllp.com
*Application for Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ………………………………………………………….... iii

INTRODUCTION ………………………………………………........................ 1

BACKGROUND ………………………………………………........................ 1

    I.     Delaware House Bill 125 (HB 125) ……..……………………........................1

         A.  The New Definitions Created by HB 125 …………………………………….. 1

         B.  HB 125 Prohibits Ordinary Individuals from Possessing, Transporting, Shipping, Transferring, or Selling Non-Firearm Objects (the NFO Ban) ............. 2

         C.  HB 125 Prohibits the Creation, Sale, or Transfer of Self-Manufactured Firearms (the SMF Ban) …………………………………………………………… 3

         D.  HB 125 Prohibits Individuals From Distributing Computer Files to Program a Three-Dimensional Printer to Manufacture or Produce a Firearm, Firearm Receiver, or Major Component of a Firearm (the Instructions Ban) ……………. 3

    II.    Impact on Plaintiffs …………………………………………………………….4

ARGUMENT……………………………………………………........................ 4

    I.     Plaintiffs Are Likely To Succeed on the Merits of Their Second Amendment Claims ……………..……….................................... 5

         A.  The NFO Ban and the SMF Ban are Categorically Unconstitutional Prohibitions Against Broad Classes of Protected Arms and Components in Common Use ..... 5

         B.  Alternatively, the NFO Ban and the SMF Ban Fail Any Level of Tiered Scrutiny Analysis ………......................................................... 8

            1.  The NFO Ban and the SMF Ban Burden Plaintiffs' Second Amendment Right …………………………………………………... 8

            2.  At a Minimum, Strict Scrutiny Should Apply  ………………………….. 10

            3.  The NFO Ban and the SMF Ban Fail Even Intermediate Scrutiny …....…… 11

    II.    Plaintiffs Are Likely To Succeed on the Merits of Their Fifth and Fourteenth Amendment Claims …………….....……....................... 12

A. Because They Mandate Destruction, Dispossession, or Physical Appropriation
of Property Without Compensation, the NFO Ban and the SMF Ban Constitute
*Per Se* Unconstitutional Takings...................................................................................... 12

III.    Plaintiffs Are Likely To Succeed on the Merits of Their First
Amendment Claims ……………..…….................................................................. 12

A.  The Instructions Ban is a Content-Based Speech Restriction .............................. 13

B.  The Instructions Ban is Overbroad........................................................................ 15

C.  The Instructions Ban is a Prior Restraint ............................................................. 17

IV.    Plaintiffs Will Suffer Irreparable Harm in the Absence of
Preliminary Injunctive Relief ……………………………………........................ 17

V.     The Balance of the Equities Favors the Grant of Preliminary
Injunctive Relief ……………………………….................................................... 18

VI.    The Court Should Waive the Bond Requirement or Set Bond at a
Nominal Amount ……………………………………………………………….. 18

VII.   The Court Should Enter Final Judgment Awarding a Permanent
Injunction …………………………………………………..……....................... 18

CONCLUSION ………………………………………………………............................ 19

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                               <u>Page</u>

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002) …………………………..………...................... 14, 15, 16, 17

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ………………………………………..……………..…….. 17

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001) ………………………………………………………......... 15

*Bd. of Trs .v. Fox*,
    492 U.S. 469 (1989) ………………………………………..…………………... 11

*Bernstein v. U.S. Dep't of State*,
    922 F. Supp. 1426 (N.D. Cal. 1996) …………………………………………… 13

*Board of Educ. v. F.C. ex rel. R.C.*,
    2 F. Supp. 2d 637 (D.N.J. Apr. 22, 1998) ……………………………............... 18

*Boos v. Barry*,
    485 U.S. 312(1988) …………………………….................................................. 13

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969)...…………………………....................................... 15, 16

*Brown v. Entm't Merchs. Ass'n.*,
    564 U.S. 786 (2011). .....…………………………................................... 15

*Bruni v. City of Pittsburgh*,
    824 F.3d 353 (3d Cir. 2016) …………………………….............................. 11

*Caetano v. Massachusetts*,
    136 S. Ct. 1027 (2016) ………………………….............................................. 5, 6

*City of Houston, Tex. v. Hill*,
    482 U.S. 451 (1987) …………………………….......................................... 15

*Connection Distrib. Co. v. Reno*,
    154 F.3d 281 (6th Cir. 1998) ……………………………......................... 18

*Defense Distributed v. Grewal*,
    971 F.3d 485 (5th Cir. 2020) …………………………….................... 14, 16

*DeLeon v. Susquehanna Cnty. Sch. Dist.*,
    747 F.2d 149 (3d Cir. 1984) ………..……….…..……….…....…...................... 19

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)………………………….……………………………..5, 6

*Drummond v. Robinson Twp.*,
    9 F.4th 217 (3d Cir. 2021) ……………………………….................... 11

*Drummond v. Twp. of Robinson*,
    784 F. App'x 82 (3d Cir. 2019) …………………………….................... 9

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) …………………….................................. 9, 17

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) ……………………………………………… 6

*Globe Newspaper Co. v. Sup. Ct. for Norfolk Cty.*,
    457 U.S. 596 (1982) ……………………………………………………… 15

