## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREARMS POLICY COALITION, INC.,<br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>JOHN CARNEY, Governor of Delaware; KATHY JENNINGS, Attorney General of Delaware,<br>　　　　　Defendants. | C.A. No. 1:21-cv-01523-MN |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Bradley P. Lehman (No. 5921)
GELLERT SCALI BUSENKELL & BROWN LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
P: (302) 425-5800
E: blehman@gsbblaw.com

OF COUNSEL:

Edward Paltzik, Esq.
JOSHPE MOONEY PALTZIK LLP
1407 Broadway, Suite 4002
New York, NY 10018
P: (212) 344-8211
E: epaltzik@jmpllp.com
*Admitted Pro Hac Vice*


*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 2

   I.   Delaware House Bill 125 (HB 125) ...................................................................... 2

     A.   HB 125 Prohibits Ordinary Individuals from Possessing, Transporting, Shipping, Transferring, or Selling Non-Firearm Objects (the NFO Ban) ................................................ 2

     B.   HB 125 Prohibits the Creation, Sale, or Transfer of Self-Manufactured Firearms (the SMF Ban) ........................................................................................................ 2

     C.   HB 125 Prohibits Individuals From Distributing Computer Files to Program a Three-Dimensional Printer to Manufacture or Produce a Firearm, Firearm Receiver, or Major Component of a Firearm (the Instructions Ban) ................................................... 3

ARGUMENT .............................................................................................................. 3

   I.   Standard of Review Under Fed. R. Civ. P. (12)(b)(6) ......................................... 3

   II.   HB 125 Violates the Second Amendment ......................................................... 4

     A.   The NFO Ban and the SMF Ban are Categorically Unconstitutional Prohibitions Against Broad Classes of Protected Arms and Components in Common Use ...................... 4

     B.   Alternatively, the NFO Ban and the SMF Ban Fail Any Level of ............................. 6

       1.   The NFO Ban and the SMF Ban Burden Plaintiffs' Second Amendment Right ..... 7

       2.   At a Minimum, Strict Scrutiny Should Apply ....................................................... 10

       3.   The NFO Ban and the SMF Ban Fail Even Intermediate Scrutiny ........................ 11

     C.   The Gun Control Act of 1968 Is Irrelevant to This Action ....................................... 12

   III.   HB 125 Violates the Fifth and Fourteenth Amendments ................................... 13

i

A.      Because They Mandate Destruction, Dispossession, or Physical Appropriation of Property Without Compensation, the NFO Ban and the SMF Ban Constitute *Per Se* Unconstitutional Takings ............................................................................................... 13

IV.   HB 125 Violates the First Amendment ......................................................................... 14

A.   The Instructions Ban Punishes Expressive Speech ..................................................... 15

B.   The Instructions Ban is a Content-Based Speech Restriction .................................... 16

C.   The Instructions Ban is Overbroad ............................................................................. 19

D.   The Instructions Ban is a Prior Restraint .................................................................... 20

CONCLUSION .............................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abramski v. United States*,
    573 U.S. 169 (2014) …………………………………..……………….……...12

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002) ………………………………..……..................... 17, 18, 19, 20

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ……………………………………..……………….…… 20

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001) ………………………………………………....…… 18, 19

*Bd. of Trs. v. Fox*,
    492 U.S. 469 (1989) ……………………………………….………...………. 11

*Bernstein v. U.S. Dep't of State*,
    922 F. Supp. 1426 (N.D. Cal. 1996) …………………………………………… 15

*Boos v. Barry*,
    485 U.S. 312(1988) ……………………..................................................16,17

*Brown v. Entm't Merchs. Ass'n.*,
    564 U.S. 786 (2011). ......................................................................... 18

*Bruni v. City of Pittsburgh*,
    824 F.3d 353 (3d Cir. 2016) ……………………….................................. 12

*Buchanan v. Warley*,
    245 U.S. 60 (1917). ……………………….................................... 14

*Caetano v. Massachusetts*,
    136 S. Ct. 1027 (2016) ……………………….....................................4,5

*City of Houston, Tex. v. Hill*,
    482 U.S. 451 (1987) ……………………….................................... 19

*Defense Distributed v. Grewal*,
    971 F.3d 485 (5th Cir. 2020) ……………………………….................16, 18, 20

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)…………………………..……………………………… *passim*

*Drummond v. Twp. of Robinson*,
   784 F. App'x 82 (3d Cir. 2019) ……………………………….........................7

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ……………………….........................................7

*Globe Newspaper Co. v. Sup. Ct. for Norfolk Cty.*,
   457 U.S. 596 (1982) ……………………………………………………18, 19

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ……………………………..……..........................7

*Horne v. Dep't of Agric.*,
   576 U.S. 351 (2015) …………………………..……...................................13

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ……………………….........................................3

*In re Rockefeller Ctr. Props. Sec. Litig.*,
   311 F.3d 198 (3d Cir. 2002) ……………………….......................................4

*Junger v. Daley*,
   209 F.3d 481 (6th Cir. 2000) …………………………………………….……..15

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982) ……………………………………………………...14

*Lucas v. South Carolina Coastal Council*,
   505 U.S. 1003 (1992) ……………………………………………………....... 14

*Maio v. Aetna*,
   221 F.3d 472 (3d Cir. 2000) ………………………………………..…………………….3

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ……………………………………….…………….....……11

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ………………………………………………….4, 8, 10

*Miller v. Bonta*,
   2021 U.S. Dist. LEXIS 105640 (S.D. Cal. June 4, 2021) …..…………………………4,5

