

Bradley P. Lehman, Esq.
302-416-3344
blehman@gsbblaw.com

July 1, 2022

**Via CM/ECF**
The Honorable Maryellen Noreika
United States District Court
District of Delaware
844 N. King Street, Unit 19, Room 4324
Wilmington, DE 19801

  Re: John Rigby, *et al.*, v. Kathy Jennings, Attorney General of Delaware,
     C.A. No. 21-01523 MN

Dear Judge Noreika:

  I write on behalf of the plaintiffs in the above-captioned action in response to Your Honor's June 23 oral order requesting that the parties submit additional briefing to address the effect of the Supreme Court's recent decision in *New York State Rifle & Pistol Assn., Inc. v. Bruen* in this case. In accordance with the parties' agreement concerning additional briefing on this issue (approved by the Court via oral order on June 27), please accept this letter brief as Plaintiffs' supplemental submission concerning the effect of *Bruen*.

  Crucially, under *Bruen*, it is *Defendant's* burden to overcome a presumption of Second Amendment protection for the conduct at issue by showing that the Bans[1] are consistent with the nation's historical firearm regulatory scheme—and Defendants have not presented *any* constitutionally relevant historical evidence to overcome the high bar that they must clear. Indeed, the primary effect of *Bruen* is to substantially streamline this Court's analysis of the pending motions, as the Supreme Court's opinion explicitly rejects the application of "means-end" analyses under intermediate or strict scrutiny in cases concerning the Second Amendment. The Court held:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them by Plaintiffs' Complaint [D.I. 1] (the "Complaint," cited herein as "Compl. ¶ __") and/or Opening Brief in Support of Plaintiffs' Motion for a Preliminary and Permanent Injunction [D.I. 6] (the "Opening Brief," cited herein as "Op. Br. at __"). Plaintiffs' Reply Brief in Further Support of Plaintiff's Motion for a Preliminary and Permanent Injunction [D.I. 16] (the "Reply Brief") is cited herein as "Reply Br. at __."

1201 N. ORANGE STREET
SUITE 300
WILMINGTON, DELAWARE 19801
P: 302. 425. 5800 | F: 302. 425. 5814

WWW.GSBBLAW.COM

8 PENN CENTER
1628 JOHN F. KENNEDY BLVD, SUITE 1901
PHILADELPHIA, PENNSYLVANIA 19103
P: 215. 238. 0010 | F: 215. 238. 0016



> this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*N.Y. State Rifle & Pistol Assoc. v. Bruen*, 2022 U.S. LEXIS 3055, at *20-21 (June 23, 2022). Going forward, the nation's courts are not to engage in any "judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Id.* at *27 (quoting *District of Columbia v. Heller*, 550 U.S. 570, 634 (2008)) (internal quotations omitted).

The *Bruen* Court continued:

> Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, *the Second Amendment extends, prima facie, to all instruments that constitute bearable arms*, even those that were not in existence at the time of the founding.
>
> […]
>
> Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

*Id.* at *34-35 (emphasis added). This Court must bear this guidance in mind when analyzing Defendant's attempts to ban the self-manufacture of modern arms and their component parts, including using 3D printers, and the dissemination of computer code that can be used to program a 3D printer for the purpose of manufacturing modern arms.

In light of the Supreme Court's guidance that the nation's courts must now focus their Second Amendment inquiries on whether a government regulation is consistent with the country's historical tradition of firearm regulation or not, it is now beyond question that this Court must permanently enjoin enforcement of the Bans as unconstitutional infringements on the Second Amendment rights of Delawareans. Serendipitously, Plaintiffs have already provided much of the relevant historical background through their Complaint and the briefing concerning preliminary and permanent injunctive relief. *See, e.g.*, Compl. ¶ 23-37, Op. Br. at 5-7 (making clear that citizens of the United States, as well as of the colonies before, have been free to manufacture, possess, and sell self-made firearms since well before the Founding). Defendant could not have carried her burden under intermediate or strict scrutiny, and the Defendant certainly cannot carry her more difficult burden under *Bruen* to overcome a presumption of Second Amendment protection for the conduct at issue by showing that the Bans are consistent with the nation's historical firearm



**GELLERT SCALI BUSENKELL & BROWN, LLC**

regulatory scheme (they are not). Defendant has provided the Court with absolutely no constitutionally relevant history to justify the Bans.

