IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREARMS POLICY COALITION, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 21-1523 (MN) |
| KATHY JENNINGS, Attorney General of Delaware, | ) ) ) | |
| Defendant. | ) ) | |

## **<u>MEMORANDUM OPINION</u>**

Bradley P. Lehman, GELLERT SCALI BUSENKELL & BROWN LLC, Wilmington, DE; Edward Paltzik, JOSHPE MOONEY PALTZIK LLP, New York, NY – Attorneys for Plaintiffs

Patricia A. Davis, Kenneth L. Wan, Andrew R. Fletcher, Deputy Attorneys General, STATE OF DELAWARE, DEPARTMENT OF JUSTICE, Wilmington, DE – Attorneys for Defendant.

September 23, 2022
Wilmington, Delaware

NOREIKA, U.S. DISTRICT JUDGE

Plaintiffs Alan Knight, John Rigby, and Firearms Policy Coalition, Inc. (collectively "Plaintiffs") filed a complaint challenging several recently enacted Delaware statutes as unconstitutional. (D.I. 1). Soon thereafter, they filed a motion for a preliminary and permanent injunction, seeking to enjoin Defendant from enforcing those statutes. (D.I. 5). Defendant has moved to dismiss Plaintiffs' complaint for failure to state a claim. (D.I. 19). For the following reasons, Plaintiffs' motion for preliminary injunction is GRANTED-IN-PART and DENIED-IN-PART, Plaintiffs' motion for permanent injunction is DENIED, and Defendant's motion to dismiss is DENIED.

I.      **BACKGROUND**

      A.      **Federal Firearm Regulation**

The significant federal statutes addressing firearms date back almost one hundred years. The National Firearms Act of 1934 "required all persons engaged in the business of selling 'firearms' . . . and all firearm owners to register with the Collector of Internal Revenue, subjected all firearm sales to a special tax, and required that they be accompanied by written order forms. The statute made it illegal to move a firearm in interstate commerce without payment of the tax, or to possess a firearm transferred in contravention of the tax and form requirements." *United States v. Rybar*, 103 F.3d 273, 279 (3d Cir. 1996) (citing Pub.L. No. 474, §§ 2–6, 48 Stat. 1236, 1237-38 (superseded by Internal Revenue Code of 1939)). Four years later, Congress passed the Federal Firearms Act of 1938, which, among other things, made it unlawful "for any person to transport, ship, or knowingly receive in interstate or foreign commerce" any firearm with a removed, obliterated, or altered serial number, required manufacturers to obtain licenses before engaging in interstate commerce, mandated that licensed dealers keep permanent records of certain

information, and barred firearm sales to certain classes of criminals and fugitives.  Pub.L. No. 785, 52 Stat. 1250-52 (1938) (repealed 1968).

The next major federal firearm legislation was the Gun Control Act of 1968, which operates (as amended) today.  18 U.S.C. §§ 921 *et. seq.*  The Gun Control Act builds upon the Federal Firearms Act by, *inter alia*, requiring licensed manufacturers and importers of firearms to identify each firearm by engraving or casting on the "frame or receiver" of the "firearm" a serial number, the manufacturer's name, and other identifying information.  *See* 18 U.S.C. § 923(i).  Until August 24, 2022, "firearm" and "firearm frame or receiver" were defined as follows:

> "Firearm" means "[a]ny weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm.  In the case of a licensed collector, the term shall mean only curios and relics."
>
> "Firearm frame or receiver" means "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

27 C.F.R. § 478.11.

As time passed, these decades-old definitions grew stale.  Traditionally, weapons had a single frame that housed the hammer, bolt or breechblock, and firing mechanism.  *See* Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27720, 27721 (2021) (proposed).  Certain modern firearms, however, have replaced the hammer with a striker, which is not included in the above definition.  *Id.*  Moreover, split-piece and multi-piece receivers, which do not house the hammer, bolt and breechblock in a single frame, have recently become popular.  *Id.*  These receivers do not meet the definition above and therefore fall outside of the Gun Control Act's scope.  The result is that entities have been manufacturing and selling kits containing split-

frame and multi-frame receivers and the tools necessary to "complete the weapon to a functional state with minimal effort, expertise, or equipment" without being subject to the requirements of the Gun Control Act.  *Id.* at 27726.  And the weapons produced by these kits are unserialized and untraceable, and no background check is conducted to ensure that purchasers may lawfully possess a firearm in accordance with federal and state law.[1]

In April 2022, the Bureau of Alcohol, Tobacco, Firearms and Explosives published a Final Rule that altered the definition of "firearm" and "firearm frame or receiver" in an attempt to close the loophole that allowed unserialized weapons to proliferate.  Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (April 26, 2022) (effective August 24, 2022).  Under the Final Rule, unfinished firearm kits that were arguably not subject to the Gun Control Act's mandates with respect to serialization, background checks and record keeping are now subject to those requirements.  The challenged Delaware statutes, described below, were passed prior to the publication of the Final Rule.

