## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREARMS POLICY COALITION, INC., | : : : : | C.A. No. 1:21-cv-01523-MN |
| Plaintiffs, | : : | |
| v. | : : | |
| KATHY JENNINGS, Attorney General of Delaware, | : : : | |
| Defendant. | : : | |

## DEFENDANT'S OPENING BRIEF IN SUPPORT OF HER
## MOTION FOR SUMMARY JUDGMENT

STATE OF DELAWARE
DEPARTMENT OF JUSTICE
Patricia A. Davis (#3857)
Kenneth L. Wan (#5667)
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, Delaware 19801
(302) 577-8400
*Attorneys for Defendant*

Date: March 25, 2024

# TABLE OF CONTENTS

**PAGE**

TABLE OF CITATIONS ............................................................................................... ii

NATURE AND STAGE OF THE PROCEEDINGS ................................................... 1

SUMMARY OF THE ARGUMENT .......................................................................... 1

STATEMENT OF FACTS ........................................................................................... 2

ARGUMENT ............................................................................................................... 8

  I.   THE GHOST GUN AND GHOST FRAMES BANS DO NOT VIOLATE THE SECOND AMENDMENT ....................................................................................... 9

      A.  THE SECOND AMENDMENT STANDARD ........................................ 9

      B.  PLAINITFFS HAVE FAILED TO DEMONSTRATE THAT THE BANNED ITEMS ARE COVERED UNDER THE SECOND AMENDMENT ................... 10

      C.  EVEN IF THE BANS IMPLICATE THE SECOND AMENDMENT, THEY ARE CONSTITUTIONAL BECAUSE THEY ARE CONSISTENT WITH THIS NATION'S HISTORICAL TRADITION OF FIREARM REGULATION ......... 12

  II.  HB 125 DOES NOT VIOLATE THE FIFTH AMENDMENT ........................................ 15

  III.  HB 125 DOES NOT VIOLATE THE FIRST AMENDMENT ......................................... 17

      A.  THE INSTRUCTIONS BAN IS NOT THE PUBLISHING OF AN ITEM OF EXPRESSIVE SPEECH ...................................................................... 17

      B.  THE INSTRUCTIONS BAN IS A VALID, CONTENT-NEUTRAL REGULATION OF PLAINTIFFS' CONDUCT THAT DOES NOT INFRINGE FIRST AMENDMENT RIGHTS ...................................................... 17

      C.  THE INSTRUCTIONS BAN IS NOT A FACIALLY UNCONSTITUTIONAL PRIOR RESTRAINT ........................................................................ 19

      D.  THE INSTRUCTIONS BAN IS NOT UNCONSTITUTIONALLY OVERBROAD .................................................................................... 19

  IV.  PLAINTIFFS' FOURTEENTH AMENDMENT CLAIMS FAIL .................................... 20

CONCLUSION .......................................................................................................... 20

## TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                        <u>**PAGE**</u>

*Adkins v. United States*,
82 Fed. Cl. 619 (2008) ..................................................................................16

*Alexander v. U.S.*,
509 U.S. 544 (1993) .....................................................................................19

*Anderson  v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................9

*Betts v. New Castle Youth Dev. Ctr.*,
621 F.3d 249 (3d Cir. 2010) ....................................................................... 20

*Bevis v. City of Naperville, Illinois*,
85 F.4th 1175 (7th Cir. 2023) .................................................................... 10

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) .................................................................................... 19

*Brockett v. Spokane Arcades*,
472 U.S. 491 (1985) .................................................................................... 20

*City of Lakewood v. Plain Dealer Pub. Co.*,
486 U.S. 750 (1988) .................................................................................... 19

*Clark v. Cmty. For Creative Non-Violence*,
468 U.S. 288 (1984)..................................................................................... 18

*Cunningham v. M & T Bank Corp.*,
814 F.3d 156 (3d Cir. 2016) .......................................................................... 9

*D.C. v. Heller*,
554 U.S. 570 (2008) ............................................................................... 10, 11

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*,
664 F. Supp. 3d 584 (D. Del. 2023) .......................................................... 10

*Fahr v. City of San Diego*,
2021 WL 4895974 (S.D. Cal. Oct. 20, 2021) ........................................... 16

*Goldblatt v. Hempstead*,
369 U.S. 590 (1962) .................................................................................... 16

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
*515 U.S. 557 (1995)* ................................................................................. 17

*Kleinman v. City of San Marcos,*
597 F.3d 323 (5th Cir. 2010) ..................................................................... 18

*Maryland Shall Issue, Inc. v. Hogan*,
963 F.3d 356 (4th Cir. 2020) ..................................................................... 16

*Maryland Shall Issue, Inc. v. Moore*,
86 F.4th 1038 (4th Cir. 2023),
*reh'g en banc granted,* 2024 WL 124290 (4th Cir. Jan. 11, 2024) ............................... 10

*McCutchen v. United States,*
145 Fed. Cl. 42, 54 (2019), aff'd 14 F.4th 1355 (Fed. Cir. 2021) ............................... 16