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ………………………...…..................... 9

*Hess v. Indiana*,
    414 U.S. 105 (1973) ……………………….................….................... 15, 17

*Horne v. Dep't of Agric.*,
    576 U.S. 351 (2015) ……………………….................…..................... 12

*Junger v. Daley*,
    209 F.3d 481 (6th Cir. 2000) ……………………………………………... 13

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013) …………………………….................... 17, 18

*Lewis v. Kugler*,
    446 F.2d 1343 (3d Cir. 1971) ……………………………………………... 17

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ……………………………………..……………... 11

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) …………………………………………………5, 10

*Miller v. Bonta,*
    2021 U.S. Dist. LEXIS 105640 (S.D. Cal. June 4, 2021) …..…………………….….. 6, 7

*Miller v. Johnson,*
    515 U.S. 900 (1995) ………………………………………………………………… 10

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012)…………………………………………………………… 5

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) …………………………………..………………………….. 13

*Police Dep't of Chicago v. Mosley,*
    408 U.S. 92 (1972) …………………………………..………………………………. 13

*Reed v. Town of Gilbert, Ariz.,*
    576 U.S. 155  (2015) ……………………………………………………………….. 13

*Reilly v. City of Harrisburg,*
    858 F.3d 173 (3d Cir. 2017) ………………………………………..………………… 4

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
    411 U.S. 1 (1973) ……………………………………………..………………….. 10

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) …………………………………………………………………. 12

*Staples v. United States,*
    511 U.S. 600 (1994) ……………………………………………..……………….. 16

*Teixeira v. Cnty. of Alameda,*
    873 F.3d 670 (9th Cir. 2017) …………………………….….................................. 9

*Temple Univ. v. White,*
    941 F.2d 201 (3d Cir. 1991) …………………………………..…………………... 18

*United States v. Aguilar,*
    515 U.S. 593 (1995) ……………………………………………..………………... 16

*Universal City Studios, Inc. v. Corley,*
    273 F.3d 429 (2d Cir. 2001) …………………………………………………………. 13

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) ……………………………………...…………………… 9

*United States v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000) …………………………………...………………………….. 15

*United States v. Stevens*,
  559 U.S. 460 (2010) …………………………………...………………………….. 16

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) …………………………………...………………………….. 13

*Wrenn v. District of Columbia*,
  864 F.3d 650 (D.C. Cir. 2017) ……………………………………………5, 18, 19

## **Constitutions, Statutes and Rules**

### United States Constitution

U.S. Const. amend. I ………………………………………………………… 12

U.S. Const. amend. II ……………………………………………………… 5

U.S. Const. amend. V …………………………………………………….. 12

U.S. Const. amend. XIV § 1 ……………..………………………………... 12

### United States Code

18 U.S.C. § 922(a)(1)(a) …………...………………………………………... 7

18 U.S.C. § 923(g) ……………………………………………………............ 3

18 U.S.C. § 923(i) …………………………………………………….... 2, 7

### Code of Federal Regulations

27 C.F.R. § 478.92 …………………………………………………................ 7

### FED. R. CIV. P.

FED. R. CIV. P. 65 …………………………………...……………………… 18

FED. R. CIV. P. 65(a)(2) …………………………………………................ 19

### California Penal Code

Cal. Penal Code § 29180(b)(1) ……………………………….................……… 10

Cal. Penal Code § 29182(b)(1) …………………………….......................................... 10

Cal. Penal Code § 23910 …………………………………………………….....................10, 11

Cal. Penal Code § 29182(a)(1) …………………………….......................................... 11

Delaware Code ("Del. C.")

11 Del. C. § 222 ….………..……………........................................................................ 1

11 Del. C. § 1459A ……………………………............................................................... 2

11 Del. C. § 1459A(a) ……….……………………….................................................... 3

11 Del. C. § 1459A(b) …………………………….......................................................... 3

11 Del. C. § 1463(a) ……….……………………….......................................................... 3

11 Del. C. § 1463(b) …………………………….............................................................. 3

11 Del. C. § 1463(c)(1)……….……………………….................................................... 3

11 Del. C. § 1463(c)(2)……….……………………….................................................... 4

11 Del. C. § 4205(b)(4)……….……………………….................................................... 2

11 Del. C. § 4205(b)(5)……….……………………….................................................... 3

## Other Sources

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, *What is ATF doing in regards to people making their own firearms*, (May 14, 2015), https://www.atf.gov/firearms/qa/what-atf-doing-regards-people-making-their-own-firearms …………………………………………………………….................... 7

Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 325 (Paul Ford ed., 1904) ……………....................................................................... 8

M. L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980) …………..................................................................... 8

WILLIAM J. KROUSE, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018 2018), https://fas.org/sgp/crs/misc/IN10957.pdf ................................. 7