*Miller v. Johnson*,
   515 U.S. 900 (1995) ………………………………………………… 10

iv

*Mugler v. Kansas*, 123 U.S. 623 (1887) …………………………………………….......... 14

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
　　138 S. Ct. 2361 (2018) ……………………………..…………………...…… 17

*Police Dep't of Chicago v. Mosley*,
　　408 U.S. 92 (1972) …………………………..……………………………… 17

*Reed v. Town of Gilbert, Ariz.*,
　　576 U.S. 155 (2015) ………………..………………………………………..... 16

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
　　411 U.S. 1 (1973) …………………..……………….……...………… 10

*Sorrell v. IMS Health Inc.*,
　　564 U.S. 552 (2011) …………………..………………………………….........14,15

*Staples v. United States*,
　　511 U.S. 600 (1994) …………………..………………..……………….....19,20

*Teixeira v. Cnty. of Alameda*,
　　873 F.3d 670 (9th Cir. 2017) …………………….…...................................7

*United States v. Aguilar*,
　　515 U.S. 593 (1995) ……………………..………..………………….......…20

*Universal City Studios, Inc. v. Corley*,
　　273 F.3d 429 (2d Cir. 2001) ………………..……………………………… 15

*United States v. Marzzarella*,
　　614 F.3d 85 (3d Cir. 2010) ……………………..…….……………….6,7

*United States v. Playboy Entm't Grp., Inc.*,
　　529 U.S. 803 (2000) ……………………..…………………………....18

*United States v. Stevens*,
　　559 U.S. 460 (2010) …………………..…..…………………….....19

*Ward v. Rock Against Racism*,
　　491 U.S. 781 (1989) …………………..…….………………...…....16

*Wrenn v. District of Columbia*,
　　864 F.3d 650 (D.C. Cir. 2017) …………………..………………….......4

**United States Constitution**

U.S. Const. amend. I …………………………………………………………………...14

U.S. Const. amend. II ……………………………………………………………………4

U.S. Const. amend. V ……………………………………………………………………13

U.S. Const. amend. XIV § 1 …………….…………………………………..…….13

**United States Code**

17 U.S.C. § 101, 102, and 113 ……………………………………………………16

18 U.S.C. § 922(a)(1)(a) …………………………………………………………12

18 U.S.C. § 922(k) ……………………………………………………………..........12

18 U.S.C. § 922(p)(1)(A) ………………………………………………………….....9

18 U.S.C. § 922(p)(1)(B) ………….…………………………………………….....9

18 U.S.C. § 922(r) …………………………………………………………………9

18 U.S.C. § 923(g) ……………………………………………………….............2

18 U.S.C. § 923(i) ………………………………………………………...2, 13

**Federal Rules of Civil Procedure**

FED. R. CIV. P. 12(b)(6) ………………………………………………........................3

**Code of Federal Regulations**

27 C.F.R. § 478.92 ……………………………………………........................13

**Delaware Code**

11 *Del. C.* § 1459A ……………………....................…………………………2

11 *Del. C.* § 1459A(a) ……………………………………………………………2

11 *Del. C.* § 1459A(b) ……………………………………………………………2

11 *Del. C.* § 1463(a) . ………………………………………………………………3

11 *Del. C.* § 1463(b) . ..……………………………………………………………3

11 *Del. C.* § 1463(c)(1) ...……………………....................................................3

11 *Del. C.* § 1463(c)(2) ……………………....................................................3

11 *Del. C.* § 1463(d) ……………………….....................................................3

11 *Del. C.* § 1463(e) . ………………………....................................................3

11 *Del. C.* § 4205(b)(4) . …………………….....................................................2

11 *Del. C.* § 4205(b)(5) . ……………………....................................................3

**Other State Bills & Statutes**

Cal. Penal Code § 29180(b)(1) …………………….....................................11

Cal. Penal Code § 29182(a)(1) …………………….....................................11

Cal. Penal Code § 29182(b)(1) …………………….....................................11

Conn. Pub. Act No. 19-6(b) ....................................................................11

**Other Sources**

3 ARCHIVES OF MARYLAND: PROCEEDINGS OF THE COUNCIL OF MARYLAND 1636-
1667 (William Hand Brown ed., 1883) ....................................................8

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, *What is ATF doing in regards to
people making their own firearms*, (May 14, 2015), https://www.atf.gov/firearms/qa/what-atf-
doing-regards-making-their-own firearms ……….......................................9,12

JOSEPH G.S. GREENLEE, *The American Tradition of Self-Made Arms* (Nov. 10,
2021 ) ....................................................................................................8

Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador
to the U.S., (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 325
(Paul Ford ed., 1904) …………….........................................................6

M. L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY
1492-1792, at 149 (1980) …………........................................................6

PENNSYLVANIA ARCHIVES, second ser. 299 (William H. Egle ed., 1887)......................9

THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, FROM 1665 TO 1678;
WITH THE JOURNAL OF THE COUNCIL OF WAR, 1675 TO 1678 (J. Hammond
Trumbull ed., 1852) ...............................................................................8

WILLIAM J. KROUSE, GUN CONTROL: 3D-PRINTED AR-15 LOWER RECEIVERS, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018), https://fas.org/sgp/crs/misc/IN10957.pdf .........................................12