Preliminarily, the Bans at issue here clearly seek to regulate conduct covered by the plain text of the Second Amendment. As noted in the Reply Brief, Defendant has not previously disputed the fact that SMFs and their predecessor materials, NFOs, are typically possessed and commonly owned by law-abiding citizens for lawful purposes like self-defense. "Ghost gun" is merely an inflammatory term used to obscure the fact that the firearms at issue are simply self-manufactured versions of popular, commonly owned firearms that are unquestionably "instruments that constitute bearable arms." As stated in earlier briefing, *Heller* is a "hardware test" (Op. Br. at 6) and does not condone reliance on notions of what is "necessary" or whether some firearm is "equally effective" as another in order to restrict Second Amendment rights. Nonetheless, the Bans completely and categorically prohibit law-abiding individuals not otherwise prohibited from exercising their Second Amendment rights to possess, acquire, sell, transfer, or self-manufacture firearms, and even components of firearms, that are of types, functions, and designs similar to industrially manufactured firearms and are themselves commonly owned and possessed firearms or components thereof.

Further, the Bans (by outlawing the use of 3D printers for the self-manufacture of SMFs and NFOs) seek to prevent Delawareans from using modern and convenient methods of self-manufacturing firearms and components thereof that they have *always* been free to self-manufacture using the technology available to them at all prior points in history. Accordingly, the conduct covered by the Bans is presumptively protected by the Second Amendment. Thus, under *Bruen*, the burden shifts to Defendant to "demonstrate that the [Bans] are consistent with this Nation's historical tradition of firearm regulation." The Defendant cannot come close to carrying this burden, and the Bans must be deemed unconstitutional and permanently enjoined.

As noted in the Reply Brief, "[T]here were no restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. All such restrictions have been enacted in the last decade." Reply Br. at 3 (quoting JOSEPH G.S. GREENLEE, *The American Tradition of Self-Made Arms*, 37 (Nov. 10, 2021), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3960566). Self-manufactured arms were legal and commonplace at the time of the Founding and the ratification of the Second Amendment, and they clearly fall within the scope of "arms" that Americans have a right to keep and bear. While a handful of states have enacted anomalous laws concerning the self-manufacture of firearms, they date back only as early as 2016 and are plainly not indicative of any historical tradition. *See* Reply Br. at 4. In the approximately 400-year history of the colonies and later the United States, no regulations at all like the Bans appeared until this most recent decade, meaning that a regulatory scheme somewhat like the Bans has been on the books in only a few states during approximately the most recent 1.5% of the time since the first colonies were established and approximately the most recent 2.4% of the time since the colonies declared their independence in 1776. That is hardly an historical tradition of such regulations.



As also discussed in the earlier briefing, federal law does not now and never has required serialization of self-manufactured firearms or components thereof. Federal law also does not now and has not historically prohibited self-manufacture of firearms or their components. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, *What is ATF doing in regards to people making their own firearms*, (May 14, 2015), https://www.atf.gov/firearms/qa/what-atf-doing-regards-people-making-their-own-firearms ("An individual may generally make a firearm for personal use."). Thus, banning the self-manufacture of commonly owned and possessed firearms and firearm components is quite clearly not consistent with any historical tradition of firearm regulation in the United States or their predecessor colonies. The Bans must be deemed unconstitutional on that basis (and are also defective due to First, Fifth, and Fourteenth Amendment violations described at greater length in earlier briefing).

Additionally, not only is serializing a modern invention (and requirement for commercially produced firearms), the arms at issue in this case are categorically common functionally (they are simply regular semiautomatic handguns and rifles), jurisdictionally (not banned except in just a few jurisdictions and only extremely recently), and historically (no constitutional regulatory pedigree in relevant history). It should also be noted that assessing whether arms are in common use for lawful purposes does not involve a numerical test—the constitutionally protected status of arms cannot turn on fact-bound sales numbers of particular makes, models, or even specific configurations; rather, the question is a categorical analysis of type and function, set against a backdrop of historically analogous regulation and availability throughout the United States. The same goes for the SMFs and NFOs at issue in this case which unquestionably pass the *Heller* "hardware test."