> **B.**    **The Challenged Delaware Laws**

On October 20, 2021, the Governor of Delaware signed House Bill 125 ("HB 125") into law.  HB 125 amends several statutes in Delaware's criminal code.  *See* An Act To Amend Title 11 Of The Delaware Code Relating To Firearms, H.B. 125, 151st Gen. Assemb. (Del. 2021) (codified at 11 Del. C. §§ 222, 1459, 1459A, 1462, 1463).  Specifically, HB 125 criminalizes the possession, manufacture, and distribution of unserialized firearms and unfinished firearm components.

---

[1]    The number of unserialized guns appears to be increasing.  Nationwide law enforcement recovered approximately 1,750 of these weapons from crime scenes in 2016.  By 2020, that number had ballooned to almost 9,000.

HB 125 creates 11 Del. C. § 1459A, which proscribes the distribution and possession of unfinished firearm frames and receivers.[2]  Section 1459A(a) makes it a felony to "knowingly transport, ship, transfer or sell" an unfinished firearm frame or receiver unless (1) the person is a federally licensed gun manufacturer or dealer, (2) "[t]he name of the manufacturer and an individual serial number are conspicuously placed on the unfinished firearm frame or receiver in accordance" with federal law, and (3) the person maintains records in accordance with federal law. Section 1459A(b) makes it unlawful to possess "an unfinished firearm frame or receiver that does not have the name of the manufacturer and individual serial number conspicuously placed on it or on a major component of the firearm into which the unfinished firearm frame or receiver will be housed," unless that person is a federally licensed gun manufacturer who is in the process of manufacturing a firearm frame or receiver.  Section 1459A became effective 90 days after HB 125's enactment.  *See* An Act To Amend Title 11 Of The Delaware Code Relating To Firearms, H.B. 125 § 4, 151st Gen. Assemb. (Del. 2021).

Further, HB 125 criminalizes distributing, possessing and manufacturing untraceable firearms.[3]  *See* 11 Del. C. § 1463(a) and (b).  Section 1463(a) bars knowingly possessing an untraceable firearm.  Section 1463's prohibition against distributing or manufacturing untraceable firearms comes in two forms.  First, § 1463(b) criminalizes knowingly manufacturing or

---

[2]     11 Del. C. § 222(35) defines "unfinished firearm frame or receiver" to be "a firearm frame or receiver that requires further machining or molding in order to be used as part of a functional firearm, and which is designed and intended to be used in the assembly of a functional firearm."

[3]     11 Del. C. § 222(37) defines "untraceable firearm" to mean "a firearm for which the sale or distribution chain from a licensed retailer to the point of its first retail sale cannot be traced by law-enforcement officials."  The definition excludes "firearms manufactured prior to 1968, muzzle-loading firearms designed to use black power [sic] or its equivalent, and firearms which are designed as replicas of antique firearms originally manufactured prior to 1898" from its ambit.  *Id.*

4

distributing an untraceable firearm.   Second, § 1463(c)(1) limits using "a three-dimensional printer[4] or similar device to manufacture or produce a firearm,[5] firearm receiver,[6] or major firearm component[7] by a non-licensed manufacturer."   In addition, § 1463(c)(2) makes it unlawful to "[d]istribute[] by any means, including the internet, to a person who is not licensed as a manufacturer, instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver or major component of a firearm."  11 Del. C. § 1463(c)(2).

HB 125 also contains regulations that Plaintiffs do not challenge.  For example, HB 125 makes it a felony to "knowingly transport, ship, possess or receive any firearm or firearm frame or receiver with the knowledge that the importer's or manufacturer's serial number has been removed, obliterated or altered in a manner that has disguised or concealed the identity or origin of the firearm," with the exception of firearms manufactured prior to 1973.  11 Del. C. § 1459.

---

[4]   11 Del. C. § 222(33) defines "three-dimensional printer" to be "a computer or computer-driven machine of [sic] device capable of producing a three-dimensional object from a digital model."

[5]   11 Del. C. § 222(13) defines "firearm" to include "any weapon from which a shot, projectile or other object may be discharged by force of combustion, explosive, gas and/or mechanical means, whether operable or inoperable, loaded or unloaded.  It does not include a BB gun."

[6]   11 Del. C. § 222(14) defines "firearm frame or receiver" to be "the part of the firearm that provides housing for the firearm's internal components, and includes the hammer, bolt or breechblock, action, and firing mechanism."

[7]   11 Del. C. § 222(19) defines "major component of a firearm" to be "the slide, barrel, cylinder, trigger group, or receiver of a firearm."

Moreover, the bill makes it a felony to possess, manufacture, transport or sell a covert[8] or undetectable firearm.[9]  11 Del. C. § 1462.