*Merke v. Lockheed Martin,*
2016 WL 1105401, (3d Cir. Mar. 22, 2016) ................................................... 9

*Nat'l Ass'n for Gun Rts. v. Lamont,*
2023 WL 4975979, a (D. Conn. Aug. 3, 2023) ................................................ 10

*New York State Club Ass'n v. City of New York,*
487 U.S. 1 (1987) ..................................................................................... 19

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
142 S. Ct. 2111 (2022) ..................................................................... *passim*

*New York v. Arm or Ally, LLC,*
2024 WL 756474 (S.D.N.Y. Feb. 23, 2024) .................................................. 12

*Ocean State Tactical, LLC v. Rhode Island,*
646 F. Supp. 3d 368, 388 (D.R.I. 2022), *aff'd,* 2024 WL 980633 (1st Cir. Mar. 7, 2024) .......... 10

*Oregon Firearms Fed'n, Inc. v. Brown,*
644 F. Supp. 3d 782 (D. Or. 2022) ............................................................. 11

*Robertson v. Allied Signal, Inc.,*
914 F.2d 360, 382 (3d Cir. 1990) ............................................................... 9

*Rocky Mountain Gun Owners v. Polis,*
2023 WL 5017253 (D. Colo. Aug. 7, 2023) .................................................. 11

*Rupp, et al., v. Bonta,*
2024 WL 1142061 (C.D. Cal. Mar. 15, 2024) ........................................ 10, 11

*Rupp v. Becerra*,
2018 WL 2138452 (C.D. Cal. May 9, 2018) ............................................................ 17

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002) ............................................................................................ 15

*Texas v. Johnson*,
491 U.S. 397 (1989) ............................................................................................ 17

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ...................................................................................... 17, 18

*U.S. v. Chi Mak*,
683 F.3d 1126 (9th Cir. 2012) ............................................................................ 20

*U.S. v. Hicks*,
980 F.2d 963 (5th Cir. 1992) .............................................................................. 20

*U.S. v. O'Brien*,
391 U.S. 367 (1968) ............................................................................................ 18

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ............................................................................................ 18

*Warth v. Seldin*,
422 U.S. 490 (1975) ............................................................................................ 19

## STATUTES

11 *Del. C.* § 1459A ...................................................................................... 2, 3

11 *Del. C.* § 1463 ................................................................................... 2, 3, 17

## OTHER RULES AND AUTHORITIES                                                    PAGE

Fed. R. Civ. P. 56 ................................................................................................ 8

U.S. Const. Amend. II ....................................................................................... 9

U.S. Const. Amend. V ...................................................................................... 15

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs John Rigby, Alan Knight, and Firearms Policy Coalition, Inc. (collectively, "Plaintiffs") filed their Complaint against Governor John C. Carney ("Governor") and Attorney General Kathleen Jennings ("A.G. Jennings") on October 27, 2021. D.I. 1. Plaintiffs' Complaint challenges the constitutionality of House Bill 125 ("HB 125"). They allege that HB 125 violates their rights under the First, Second, Fifth, and Fourteenth Amendments to the U.S. Constitution. *Id.* at 26-38.  On December 30, 2021, the Parties stipulated to the dismissal of the Governor, leaving A.G. Jennings as the sole remaining Defendant. D.I. 23, 24.

On November 2, 2021, Plaintiffs filed a motion for a preliminary and permanent injunction. D.I. 5.  On September 23, 2022, the Court, granted the motion for a preliminary injunction in part, and denied the motion for a permanent injunction. D.I. 6, 11, 16, 39. On March 1, 2023, the Court issued a scheduling order. D.I. 45. The only discovery that occurred is A.G. Jennings production of three expert declarations. D.I. 48. Plaintiffs provided no discovery. Discovery is now closed. This is A.G. Jennings's opening brief in support of her Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

1. Plaintiffs' Second Amendment challenge fails because the items HB 125 outlaws are not entitled to protection, and even if entitled to protection, HB 125 is still constitutional because it is consistent with this Nation's historical tradition of firearm regulation.

2. Plaintiffs' Fifth Amendment claim fails because HB 125 is valid.

3. Plaintiffs' First Amendment claim fails because HB 125 does not regulate speech, but even if it did, HB 125 survives First Amendment scrutiny.

4. Plaintiffs' Fourteenth Amendment claims fail because their claims are governed by other, more specific constitutional provisions.

1

**STATEMENT OF FACTS**

On October 21, 2021, the Governor signed into law HB 125. HB 125 addresses the threat posed by unserialized firearms and firearm components, as well as untraceable firearms. In relevant part, HB 125 first creates 11 *Del. C.* § 1459A, which provides:

> **Possession of an unfinished firearm frame or receiver with no serial number.**
>
> (a) No person shall knowingly transport, ship, transfer, or sell an unfinished firearm frame or receiver unless all of the following apply:
>
> (1) The person is a federally-licensed gun dealer or manufacturer.
>
> (2) The name of the manufacturer and an individual serial number are conspicuously placed on the unfinished firearm frame or receiver in accordance with the procedures for the serialization of a firearm in 18 U.S.C. § 923(i).
>
> (3) The person maintains records for the unfinished firearm frame or receiver in accordance with the requirements for maintenance of records in 18 U.S.C. § 923(g).
>
> (b) No person shall knowingly possess an unfinished firearm frame or receiver that does not have the name of the manufacturer and individual serial number conspicuously placed on it or on a major component of the firearm into which the unfinished firearm frame or receiver will be housed.
>
> (c) Subsection (b) of this section does not apply to a federally-licensed gun manufacturer during the manufacturing process of a firearm frame or receiver.
>
> (d) Possession of an unfinished firearm frame or receiver with no serial number is a class D felony.