## INTRODUCTION

House Bill 125 ("HB 125" or the "Bill"), signed into law on October 20, 2021, by Defendant John Carney, Governor of Delaware, bans: (a) the possession, transportation, shipping, transfer, or sale of non-firearm objects ("NFOs")—*i.e.*, various components, parts, or predecessor materials, that, while not themselves firearms, could conceivably be used to construct a firearm (the "NFO Ban"), (b) the possession of self-manufactured firearms ("SMFs")—self-made firearms that do not bear a federally licensed firearm manufacturer's serial number—as well as, prospectively, the use of three-dimensional printers ("3D Printers") to manufacture firearms (the "SMF Ban"), and (c) the distribution by the Internet or otherwise any instructions in the form of computer files or code that may be used to program a 3D Printer to manufacture or produce a firearm, firearm receiver, or major component of a firearm (the "Instructions Ban") (the NFO Ban, SMF Ban, and Instructions Ban collectively referred to as "Delaware's Bans" or the "Bans"). The SMF Ban and the Instructions Ban are effective immediately, while the NFO Ban is effective January 18, 2022.

Plaintiffs John Rigby ("Rigby") and Alan Knight ("Knight"), both Delaware citizens and both of whom are members of Plaintiff Firearms Policy Coalition, Inc. ("FPC"), together with similarly situated Delaware citizens and FPC members, face imminent and irreparable harm as a result of the Bans. Accordingly, Plaintiffs respectfully submit this Brief in support of their motion for a preliminary and permanent injunction.

## BACKGROUND

### I.    Delaware House Bill 125 (HB 125)

#### A.  The New Definitions Created by HB 125

Section 1 of the Bill amends 11 Del. C. § 222, by creating, in pertinent part, the following definitions: "'*Firearm frame or receiver*' means the part of the firearm that provides housing for

1

the firearm's internal components, and includes the hammer, bolt or breechblock, action, and firing mechanism."; "'*Major component of a firearm'* means the slide, barrel, cylinder, trigger group, or receiver of a firearm."; "'*Three-dimensional printer'* means a computer or computer-driven machine of [sic] device capable of producing a three-dimensional object from a digital model."; "'*Unfinished firearm frame or receiver'* means a firearm frame or receiver that requires further machining or molding in order to be used as part of a functional firearm, and which is designed and intended to be used in the assembly of a functional firearm."; "'*Untraceable firearm'* means a firearm for which the sale or distribution chain from a licensed retailer to the point of its first retail sale cannot be traced by law enforcement officials.'"[1] (Italics and underline in all definitions added).

### B. HB 125 Prohibits Ordinary Individuals from Possessing, Transporting, Shipping, Transferring, or Selling Non-Firearm Objects (the NFO Ban)

Section 2 of the Bill amends Del. C. Title 11, Chapter 5 to create § 1459A (Possession of an unfinished firearm frame or receiver with no serial number). Effective January 18, 2022,[2] it is a Class D felony[3] for anyone in Delaware to "knowingly transport, ship, transfer, or sell an unfinished frame or receiver" unless . . . . "[t]he person is a federally licensed gun dealer or manufacturer," "[t]he name of the manufacturer and an individual serial number are conspicuously placed on the unfinished firearm frame or receiver in accordance with the procedures for the serialization of a firearm in 18 U.S.C. § 923(i)," *and* "[t]he person maintains records for the

---

[1] "'*Untraceable firearm*'" does not include any of the following: a. Firearms manufactured prior to 1968, b. Muzzle-loading firearms designed to use black power [sic] or its equivalent, and c. Firearms which are designed as replicas of antique firearms originally manufactured prior to 1898.

[2] Section 4 of the Bill states that the NFO Ban takes effect 90 days following the Bill's enactment into law.

[3] A Class D felony is punishable by up to 8 years in prison. 11 Del. C. § 4205(b)(4).

unfinished firearm frame or receiver in accordance with the requirements for maintenance of records in 18 U.S.C. § 923(g)" (11 Del. C. § 1459A(a)), and a Class D felony for anyone in Delaware to "knowingly possess an unfinished firearm frame or receiver that does not have the name of the manufacturer and serial number conspicuously placed on it or on a major component of the firearm into which the unfinished firearm frame or receiver will be housed." 11 Del. C. § 1459A(b).

### C. HB 125 Prohibits the Creation, Sale, or Transfer of Self-Manufactured Firearms (the SMF Ban)

Section 2 of the Bill amends Del. C. Title 11, Chapter 5 to create § 1463, which contains the SMF Ban. Effective immediately, any person is guilty of a Class E felony[4] when that person "knowingly possesses an untraceable firearm" (§§ 1463(a), (d)); guilty of a Class D felony when that person "knowingly manufactures, assembles, causes to be manufactured or assembled, sells, or transfers an untraceable firearm" (§§ 1463(b), (e)); and guilty of a Class D felony when that person "[u]ses a three-dimensional printer or similar device to manufacture or produce a firearm, firearm receiver, or major firearm component when not licensed as a manufacturer" (§§ 1463(c)(1), (e)).

### D. HB 125 Prohibits Individuals From Distributing Computer Files to Program a Three-Dimensional Printer to Manufacture or Produce a Firearm, Firearm Receiver, or Major Component of a Firearm (the Instructions Ban)

11 Del. C. § 1463, as created by the Bill, also contains the Instructions Ban. Effective immediately, any person is guilty of a Class D Felony when that person "[d]istributes by any means, including the internet, to a person who is not licensed as a manufacturer, instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic

---

[4] A Class E felony is punishable by up to 5 years in prison. 11 Del. C. § 4205(b)(5).

format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver or major component of a firearm." (§§ 1463(c)(2), (e)).