**INTRODUCTION**

House Bill 125 ("HB 125" or the "Bill"), signed into law on October 20, 2021, bans (a) the possession, transportation, shipping, transfer, or sale of non-firearm objects ("NFOs")—*i.e.*, various components, parts, or predecessor materials, that, while not themselves firearms, could conceivably be used to construct a firearm (the "NFO Ban"), (b) the possession of self-manufactured firearms ("SMFs")—self-made firearms that do not bear a federally licensed firearm manufacturer's serial number—as well as, prospectively, the use of three-dimensional printers ("3D Printers") to manufacture firearms (the "SMF Ban"), and (c) the distribution by the Internet or otherwise any instructions in the form of computer files or code that may be used to program a 3D Printer to manufacture or produce a firearm, firearm receiver, or major component of a firearm (the "Instructions Ban") (the NFO Ban, SMF Ban, and Instructions Ban collectively referred to as "Delaware's Bans" or the "Bans").   The SMF Ban and the Instructions Ban are effective immediately, while the NFO Ban is effective January 18, 2022.

Plaintiffs John Rigby ("Rigby") and Alan Knight ("Knight"), both Delaware citizens and members of Plaintiff Firearms Policy Coalition, Inc. ("FPC"), together with similarly situated Delaware citizens and FPC members, face imminent and irreparable harm as a result of these unconstitutional Bans, which violate their rights under the First, Second, Fifth, and Fourteenth Amendments to the U.S. Constitution.   Accordingly, Plaintiffs filed their Complaint against Defendants, Governor John Carney and Attorney General Kathleen Jennings (collectively the "Defendants"), on October 27, 2021.  D.I. 1.  On November 2, 2021, Plaintiffs filed their motion for a preliminary and permanent injunction seeking to enjoin Defendants' enforcement of HB 125.  D.I. 5, 6.  Defendants filed their opposition to Plaintiffs' motion on November 16, 2021.  D.I. 11.  That motion for injunctive relief is pending.  On December 9, 2021, Defendants filed their motion

to dismiss Plaintiffs' Complaint.  D.I. 19, 20.  Plaintiffs respectfully submit this brief in opposition

to Defendants' motion to dismiss.

## BACKGROUND

**I.      Delaware House Bill 125 (HB 125)**

   **A.  HB 125 Prohibits Ordinary Individuals from Possessing, Transporting, Shipping, Transferring, or Selling Non-Firearm Objects (the NFO Ban)**

Section 2 of the Bill amends *Del C.* Title 11, Chapter 5 to create § 1459A (Possession of

an unfinished firearm frame or receiver with no serial number).  Effective January 18, 2022,[1] it is

a Class D felony[2] (i) for anyone in Delaware to "knowingly transport, ship, transfer, or sell an

unfinished frame or receiver unless . . . . "[t]he person is a federally licensed gun dealer or

manufacturer," "[t]he name of the manufacturer and an individual serial number are conspicuously

placed on the unfinished firearm frame or receiver in accordance with the procedures for the

serialization of a firearm in 18 U.S.C. § 923(i)," *and* "[t]he person maintains records for the

unfinished firearm frame or receiver in accordance with the requirements for maintenance of

records in 18 U.S.C. § 923(g)" (11 *Del. C.* § 1459A(a)), and a Class D felony for anyone in

Delaware to "knowingly possess an unfinished firearm frame or receiver that does not have the

name of the manufacturer and serial number conspicuously placed on it or on a major component

of the firearm into which the unfinished firearm frame or receiver will be housed."  11 *Del. C.* §

1459A(b).

   **B.  HB 125 Prohibits the Creation, Sale, or Transfer of Self-Manufactured Firearms (the SMF Ban)**

Section 2 of the Bill amends *Del. C.* Title 11, Chapter 5 to create § 1463, which contains

---

[1] Section 4 of the Bill states that the NFO Ban takes effect 90 days following the Bill's enactment into law.

[2] A Class D felony is punishable by up to 8 years in prison. 11 *Del. C.* § 4205(b)(4).

the SMF Ban.  Effective immediately, any person is guilty of a class E felony[3] when that person "knowingly possesses an untraceable firearm" (§§ 1463(a), (d)); guilty of a class D felony when that person "knowingly manufactures, assembles, causes to be manufactured or assembled, sells, or transfers an untraceable firearm" (§§ 1463(b), (e)); and guilty of a class D felony when that person "[u]ses a three-dimensional printer or similar device to manufacture or produce a firearm, firearm receiver, or major firearm component when not licensed as a manufacturer" (§§ 1463(c)(1), (e)).

### C. HB 125 Prohibits Individuals From Distributing Computer Files to Program a Three-Dimensional Printer to Manufacture or Produce a Firearm, Firearm Receiver, or Major Component of a Firearm (the Instructions Ban)

11 *Del. C.* § 1463, as created by the Bill, also contains the Instructions Ban.  Effective immediately, any person is guilty of a class D Felony when that person "[d]istributes by any means, including the internet, to a person who is not licensed as a manufacturer, instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver or major component of a firearm."  (§§ 1463(c)(2), (e)).

## ARGUMENT

### I. Standard of Review Under Fed. R. Civ. P. (12)(b)(6)

"A motion to dismiss made pursuant to Rule 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief."  *Maio v. Aetna*, 221 F.3d 472, 481-482 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)).  "Dismissal under Rule 12(b)(6) is not appropriate unless it appears *beyond doubt* that plaintiff can

---

[3] A Class E felony is punishable by up to 5 years in prison.  11 *Del. C.* § 4205(b)(5).

prove no set of facts in support of his claim which would entitle him to relief." *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 215-216 (3d Cir. 2002) (internal citations omitted) (emphasis added).