While the Instructions Ban is an impermissible content-based prior restraint on speech that violates the First Amendment and perhaps implicates the Second Amendment less directly than the other Bans, the obvious and sole purpose of the Instructions Ban is to chill the protected Second Amendment conduct described above by making it a *felony* to assist someone in engaging in that protected conduct. Defendant admits as much, arguing in her briefing that the Instructions Ban is targeted at "blueprints" for manufacturing firearms and their components. At its core, the Instructions Ban is a firearm regulation just like the SMF Ban and NFO Ban, and there is absolutely no historical tradition of making it a crime to help a person not otherwise prohibited to self-manufacture commonly owned and possessed arms and their components by providing instructions, blueprints, advice, templates, tools, etc. Accordingly, the Instructions Ban is unconstitutional.

In sum, *Bruen* places a very heavy burden on Defendant and on other would-be regulators by completely eliminating any "means-end" testing like intermediate or strict scrutiny in the Second Amendment context and instead giving a presumption of Second Amendment protection to conduct, like the conduct at issue here, that is covered by the plain text of the amendment. Rather than grappling with the State's burden under *Bruen* to show how the Bans comport with the nation's historical tradition of firearm regulation (they do not), Defendant attempts to side-step it completely and shift the burden to Plaintiffs to justify their desire for SMFs and NFOs. Plaintiffs owe the State no explanation or justification. The burden is on Defendant to defend the Bans under



the proper analysis elucidated in *Bruen*, but Defendant has utterly failed to do so, and the record before this Court fully supports Plaintiffs' position and right to permanent injunctive relief.

Instead of attempting to provide the Court with any historical analogues for the Bans as *Bruen* requires (there are none), Defendant now for the first time takes the radical position that the conduct outlawed by the Bans is not covered by the Second Amendment's guarantee of a right to "keep and bear arms" at all, but that is quite clearly not true in light of *Heller*'s "hardware test."[2] The right to keep and bear, for example, a self-manufactured Glock-style pistol or AR-15 rifle is no more limited than the right to keep and bear a Glock pistol or an AR-15 rifle purchased from a store. Notions of whether a particular firearm is necessary or can be procured in a similar form from a commercial manufacturer are wholly immaterial. Americans have *always* had the right to self-manufacture the common arms of their time, and that right has never been contingent on whether the same arms could also be purchased at a shop – whether it be an early colonial or frontier gunsmith or a national sporting goods chain.

The Bans are unconstitutional and must be permanently enjoined. In addition, Plaintiffs are entitled to recover their costs, attorneys' fees, and other allowable expenses under 42 U.S.C. § 1988 or other applicable laws. Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss and grant Plaintiff's motion seeking a permanent injunction prohibiting enforcement of the unconstitutional Bans.

Respectfully submitted,

*/s/ Bradley P. Lehman*
Bradley P. Lehman (DE 5921)

Cc (via CM/ECF):   Kenneth Wan, Esq.
Patricia Davis, Esq.
Andrew Fletcher, Esq.

---

[2] Also, courts have previously held that self-manufacturing of firearms is protected Second Amendment conduct. *See Palmer v. Sisolak*, 2021 U.S. Dist. LEXIS 203547 (D. Nev. July 26, 2021) (finding that law banning self-manufacture of unserialized firearms and components "does not severely burden Second Amendment protected conduct, but merely regulates it," and ultimately upholding the ban under the two-step intermediate scrutiny analysis expressly rejected by *Bruen*). Thus, the Bans target protected Second Amendment conduct, and Defendant cannot meet its burden under *Bruen*. This Court also implicitly recognized that the Bans address protected Second Amendment conduct when it asked the State to present whatever evidence it believed would be sufficient to carry its burden under enhanced scrutiny.