HB 125 also contains a severability provision.  It states that "[i]f any provision of this Act or the application of this Act to any person or circumstance is held invalid, the provisions of this Act are severable if the invalidity does not affect the other provisions of this Act that can be given effect without the invalid provision or the application of this Act that can be given effect without the invalid application."  An Act To Amend Title 11 Of The Delaware Code Relating To Firearms, H.B. 125 § 3, 151st Gen. Assemb. (Del. 2021).

### C.    Present Motions

Plaintiff John Rigby is a resident of Delaware who 1) self-manufactured a handgun that he removed out of state due to fear of criminal sanction, 2) wishes to manufacture firearms with firearm components that he owns, and 3) owns a 3D printer with the desire and intent to use it to manufacture firearms using code that he possesses.  (*See* D.I. 7).  But for HB 125, Plaintiff Rigby avers that he would still possess his self-manufactured handgun, continue building firearms, and distribute code that may be used to manufacture firearms on a 3D printer.  (*Id.*).

Plaintiff Alan Knight is a Delaware resident who owns and possesses two unserialized unfinished receivers suitable for the manufacture and assembly of an AR-15 design rifle.  (*See* D.I. 8).  Knight asserts that he wishes to use these firearm components to manufacture a

---

[8]    11 Del. C. §222(4) defines "covert firearm" as "any firearm that is constructed in a shape or configuration such that it does not resemble a firearm."

[9]    11 Del. C. §222(34) defines "undetectable firearm" to mean "a firearm constructed entirely of nonmetal substances, or a firearm that after removal of all of the major components of a firearm, is not detectable by walk-through metal detectors calibrated and operated to detect the security exemplar, or firearm which includes a major component of a firearm, which, if subject to the types of detection devices commonly used at airports for security screening, would not generate an image that accurately depicts the shape of the component.  It does not include a firearm subject to the provisions of 18 U.S.C. § 922(p)(3) through (6)."

firearm for his own use and not to sell or otherwise dispose of it.  Knight also desires to obtain additional firearm components to manufacture firearms for his own use.  (*Id.* ¶ 7).

Plaintiff Firearms Policy Coalition, Inc. is a 501(c)(4) non-profit incorporated under the laws of Delaware with a place of business in Clark County, Nevada.  (D.I. 1 ¶ 13).  In this litigation, Firearms Policy Coalition represents its members "who include gun owners, prospective gun owners and self-manufacturers, retailers of NFOs, parts, and firearms, and others[.]"  (*Id.* ¶ 100).  Plaintiffs Rigby and Knight are members of the Firearm Policy Coalition.  (D.I. 7 ¶ 4, D.I. 8 ¶ 4).

Defendant Kathy Jennings is the Attorney General of Delaware.  (D.I. 1 ¶ 15).

Plaintiffs' motion for injunctive relief seeks to enjoin Defendant from enforcing 11 Del. C. §§ 1459A, 1463(a), (b), (c)(1) and (c)(2).  Specifically, Plaintiffs assert that §§ 1459A, 1463(a), 1463(b) and 1463(c)(1) violate their Second Amendment rights, § 1463(c)(2) runs afoul of the First Amendment, and §§ 1459A(b) and 1463(a) constitute an impermissible taking of private property under the Fifth Amendment.

Also before the Court is Defendant's motion to dismiss pursuant to Rule 12(b)(6).[10] (D.I. 19).  Defendant asserts that Plaintiffs have failed to state a cognizable claim under the First Amendment, Second Amendment, or Fifth Amendment, and seeks dismissal of each of Plaintiffs' claims.

---

[10]     Initially, Plaintiffs' complaint named both Governor John Carney and Delaware Attorney General Kathy Jennings as defendants.  Defendants sought dismissal of Governor Carney under Rule 12(b)(1) and the parties have since stipulated to dismiss Governor Carney as a defendant.  (*See* D.I. 20 at 6–10; D.I. 23, 24).  Accordingly, all that remains of the motion to dismiss is Defendant Jennings's motion pursuant to Rule 12(b)(6).

## II.   LEGAL STANDARDS

### A.   Motion for Preliminary and Permanent Injunction

A motion for preliminary injunction requires analyzing whether: (1) the moving party has demonstrated a likelihood of success on the merits, (2) the moving party will suffer irreparable harm if an injunction is not granted, (3) the balance of equities tips in favor of the moving party, and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Osorio-Martinez v. Attorney Gen. United States of Am.*, 893 F.3d 153, 178 (3d Cir. 2018). A preliminary injunction is only appropriate if the first two factors are satisfied and all four factors, taken together, weigh in the moving party's favor. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017). To obtain a permanent injunction, a plaintiff must show actual success on the merits rather than a likelihood of success on the merits. *See Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.")