HB 125 also signed to law 11 *Del. C.* § 1463, which provides, in relevant part:

> **Untraceable firearms; class E or D felony.**
>
> (a) A person is guilty of possessing an untraceable firearm when then person knowingly possesses an untraceable firearm.

(b) A person is guilty of manufacturing an untraceable firearm when the person knowingly manufactures, assembles, causes to be manufactured or assembled, sells, or transfers an untraceable firearm.

(c) A person is guilty of manufacturing or distributing a firearm using a 3-dimensional printer when the person does any 1 of the following:

(1) Uses a 3-dimensional printer or similar device to manufacture or produce a firearm, firearm receiver, or major firearm component when not licensed as a manufacturer.

(2) Distributes by any means, including the internet, to a person who is not licensed as a manufacturer, instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a 3-dimensional printer to manufacture or produce a firearm, firearm receiver or major component of a firearm.

HB 125 contains other provisions not at issue here.

Plaintiffs claim that 11 *Del. C.* § 1459A ("Ghost Frame Ban") and 11 *Del. C.* § 1463(a), (b), and (c)(1) ("Ghost Guns Ban") (collectively, "Bans") violate their Second, Fifth, and Fourteenth Amendments rights, and 11 *Del. C.* § 1463(c)(2) ("Instructions Ban") violates their First and Fourteenth Amendments rights. D.I. at 26-38.

### *Ghost guns are primarily used for illegal purposes*

Unserialized privately-made firearms (hereinafter "PMFs" or "ghost guns") "are marketed to supply firearms to violent criminals" and "increasingly used in criminal activity" because they can be obtained without the procedural safeguards, such as background checks, associated with conventional firearm purchases. Declaration of Daniel Webster, September 29, 2023, attached as Exhibit A ("Webster Dec.") at 5, 8, 10-11; Declaration of Robert Spitzer, September 28, 2023, attached as Exhibit B ("Spitzer Dec.") at 4. A study regarding ghost guns usage in Oakland, California from 2017 to 2021 revealed that ghost guns "were 33.3% more likely than other types

of recovered firearms to be used in the commission of a violent crime" and that, during that time frame, firearm homicides increased by 69%, and the percentage of guns recovered that were PMFs increased from 1.4% to 24%. Webster Dec. at 5.

Indeed, "individuals who commit violent crimes with firearms prefer to obtain [them] without background checks and recordkeeping that would allow law enforcement to link them to a particular firearm." *Id.* at 6. A national survey of prisoners found that, of those armed with a gun when committing the crime that led to their imprisonment, only 10% purchased the firearm from a licensed dealer, and that of the inmates who could legally possess a firearm when the crime was committed, only 20% obtained it legally. *Id.* Further, those seeking to obtain firearms via improper channels preferred new guns as opposed to one possibly linked to a prior crime. *Id.* at 6-7. Thus, background checks and other regulations are imperative to prevent firearm use in crimes. *Id.* at 12. Notably, "[t]he presence or absence of serial numbers on firearms has no effect on their functionality, and one is hard pressed to imagine why any law-abiding citizen would want to own a gun with no identifying serial numbers. It does, however, have profound consequences for their use in criminality and public safety." Spitzer Dec. at 5.

### *SMFs are not a part of American history or tradition*

There is no American tradition of amateurs assembling firearms. Declaration of Brian DeLay, September 29, 2023, attached as Exhibit C ("DeLay Dec.") at 3, 9. In the eighteenth century, colonial America imported the vast majority of firearms from European manufacturers, because, at the time, firearms "were the most technologically complex objects the majority of people ever encountered." *Id.* at 9-10. Certain core components of the firearm, such as the barrel and lock, "were very difficult to procedure and extraordinarily difficult to produce in quantity." *Id.* at 11.

At the time, gun barrels were made from wrought iron. *Id.* Barrels could withstand the repeated pressures of gunpowder explosions if well made. *Id.* However, making a quality gun barrel was complicated, requiring a laborious process to ensure the barrel would not fail. *Id.* Makers had to ensure the barrel seam was properly sealed to ensure the barrel would not explode, and coat the barrel to prevent rust. *Id.* at 12. Barrels of poor quality could fail, resulting in injury to the user. *Id.* The difficulty of making quality barrels is underscored by the fact, at the time, even barrels made by professional craftsmen had a 25% failure rate. *Id.* at 13.