## II. Impact on Plaintiffs

Defendants' enactment and enforcement of the provisions at issue in HB 125 inflicts irreparable harm upon Rigby and Knight and upon institutional Plaintiff FPC, by denying them and FPC's members, their (i) Second Amendment right to possess arms and components in common use, (ii) their Fifth and Fourteenth Amendment rights against compelled dispossession or physical appropriation of property without just compensation, and (iii) their First Amendment rights to disseminate, receive, and utilize computer files that are constitutionally protected speech. Given that the SMF Ban and Instructions Ban are effective immediately, and the NFO Ban effective January 18, 2022, the need for injunctive relief is urgent.

## ARGUMENT

A plaintiff seeking preliminary injunctive relief must demonstrate (1) a likelihood of success on the merits[5] and (2) a prospect of irreparable injury if the injunction is not granted. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). In addition, "the district court . . . should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id*. Here, all four factors favor preliminarily enjoining Defendants from enforcing Delaware's Bans.

---

[5] Establishing a likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not." *Reilly*, 858 F.3d 173 at 179.

I. **Plaintiffs are Likely to Succeed on the Merits of their Second Amendment Claims**

A. **The NFO Ban and the SMF Ban are Categorically Unconstitutional Prohibitions Against Broad Classes of Protected Arms and Components in Common Use**

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, *shall* not be infringed." U.S. CONST. amend. II (emphasis added). Incorporated against the states through the Fourteenth Amendment (*McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010)), the Second Amendment guarantees "an individual right to keep and bear arms," which is "a fundamental constitutional right guaranteed to the people." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). This takes "off the table" any "absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 616, 636. When confronted with such absolute prohibitions, courts may invalidate the law in question without resort to tiered scrutiny analysis. *See, e.g.*, *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017) (invalidating District of Columbia's "good-reason law" relating to concealed carry without resort to tiered scrutiny analysis); *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (invalidating Illinois law prohibiting almost all carry of guns outside the home without resort to tiered scrutiny analysis). "It's appropriate to strike down such 'total bans[s]' without bothering to apply tiers of scrutiny because no such analysis could ever sanction obliterations of an enumerated constitutional right." *Wrenn*, 864 F.3d at 665 (citing *Heller*, 554 U.S. at 629).

Consistent with historical tradition, the Second Amendment right necessarily encompasses firearms and firearms components "typically possessed by law-abiding citizens for lawful purposes . . . ." *Heller*, 554 U.S. at 625. The government may only ban weapons that are dangerous *and* unusual, *i.e.*, weapons that are *not* in common use. *Id.* at 627; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J., concurring) ("A weapon may not be banned

5

unless it is *both* dangerous *and* unusual.") (emphasis in original); *Miller v. Bonta*, 2021 U.S. Dist. LEXIS 105640, at *16 (S.D. Cal. June 4, 2021) ("*Heller* asks whether a law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes. It is a hardware test."). "[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class arms commonly used for lawful purposes." *Caetano*, 136 S. Ct. at 1031. An arm is not "unusual" so as to fall outside the ambit of this protection so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Id*. at 1032 (Alito, J., concurring) (emphasis in original); *see also Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (If "the banned weapons are commonly owned . . . then they are not unusual.").

SMFs and their predecessor materials—NFOs—are typically possessed and commonly owned by law-abiding citizens for lawful purposes such as self-defense, are therefore not unusual, and thus protected by the Second Amendment. For example, Rigby lawfully owns a self-manufactured Glock-compatible[6] handgun, which he completed from a Polymer80[7] NFO before enactment of Delaware's Bans, and which he has removed to a location outside of Delaware in a legal manner due to his reasonable fear of criminal sanction. Declaration of Rigby ("Rigby Decl.") at ¶¶ 8, 9. Rigby desires to make additional SMFs, including handguns, using the 3D Printer that he owns, and Knight also desires to make SMFs, including handguns. Rigby Decl. at ¶¶ 10, 15;

---

[6] *See, e.g.*, https://www.polymer80.com/PF940v2-80-Full-Size-Frame-Kit-_2 ("The PF940v2™ is compatible with components for 3-pin 9mm [Glock®] G17, 34, 17L; .40S&W G22, 35, 24; and .357Sig G31.") (last accessed Oct. 26, 2021). These Glock-platform handguns are some of the most common in the United States, and *Heller*'s "hardware test" is not limited to the original designer or a specific manufacturer.

[7] "About Polymer80," online at https://www.polymer80.com/about-us: "Polymer80, Inc. designs and develops innovative firearms and after-market accessories that provide ways for our customer to participate in the build process, while expressing their right to bear arms. This provides a fun learning experience and a greater sense of pride in their completed firearm, strengthening our brand loyalty. We summarize this with our motto of 'Engage Your Freedom.'" (last accessed Oct. 26, 2021). Polymer80, Inc., is presently located in Dayton, Nevada.