## II.      HB 125 Violates the Second Amendment

### A.   The NFO Ban and the SMF Ban are Categorically Unconstitutional Prohibitions Against Broad Classes of Protected Arms and Components in Common Use

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, *shall* not be infringed." U.S. CONST. amend. II (emphasis added).  Incorporated against the states through the Fourteenth Amendment (*McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010)), the Second Amendment guarantees "an individual right to keep and bear arms," which is "a fundamental constitutional right guaranteed to the people." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).  This takes "off the table" any "absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 616, 636.  When confronted with such absolute prohibitions, Courts may invalidate the law in question without resort to tiered scrutiny analysis. *See, e.g.*, *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017) (invalidating District of Columbia's "good-reason law" relating to concealed carry without resort to tiered scrutiny analysis).

Consistent with historical tradition, the Second Amendment right necessarily encompasses firearms and firearms components "typically possessed by law-abiding citizens for lawful purposes . . . ." *Heller*, 554 U.S. at 625.  The government may only ban weapons that are dangerous *and* unusual, *i.e.*, weapons that are *not* in common use. *Id.* at 627; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J., concurring) ("A weapon may not be banned unless it is *both* dangerous *and* unusual.") (emphasis in original); *Miller v. Bonta*, 2021 U.S. Dist.

4

LEXIS 105640, at *16 (S.D. Cal. June 4, 2021) ("*Heller* asks whether a law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes.  It is a hardware test.").  "[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano*, 136 S. Ct. at 1031.  An arm is not "unusual" so as to fall outside the ambit of this protection so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Id*. at 1032 (Alito, J., concurring) (emphasis in original).

SMFs and their predecessor materials—NFOs—are typically possessed and commonly owned by law-abiding citizens for lawful purposes such as self-defense, are therefore not unusual, and thus protected by the Second Amendment.  For example, Plaintiff Rigby lawfully owns a self-manufactured Glock-compatible handgun, which he completed from an NFO before enactment of Delaware's Bans, and which he has removed to a location outside of Delaware in a legal manner due to his reasonable fear of criminal sanction.  Complaint at ¶ 76.  Rigby desires to make additional SMFs, including handguns, using the 3D Printer that he owns (Complaint at ¶ 84), and Knight also desires to make SMFs, including handguns (Complaint at ¶ 96).  Handguns are recognized as "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629.  Additionally, Rigby and Knight both own unserialized, unfinished lower receivers for the common AR-15 design rifle, an NFO within the meaning of the NFO Ban. Complaint at ¶¶ 78-79, 92-93.  AR-15-type rifles, and their components, are also commonly owned by law-abiding citizens. *Miller*, 2021 U.S. Dist. LEXIS 105640 at *16.

SMFs, and the possession and use of firearms predecessor materials by individuals to make SMFs, are not new.  In fact, they have been commonly possessed by law-abiding citizens for lawful purposes, including self-defense, *throughout* American history.  Manufacturing of firearms was entirely unregulated during the colonial and founding eras in America, and there were no

5

restrictions on who could be a gunsmith or make guns. *See, e.g.*, Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904) ("Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."); *see also* M. L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980) ("The influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era.").

No history or precedent exists for extinguishing law-abiding citizens' commonplace ability to self-manufacture firearms for self-defense or other lawful purposes, or for prohibiting law-abiding citizens from possessing SMFs and NFOs. The Second Amendment's text as informed by its history and tradition reflects the right to self-manufacture firearms. Accordingly, the NFO Ban and the SMF Ban are categorically unconstitutional and should be enjoined as such, without resort to tiered scrutiny analysis.

### B.  Alternatively, the NFO Ban and the SMF Ban Fail Any Level of Tiered Scrutiny Analysis

While Plaintiffs maintain tiered scrutiny is not the appropriate analysis, they recognize that the law of this Circuit has utilized tiered scrutiny. When resorting to tiered scrutiny, the Third Circuit has established "a two-pronged approach to Second Amendment challenges." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). "First, [courts] ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee . . . . [Second,] [i]f it does, [they] evaluate the law under some form of means-end

scrutiny." *Id*.[4]  The first prong is a "threshold inquiry" into whether the challenged conduct is protected by the right to keep and bear arms.  *Id*.  As federal courts have repeatedly recognized, this unassailable "right to *possess* firearms for protection implies . . . corresponding right[s]" without which "the core right wouldn't mean much."  *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (emphasis added).  This Circuit has acknowledged that its "sister circuits have conducted such an analysis and their opinions are illustrative."  *Drummond v. Twp. of Robinson*, 784 F. App'x 82, 84 n.8 (3d Cir. 2019) (citing *Teixeira Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

### 1.  The NFO Ban and the SMF Ban Burden Plaintiffs' Second Amendment Right

Under the threshold inquiry, the NFO Ban and the SMF Ban severely burden conduct protected by the Second Amendment.  The NFO Ban *completely* prohibits law-abiding citizens from possessing, transporting, shipping, transferring, or selling various components, parts, or predecessor materials, that, while not themselves firearms, could be used to construct types of firearms commonly owned by law-abiding citizens—including popular handguns such as Rigby's Glock-compatible design and AR-15-type rifles of the type Rigby and Knight contemplate assembling—and *completely* prevents the self-manufacture of such firearms by ordinary, law-abiding citizens, with or without the use of a 3D Printers.  Indeed, HB 125's definition of "[u]nfinished firearm frame or receiver" encompasses virtually *all* conceivable forms and types of NFOs.  Similarly, the SMF ban indiscriminately criminalizes all conceivable forms and types of self-manufactured firearms.