### B.   Motion to Dismiss

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the non-moving party. *See Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232–33 (3d Cir. 2008). Dismissal under Rule 12(b)(6) is only appropriate if a complaint does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). This plausibility standard obligates a plaintiff to provide "more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action."
*Twombly*, 550 U.S. at 555.  Instead, the pleadings must provide sufficient factual allegations to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 506 U.S. at 678.

## III.  MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION

### A.  Likelihood of Success on the Merits

In Plaintiffs motion to enjoin Defendant from enforcing 11 Del. C. § 1459A and § 1463(a), (b), (c)(1) and (c)(2), they allege that their Second Amendment rights are infringed by all of the subparts of these statutes other than § 1463(c)(2), which Plaintiffs separately argue transgresses the First Amendment.  The Court addresses the arguments in turn.

### 1.  Second Amendment Claims

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court set forth the test to be used for analyzing Second Amendment challenges:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

142 S. Ct. 2111, 2126 (2022) (citations omitted).  Although *Bruen* displaced the previous test employed by Courts of Appeals, *Bruen* is not altogether new.  Indeed, the Court must still ask first whether the challenged law burdens the Second Amendment.  *Id.* at 2127; *see United States v. Ingram*, No. 0:18-cr-557-MGL-3, 2022 WL 3691350, at *2 (D.S.C. Aug. 25, 2022) (discussing how *Bruen* did not displace the previous test's first step).  And, if so, then the Court must determine

whether those statutes are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

Here, the challenged statutes prohibit three types of conduct – (1) distribution, (2) possession, and (3) manufacture of unfinished firearm frames and receivers and untraceable firearms:

> *Distribution.*   Sections 1459A(a) and 1463(b) concern the distribution of unfinished frames or receivers and untraceable firearms, respectively.  Section 1459A(a) makes it unlawful for all but federally licensed gun dealers or manufacturers who maintain records in accordance with federal law to "transport, ship, transfer, or sell" unfinished firearm frames or receivers.  Section 1463(b) bars the sale or transfer of an untraceable firearm.

> *Possession.*   Sections 1459A(b) and 1463(a) deal with the possession of unfinished frames and receivers and untraceable firearms, respectively.  Section 1459A(b) prohibits the possession of an unfinished frame or receiver that is not serialized and marked in accordance with federal law and § 1463(a) criminalizes the knowing possession of an untraceable firearm.

> *Manufacture.*   Sections 1463(b) and 1463(c)(1) both prohibit manufacturing an untraceable firearm.   Section 1463(b) bars manufacturing an untraceable firearm and § 1463(c)(1) prohibits all but licensed manufacturers from using a three-dimensional printer to manufacture a firearm, firearm receiver, or major firearm component.

The Court will separately consider each prohibition.

> **a.     The Statutes Concerning the Distribution of Firearms (§§1459A(a) and 1463(b))**

In *District of Columbia v. Heller*, the Supreme Court identified a non-exhaustive list of "presumptively lawful regulatory measures" that included "laws imposing conditions and qualifications on the commercial sale of arms."  554 U.S. 570, 625–27 (2008).  Such laws "comport with the Second Amendment because they affect individuals or conduct unprotected by the right

to keep and bear arms." [11] *Binderup v. Att'y. Gen. United States of Am.*, 836 F.3d 336, 343 (3d Cir. 2016) (*en banc*); *see also Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (2022).  Of course, not every regulation on the commercial sale of arms is presumptively lawful.  In *United States v. Marzzarella*, the Third Circuit explained that "[i]n order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition." 614 F.3d 85, 91 n.8 (3d Cir. 2010).

Here, §§ 1459A(a) and 1463(b) permit anyone lawfully able to sell a firearm to do so, and simply require that those selling or transferring firearms to abide by federal law when doing so. Section 1459A(a) permits federally licensed gun dealers and manufacturers who abide by federal law's serialization and record-keeping requirements to transport, ship, transfer, and sell unfinished firearm frames and receivers.  Thus, Plaintiffs will have still have access to these components. Further, § 1463(b) bars the sale or transfer of untraceable firearms but does not prohibit any type of firearm to be bought or sold, so long as it is traceable.  Barring the distribution of untraceable firearms may make purchasing a firearm more inconvenient, but this does not amount to a Second Amendment burden because of the easy access to traceable firearms.  *See, e.g.*, *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) (explaining that "gun buyers have no right to have a gun store in a particular location, at least as long as their access is not meaningfully constrained.").  Therefore, the Court finds that these regulations impose conditions on the sale and

---

[11]     Sections 1459(a) and 1463(b) do not solely target commercial transactions.  There is no reason to believe, however, that the non-commercial character of a transaction changes the analysis.  *See Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1074 (D. Colo. 2014) ("Logically, if the government can lawfully regulate the ability of persons to obtain firearms from commercial dealers, that same power to regulate should extend to non-commercial transactions."), *vacated on other grounds and remanded*, 823 F.3d 537 (10th Cir. 2016).

transfer of firearms that do not burden Plaintiffs' Second Amendment rights because they do not bar the sale of any type of weapon or impose onerous regulations on those wishing to distribute unfinished firearm frames and receivers.