The lock (the mechanism that caused the ignition of gunpowder) was even more difficult to assemble, consisting of over a dozen individual parts and requiring complicated tasks such as cutting iron with dies, repeated heating and cooling of iron, and the cutting of screws. *Id.* at 10-11, 13-15. Locks also contained delicate springs made from steel, requiring the maker to tightly pack iron and charcoal dust and placed it in a furnace for days, a process that yielded inconsistent results. *Id.* at 16. It was not until the mid-eighteenth century that a watchmaker from Sheffield, England invented a more consistent method of producing quality steel. *Id.* at 17. This led to the steel makers in that area to dominate the industry well past the mid-nineteenth century, which in turn led to European nations manufacturing most eighteenth-century firearms. *Id.* This was due to the access of the more reliable steel making process, along with already existing manufacturing facilities and sustained economies of scale. *Id.* These nations were already making arms for their armed forces. *Id.* at 17-19. Conversely, nothing like this existed in colonial America. *Id.* at 19.

The large majority of gunsmiths in colonial American only repaired firearms. *Id.* at 22. Few gunsmiths made firearms (generally with a combination for self-made and imported components), but nothing like the ghost guns of today. *Id.* at 24. Rather, all the parts were sourced individually, and assembled by professionals. *Id.* at 25. Even rarer was the gunsmith that made

firearms from scratch and did so sparingly. *Id.* For example, a gunsmith who had such capabilities only made three firearms over a twenty-year period. *Id.* at 25-26.

America did not begin significant domestic production of firearms until the late 1790s. *Id.* at 37. Before that time, America imported firearms, even to arm soldiers for war. *Id.* at 26-34. Indeed, during the Revolutionary War, American soldiers were not armed with domestically made arms, but foreign arms maintained and repaired by American gunsmiths. *Id.* at 34. Importantly, "[t]he individuals who worked at arsenals or under contract were not exponents of an 'American tradition of self-made arms' or the forbears of today's amateurs with gun kits trying to evade state regulation. They were professionals or professionals-in-training, working in an industry intimately connected to the state." *Id.* at 39.

### *History of Gun Serialization*

"Meaningful serialization of firearms is a relatively recent phenomenon" because "in the 1700s and most of the 1800s, uniform firearms serializing was a non-existent solution to a nonexistent problem." Spitzer Dec. at 5. At the time, "guns were made by hand one at a time" with no reason or incentive for uniform serialization. *Id.* When manufacturing processes improved, gun manufacturers did place numbers on their firearms as early as 1840, but only for internal purposes. *Id.* at 6-7. The first federal law to implement serial numbers was the National Firearms Act of 1934, which required serialization of the certain weapons the Act regulated. *Id.* at 7. The Gun Control Act of 1968 expanded uniform serialization for all firearms. *Id.*

### *Historical Regulations*

"[S]everal categories of historic gun [and other weapons] laws were enacted to address the problem of specific types of weapons considered to pose a particular threat to public safety and good order, including those considered to pose a particular danger—even including modified or

'self-made' weapons." *Id.* at 8. These types of weapons posed a "specific, regulatable harm or risk to the public." *Id.*

**Bowie Knifes** In the 1830s, Americans widely relied on knives with thin, long blades for fights and duels.  *Id.* at 21-22. These fighting knives, including the famous Bowie knife, became increasingly popular and accounted for a rising number of homicides. *Id.* at 22-23.  In response, multiple states prohibited or restricted the carry of Bowie knives and similar knives.  *Id.* at 20-21, 27-29.  Between 1837 and 1925, 29 states enacted laws barring the concealed carry of Bowie knives; 15 states categorically barred their carry whether concealed or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; and other states regulated Bowie knives through taxes or penalties.  *Id.* at 29.

**Clubs and Blunt Weapons** Multiple states regulated or banned weapons preferred by criminals, including clubs, bludgeons, and slungshots. *Id.* at 30-33. At least 14 states barred the carrying of "clubs" generically; the oldest such passed in 1664, and states continued passing laws through the early 1900s. *Id.* at 32. Between 1799 and the early 1900s, 15 states barred bludgeon carrying. *Id.* at 31. In addition, at least 16 states passed anti-billy club laws between 1862 and the early 1900s. *Id.* Anti-slungshot laws were enacted by 42 states between 1850 and the early 1900s, with 71 laws enacted in the nineteenth century and 12 laws enacted in the twentieth century.  *Id.* at 32.  Finally, 10 states enacted anti-sandbag laws between 1866 and the early 1900s.  *Id.* at 33.

**Trap Guns** Trap guns were devices that rigged a gun to be fired when a string or wire was tripped. *Id.* at 8. Traps guns were outlaw because they posed a significant danger to the public. *Id.* Specifically, there was likelihood that the device would harm an innocent person, and that the harm was overly harsh to protect against crimes of theft. *Id.* at 10. At least 18 states enacted laws to ban

trap guns, with New Jersey being the earliest in 1771. *Id.* at 9-10. 11 were enacted between the 1700s and 1800s, with the remaining 9 enacted in the early 1900s. *Id.* at 10.