Declaration of Knight ("Knight Decl.") at ¶ 9.  Handguns are recognized as "the most popular weapon chosen by Americans for self-defense in the home."  *Heller*, 554 U.S. at 629.  Rigby and Knight both own unserialized, unfinished lower receivers for the common AR-15 design rifle, an NFO within the meaning of the NFO Ban.  Rigby Decl. at ¶ 12; Knight Decl. at ¶ 10.  AR-15-type rifles, and their components, are also commonly owned by law-abiding citizens.  *Miller*, 2021 U.S. Dist. LEXIS 105640 at *16.

Moreover, federal law does not prohibit the manufacture of a firearm for personal use.  That is true even if the firearm is built using an NFO, a 3D-printed frame or receiver, machined from a block of raw materials, or stamped from a piece of sheet metal.  *See*  BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES , *What is ATF doing in regards to people making their own firearms*, (May       14,       2015), https://www.atf.gov/firearms/qa/what-atf-doing-regards-people-making-their-own-firearms ("An individual may generally make a firearm for personal use.");  WILLIAM J. KROUSE, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018), https://fas.org/sgp/crs/misc/IN10957.pdf ("In short, unfinished receivers and the components needed to build fully functional AR-15s and other firearms are legally available on the U.S. civilian gun market and can be purchased without a background check under federal law."); *see also, e.g.*, 18 U.S.C. § 922(a)(1)(a).

Engraving a serial number on NFOs is not required, nor is the serialization of firearms manufactured by ordinary citizens who are not licensed manufacturers or licensed importers. Federal law only requires that *"[l]icensed importers and licensed manufacturers* shall identify by means of a serial number engraved or cast on the receiver or frame of  the weapon . . . each firearm imported  or  manufactured  by  such  importer  or  manufacturer."   18 U.S.C. § 923(i) (emphasis added); *see also* 27 C.F.R. § 478.92 (similar).

7

SMFs, and the possession and use of firearms predecessor materials by individuals to make SMFs, are not new.  In fact, they have been commonly possessed by law-abiding citizens for lawful purposes, including self-defense, *throughout* American history.  Manufacturing of firearms was entirely unregulated during the colonial and founding eras in America, and there were no restrictions on who could be a gunsmith or make guns.  *See, e.g.*, Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904) ("Our citizens have always been free to make, vend, and export arms.  It is the constant occupation and livelihood of some of them."); *see also* M. L. BROWN*,* FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980) ("The influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era.").

No history or precedent exists for extinguishing law-abiding citizens' commonplace ability to self-manufacture firearms for self-defense or other lawful purposes, or for prohibiting law-abiding citizens from possessing SMFs and NFOs.  The Second Amendment's text as informed by its history and tradition reflects the right to self-manufacture firearms.  Accordingly, the NFO Ban and the SMF Ban are categorically unconstitutional and should be enjoined as such, without resort to tiered scrutiny analysis.

### B.  Alternatively, the NFO Ban and the SMF Ban Fail Any Level of Tiered Scrutiny Analysis

### 1.  The NFO Ban and the SMF Ban Burden Plaintiffs' Second Amendment Right

While Plaintiffs maintain that tiered scrutiny is not the appropriate method of analysis in Second Amendment challenges, they recognize that this Circuit has typically utilized tiered scrutiny.  When resorting to tiered scrutiny, the Third Circuit has established "a two-pronged

approach to Second Amendment challenges." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). "First, [courts] ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee . . . . [Second,] [i]f it does, [they] evaluate the law under some form of means-end scrutiny." *Id.*[8] The first prong is a "threshold inquiry" into whether the challenged conduct is protected by the right to keep and bear arms. *Id.* As federal courts have repeatedly recognized, this unassailable "right to *possess* firearms for protection implies . . . corresponding right[s]" without which "the core right wouldn't mean much." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (emphasis added). This Circuit has acknowledged that its, "sister circuits have conducted such an analysis and their opinions are illustrative." *Drummond v. Twp. of Robinson*, 784 F. App'x 82, 84 n.8 (3d Cir. 2019) (citing *Teixeira Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

Under the threshold inquiry, the NFO Ban and the SMF Ban severely burden conduct protected by the Second Amendment. The NFO Ban *completely* prohibits law-abiding citizens from possessing, transporting, shipping, transferring, or selling various components, parts, or predecessor materials, that, while not themselves firearms, could conceivably be used to construct types of firearms commonly owned by law-abiding citizens—including semi-automatic handguns such as Rigby's Glock-compatible design and AR-15-type rifles of the type Rigby and Knight contemplate assembling—and *completely* prevents the self-manufacture of such firearms by ordinary, law-abiding citizens, with or without the use of 3D Printers. Indeed, HB 125's definition of "[u]nfinished firearm frame or receiver" encompasses virtually *all* conceivable forms and types

---

[8] Plaintiffs reserve their right to argue in subsequent proceedings that a tiered scrutiny approach is never appropriate in Second Amendment cases. *See Heller v. District of Columbia*, 670 F.3d 1244, 1271–85 (D.C. Cir. 2011) (Heller II) (Kavanaugh, J., dissenting).

of NFOs.  Similarly, the SMF ban indiscriminately criminalizes all conceivable forms and types of self-manufactured firearms.