---

[4] Plaintiffs reserve their right to argue in subsequent proceedings that a tiered scrutiny approach is never appropriate in Second Amendment cases.  *See Heller v. District of Columbia*, 670 F.3d 1244, 1271–85 (D.C. Cir. 2011) (Heller II) (Kavanaugh, J., dissenting).

Defendants argue that HB 125 "does not burden Second Amendment protected conduct" because "the law's serialization requirements are properly classified as 'longstanding' gun-control measures that are 'presumptively lawful' . . . ." Defendants' Brief in Support of Motion to Dismiss ("Def. Br.") at 11 (D.I. 20) (citing *Heller*, 554 U.S. at 635). Defendants' application of *Heller* to the facts in this action is erroneous. The *Heller* Court did deem certain firearm regulations longstanding and thus presumptively lawful, such as "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places . . . or laws imposing conditions and qualification on the *commercial* sale of arms." *Heller*, 554 U.S at 626-627 (emphasis added). But the Court indicated that the key question in determining whether a regulation presumptively lawful is that it must be, at a minimum, "longstanding"—which the Court reiterated in 2010. *See McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). Here, Defendants are simply incorrect in their assertion that regulations requiring serialization of *self-built* firearms are longstanding:

> In fact, there were no restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. All such restrictions have been enacted in the last decade.

JOSEPH G.S. GREENLEE, *The American Tradition of Self-Made Arms*, 37 (Nov. 10, 2021 ), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3960566. A few colonial laws[5]

---

[5] Maryland in 1661 required "[t]hat all Smiths which have tooles be forced to fix armes for the Soldiers." 3 ARCHIVES OF MARYLAND: PROCEEDINGS OF THE COUNCIL OF MARYLAND 1636-1667, at 531 (William Hand Brown ed., 1883). Connecticut in 1665 allowed authorities, "upon just complaint of any souldier or inhabitant in this Colony, to . . . order and require [Gunsmiths] . . . forthwith to doe what is requisite to be done for fitting the Armes sent to them." THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, FROM 1665 TO 1678; WITH THE JOURNAL OF THE COUNCIL OF WAR, 1675 TO 1678, at 19 (J. Hammond Trumbull ed., 1852).

and one during the Revolutionary War[6] required gunsmiths to repair militia arms prior to resuming work for private customers.  But even these laws did not prohibit the self-manufacturing of firearms or impede citizens from exercising their freedom to defend themselves with arms of their choice.  Today, it remains legal to self-manufacture firearms under federal law.  BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, *What is ATF doing in regards to people making their own firearms*, (May 14, 2015),  https://www.atf.gov/firearms/qa/what-atf-doing-regards-people-making-their-own-firearms ("An individual may generally make a firearm for personal use.").  To the extent federal laws apply to SMFs, such laws do not specifically target SMFs, but rather are related to firearms generally.  *See e.g.*, 18 U.S.C. § 922(p)(1)(A), 18 U.S.C. § 922(p)(1)(B), and 18 U.S.C. § 922(r).

While a tiny minority of other states aside from Delaware have enacted anomalous laws regulating self-manufacturing of firearms, none are longstanding, and have instead been enacted within approximately the past five years.  Moreover, states like California and Connecticut do not outright prohibit SMFs—rather, their laws require individuals to obtain serial numbers for their SMFs from state authorities.  Elsewhere in the United States, and at the federal level, there are no specific laws or regulations targeting SMFs built by law-abiding citizens for lawful purposes, including but not limited to self-defense.  Even if serialization were longstanding (and it is not), HB 125 doesn't facilitate serialization of SMFs and NFOs, and therefore effectively bans them. There is absolutely no longstanding precedent for that.

---

[6] PENNSYLVANIA ARCHIVES, second ser. 299 (William H. Egle ed., 1887) ("Resolved, That in the case any of the gun-smiths, in the county of Lancaster . . . shall refuse to go to work and make their proportion of the firelocks and bayonets required of this county . . . the tools of the said gun-smiths so refusing shall be taken from them, and moreover the said gun-smiths shall not be permitted to carry on their trades until they shall engage to go to work as aforesaid . . . .").

Lastly, Defendants conclude their argument that HB 125 does not burden protected conduct by offering the bizarre contention, unsupported by any legal citations, that Plaintiffs "fail to present evidence that self-assembling from unserialized components is necessary or superior for home defense." Def. Br. at 12. However, this is an improper attempt at burden-shifting, as Plaintiffs are under no burden to demonstrate that a particular arm or class of arms is "necessary or superior"— the only question is whether the arms in question are *commonly or typically owned*. *Heller*, 554 U.S. at 625, 627. It is therefore unsurprising that Defendants are unable to support this argument with citation to case law, since this fabricated "necessary or superior" standard simply does not exist.

## 2. At a Minimum, Strict Scrutiny Should Apply

If this Court concludes that the NFO Ban and the SMF Ban are not categorically unconstitutional, the Bans, which burden core Second Amendment rights, must at the least be subjected to the highest level of constitutional scrutiny. "[S]trict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). The right to keep and bear arms is not only specifically enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778.