**b.     The Statutes Criminalizing Possession of Firearms**

In contrast to the statutes regulating distribution of firearms, the contested statutes prohibiting the possession of unfinished frames and receivers (§ 1459A(b)) and untraceable firearms (§ 1463(a)) do burden rights protected by the Second Amendment.  The Second Amendment, which protects "the right of the people to keep and bear Arms," protects the possession of untraceable firearms and unfinished firearms and receivers because its text covers the possession of firearms.  Sections 1459A(b) and 1463(a) criminalize the possession of unserialized finished firearm frames and untraceable firearms without providing any way for Plaintiffs to keep firearms they lawfully manufactured.[12]  Thus, the Second Amendment presumptively extends to the conduct prohibited by these statutes.

Defendant asserts that these statutes do not burden conduct protected by the Second Amendment because unfinished frames and receivers and untraceable firearms are "not in common use and typically possessed by law-abiding citizens for lawful purposes."  (*See* D.I. 36 at 3; *Heller*, 554 U.S. at 625 (2008)).  Defendant, however, has offered no evidence to support the assertion. Indeed, Defendant's "evidence" on this point consists of a single statistic: that law enforcement recovered almost 24,000 untraceable firearms at crime scenes nationwide between 2016 and 2020. (D.I. 11 at 4).  Although this indicates that untraceable firearms are at times used by criminals, it

---

[12]     California, for example, permits individuals to "[a]pply to the Department of Justice for a unique serial number or other mark of identification" for their firearms.  Cal. Penal Code § 29180 (b)(1).  Unlike California, Delaware is criminalizing the possession of once-lawfully possessed firearms without giving Plaintiffs any opportunity to maintain possession of their firearms by applying for a serial number.

ignores that firearms unquestionably protected by the Second Amendment are also sometimes used by criminals. What is important is whether the prohibited untraceable firearms and unfinished firearm components are "not typically possessed by law-abiding citizens for lawful purposes." On the record currently before the Court, Defendant has failed to provide evidence that persuades the Court that this standard has been met.[13] Therefore, the Court finds that these statutes burden rights protected by the Second Amendment.

---

[13]     Defendant suggests that it is Plaintiffs' burden to prove that the Second Amendment protects the right to possess untraceable firearms and unfinished firearm frames and receivers. (*See* D.I. 36 at 3 ("Plaintiffs allege no facts demonstrating that self-manufactured or self-assembled, unserialized and untraceable guns are in 'common use' and typically owned for lawful purposes today"), at 4 ("Plaintiffs do not explain why a law-abiding citizen would prefer an unserialized and untraceable firearm, nor do they provide any lawful purpose for possessing unserialized and untraceable firearms, when serialized and traceable firearms have long been the norm and are widely available.")). It is, however, Defendant's burden to prove that the challenged regulation does not implicate the Second Amendment. *See New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015) (explaining that *Heller* "identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting"); *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011) ("[I]f the government can establish that a challenged law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment – 1791 or 1868 – then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review."); *Tyler v. Hillsdale Cnty. Sheriff's Dept.*, 837 F.3d 678, 685-86 (6th Cir. 2016) (placing burden on government to demonstrate that the law regulates conduct outside the scope of the second amendment). That burden does not flip simply because the context of the inquiry is a motion for preliminary injunction. *See Miller v. Bonta*, 542 F. Supp. 3d 1009, 1029 (S.D. Cal. 2021) ("Plaintiffs do not have to shoulder the burden of proving that they are entitled to enjoy Second Amendment rights. The command of the Amendment is that the right to keep and bear arms 'shall not be infringed.' It follows that when a citizen complains in a facial challenge that the government is infringing, then it is the government that must carry the burden of justifying its restriction of Second Amendment rights. . . . The correct starting orientation is that no arm may be prohibited. If a plaintiff challenges the government's prohibition, it is on the government first to prove the banned arm is dangerous and unusual, and if not that it is not commonly possessed, or not commonly possessed by law-abiding citizens, or not commonly possessed for lawful purposes or militia readiness."), *vacated on other grounds,* No. 21-22608, 2022 WL 3095986 (9th Cir. August 1, 2022).