***Punt/Pivot/Swivel Guns*** Punt, Pivot, and Swivel Guns were various types of arms that are, in essence, small cannons. *Id.* at 11. A single shot from these weapons could kill fifty to one hundred birds. *Id.* 25 states enacted 4 laws that outlawed the possession, firing, or use of such weapons. Massachusetts enacted several laws in the 1700s, while 17 states enacted laws in the 1800s, and 18 states enacted laws in the early 1900s. *Id.* at 12. While a majority of the laws concerned their use for hunting, others were enacted for general safety concerns. *Id.* Because these weapons were dangerous and unusual, they were historically banned. *Id.* at 14.

***Gunpowder*** "[G]unpowder storage laws of the eighteenth century…constituted a significant limit on the right to bear arms." *Id.* at 20. Gunpowder laws were enacted in response to, *inter alia*, the fear of fire and explosions when most structures were made of wood or other flammable materials. *Id.* at 14. Safe storage laws were enacted even though they "made it more difficult for people to load their guns quickly to defend themselves from attack." *Id.* In total, 49 states enacted 228 laws, with 6 colonies enacting 10 laws in the 1600s, 8 states/colonies enacting 20 laws in the 1700s, 175 laws passed in the 1800s, and 76 laws in the 1900s until 1934. *Id.* at 15-16. These laws determined the amount of gunpowder that could be kept, the type of container to be used, how gunpowder could be used, how it could be transported, and even restricted to whom it could be sold to. *Id.* at 15-17.

## ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party. *Cunningham v. M & T Bank Corp.*, 814 F.3d 156, 160 (3d Cir. 2016). To defeat summary judgment, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48 (1986); *Merke v. Lockheed Martin*, 2016 WL 1105401, at *2 (3d Cir. Mar. 22, 2016) ("[T]he non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]"). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247-48. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Id.* Mere speculation, conclusory allegations, and bare denials are insufficient to raise a genuine issue of material facts. *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 (3d Cir. 1990).

A.G. Jennings is entitled to summary judgment on all claims. First, the Bans do not violate Plaintiffs' Second Amendment rights because the banned items are not entitled to any Second Amendment protection. Even if they were, the Bans pass constitutional muster. Because the Bans are constitutional, there is no Fifth Amendment taking. Further, the Instructions Ban does not implicate Plaintiffs' First Amendment rights because it does not target speech, and even if it did, the statute is lawful. Finally, Plaintiffs cannot bring Fourteenth Amendment claims.

## I.     The Ghost Guns and Ghost Frames Bans do not violate the Second Amendment.

### A.  The Second Amendment Standard.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.  "Like most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever

and for whatever purpose." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *Heller I*, 554 U.S. at 626).

      *Bruen* sets the standard for Second Amendment challenges. Under *Bruen*, the Court must first determine if the plain text of the Second Amendment covers the individual's conduct. *Id.* at 2129-30. If not, "then the Second Amendment does not apply, and the regulation is constitutional." *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 590 (D. Del. 2023) (interpreting *Bruen*). If the conduct is covered under the Second Amendment, then "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

    **B.** **Plaintiffs have failed to demonstrate that the banned items are covered under the Second Amendment.**

      Plaintiff bears the burden of demonstrating that their conduct is covered by the Second Amendment. *Delaware State Sportsmen's Ass'n, Inc.* 664 F. Supp. 3d at 590; *see also Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1194 (7th Cir. 2023) (holding that plaintiffs bear the burden of showing that a weapon is eligible for Second Amendment coverage); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 388 (D.R.I. 2022), *aff'd*, 2024 WL 980633 (1st Cir. Mar. 7, 2024) (holding that plaintiff bore the burden of showing large capacity magazines were covered under Second Amendment); *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1042 (4th Cir. 2023), *reh'g en banc granted,* 2024 WL 124290 (4th Cir. Jan. 11, 2024) (finding that plaintiffs bore the burden to show that their conduct was covered under the Second Amendment); *Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979, at *15 (D. Conn. Aug. 3, 2023) (holding that "*Bruen* and *Heller* make clear that [p]laintiffs have the burden of making the initial showing that they are seeking to possess or carry firearms that are in common use today for self-defense and are typically possessed by law-abiding citizens for that purpose." (internal quotations omitted)); *Rupp, et al., v.*

*Bonta*, 2024 WL 1142061, at *9 (C.D. Cal. Mar. 15, 2024) (finding "the burden on Plaintiffs to make a showing that would bring them within the ambit of Second Amendment."); *Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017253, at *9 (D. Colo. Aug. 7, 2023) ("plaintiffs must show their conduct is covered by the Second Amendment") *Oregon Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 799 (D. Or. 2022) (finding that plaintiff had the burden to show the ban items were "in common use today for self-defense and thereby covered by the plain text of the Second Amendment" (internal quotations omitted)). Only if plaintiffs show that "the Second Amendment's plain text covers an individual's conduct, [will] the Constitution presumptively protect[ ] that conduct." *Bruen*, 142 S. Ct. at 2129-30. To meet this threshold burden, plaintiffs must demonstrate that the "textual elements" of the Second Amendment's operative clause apply to the conduct being restricted. *Id.* at 2134 (quoting *Heller I*, 554 U.S. at 592). Thus, plaintiffs must show that that the regulated item fits within the category of "bearable arms," *id.* at 2132, and that it is "commonly used" for self-defense purposes, *id.* at 2138. *See, e.g.*, *id.* at 2134-35 (citation omitted) (before determining whether restriction was "consistent with this Nation's historical tradition of firearm regulation," Supreme Court confirmed that plaintiffs were "part of 'the People' whom the Second Amendment protects" and that "handguns are weapons 'in common use' today for self-defense"). The relevant question is whether the arm is "in 'common use' for self-defense today." *Bruen,* 142 S. Ct. at 2143 (citing *Heller I*, 554 U.S. at 627).