### 2. At a Minimum, Strict Scrutiny Should Apply, and the Bans Must Fail

If this Court concludes that the NFO Ban and the SMF Ban are not categorically unconstitutional, the Bans, which burden core Second Amendment rights, must at the least be subjected to the highest level of constitutional scrutiny.  "[S]trict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).  The right to keep and bear arms is not only specifically enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights."  *McDonald*, 561 U.S. at 768, 778.

Any public safety interest the State may claim must be analyzed within the rubric of strict scrutiny, and there has been no effort to tailor the new law to minimize imposing unnecessary or overly broad restraints—much less to establish "the least restrictive means" of achieving any "compelling" interests.  *Miller v. Johnson*, 515 U.S. 900, 920 (1995).  There has been no showing that *any* of the countless law-abiding Delawareans targeted under these Bans has had any involvement in any crime associated with any NFO or SMF.

There are many less restrictive means for achieving the alleged State interest.  Even California—hardly reticent when it comes to regulating firearms—took a different approach: a person can (and is required to) "[a]pply to the Department of Justice for a unique serial number or other mark of identification" prior to constructing a firearm.  Cal. Penal Code § 29180(b)(1).  Before the Department issues the serial number to an applicant, it conducts a background check.  Cal. Penal Code § 29182(b)(1).  And, if the applicant is not disqualified, the Department "shall

grant" such an application "in the form of serial numbers pursuant to Section 23910 to, persons who wish to manufacture or assemble firearms pursuant to subdivision (b) of Section 29180." Cal. Penal Code § 29182(a)(1).

Unlike California, Delaware simply bans all conduct and possession *in toto*, forcing all law-abiding citizens to purchase only from State-approved manufacturers of firearms and firearm predecessor materials, often more expensive than what can be constructed with a 3D Printer or small computer numerical control (CNC) machine at home.  Rigby Decl. at ¶ 16; Knight Decl. at ¶ 13.  Accordingly, strict scrutiny should apply, and the Bans plainly cannot withstand scrutiny.

### 3.  The NFO Ban and the SMF Ban Fail Even Intermediate Scrutiny

The lack of meaningful tailoring in this broad prohibition renders the NFO Ban and the SMF Ban unconstitutional even under intermediate scrutiny, because that test requires at least "a means narrowly tailored to achieve the desired objective."  *Bd. of Trs .v. Fox*, 492 U.S. 469, 480 (1989).  Here, the NFO Ban and the SMF Ban show no evidence of *any* tailoring.  Even under intermediate scrutiny, the government must show, at the least, "that it considered different methods that other jurisdictions have found effective," such as California's approach.  *McCullen v. Coakley*, 573 U.S. 464, 494 (2014); *see also Drummond v. Robinson Twp*., 9 F.4th 217 (3d Cir. 2021) (changes to local zoning ordinance restricting the activities of a gun club, including a rule banning center-fire rifle practice, failed intermediate scrutiny where officials failed to consider "more targeted tools").  There is no evidence that Defendants even considered the California approach or other alternatives—which is alone fatal, under intermediate scrutiny.  *Bruni v. City of Pittsburgh*, 824 F.3d 353, 371 (3d Cir. 2016).

II.   **Plaintiffs are Likely to Succeed on the Merits of their Fifth and Fourteenth Amendment Claims**

    A.   **Because They Mandate Destruction, Dispossession, or Physical Appropriation of Property Without Compensation, the NFO Ban and the SMF Ban Constitute *Per Se* Unconstitutional Takings**

The Fifth Amendment states, in pertinent part, "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. The Fourteenth Amendment to the United States Constitution states, in pertinent part, ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law [the Due Process Clause of the Fourteenth Amendment]." U.S. CONST. amend. XIV § 1

Delaware's Bans mandate that its citizens destroy or dispossess themselves of their NFOs and SMFs, or face arrest and involuntarily surrender of same to law enforcement, while making no provision for just compensation. "When it comes to physical appropriations, people do not expect their property, real or *personal*, to be . . . taken away." *Horne v. Dep't of Agric.*, 576 U.S. 351, 352 (2015). Such appropriation gives "rise to a *per se* taking." *Id*. at 360. "The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home." *Id*. at 358. The same logic holds true for firearms and firearms components, and the NFO Ban and SMF ban are *per se* unconstitutional takings under the Fifth and Fourteenth Amendments.

III.   **Plaintiffs are Likely to Succeed on the Merits of their First Amendment Claims**

The First Amendment states, in pertinent part: "Congress shall make no law . . . .abridging the freedom of speech . . . ." U.S. CONST. amend. I. "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). "Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by

the First Amendment." *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."), *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("For the purposes of First Amendment analysis, this court finds that source code is speech.").  The First Amendment thus applies to the type of speech impacted by the Instructions Ban—digital firearms information, which Rigby and others similarly situated would disseminate but for his reasonable fear of criminal sanction.  Rigby Decl. at ¶ 17.