Any public safety interest the State may claim must be analyzed within the rubric of strict scrutiny, and there has been no effort to tailor the law to minimize imposing unnecessary or overly broad restraints—much less to establish "the least restrictive means" of achieving any "compelling" interests. *Miller v. Johnson*, 515 U.S. 900, 920 (1995). There has been no showing that *any* of the countless law-abiding Delawareans targeted under these Bans has had any

involvement in any crime associated with any NFO or SMF.

There are many less restrictive means for achieving alleged state interest.  For example, California law provides that the state's Department of Justice "shall issue" a unique serial number to prospective self-manufacturers who apply for one and pass a background check.  *See* Cal. Penal Code § 29180(b)(1), Cal. Penal Code § 29182(b)(1), and Cal. Penal Code § 29182(a)(1).  Similarly, in Connecticut, a citizen who has completed the self-manufacture of a firearm must apply for a unique serial number, and such number "shall issue" to the applicant "immediately" once it is determined that the applicant is not prohibited from purchasing a firearm.  *See* Conn. Pub. Act No. 19-6(b).

Unlike California and Connecticut, Delaware provides no options other than destruction or dispossession of the forbidden items, or prosecution for possession of same.  Delaware simply bans all conduct and possession *in toto*, forcing all law-abiding citizens to purchase only from State-approved manufacturers of firearms and firearm predecessor materials, which is often more expensive than what can be constructed with a 3D Printer or small computer numerical control (CNC) machine at home.  Complaint at ¶ 124.  Accordingly, strict scrutiny should apply, and the Bans cannot withstand strict scrutiny.

### 3.  The NFO Ban and the SMF Ban Fail Even Intermediate Scrutiny

The lack of meaningful tailoring in this broad prohibition renders the NFO Ban and the SMF Ban unconstitutional even under intermediate scrutiny, because that test requires at least "a means narrowly tailored to achieve the desired objective."  *Bd. of Trs .v. Fox*, 492 U.S. 469, 480 (1989).  Even under intermediate scrutiny, the government must show, at the least, "that it considered different methods that other jurisdictions have found effective," such as California's or Connecticut's approach.  *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).  There is no evidence

that Defendants even considered the approaches adopted by California or Connecticut, or any other alternatives—which is alone fatal under intermediate scrutiny. *Bruni v. City of Pittsburgh*, 824 F.3d 353, 371 (3d Cir. 2016).

### C. The Gun Control Act of 1968 Is Irrelevant to This Action

Defendants attempt to justify HB 125 by reference to the Gun Control Act of 1968 (the "Gun Control Act"). Def. Br. at pp. 2-3. As Defendants correctly point out, the Gun Control Act regulates "sales *by licensed firearm dealers*" as well as the construction of firearms by "licensed manufacturer[s]." *Id.* at 2 (citing *Abramski v. United States*, 573 U.S. 169, 172 (2014) (emphasis added)). However, as indicated herein *supra*, federal law, including the Gun Control Act, does not prohibit the manufacture of a firearm by ordinary individuals for personal use. That is true even if the firearm is built using an NFO, a 3D-printed frame or receiver, machined from a block of raw materials, or stamped from a piece of sheet metal. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, *What is ATF doing in regards to people making their own firearms*, (*supra*); WILLIAM J. KROUSE, GUN CONTROL: 3D-PRINTED AR-15 LOWER RECEIVERS, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018), https://fas.org/sgp/crs/misc/IN10957.pdf ("In short, unfinished receivers and the components needed to build fully functional AR-15s and other firearms are legally available on the U.S. civilian gun market and can be purchased without a background check under federal law."); *see also, e.g.*, 18 U.S.C. § 922(a)(1)(a). Whereas the requirements under the Gun Control Act apply to licensed manufacturers, both the SMF and the NFO Bans prevent ordinary individuals from self-manufacturing firearms.

Defendants also cite to Section 922(k) of the Gun Control Act (18 U.S.C. § 922(k)), claiming that under the statute, "[i[t is a crime to possess a firearm that has had its serial number removed." Def. Br. at p. 3. However, this citation is irrelevant because this action does not concern

12

the regulation of firearms that were previously serialized and had the serial number then defaced or removed.  In fact, engraving a serial number on NFOs is not required, nor is the serialization of firearms manufactured by ordinary citizens who are not licensed manufacturers or licensed importers.  Federal law only requires that *"[l]icensed importers and licensed manufacturers* shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon . . . each firearm imported or manufactured by such importer or manufacturer."  18 U.S.C. § 923(i) (emphasis added); *see also* 27 C.F.R. § 478.92 (similar).  Therefore, Defendants' references to the Gun Control Act are simply inapplicable and irrelevant to the case at bar.

### III.    HB 125 Violates the Fifth and Fourteenth Amendments

#### A.    Because They Mandate Destruction, Dispossession, or Physical Appropriation of Property Without Compensation, the NFO Ban and the SMF Ban Constitute *Per Se* Unconstitutional Takings

The Fifth Amendment states, in pertinent part, "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V.  The Fourteenth Amendment to the United States Constitution states, in pertinent part, ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law [the Due Process Clause of the Fourteenth Amendment]." U.S. CONST. amend. XIV § 1

Delaware's Bans mandate that its citizens destroy or dispossess themselves of their NFOs and SMFs or face arrest and involuntarily surrender of same to law enforcement, while making no provision for just compensation.  "When it comes to physical appropriations, people do not expect their property, real or *personal*, to be . . . taken away." *Horne v. Dep't of Agric.*, 576 U.S. 351, 352 (2015).  Such appropriation gives "rise to a *per se* taking." *Id.* at 360.  "The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your

home." *Id*. at 358.  The same logic holds true for firearms and firearms components.