Turning to the second step in the *Bruen* analysis, the Court finds that Defendant has not demonstrated that § 1459A(b) and § 1463(a) are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.   Defendant argues that "[l]aws tracking and restricting the possession of firearms date back to colonial times" and that "[s]erialization dates to the same time period as *Heller*'s examples and should also be considered a longstanding and presumptively valid measure," but Defendant has not identified a single statute or regulation to substantiate her argument.  (D.I. 11 at 8; *see also* D.I. 36).  "Courts are [] entitled to decide a case based on the historical record compiled by the parties" and Defendant has furnished nothing to justify this law as longstanding except for attorney argument.  *Bruen*, 142 S. Ct. at 2130 n.6.[14] Attorney argument is not evidence.  *Scott v. DST Sys., Inc.*, No. 1:18-cv-286-RGA, 2019 WL 3997097, at *5 (D. Del. Aug. 23, 2019); *CryoLife, Inc. v. C.R. Bard, Inc.*, No. 14-cv-559-SLR, 2015 WL 1093543, at *3 (D. Del. Mar. 10, 2015).  Indeed, the absence of historical evidence in Defendant's briefing stands in stark contrast to that of other parties who have defended firearm regulations under *Bruen*'s framework.  *See, e.g.*, Defendant's Supplemental Briefing, *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, No. 22-cv-501-BLF (N.D. Cal. July 8, 2022), ECF No. 64. With no evidence of longstanding analogous firearm regulations in the record, the Court cannot conclude that § 1459A(b) and § 1463(a) are "consistent with the Nation's historical tradition of firearm regulation."

Thus, Plaintiffs have demonstrated a likelihood of success on the merits that § 1459A(b) and § 1463 violate their Second Amendment rights.   These statutes burden constitutionally

---

[14]      "The job of judges is not to resolve historical questions in the abstract; it is to resolve legal questions presented in particular cases or controversies.  That "legal inquiry is a refined subset" of a broader "historical inquiry," and it relies on "various evidentiary principles and default rules" to resolve uncertainties.  *Bruen*, 142 S. Ct. at 2130 n.6 (quoting W. Baude & S. Sachs, Originalism and the Law of the Past, 37 L. & Hist. Rev. 809, 810–811 (2019)).

protected conduct because possession of firearms and firearm frames and receivers is within the scope of the Second Amendment's right to "keep and bear Arms" and Defendant has not shown that these firearms and components are not commonly owned by law-abiding citizens for lawful purposes. Further, Defendant has offered no evidence that these statutes are consistent with the nation's history of firearm regulation.

### c.     The Statutes Prohibiting Manufacturing of Firearms

Plaintiffs also contend that those portions of § 1463(b) and § 1463(c)(1) that prohibit manufacturing untraceable firearms are unconstitutional. Defendant again asserts that this regulation concerns conduct that is not protected by the Second Amendment. The Court disagrees. In *Ezell v. City of Chicago*, the Seventh Circuit struck down a Chicago ordinance that simultaneously (1) permitted only those who have trained at a firing-range to possess firearms and (2) barred firing-ranges within city limits. The Seventh Circuit reasoned that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." 651 F.3d 684, 704 (7th Cir. 2011). Similarly, here, the right to keep and bear arms implies a corresponding right to manufacture arms. Indeed, the right to keep and bear arms would be meaningless if no individual or entity could manufacture a firearm. Thus, if possessing untraceable firearms is protected by the Second Amendment, then so too is manufacturing them.

Proceeding to *Bruen*'s historical inquiry, Defendant once again resorts to conclusory argument and has furnished no evidence that the laws in question are in line with the nation's historical tradition of firearms regulation. It is Defendant's burden to justify a Second Amendment burden as longstanding and Defendant has not put forth any evidence to meet her burden. Accordingly, the Court finds that Plaintiffs have demonstrated a likelihood of success that those

portions of § 1463(b) and § 1463(c)(1) that prohibit manufacturing untraceable firearms are unconstitutional.

### 2.   <u>First Amendment Claims</u>

Plaintiffs challenge § 1463(c)(2), which prohibits "distribut[ing] by any means, including the internet, to a person who is not licensed as a manufacturer, instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, or major component of a firearm," on multiple First Amendment grounds.  First, Plaintiffs allege that the statute is an unjustifiable content-based speech regulation. (D.I. 6 at 13–15).  Second, Plaintiffs contend that the law is overbroad.  (*Id*. at 15–16).  Finally, Plaintiffs claim that the statute amounts to an impermissible prior restraint on speech.  (*Id*. at 17). The Court addresses these challenges in turn.[15]

---

[15]    The Court must consider these challenges if § 1463(c)(2) burdens constitutionally protected speech.  Defendant argues that the statute does not target speech as it concerns only "blueprints that can be used with a three-dimensional printer to automatically generate firearms and firearms components." (D.I. 11 at 13–14).  Plaintiffs argue that "the process of assembling or self-manufacturing a firearm involves various levels of individual choice and customization, and application of individual skill, and is thus expressive" and that the ban "punishes the idea to be communicated or conveyed – information relating to the creation of a firearm[.]" (D.I. 16 at 9).