In the instant case, Plaintiffs failed to meet their burden demonstrating that the items at issue are covered under the plain text of Second Amendment. Plaintiffs fail to submit any evidence that unfinished firearm frames or receivers with no serial number, the firearms created from these items, or untraceable firearms are in common use for self-defense. In fact, there is no record evidence that these items are in common use for any lawful purpose. Indeed, the "presence or

absence of serial numbers on firearms has no effect on their functionality, and one is hard pressed to imagine why any law-abiding citizen would want to own a gun with no identifying serial numbers." Spitzer Dec. at 5. Thus, ghost guns and unserialized frames and receivers are not entitled to any Second Amendment protection, and the Bans should be upheld on that fact alone.

Nor could Plaintiffs meet such a burden. A ban on unfinished firearm frames or receivers with no serial number are not even covered under the Second Amendment because they do not "prohibit people legally entitled to bear arms from purchasing a firearm or, for that matter, from buying unfinished frames and receivers and then making them into fully functional firearms; they must simply buy serialized parts from a licensed dealer after undergoing the same background check as any other firearms purchaser." *New York v. Arm or Ally, LLC*, 2024 WL 756474, at *13 (S.D.N.Y. Feb. 23, 2024). Such a ban concerns "unregistered firearms being sold to ineligible purchasers — thus fall outside the text of the Second Amendment, along with, for example, the very regulations that dictate who is and is not legally entitled to bear arms." *Id.* (citing *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (emphasizing that the Second Amendment does not foreclose regulations that require "fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force")). The same reasoning applies here. Plaintiffs are not prohibited from making their own firearms or possessing firearms. Rather, they must simply obtain firearms or components that have a serial number.

### C. Even if the Bans implicate the Second Amendment, they are constitutional because they are consistent with this Nation's historical tradition of firearm regulation.

Even if a plaintiff meets their initial burden, the government may nonetheless "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm

regulation." *Bruen*, 142 S. Ct. at 2130.  In conducting this historical inquiry, "[c]ourts are …
entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6.

In *Bruen*, the Supreme Court explained that "history guide[s] our consideration of modern
['arms'] regulations that were unimaginable at the founding." *Id.* at 2132.  "[C]ases implicating
unprecedented societal concerns or dramatic technological changes," like the instant case, "may
require a more nuanced approach." *Id.*   Under *Bruen*, this Court's historical inquiry into the
Statutes should be guided by "historical inquiry" and "reasoning by analogy." *Id.* at 2133.  *Bruen*
does not require a historical "twin."   Rather, "analogical reasoning requires only …. a well-
established and representative historical *analogue*." *Id.* (cleaned up and emphasis in original).
"[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be
analogous enough to pass constitutional muster." *Id.*

 "[W]hether a historical regulation is a proper analogue for a distinctly modern firearm
regulation requires a determination of whether the two regulations are '*relevantly similar*.'"
*Bruen*, 142 S. Ct. at 2132 (emphasis added).   *Bruen* identifies two "central" "metrics":
"[1] whether modern and historical regulations impose a comparable burden on the right of armed
self-defense and [2] whether that burden is comparably justified." *Id.* at 2133 (cleaned up).

Regarding the challenged Bans, there are multiple "relevantly similar" analogues,
especially given the unprecedented societal concerns and dramatic technological changes
associated with ghost guns and the like.  American history is replete with regulations on the right
to bear those arms viewed as presenting a particular threat to society from violence and crime.

**Clubs, bludgeons, Bowie knives**  Early in the Nation's history, the firearms of the time—
technologically quite different from modern-day guns—were not viewed as a concern for violence
and crime.  As such, concern with violent crime focused on more rudimentary weapons such as

clubs, bludgeons, fighting knives, and slungshots. As violent crime began to surge in the early 1800s, states increasingly regulated these weapons. Indeed, various states enacted prohibitions on these weapons throughout the nineteenth century. A notable example is the Bowie knife. Popularized by adventurer Jim Bowie in the notorious "Sandbar Duel" in 1827, the Bowie knife, along with similar long, thin-bladed knives, became a weapon used for fights and duels in the nineteenth century. Bowie knives were responsible for a large share of the rising number of homicides in the early nineteenth century, and state governments reacted with anti-knife legislation. Between 1837 and 1925, 29 states enacted laws to bar the concealed carry of Bowie knives and 15 states categorically barred their carry outright.