### A.  The Instructions Ban is a Content-Based Speech Restriction

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).  The Instructions Ban punishes the *idea* intended to be communicated or conveyed—digital firearms information.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Boos v. Barry*, 485 U.S. 312, 320-21 (1988).  "Content-based laws—those that target speech based on its communicative intent—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Id.*; *see also Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("This stringent standard reflects the fundamental principle that governments have 'no power to restrict expression because of its messages, ideas, its subject matter, or its content.' ")).  Defendants cannot meet this burden for at least three reasons.

First, the Instructions Ban does not survive strict scrutiny because it does not advance a compelling state interest.  Also enacted as part of HB 125, Delaware has banned ordinary, law-

abiding citizens from using 3D Printers to manufacture firearms.  The Instructions Ban simply cannot survive strict scrutiny because it prohibits distribution of digital information about conduct that is constitutionally protected, full stop.  However, even if, *arguendo*, the prohibition against making firearms using 3D Printers were constitutional (which it is not), the Instructions Ban would still be unable to survive strict scrutiny.  The holding of *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) is instructive: "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it."  *Id*. at 253.  The government lacks a compelling state interest and "may not prohibit speech" if the prohibition is based on a mere "remote connection" between the speech and a third party's hypothetical criminal conduct.  *Id*.  "Without a significantly stronger, more direct connection, the Government may not prohibit speech on the ground that it may encourage [third-parties] to engage in illegal conduct."  *Id*.  As well, even if the SMF Ban were constitutional, the Instructions Ban would be overinclusive and not narrowly tailored because it restricts Delaware citizens from posting information on the Internet that can be accessed by persons in other states where 3D-printed firearms are not prohibited, and also because Delaware has no practical way to regulate this kind of information, which has long been readily accessible on the Internet from websites hosted in other jurisdictions.  *See Defense Distributed v. Grewal*, 971 F.3d 485, 493 n.7 (5th Cir. 2020).  Either way, under *Ashcroft*, Delaware lacks a compelling state interest in banning the expression of digital firearms information by Rigby and other Delaware citizens.

Second, the Instructions Ban does not meet the narrow tailoring requirement because there are less restrictive alternatives.  Delaware can achieve its ends by punishing criminal conduct involving the *use* of firearms, particularly those which it seeks to regulate through the Instructions Ban—not speech that is merely and only sometimes remotely associated with that conduct.  *See*

14

*Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it.").

Third, Defendants cannot prove that the Instructions Ban advances the State of Delaware's aim, which is ostensibly to combat the supposed danger to public safety posed by 3D-printed firearms. There is no proof that this supposed danger is anything more than speculative. In the First Amendment context, justifications backed by mere "anecdote and supposition" do not suffice (*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000)), and neither does "ambiguous proof." *Brown v. Entm't Merchs. Ass'n.*, 564 U.S. 786, 800 (2011). Compelling "empirical support" of efficacy must be given. *Globe Newspaper Co. v. Sup. Ct. for Norfolk Cty.*, 457 U.S. 596, 609 (1982). None exists here.

### B. The Instructions Ban is Overbroad

Even if some speech is unprotected, the overbreadth doctrine "prohibits the Government from banning [the] unprotected speech" where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft,* 535 U.S. at 255; *see also City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987). The Instructions Ban violates this doctrine in at least two ways.

First, the Instructions Ban is overbroad because it criminalizes speech regardless of its relationship to illegal conduct. The "government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time'"; it may "suppress speech for advocating the use of force or a violation of law only if 'such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'" *Ashcroft*, 535 U.S. at 253-54 (quoting *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam), and *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)). In this context, states can only prohibit speech to prevent illegal conduct when the speech is "integral to criminal conduct."

*United States v. Stevens*, 559 U.S. 460, 468 (2010) (emphasis added).  But speech cannot be "integral to criminal conduct" if it has only a "contingent and indirect" relationship to that conduct. *Ashcroft*, 535 U.S. at 250.  It is not enough for Delaware to allege that there is "some unquantified potential for subsequent criminal acts."  *Id*.  Indeed, the U.S. Supreme Court has recognized that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law abiding third party."  *Bartnicki*, 532 U.S. at 529-530.  Virtually all of the speech covered by the Instructions Ban falls squarely on the protected side of *Brandenburg* and *Ashcroft's* line, either because the expression's recipient commits no illegal act at all or because, if they did, the causal link is merely contingent and indirect.  *Cf. Staples v. United States*, 511 U.S. 600, 610 (1994) ("[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country.").  Yet the Instructions Ban still criminalizes every instance of "distribut[ion]".

Second, the Instructions Ban is overbroad because it fails to distinguish between information that has, and has not, been committed to the public domain.  Digital firearms information is already freely circulating in the public domain because of publications that took place well before this law was enacted.  *See Defense Distributed*, 971 F.3d at 493 n.7 (internal citations omitted) (digital firearms information "can be located with a simple Google search" and has been "downloaded 'hundreds of thousands of times.' ")  "[T]he Government may not . . . restrict individuals from disclosing information that lawfully comes into their hands in the absence of a 'state interest of the highest order.' "  *United States v. Aguilar*, 515 U.S. 593, 605 (1995).  However, this Ban draws no distinction between truly novel "instructions" and those that anyone has been able to obtain with simple Google searches for years.  Therefore, the Instructions Ban's coverage of these readily available files renders it overbroad.