Defendants argue, *inter alia*, that they need not compensate Plaintiffs for the taking of their NFOs and SMFs because HB 125 is a "valid exercise of the State's police power . . . ." Def. Br. at 16.  This argument stretches the police power well past its limits.  "[T]he police power, broad as it is, cannot justify the passage of a law . . . which runs counter to the limitations of the federal Constitution." *Buchanan v. Warley*, 245 U.S. 60, 74 (1917).  There is no exception when the regulatory object is property.  *Id.*  The Supreme Court has repeatedly held that a state has a constitutional duty to compensate owners for the property it takes, even when it uses its police power to take the property.  *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982).

To be sure, public safety provisions like nuisance laws may be part of "the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property," *Lucas*, 505 U.S. at 1027, and in certain circumstances this may mean that banning certain types of property will not implicate the Takings Clause.  But this is only when the provisions in question *predate acquisition*: "Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership."  *Id.* at 1029; *cf. Mugler v. Kansas*, 123 U.S. 623, 672 (1887).  No citizen, therefore, may be dispossessed of property that is entirely lawful under legal principles existing at the time of acquisition.

## IV.    HB 125 Violates the First Amendment

The First Amendment states, in pertinent part: "Congress shall make no law . . . .abridging the freedom of speech . . . ."  U.S. CONST. amend. I.  "[T]he creation and dissemination of

information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). "Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment." *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."), *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("For the purposes of First Amendment analysis, this court finds that source code is speech."). The First Amendment thus applies to the type of speech impacted by the Instructions Ban—digital firearms information, which Rigby and others similarly situated would disseminate but for their reasonable fear of criminal sanction. Complaint at ¶ 85.

### A. The Instructions Ban Punishes Expressive Speech

Defendants argue that the Instructions Ban does not prohibit the mere publication or distribution of ideas but instead bans "blueprints that can be used with a three-dimensional printer to automatically generate firearms and firearms components." Def. Br. at p. 17. They further argue that "[w]hatever expressive value may exist in the theory of these files, they function to create a firearm" and thus the "files subject to the Instructions Ban are not constitutionally protected." *Id.*

Defendants argue, incorrectly, that the computer files themselves are simply "blueprints" that automatically generate firearms and firearms components, and therefore that they have no *bona fide* expressive value simply because they help individuals assemble a firearm. Even if the Court were to accept this deeply troubling argument, the process of assembling or self-manufacturing a firearm involves various levels of individual choice and customization, and

15

application of individual skill, and is thus expressive. *See, e.g.,* Declaration of Rigby in Further Support of Plaintiffs' Motion for a Preliminary and Permanent Injunction (D.I. 17); *see also* Ex. 1 attached to Declaration of Bradley Lehman in Further Support of Plaintiffs' Motion for a Preliminary and Permanent Injunction (D.I. 18).[7]  Indeed, individuals who assemble or self-manufacture firearms do not merely follow blueprints in automatic fashion; rather, they use computer files or kits as a guide for designing and implementing their own expressive ideas to the 3D-printed base products.[8]  *Id.*  The very existence of the Instructions Ban belies the notion that these files have no expressive content, since the only way these computer files would be distinguished from files that are not subject to the Ban is by their content. Thus, despite Defendants' tortured logic, the fact of the matter is that the Instructions Ban *does* punish the *idea* intended to be communicated or conveyed—information relating to creation of a firearm, as Defendants concede, and is thus content-based and unconstitutional. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Boos v. Barry*, 485 U.S. 312, 320-21 (1988).

### B.  The Instructions Ban is a Content-Based Speech Restriction

"Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).  The Instructions Ban punishes the *idea* intended to be communicated or conveyed—digital firearms information. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791

---

[7] Declaration of John Walker, an industry expert in computer-assisted design. Mr. Walker's declaration was originally submitted in support of the plaintiffs' motion for a preliminary injunction in *Defense Distributed, et al. v. Grewal*, No. 3:19-cv-04753-AET-TJB (D.N.J.).

[8] Moreover, even if individuals were merely following "blueprints," it would not lessen the expressive content of the blueprints, which are entitled to copyright protection as "pictorial, graphic, and sculptural works" under the United States Copyright Act of 1976. *See, e.g.*, 17 U.S.C. § 101, 102, and 113.

(1989); *Boos*, 485 U.S. at 320-21.  "Content-based laws—those that target speech based on its communicative intent—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Id.*; *see also Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("This stringent standard reflects the fundamental principle that governments have 'no power to restrict expression because of its messages, ideas, its subject matter, or its content.' ")).  Delaware cannot meet this burden for at least three reasons.

First, the Instructions Ban does not survive strict scrutiny because it does not advance a compelling state interest.  The Instructions Ban simply cannot survive strict scrutiny because it prohibits distribution of digital information about conduct that is constitutionally protected, full stop.  However, even if Delaware's new prohibition against making firearms using 3D printers was constitutional (which it is not), the Instructions Ban would still be unable to survive strict scrutiny.  The holding of *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) is instructive: "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it."  *Id.* at 253.  The government lacks a compelling state interest and "may not prohibit speech" if the prohibition is based on a mere "remote connection" between the speech and a third party's hypothetical criminal conduct.  *Id.*  "Without a significantly stronger, more direct connection, the Government may not prohibit speech on the ground that it may encourage [third parties] to engage in illegal conduct." *Id.*  Even if the SMF Ban were constitutional (it is not), the Instructions Ban would be overinclusive and not narrowly tailored because it restricts Delaware citizens from posting information on the internet that can be accessed by persons in other states where 3D-printed firearms are not prohibited, and also because Delaware has no practical way to regulate

this kind of information, which has long been readily accessible on the internet from websites hosted in other jurisdictions. *See Defense Distributed v. Grewal*, 971 F.3d 485, 493 n.7 (5th Cir. 2020). Either way, under *Ashcroft*, Delaware lacks a compelling state interest in banning the expression of digital firearms information by Rigby and other Delaware citizens.