As between the parties, Defendant's characterization is closer to the mark.  Section 1463(c)(2) does not prohibit discussing how to manufacture a firearm or providing instructions of how to do the same.  Rather, the statute prohibits distributing to non-licensed manufacturers computer files and code that "may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, or major component of a firearm."  The "may be used to program" clause restricts § 1463(c)(2)'s scope to *functional* computer files or code.

The Court is skeptical that § 1463(c)(2) implicates the First Amendment.  Code that is functional will "induce action without the intercession of the mind or the will of the recipient."  *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000).  When the action to be induced, in this case the manufacturing of a firearm, is unrelated to the First Amendment, it makes little sense that the First Amendment would be

### a.     Whether the Statute is a Content-Based Regulation

To determine the appropriate level of scrutiny, the Court must determine whether § 1463(c)(2) is a content based or content neutral regulation.  *See Bruni v. City of Pittsburgh*, 941 F.3d 73, 83 (3d Cir. 2019).  Content based restrictions are subject to strict scrutiny and content neutral regulations are subject to intermediate scrutiny.  *See id.* at 83–84.  "A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'"  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).  A regulation may also be content based if it cannot be "justified without reference to the content of the regulated speech" or was adopted "because of disagreement with the message [the speech] conveys."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  If a law does not have a content based purpose or justification, the law is content neutral.  *City of Austin*, 142 S. Ct. at 1471.

"First Amendment precedents and doctrines have consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral," so it is of no consequence that § 1463(c)(2) requires analysis of whether the code is functional and what the code's function is.  *City of Austin*, 142 S. Ct. at 1473.  For example, in *Defense Distributed v. United States Department of State*, a regulation restricting the export of defense articles was found to be content neutral because it "does not regulate disclosure of technical data based on the

---

implicated by regulations concerning that action.  Imagine, for example, a local regulation mandating that self-driving vehicles be programmed so that they drive no faster than 25 miles per hour in school zones during certain hours.  Would such a regulation compel speech?  The Court suspects not, given that the aim of the regulation would be to promote public safety rather than compelling anything expressive.  Nevertheless, the Court need not decide this issue on the preliminary record before it because Defendant prevails even assuming § 1463(c)(2) burdens protected speech.

message it is communicating[,]" but was instead imposed "to satisfy a number of foreign policy and national defense goals[.]"  121 F. Supp. 3d 680, 694 (W.D. Tex. 2015), *aff'd sub nom. Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016).  Similarly, courts have found that an anti-trafficking provision of the Digital Millennium Copyright Act that bars distributing code used to circumvent anti-piracy measures to be content neutral because the statute has "nothing to do with suppressing particular ideas of computer programmers . . . [r]ather, it is focused squarely upon the effect of the distribution of the functional capability that the code provides."  *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 329 (S.D.N.Y.), *aff'd sub nom. Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).  Like the Digital Millennium Copyright Act, § 1463(c)(2) is not concerned with stifling expression of any idea.  It is concerned with controlling the distribution of untraceable firearms.  Section 1463(c)(2) focuses on whether the code "may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver or major component of a firearm," not whether the code expresses any particular idea.  Indeed, the regulation does not prohibit discussing how to use a 3D-printer to build a firearm or conveying information that would aid someone in doing so.  Rather, the regulation prohibits distributing code that could itself function to build a firearm.  The Court will therefore subject § 1463(c)(2) to intermediate scrutiny.

A law passes muster under intermediate scrutiny if it "(1) advances a 'substantial' governmental interest; (2) does not 'burden substantially more speech than is necessary' (i.e., the statute must be narrowly tailored); and (3) leaves open 'ample alternative channels for communication.'"  *Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 535 (3d Cir. 2012) (quoting *Ward*, 491 U.S. at 798–800).  "A statute may satisfy intermediate scrutiny even though it is not the 'least restrictive or least intrusive' means of furthering the government's substantial

interest." *Id.* (quoting *Ward*, 491 U.S. at 798).  It is evident that § 1463(c)(2) advances a substantial government interest, as distributing a mechanism for automatically manufacturing untraceable firearms to non-licensed manufactures implicates public safety.  *See Defense Distributed,* 121. F. Supp. 3d at 694–95 (finding that the government has a substantial interest in regulating the dissemination of military information, including blueprints to manufacture 3D-printed firearms); *see also Universal City Studios*, 111 F. Supp. 2d at 330 (finding that "[t]he anti-trafficking provision of the DMCA furthers an important governmental interest – the protection of copyrighted works stored on digital media from the vastly expanded risk of piracy in this electronic age.").  Moreover, the statute does not burden substantially more speech than is necessary.  The statute prohibits only the distribution of functional code.  It does not prohibit gunsmiths and hobbyists from exchanging information about how to use their 3D-printer to manufacture a firearm, or for instructing individuals on how to program their 3D-printer to make the firearm of their choice.  The statute is concerned with the distribution of functional code that can build a firearm, firearm receiver, or major firearm component – a concern that aligns with the government's substantial interest in restricting the distribution of untraceable firearms.  Given the narrow scope of the statute, the Court finds that it leaves ample alternative channels to communicate about how to use a 3D-printer to manufacture a firearm, firearm receiver, or major firearm component.  Accordingly, the Court finds that § 1463(c)(2) is a valid, content neutral regulation of speech.