These laws are a historical analogue as they address the same concerns of their time that the Bans address today; they sought to outlaw weapons connected with violent crime and criminality. In fact, many of the nineteenth-century laws prohibiting clubs, fighting knives, and slungshots were *more restrictive* than the Bans at issue because they do not actually restrict possessing firearms, they only require serialized parts. In the case of the nineteenth-century laws, that burden was directed at a concern with the threat of violence and crime associated with the weapons at issue. So too here. While firearms are of course many times *more* dangerous than clubs, bludgeons, Bowie knives, and the like, legislatures in early America repeatedly imposed restrictions and prohibitions on those weapons based on a concern with a threat of violence and criminality analogous to the Delaware General Assembly's modern-day concern with ghost guns and unfinished frames and receivers with no serial number.

**Trap Guns** The laws addressing trap guns are another historical analogue to the laws at issue. Trap guns were self-made devices that had to be outlawed because they posed too high a risk to the safety of the general public. Here, the ban on ghost guns and unfinished frames and

receivers with no serial address a similar issue: that SMFs and the like must be banned because they are homemade devices that pose too high of a risk to public safety.

**Punt/Pivot/Swivel Guns** The laws restricting these types of weapons are also historical analogues to the Bans at issue. Law restricting punt guns and the like demonstrate that America historically banned dangerous and unusual weapons. Ghost guns and unserialized unfinished frames and receivers are no different. As discussed, *supra*, these weapons were dangerous, and not in common use, and thus unusual.

**Gunpowder** The historical laws governing gunpower are also analogous to the Ghost Gun and Ghost Receiver Bans. The gunpowder laws did not ban all access to gunpowder. Rather, they implemented rules governing the amount that could be possessed and how it must be stored to address safety concerns of fire and explosion. Here, the Ghost Gun and Ghost Receiver Bans do the same. They do not ban all access to firearms. Rather, the place conditions that allow firearms and certain firearm components to be traced in the event they are used for a crime, and require that an individual undergo a background check before obtaining the items.

In sum, they are numerous historical analogues to establish that the ban on ghost guns and unfinished frames and receivers with no serial numbers are consistent with this Nation's historical tradition of firearm regulation. Therefore, the Bans do not violate the Second Amendment.

## II.      HB 125 does not violate the Fifth Amendment.

Plaintiffs' takings claim fails because neither a physical nor regulatory taking has occurred.

Physical Taking: HB 125 does not effect a physical taking. The Takings Clause expressly prohibits the taking of "private property . . . *for public use, without just compensation*." U.S. Const. Amend. V (emphasis added). A physical taking of property occurs only "[w]hen the government physically takes possession of an interest in the property for some public purpose." *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). HB 125 is a prohibition

15

against unserialized and untraceable firearms and unserialized, unfinished receivers and firearms frames. It does not transfer title of the unfinished receivers or unserialized firearms to the government, nor is there any indication that the State of Delaware intends to put the devices to its own use. Federal courts have already rejected the takings argument made by plaintiffs in other cases challenging similar regulations on unserialized firearms as well as in connection with bump-stock bans. *Fahr v. City of San Diego*, 2021 WL 4895974, at *12 (S.D. Cal. Oct. 20, 2021); *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 366 (4th Cir. 2020); *McCutchen v. United States*, 145 Fed. Cl. 42, 54 (2019), *aff'd* 14 F.4th 1355 (Fed. Cir. 2021).

Regulatory Taking: A government does not need to compensate owners when it prohibits a type of personal property through a valid law. *Maryland Shall Issue, Inc.*, 963 F.3d at 366-67. The police power exception of the Takings Clause provides that "[a] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking." *Mugler v. Kansas*, 123 U.S. 623, 668 (1887). "If [a law] is otherwise a valid exercise of the [government's] police powers, the fact that it deprives the property of its most beneficial uses does not render it unconstitutional." *Goldblatt v. Hempstead*, 369 U.S. 590, 592 (1962) (citations omitted). HB 125 seeks to regulate ghost guns to eliminate unserialized, untraceable firearms, thereby promoting and protecting the public health, safety, and general welfare of the citizens of the State of Delaware.

Several other courts analyzing firearms restrictions in the context of the police power exception to the Takings Clause have reached similar conclusions. *See Fahr*, 2021 WL 4895974, at *13 (holding that prohibition on unserialized firearms and firearms components did not constitute a physical or regulatory taking); *Adkins v. United States*, 82 Fed. Cl. 619, 623-24 (2008)

(holding that prohibition on the sale of machine guns to anyone other than law enforcement agencies did not constitute a physical or regulatory taking); *Rupp v. Becerra*, 2018 WL 2138452, \*8-\*9 (C.D. Cal. May 9, 2018) (dismissing a takings claim on the grounds that a California prohibition on certain weapons represented an exercise of police power and not a taking). HB 125 represents a valid exercise of the State's police power and therefore summary judgment is appropriate for Plaintiffs' Takings Claim.

### III.     HB 125 does not violate the First Amendment.

#### A.  The Instructions Ban is not the publishing of an item of expressive speech.

Although "speech" under the First Amendment is not limited to written or spoken words, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995), the Supreme Court has made clear that the First Amendment does not encompass all types of conduct. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("[W]e have rejected the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.'" (quotations omitted)). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley*, 515 U.S. at 569.