### C.  The Instructions Ban is a Prior Restraint

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against constitutional validity."  *Bantam Books, Inc. v. Sullivan*, 372 U.S.  58, 69 (1963).  The Instructions Ban is a prior restraint because it requires—in advance, and upon pain of criminal sanction—that Rigby and similarly situated Delaware citizens *never* distribute the forbidden digital firearms information, and thus effectively restrains them from sharing ideas about firearms with others.  The Instructions Ban is nothing more than censorship.  It operates as a prior restraint on speech based on nothing more than speculation that an unlawful act involving an SMF assembled using the forbidden information will be "committed 'at some indefinite future time.' " *Ashcroft*, 535 U.S. at 253 (quoting *Hess*, 414 U.S. at 108).  Ultimately, as here, a "law imposing criminal penalties on protected speech is a stark example of speech suppression."  *Id*. at 244.

### IV.  Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction

It is well accepted that the deprivation of a constitutional right constitutes irreparable harm. *See, e.g., K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist*., 710 F.3d 99, 113 (3d Cir. 2013); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971); *see also Ezell*, 651 F.3d at 699 ("Infringements of this [Second Amendment] right cannot be compensated by damages.")

Here, Plaintiffs face ongoing deprivations of their First, Second, Fifth, and Fourteenth Amendment rights.  Each day Defendants' unconstitutional NFO Ban, SMF Ban, and Instructions Ban continue in force, Rigby, Knight, and other ordinary law-abiding citizens who reside in Delaware, including but not limited to other members of FPC, risk felony prosecution, incarceration, and permanent loss of their Second Amendment rights because they possess SMFs or desire to share information with other individuals about the practice of self-manufacturing firearms, forbidden by the Instructions Ban.  Rigby Decl. at ¶¶ 11, 15, 17, 18; Knight Decl. at ¶¶

9, 12, 14.  Moreover, as of January 18, 2022, these ordinary law-abiding citizens will be at risk of felony prosecution, incarceration, and permanent loss of their Second Amendment rights because they possess NFOs.  Rigby Decl. at ¶¶ 13, 14, 18; Knight Decl. at ¶¶ 11, 14.  These injuries cannot be compensated through money damages.  *See id.*

## V.   The Balance of the Equities Favors the Grant of Preliminary Injunctive Relief

The public interest and balance of equities likewise favor Plaintiffs.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights" (*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)), for "the enforcement of an unconstitutional law vindicates no public interest."  *K.A. ex rel. Ayers*, 710 F.3d at 114; *see also Wrenn*, 864 F.3d at 667.  On the other side of the scale, Defendants suffer little harm in the event that preliminary injunctive relief is granted to Plaintiffs, as there is no substantial reason to believe that the Bans are needed to ensure public safety.

## VI.   The Court Should Waive the Bond Requirement or Set Bond at a Nominal Amount

The Third Circuit has recognized that the district court may sometimes dispense with the security requirements of FED. R. CIV. P. 65.  *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991).  "The court should also consider whether the applicant seeks to enforce a federal right and, if so, whether imposing the bond requirement would unduly interfere with that right."  *Board of Educ. v. F.C. ex rel. R.C.*, 2 F. Supp. 2d 637, 646 (D.N.J. Apr. 22, 1998).  Here, where Plaintiffs seek to enforce their constitutional rights, they should not be required to post security.  However, in the event that the Court determines that some bond is necessary here, any such bond should be set at a nominal amount.

## VII.   The Court Should Enter Final Judgment Awarding a Permanent Injunction

Because the claims in this case require no further factual development, permanent injunctive relief is appropriate.  "[A] preliminary injunction hearing may be combined with a

18

hearing on the merits, pursuant to FED. R. CIV. P. 65(a)(2), if it is accompanied by notice to the parties sufficient to enable them to present all of their evidence." *DeLeon v. Susquehanna Cnty. Sch. Dist.*, 747 F.2d 149, 152 n.6 (3d Cir. 1984). Here, "the merits of the plaintiffs' challenge are certain and don't turn on disputed facts," and thus the Court should enter final judgment in the form of permanent injunctive relief. *Wrenn*, 864 F.3d at 667.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion in its entirety and enter an order, substantially in the form submitted herewith, preliminarily and permanently enjoining Defendant's enforcement of the Bans created by H.B. 125.

Respectfully submitted,

Dated: November 2, 2021

GELLERT SCALI BUSENKELL & BROWN LLC

*/s/ Bradley P. Lehman*
Bradley P. Lehman (No. 5921)
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
P: (302) 425-5800
E: blehman@gsbblaw.com

OF COUNSEL:

JOSHPE MOONEY PALTZIK LLP
Edward Paltzik
1407 Broadway, Suite 4002
New York, NY 10018
P: (212) 344-8211
E: epaltzik@jmpllp.com
*Application for Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs*

19