Second, the Instructions Ban does not meet the narrow tailoring requirement because there are less restrictive alternatives. Delaware can achieve its ends by punishing criminal conduct involving the *use* of firearms, particularly those which it seeks to regulate through the Instructions Ban—not speech that is merely and only sometimes remotely associated with that conduct. *See Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."). Third, Delaware cannot prove that the Instructions Ban advances the state's aim, which is ostensibly to combat the supposed danger to public safety posed by 3D printed firearms. There is no proof that this supposed danger is anything more than speculative. In the First Amendment context, justifications backed by mere "anecdote and supposition" do not suffice, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000), and neither does "ambiguous proof," *Brown v. Entm't Merchs. Ass'n.*, 564 U.S. 786, 800 (2011). Compelling "empirical support" of efficacy must be given. *Globe Newspaper Co. v. Sup. Ct. for Norfolk Cty.*, 457 U.S. 596, 609 (1982).

Third, Delaware cannot prove that the Instructions Ban advances the state's aim, which is ostensibly to combat the supposed danger to public safety posed by 3D printed firearms. There is no proof that this supposed danger is anything more than speculative. In the First Amendment context, justifications backed by mere "anecdote and supposition" do not suffice, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000), and neither does "ambiguous proof," *Brown v. Entm't Merchs. Ass'n.*, 564 U.S. 786, 800 (2011). Compelling "empirical support" of efficacy

18

must be given.  *Globe Newspaper Co. v. Sup. Ct. for Norfolk Cty*., 457 U.S. 596, 609 (1982).  None exists here.

### C.  The Instructions Ban is Overbroad

Even if some speech is unprotected, the overbreadth doctrine "prohibits the Government from banning [the] unprotected speech" where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft,* 535 U.S. at 255; *see also City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987). The Instructions Ban violates this doctrine in at least two ways.

First, the Instructions Ban is overbroad because it criminalizes speech regardless of its relationship to illegal conduct.  The "government may not prohibit speech because it increases the chance an unlawful act will be committed at some indefinite future time"; it may "suppress speech for advocating the use of force or a violation of law only if such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  *Ashcroft*, 535 U.S. at 253-54 (internal quotations omitted).  In this context, states can only prohibit speech to prevent illegal conduct when the speech is "integral to criminal conduct."  *United States v. Stevens*, 559 U.S. 460, 468 (2010) (emphasis added).  But speech cannot be "integral to criminal conduct" if it has only a "contingent and indirect" relationship to that conduct.  *Ashcroft*, 535 U.S. at 250.  It is not enough for Delaware to allege that there is "some unquantified potential for subsequent criminal acts."  *Id*.  Indeed, the Supreme Court has recognized that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law abiding third party."  *Bartnicki*, 532 U.S. at 529-530.  Virtually all of the speech covered by the Instructions Ban falls squarely on the protected side of *Bartnicki* and *Ashcroft's* line, either because the expression's recipient commits no illegal act at all or because, if they did, the causal link is merely contingent and indirect.  *Cf. Staples v. United States*,

511 U.S. 600, 610 (1994) ("[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country.").  Yet the Instructions Ban still criminalizes every instance of "distribut[ion]".

Second, the Instructions Ban is overbroad because it fails to distinguish between information that has, and has not, been committed to the public domain.  Digital firearms information is already freely circulating in the public domain because of publications that took place well before this law was enacted.  *See Defense Distributed*, 971 F.3d at 493 n.7 (internal citations omitted) (digital firearms information "can be located with a simple Google search" and have been "downloaded 'hundreds of thousands of times.'"  "[T]he Government may not . . . restrict individuals from disclosing information that lawfully comes into their hands in the absence of a state interest of the highest order."  *United States v. Aguilar*, 515 U.S. 593, 605 (1995).  However, this Ban draws no distinction between truly novel "instructions" and those that anyone has been able to obtain with simple Google searches for years.  Therefore, the Instructions Ban's coverage of these readily-available files renders it overbroad.

### D.  The Instructions Ban is a Prior Restraint

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against constitutional validity."  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 69 (1963).  The Instructions Ban is nothing more than censorship.  It operates as a prior restraint on speech, based on nothing more than speculation that an unlawful act involving an SMF assembled using the forbidden information will be "committed at some indefinite future time." *Ashcroft*, 535 U.S. at 253 (internal quotation omitted).  Ultimately, as here, a "law imposing criminal penalties on protected speech is a stark example of speech suppression."  *Id*. at 244.

### CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Dated: December 27, 2021

GELLERT SCALI BUSENKELL & BROWN LLC

*/s/ Bradley P. Lehman*
Bradley P. Lehman (No. 5921)
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
P: (302) 425-5800
E: blehman@gsbblaw.com

OF COUNSEL:

JOSHPE MOONEY PALTZIK LLP
Edward Paltzik
1407 Broadway, Suite 4002
New York, NY 10018
P: (212) 344-8211
E: epaltzik@jmpllp.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*