**b.**      **Whether the Statute is Overbroad**

The Court also finds that § 1463(c)(2) is not overbroad.  "According to [] First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech."  *U.S. v. Williams*, 553 U.S. 285, 298 (2008).  A litigant challenging a statute as overbroad will succeed if the "statute's overbreadth [is] *substantial*, not only in an absolute sense, but also

relative to the statute's plainly legitimate sweep." *Id.* As explained above, this statute is narrowly focused on distributing functional code. It does not prohibit discussing how to use a 3D-printer to manufacture firearms or instructing someone on how to create the code to do so. The statute only prohibits distributing code which "may be used to program" a 3D-printer to manufacture a firearm, firearm receiver, or major component of a firearm. Thus, the Court does not find that this statute to be overbroad.

### c. Whether the Statute is a Prior Restraint on Speech

"The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, pp. 4-14 (1984)). A prior restraint censors speech prior to its dissemination rather than imposing punishment after the speech has been communicated. *See id.* at 553-54 (explaining that the First Amendment jurisprudence has "steadfastly preserved the distinction between prior restraints and subsequent punishments" stemming from English common law). In this case, § 1463(c)(2) is not a prior restraint scheme because it operates by imposing punishment after the purported speech has occurred.

### B. Irreparable Harm

"[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted). "When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary." 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2022); *see also Bullock v. Carney*, No. 20-2096, 2020 WL 7038527, at *3 (3d Cir. June 4, 2020) (Phipps dissenting) (citing Wright and Miller

§ 2948.1).  Here, Plaintiffs face irreparable harm in the absence of an injunction because they are threatened by criminal penalties should they engage in conduct protected by the Second Amendment.[16]  This element therefore weighs in favor of granting injunctive relief.

### C.     Remaining Factors: Public Interest and Balance of Hardships

The remaining two factors, on balance, also tip in favor of granting preliminary injunctive relief.  The public interest favors Plaintiffs as the "enforcement of an unconstitutional law vindicates no public interest." *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) (citing *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.")).  As to the balance of hardships, Plaintiffs have shown that it is likely that they are suffering a deprivation of their constitutionally protected rights and Defendant's argument that an injunction would constrain the state's ability to address the proliferation of unserialized, untraceable firearms that are being used for nefarious purposes is somewhat compelling.[17]  Thus, this factor is largely neutral.

### D.     Only Preliminary Relief is Appropriate

As discussed, the four factors, considered as a whole, dictate granting preliminary relief, enjoining enforcement of §§ 1459A(b), 1463(a) and 1463(c)(1) as well as the portions of § 1463(b) that prohibit manufacturing or assembling untraceable firearms.  *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017).  The Court, however, denies Plaintiffs' motion for permanent injunctive relief.  The issues at stake are of significant public importance and the Court will not conclusively decide them now on a preliminary record.  The

---

[16]     As discussed above, Plaintiffs have demonstrated a likelihood of success on the merits on the record presently before the Court.

[17]     The Court is not enjoining enforcement of laws that constrain the distribution of firearms.

parties will, therefore, have the opportunity to further develop the record should they wish to do so.

## IV.    **MOTION TO DISMISS**

As explained above, Plaintiffs demonstrated a likelihood of success on the merits of their Second Amendment claim.  Although Plaintiffs have not demonstrated a likelihood of success on the merits of their First Amendment claim, it is a well-pleaded claim and not fit for dismissal. Plaintiffs' complaint also includes a well-pleaded Takings Claim.[18]  Plaintiffs have stated a *prima facie* Takings Claim because they allege that the challenged laws required them to dispossess themselves of the proscribed firearms and unfinished frames and receivers.  (D.I. 1 ¶¶ 80-81, 92-95, 105-06).  Defendant argues that this does not state a Takings Claim because "[a] government does not need to compensate owners when it prohibits a type of personal property through a valid law." (D.I. 20 at 15).  This argument fails, however, because Defendant has not demonstrated that the laws requiring dispossession of Plaintiffs' property are valid.  Therefore, Defendant's motion to dismiss will be denied in its entirety.

## V.    **CONCLUSION**

For the above reasons, Plaintiffs' motion for a preliminary injunction is GRANTED-IN-PART and DENIED-IN-PART, Plaintiffs' motion for a permanent injunction is DENIED, and Defendant's motion to dismiss is DENIED.  An appropriate order will be entered.

---

[18]    Because the Court is granting preliminary relief on Plaintiffs' Second Amendment claim, analyzing Plaintiffs' motion for injunctive relief did not require analysis of the Takings Claim.