The Instructions Ban does not prohibit the mere publication or distribution of ideas. The files at issue are essentially blueprints that can be used with a three-dimensional printer to automatically generate firearms and firearms components.  Indeed, this Court was "skeptical that § 1463(c)(2) implicates the First Amendment." D.I. 38 at 16, fn. 15.

#### B.  The Instructions Ban is a valid, content-neutral regulation of Plaintiffs' conduct that does not infringe First Amendment Rights.

The Instructions Ban is not a content-based speech restriction subject to strict scrutiny. "[R]egulations that are unrelated to the content of speech" receive less demanding First

17

Amendment scrutiny because they "pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). When the purpose of imposing a regulation is "justified without reference to the content of the regulated speech," the regulation is content-neutral. *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 (1984). It is the State's purpose, not other factors, that is the "controlling consideration" in this determination. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

HB 125 regulates the conduct of distributing untraceable firearms for the purpose of advancing public safety. The computer files subject to the Instructions Ban function to automatically produce such weapons or their components. Whatever expressive value may exist in the theory of these files, they function to create a firearm. Thus, the State may restrict their distribution on the basis of their functionality to create untraceable firearms. HB 125 is not the product of government hostility toward the spread of ideas about 3D printing of firearms, but rather against the means to easily do so.  Accordingly, HB 125 is not directed at the content of expression and strict scrutiny does not apply to a First Amendment analysis of the Instructions ban. Indeed, this Court also found strict scrutiny inapplicable here. D.I. 38 at 18.

Under intermediate scrutiny, the State's regulation of "'speech' and 'non-speech' elements [] united in a course of conduct" must be sustained if it is "within the constitutional power of the government, it furthers an important or substantial government interest, the government interest is unrelated to the suppression of free expression, and the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010) (quoting *U.S. v. O'Brien*, 391 U.S. 367, 376 (1968)). As set forth above, these standards are met by HB 125.  Accordingly, the Instructions Ban is constitutional under the First Amendment.

18

**C.  The Instructions Ban is not a facially unconstitutional prior restraint.**

The Instructions Ban is not an unlawful prior restraint on speech. "The doctrine of prior restraint originated in the common law of England, where prior restraints of the press were not permitted, but punishment after publication was." *Alexander v. U.S.*, 509 U.S. 544, 553 (1993). The classic administrative prior restraint is often described as a licensing scheme for speech, where the plaintiff's right to speak is conditioned on a prior approval from the government. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988). Such a prior restraint is contrasted with prohibitions on certain speech enforced by punishment *after* the fact, which is not a prior restraint. *See id.* at 764. The Instructions Ban does not represent a licensing scheme or a prior restraint. Nor is it directed at expressive speech, but instead is directed to addressing the act of distributing untraceable firearms and related technical data, a category of conduct that is not characteristically expressive. This Court also found no prior restraint. D.I. 38 at 20.

**D.  The Instructions Ban is not unconstitutionally overbroad.**

Overbreadth is an exception to the prudential standing requirement that a plaintiff may only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In circumstances where a regulation is alleged to be so broad that it is incapable of any permissible application, courts may allow a party to bring a facial challenge to a statute because it threatens others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and plaintiffs must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep." *Id.* at 615.

19

Plaintiffs' overbreadth claim cannot meet these standards. First, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *U.S. v. Hicks*, 980 F.2d 963, 969 (5th Cir. 1992) (quoting *Brockett v. Spokane Arcades*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* Here, as the Supreme Court observed in *Brockett*, Plaintiffs do not allege any "want of a proper party to challenge the [statute], no concern that the attack on the [statute] will be unduly delayed or protected speech discouraged." 472 U.S. at 504. Indeed, this Court found that the Instructions Ban was not overbroad. D.I. 38 at 20.

Second, even if the merits of Plaintiffs' overbreadth claim are reached, the Instructions Ban has a substantially permissible purpose. It serves the vital purpose of ensuring public safety. Accordingly, no substantial overbreadth exists here, and Plaintiffs are not likely to succeed on this claim. *See U.S. v. Chi Mak*, 683 F.3d 1126, 1136 (9th Cir. 2012) (rejecting overbreadth challenge).

## IV.   Plaintiffs' Fourteenth Amendment claims fail.

When "a constitutional claim is covered by a specific constitutional provision … the claim must be analyzed under the standard appropriate to that specific provision, not under" the Fourteenth Amendment. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (citation omitted). Because all of Plaintiffs' claims are govern by specific constitutional amendments, they do not have separate Fourteenth Amendment claims.

## <u>CONCLUSION</u>

WHEREFORE, A.G. Jennings respectfully requests that this Honorable Court grant her Motion for Summary Judgment and enter judgment in her favor.

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

*/s/ Kenneth L. Wan*
Patricia A. Davis (No. 3857)
Kenneth L. Wan (No. 5667)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Date: March 25, 2024          *Attorneys for Defendant*

21