# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREARMS POLICY COALITION, INC., | : : : | C.A. No. 1:21-cv-01523-MN |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| KATHY JENNINGS, Attorney General of Delaware, | : : | |
| | : | |
| Defendant. | : | |

## EXHIBITS TO DEFENDANT'S OPENING BRIEF IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

Patricia A. Davis (No. 3857)
Kenneth L. Wan (No. 5667)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400

Date: March 25, 2024                    *Attorneys for Defendant*

## <u>TABLE OF EXHIBITS</u>

**A.  DECLARATION OF DANIEL WEBSTER, SEPTEMBER 29, 2023**

**B.  DECLARATION OF ROBERT SPITZER, SEPTEMBER 28, 2023**

**C.  DECLARATION OF BRIAN DELAY, SEPTEMBER 29, 2023**

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREARMS POLICY COALITION, INC., | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | C.A. No. 1:21-cv-01523-MN |
| KATHY JENNINGS, Attorney General of Delaware, | : : : | |
| Defendants. | : : : : | |

### DECLARATION OF DANIEL W. WEBSTER

I, Daniel Webster, the undersigned, declare as follows:

1.      I am Bloomberg Professor of American Health in Violence Prevention in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health.  For 21 years, I served as director or co-director of an academic center focused on research to inform firearm policy.  I currently serve as Distinguished Scholar for the Johns Hopkins Center for Gun Violence Solutions.  I previously served as Co-Director of the Johns Hopkins Center for the Prevention of Youth Violence.

2.      I have been asked by the Delaware Department of Justice to provide information and my opinion about current research relevant to unserialized privately-made firearms (PMFs) use in crime and how the growing availability of PMFs affects criminal acquisition of and use of

1

firearms to commit violent crime, and gun trafficking to supply individuals in the underground gun market.   I have provided my services at the hourly rate of $600.

## BACKGROUND AND QUALIFICATIONS

3.      I began my career in public safety research in 1985 as a Research Associate at the University of Michigan's School of Public Health, and I have devoted most of my research since then to gun-related violence and its prevention. I have a Master of Public Health degree from the University of Michigan and a doctorate in Health Policy and Management from the Johns Hopkins School of Public Health.  This graduate training included many advanced courses in epidemiology, research methods, and statistical analysis.

4.      Immediately prior to joining the faculty at Johns Hopkins, I directed a program on violence research at the Washington (D.C.) Hospital Center.  I joined the faculty of the Johns Hopkins School of Public Health in 1992, and since 2010 have been a tenured Professor of Health Policy and Management.  I teach graduate courses on violence prevention.  Previously, I taught courses in research and evaluation methods at Johns Hopkins, directed the Ph.D. program in Health and Public Policy, and served on the steering committee of a pre- and post-doctoral training program in violence prevention research funded by the National Institutes of Health.

5.      I have directed numerous studies related to gun violence and its prevention.  I have published 152 scientific articles and nine invited commentaries in academic peer-reviewed journals, the vast majority of these addressed some aspect of violence and/or firearm injuries and their prevention.  I am the lead editor of a book entitled *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* by Johns Hopkins University Press (2013), and I am the lead author for two chapters and co-author on three other chapters in this book.  In addition, I recently served as special editor or co-editor of three special issues on gun violence for top tier

2

public health journals.  A true and correct copy of my curriculum vitae, detailing my qualifications and these publications, is attached as Exhibit A to this report.

## SUMMARY OF OPINIONS

### I.      Firearm violence is a major threat to the health and safety of Americans generally and of Delaware residents specifically

6.      In 2021, the Centers for Disease Control and Prevention recorded 20,958 homicides committed with firearms for a rate of 6.3 per 100,000. In this same year, 80 Delaware residents died due to homicides committed with firearms, a rate of 8.0 firearm homicides per 100,000 population – 27% higher than the national average – making Delaware the state with the 14th highest rate of firearm homicides. In 2021, Delaware law enforcement agencies reporting crime data reported 1,395 aggravated assaults with firearms and 242 robberies with firearms. The enormous social costs of firearm violence goes well beyond lives lost and injuries incurred. Many who are not directly victimized by gun violence are traumatized by their exposure to gun violence and the cost of living in fear.

7.      Most violent crime committed with firearms in Delaware do not result in an arrest, but a substantial portion of arrests of persons for committing robberies with firearms (33 of 87 in 2021 or 38%) and aggravated assaults with firearms (139 of 439 in 2021 or 32%). Law enforcement agencies do not report whether individuals who are arrested for committing violence crimes had been previously prohibited from possessing firearms, but special studies indicate that most violent offenders who are convicted of violent offenses with firearms had previous convictions or other conditions which prohibited them from legal possession of firearms.[1]

---

[1] Katherine A. Vittes, Jon S. Vernick, and Daniel W. Webster. (2013) Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership. *Injury Prevention*, Vol. 19:26-31. doi: 10.1136/injuryprev-2011-040290

## II.     While criminal use of unserialized, privately-made firearms is difficult to measure, data suggests that it is increasing dramatically

8.     A recent report from the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) reported that between 2017 and 2021, information on 37,980 privately-made firearms was submitted to the ATF's crime gun tracing center. The agency indicates that this is likely to represent a significant undercount of PMFs used in crime because most law enforcement agencies do not have specific policies and protocols for tracking PMFs used in crime and there is no incentive to report PMFs to the ATF because the ATF is very rarely able to trace such guns because serial numbers are integral to the firearm tracing process. The number of PMFs recovered by law enforcement and reported to the ATF grew by more than 1000% between 2017 and 2021. The historic surge in gun violence across the United States in 2020 and continuing into 2021 coincided with a 125% increase in reports to the ATF of PMF recoveries by law enforcement between 2019 and 2021.



*Figure OFT-04: Suspected PMFs Recovered and Traced, 2017 – 2021*

9.      Given the relatively recent emergence of PMFs among guns used in crime, there has been relatively little formal research on PMFs. A recent study used data from Oakland, California to examine recent changes in gun violence in that city and the types of firearms recovered. From 2017 to 2021, the rate of firearm homicides in Oakland increased by 69 percent (15.2 to 26.6 per 100,000 population).[2] Over this same period, the percentage of guns recovered by Oakland Police Department that were PMFs increased from 1.4% to 24%. (A similar surge in law enforcement recoveries of unserialized PMFs has been documented statewide in California, a state with comprehensive firearm sales regulations that constrain the local supply guns into the underground market, reaching 1 in 5 of every gun linked to crime.[3]) The crimes associated with PMFs in Oakland over this period included 41 homicides and 66 nonfatal shootings. After statistically controlling for other factors, researchers found that the odds that a police-recovered firearm was a PMF increased by 521.6% from the pre-pandemic (2017-2019) to the pandemic era of elevated gun homicide rates (2020-2021). Furthermore, after controlling for other factors, researchers found that PMFs were 33.3% more likely than other types of recovered firearms to be used in the commission of a violent crime. These findings are consistent with the hypothesis that PMFs are marketed to supply firearms to violent criminals as the end users. The authors of the study concluded, "These analyses suggest that PMFs have become a weapon of choice for violent

---

[2] Anthony A. Braga, Lisa M. Barao, Garen J. Wintemute, Steve Vale, and Jamie Valente. (2022) Privately manufactured firearms, newly purchased firearms, and the rise of gun violence. *Preventive Medicine*,
 https://doi.org/10.1016/j.ypmed.2022.107231
[3] Hannah S. Laqueur, Christopher McCort, Colette Smirniotis, Sonia Robinson & Garen J. Wintemute. (2023) Trends and sources of crime guns in California, 2010-2021. *Journal of Urban Health*, https://link.springer.com/article/10.1007/s11524-023-00741-y

gun criminals as they currently represent nearly 1 in 4 guns recovered by the OPD and do not plausibly account for that share of guns entering firearms commerce."[4]

### III. Individuals barred from legal purchase and possession of firearms (e.g., felons, underage youth) and traffickers are likely to prefer privately made, unserialized firearms for use in crime.

10.     The same principles of microeconomics apply to underground markets as do for "above ground" or legal markets that operate within some degree of public view. Potential buyers consider the costs and benefits of products and potential suppliers of those products seek to maximize their benefits relative to the costs. The costs and benefits are not limited to the price of the goods, but also include nonfinancial transaction costs or benefits. Such transaction costs include inconvenience, time and effort required to make the purchase or sale, risk of being arrested and incarcerated, risk of physical assault or robbery, and risks of acquiring a defective product. In the context of underground gun markets, a large national survey of persons incarcerated in state prisons finds that only 10% of persons who were armed with a gun when committing the offense leading to their incarceration had purchased a firearm directly from a licensed dealer.[5]  Firearms were most commonly obtained from street sources, family, and close friends. In a study using data from this national survey of prison inmates in 2004, we found that only 20% of those who were legal to possess the firearms that they used to commit a crime obtained the gun used from a gun store or pawn shop, often using street sources, family, and friends to obtain guns.[6] Yet those involved in crime are wary of the risks of obtaining a used firearm on the underground market that

---

[4] Braga et al. 2022 at page 6.
[5] Lauren Alper and Lauren G. Beatty. Source and Use of Firearms Involved in Crime: Survey of Prison Inmates, 2016. Bureau of Justice Statistics, U.S. Department of Justice, Washington, DC. March 2021. https://bjs.ojp.gov/content/pub/pdf/suficspi16.pdf
[6] Vittes, Vernick, and Webster in 1 above, Table 3.

might have been used in a prior crime and prefer to get guns that are "fresh" or "out of the box."[7] These data, including data from large national surveys, suggest that individuals who commit violent crimes with firearms prefer to obtain firearms without background checks and record-keeping that would allow law enforcement to link them to a particular firearm.

11.     It is important to note that supply constraints – few trusted suppliers of preferred guns – in the underground market does restrict criminal access to firearms. In a study that I co-authored of individuals on parole or probation in Baltimore, Maryland who had some experience in the underground gun market, more than half of these were unsuccessful in their most recent attempt to obtain a firearm due to cost- or source-related barriers.[8] Additional data supports the idea that not all criminals are able to access firearms. Although use of a firearm makes robbery much easier than not having a firearm and most individuals who commit robberies do it a lot, only 40% of robberies in the U.S. involve assailants' use of a firearm and the share of robberies that involve use of a firearm varies greatly across states with states with the highest prevalence of gun ownership have a higher share of robberies committed with a firearm and low gun ownership states have proportionately fewer robberies committed with firearms.[9]

12.     Surveys of firearms traffickers do not exist; however, it seems likely that they are aware that avoiding background checks, record-keeping, and the traceability of firearms to them as sellers lowers their risks and costs of doing business in the underground gun market. That is

---

[7] Daniel W. Webster, Loraine H. Freed, Shannon Frattaroli, Modena H. Wilson. (2002)  How delinquent youth acquire guns: Initial versus most recent gun acquisitions. *Journal of Urban Health* Vol. 79:60-69.

[8] Cassandra K. Crifasi, Shani A. L. Buggs, Marisa D. Booty, Daniel W. Webster, and Susan G. Sherman. (2020) Baltimore's Underground Gun Market: availability of and access to guns. *Violence and Gender* https://doi.org/10.1089/vio.2019.0054

[9] Anthony A. Braga and Philip J. Cook. (2023) *Policing Gun Violence: Strategic Reforms for Controlling Our Most Pressing Crime Problem.* New York: Oxford University Press. Page 39.

why traffickers obtain firearms through unregulated transactions at gun shows in states with weak gun sales regulations and from street sources and sometimes attempt to obliterate serial numbers from guns that they traffic to criminals.[10]

13.     It is easy to see that an unserialized PMF that does not involve a background check nor record-keeping of a serialized gun would lower the transaction costs of sellers and purchasers of firearms in the underground market by greatly reducing the likelihood of being arrested and incarcerated for illegally transferring or possession of firearms. It is well documented that successful gun trafficking investigations often start with or have as an important step an examination of the traces of firearms used in crimes to identify persons suspected of supplying firearms to criminals.[11] Firearms that do not require background checks of the purchaser, do not have a paper trail of records and unique serial numbers have greatly reduces the risk of apprehension and legal sanctions including incarceration for sellers and buyers. Potential reliability concerns and reduced selection of types of firearms or firearm features for PMFs in comparison to firearm manufactured and sold by licensed dealers suggest that the unique benefits to traffickers and persons engaged in crime to having firearms that are untraceable and without pre-sale background checks outweigh the downsides of PMFs as consumer options.

---

[10] Anthony A. Braga, Garen J. Wintemute, Glenn L. Pierce, Philip J. Cook, and Greg Ridgeway. (2012) The empirical evidence on illegal gun market dynamics. *Journal of Urban Health*, Vol. 89(5):779-93. doi: 10.1007/s11524-012-9681-y.

[11] Anthony A. Braga and Peter L. Gagliardi.  Enforcing federal laws against firearms traffickers: Raising operational effectiveness by lowering enforcement obstacles. (2013) Pages 109-122 in Daniel W. Webster and Jon S. Vernick, Eds. *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.* Johns Hopkins University Press.

#### IV.    Unserialized privately-made firearms likely expand the supply of guns available to prohibited and dangerous individuals and increase high-risk gun acquisition.

14.    The principles of microeconomics predict and empirical evidence demonstrates that if the cost of a product decreases while the supply and demand for the product increases, the result is more units of the product are purchased.[12] As explained above, unserialized PMFs significantly reduce the transaction costs associated with selling and buying firearms on the underground market for potential traffickers, potential purchasers who are legally prohibited, as well as others who may be engaged in illegal activities but are not proscribed purchasers. If unserialzed PMFs were simply offering substitutes for other guns in the underground gun market and not expanding the number of guns in that market,  there would be declines in the number and share of crime guns with classic markers of straw purchases and related methods of diversion – time from sale to crime involvement less than 12 months - and declines in the number of crime guns with obliterated serial numbers and in thefts of guns. Yet, nationally, the number and share of crime guns with sale to crime intervals under 12 months increased significantly between 2017 and 2021 and the number of recovered firearms with obliterated serial numbers – another strong indicator of trafficking – and crime guns that were part of multiple firearm sales transactions also increased over this period.[13] Similar patterns were reported in an in-depth study of crime guns in California.[14] National trends in firearms stolen from homes and motor vehicles are not reported by any Federal law enforcement agency. However, a recent published study using data from the FBI's Uniform Crime Reporting

---

[12] Paule Krugman and Robin Wells. (2017) *Microeconomics, 5th Edition.* Worth Publishers.
[13] Bureau of Alcohol, Tobacco, Firearms and Explosives. National firearms commerce and trafficking assessment (NFCTA): firearms in commerce - volume two. Part III, Crime Guns Recovered and Traced Within the United States and Its Territories.  https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.
[14] Laqueur et al. 2023 above.

program noted sharp increases in thefts of firearms, especially from motor vehicles, associated with many states relaxing regulations on carrying guns outside the home.[15]  Another indicator of the availability of firearms to dangerous individuals – the percentage of homicides committed with firearms – also increased from 74 percent in 2018 to 81 percent in 2021.[16] Combined, these various data points support the hypothesis that the large increase in the recovery of unserialized PMFs in crime has increased access to firearms among high-risk individuals who are using those guns to commit violent crimes.

**V.   Background checks, record-keeping, and serialization of firearms are foundations of effective firearm policies to prevent firearm acquisition by prohibited persons.**

15.   Most of U.S. and state firearm policy has been based on the widely accepted premise – supported by science and legal scholarship – that some individuals are too dangerous to possess firearms. Specific policies have been developed to identify which conditions merit firearm prohibitions and what measures are taken to reduce the likelihood that prohibited individuals access firearms. To prevent dangerous and unlawful access to firearms, Federal firearm laws and regulations – often complemented by similar state policies – require that firearms that are made and sold have unique serial numbers and that licensed manufactures and retailers maintain records that allow law enforcement to trace any firearm that they recover in criminal investigations to its initial sale by an identifiable seller to an identifiable purchaser. In addition to aiding specific

---

[15] Johnathan J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philp J. Cook. (2022) More Guns, More Unintended Consequences: The Effects of Right-to-Carry on criminal behavior and policing in cities. National Bureau of Economic Research Working Paper 30190. http://nber.org/papers/w30190.

[16] National Center for Injury Prevention and Control. WISQARS Fatal Injury Reports. Centers for Disease Control and Prevention. Accessed September 28, 2023. https://www.cdc.gov/injury/wisqars/fatal/index.html

investigations to crimes of violence involving firearms, information from the traced firearm is often critical to investigations of illegal transfers and broadscale trafficking of firearms.[17]

16.     Given the public health burden of firearm violence in Delaware and the importance of keeping firearms from individuals legally prohibited from possessing firearms, it is logical that policy makers would take steps to address gaps in their laws that are intended to reduce firearm access to prohibited individuals such as their recent restrictions on the sale or purchase of unserialized PMFs. Privately made firearms are typically unserialized and have not been through the regulatory processes put in place by federal and state governments to prevent unlawful access of firearms to persons prohibited by law from possessing firearms. According to the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), unserialized PMFs "create difficulty in tracing the origins of the firearm and linking them to related crimes." [18] The ATF reports that of the more than 45,000 unserialized PMF recovered in criminal investigations, including 692 homicides or attempted homicides, and submitted for tracing to the ATF, less than one percent could be traced.[19]

---

[17] Philip J. Cook and Anthony A. Braga (2001) Comprehensive firearms tracing: Strategic and investigative use of data on firearms markets. *Arizona Law Review* vol. 43: 277-309.
Anthony A. Braga and Peter L. (2013) Gagliardi. Enforcing Federal Laws Against Firearms Traffickers: Raising Operational Effectiveness by Lowering Enforcement Obstacles. Pages 143-154 in Daniel W. Webster and Jon S. Vernick, Eds. *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.* Johns Hopkins University Press.
Daniel W. Webster and Jon S. Vernick. (2013) Spurring Responsible Firearms Sales Practices through Litigation: The Impact of New York City's Lawsuits Against Gun Dealers on Interstate Gun Trafficking. Pages  123-32 in Daniel W. Webster and Jon S. Vernick, Eds. *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.* Johns Hopkins University Press.

[18] https://www.atf.gov/firearms/privately-made-firearms
[19] U.S. Department of Justice. FACT SHEET: Privately Made Firearms (PMFs), aka "Ghost Guns," "Buy-BuildShoot" kits, and the "Frame or Receiver" Final Rule https://www.justice.gov/opa/press-release/file/1493431/download

17.     I and other scholars who have studied the acquisition of firearms for criminal use and gun trafficking have found strong evidence that firearms are diverted from the legal to illegal underground market are due to weaknesses in firearms regulations that are exploited by traffickers and individuals who use firearms to commit violent crimes.[20] States with the weakest regulations over firearms transfers – the absence of any of the policies found to reduce the diversion of guns for criminal use such as comprehensive background checks, strong firearm dealer regulation and oversight, handgun purchaser licensing, and mandatory reporting of firearm theft or loss – export a disproportionate share of firearms used in crime in states that have the strongest, most comprehensive regulations intended to promote accountability among firearm sellers.[21] Each of the policies have been found to be associated with fewer guns being diverted for criminal use also make it easier for law enforcement to investigate firearms crimes and bring violators to justice by linking individuals to specific firearms used in crime.

---

[20] Daniel W. Webster, Jon S. Vernick, Emma E. McGinty, and Ted Alcorn. "Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws," pp. 109-122 in Daniel W. Webster and Jon S. Vernick, Eds. *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.* Johns Hopkins University Press, 2013.
Tessa Collins, Rachael Greenberg, Michael Siegel, Ziming Xuan, Emily F Rothman, Shea W Cronin, and David Hemenway. (2019) State Firearm Laws and Interstate Transfer of Guns in the USA, 2006-2016. *Journal of Urban Health*, 95(3):322-336. doi: 10.1007/s11524-018-0251-9.

Daniel W. Webster and Garen J. Wintemute. (2015) Effects of policies designed to keep firearms from high-risk individuals.  Annual Reviews of Public Health. Vol. 36:21-37.

 Kahane LH. State gun laws and the movement of crime guns between states.
(2020) *International Review of Law and Economics*. Vol. 61:105871.

[21] Daniel W. Webster, Jon S. Vernick, and Maria T. Bulzachelli. (2009) Effects of state-level firearm seller accountability policies on firearms trafficking.  Journal of Urban Health Vol. 86:525-537. doi: 10.1007/s11524-009-9351-x.
Webster, Vernick, McGinty, and Alcorn (2013) above

**VI.     Delaware's law requiring unfinished frames and receivers to have serial numbers, limits on sales of unfinished frames and receivers to licensed firearm manufacturers and dealers, requiring sellers of unfinished frames and receivers to retain records of the sales, and bans untraceable firearms is consistent with what we know works to prevent the diversion of guns to prohibited persons.**

18.     Without these provisions, the system infrastructure to deter illegal transfers and illegal possession of firearms can be too easily sidestepped by the manufacture, marketing, and trafficking of unserialized and unregulated firearms.

*[Signature page appears on following page]*

Pursuant to 28 USC §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 29, 2023

_____
Daniel Webster

Exhibit A

**CURRICULUM VITAE**

**Daniel William Webster, ScD, MPH**

## PROFESSIONAL DATA

| | |
|---|---|
| *Business Address:* | Johns Hopkins Bloomberg School of Public Health |
| | Department of Health Policy & Management |
| | 624 N. Broadway, Room 580, Baltimore, MD  21205 |
| | office: 410.955.0440 |
| *E-mail:* | dwebster@jhu.edu |
| *Twitter:* | @DanielWWebster1 |

## EDUCATION AND TRAINING

| | |
|---|---|
| *Doctor of Science, 1991* | The Johns Hopkins University School of Hygiene and Public Health |
| | Department of Health Policy and Management |
| *Masters of Public Health, 1985* | The University of Michigan School of Public Health |
| | Department of Health Planning and Administration |
| *Bachelors of Arts, 1982* | The University of Northern Colorado Psychology |

## PROFESSIONAL EXPERIENCE

***Johns Hopkins University***

### *Academic Appointments*

Bloomberg Professor of American Health in Violence Prevention, 2018 – present

Professor, Health Policy & Management, Bloomberg School of Public Health, 2010 – present

Professor, Division of Public Safety Leadership, School of Education, 2010 – present

Associate Professor, Health Policy & Management, Bloomberg School of Public Health, 2001-2010

Assist Professor, Health Policy & Management, Bloomberg School of Public Health, 1995-2001

Instructor, Health Policy & Management, Bloomberg School of Public Health, 1992-1995

### *Academic Leadership*

Director, Health & Public Policy PhD Program, Bloomberg School of Public Health, 2013 – 2015

Team Co-Lead, Violence Prevention Workgroup, Bloomberg American Health Initiative, 2016 – 2022

### *Research Center Positions*

Co-Director (2022) and Distinguished Scholar (2023- ), Johns Hopkins Center for Gun Violence Solutions.

Director, Center for Gun Violence Prevention and Policy/Center for Gun Policy and Research, Bloomberg School of Public Health, 2012 – 2022.

Co-Director, Center for Gun Policy and Research, 2001-2012

Core Faculty, Center for Mental Health and Substance Abuse Policy Research, 2016 – present

Deputy Director for Research, Center for the Prevention of Youth Violence, 2005 – 2017

Core Faculty, Center for the Prevention of Youth Violence, 2000 – 2017

Core Faculty, Center for Injury Research and Policy, 1992 – present

Co-Director, Center for Gun Violence Solutions, Bloomberg School of Public Health, 2001 – 2012

### *Other Non-JHU Professional Experience*

Director of Violence Research, Washington Hospital Center, Trauma, Surgical Critical Care, and Emergency Medicine Department, Washington, DC., 1990 – 1992

Guest Researcher, National Institute on Aging; Epidemiology, Demography, and Biometry Program, Bethesda, MD, 1988

Injury Control Analyst, American National Red Cross, Washington, DC., 1986 – 1987

Research Associate II, Program for Urban Health Research, Department of Epidemiology, School of Public Health, The University of Michigan, Ann Arbor, 1985 – 1986

Research Associate I, Systems Analysis Division, The University of Michigan Transportation Research Institute, Ann Arbor, 1984 – 1985

Research Assistant I, Department of Health Behavior and Health Education, School of Public Health, The University of Michigan, Ann Arbor, 1983 – 1984

Social Worker, Department for Social Services, Cabinet for Human Resources, Commonwealth of Kentucky, Warsaw, Kentucky, 1982 – 1983

## PROFESSIONAL ACTIVITIES

### *Society Membership and Leadership - Participation on Advisory Panels and Boards*

Scientific and Expert Advisory Board, Building Blocks DC and Washington, DC's Office of Gun Violence Prevention., 2021-present.

Member, Council on Criminal Justice, Violent Crime Working Group, 2021- present.

Co-Chair of Policy Workgroup and Executive Session Member, West Creek Community of Practice for a Fair and Just Response to Gun Violence, 2019-present.

John Jay College Research Advisory Group on Preventing and Reducing Community Violence, 2020

Expert Panel on Firearms Data Infrastructure for NORC of the University of Chicago, 2019-2020

Founding member and Co-Chair, advisory board for Safe Streets Baltimore, Baltimore City Health Department and Mayor's Office for Criminal Justice, 2016 - 2020

Director, Johns Hopkins-Baltimore Collaborative for Violence Reduction, 2016 –2019

Director, Baltimore Homicide Review Commission.  City of Baltimore, 2014 – 2015

Advisory Committee on Violent Media and Gun Violence to the Directorate of the Social, Behavioral and Economic Sciences Division, National Science Foundation, 2013

Institute of Medicine, Planning Committee for Workshop on Evidentiary Base for Violence Prevention across the Lifespan and Around the World, 2012-2013

Invited participant to the Baltimore City GunStat project to provide technical assistance to law enforcement officials on gun law enforcement strategies, 2007 – present

Expert reviewer, Child Death Review Capacity Building Project, Harborview (University of Washington) Injury Prevention and Research Center, 2006

Advisory Council, California Department of Justice for planning gun violence prevention campaign, 2005 - 2009

Lethality Assessment Committee, advisory group for the Maryland Network Against Domestic Violence to develop a model lethality assessment protocol for police and providers of services to victims of intimate partner violence, 2003 - 2009

Johns Hopkins Univ. President's Council on Urban Health, Violence Working Group, 1998-2000

Baltimore City Task Force on Gunshot Wound Lethality, 1996-1997

## EDITORIAL AND OTHER PEER REVIEW ACTIVITIES

### *Journal Peer Review Activities*

Editorial Board, Journal of Urban Health, 2023-

American Journal of Epidemiology

American Journal of Preventive Medicine

American Journal of Public Health

Annals of Emergency Medicine

Annual Reviews of Public Health, Special Symposium Editor, 2014-2015

Archives of Pediatric and Adolescent Medicine Canadian Medical Association Journal

Criminology & Public Policy

Epidemiologic Reviews, Special Issue Editor 2015-2016

Guide to Clinical and Preventive Services

Health Education and Behavior, Special Issue Editorial Board Member

Health Education Research

Injury Epidemiology

Injury Prevention, Editorial Board, 2005-2010

JAMA, Journal of the American Medical Association

Journal of Crime and Delinquency

Journal of Criminal Justice

Journal of General and Internal Medicine

Journal of Health Politics, Policy, and Law

Journal of Interpersonal Violence

Journal of Policy Analysis & Management

Journal of Quantitative Criminology

Journal of Trauma

Journal of Urban Health

Journal of Women's Health

New England Journal of Medicine

Pediatrics

Politics and Policy

Preventive Medicine, Co-editor, special issue on gun violence, 2015; co-editor special issue on gun violence 2022

Proceedings of the National Academy of Sciences

Social Science & Medicine

Sothern Economic Journal

Western Criminology Review


***Grant Review***

National Center for Injury Control and Prevention, Centers for Disease Control and Prevention, Youth Violence Prevention Through Community-Level Change, April 2004

National Center for Injury Control and Prevention, Centers for Disease Control and Prevention, May 2001

National Institutes of Health, Clinical Sciences Special Emphasis Panel, Small Business Innovation Research Program, March 1999

National Center for Injury Control and Prevention, Centers for Disease Control Review Panel, June 1998

National Institute for Mental Health, Behavioral Science Track Award for Rapid Transition B/START Program, April 1998


## HONORS AND AWARDS

Inaugural (Endowed) Bloomberg Professor of American Health, 2018

Johns Hopkins University Distinguished Alumni Award, 2017

Injury Free Coalition for Kids, Pioneer Award, 2017

Leon Robertson Award for best 2016 article in Injury Epidemiology, co-author, 2017

Baltimore City Health Equity Leadership Award, 2016

David Rall Award for Science-Based Advocacy, American Public Health Association, 2015

Finalist for The Baltimore Sun's award for Marylander of the Year, 2013

Selected for Institute of Medicine Planning Committee for the Evidentiary Base for Violence Prevention Across the Lifespan and Around the World Workshop, 2012

Delta Omega Honorary Society in Public Health – Alpha Chapter, Johns Hopkins Bloomberg School of Public Health, Faculty induction, 2005

Education Award from the Maryland Network Against Domestic Violence, 2004

Delta Omega Honorary Society - Alpha Chapter Certificate of Merit, 1989

William Haddon Memorial Fellowship, The Johns Hopkins School of Public Health, 1988-1989

Public Health Traineeship, The Johns Hopkins School of Public Health, 1987-1989


**PUBLICATIONS**

***Journal Articles, Peer Reviewed***

152. Doucette ML, Crifasi CK, McCourt AD, Ward JA, Fix R, **Webster DW**. Deregulation of public civilian gun carrying and violent crimes: A longitudinal analysis 1981–2019 (wiley.com) *Criminology & Public Policy* 2023.

151. Li MM, **Webster DW**, Small DS. Examining a hypothesized causal chain for the effects of the 2007 repeal of the permit-to-purchase licensing law in Missouri: homicide guns recovered in state and within a year of purchase. *Journal of Urban Health*, forthcoming 2023.

150. Crifasi CK, Ward J, McCourt AD, **Webster D**, Doucette ML. The association between permit-to-purchase laws and shootings by police. 10, 28, *Injury Epidemiology*, 2023; *https://doi.org/10.1186/s40621-023-00439-4*

149. Ward JA, Uzzi M, Hudson T, **Webster DW**, Crifasi CK. Differences in perceptions of gun-related safety by race and gun ownership in the United States. *Journal of Law, Medicine, and Ethics*, 2023; 51:14-31.

148. Kagawa R, Charbonneau, McCort C, McCourt A, Vernick J, **Webster D**, Wintemute G. Effects of comprehensive background check policies on firearm fatalities in four states. *American Journal of Epidemiology*, accepted Dec. 22, 2022.

147. **Webster DW**, Richardson J Jr., Meyerson N, St. Vil C, Topazian R. Observations and recommendations based on a review of research on the effects of hospital-based violence intervention programs on risks for future violence. *ANNALS of Political and Social Sciences*, 2023;74(1). Published online. https://doi.org/10.1177/00027162231173323

146. Stone EM, Crifasi CK, Ward JA, Vernick JS, **Webster DW**, McGinty EE, Barry CL. National Support for Gun Policies Among U.S. Adults in 2019 and 2021. *Preventive Medicine*, 2022 Sep 7:107242. doi: 10.1016/j.ypmed.2022.107242. Online ahead of print. PMID: 36087625.

145. **Webster DW**, Gostin LO. The Supreme Court Expands Second Amendment Rights as the Nation Experiences Historic Levels of Firearms Violence. *JAMA*, 2022; 328(12):1187-1188. doi: 10.1001/jama.2022.14073. PMID: 36166019

144.  Doucette ML, McCourt AD, Crifasi CK, **Webster DW**. Impact of Changes to Concealed Carry Weapons Laws on Fatal and Non-Fatal Violent Crime, 1980-2019. *American Journal of Epidemiology*, 2022 Sep 14:kwac160. doi: 10.1093/aje/kwac160. Online ahead of print. PMID: 36104849

143.  Ward JA, McGinty EE, Hudson T, Stone EM, Barry CL, **Webster DW**, Crifasi CK. Reimagining public safety: Public opinion on police reform and gun violence prevention by race and gun ownership in the United States. *Preventive Medicine* 2022; 107180, ISSN 0091-7435, https://doi.org/10.1016/j.ypmed.2022.107180

142.  Doucette ML, Ward JA, McCourt AD, **Webster D**, Crifasi CK. Officer-involved shootings and concealed carry firearm laws: An analysis of Gun Violence Archive data, 2014-2020. *J Urban Health*. 2022 Jun;99(3):373-384. doi: 10.1007/s11524-022-00627-5. PMID: 35536393 **-Awarded best article of the year in J Urban Health (2022)**

141.  Crifasi CK, William RG, Booty MD, Owens-Young JL, **Webster DW**, Buggs SAL. Community Perspectives on Gun Violence and Safety: The Role of Policing in Baltimore City. *Journal of Criminal Justice*. 2022 https://doi.org/10.1016/j.jcrimjus.2022.101964

140.  Crifasi CK, Ward JA, McGinty EE, Barry CL, **Webster DW**. Public Opinion on Laws Regulating Public Gun Carrying. *Preventive Medicine*. 2022; vol. 159 https://doi.org/10.1016/j.ypmed.2022.107067.

139.  **Webster DW**. Public health approaches to reducing community gun violence. *Daedalus,* Reimagining Justice: The Challenges of Violence & Punitive Excess. (Winter) 2022; 151:38-48. https://doi.org/10.1162/DAED_a_01886

138.  Crifasi CK, Ward JA, McGinty EE, **Webster DW**, Barry CL. Gun purchasing behaviours during the initial days of the COVID-19 pandemic, March to mid-July 2020. *International Review of Psychiatry*. 2021 Nov;33(7):593-597. doi: 10.1080/09540261.2021.1901669

137.  Crifasi CK, Ward JA, McGinty EE, **Webster DW**, Barry CL. Public Opinion on Gun Policy by Race and Gun Ownership Status. *Preventive Medicine*. 2021; 149:106607. doi: 10.1016/j.ypmed.2021.106607. .PMID: 33984373

136.  Zeoli AM, Paruk J, Branas CC, Carter PM, Cunningham R, Heinze J, **Webster DW**. Use of Extreme Risk Protection Orders to Reduce Gun Violence in Oregon. *Criminology & Public Policy* 2021; 20:243-261. https://doi.org/10.1111/1745-9133.12544

135.  Crifasi CK, Ward JA, McGinty EE, **Webster DW**, and Barry CL. Gun Purchasing Behaviors during the Initial Phase of the COVID-19 Pandemic, March to mid-July 2020. International Review of Psychiatry, Published online 24 June 2021

https://doi.org/10.1080/09540261.2021.1901669

134.  Merrill-Frances M, McGinty EE, Barry CL, **Webster DW**, Crifasi CK. Association between gun owner attitudes and their behavior in private firearm sales. Preventive Medicine 2021 Feb 10;147:106454. doi: 10.1016/j.ypmed.2021.106454. Online ahead of print.PMID: 33581183

133.  Buggs SAL, **Webster DW**, Crifasi CK.  Using synthetic control methodology to estimate effects of a Cure Violence intervention in Baltimore, Maryland. Injury Prevention Published Online First: 08 February 2021. http://dx.doi.org/10.1136/injuryprev-2020-044056

132.  Frattaroli S, Zeoli AM, **Webster DW**. Armed, Prohibited and Violent at Home: Implementation and enforcement of restrictions on gun possession by domestic violence offenders in four U.S. localities. Journal of Family Violence, 2021 https://doi.org/10.1007/s10896-020-00241-6

131.  Crifasi CK, Boot MD, Buggs SAL, **Webster DW**, Sherman SG. Worth the risk? Gun carrying and perceived criminal justice responses in Baltimore. Injury Prevention, 2020 injuryprev-2020-043917. doi: 10.1136/injuryprev-2020-043917. Online ahead of print. PMID: 33303560

130.  Abelow H, Crifasi C, **Webster DW**.  The legal and empirical case for firearm purchaser licensing. The Journal of Law, Medicine & Ethics, 2020; 48(S2):17-24. doi: 10.1177/1073110520979397. PMID: 33404297

129. McCourt AD, Crifasi CK, Stuart ES, Vernick JS, Kagawa RMC, Wintemute GJ, **Webster DW**. Effects of Purchaser Licensing and Point-of-Sale Background Check Laws on Firearm Homicide and Suicide in Four States.  American Journal of Public Health 2020;110:1546-1552. doi: 10.2105/AJPH.2020.305822. Epub 2020 Aug 20. PMID: 32816544

128. **Webster DW**, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States. Criminology & Public Policy, 2020;19:171–212. doi.org/10.1111/1745-9133.12487

127. Trangenstein P, Eck R, Lu Y, **Webster D**, Jennings JM, Latkin C, Milam AJ, Furr-Holden D, Jernigan DH.  The Violence Prevention Potential of Reducing Alcohol Outlet Access in Baltimore, MD.  Journal of Studies on Alcohol and Drugs 2020; 81:24-33. doi: 10.15288/jsad.2020.81.24. PMID: 32048598

126. Crifasi CK, Buggs SAL, Booty MD, **Webster DW**, Sherman SG. Baltimore's Underground Gun Market: availability of and access to guns.  Violence and Gender 2020  https://doi.org/10.1089/vio.2019.0054

125. Booty M, O'Dwyer J, **Webster D**, McCourt A, Crifasi C. Describing a "mass shooting": the role of databases in understanding burden. Injury Epidemiology, 2019;6:47. doi:10.1186/s40621-019-0226-7

124. Stone E, Barry CL, Crifasi CK, **Webster DW**, Vernick JS, McGinty EE.  Support for Gun Policies among Young Adults in the U.S., 2017-2019.  Preventive Medicine 2020;135:106094. doi: 10.1016/j.ypmed.2020.106094

123. Castillo-Carniglia A, **Webster DW**, Wintemute GJ. Effect on background checks of newly enacted comprehensive background check policies in Oregon and Washington: a synthetic control approach. Injury Epidemiology. 2019;6:45. Published 2019 Nov 27. doi:10.1186/s40621-019-0225-8

122. Barry CL, Stone E, Crifasi CK, Vernick JS, **Webster DW**, McGinty EE. Trends in Americans' Support for Gun Policies.  Health Affairs 2019; 38:1727-34. doi: 10.1377/hlthaff.2019.00576

121. Crifasi CK, Stone EM, McGinty B, Vernick JS, Barry CL, **Webster DW**. Differences in public support for handgun purchaser licensing. Injury Prevention 2019 Sep 6. pii: injuryprev-2019-043405. doi: 10.1136/injuryprev-2019-043405

120. Crifasi CK, O'Dwyer JK, McGinty EE, **Webster DW**, Barry CL. Desirability of personalized guns among current gun owners.  American Journal of Preventive Medicine. 2019 Jun 7. pii: S0749-3797(19)30155-2. doi: 10.1016/j.amepre.2019.02.024. [Epub ahead of print] PMID: 31196718

119. Hasegawa RB, **Webster DW**, Small DS.  Bracketing in the Comparative Interrupted Time-Series Design to Address Concerns about History Interacting with Group: Evaluating Missouri's Handgun Purchaser Law.  Epidemiology 2019 May;30(3):371-379. doi: 10.1097/EDE.0000000000000989. PMID: 30969945 Paper was runner-up for Rothman Prize for best article in 2019

118. Zeoli AM, **Webster DW**.  Firearm policies that work. JAMA. 2019 Feb 25. doi: 10.1001/jama.2019.0706

117. Decker MR, Wilcox HC, Holliday CN, **Webster DW**.  An integrated public health approach to interpersonal violence and suicide prevention and response.  Public Health Rep. 2018 Nov/Dec;133(1_suppl):65S-79S. doi: 10.1177/0033354918800019.  PMID: 30426878

116. Crifasi CK, McCourt AD, Booty MD, **Webster DW**. Polices to Prevent Illegal Acquisition of Firearms: Impacts on Diversions of Gun for Criminal Use, Violence, and Suicide. Current Epidemiology Reports 2019; 6:238–247

115. Castillo -Carniglia A, **Webster DW**, Cerdá M, Kagawa R, Vernick JS, Wintemute GJ, Crifasi CK. California's comprehensive background check and misdemeanor violence prohibition policies, and firearm mortality.  Annals of Epidemiology 2019; 30:50-56. doi: https://doi.org/10.1016/ j.annepidem.2018.10.001

114. Trangenstein PJ, Curriero FC, **Webster D**, Jennings JM, Latkin C, Eck R, Jernigan DH.  Outlet type, access to alcohol, and violent crime. Alcoholism: Clinical and Experimental Research 2018 Nov;42(11):2234-2245. doi: 10.1111/acer.13880. Epub 2018 Sep 26. PMID: 30256427

113. Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, **Webster DW**. Association between Firearm Laws and Homicide in Large, Urban U.S. Counties, Journal of Urban Health 2018 Jun;95(3):383-390. doi: 10.1007/s11524-018-0273-3.  Correction: Oct 2018; 95 (5):773-776.  10.1007/s11524-018-0306-y

112. Barry CL, **Webster DW**, Stone E, Crifasi CK, Vernick JS, McGinty EE.  Five Years after Newton: Public Support for Gun Violence Prevention Policies among Gun Owners and Non-Gun Owners. American Journal of Public Health. Published online ahead of print May 17, 2018: e1-e4. Doi:10.2105/AJPH.2018.304432)

111. Crifasi CK, McGinty EE, Douchette M, **Webster DW**, Barry CL. Storage practices of U.S. gun owners in 2016. American Journal of Public Health, 2018; 108:532-537. doi: 10.2105/AJPH.2017.304262. Epub 2018 Feb 22.  PMID: 29470124

110. Crifasi CK, Frances M, Vernick JS, **Webster DW**. Changes in the legal environment and enforcement of firearm transfer laws in Pennsylvania and Maryland.  Injury Prevention January 13, 2018 [Epub ahead of print] as 10.1136/injuryprev-2017-042582

109. Zeoli AM, McCourt A, Buggs S, Lilley D, Frattaroli S, **Webster DW**. Analysis of the strength of legal firearms restrictions for perpetrators of domestic violence and their impact on intimate partner homicide.  American Journal of Epidemiology 2018;187(11):2365–2371. doi: 10.1093/aje/kwy174

108. Kagawa RM, Rudolph KE, Cerda M, Castillo AC, Shev BA, **Webster D**, Vernick JS, Crifasi CK, Wintemute GJ. Repeal of comprehensive background check policies and firearm homicide and suicide. Epidemiology 2018;29:494-502. doi: 10.1097/EDE.0000000000000838. PMID: 29613872

107. Castillo AC, Kagawa RM, **Webster DW**, Vernick JS, Cerda M, Wintemute GJ.  Comprehensive Background Check Policy and Firearm Background Checks in Three States.  Injury Prevention 2017; doi:10.1136/injuryprev-2017-042475

106. **Webster DW**, Buggs SAL.*  Can an Efficacious Strategy for Curtailing Illegal Drug Sales Be Counted on to Reduce Violent Crime?  Criminology & Public Policy 2017;16: 821-825

105. Stuart EA, Crifasi C, McCourt A, Vernick JS, **Webster D**.  Differing perspectives on analyzing data related to firearms and suicide.  American Journal of Public Health. 2017 Aug;107(8):e26. doi: 10.2105/AJPH.2017.303890

104. Crifasi CK, Choksey S, Buggs S,* **Webster DW**.  The initial impact of Maryland's Firearm Safety Act of 2013 on the supply of crime guns in Baltimore.  The Russel Sage Foundation Journal for the Social Sciences 2017;3(5):128-140. https://www.jstor.org/stable/10.7758/rsf.2017.3.5.06

103. Crifasi CK, Pollack K, **Webster DW**. Assaults against U.S. law enforcement officers in the line-of-duty: Situational context and predictors of lethality. Injury Epidemiology 2016; 3:29. PMID: 27885587

102. Tung GJ, Vernick JS, Stuart EA, **Webster DW**, Gielen AC. Federal Actions to Incentivize State Adoption of 0.08g/dl Blood Alcohol Concentration Laws. Injury Prevention 2016 Oct 31. doi: 10.1136/injuryprev-2016-042087. PMID: 27799290

101. Milam AJ, Buggs S*, Furr-Holden CD, Leaf P, Bradshaw CP, **Webster D**.  Changes in Attitudes towards Guns and Shootings following Implementation of the Baltimore Safe Streets Intervention. *J Urban Health*, 2016 Aug;93(4):609-26. doi: 10.1007/s11524-016-0060-y PMID: 27294969

100. Masho SW, Schoeny M, Sigel E, **Webster D**. Outcomes, data, and indicators of violence at the community level. Journal of Primary Prevention 2016;37:121-39. doi: 10.1007/s10935-016-0429-4

99. Wintemute GJ, Frattaroli S, Wright MA, Claire BE, Vittes KA, **Webster DW**.  Firearms and the incidence of arrest among respondents to domestic violence restraining orders. Injury Epidemiology, 2015; 2:14. doi: 10.1186/s40621-015-0047-2

98. Riedel LE, Barry CL, McGinty EE, Bandara SN, **Webster DW**, Toone RE, Huskamp HA. Improving Health Care Linkages for Persons: The Cook County Jail Medicaid Enrollment Initiative. J Correct Health Care. 2016 Jul;22(3):189-99. doi: 10.1177/1078345816653199.  PMID: 27302704

97. Messing JT, O'Sullivan CS, **Webster D**, Campbell J. Are Abused Women's Protective Actions Associated with Reduced Threats, Stalking, and Violence Perpetrated by their Male Intimate Partners? Violence Against Women 2016 Apr 26. pii: 1077801216640381. [Epub ahead of print] PMID: 27118689

96. Parker EM, Gielen AC, Castillo R, **Webster D**, Glass N.  Intimate partner violence and patterns of safety strategy use among women seeking temporary protective orders: a latent class analysis. Violence Against Women 2016 Mar 6. pii: 1077801216631436. [Epub ahead of print] PMID: 26951307

95. Messing JT, Campbell J, **Webster DW**, Brown S, Patchell B, Wilson JS.  The Oklahoma lethality assessment study: A quasi-experimental evaluation of the Lethality Assessment Program.  Social Service Review 2015: 89: 499-530.  DOI: 10.1086/683194

94. **Webster DW**, Cerdá M, Wintemute GJ, Cook PJ.  Epidemiologic evidence to guide the understanding and prevention of gun violence.  Epidemiologic Reviews 2016; 38(1):1-4. doi: 10.1093/epirev/mxv018. Epub 2016 Feb 10. PMID: 26905892

93. Milam AJ, Furr-Holden CD, Leaf P, **Webster D**.  Managing Conflicts in Urban Communities: Youth Attitudes Regarding Gun Violence.  J Interpersonal Violence 2016; Mar 27. pii: 0886260516639584. [Epub ahead of print] PMID: 27021734

92. Bushman BJ, Newman K, Calvert SL, Downey G, Drezde M, Gottfredson M, Jablonski NG, Masten AS, Morrill C, Neil DB, Romer D, **Webster DW**.  Youth violence: what we know and what we need to know. American Psychologist 2016;71:17-39. doi: 10.1037/a0039687

91. Wintemute GJ, Frattaroli S, Wright MA, Claire BE, Vittes KA, **Webster DW**.  Firearms and the incidence of arrest among respondents to domestic violence restraining orders.  Injury Epidemiol. 2015;2(1):14. Epub 2015 Jun 23. PMID: 27747746

90. Bandara SN, Huskamp HA, Riedel LE, McGinty EE, **Webster D**, Toone RE, Barry CL. Leveraging the Affordable Care Act to enroll justice-involved populations in Medicaid: an inventory of state and local efforts.  Health Affairs 2015;34:2044-51. doi: 10.1377/hlthaff.2015.0668. PMID: 26643624

89. Crifasi CK, Pollack K, **Webster DW**.  The influence of state-level policy changes on the risk environment for law enforcement officers.  Injury Prevention 2016; 22:274-8. doi: 10.1136/injuryprev-2015-041825.  PMID: 26718550

88. Kennedy-Hendricks A, Richey M, McGinty EE, Stuart EA, Barry CL, **Webster DW**. Opioid Overdose Deaths and Florida's Crackdown on Pain Clinics. Am J Public Health 2015 Dec 21:e1-e8. [Epub ahead of print] PMID: 26691121

87. Rutkow L, Chang HY, Daubresse M, **Webster DW**, Stuart EA, Alexander GC.  Effect of Florida's prescription drug monitoring program and pill mill laws on opioid prescribing and use.  JAMA Internal Med 2015; online August 17, 2015. doi:10.1001/jamainternmed.2015.3931

86. Crifasi CK, Meyers JS, Vernick JS, **Webster DW**. Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates.  Preventive Med. Jul 23, 2015. pii: S00917435(15)00229-7. doi: 10.1016/j.ypmed.2015.07.013. [Epub ahead of print] PMID: 26212633

85. McGinty EE, Sell TK, Wolfson JA, **Webster DW**.  Political communication about firearm policy in the United States: Competing news media messages about background check proposals in the year following the Newtown shooting.  J Health Politics, Policy, and Law, 2015 Nov 13. pii: 3445592. [Epub ahead of print] PMID: 26567381

84. Barry CL, Kennedy Hendricks A, Gollust SE, Niederdeppe J, Bachhuber MA, **Webster D**, McGinty EE. Understanding Americans' Views on Opioid Pain Reliever Abuse.  Addiction. 2015 Jul 25. doi: 10.1111/add.13077. [Epub ahead of print] PMID: 26212522

83. Rudolph KE, Stuart EA, Vernick JS, **Webster DW**.  Association between Connecticut's permit-to-purchase handgun law and homicides. American Journal of Public Health, 2015;105(8):e49-54. doi:10.2105/AJPH.2015.302703

82. Barry C, McGinty EE, Vernick JS, **Webster DW**.  Two Years after Newtown - Public Opinion on Gun Policy Revisited.  Preventive Medicine 2015 May 18. pii: S0091-7435(15)00166-8. doi: 10.1016/j.ypmed.2015.05.007

81. **Webster DW**, Wintemute GJ.  Effects of policies designed to keep firearms from high-risk individuals.  Annual Reviews of Public Health.  2015;36:21-37.  PMID: 25581152

80. McGinty EE, Frattaroli S, Appelbaum P, Bonnie R, Grilley A, Horwitz J, Swanson J, **Webster DW**.  Using research evidence to reframe the policy debate around mental illness and guns: Process and recommendations.  Am J Public Health. 2014;104(11):e22-6. doi: 10.2105/AJPH.2014.302171

79. **Webster DW**, Crifasi CK, Vernick JS.  Effects of the repeal of Missouri's handgun purchaser licensing law on homicides.  J Urban Health 2014;91:293-302. Erratum: J Urban Health 2014; 91:598-601

78. McGinty EE, **Webster DW**, Jarlenski ML, Barry CL News media framing of serious mental illness and gun violence in the United States, 1997-2012 Am J Public Health 2014;104:406-13. doi: 10.2105/AJPH.2013.301557

77. Cavanaugh CE, Messing JT, Amanor-Boadu Y, O'Sullivan CS, **Webster D**, Campbell J.  Intimate partner sexual violence: a comparison of foreign-born versus U.S.-born physically abused Latinas.  J Urban Health 2014;91:122-35. PMID: 23959640

76. McGinty EE, **Webster DW**, Barry CL. Gun policy and serious mental illness: Priorities for future research and policy. Psychiatric Services 2014;65:50-8. doi: 10.1176/appi.ps.201300141

75. Tung GJ, Vernick JS, Stuart EA, **Webster DW**. Political factors affecting the enactment of clean indoor air laws.  Am J Public Health. 2014;104(6):e92-7. doi: 10.2105/AJPH.2013.301689

74. Whitehill JM, **Webster DW**, Frattaroli S, Parker EM. Interrupting violence: How the CeaseFire program prevents imminent gun violence through conflict mediation. J Urban Health 2014;91:84-95. doi: 10.1007/s11524-013-9796-9

73. Wintemute GJ, Frattaroli S, Wright MA, Claire BE, Vittes KA, **Webster DW**. Identifying armed respondents to domestic violence restraining orders and recovering their firearms: process evaluation of an initiative in California. Amer J Public Health 2014;104:e113-8. doi: 2013.301484. PMID: 24328660

72. Vittes KA, **Webster DW**, Frattaroli S, Claire BE, Wintemute GJ. Removing guns from batterers: Findings from a survey of domestic violence restraining order recipients in California. Violence Against Women 2013; 19:602-16. doi: 10.1177/1077801213490561

71. Milam AJ, Furr-Holden D, Bradshaw CP, **Webster DW**, Leaf PJ.  Alcohol environment, perceived safety, and exposure to alcohol, tobacco, and other drugs in early adolescence.  Journal of Community Psychology 2013;41:867-883

70. McGinty EE, **Webster DW**, Barry CL. Dangerous People or Dangerous Guns? Effects of news media messages about mass shootings on attitudes toward persons with serious mental illness and public support for gun control policies. American Journal of Psychiatry 2013;170:494-501

69. Barry CL, McGinty EE, Vernick JS, **Webster DW**.  After Newtown – public opinion on gun policy and mental illness.  New England Journal of Medicine 2013;368:1077-1081. doi: 10.1056

68. Vittes KA, Vernick JS, **Webster DW**.  Common sense gun policy reforms for the United States. British Medical Journal 2012; 345:e8672. doi: 10.1136 /bmj.e8672

67. Alexander GC, **Webster DW**, Kruszewski SP.  Rethinking opioid prescribing to protect patient ]safety and public health.  JAMA 2012;308:1865-6. doi: 10.1001 /jama.2012.14282

66. Whitehill JM, **Webster DW**, Vernick JS. Street conflict mediation to prevent youth violence: conflict characteristics and outcomes.  Injury Prev 2013; 19:204-9. doi: 10.1136 /injuryprev-2012-040429

65. Vittes KA, Vernick JS, **Webster DW**. Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership.  Injury Prevention 2013;19:26-31. doi: 10.1136/injuryprev-2011-040290

64. Kercher C, Swedler DI, Pollak KM, **Webster DW**.  Homicides of law enforcement officers responding to domestic disturbance calls.  Injury Prevention 2013; 19:331-5

63. **Webster DW**, Whitehill JM, Vernick JS, Curriero FC. Effects of Baltimore's Safe Streets Program on gun violence: a replication of Chicago's CeaseFire program. J Urban Health 2013;90:27-40. doi: 10.1007/s11524-012-9731-5

62. **Webster DW**, Vernick JS, Bulzacchelli MT, Vittes KA.  Recent federal gun laws, gun dealer accountability and the diversion of guns to criminals in Milwaukee.  J Urban Health 2012;89:87-97

61. Yang C, German D, **Webster DW**, Latkin C. Experiencing violence as a predictor of drug use relapse among former drug users in Baltimore, Maryland. J Urban Health 2011;88:1044-51

60. Vernick JS, Rutkow L, **Webster DW**, Teret SP. Changing the constitutional landscape for firearms: the Supreme Court's recent second amendment decisions.  Amer. J Public Health 2011;101;2021-6

59. Franklin FA II, Pan WK, **Webster DW**, LaVeist TA.  Alcohol outlets and violent crime in the nation's capital. Western Journal of Emergency Medicine 2010;11:283-290

58. Wintemute GJ, Hemenway D, **Webster DW**, Pierce G, Braga AA.  Gun shows and gun violence: fatally flawed study yields misleading results. American Journal of Public Health 2010;100:1856-60

57. Wright MA, Wintemute GJ, **Webster DW**.  Factors affecting a recently-purchased handgun's risk for use in crime under circumstances that suggest gun trafficking.  J Urban Health 2010; 87:352-364

56. Zeoli AM, **Webster DW**.  Effects of domestic violence policies, alcohol taxes and police staffing levels on intimate partner homicide in large U.S. cities.  Injury Prevention 2010;16:90-95

55. **Webster DW**, Frattaroli S, Vernick JS, O'Sullivan C, Roehl J, Campbell JC. Women with protective orders report failure to remove firearms from their abusive partners: Results from an exploratory study.  Journal of Women's Health 2010;19:93-98

54. **Webster DW**, Vernick JS. Keeping firearms from drug and alcohol abusers. Injury Prevention 2009;15:425-7

53. **Webster DW**, Vernick JS, Bulzacchelli MT.  Effects of state-level firearm seller accountability policies on firearms trafficking.  Journal of Urban Health 2009;86:525-537. doi: 10.1007/s11524-009-9351-x. Epub 2009 May 29.PMID: 19479382

52. Snider C, **Webster D**, O'Sullivan CS, Campbell JC.  Intimate partner violence: Development of a Brief Risk Assessment for the Emergency Department.  Academic Emergency Medicine 2009;16:1-8

51. Rutkow L, Vernick JS, **Webster DW**, Lennig DJ.  Violence against women and the Supreme Court:  recent challenges and opportunities for advocates and practitioners. Violence Against Women 2009; 15:1248-1258

50. Campbell JC, **Webster DW**, Glass N.  The Danger Assessment:  Validation of a Lethality Risk Assessment Instrument for Intimate Partner Femicide.  J Interpersonal Violence 2009;24:653-674

49. Hu G, **Webster DW**, Baker SP.  Hidden homicide trends in the U.S., 1999-2004.  J Urban Health 2008;85:597-606

48. Bulzacchelli MT, Vernick JS, Sorock GS, **Webster DW**, Lees PS. Circumstances of Fatal Lockout/Tagout- Related Injuries in Manufacturing. Amer J Industrial Medicine 2008;51:728-734

47. Outwater A, Campbell JC, **Webster DW**, Mgaya E. Homicide death in Sub-Saharan Africa: A review 1970-2004. African Safety Promotion 2008;5:31-44

46. Vernick JS, Hodge J , **Webster DW**.  The ethics of restrictive licensing for handguns: Comparing the United States and Canadian approaches to handgun regulation.  Journal of Law, Medicine, and Ethics 2007;35:668-678

45. Bulzacchelli MT, Vernick JS, **Webster DW**, Lees PS. Effects of OSHA's Control of Hazardous Energy (Lockout/Tagout) Standard on Rates of Machinery- Related Fatal Occupational Injury. Injury Prevention 2007;13:334-338

44. Vernick JS, **Webster DW**. Policies to prevent firearms trafficking. Injury Prevention 2007;13:78-79

43. Weiner J, Wiebe DJ, Richmond TS, and other including **Webster D**. Reducing firearm violence: a research agenda. Injury Prevention 2007;13:80-84

42. Vernick JS, **Webster DW**, Bulzacchelli MT.  Regulating firearms dealers in the United States: an analysis of state law and opportunities for improvement.  J Law Med and Ethics 2006;34:765-775

41. Vernick JS, Teret SP, Smith GA, **Webster DW**.  Counseling About Firearms: Proposed Legislation is a Threat to Physicians and Their Patients.  Pediatrics 2006; 118:2168-72

40. Manganello J, **Webster DW**, Campbell JC.  Intimate partner violence and health provider training and screening in the news.  Journal of Women's Health 2006; 43:21-40

39. **Webster DW**, Zeoli AM, Bulzacchelli MT, Vernick JS.  Effects of police stings of gun dealers on the supply of new guns to criminals.  Injury Prevention 2006;12:225-230

38. **Webster DW**, Vernick JS, Bulzacchelli MT.  Effects of a gun dealer's change in sales practices on the supply of guns to criminals.  Journal of Urban Health 2006; 83:778-787.

37. Koziol-McLain J, **Webster DW**, MacFarlane J, Block CR, Glass N, Campbell JC. Risk factors for femicide-suicide in abusive relationships: results from a multi-site case control study. Violence & Victims 2006;21:3-21

36. Vernick JS, Johnson SB, **Webster DW**.  Firearm suicide in Maryland: characteristics of older versus younger suicide victims.  Maryland Medicine, 2005; 6(3):24-2

35. Lewin NL, Vernick JS, Beilenson PL, Mair JS, Lindamood LM, Teret SP, **Webster DW**.  Using local public health powers as a tool for gun violence prevention: the Baltimore youth ammunition initiative. American Journal of Public Health 2005; 95:762-765

34. **Webster DW**, Vernick JS, Zeoli AM, Manganello JA.  Effects of youth-focused firearm laws on youth suicides. JAMA 2004; 292:594-601

33. Vernick JS, O'Brien M, Hepburn LM, Johnson SB, **Webster DW**, Hargarten SW.  Unintentional and undetermined firearm deaths: a preventable death analysis of 3 safety devices. Injury Prev 2003; 9:307-11

32. Vernick JS, Pierce MW, **Webster DW**, Johnson SB, Frattaroli S.  Technology to detect concealed weapons: 4th Amendment limits on a public health and law enforce tool.  J Law, Med. and Ethics 2003; 31:567-579

31. Campbell JC, **Webster DW**, Koziol-McLain J, et al.  Risk factors for femicide within physically abusive intimate relationships: Results from a multi-site case control study.  Am J Public Health 2003; 93:1089-97.

30. Campbell JC, **Webster DW**, Koziol-McLain J, et al.  Assessing risk factors for intimate partner homicide.  NIJ Journal 2003;250:14-19

29. Roche KM, **Webster DW**, Alexander CS, Ensminger ME.  Neighborhood variations in the salience of parental support to boys' fighting.  Adolescent and Family Health 2003;3:55-63

28. Solomon BS, Duggan AK, **Webster DW**, Serwint JR.  Pediatric resident firearm safety counseling during adolescent health maintenance visits. Arch Pediatric and Adolescent Med 2002;156:769-775

27. **Webster DW**, Vernick JS, Hepburn LM.  Effects of Maryland's law banning Saturday night special handguns on homicides.  American Journal of Epidemiology 2002;155:406-412

26. **Webster DW**, Freed LH, Frattaroli S, Wilson MH.  How delinquent youth acquire guns: Initial versus most recent gun acquisitions. Journal of Urban Health 2002;79:60-69.

25. Frattaroli S, **Webster DW**, Teret SP.  Unintentional gun injuries, firearm design, and prevention: A perspective on urban health.  Journal of Urban Health 2002;79:49-59

24. Sachs CJ, Kosiol-McLain J, Glass N, **Webster DW**, Campbell JC.  A population-based survey assessing support for mandatory domestic violence reporting by healthcare personnel.  Women and Health 2002;35:121-133

23. **Webster DW**, Vernick JS, Hepburn LM.  The relationship between licensing, registration and other state gun sales laws and the source state of crime guns.  Injury Prevention 2001;7:184-189

22. Sharps PW, Campbell JC, Campbell D, Gary F, **Webster D**.  The role of alcohol use in intimate partner femicide. American Journal on Addictions, 2001;10:122-135

21. Freed LH, **Webster DW**, Longwell JJ, Carrese J, Wilson MH.  Deterrents to gun acquisition and carrying among incarcerated adolescent males.  Arch Pediatric and Adoles Med 2001;155:335-341

20. **Webster DW**, Starnes M.  Reexamining the association between child access prevention gun laws and unintentional firearm deaths among children, Pediatrics, 2000;106:1466-1469

19. Vernick JS, **Webster DW**, Hepburn LM.  Maryland's law banning Saturday night special handguns:  Effects on crime guns.  Injury Prevention 1999; 5:259-263

18. Howard KA, **Webster DW**, Vernick JS.  Beliefs about the risks of firearms in the home: Analysis of a national survey (U.S.A.).  Injury Prevention 1999;5:284-289

17. Teret SP, **Webster DW**.  Reducing gun deaths in the United States: Personalized guns would help – and would be achievable.  British Medical Journal 1999:318:1160-1161

16. Teret SP, **Webster DW**, Vernick JS, et al.  Public support for innovative gun policies: The results of two national surveys.  New England Journal of Medicine 1998;339:813-818

15. **Webster DW**, Vernick JS, Ludwig J.  No proof that right-to-carry laws reduce violence, American Journal of Public Health, 1998;88:982-983

14. **Webster DW**, Vernick JS, Ludwig J, Lester KJ.  Flawed gun policy research could endanger public safety.  American Journal of Public Health 1997;87:918-921

13. Vernick JS, Teret SP, **Webster DW**.  Regulating firearm advertising promising home protection: The legal basis for a public health intervention.  JAMA 1997;277:1391-1397

12. **Webster DW**, Wilson MEH.  Gun violence among youth and the pediatrician's role in primary prevention.  Pediatrics 1994;94:617-622

11. **Webster DW**.  The unconvincing case for school-based conflict resolution programs for adolescents.  Health Affairs 1993;12(4):126-141

10. **Webster DW**, Gainer PS, Champion HR.  Weapon carrying among inner-city junior high school students:  Defensive behavior vs aggressive delinquency.  Amer J Public Health 1993; 83:1604-1608

9. Gainer PS, **Webster DW**, Champion HR.  A youth violence prevention program description and preliminary evaluation.  Archives of Surgery 1993;128:303-308

8. **Webster DW**, Champion HR, Gainer PS, Sykes L.  Epidemiologic changes in gunshot wounds in Washington, DC, 1983-1990.  Archives of Surgery 1992;127:694-698

7. Oschner MG, Hoffman AP, DiPasquale D, Cole FJ, **Webster DW**, Champion HR.  Associated aortic rupture-pelvic fracture: an alert for orthopedic and general surgeons. J Trauma, 1992;33:429-34

6. **Webster DW**, Wilson MEH, Duggan AK, Pakula LC.  Parents' beliefs about preventing gun injuries to children.  Pediatrics 1992;89:908-914

5. **Webster DW**, Wilson MEH, Duggan AK, Pakula LC.  Firearm injury prevention counseling:  a study of pediatricians' beliefs and practices.  Pediatrics 1992;89:902-907

4. Harburg E, DiFrancesco W, **Webster DW**, Gleiberman L, Schork MA:  Familial transmission of alcohol use: II. Imitation of and aversion to parent drinking (1960) by adult offspring (1977); Tecumseh, Michigan.  Journal of Studies on Alcohol 1990;51:245-256

3. **Webster DW**, Harburg E, Gleiberman L, Schork MA, DiFrancesco W:  Familial transmission of alcohol use:  I. Parent and adult offspring alcohol use over 17 years, Tecumseh, Michigan.  Journal of Studies on Alcohol 1989;50:557-566

2. Wagenaar AC, **Webster DW**, Maybee RG:  Effects of child restraint laws on traffic fatalities in eleven states.  Journal of Trauma 1987;27:726-732

1.Wagenaar AC, **Webster DW**:  Preventing injuries to children through compulsory automobile safety seat use.  Pediatrics 1986;78:662-***672***


*Invited Commentaries in Scientific Journals*

10. South EC, Hemenway D, **Webster DW**. Gun violence research is surging to inform solutions to a devastating public health crisis. *Preventive Medicine* 2022 Oct 27:107325. doi: 10.1016/j.ypmed.2022.107325.

9. Zeoli AM, **Webster DW**.  Firearm policies that work. JAMA 2019 Feb 25. doi: 10.1001/jama.2019.0706. [Epub ahead of print]

8. **Webster DW**, Buggs SAL.  Can an efficacious strategy for curtailing illegal drug sales be counted on to reduce violent crime? Criminology & Public Policy 2017; 16:821-825. DOI: 10.1111/17459133.12326

7. **Webster DW**.  The true impact of mass shootings on Americans.  Annals of Internal Medicine. 2017; Annals of Internal Medicine. 2017 May 2. doi: 10.7326/M17-0943. PMID: 28462426

6. McGinty EE, **Webster DW**. The role of alcohol and drugs in firearm violence. JAMA Internal Med. 2017 Jan 3. doi: 10.1001/jamainternmed.2016.8192. [Epub ahead of print] PMID: 28055044

5. **Webster DW**.  Lessons from Australia's National Firearms Agreement.  JAMA. 2016;316:279-81. doi: 10.1001/jama.2016.8819. PMID: 27332736

4. Hemenway D, **Webster DW**.  Increasing knowledge for the prevention of firearm violence

3. Preventive Medicine, Jun 8, 2015. pii: S0091-7435(15)00198-X. doi: 10.1016/j.ypmed.2015.06.001

2. **Webster DW**. Commentary: Evidence to guide gun violence prevention in America.  Annual Reviews of Public Health. 2015;36:1-4. PMID: 25581156

1. Frattaroli S, Wintemute GJ, **Webster DW**. Implementing a public health approach to gun violence prevention: The importance of physician engagement.  Ann Internal Medicine, 2013; 159:306-7


### *Journal Articles Not Peer-Reviewed*

2. **Webster DW**, Chaulk CP, Teret SP, Wintemute GJ.  Reducing firearm injuries.  Issues in Science & Technology 1991; 7 (Spring): 73-79

1. **Webster DW**. Suicide in the subway:  case consultation:  suicide and mass transit: commentary.  Journal of Suicide and Life-Threatening Behavior 1991;21:209-212


### *Books and Book Chapters*

12. McGinty EE, **Webster DW**. "Defining the problem: the relationship between mental illness and gun violence," in Gold LH, Simon RI., eds. Gun Violence and Mental Illness. Arlington, VA: American Psychiatric Press, 2015.

11. **Webster DW**, Vernick JS, Eds.  Updated Evidence and Policy Developments on Reducing Gun Violence in America. Baltimore, MD: Johns Hopkins University Press, 2014.

10. **Webster DW**, Vernick JS, Eds. Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press, 2013.

9. Chapters contributed to in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press, 2013:

8. Vittes KA, **Webster DW**, Vernick JS.  "Reconsidering the Adequacy of Current Conditions on Legal Firearm Ownership," pp. 65-76.

7. **Webster DW**, Vernick JS, McGinty EE, Alcorn T. "Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws," pp. 109-122.

6. **Webster DW**, Vernick JS. "Spurring Responsible Firearms Sales Practices through Litigation: The Impact of New York City's Lawsuits Against Gun Dealers on Interstate Gun Trafficking," p. 123-32.

5. Vernick JS, **Webster DW**.  "Curtailing Dangerous Practices by Licensed Firearm Dealers: Legal Opportunities and Obstacles." pp. 133-142.

4. McGinty EE, **Webster DW**, Vernick JS, Barry CL.  "Public Opinion on Proposals to Strengthen U.S. Gun Laws: Findings from a 2013 Survey," pp. 239-257.

3. Vernick JS, **Webster DW**, Vittes KA.  "Law and Policy Approaches to Keeping Guns from High-Risk People" in Culhane J. ed. Reconsidering Law and Policy Debates: A Public Health Perspective. New York: Cambridge University Press, 2011.

2. Vernick JS, **Webster DW**.  Amicus Brief to U.S. Supreme Court regarding District of Columbia vs. Heller for the petitioner. Written on behalf of American Public Health Assoc., American College of Preventive Medicine, American Trauma Society, and the American Assoc. of Suicidology, Jan. 2008

1. **Webster DW**. Child Access Prevention (CAP) Laws.  In Gregg Lee Carter (Ed.) Entry in Encyclopedia of Guns in American Society.  Santa Barbara, CA:  ABC-CLIO, 2003

*Reports*

27. John Jay College Research Advisory Group on Preventing and Reducing Community Violence, **Webster DW** – member. Reducing Violence Without Police: A Review of Research Evidence. New York, NY: Research and Evaluation Center, John Jay College of Criminal Justice, City University of New York, November 2020. https://johnjayrec.nyc/2020/11/09/av2020/

26. Expert Panel on Firearms Data Infrastructure, **Webster DW** – member, and John Roman. A Blueprint for Firearms Data Infrastructure: Recommendations from NORC's Expert Panel on Firearms Data Infrastructure. NORC at the University of Chicago, October 2020

25. **Webster DW**, Crifasi CK, Williams RG, Booty MD, Buggs SAL.  Reducing Violence and Building Trust: Data to Guide Gun Law Enforcement in Baltimore. Johns Hopkins Center for Gun Policy and Research, June 2020.

24. Expert Panel on Firearms Data Infrastructure, **Webster DW** – member. The State of Firearms Data in 2019, NORC at the University of Chicago, January 2020

23. Crifasi CK, McCourt AD, **Webster DW**.  Impact of Handgun Purchaser Licensing on Gun Violence. Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, 2019

22. Crifasi CK, McCourt A, **Webster DW**.  Policies to Reduce Gun Violence in Illinois: Research, Policy Analysis and Recommendations. Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, February 2019

21. **Webster DW**, Buggs SAL, Crifasi CK.  Estimating the Effects of Law Enforcement and Public Health Interventions to Reduce Gun Violence in Baltimore.  Johns Hopkins Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, January 2018.

20. **Webster DW**, Crifasi CK, Vernick JS, McCourt A.  Concealed Carry of Firearms: Facts vs. Fiction.  Johns Hopkins Center for Gun Policy and Research, November 2017

19. **Webster DW**, Donohue JJ III, Klarevas L, Crifasi CK, Vernick JS, Jernigan D, Wilcox HC, Johnson SB, Greenberg S, McGinty EE.  Firearms on College Campuses:  Research Evidence and Policy Implications.  Johns Hopkins Center for Gun Policy and Research, Johns Hopkins University, October 15, 2016

18. Braga AA, **Webster DW**, White MD, Saizow H.  Gun Violence: Smart Policing Initiative Spotlight on Evidence-Based Strategies and Impacts. Alexandria, VA: CNA Analysis & Solutions, Mar. 2014

17. Bushman B, Newman K, Calvert S, Downey G, Dredze M, Gottfredson M, Jablonski NG, Masten A, Morrill C, Neil DB, Romber D, **Webster D**.  Predictors of Youth Violence.  Report prepared at the request of the National Sciences Foundation, December 2013

16. American Psychological Association Panel of Experts Report – Cornell D, Evans AC Jr., Guerra NG, Kinscherff R, Mankowski E, Randazzo MR, Scrivner E, Sorenson SB, Tynan WD, **Webster DW**.  Gun Violence: Prediction, Prevention and Policy.  American Psychological Association, Washington, DC, December 2013

15. Consortium for Risk-Based Firearm Policy, **DW Webster** contributing member. Guns, Public Health, and Mental Illness: An Evidence-Based Approach to State Policy.  December 2013

14. Consortium for Risk-Based Firearm Policy, **DW Webster** contributing member. Guns, Public Health, and Mental Illness: An Evidence-Based Approach to Federal Policy.  December 2013

13. **Webster DW**.  Evaluation of Baltimore's Strategies for Reducing Gun Violence. Report prepared for the Baltimore Police Department, Smart Policing Initiative grant, U.S. Bureau of Justice Assistance, Aug. 2013

12. **Webster DW**, Vernick JS, Vittes KA, McGinty EE, Teret SP, Frattaroli S.  The Case for Gun Policy Reforms in America.  Johns Hopkins Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD, October 2012

11. **Webster DW**. Whitehill JM, Vernick JS, Parker E.  Evaluation of Baltimore's Safe Streets Program: Effects on Attitudes, Participants' Experiences, and Gun Violence. Johns Hopkins Center for the Prevention of Youth Violence, January 2012

10. **Webster DW**, Illangasekare SL.  Best Practices for the Prevention Youth Homicide and Serious Violence.  Johns Hopkins Urban Health Institute, October 2010

9. **Webster DW**, Vernick JS, Mendel J.  Interim Evaluation of Baltimore's Safe Streets Program. Johns Hopkins Center for the Prevention of Youth Violence, Jan. 2009

8. **Webster DW**, Vittes KA. Using GunStat Data to Assess Progress on the Prosecution of Gun Cases in Baltimore City. Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, December 2009

7. **Webster DW**, Mendel J.  Effects of Baltimore's Operation Safe Kids on Re-Arrest.  Johns Hopkins Center for the Prevention of Youth Violence, June 2008

6. **Webster DW**.  Interventions to reduce deaths and injuries associated with youth violence. White paper commissioned by the Robert Wood Johnson Foundation.  May 2006

5. **Webster DW**.  Preventing intimate partner violence.  White paper commissioned by the Robert Wood Johnson Foundation.  June 2006

4. **Webster DW**, Vernick JS, Teret SP.  How Cities Can Reduce Illegal Guns and Gun Violence.  Johns Hopkins Center for Gun Policy and Research, April 2006. Updated January 2008

3. Campbell JC, **Webster DW**, O'Sullivan C, Roehl J, Mahoney P, White M, Guertin K.  Intimate Violence Risk Assessment Validation Study. Report submitted to the National Institute of Justice, September 2004. 2000WTVX0011

2. **Webster DW**, Kim A.  Evaluation of the Maryland Gun Violence Act of 1996: Effects on the Illicit Gun Market. Prepared for the U.S. Bureau of Alcohol, Tobacco, and Firearms, September 2003

1. **Webster DW**, Vernick JS, Kaljee L, Cameron DD, Frattaroli S, Johnson S.  Public attitudes About New Law Enforcement Technologies and Related to Strategies to Reduce Gun Violence.  Report by the Johns Hopkins Center for Gun Policy and Research to the National Institute of Justice, 2002


***Consultations or Collaborations with Policymakers, Community Groups, and Other Stakeholders***

13. Firearm Data Infrastructure Working Group. Safe States Alliance, 2022- present.

12. Center for Research and Evaluation of the John Jay College for Criminal Justice, Research Advisory Group on Preventing and Reducing Community Violence, 2020.

11. National Opinion Research Center, University of Chicago, 2019-2020.  Expert advisor on project to develop recommendations for building a data infrastructure for gun violence research. Funded by the National Collaborative for Gun Violence Research.

10. Consultant and Participant, Square One Justice Project to Reimagine Criminal Justice, Columbia University, 2019-2020.

9. Violence Prevention Research Program, University of California, Davis, 2014–2018.  Identify state background check policies for firearm purchasers and develop plans for evaluating the laws' effects on violence and injuries

8. John Jay School of Criminal Justice, 2017 –2019. Advise team evaluating Cure Violence public health interventions in New York to reduce shootings and other serious violence

7. Police Executive Research Forum, 2012-2014.  Advise PERF and law enforcement officials in four cities on strategies to combat gun violence as part of a USDOJ Bureau of Justice Assistance project

6. California Dept. of Justice, Firearms Division, 2005-2006.  Provide advice about how the state should use funds from its litigation against Wal-Mart to advance gun violence prevention

5. The Robert Wood Johnson Foundation, 2005-2006.  Prepare advice and white papers on the prevention of youth violence and the prevention of intimate partner violence

4. National Association for the Advancement of Colored People, 1999-2000.  Assistance with gun violence victimization survey of NAACP members for use in lawsuit against the gun industry

3. Duke University and Georgetown University, 1998-1999.  Consultation on project to estimate the economic costs associated with firearm injuries

2. Consortium of Virginia Urban Municipalities on strategies to reduce violence, 1992

1. Center to Prevent Handgun Violence, Washington, DC, 1991-1993.  Conducted survey of pediatricians on materials being developed for education families about firearm injury prevention


### *Media Dissemination*

Frequently interviewed and quoted by major news media outlets including *CNN, MSNBC, CBS, PBS News Hour, National Public Radio, The New York Times, The Washington Post, USA Today, US News and World Report, TIME, Newsweek, The Guardian, Newsweek, Vox, Newsy.*

**PART II**

**TEACHING**

*Academic Advisees,* **Johns Hopkins University**

 Erin Boguski, MPH (parttime), 2021 – present

 Jennifer Styles, MPH (parttime), 2021 – present

 Yaniris Gomez, MPH (parttime), 2021 – present

 Simimidele Badero, MPH (parttime), 2021 - present

 Rev. Wendy Calderon-Payne, MPH (parttime), 2021 – present

 Kristina Singleton, MPH (parttime) 2021 - present

 Lyndsey O'Rourke, MPH (parttime), 2021 – Present

 Carly Pysher, MPH (parttime), 2021 - Present

 Caroline Palmer (parttime), MPH, 2021 – Present

 Nargus Narounzadeh (parttime), MPH, 2021 - Present

 Cailin Crocket, MPH (parttime), 2020 – Present

 Nicholas Meyerson, PhD, 2020 – Present

 Don Hedrick, DrPH, 2020 – Present

 Eric Cumberbach, MPH, 2020 – Present

 Kelly Burke, MPH (parttime), 2019 – Present

 Josh Peterson, MPH (parttime), 2018 – 2022

 Amanda Capitummino, MPH 2018-2019

 Alexander McCourt, PhD, 2014-2018

 Christine McKenna, MPH, 2013-2014

 Shani Buggs, PhD, 2013 – 2018

 Cassandra Kercher, PhD, 2011–2014

 Dara Johnson, MPH, 2011 – 2012

 Janis Sethness, MPH, 2011 – 2012

 Donald Chalfin, MPH, 2010 – 2014

 Jeane Garcia Davis, MPH, 2008-2011

 Summer Venable, MPH, 2008-2010

 Jillian Fry, PhD, 2007 – 2012

 Gayle Nelson, MPH, 2007-2009

 James Saltzman, MPH, 2007-2008

Jennifer Mendel Whitehill, PhD, 2006 – 2011

Elizabeth Saylor, PhD candidate, 2003 - 2007

April Zeoli, PhD, 2002 – 2007

Allegra Kim, PhD 2001 – 2006

Jennifer Manganello, PhD, 1999-2003

Kim Ammann Howard, PhD, 1997

*Co-Advisees,* **Johns Hopkins University**

Julia Ward, PhD, 2019 – 2023

Emma (Beth) McGinty, PhD, 2010 – 2013

Rachel Garfield (MHS Health Policy), 1998 –

Leonardo Goe (MHS Health Policy), 1997-98

*Thesis Committees,* **Johns Hopkins University**

Sara Solomon, DrPH, 2023
John Thorn, PhD, 2020
Pamela Trangenstein, PhD, 2019
Joceyln Kelly, 2015
Erin Person, PhD, 2015
Lian-Yu Chen, PhD, 2014
Nicole Lunardi, MSPH, 2014
Elizabeth Parker, PhD, 2013
Michael Kim, PhD, 2013
Gregory Tung, PhD, 2012
Lareina La Flair, PhD, 2012
Mahua Mandel, PhD, 2012
Susan Ganbarpour, DrPH, 2011
Vanessa Kuhn, PhD in HPM, 2010
Donna Ansara, PhD in PFHS, 2008
Anne Outwater, PhD in Nursing, 2007
April Zeoli, PhD in HPM, 2007
Maria Bulzacchelli, PhD in HPM, 2006
Swapnil P. Maniar, PhD in PFHS, 2005
Lisa Hepburn, PhD in HPM, 2001
Marsha Rosenberg, PhD in Mental Hygiene,2001
Li-Hui Chen, PhD in HPM, 1999
Shannon Frattaroli, PhD in HPM, 1998
Kathleen Roche, PhD in MCH, 1998

*Preliminary Oral Exam Committees,* **Johns Hopkins University**

Shannon Frattaroli, Marguerite Roe, Li-Hui Chen, Mary Beth Skupien, Monique Shepard, Beth Hooten, Farfifteh Duffy, Mary Garza, Lisa Hepburn, Marc Starnes, Jennifer Manganello, Allegra Kim, Christina Pallitto, Swapnil Maniar, Christine Koth, Maria Bulzacchelli, Margaret Haynes, Frank Franklin, Donna Ansara, Vanessa Kuhn, Susan Ghanbarpour, Greg Tung, Adam, Milam, Michael Kim, Beth McGinty, Erin Pearson

### *Post-Doctoral Mentoring,* **Johns Hopkins University**

Lareina LaFlair, NIDA Drug Dependency Epidemiology, 2012-2013

Erica Sutton, MD, NIMH Violence Research Fellow, 2003-2005

Barry Solomon, MD, Pediatric Fellow, 1999-2002

Shannon Frattaroli, Kellogg Community Health Scholar, 1999-2000

Lorraine Freed, MD, MPH, RWJ Clinical Scholar 1996-98

### *Online Instruction,* **Johns Hopkins University**

Lead Instructor; Reducing Gun Violence in America: Evidence for Change, Coursera, 2019 – Present

### *Classroom Instruction,* **Johns Hopkins University**

Instructor; Understanding and Preventing Violence, 1993 – Present

Instructor; Crafting Effective Solutions to Gun Violence: Problem Solving Seminar, 2021 – Present

Instructor; Graduate Seminar in Injury Research and Policy, 2005 – 2018

Instructor; Graduate Seminar in Health and Public Policy, 2012 – 2014

Co-Instructor; Research and Evaluation Methods for Health Policy, 2008 – 2010

Lead Instructor; Research and Evaluation Methods for Health Policy, 2011-2015

### *Lecturer,* **Johns Hopkins University**

Epidemiology and Evidence-Based Policy Public Health Policy

Health Policy I: Social & Economic Determinants of Health

Proposal Writing (Health Policy & Management)

Introduction to Urban Health

Suicide as a Public Health Problem

Adolescence and Adolescent Health

Issues in Injury and Violence Prevention

Methodological Issues in Injury and Violence

Applications in Program Monitoring and Evaluation

Alcohol, Society, and Health

Baltimore and "The Wire": A Focus on Major Urban Issues

Community Health Practicum

### *Program Management & Training Program Involvement,* **Johns Hopkins University**

Core Faculty, Drug Dependency Epidemiology Program (pre- and post-doctoral training program funded by NIDA), 2011 – Present

Program Head, PhD program in Health and Public Policy, 2006–2007; 2012 -2014

Executive Committee and Core Faculty, Interdisciplinary Research Training Program on Violence Research, pre- and post-doctoral training program funded by NICHD, 2008-2015

Faculty Director, Certificate Program in Injury Control, 1999- 2012

Executive Committee and Core Faculty, Interdisciplinary Research Training Program on Violence (pre- and post-doctoral training program funded by NIMH), 1999-2008

Resource Faculty, Alcohol, Injury and Violence Training Program (pre-doctoral training program funded by NIAAA), 2001-2007

## RESEARCH GRANT PARTICIPATON

**Research and Training to Advance Equitable Solutions to Reduce Gun Violence that are Supported by Impacted Communities**

Dates:                              11/15/22 – 11/14/27

Sponsoring Agency:       Robert Wood Johnson Foundation

Amount:                          $5,000,000

Principal Investigator:    Co-PIs: Daniel Webster, Cassandra Crifasi

Effort:                             10% year 1, 15% year 2, 20% years 3-5

Main Objectives:            Increase diversity, equity, and inclusion in gun violence prevention research. Complete several research projects at the intersection of gun violence prevention and equity.

**Evaluating and Enhancing Community Violence Intervention Effectiveness in the Nation's Capital City**

Dates:                              1/1/2023 – 12/31/2027

Sponsoring Agency:       Arnold Ventures

Amount:                          $1,841,961

Principal Investigator:   CoPIs: Daniel Webster, Joseph Richardson, Jr.

Effort:                             25% year 1, 30% years 2-4

Main Objectives:            Describe community violence intervention implementation, assess CVI workers' and program participants' experiences, and estimate program effects on gun violence.

**Estimating the Effects of Handgun Purchaser Licensing and Right to Carry Laws on Arrests, Incarceration, and Racial Disparities**

Dates:                          1/1/22 – 12/31/23

Sponsoring Agency:   The Joyce Foundation

Role:                           PI

Effort:                         15%

Main Objectives:      Derive valid estimates of the association between permit-to-purchase handgun laws and right to carry laws on arrests for weapons and violent offenses, incarceration, and racial disparities in these outcomes.

**The Role of Permit-to-Purchase in the Primary Prevention of Multiple Forms of Violence**

Dates:                          09/30/2021 – 09/29/2024

Sponsoring Agency:   Centers for Disease Control and Prevention (CDC) - 1U01CE003368-01

Amount:                      $1,049,998

Role:                           Co-Investigator (Cassandra Crifasi, PI)

Main Objective:         To assess the impact of Permit-to-Purchase laws on youth violence victimization and perpetration, youth suicide, intimate partner homicide, and familicide.

**Forecasting the impacts of permit-to-purchase handgun laws on firearm-related mortality in Oregon for Effective Gun Violence Prevention Advocacy**

Dates:                          7/1/22 – 6/30/24

Sponsoring Agency:   Bloomberg American Health Initiative

Amount:                      $382.070

Principal Investigator:   Co-PI: Daniel Webster and Joshua Horwitz

Effort:                         $25% in year 1

Main Objective:         Generate data on estimated effects of handgun purchaser licensing law in Oregon based on effects of PTP in Connecticut and provide evidence-based advocacy for effective policies to prevent gun violence in Oregon.

**Review of Research Relevant to the Effectiveness of Hospital-based Violence Intervention Programs with Recommendations for Future Research and Policy**

Dates:                          1/1/21 – 12/31/21

Sponsoring Agency:    Arnold Ventures

Principal Investigator: Daniel W. Webster

Amount:                      $83,167

Role/Effort:               PI / 15%

Main Objectives:   Evaluate the scientific rigor of studies to evaluate the impacts of hospital-based violence intervention programs, synthesize findings from those studies, and develop recommendations for enhancing the programs and research.

**Expanding and Improving Data on Nonfatal Gun Crime Incidents for Research on Gun Violence and Its Prevention**

Dates:                        9/1/2020 – 6/30/2023

Principal Investigator: Daniel W. Webster

Sponsoring Agency:   National Collaborative for Gun Violence Research

Amount:                     $255,247

Effort:                        20%

Main Objectives:      Expand data on nonfatal criminal shootings, estimate biases in the FBI's UCR data on nonfatal gun crime, estimate gun law effects on nonfatal gun violence.

**Estimating the Effects of Community Violence Intervention on Gun Violence in Baltimore City**

Dates:                        10/1/21 – 9/30/22

Sponsoring Agency:    Baltimore City Mayor's Office for Neighborhood Safety and Engagement

Amount:                     $126,429

**Impact of Criminal Justice and Community-Based Interventions on Gun Violence Reduction**

Dates:                        12/01/2020 – 5/31/2023

Principal Investigator: Daniel W. Webster (for subaward from Urban Institute)

Sponsoring Agency:   New York City's Mayor's Office for Criminal Justice

Amount:                     $255,247

Effort:                        25%

Main Objectives:      Estimate the impact of community prevention programs and law enforcement initiatives to reduce gun violence.

**Comprehensive Background Check Policies and Firearm Violence: Identifying Effective Design, Implementation, and Enforcement Strategies - subaward**

Dates:                        7/1/2019 – 6/30/2022

Principal Investigator: Daniel W. Webster (of subaward)

Sponsoring Agency:   University of California, Davis - the National Collaborative for Gun Violence Research

Amount:                     $122,612

| Effort: | 5% |
|---|---|
| Main Objectives: | Identify aspects of systems for background checks that affect efforts to prevent high-risk individuals from acquiring firearms. |

**Evaluating the Effects of Legal Standards for Civilian Concealed Gun Carrying**

| Dates: | 4/11/2018 – 8/31/2021 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Amount | $407,000 |
| Effort: | 20% |
| Main Objectives: | Estimate the impacts of various type of state laws governing civilian gun carrying in relations to legal qualifications and standards of legal carriers. |

**Effects of Permitless Concealed Carry-On Violent Crime**

| Dates: | 10/1/2019 - 3/31/2021 |
|---|---|
| Principal Investigator: | Cassandra Crifasi |
| Sponsoring Agency: | New Venture Fund – Fund for Safer Future |
| Amount: | $250,000 |
| Effort: | 5% |
| Main Objective: | To assess the impacts of deregulating civilian gun carrying on violent crime. |

**Development and Testing of a Virtual Reality Experience for Civilian Carriers of Concealed Firearms**

| Dates: | 1/1/2020 – 12/31/2021 |
|---|---|
| Principal Investigator: | Cassandra Crifasi |
| Sponsoring Agency: | The Davide and Lucille Packard Foundation |
| Amount: | $500,000 |
| Effort: | 5% |
| Main Objective: | Develop and test a system for evaluating the performance of civilian gun carriers under realistic situations. |

**Core Support for Johns Hopkins Center for Gun Policy and Research and Youth Education on Evidence-Based Gun Violence Prevention**

| Dates: | 7/1/2018 – 6/30/2020 |
|---|---|

| Principal Investigator: | Daniel W. Webster |
|---|---|
| Sponsoring Agency: | David and Lucille Packard Foundation |
| Amount: | $750,000 |
| Effort: | 25% |
| Main Objectives: | Conduct and translate research to inform gun violence prevention. Develop  Open Online Course and Summer Youth Institute on gun violence prevention. |

**Johns Hopkins-Baltimore Collaborative for Violence Reduction**

| Dates: | 1/1/16 – 9/30/19 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Abell Foundation and The Annie E. Casey Foundation |
| Funding Level: | $875,000 |
| Effort: | 30% |
| Main Objectives: | Assess police efforts to reduce violent crime and enhance training to promote more effective policing. |

**Study of Baltimore's Underground Gun Market**

| Dates: | 7/1//15 –6/30/17 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Everytown for Gun Safety |
| Funding Level: | $240,245 |
| Effort: | 15% |
| Main Objectives: | Collect and analyze data from surveys of offenders, crime gun trace data, and gun-related arrests to describe Baltimore's underground gun market and assess evidence that 2013 state gun laws affected the diversion of guns to criminals. |

**Effects of Universal Background Check Laws for Handgun Sales in Maryland and Pennsylvania**

| Dates: | 8/1//15 – 7/31/18 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $357,000 |
| Effort: | 18% |
| Main Objectives: | Describe the implementation and enforcement of universal background check laws for handgun purchases in Maryland and Pennsylvania and estimate the effects of the laws and enforcement practices on gun violence. |

**Estimating Effects of Gun Policies on Intimate Partner Homicides**

Dates:                           8/1/15 – 6/30/17

Principal Investigator:   Daniel W. Webster, subcontract to Michigan State University

Sponsoring Agency:      The Joyce Foundation

Funding Level:              $267,276

Effort:                          10%

Main Objectives:          To estimate the impact of firearm sales laws on intimate partner homicides and examine factors relevant to successful enforcement of those laws.

**Promoting Evidence-based Policies to Reduce Domestic Violence Involving Guns**

Dates:                           7/1/15 – 6/30/16

Principal Investigator:   Daniel W. Webster

Sponsoring Agency:      Norman Raab Foundation

Funding Level:              $25,000

Effort:                          2%

**Analysis of the Strength of Legal Firearms Restrictions for Perpetrators of Domestic Violence and their Impact on Intimate Partner Homicide**

Dates:                           8/1/15 – 1/31/18

Principal Investigator:    Daniel W. Webster

Sponsoring Agency:      The Joyce Foundation

Funding Level:              $176,389

Effort:                          10%

Main Objectives:          Describe the implementation and enforcement of domestic violence related firearm laws and their impact on intimate partner homicides.

**Baltimore Homicide Review Commission**

Dates:                           9/1/14 – 12/31/15

Principal Investigator:   Daniel W. Webster

Sponsoring Agency:      Baltimore City Mayor's Office

Funding Level:              $135,000

Effort:                          15%

| Main Objectives: | Conduct in-depth reviews of homicides in three police districts in Baltimore to identify determinants of lethal violence and develop recommendations for policies, procedures, and programs to prevent homicides. |
|---|---|

### Study of Baltimore's Underground Gun Market

| | |
|---|---|
| Dates: | 7/1//14 – 6/30/15 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency | The Norman Raab Foundation |
| Funding Level: | $50,000 |
| Effort: | 5% |
| Main Objectives: | Gather data about how criminals access firearms, how they connect with suppliers, what barriers they face, and their perceptions of gun laws. |

### Effects of Drug and Gun Law Enforcement on Violence in Baltimore

| | |
|---|---|
| Dates: | 1/1/14 – 12/31/15 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Abell Foundation |
| Funding Level: | $144,918 |
| Effort: | 15% |
| Main Objectives: | Estimate the effects of law enforcement activities directed at drug and gun law violations on violent crime in Baltimore from 1986 through 2012. |

### Gun Owners Perspectives on Safe Gun Ownership and Sales Practices

| | |
|---|---|
| Dates: | 10/01/2013 – 03/31/16 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Harold B. Simmons Foundation |
| Funding Level: | $411,421 |
| Effort: | 20% |
| Main Objectives: | Study gun owners' attitudes relevant to safe firearm sales and storage. |

### Johns Hopkins Center for the Prevention of Youth Violence

| | |
|---|---|
| Dates: | 9/15/11 – 9/14/16 |
| Principal Investigator: | Philip Leaf |

| | |
|---|---|
| Sponsoring Agency: | Centers for Disease Control and Prevention |
| Funding Level: | $6 million |
| Effort: | 20% to 25% |
| Main Objectives: | Develop, implement, and evaluate a comprehensive community intervention to prevent youth violence in the Park Heights neighborhood of Baltimore. |

**Prescription Opioid Addiction Research Study**

| | |
|---|---|
| Dates: | 9/01/2012 – 8/31/2014 |
| Principal Investigator: | Colleen L. Barry |
| Sponsoring Agency: | AIG |
| Funding Level: | $430,655 |
| Effort: | 10% |
| Main Objectives: | To assess of the growing problem of prescription opioid addiction, and to identify promising policy and clinical approaches to address the problem. |

**National Gun Violence Research Center - subcontract**

| | |
|---|---|
| Dates: | 5/01/13 – 5/31/14 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Police Executive Research Forum |
| Funding Level: | $41,762 |
| Effort: | 20% |
| Main Objectives: | Assist PERF with designing and conducting studies of innovative policing strategies to combat gun violence. |

**Evaluation of the Effects of Permit to Purchase Handgun Laws**

| | |
|---|---|
| Dates: | 9/1/12 - 8/31/14 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $222,242 |
| Effort: | 25% |
| Main Objectives: | To evaluate the effects of changes in permit to purchase handgun laws in Connecticut and Missouri on homicides and the diversion of guns to criminals. |

Webster 30
*September 2023*

**Gun Violence Reduction Program**

Dates:                          1/01/11 – 12/31/13

Principal Investigator:         Daniel W. Webster

Sponsoring Agency:              Bloomberg Philanthropies

Funding Level:                  $500,000

Effort:                         5% to 40%

Main Objectives:                Conduct research, policy analysis, and technical assistance to inform efforts to reduce the availability of illegal guns and gun violence.


**Evaluation of Baltimore Policing Strategies to Reduce Gun Violence**

Dates:                          10/1/2010 – 3/31/2012.

Principal Investigator:         Daniel W. Webster

Sponsoring Agency:              U.S. Dept. of Justice, Bureau of Justice Assistance

Funding Level:                  $60,000

Effort:                         15%

Main Objectives:                Develop unbiased estimates of the impact of 3 strategies being implemented by Baltimore police to reduce violence.


**Impact of Safe Streets' Outreach Workers on the Lives of Their Clients**

Dates:                          12/1/09 – 6/30/10

Principal Investigator:         Daniel W. Webster

Sponsoring Agency:              Baltimore City Health Department

Funding Level: $               72,000

Effort:                         25%

Main Objectives:                Measure the impact of the Safe Streets program on program participants and analyze of the relationships between program activities and gun violence.


**Effects of the Lethality Assessment Program on Intimate Partner Violence**

Dates:                          3/15/10 – 3/14/12

Principal Investigator:         Daniel Webster

Sponsoring Agency:              Centers for Disease Control and Prevention (through Center grant to JHU)

Funding Level:                  $388,282

Effort:                         20%

Main Objectives:      Estimate the effects of the Maryland Lethality Assessment program on intimate partner homicide and repeat intimate partner violence.


**Gun Violence Reduction Program**

Dates:                        1/01/08 – 12/31/10

Principal Investigator:   Daniel W. Webster

Sponsoring Agency:       Anonymous donor

Funding Level:            $500,000

Effort:                       25%

Main Objectives:      Conduct research, policy analysis, and technical assistance to inform efforts to reduce the availability of illegal guns and gun violence.


**Analyzing and Developing Policies to Limit Firearm Access by High-Risk People**

Dates:                        5/1/09 – 4/30/11

Principal Investigator:   Daniel W. Webster

Sponsoring Agency:       The Joyce Foundation

Funding Level:            $179,971

Main Objectives:      Research and describe state laws pertaining the potential public safety gains for expanding current prohibition categories for firearm purchase and possession.


**Data for Combating Illegal Guns**

Dates:                        1/01/08 – 12/31/08

Principal Investigator:   Daniel W. Webster

Sponsoring Agency:       Maryland Governor's Office for Crime Control and Prevention

Funding Level:            $75,419

Main Objectives:      Assist Baltimore and Maryland State Police to collect and analyze data on crime guns and illegal gun trafficking.


**Analyzing & Assisting Innovative City-Level Efforts to Prevent Gun Violence**

Dates:                        5/1/07 – 4/30/09

Principal Investigator:   Daniel W. Webster

Sponsoring Agency:       The Joyce Foundation

Funding Level:            $175,000

| | |
|---|---|
| Main Objectives: | Analyze data on illegal gun trafficking and provide consultation to enhance data to inform efforts to stem gun trafficking in Milwaukee. Case study of Chicago Police Department's efforts to thwart gun trafficking. |

**Evaluation of the California Firearms Domestic Violence Intervention Project**

| | |
|---|---|
| Dates: | 1/15/07 – 1/14/10 |
| Principal Investigator: | Garen Wintemute (UC Davis) and Shannon Frattaroli (JHBSPH) |
| Sponsoring Agency: | California Department of Justice |
| Funding Level: | $31,481 subcontract from UC Davis for first year |
| Effort: | 10% |
| Main Objectives: | Evaluate a program in 2 California counties to enhance implementation of state laws prohibiting certain domestic violence offenders from possessing firearms. |

**Baseline Data for Evaluating a Community Initiative to Reduce Youth Homicides**

| | |
|---|---|
| Dates: | 3/01/07 – 2/28/09 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Baltimore City Health Department |
| Funding Level: | $75,122 |
| Effort: | 6% |
| Main Objectives: | Collect and analyze baseline data on violent crime and youths' attitudes relevant to gun violence in intervention and comparison neighborhoods. |

**Evaluation of a community gun violence prevention initiative in Baltimore.**

| | |
|---|---|
| Dates: | 9/1/05 – 8/31/10 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Centers for Disease Control and Prevention |
| Funding Level: | $745,352 |
| Effort: | 25%-30% |
| Main Objectives: | Estimate the impact of the initiative on youth gun violence victimization and perpetration and attitudes and behaviors of high-risk youth. |

**Effects of a Formal Danger Assessment and Risk Communication Intervention on Actions Taken to Reduce Risks of Intimate Partner Violence**

| | |
|---|---|
| Dates: | 9/1/04 – 8/31/09 |

| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Centers for Disease Control and Prevention |
| Funding Level: | $485,000 |
| Effort: | 20%-25% |
| Main Objectives: | Determine whether a formal, quantitative assessment of danger, and a standard protocol for communicating the assessed risk of future partner violence and scientific support for protection strategies is more effective than current procedures in motivating protective actions and lowers risk for future violence. |

### Reducing Illegal Gun Trafficking Through Research and Technical Assistance

| Dates: | 5/1/05 – 4/30/08 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $181,117 |
| Effort: | 25%-30% |
| Main Objective: | Disseminate research findings to law enforcement agencies, advocates, and the media on policies shown to reduce illegal gun trafficking. |

### Effects of Police Stings of Gun Dealers on the Illegal Gun Market

| Dates: | 11/1/03 - 10/31/04 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Overbrook Foundation |
| Funding Level: | $37,000 |
| Effort: | 20% |
| Main Objectives: | Assess the impact of police stings of 12 gun dealers suspected of making illegal gun sales in Chicago on the flow of new guns into the illicit gun market. |

### Evaluating and Developing Policies to Regulate Licensed Gun Dealers

| Dates: | 4/1/02 - 3/31/04 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The John D. and Catherine T. MacArthur Foundation |
| Funding Level: | $260,000 |
| Effort: | 35% |
| Main Objectives: | 1) Document state policies and practices for regulation and oversight of licensed gun dealers; 2) Assess effects of those measures on gun trafficking; and 3) Recommend strategies for deterring diversions of guns to criminals. |

**Working with Health Commissioners to Reduce Gun Violence**

Dates:                          7/01/03 - 6/30/04

Principal Investigator:   Jon S. Vernick

Sponsoring Agency:      Richard and Rhoda Goldman Fund

Funding Level:             $100,000

Effort:                         15%

Main Objective:           Identify and provide technical assistance to city or county health commissioners in order to use public health powers to shut down corrupt gun dealers who endanger the public's health.


**Separating Kids from Guns Program**

Dates:                          10/01/01 - 9/30/03

Principal Investigator:   Shannon Frattaroli

Co-PI:                         Daniel W. Webster

Sponsoring Agency: The David and Lucille Packard Foundation

Funding Level:             $300,000

Effort:                         25%

Main Objective:           Conduct research, perform policy analysis, disseminate information relevant to protecting children and adolescents from unsupervised access to guns.


**Johns Hopkins Center for Gun Policy and Research**

Dates:                          01/01/99 - 4/30/04

Sponsoring Agency:      The Joyce Foundation

Principal Investigator:   Stephen P. Teret (1995-2001), Jon S. Vernick (2001-present)

Co-Prin. Invest.:          Daniel W. Webster (2001-present)

Funding Level:             2001-2003: $600,000

Effort:                         15% (05/01/03 - 4/30/04)

                                 35% (05/01/01 - 4/30/03)

                                 25% (01/01/00 - 4/30/01)

                                 35% (01/01/96 - 12/31/99)

                                 20% (01/01/95 - 12/31/96)

Main Objective:           Develop and analyze policies to reduce firearm injuries.

Responsibilities:      Co-direct Center, initiate and conduct research and analysis relevant to gun policy; develop and analyze gun policy surveys; assist groups working to reduce gun violence; serve as resource to media and policymakers.

**Effects of Minimum Age Restrictions on Handgun Purchase and Possession – Center for the Prevention of Youth Violence**

Dates:                      10/01/00 - 9/30/05

Principal Investigator:   Daniel W. Webster

Sponsoring Agency:     Centers for Disease Control and Prevention

Funding Level:          $306,695

Main Objective:         Estimate the effects of minimum age restrictions on handgun purchases and possession on youth homicide offending and suicides

**Evaluation of Instruments to Assess Risk for Intimate Partner Violence**

Dates:                      8/01/00 - 3/31/04

Principal Investigator:   Jacquelyn C. Campbell

Sponsoring Agency:     National Institute of Justice

Funding Level:          $619,792

Effort:                     20%

Main Objective:         Determine the sensitivity, specificity, and predictive value of four instruments designed to assess future risk for violent victimization by an intimate partner.

**The Center for Injury Research and Policy:**

Dates:                      1987-2005

Sponsoring Agency:     Centers for Disease Control and Prevention

Principal Investigator:   Ellen MacKenzie

Funding Level:          1999-2003: $750,000 per year

Effort:                     10% (09/03/03 - 8/31/04)

                           10% (09/01/00 - 8/31/01)

                           20% (09/01/99 - 8/31/00)

                           10% (09/01/98 - 08/31/99)

                           25% (09/01/94 - 08/31/98)

                           20% (04/01/94 - 08/31/94)

                           50% (07/01/92 - 03/31/94)

100% (04/01/92 - 06/30/93)

Main Objective:        One of the eight regional injury control research centers.

Responsibilities:      Evaluate state-level gun policies, direct study of risk factors for serious injuries from intimate partner assaults, develop research proposals, serve as resource to students, media, practitioners, and policy makers.

**Developing and Analyzing Data for Effective Gun Law Enforcement**

Dates:                 3/01/01 - 2/28/02

Principal Investigator:   Daniel W. Webster

Sponsoring Agency:     Governor's Office of Crime Control and Prevention

Funding Level:         $102,911

Effort:                35%

Main Objective:        Develop databases for information about the sources of crime guns and the prosecution of gun crimes

**Developing a Dataset of State Gun Laws**

Dates:                 12/01/00 - 11/30/01

Principal Investigator:   Jon S. Vernick

Sponsoring Agency:     Annie E. Casey Foundation

Funding Level:         $45,000

Effort:                10%

Main Objective:        Determine the presence and effective dates of specific types of gun laws in each of the 50 U.S. states and the DC and share with interested researchers.

**Effects of Personalized Guns in Maryland**

| | |
|---|---|
| Dates: | 9/1/99 - 8/31/00 |
| Sponsoring Agency: | The Abell Foundation |
| Funding Level: | $40,533 |
| Principal Investigator: | Stephen Teret |
| Effort: | 10% |
| Main Objective: | Assess likely effects of a law to require personalized guns in Maryland |

**Risk Factors for Homicide in Violent Intimate Relationships**

| | |
|---|---|
| Dates: | 9/01/96 - 2/28/00 |
| Sponsoring Agency: | NIDA, NIMH, CDC, NIJ, NIA |
| Principal Investigator: | Jacquelyn Campbell |
| Funding Level: | $1,267,744 |
| Effort: | 10% (09/01/99 - 02/28/00) |
| | 25% (09/01/98 - 08/31/99) |
| | 10% (09/01/97 - 08/31/98) |
| | 15% (09/01/96 - 08/31/97) |
| Main Objective: | Determine risk factors for homicide or attempted homicide among women involved in violent intimate relationships and develop predictive screening devices for clinicians, shelter workers, and the courts. |

**Preventing Firearm Suicide and Unintentional Deaths Through Safer Gun Design**

| | |
|---|---|
| Dates: | 1/01/00 - 12/31/00 |
| Principal Investigator: | Jon S. Vernick |
| Sponsoring Agency: | Funders' Collaborative for Gun Violence Prevention |
| Funding Level: | $176,755 |
| Effort: | 10% |
| Main Objective: | Evaluate potential benefits of safer gun designs |

**Public Attitudes About New Law Enforcement Technologies**

| | |
|---|---|
| Dates: | 06/01/97 – 05/31/99 |
| Sponsoring Agency: | National Institute of Justice |
| Principal Investigator: | Daniel W. Webster |

Funding Level:        $266,625

Main Objectives:      Assess public attitudes relevant to law enforcement strategies to detect concealed weapons in
                      high-crime areas including the use of new technology, concerns about safety, privacy, and
                      fairness in the way that law enforcement officials apply new technology. Qualitative study of
                      residents of a high-crime neighborhood in Baltimore and a national phone survey of urban
                      residents.

**Evaluation of the California Violence Prevention Initiative**

Dates:                7/01/93 - 4/15/96

Sponsoring Agency:    The California Wellness Foundation

Principal Investigator: Stephen P. Teret

Co-Prin. Investigator: Daniel W. Webster Funding

Level:                $3.1 million

Effort:               50%

Main Objectives:      Conduct process and outcome evaluation of a statewide violence prevention initiative.

**Evaluation of Violence Prevention Public Education Campaign**

Dates:                4/01/94 - 3/31/95

Sponsoring Agency:    The California Wellness Foundation

Principal Investigator: Daniel W. Webster

Funding Level:        $40,000

Effort:               20%

Main Objectives:      The describe all facets of the campaign and the political and social context in which the campaign
                      is conducted and evaluate the effects of the campaign on public opinion, opinion leaders, the
                      media, and policy makers.

**Planning "The Consortium on Gun Policy and Information"**

Dates:                4/01/94 - 10/31/94

Sponsoring Agency:    The Joyce Foundation

Principal Investigator: Stephen P. Teret

Funding Level:        $40,000

Effort:               10%

Main Objectives:      To assess the need for a "Consortium on Gun Policy and Information" that would provide factual
                      information on firearms and the public's health to various consumers.

**ACADEMIC SERVICE**

**Johns Hopkins University**

Finance Committee, Health Policy and Management, 2020 – Present

Appointments and Promotions Committee, School of Public Health, 2012 – 2015

Conflict of Interest Committee, School of Public Health, 2011 – 2012

Academic Policy and Admissions Committee, Health Policy and Management, 2006 – 2007, 2012 – 2014

Faculty Development Committee, Health Policy and Management, 2010 – Present

Qualifying Exam Committee, Health Policy and Management, 1998- 1999, 2001 – 2008

Qualifying Exam Committee, Health Policy and Management, Chair 2004 – 2008

Health Policy and Management, Doctoral Admissions Committee, 2006 – 2007

Affirmative Action Committee, School, 2005 – 2010

9 Ad Hoc Committees for Appointments and Promotions, 2006 – Present

Search Committee, Leon Robertson Chair in Injury Control, 2005 – 2006

Academic Policy and Admissions Committee, Health Policy and Management, 1997- 1999

Ad-Hoc Committee on Statistics Training, Health Policy and Management, 1997-1998

Research Policy Committee, Health Policy and Management, 1995-97

**PRESENTATIONS**
*Scientific Meetings*

**Webster DW.**  Evidence-Based Public Health Approaches to Reducing Violence with Less Reliance on Police and Prisons. Presentation before the Workshop on Addressing the Drivers of Criminal Justice Involvement to Advance Racial Equity for the Committee on Reducing Racial Inequalities in the Criminal Justice System, National Academy of Science, Engineering, and Medicine, March 2021.

**Webster DW**. The Role of Firearms and Firearm Policy in Fatal Shootings by Police. Annual FACTS (Firearm Safety Among Children and Teens) Symposium, the University of Michigan, 2020.

**Webster DW**.  Strengthening the science of firearm policy evaluations. Research Symposium: Preventing Firearm Injuries among Children and Teens: The State of the Science. University of Michigan, October 2019.

**Webster DW.**  Public Health Approaches to Preventing Gun Violence. Plenary session presentation at the Annual meeting of the American Society of Criminology, Atlanta, GA, November 2018.

**Webster DW.**  Research and public safety collaborations focused on reducing gun violence in Baltimore.  Presented at the Annual meeting of the American Society of Criminology, New Orleans, November 2016.

**Webster DW.**  What have we learned about the impact of states' gun policies. Plenary session presentation at the annual meeting of the American Public Health Association, Denver, Nov. 2016.

**Webster DW,** Crifasi CK, Meyers JS, Vernick JS.  Effects of changes in permit-to-purchase handgun laws on suicide rates.  Presented at the Annual Meeting of the American College of Epidemiology, Atlanta, GA, September 29, 2015.

**Webster DW**, Meyers JS, Buggs S.  Access to firearms among youth in the United States: Patterns, consequences, and prevention strategies. Presented at the Institute of Medicine's Forum on Global Violence Prevention, Workshop on Lethal Means of Violence, Washington, DC, December 18, 2014.

**Webster DW**.  State of the science and need for additional research to prevent gun violence in America.  Presentation at the Martha May Elliott Forum at the American Public Health Association Annual Meetings, New Orleans, November 2014.

**Webster DW**.  Community Involvement in the Evaluation of Baltimore's Safe Streets Program to Reduce Youth Violence.  Presented at the annual meetings of the Society for Prevention Research, Washington, DC May 29, 2014.

**Webster DW**.  Mental health and means of violence.  Presented at Workshop on Violence and Mental Health: Opportunities for Prevention and Early Intervention, Institute of Medicine's Forum on Global Violence Prevention, February 26, 2014.

**Webster DW**.  Effects of Missouri's permit to purchase handgun licensing law on the diversion of firearms to criminals and homicides.  Presented at the annual meetings of the American Public Health Association, Boston, November 2013.

Vittes KA, **Webster DW**, Vernick JS.  Associations between state gun sales laws and the source of criminals' handguns they used to commit crime. Presented at the annual meetings of the American Public Health Association, Boston, November 2013.

**Webster DW**.  Effects of Baltimore's Safe Streets Program on Gun Violence and Youth Attitudes toward Resolving Conflicts with Guns.  Presented at the World Health Summit, Berlin, Germany, October 2013.

**Webster DW**.  Safe Streets Baltimore – program effects on gun violence, youth attitudes, and the lives of program participants.  Presented at the meetings of the Society for the Advancement of Violence and Injury Research, Baltimore, June 2013.

Parker EM, Gielen AC, Castillo R, **Webster DW**. Intimate Partner Violence and Patterns of Safety Strategy Use among Women Seeking Temporary Protective Orders: A Latent Class Analysis. Presented at the meetings of the Society for the Advancement of Violence and Injury Research, Baltimore, June 2013.

**Webster DW**.  Priorities for public health efforts to reduce gun violence.  Presentation to the Institute of Medicine's Workshop on Priorities for Public Health Research Agenda to Reduce Firearm-Related Violence, Washington, DC, April 2, 2013

**Webster DW**.  State gun laws' effects on the intra- and interstate diversion of guns used by criminals.  Presented at the annual meetings of the American Society of Criminology, Washington, DC, November 2011.

**Webster DW**.  Effects of state gun sales laws on the exportation of guns used by criminals.  Presented at the annual meetings of the American Public Health Association Meetings, Washington, DC, November 2011.

**Webster DW**, Mendel JS, Vernick. Evaluating Baltimore's Safe Streets Program's effects on violence.  Presented at the annual meetings of the Amer. Public Health Assoc., Denver, Nov. 2010.

**Webster DW**, Vernick JS, Mendel JS.  Interim evaluation of Baltimore's Safe Streets initiative: Effects on gun violence.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

**Webster DW**.  Impact of danger assessment screening and safety education on abused women's perceived risk of serious re-abuse.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

Mendel JS, **Webster DW**, Vernick JS.  Street outreach to prevent gun violence in Baltimore: An analysis of high-risk conflict mediation.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

Vernick JS, **Webster DW**.  An environmental approach to preventing firearm violence: targeting illegal gun trafficking.  Annual Meetings of Amer. Public Health Assoc., Philadelphia, Nov. 2009.

Vittes KA, **Webster DW**.  Potential effects of expanding firearm prohibitions in the U.S.: analysis of data from a national survey of prisoners.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

**Webster DW**, Vernick JS, Bulzacchelli MT.  Effects of Policies to Promote Firearm Dealer and Owner Accountability on Firearm Trafficking.  Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**. Firearm violence roundtable: Data collection, data quality, and data access.  Roundtable discussion led at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Vernick JS.  Implementation of a Community Gun Violence Prevention Program: A Focus on Outreach Workers' Efforts.  Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Mahoney P, Campbell JC, Ghanbarpou S, Stockman J.  Factors associated with seeking a long term protective order and staying away among women seeking temporary protective orders against a male partner.  Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Mahoney P, Campbell JC, Ghanbarpou S.  Communicating empirically-based information about risks and protection strategies to survivors of intimate partner violence. Presented at the Annual Meeting of the American Public Health Association, Washington, DC, Nov. 2007.

**Webster DW**, Vernick JS, Bulzacchelli MT.  Association Between Regulations and Oversight of Firearm Dealers and Gun Trafficking.  Presented at the Annual Meeting of the American Society of Criminology, Atlanta, November 2007.

Campbell JC, O'Sullivan C, Roehl J, **Webster DW**, Mahoney P, White M, Eliacin J, Guertin K. What battered women know and do to protect themselves from abuse:  results and methodological challenges from the domestic violence risk assessment validation experiment. Paper presented at the 9th International Family Violence Research Conference, Portsmouth, NH, July 2005.

**Webster DW**, Vernick JS, Manganello JA, Zeoli AM.  Effects of youth-focused firearm laws on youth suicides. Paper presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

Vernick JS, **Webster DW**, Pierce MW, Johnson SB, Frattaroli S. Judging the constitutionality of injury interventions using empirical data: The case of concealed weapons detectors. Paper presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

Vernick JS, Lewin NL, Beilenson PL, Mair JS, Lindamood MM, Teret SP, **Webster DW**.  Using local public health powers as a tool for gun violence prevention: The Baltimore Youth Ammunition Initiative. Paper to be presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

**Webster DW**.  Cracking down on corrupt gun dealers in Chicago: Effects on the illicit gun market. Paper presented at the annual meeting of the American Public Health Association, San Francisco, November 2003.

Campbell JC, **Webster DW**, Mahoney P, Rhoel J, O'Sullivan C. Domestic violence risk assessment and history of injury. Presented at the Annual Meeting of the American Public Health Association, San Francisco, November 2003.

Kim A, **Webster DW**.  Effects of a one-gun-a-month purchase limit on illicit gun trafficking and availability. Presented at the Annual Meeting of the American Public Health Association, San Francisco, November 2003.

Campbell JC, **Webster DW**, Chouaf K, et al. "If I can't have you, no one can": Further exploration of estrangement increasing risk of intimate partner femicide. Presented at the Annual Meetings of the American Society of Criminology, Chicago, November 2002.

Kim A, **Webster DW**.  The effects of the 1996 Maryland Gun Violence Prevention Act on Illicit Gun Markets. Presented at the Annual Meeting of Amer. Public Health Assoc., Philadelphia, Nov. 2002.

**Webster DW**, Vernick JS, Hepburn L.  The association between licensing, registration, and other gun sales laws and the state-of-origin of crime guns.  Presented at the National Association for Injury Control Research Centers meeting, Pittsburgh, May 2001.

**Webster DW**, Vernick JS, Hepburn L.  The association between licensing, registration, and other complementary gun sales laws and the state-of-origin of crime guns.  Presented at the annual meetings of the American Public Health Association, Boston, November 2000.

Campbell JC, **Webster DW**, et al.  Risk factors for intimate partner femicide among women in physically abusive relationships.  Presented at the annual meetings of the American Public Health Association, Boston, November 2000.

**Webster DW**, Vernick JS, Hepburn L.  Can comprehensive gun control and enforcement keep guns from being used in crime?  Presented at the annual meetings of the American Society of Criminology, Toronto, Ont., November 1999.

Roche K, **Webster DW**, Alexander C, Ensminger M.  Neighborhood effects on the association between parenting and youth fighting.  Presented at the American Sociological Association Annual Meetings, 1999.

**Webster DW**.  Assessing sources of data on risk factors for intimate partner homicide: Proxy respondent surveys versus police records.  Femicide Research Working Meeting, Chapel Hill NC, February 1999.

**Webster DW**, Campbell JC, Curry MA.  Issues of using proxy informants in femicide research. Annual meetings of the American Society of Criminology, Washington DC,  November 1998.

McFarlane J, **Webster DW**, Campbell JC, Block CR, Ulrich Y.  Femicide with and without suicide by an intimate partner: A comparative analysis.  Annual meetings of the American Society of Criminology, Washington DC, November 1998.

**Webster DW**, Vernick JS, Huang K.  The effects of Maryland's law banning Saturday Night Specials on homicides. American Public Health Assoc. Annual Meeting, Washington DC, Nov. 1998. Vernick JS, Webster DW, Huang K. Maryland's 1988 law banning Saturday Night Special handguns:  Effects on intermediate outcomes.  American Public Health Association Annual Meeting, Washington DC, November 1998.

**Webster DW**.  Investigating a sudden increase in the lethality of shootings in Baltimore: A case study.  American Public Health Association Annual Meeting, Indianapolis IN, November 1997.

Freed LH, Wilson MHS, Longwell JJ, Carrese J, **Webster DW**.  Deterrent to gun carrying among incarcerated adolescent males.  Presented at the Annual Meeting of the Robert Wood Johnson Clinical Scholars Meeting, November 1998.

**Webster DW**, Kaljee L, Vernick JS, Cameron DD.  Attitudes about new law enforcement technologies and strategies for detecting concealed weapons in a high-crime urban community.  Presented at the National Institute of Justice Annual Research and Evaluation Meetings, Washington DC, July 1998.

**Webster DW**, Campbell JC.  Issues in using case-control methods in homicide research.  Annual Meetings of the American Society of Criminology, San Diego CA, November 1997.

**Webster DW**.  Methodological challenges to evaluating the Brady Law.  Annual Meetings of the Homicide Research Working Group, Shepherdstown, WV, June 9 1997.

**Webster DW**.  Modifying guns tor reduce child and adolescent mortality: A Risk Analysis. American Public Health Association Annual Meeting, New York, November 1996.

**Webster DW**.  School-based efforts to reduce adolescent violence.  Presented at Children Harmed and Harmful:  Risks and Risk-Taking Among 10-15 Year-Olds, Working Conference.  Chicago, September 1994.

**Webster DW**.  Tackling the problem of gun carrying among youth:  Behavior change vs. environmental change.  Paper presented at the National Conference on Risk-Taking Behaviors Among Children and Adolescents.  Arlington, VA, June 1994.

**Webster DW**.  Individual vs. community perspective on the study and prevention of youth weapon carrying.  Public Health Service Annual Professional Meetings, Baltimore, MD, April 1994.

**Webster DW**, Wilson MEH.  The role of primary care pediatricians in preventing firearm injuries to children and youth.  Johnson & Johnson Pediatric Institute Conference on the Pediatrician's Role in Violence Prevention, Dulles, VA, March 1994.

**Webster DW**, Gainer PS, Champion, HR.  Determinants of weapon carrying within a sample of inner city junior high school students.  Paper to be presented at the American Public Health Association Annual Meetings, Washington, DC, November 1992.

**Webster DW**.  Short-term effects of a primary prevention program for youth violence.  American Psychiatric Association Annual Meetings, Washington, DC, May 1992.

**Webster DW**, Sykes L, Champion HR, Gainer PS.  The effects of Washington D.C.'s epidemic of gun violence on trauma center admissions and wound profiles.  American Public Health Association Annual Meetings, Atlanta, GA, November 1991.

Champion HR, Oschner MG, **Webster DW**.  A retrospective review of over 300 abdominal gunshot wounds at an urban Level I trauma center.  International Society of Surgery Conference, Stockholm, Sweden, August 1991.

Wilson MEH, **Webster DW**, Duggan AK, Pakula LC.  Firearm injury prevention counseling:  are pediatricians and parents ready?  American College of Physicians Annual Meetings, April 1991.

**Webster DW**, Wilson MEH, Duggan AK.  Parental beliefs and practices concerning firearm injury prevention.  American Public Health Association Annual Meetings, New York, October 1990.

**Webster DW**, Wilson MH, Duggan AK. Determinants of pediatrician firearm injury prevention counseling practices.  American Public Health Assoc. Annual Meetings, New York, October 1990.

**Webster DW**, Wilson MH, Duggan AK. Pediatrician attitudes and practices concerning firearm injury prevention counseling. Amer. Pediatric Soc./Soc. Pediatric Research Meetings, Chicago, 1990.

Waller AE, **Webster DW**, Baker SP.  Homicide and suicide among children, United States, 19801985.  American Public Health Association Annual Meeting, Chicago, October 1989.
Keyl PM, **Webster DW**, Smith GS, Baker SP.  The effect of Maryland's seat belt law on fatality risks.  SAE Conference on the Evaluation of Trends in Auto Safety, National Highway Traffic Safety Administration, Washington, DC, May 1989.

*Invited Presentations, Seminars & Webinars*

**Public Health Models and Evidence to Guide the Prevention of Gun Violence.**  2nd Annual Sarah and Erin Braner Endowed Lecture for the Department of Pediatrics at Oregon Health and Science University's (OHSU) Doernbecher Children's Hospital, Portland. November 2019.

**A Roadmap for Reducing Gun Violence in America**. 28th Annual Herbert Lourie Memorial Lecture on Health Policy, Maxwell School of Citizenship and Public Affairs, Syracuse University, Oct. 2016.

**Gun Violence in America: How Culture and Politics Shape Our Response.  Public Health Models for Reducing Gun Violence.** 22nd Annual Rosemary Flanigan Lecture, Center for Practical Bioethics, KU School of Medicine, The University of Kansas, August 2016.

**Lessons from Baltimore's Safe Streets Program on Community Efforts to Reduce Gun Violence.**  National Academies of Science, Engineering, and Medicine Workshop on Community Violence Prevention.  Brooklyn, NY, June 16, 2016.

**Effects of Extending Background Check Requirements to Firearm Sales by Private Gun Owners**.  White House meeting for state and local officials on strategies to reduce gun violence.  Washington, DC, May 24, 2016.

**Priorities for Advancing Research on Gun Violence.** American Association for the Advancement of Science Forum on Science and Technology Policy, Washington, DC, April 2016.

**Evidence to Guide Public Health Efforts to Reduce Gun Violence.**  Keynote presentation, Gun Violence: A Public Health Crisis Symposium, Washington University of St. Louis, April 5, 2016.

**Effects of Drug Law Enforcement Practices on Gun Violence**, Baltimore, 2003-2015.

**Presentation,** 2016 National High-Intensity Drug Trafficking Areas Conference, Washington, DC, Feb. 18, 2016.

**Public Health Approaches to Reducing Gun Violence in America Presentation,** Moving from Crisis to Action: A Public Health Approach to Reducing Gun Violence, Mother Emanuel A.M.E. Church, Charleston, SC, Dec. 4, 2015.

**Evidence on Policies to Keep Guns from High-Risk Individuals**, The Brady Center for Gun Violence Prevention and the American Public Health Association's Summit. Washington, DC, Oct. 27, 2015.

**Charting a Course Toward Fewer Gun Deaths in America**, National Public Health Week Grand Rounds Lecture, Drexel University, School of Public Health, Philadelphia, April 8, 2015.

**Evidence to Guide Gun Violence Prevention in America**, National Public Health Week Grand Rounds, University of Delaware, Newark, DE, April 6, 2015

**Research on Policies to Keep Firearms from Dangerous People Forum on Gun Violence Prevention**, American Public Health Association and Brady Campaign to Prevent Gun Violence.  Washington, DC, March 2, 2015.

**Why Collective Efficacy Makes us Safer than "Good Guys with Guns."** Q Commons Baltimore. Baltimore. February 26, 2015.

**Evidence that State Gun Policies Can Reduce Gun Availability to Criminals and Gun Violence.** Gun Violence Prevention Summit for State Legislators, Arlington, VA, December 9, 2014.

**Opportunities and Challenges for Prosecutors Combatting Gun Violence in America.** Keynote presentation to the first meeting of Prosecutors Against Gun Violence, Atlanta, Oct. 21, 2014.

**Evidence-Based Strategies to Reduce Gun Violence in America.** Presentation as part of the Distinguished Guest Faculty Seminars, University of Michigan Injury Research Center, Ann Arbor, Oct. 21, 2014.

**Evidence-Based Strategies for Reducing Gun-Related Violence and Injuries Among Youth.** Grand Rounds Presentation, Department of Pediatrics and Adolescent Medicine, Johns Hopkins University, School of Medicine. Sept. 24, 2014.

**America's Path to Fewer Gun Deaths.** Presented at TEDMED Conference, Washington, DC, Sept. 10, 2014.

**Evidence-Based Policies to Reduce Gun Violence in America.** George Mason University, Center for Evidence-Based Crime Policy's 2014 Symposium, June 23, 2014.

**Using Research Evidence to Strengthen Maryland's Gun Laws.** Mid-Atlantic Public Health Grand Rounds, Johns Hopkins Bloomberg School of Public Health, June 18, 2014.

**Evidence to Support Efforts to Reform America's Gun Laws.** The Brady Campaign Summit. Washington, DC, November 2013.

**A Way Forward for Policies to Reduce Gun Violence in America**. Invited to be a William J. Clinton Distinguished Lecturer for the Clinton School of Public Service, University of Arkansas, Little Rock, Sept. 10, 2013.

**Public Health Approaches to Reducing Gun Violence.** The Group Dynamics Seminar Series, Institute for Social Research, University of Michigan, Ann Arbor, MI, October 7, 2013.

**Preventing Intimate Partner Homicides by Keeping Firearms from Perpetrators of Domestic Violence.** Summit on Civil Protection Orders, National Council of Juvenile and Family Court Judges, Washington, DC, June 2013.

**Data and Informatics needs for gun violence prevention research.** Webinar for the Public Health Informatics Working Group for the American Medical Informatics Association. June 2013.

**Gun Violence: The Healthcare Providers Role in Prevention, National Healthcare Collaborative on Violence and Abuse**. Webinar, June 2013.

**Firearm Policy and Gun Violence Prevention.** Webinar for California Public Health Grand Rounds, May 2013.

**Public Health Interventions to Reduce Gun Violence to Youth.** Keynote session, Pediatric Academic Societies Annual Meeting, May 2013.

**Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence: Workshop.** Institute of Medicine, Washington, DC, April 2013.

**Preventing Violence with Policies to Keep Guns from High-Risk People.** George Washington University, School of Public Health, Forum – From Dialogue to Action: Preventing Gun Violence, April 5, 2013.

**Research to Inform Policies to Keep Guns from High Risk People.** The United States General Accountability Office, April 3, 2013.

**Policy Priorities for Reducing Youth Gun Violence: A Way Forward.** Semi-annual meeting of the Maternal and Child Health Section of the American Public Health Association, February 2013.

**Importance of Assessing Threats to Study Validity: Cautions About Applying Questionable Evidence to Policies and Programs to Reduce Violence**. Evidence for Violence Prevention Across the Lifespan and Around the World: A Workshop of the Forum on Global Violence Prevention, Institute of Medicine, Washington, DC, January 23-24, 2013.

**Preventing Gun Violence to Youth**. Keynote presentation, King Holiday Celebration, Martin Luther King, Jr. Center for Non-Violence, New York, NY, January 2013.

**Changing the Code of the Street in Baltimore's Most Violent Neighborhoods: Evaluation of a CeaseFire-like Intervention.** Patricia F. Waller Lecture. University of North Carolina, October 2012.

**Reducing Risk for Re-assault of Victims of Intimate Partner Violence**. Network for Public Health Law's Eastern Region Symposium. University of Maryland Law School, Baltimore, June 26, 2012.

**Firearm Seller Accountability Measures and the Diversion of Guns to Criminals**. Congressional briefing organized by George Mason University's Center for Evidence Based Crime Policy, Washington, DC, February 2012.

**Research with Victims of Intimate Partner Violence: Risks, Benefits, and Safety Strategies**. Plenary session, Advancement of Ethical Research Conference, National Harbor, MD, December 2011.

**Evaluating Baltimore's Replication of Chicago's CeaseFire Program: Effects on Youth Attitudes and Gun Violence.** Centers for Disease Control and Prevention, Atlanta, January 7, 2010.

**Public Health Approaches to Gun Violence Prevention**. Conference on Promoting Community Safety and Preventing Violence: Integrating Lessons from Research and Practice. Ohio State University, Columbus, OH, June 2009.

**Keys to States Keeping Guns from Criminals and Reducing Gun Violence**. Meeting of State Legislators Against Gun Violence, Gracie Mansion, New York, May 8, 2009.

**Effects of Baltimore's Safe Streets Program: A Public Health Approach to Reducing Gun Violence**. Trauma Seminar Series, Johns Hopkins Hospital, March 2009.

**Effective Strategies for Combating Illegal Guns and Gun Violence**. Roundtable on Gun Violence Prevention, International Association of Chiefs of Police, Chicago, IL, November 2008.

**Research Supporting the Lethality Assessment Program**. Maryland Judicial Conference, Linthicum Heights, MD, June 20, 2008.

**Evidence-Based Strategies for Reducing Illegal Guns and Gun Violence**. Seminar for the Baltimore Police Department Command Staff Training, Baltimore, May 22, 2008.

**Preventing Gun Violence**. Invited seminar for the Baltimore City Circuit Court Judges, April 2008.

**How Cities Can Reduce Gun Violence**. Mid-Atlantic Regional Meeting, Mayors Against Illegal Guns, March 2007.Strategies to Reduce Illegal Gun Trafficking.  Harvard Injury Control Research Center, January 2007.

**Expert Panel, Midwest meeting of Mayors Against Illegal Guns**, Chicago, October 2006.

**Expert Panel for Mayors Against Illegal Guns Summit**, New York, April 2006.

**Promising Approaches for Violence Prevention**.  Association of Baltimore Area Grantmakers, Baltimore, March 2006.

**Evidence of the Effectiveness of Gun Policies**.  Graduate Seminar in Injury Research and Policy, Johns Hopkins Bloomberg School of Public Health, February 2004.

**Recent Research on Gun Violence Prevention**.  Seminar at the 2003 Child Advocacy Leadership Institute, Advocates for Children and Youth, Washington, DC, November 2003.

**Gun Policy: Understanding the Research and Defending the Data**.  Seminar at 2002 Child Advocacy Leadership Institute, National Association of Child Advocates, Washington, DC, November 2002.

**Preventing Gun Violence Among Youth**. Seminar for the University of Maryland Journalism Fellowship in Child and Family Policy, Washington, DC, November 2002.

**Opportunities for Preventing Gun Violence**, the U.S.  Robert W. Leraas Lecture, St. Olaf College, Northfield MN, October 2002.

**The Impact of Gun Safe Storage Laws on Firearm Mortality Risks among Youth**. National Academy of Sciences, Institute of Medicine Meeting on Youth and Gun Violence. Washington, DC, Sept 2002.

**Recent Research on the Effectiveness of Gun Policies**. Citizens' Conference to Stop Gun Violence.  Arlington, VA, February 2002.

**How Criminally-Involved Youth Obtain Their Guns**. Citizens' Conference to Stop Gun Violence.  Arlington, VA, February 2002.

**The Role of Alcohol in Interpersonal Violence**. Johns Hopkins University, Center for Injury Research and Policy Seminar, October 2001.

**Risk Factors for Near Fatal Intimate Partner Assaults**. Johns Hopkins University, Department of Mental Hygiene's Seminar Series on Violence Research, September 2001.

**Effects of Child Access Prevention Gun Laws on Unintentional Gun Deaths to Children**. Presented at the annual meeting of the Handgun Epidemic Lowering Plan (HELP) Network, Atlanta, April 2001.

**Public Health Models for Reducing Gun Violence**. Grand rounds presentation at George Washington University School of Medicine, Washington, DC, April 2000.

**Methodological Challenges to Studying Risk Factors for Intimate Partner Homicide**. Seminar for the Center for Injury Research and Policy, Johns Hopkins School of Public Health, March 1999.

**School-Based Interventions to Reduce Youth Violence: Do Our Programs Fit the Problem?**  Annual conference of Maryland State School Health Council, Ocean City MD, April 1998.

**The Role of Health Professionals in the Prevention of Youth Violence**. Continuing medical education seminar at Bethesda Memorial Hospital, Boynton Beach, FL, February 1998.

**Determinants of Youth Violence and Scientific Support for Interventions**. Best Practices in Adolescent Health Conference, Annapolis MD, May 1996.

**Media Advocacy and Public Health: A Case Study of a Campaign to Increase Support for Handgun Restrictions**. Johns Hopkins University School of Public Health Seminar, April 1995.

**The Evaluation of the Policy Program of the California Wellness Foundation's Violence Prevention Initiative**, MPH Seminar, November 1995.

**The Limitations of Skill-Focused Conflict Resolution Curricula for Reducing Youth Violence**.  Handgun Epidemic Lowering Plan (HELP) Network Annual Meeting.  Chicago, September 1994.

**Promising Public Health Approaches to Violence Prevention**. Presentation to the Board of Directors, Physicians for Social Responsibility, Bethesda, MD, March 1994.

**The Ability of Gun Laws to Reduce Deaths and Injuries**. Presentation to the Maryland State Office of Strategic Drug Enforcement Coordination, Columbia, MD, January 1994.

**The Limitations of Conflict Resolution Curricula for Adolescents**. National Symposium on Violence, Safety, and Health in Urban Schools.  Sponsored by the Council of Great City Schools, Washington, DC, December 1993.

**The Role of Public Health in Violence Prevention**. JHU Seminar sponsored by the Department of Mental Hygiene and The Injury Prevention Center, December 1993.

**Research on Strategies to Prevent Youth Violence. Creative Solutions to Problem of Urban Violence**. Symposium sponsored by the Baltimore Urban League and the YMCA. Baltimore, April 6, 1993.

**Public Health Professionals' Role in Reducing Injuries from Violence.  Preventive Medicine in Minority Communities:  First or Last Resort?** Symposium sponsored by the Student National Medical Association of The Johns Hopkins School of Medicine.  Baltimore, MD, April 3, 1993.

**Health Professionals' Role in Limiting Children's Access to Firearms**. Surgeon General's Invitational Workshop. Keeping Kids Safe:  Strategies for Preventing Violence and Injury, Columbia, MD, November 19, 1992.

**A Legislative Agenda for Violence Reduction**. Consortium of Virginia Urban Municipalities, Williamsburg, VA, July 10, 1992.

**The Epidemiology of Violence and Public Health Approaches to the Problem**. Keynote Address, 13th Annual Institute of the Virginia Organization of Health Care Social Workers, Richmond, June 1992.


## ADDITIONAL INFORMATION

*Personal Statement*

that synthesizes your research, policy, and practice goals, objectives and impact  [This section allows you to "tell your story" and "connect the dots" – very important, particularly for faculty doing a wide range of tasks that are not captured through traditional "academic metrics". Keep it concise (no more than half a page)]


*Keywords*

violence, violence prevention, firearm injuries, gun policy, domestic violence, substance abuse


*Research Objectives*

To study the causes and prevention of interpersonal and self-inflicted violence and associated injuries; to study the effectiveness interventions intended to reduce severe forms of violence; to develop and assess instruments designed to assess the risk for future violence.


*Community Involvement*

Coach, Bethesda-Chevy Chase Baseball Youth League 2001- 2010

Served as Co-Chair of Social Justice Committee and as a member of the Board of Trustees at Temple Emanuel, Kensington, MD, 2004- 2007

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREARMS POLICY COALITION, INC., | : <br> : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | :    C.A. No. 1:21-cv-01523-MN <br> : |
| KATHY JENNINGS, Attorney General of Delaware, | : <br> : <br> : |
| Defendants. | |

**<u>DECLARATION OF ROBERT J. SPITZER</u>**

I, Robert J. Spitzer, the undersigned, declare as follows:

1.      I have been asked to render an opinion on the history of firearms restrictions pertaining to old gun laws concerning trap guns, swivel/punt/pivot guns, gunpowder, Bowie and similar fighting knives, and types of clubs enacted in the nineteenth century and earlier, as these all pertain to Delaware's ghost gun law.

2.      This declaration is based on my own personal knowledge, research, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

3.      I have been retained by the Delaware Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $500 per hour.

**BACKGROUND AND QUALIFICATIONS**

4.      I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland.  I was also a visiting professor at Cornell University for thirty years.  I am currently an adjunct professor at the College of William and Mary School of Law.  I

earned my Ph.D. in Government from Cornell University.  I reside in Williamsburg, Virginia.  A copy of my curriculum vitae is attached to this Declaration.

5.      I have been studying, teaching, and writing about gun policy for over thirty years. My first publication on the subject appeared in 1985.  Since then, I have published six books and over one hundred articles, papers, and essays on gun policy.  My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues.  My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995.  It examines firearms policy in the United States through the lenses of history, law, politics, and criminology.  The ninth edition of the book was published in August (copyright 2024) by Routledge Publishers.  My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws.  I am frequently interviewed and quoted in the national and international media on gun-related matters.  For over twenty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence).

6.      I have provided written testimony as an expert witness in the following cases (in addition to this case): *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.); *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, No. 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, No. 17-cv-00746 (C.D. Cal.); *Gates v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No. 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *Nat'l Ass'n for Gun Rights, Inc. v. City of*

*Highland Park*, No. 22-cv-4774 (N.D. Ill.); *Nat'l Ass'n for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-cv-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & Cnty. of Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, No. 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, No. 11-cv-9916 (C.D. Cal.); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. 1:22-cv-00951(D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum*, No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 23-141 (S.D. Ill.); *Mitchell v. Atkins*, No. 19-cv-5106 (W.D. Wash.); *Keneally v. Raoul*, No. 23-cv-50039 (N.D. Ill.); *McGregor v. Cnty. of Suffolk*, No. 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, No. 22-cv-10989 (S.D.N.Y.); *Rocky Mountain Gun Owners, et. al. v. Town of Superior*, No. 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, No. 17-cv-00903 (E.D. Cal.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, No. 23-cv-209-RJD (S.D. Ill.); *Fed. Firearms Licensees of Ill. v. Pritzker*, No. 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, No. 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, No. 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, No. 23-cv-05364 (W.D. Wash.); *RMGO/Mosgrove v. Polis.*

7.  I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq v. Beaty*, U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago*, U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar*, Illinois Supreme Court, No. 08 CR 12069 (2012).

8.  I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to

the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

**SUMMARY OF OPINIONS**

*I.  INTRODUCTION*

9.    Delaware's 2021 law outlawing the manufacture and possession of homemade "ghost guns"—firearms without identifying serial numbers that would otherwise allow the guns to be traced by law enforcement—is part of a recent effort by states to stem the rising spread of such weapons used in crime. Analysis supports the conclusion that ghost guns have been increasingly used in criminal activity. In 2016, fewer than 3000 were collected and reported to the Department of Justice. By 2021, that number had risen to nearly 20,000, an increase of over 1000 percent. These numbers are considered to be a significant underestimation of ghost guns in circulation.[1]

10.    According to the Giffords Law Center, "[t]he ghost gun industry has developed gun build kits and related products that allow untrained amateurs to quickly and easily assemble their own firearms from unregulated parts—including frames and receivers that are left just unfinished enough to escape the definition of 'firearm' under state or federal gun safety laws."[2] As of this writing, 12 states plus the District of Columbia have enacted ghost gun restrictions. In 2022, the

---

[1] Michelle Rippy, "The Ghost Guns Haunting National Crime Statistics," Federation of American Scientists, June 6, 2023, https://fas.org/publication/the-ghost-guns-haunting-national-crime-statistics/. See also Hannah S. Laqueur et al., "Trends and Sources of Crime Guns in California: 2010-2021," *Journal of Urban Health* 100(September 11, 2023), https://link.springer.com/article/10.1007/s11524-023-00741-y

[2] "Ghost Guns," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/ghost-guns/

federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) issued an administrative rule to define weapons parts kits convertible into fully assembled firearms as "firearms," meaning that the parts had to be serialized and sold with a background check, as is the case with fully assembled firearms.[3]

11.     The presence or absence of serial numbers on firearms has no effect on their functionality, and one is hard pressed to imagine why any law-abiding citizen would want to own a gun with no identifying serial numbers. It does, however, have profound consequences for their use in criminality and public safety. Throughout American history, governments have imposed restrictions on a wide array of specific weapons considered to pose a particular threat to public safety and good order, including those considered to pose a particular danger—even including modified or "self-made" weapons. Before turning to those, however, this Declaration first considers the history of the imprinting of serial numbers on firearms, and the relationship of that to early firearms production.

## II.     EARLY FIREARMS PRODUCTION AND FIREARMS SERIALIZATION

12.     Meaningful serialization of firearms is a relatively recent phenomenon. While guns made in America in the 1700s might have had a maker's mark or similar embellishment, there was no reason, methodology, or imperative to develop and implement a comprehensive firearms numbering system. As National Rifle Association (NRA) President Karl Frederick testified in 1934 during congressional hearings on the National Firearms Act then under consideration, "numbering weapons is a modern device and it is not found in the older weapons."[4]

---

[3] "Ghost Guns."

[4] "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 53.

13.     As historian Kevin Sweeney explains, firearm production in America in the late eighteenth century was a slow and laborious process where firearms were made one at a time, a process that required an array of skills. If working with assistants, according to Sweeney, "a colonial gunsmith might have been able to make two to possibly three muskets a week if some of the more intricate parts such as the lock mechanism were obtained from other sources." [5] Most of the guns available in America came from abroad, and gunsmiths in America spent most of their time and effort repairing existing firearms rather than making new ones. [6] This continued to be true into the early nineteenth century.

14.     In a pre-industrial, developing nation where guns were made by hand one at a time, there would obviously be no reason, notion, ability, or incentive to enact some kind of uniform firearm numbering system. Obviously, manufacturing improvements and other circumstances changed as the nation evolved and developed, leading eventually to firearms serializing. But in the 1700s and most of the 1800s, uniform firearms serializing was a non-existent solution to a non-existent problem. Moreover, it would have been all but impossible to establish some kind of uniform firearms serializing across the country in this agrarian, pre-industrial society where transportation and communications were slow, record-keeping was primitive and unsophisticated, and guns were made by hand by local artisans, one at a time.

15.     Around the time of the development of multi-shot firearms and the rise of mass production techniques, gun companies began to introduce firearms numbering, though their numbering schemes were idiosyncratic and unsystematic, and implemented for internal purposes.

---

[5] Kevin Sweeney, "An Eighteenth-Century Gun Culture Shaped by Constraints," Duke Center for Firearms Law, September 6, 2023, https://firearmslaw.duke.edu/2023/09/an-eighteenth-century-gun-culture-shaped-by-constraints/
[6] Sweeney, "An Eighteenth-Century Gun Culture Shaped by Constraints."

As early as 1840, Colt began numbering its revolvers, but "Colt always started each new model at serial number '1', and progressed upward until the model was discontinued," but it was an "often confusing serial number system. Colt often mixed several models in the same serial number ranges or split models out by caliber."[7] In the 1860s, some Henry rifle serial numbers "overlap[ped]."[8] "Firearms made at Springfield Armory after 1865 were given unique serial numbers for identification purposes. Before 1865, serial numbers were not given to National Armory Weapons, even though production began at Springfield Armory in 1795 with the Model 1795 Flintlock Musket."[9] Historic serial numbering for Winchester firearms was neither "complete" nor "always verifiable."[10]

16.     As this account makes clear, early serializing was done purely within gun companies by and for manufacturing and internal record-keeping purposes, not because of any notion that it would be helpful or important for law enforcement or government policy. When the need and the technology arose, numbering was implemented.

17.     The first federal law to require distinctive numbering on some firearms was the National Firearms Act of 1934, which required the weapons regulated by the law (including fully automatic firearms and sawed-off shotguns) to have an identifying "manufacturer's number" for dealers and owners to "register" along with other information.[11] Uniform national serializing was established for all firearms in the Gun Control Act of 1968.[12]

---

[7] "Date Made & Model Info," *Colt Fever*, https://coltfever.com/date-made-model-info/
[8] https://proofhouse.com/win/winchester.htm
[9] "Firearm Serial Numbers," National Park Service,
https://www.nps.gov/spar/learn/historyculture/firearm-serial-numbers.htm
[10] "What year was my Winchester manufactured?" Winchester Repeating Arms,
https://www.winchesterguns.com/support/faq/date-your-firearm.html
[11] National Firearms Act of 1934, 48 Stat. 1236.
[12] 82 Stat. 1213.

18.     Returning to ghost gun laws, several categories of historic gun laws were enacted to address the problem of specific types of weapons considered to pose a particular threat to public safety and good order, including those considered to pose a particular danger—even including modified or "self-made" weapons. These include historic weapons laws pertaining to trap guns (which were modified/self-made by the guns' owners), punt/pivot/swivel guns, gun powder, Bowie knives, and certain types of clubs. All of these categories of weapons were identified as posing specific, regulatable harm or risk to the public, and were therefore subject to extensive regulation.

### III.   HISTORICAL RESTRICTIONS ON TRAP GUNS

19.     Not to be confused with firearms used in trapshooting, trap guns were devices or contraptions rigged in such a way as to fire when the owner was not present to operate the gun. Typically, trap guns could be set to fire remotely by rigging the firearm to be fired with a string or wire which then discharged when tripped.[13]   While the "technology" involved in rigging and setting a trap gun was simple, it was nevertheless a modification that transformed a firearm from something that could only be operated by a person holding the weapon to one that would operate with no one present, aside from the unlucky person who might trip the device and set it off.

20.     This early law from New Jersey in 1771 both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[14]

---

[13] See Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80(2017): 67.
[14] 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

21.     Also sometimes referred to as "man traps" or "infernal machines,"[15] the term trap

gun came to encompass other kinds of traps designed to harm or kill those who might encounter

them, including for purposes of defending property from intruders.

22.     At least 18 states had anti-trap gun laws.[16] The earliest such law encountered was

---

[15] E.g. 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3; "The Man Trap," *The Buffalo Commercial*, Nov. 1, 1870, https://www.newspapers.com/image/264632378.

[16] 1910 Md. Laws 521, § 16c; 1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1; 1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236; The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota Page 993, Image 287 (Vol. 2, 1873), Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65; 1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18; 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 (1771);  1877 N.Y. Laws 434, Chap. 411, 434-39, CHAP. 411; 1886 N.Y. Laws 361, Chap. 194, 361-62, Chap. 194; 1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1; The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1259, Image 1293 (1895); 1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2; 1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6; 1892 R.I. Pub. Laws 14, An Act In Amendment Of Chapter 92 Of The Public Statutes, Entitled "Of Firearms And Fireworks, § 6; Edmund William McGregor Mackey, The Revised Statutes of the State of South Carolina, Prepared by Commissioners under an Act of the General Assembly, Approved March 9, 1869, to Which is Prefixed the Constitution of the United States and the Constitution of South Carolina Page 404, Image 482 (1873), Hunting, General Provisions, § 21; 1931 S.C. Acts 78; 1909 S.D. Sess. Laws 450, ch. 240, §§ 21-22; An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866); 1901 Utah Laws 97-98, ch. 96, §§ 1-3; 1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1; Vermont Public Acts, No. 80—An Act Revising, in Amendment of and in Addition to the Fish and Game Laws. pp. 89-90, 1892; 1912 Vt. Acts and Resolves 261; 1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3; David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the

the 1771 New Jersey law (above).  Eleven laws were enacted in the 1700s-1800s, and 9 in the early

1900s (some states enacted multiple laws across the centuries; see Exhibit B).

23.     Unlike the other weapons restrictions examined here, opinion was initially more

divided on the relative merits or wisdom of setting such devices, with some arguing that thieves

or criminals hurt or killed by the devices had it coming,[17] though the weight of opinion seemed

mostly against such devices because of the likelihood that innocent persons could be injured or

killed, and also because such devices represented an arbitrary and excessive meting out of private,

vigilante-type "justice" that was unjustifiably harsh—to seriously wound or kill a person—for

crimes like stealing food or similar commodities.[18]  Those who set gun traps typically did so to

defend their places of business, properties, or possessions.  This 1870 newspaper account from an

incident in New York City provides an example where a burglar was killed by a gun-trap set by a

shopkeeper, who was then prosecuted: "As there is a statute against the use of such infernal

---

Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the
Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with
References, Showing the Time of the Enactment of Each Section, and Also References to
Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1964, Image 859 (Vol. 2,
1872); 1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals, ch. 530, § 1. Trap gun
laws discovered from newspaper accounts: Missouri: "Shot by a Trap-Gun," The South Bend
Tribune, Feb. 11, 1891, https://bit.ly/3CtZsfk; New York: "The Man Trap," The Buffalo
Commercial, Nov. 1, 1870, https://bit.ly/3yUSGNF; Ohio:  "How a Melon Thief Came to Grief,"
Wellington Enterprise, Wellington, Ohio, September 21, 1881,
https://www.newspapers.com/image/171228605/?terms=%22trap%20gun%22&match=1;
Pennsylvania: The Wrightsville Star, Wrightsville, Pa., March 7, 1873, 3,
https://www.newspapers.com/image/774191522/?terms=%22trap%20gun%22&match=1

[17] For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27,
1870: "A burglar while attempting to break into a shop in New York, Monday night, had the top
of his head blown off by a trap-gun so placed that it would be discharged by any one tampering
with the window.  A few such 'accidents' are needed to teach the thieves who have lately been
operating in this city, a lesson."

[18] This is my observation based on my reading of historic newspaper accounts from the late
1800s, and from the number of anti-trap gun laws enacted.  As policing became more consistent,
professional, and reliable, support for vigilante-type actions like setting trap guns seems to have
declined.

machines, which might cause loss of life to some innocent person, the jury censured Agostino."

After the verdict the man continued to be held under $2,000 bail.[19]

24.     Inevitably, the traps wound up hurting or killing innocents, even including the person who set the trap.  For example, this 1891 newspaper account from Chillicothe, Missouri illustrated the problem: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun.  Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[20] Restrictions on trap guns pose a remarkably similar historical parallel to modern ghost gun restrictions.


## IV.  HISTORICAL LAWS RESTRICTING PUNT/PIVOT/SWIVEL GUNS

25.     Guns that were referred to as punt guns, pivot guns, and swivel guns, were various similar types of large firearms that also included what might be considered small cannons. Punt guns were loosely defined as large bore muzzle-loaded shotguns. Described as "the poster-child of waterfowl market hunting of the 1800s," a single discharge from a punt gun "could annihilate 50-100 birds."[21] The use of these weapons to hunt waterfowl resulted in decimation of their numbers around the turn of the twentieth century. Pivot guns were small cannons that were mounted on a pivot or revolving carriage enabling them to be aimed in a wide arc.[22] These too were used for hunting various game and waterfowl. Similarly, swivel guns were also mounted or attached to a swivel or pedestal in order to be rotated vertically or horizontally for a wide range of

---

[19] "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF.
[20] "Shot by a Trap-Gun," *South Bend Tribune*, February 11, 1891, https://bit.ly/3CtZsfk.
[21] "The Punt Gun and the Race to Save America's Wildlife," Boone and Crockett Club, https://www.boone-crockett.org/punt-gun-and-race-save-americas-wildlife
[22] https://www.yourdictionary.com/pivot-gun://academic-accelerator.com/encyclopedia/pivot-gun

fire.[23] By one definition, a swivel gun is "one of the smallest cannons, typically less than 1 m (3.3 ft) in length and caliber up to 3.8 cm (1+1⁄2 in). It can fire a variety of ammunition, but was commonly used to fire Grapeshot and small caliber ammunition."[24]

26.     From the 1700s to the early 1900s, at least 25 states enacted 44 laws that punished the possession, firing, or use of these types of weapons. One state, Massachusetts, enacted several such laws in the 1700s; 17 states enacted such laws in the 1800s, and 18 states enacted laws in the early 1900s (see Exhibit C. Some states enacted laws in more than one century).

27.     With a handful of exceptions, these laws were directed against the use of these weapons in hunting. Beyond simply being unsportsmanlike, the rapid decimation of game that resulted from their use was a primary concern, along with more general safety concerns. Among those laws reflecting general public safety concerns were several enacted by Massachusetts in 1783. One of these laws noted that if "cannon, swivels, mortars, howitzers, cohorns [a small mortar]" were discovered in any building or structure in Boston, the weapons "shall be adjudged forfeit, and be sold at public auction."[25] Two other laws enacted that year expanded and amplified this stricture.[26]

28.     An 1877 ordinance for the city of Norwich, Connecticut, punished any who would fire "any swivel, musket, fowling-piece, pistol, or other gun of any description within said city"

---

[23] https://www.merriam-webster.com/dictionary/swivel%20gun
[24] https://academic-accelerator.com/encyclopedia/swivel-gun
[25] 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.
[26] 1783 Mass. Acts 218; Thomas Wetmore, Commissioner, The Charter and Ordinances of the City of Boston: Together with the Acts of the Legislature Relating to the City Page 142-143, Image 142 (1834) available at The Making of Modern Law: Primary Sources. [1783].

subject to a fine. An 1890 Bradford, Vermont ordinance also penalized any who would fire a list of weapons including any cannon or swivel gun within its vicinity.[27]

29.     As mentioned, the vast majority of anti-punt/pivot/swivel gun laws punished their use in hunting. The particular types of game listed in these laws varied, according to the types of game found in the respective states and those most vulnerable to decimation by the use of these weapons. For example, An 1874 Maryland law was specific as to game, time of use, and method: "no person shall, during the hours intervening between twilight at evening and twilight of the following morning, shoot or kill, or shoot at . . . any wild fowl within the limits of Worcester County. . . . with any swivel or pivot gun, or any kind of gun which cannot be conveniently discharged from the shoulder at arms length and without a rest."[28] A 1911 Delaware law was more broad and general when it made it "unlawful to shoot at or kill any birds or animals protected by the laws of this State with any device, swivel or punt gun, or with any gun other than such as is habitually raised at arm's length and fired from the shoulder."[29] An 1872 Michigan law said: "No person or persons shall at any time kill or attempt to kill any wild duck, or other wild fowl, with or by means of a swivel or punt gun. . . ."[30] An 1871 Wisconsin law enacted for "the Preservation of Fish and Game" said that no person was to "kill any wild duck, brant or wild goose, with or by means of the device, instrument or fire arm known as a punt or swivel gun, or with or by means of

---

[27] Act of Incorporation and By-Laws of the Village of Bradford Page 14, Image 15 (1890) available at The Making of Modern Law: Primary Sources. Vermont. By-laws, Miscellaneous, § 6.

[28] 1874 Md. Acts 224, An Act To Protect Wild Fowl in Worcester County, ch. 164, §§ 1-2.

[29] 1911 Del. Laws 324, Of Fish, Oysters and Game, § 8.

[30] James S. Dewey, The Compiled Laws of the State of Michigan. Compiled and Arranged under an Act of the Legislature, Approved January 25, 1871 Page 680, Image 690 (Vol. 1, 1872).

any gun or fire arm other than such guns or fire arms as are habitually raised at arm's length and fired from the shoulder. . . ."[31]

30.     As this account makes clear, these types of weapons were undeniably considered "dangerous and unusual," and therefore subject to widespread laws against them.

## V.    HISTORICAL RESTRICTIONS ON GUNPOWDER

31.     Gunpowder has been widely and extensively regulated in the colonies and states. In fact, with one exception, every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century (see Exhibits D-G). When new or more devastating explosives were invented, they too were subject to similar regulation.

32.     These regulations served several purposes. Early in our history, a primary concern was to accumulate, preserve, and make available gunpowder for collective defense needs. Non-military public safety imperatives also motivated the enactment of gunpowder laws from the seventeenth through the twentieth century. These measures generally focused on safe storage, transport, and use. As Adam Winkler observes, with respect to the Founding period, "[t]here were laws requiring gunpowder to be stored safely, even though the rules made it more difficult for people to load their guns quickly to defend themselves against attack."[32]

33.     In particular, fear of the devastating effects of fires and explosions was a major concern at a time when most structures were made of wood or other highly flammable materials, fire retardant materials and safety standards in construction were virtually unheard of, and the state

---

[31] David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1960-1961, Image 855-856 (Vol 2, 1872) available at The Making of Modern Law: Primary Sources.
[32] Adam Winkler, *Gunfight* (NY: W.W. Norton, 2011), 286. See also 116-17.

of firefighting was primitive. As historian Jill Lepore notes, "[f]ire was the greatest danger facing an early modern city."[33] As Mark Anthony Frassetto concludes: "[h]istorically, virtually every jurisdiction heavily regulated the possession, transportation, sale, and manufacture of gunpowder to prevent fires and explosions and regulated the shooting of guns both to protect against unintentional shootings and fires caused by gunshots."[34] Saul Cornell and Nathan DeDino conclude that: "[b]y the close of the eighteenth century, there was already a tradition of statutes regulating the storage and transport of gunpowder."[35] They note that gunpowder laws were not simply restricted to large cities like Boston, New York, and Philadelphia, but, in the case of Pennsylvania, for example, "appeared within the statutes that provided for the initial incorporation of new towns alongside the provisions that created commons and streets and regulated public nuisances."[36] Early laws were also very specific in stipulating the amount of gunpowder that could be kept, where it could be kept, the types of containers holding the powder, the specific means and circumstances by which it would be transported, and its use.[37] Notably, these laws existed even as gunpowder was indispensable for the discharge of flintlock-style firearms.

34.    As Exhibit D shows, at least 6 colonies enacted at least 10 gunpowder laws in the 1600s, at least 8 colonies/states enacted 30 gunpowder laws in the 1700s, 175 laws were enacted in the 1800s, and 76 laws in the 1900s up until 1934 (the end point of the dataset; see Exhibits E,

---

[33] Jill Lepore, *New York Burning: Liberty, Slavery and Conspiracy in Eighteenth-Century Manhattan* (NY: Knopf, 2005), 42.

[34] Mark Anthony Frassetto, "The Duty to Bear Arms: Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment" (January 12, 2022), 8, in *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (eds. Jacob Charles, Joseph Blocher & Darrell Miller) (Oxford University Press, Forthcoming), Available at SSRN: https://ssrn.com/abstract=4007491 or http://dx.doi.org/10.2139/ssrn.4007491

[35] Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73(2004): 510.

[36] Cornell and DeDino, "A Well-Regulated Right," 511.

[37] Cornell and DeDino, "A Well-Regulated Right," 511-12; Frassetto, "The Duty to Bear Arms," 8-10.

F, and G for full texts of these laws), yielding a grand total of at least 288 laws in 49 states. In short, the states enacted a blizzard of these laws, demonstrating ubiquitous and plenary governmental authority to regulate gunpowder, extending to all corners of municipalities, including private homes and other buildings. To examine the earliest of these laws, a colonial Virginia law enacted in 1623 restricted discharging firearms to save gunpowder: "That no commander of any plantation do either himselfe or suffer others to spend powder unnecessarily in drinking or entertainments, &c."[38]

35.     In 1629, Virginia directed that colonists "shall use their best endeavors to preserve and keep in dry and tight houses or casks" the constituent components to make gunpowder, including potash, "saltpeeter," wood ash, and also that they "preserve and keep all their urine"[39] for that purpose. Connecticut's 1665 law criminalized selling or bartering gunpowder to Native Americans.[40] New Jersey's 1639 law did the same, although the punishment in that colony for doing so was death.[41] New York's 1652 law[42] and 1664 law barred sale of powder to Indians, but in the case of the 1664 law, it also barred selling gunpowder "to any person inhabiting out of this Government."[43] Pennsylvania's 1676 law also penalized sale of gunpowder "to any Indian

---

[38] The Laws of Virginia, Vol. 1, 1623, 127;
https://archive.org/details/statutesatlargeb01virg/page/126/mode/2up?view=theater
[39] 1629 Va. Acts 151, Acts of March 24th, 1629, Act 5, For the better furtherance and advancement of staple commodities. . . ."
[40] The Public Records Of The Colony Of Connecticut, Prior To The Union With New Haven Colony, May, 1665 Page 79, Image 91.
[41] 1639 N.J. Laws 18, Ordinance of the Director and Council of New Netherland, Prohibiting the Sale of Firearms, etc. to Indians . . .
[42] 1652 N.Y. Laws 128 Ordinance of the Director and Council of New Netherland Against Illegal Trade In Powder, Lead And Guns In New Netherland By Private Persons.
[43] The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 40-41, Image 62-63 (1896).

whatsoever, nor to any person inhabiting out of this government."[44] A 1651 Massachusetts law barred the transport of gunpowder outside of the colony's jurisdiction (except with permission). The penalty for violation was "forfeiting all such powder."[45] A 1690 New York law united gunpowder regulation with a very specific burden on firearm discharge when it made it unlawful "to burn any powder. . .upon pain of paying for every shot or discharging of gun or pistol" unless for authorized reasons.[46]

36.    Note that, even in this very early period, the colonies could restrict or even bar gunpowder use for gun firing; impose penalties that included the taking of powder from any offending individuals; and restrict gunpowder transport. The only exceptions to these restrictions were instances when governmental or military authorities sanctioned gunpowder use.

37.    These kinds of restrictions, along with many others, lace the gunpowder laws in the centuries to come. These laws sharply burdened the ability of individuals to keep and use gunpowder for personal purposes.

38.    For example, a 1750 Pennsylvania law penalized the discharge of any firearm within any established municipality in the colony. Violators faced gun forfeiture and other penalties.[47] A 1783 Massachusetts law restricting firearms and gunpowder in Boston began by noting that "The depositing of loaded arms in the houses of the town of Boston is dangerous." It

---

[44] Charter To William Penn, And Laws Of The Province Of Pennsylvania, Passed Between The Years 1682 And 1700 Page 32, Image 37 (1879) available at The Making of Modern Law: Primary Sources. 1650-1699.

[45] William Henry Whitmore, The Colonial Laws of Massachusetts: Reprinted From the Edition of 1672, with the Supplements Through 1686: Containing Also, a Bibliographical Preface and Introduction, Treating of All the Printed Laws From 1649 to 1686: Together with the Body of Liberties of 1641, and the Records of the Court of Assistants, 1641-1644 Page 126, Image 330 (1890) available at The Making of Modern Law: Primary Sources. 1651.

[46] The State Of New – York Page 222-223, Image 228-229 (1849) available at The Making of Modern Law: Primary Sources. 1650-1699: 1690.

[47] 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries.

barred bringing gunpowder or gunpowder-loaded firearms into any house or other structure in the

city. The penalty for doing so was that "such person shall forfeit" the firearm and pay a fine.[48]

Similarly, Maine enacted two related measures in 1821. One provided that officials of towns were

to be "empowered to make rules and regulations" regarding "all gun powder which is or may be

within such town, shall be kept, had or possessed therein; and no person or persons shall have,

keep, or possess within such town, any gun powder, in any quantity, manner, form or mode. . . ."[49]

Local officials were further empowered in the second law "to enter any building, or other place,

in such town, to search for gun powder. . . ."[50] to enforce these restrictions.

    39.    New Haven, Connecticut passed a provision in 1827 barring the possession or

storage of more than a pound of gunpowder without first obtaining a license.[51] (Restrictions based

on the amount of gunpowder were common, with maximum weights commonly ranging from a

pound to 25 pounds; see Exhibit E).[52]

    40.    Delaware enacted laws in 1841[53] and 1845[54] that were to "prevent the firing of

guns, crackers or squibs" within two towns. Michigan enacted measures in 1867 and 1901 for

named local townships "[t]o regulate the buying, selling, and using of gunpowder. . . and the

discharge of fire-crackers and fire-arms. . . ."[55] An 1895 Vermont town measure said that no one

---

[48] 1783 Mass. Acts 218, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun-Powder Within the Town of Boston, ch.13.

[49] Laws of the State of Maine; to Which are Prefixed the Constitution of the U. States and of Said State, in Two Volumes, with an Appendix Page 112-113, Image 183-184 (Vol. 1, 1821) § 1.

[50] 1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5.

[51] Charter and By-Laws of the City of New Haven, [Conn.] November, 1848 Page 48-49, Image 48-49 (1848) available at The Making of Modern Law: Primary Sources. 1827.

[52] Frassetto, "The Duty to Bear Arms," 9.

[53] 1841 Del. Laws 198, A Supplement to the Act Entitled "An Act for Establishing the Boundaries of the Town of Dover, and for Other Purposes Therein Mentioned," § 2.

[54] 1845 Del. Laws 10, A Supplement To The Act Entitled "An Act To Survey, Lay Out And Regulate the Streets Of Smyrna and for Other Purposes," ch. 12, § 2.

[55] 1867 Mich. Pub. Acts 2d Reg. Sess. 68, An Act To Revise The Charter Of The Village Of Hudson, § 31, pt. 12; 1901 Mich. Pub. Acts 154, Local Acts, An Act to Revise and Amend the Charter of the City of

"shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient. . . ."[56]

41.     Measures of this sort extended well into the twentieth century, as in this 1913 Missouri law applying to "cities of the second class" enacted to "regulate, restrain and prevent the discharge of firearms, fireworks, rockets or other explosive materials and substances in the city and to regulate the keeping, storage and use of powder, dynamite, guns, guncotton, nitroglycerine, fireworks and other explosive materials and substances in the city, or within two miles of the limits thereof."[57] While applying to gun discharge, it also now encompassed the newer generation of explosives like dynamite and nitroglycerine, as such laws commonly did beginning in the latter half of the nineteenth century (see Exhibits E, F, and G).

42.     State and town jurisdictions around the country commonly and widely gave full regulatory authority to local officials, like this one for officials in Boise County, Idaho in 1863, who were given "full power and authority . . . to regulate the storage of gunpowder and other combustible materials . . . ."[58] in populated communities. Moreover, gunpowder laws "were not

---

Muskegon . . . , tit.7, § 24, pt. 11. The 1901 law applied specifically to "barns, stables and other buildings."

[56] Quoted in Brief of Amicus Curiae Patrick J. Charles at App. 13, N.Y. State Rifle & Pistol Ass'n, v. City of New York (Ordinances of the City of Barre, Vermont, CHAPTER 16, SEC. 18), 1895.

[57] 1913 Mo. Laws 437, Municipal Corporations: Cities of the Second Class, § 8, pt. 61.

[58] 1863 Id. Sess. Laws 634, To Incorporate the City of Idaho in Boise County, § 5. For example, see also 1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12; 1855 Ill. Laws, 25, An Act To Incorporate the Town of Daville, § 16; The Revised Statutes of the State of Indiana, Passed at the Thirty-Sixth Session of the General Assembly; Also, Sundry Acts, Ordinances, and Public Documents Directed to be Printed Along with the Said Statutes: To Which are Prefixed the Constitution of the United States and of the State of Indiana Page 485-486, Image 499-500 (Vol. 1, 1852); 1860 Kan. Sess. Laws 137, An Act to Amend and Consolidate the Several Act Relating to the City of Lawrence, § 35, pt. 7 1860; 1881 Wash. Sess. Laws 121-22, An Act to Incorporate the City of Port Townsend, ch. 2, § 21; 1901 Mich. Pub. Acts 154, Local Acts, An Act to Revise and Amend the Charter of the City of Muskegon . . . , tit.7, § 24, pt. 11; 1902 N.J. Laws 294, An Act Relating to, Regulating and Providing for the Government of Cities, ch. 107, § 14, pt. 33.

challenged under the Second Amendment or state Second Amendment analogues."[59]

43.    As Adam Winkler concluded, "the basic idea that gun possession must be balanced with gun safety laws was one that the founders endorsed."[60] Cornell and DeDino reach a similar conclusion, saying that gunpowder laws "were clearly crafted to meet the needs of public safety, but they also provided a check on the creation of a private arsenal. . . .The gunpowder storage laws of the eighteenth century thus constituted a significant limit on the right to bear arms."[61] Obviously, gunpowder was essential for the discharge of firearms during this time. As the foregoing account demonstrates, state and local regulatory authority over every aspect of gunpowder, including its use for firearms or other purposes, was extensive, ubiquitous, and plenary, encompassing and superseding any contemplated private uses of the same.

## VI.    HISTORICAL RESTRICTIONS ON BOWIE KNIVES AND SIMILAR LONG-BLADED KNIVES

44.    Note at the outset that knives and blunt objects like clubs (discussed in the next section) are not firearms. They are, however, weapons, and "arms" as that term is used in the debate over gun policy and the Second Amendment.[62]

45.    The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws

---

[59] Frassetto, "The Duty to Bear Arms," 8. Frassetto points out (8) that "the limited number of [court] challenges related to whether regulating gunpowder storage fell within the state police power or whether storing gunpowder in cities represented a per se nuisance."

[60] Winkler, *Gunfight,* 117.

[61] Cornell and DeDino, "A Well Regulated Right," 512.

[62] Stephen P. Halbrook, "What the Framers Intended: A Linguistic Analysis of the Right to 'Bear Arms,'" *Law and Contemporary Problems* 49(Winter 1986): 158, https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=3830&context=lcp; *D.C. v. Heller,* 554 U.S. 570, 582 (2008); Eric Ruben, "The Gun Rights Movement and 'Arms' Under the Second Amendment," Brennan Center for Justice, June 2021, file:///C:/Users/Bob/Downloads/Ruben_final.pdf

barring or restricting these weapons.[63] In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name.[64] From then to the start of the twentieth century, every state plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives: a total of at least 42 states (including the District of Columbia) barred or restricted Bowie knives by name; and another 8 states enacted laws barring the category or type of knife embodied by the Bowie knife but without mentioning them by name (see Exhibit H) totaling 49 states plus the District of Columbia.[65]

46.     The Bowie knife is generally credited with having been invented by the brother of adventurer Jim Bowie, Rezin Bowie.  The knife was named after Jim Bowie, who reputedly killed one man and wounded another using the "big knife" given to him by his brother in the alternately notorious or celebrated "Sandbar Duel" in 1827.[66]

47.     The "Bowie knife" rapidly became known beginning in the 1830s for the distinctive type of long-bladed and usually single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named. While Bowie knives initially "came in a variety of forms— with or without guards, with differently shaped blades," they eventually became more standardized

---

[63] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 582, and in Flayderman, *The Bowie Knife*, 53–54.

[64]  A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law.

[65] Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states; 1900s: 13 states.  See Exhibit H.

[66] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/ entries/bowie-knife-2738/; Davis, *Three Roads to the Alamo*, 207-8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676–77). David Kopel says, erroneously, that "Jim Bowie used a traditional knife at a famous 'sandbar fight' on the lower Mississippi River in 1827." Rezin Bowie had just developed the distinctive knife his brother used in the fight, so it could not have been "traditional." David Kopel, "Bowie knife statutes 1837-1899," *The Volokh Conspiracy*, November 20, 2022, https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

as "a large knife with a cross guard and a blade with a clipped point."[67]  The distinctive traits of the Bowie knife are revealed in Robert Abels' publication, *Bowie Knives*, which includes pictures of nearly one hundred such knives made between 1835 and 1890.[68] The Bowie legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death at the Alamo in 1836), and the knife's distinctive features, encouraged its proliferation,[69] referred to by one historian as "the craze for the knives."[70]  As was true of other knives with long, thin blades,[71] they were widely used in fights, duels, and other crimes, especially at a time when single-shot pistols were often unreliable and inaccurate.[72]  Indeed, such knives were known as "fighting knives"[73] that were "intended for [interpersonal] combat."[74]  In the early nineteenth century "guns and knives accounted for a growing share of the known weapons that whites used to kill whites."[75]

In 1834, for example, a grand jury in Jasper County, Georgia deplored

> the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[76]

---

[67] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/entries/bowie-knife-2738/.

[68] Robert Abels, *Bowie Knives* (NY: Abels, 1979).

[69] Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39–63.

[70] Davis, *Three Roads to the Alamo*, 583.

[71] Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

[72] Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 485; Paul Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques* (Boulder, CO: Paladin Press, 2010), 35-44.

[73] Randolph Roth, *American Homicide* (Cambridge, MA: Harvard University Press, 2009), 218.

[74] Flayderman, *The Bowie Knife*, 59.

[75] Roth, *American Homicide*, 218.

[76] Quoted in Roth, *American Homicide*, 218–19.

48.     Homicide rates increased in the South in the early nineteenth century, as did laws restricting concealed weapons carrying.  Dueling also persisted during this time, even as the practice was widely deplored by religious and other groups, in newspapers, by anti-dueling societies and political leaders.[77]  Bowie knife writer Norm Flayderman provides abundant and prolific evidence of the spread and early criminal use of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper and other accounts, and providing references to literally hundreds of additional articles and accounts attesting to the widespread use of Bowie knives in fights, duels, brawls and other criminal activities.[78]  Flayderman concludes that, as early as 1836, "most of the American public was well aware of the Bowie knife."[79]  (Very much like the allure of contemporary assault weapons to some,[80] the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[81])  All this contributed to widespread enactment of laws prohibiting dueling in the states.[82]  In 1839, Congress passed a measure barring dueling in the District of Columbia.[83]  Both pistols and knives were prominently used in such affairs.[84]

---

[77] Baugh, *Rendezvous at the Alamo*, 51.
[78] Flayderman, *The Bowie Knife*, 25–64; 495–502.
[79] Ibid., 43.
[80] Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12–15, 65; David Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian,* March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.
[81] Flayderman, *The Bowie Knife*, 46.
[82] A search for the word "duel" in the Duke Center for Firearms Law database of old gun laws yields 41 results.  See https://firearmslaw.duke.edu/repository/search-the-repository/.
[83] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.
[84] Roth, *American Homicide*, 180–83, 210–17.

49.     At least three state court cases dealt in some manner with fighting knives like the Bowie knife. In the 1840 case of *Aymette v. State*[85] the Supreme Court of Tennessee upheld the conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of 1837–1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months."[86]   In its decision, the court concluded that the prohibition against wearing the named weapons was well justified in that they "are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[87]   The court continued, "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens. . . ."[88]   Further, the court added that the state law existed "to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms. . . ."[89]

50.     Four years later, the Tennessee Supreme Court again dealt with a Bowie knife law violation and challenge. In the case of *Haynes v. Tennessee* (1844),[90] Stephen Haynes was indicted for carrying a concealed Bowie knife. He was convicted of wearing a knife that resembled a Bowie

---

[85] Cited in *District of Columbia v. Heller*, 554 U.S. 570 (2008).
[86] *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).
[87] *Aymette v. State*, 156.
[88] *Aymette v. State*, 157.
[89] *Aymette v. State*, 157.
[90] *Haynes v. Tennessee*, 24 Tenn. 120 (1844).

knife but appealed his conviction on the grounds that he was actually carrying a "Mexican pirate knife," which reputedly had a shorter, narrower blade. (At the trial, witnesses disagreed as to the proper name for the knife in question.) He also argued that the state law, in listing various types of knives including those "similar" to Bowie knives, was "too indefinite" and could therefore lead to "absurd consequences" that "must follow its enforcement. . . ."[91] On appeal, the court upheld his conviction and commended the Tennessee state legislature's enactment: "The design of the statute was to prohibit the wearing of bowie knives and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil disposed persons but too often ended in assassination."[92] The court continued: "The design, meaning, and intent was to guard against the destruction of human life, by prohibiting the wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill. . . ."[93] The court noted that the state law "wisely provides against bowie knives, Arkansas tooth picks, or any other weapon in form, shape or size, resembling them."[94] Noting the similarity among knives and the possibility of an unjust outcome where, say, a person might be convicted of carrying a mere pocket knife, the court posed this question: "what is to protect against conviction, when the words of the statute cover the charge, and its true spirit and meaning does not?" Their answer: "the judge and jury who try the case."[95] As the author of a book on Bowie knives noted, "the fact that the term 'bowie knife' had never been precisely defined did not help his [Haynes's] case."[96]

---

[91] *Haynes v. Tennessee*, 122.
[92] *Haynes v. Tennessee*, 122.
[93] *Haynes v. Tennessee*, 123.
[94] *Haynes v. Tennessee*, 122.
[95] *Haynes v. Tennessee*, 123.
[96] Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques*, 43.

51.     A third state court case relevant to the legal status of Bowie knives is *Cockrum v. State* (1859).[97] The *Cockrum* case involved John Cockrum, who was charged with the murder of his brother-in-law, William Self, with a Bowie knife.[98] Under Texas law, "a homicide, which would otherwise be a case of manslaughter, if committed with a bowie-knife or dagger, shall be deemed murder and punished as such. . . ."[99] The court upheld the added penalty provision of the law relating to use of a Bowie knife, despite the court's very expansive interpretation of the right to bear arms, but reversed and remanded the man's conviction because of an error related to statutory changes and jury instructions. It described the Bowie knife as "an exceeding destructive weapon," an "instrument of almost certain death," and "the most deadly of all weapons in common use."[100] Further, the court said: "He who carries such a weapon. . .makes himself more dangerous

---

[97] *Cockrum v. State,* 24 Tex. 394 (1859), https://constitution.org/1-Constitution/2ll/2ndcourt/state/177st.htm. David Kopel says that a fourth case, *Nunn v. State*, 1 Ga. 243 (1846), is a "major state supreme court case[s] involving Bowie knives." "The legal history of bans on firearms and Bowie knives before 1900," *The Volokh Conspiracy,* November 20, 2022, https://reason.com/volokh/2022/11/20/the-legal-history-of-bans-on-firearms-and-bowie-knives-before-1900/. But *Nunn* involved a man who was prosecuted for carrying a pistol (openly, not concealed), not a knife. A state law criminalized concealed carry of various named weapons, including pistols and Bowie knives, whereas a different provision allowed for open carrying of named weapons, including Bowie knives, but failed to include pistols on that list. Noting the "great vagueness" in the statute's wording, the court reversed the man's conviction and wrote that there was a constitutional right to open carry "for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State." By contrast, the court upheld the constitutionality of the concealed carry restrictions and noted that those restrictions were enacted "to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons*." 246; italics in original.

[98] https://www.genealogy.com/ftm/p/i/l/Karen-Pilgrim-TX/WEBSITE-0001/UHP-0254.html

[99] *Cockrum v. State*, 394.

[100] *Cockrum v. State*, 403–04. Kopel says, incorrectly, that "Bowie knives. . . were regulated the same as a butcher's knife." According to the Duke Center for Firearms Law Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/search-the-repository/) six states had laws that restricted butcher knives by name, whereas 42 states restricted Bowie knives by name. See Exhibit H. Kopel, "Bowie knife statutes 1837-1899."

to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon."[101]

52.     All of these cases underscore the courts' recognition of the dangerous nature and nefarious use of Bowie knives not only by their characterizations of them, but by the fact that they are treated in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons including pistols and various named clubs.[102]

53.     The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons.[103] In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name.[104] From then to the start of the twentieth century, every state plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives: a total of at least 42 states (including the District of Columbia) barred or restricted Bowie knives

---

[101] *Cockrum v. State*, 403.

[102] Among the notorious incidents attached to the Bowie knife was its use by two of the conspirators in the Lincoln assassination in 1865. The plan was to assassinate President Lincoln, Vice President Andrew Johnson, and Secretary of State William Seward. The man assigned to attack Seward, Lewis Powell, entered the Seward home armed with a pistol and a Bowie knife. When one of Seward's sons tried to stop him, Powell tried to shoot him, but his gun misfired, so he used it as a club against the son. When he encountered another son, Powell slashed him with his Bowie knife, the weapon he then used to attack Seward who, thanks to a neck collar, survived. David Morgan, "Lincoln assassination: The other murder attempt," *CBS News,* May 10, 2015, https://www.cbsnews.com/news/lincoln-assassination-the-other-murder-attempt/; https://www.history.com/topics/american-civil-war/william-seward. John Wilkes Booth also carried what was later identified as a Bowie knife which he used to slash the officer who accompanied Lincoln to the theater and who tried to stop Booth after he shot the president. Booth slashed the man in the arm with his knife to make his escape. https://lincolnconspirators.com/2018/12/31/cloak-and-daggers-cutting-through-the-confusion-of-the-assassination-knives/

[103] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53–54.

[104] A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law.

by name; and another 8 states enacted laws barring the category or type of knife embodied by the Bowie knife but without mentioning them by name (see Exhibit H) totaling 49 states plus the District of Columbia.[105]  For example, 15 states banned all carrying of Bowie knives (by banning both concealed carry and open carry), while others imposed taxes on individuals' acquisition or possession of them. Georgia sought to stamp out Bowie knife circulation (as well as that of other named weapons) in an 1837 law: "it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons . . . Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c."[106]  The desirability and utility of concealed-carry restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence. Arkansas combined no-carry provisions (whether concealed or openly) applying to Bowie knives, as well as pistols and other weapons, with another provision in the same law that made it a misdemeanor to "sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person"[107] bowie knives, pistols, or other listed weapons. Even though the law allowed persons to have them on their own premises, it begs the question of how,

---

[105] Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states; 1900s: 13 states.  See Exhibit H.
[106] 1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, § 1.
[107] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § 1-3. The law also allowed for legal transport for people on a journey, a common exception in such laws.

exactly, a person could legally obtain such weapons in the first place if they weren't already owned within a family before the 1881 law was enacted.

54.     States relied on a variety of regulatory techniques to suppress Bowie knife carrying: 29 states enacted laws to bar their concealed carry; 15 states barred their carry whether concealed or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax for those who owned the knives; 10 states barred their sale to specified groups of people; and 4 states enacted penalties for brandishing the knives (see Exhibit H).

55.     The extensive and ubiquitous nature of these Bowie knife prohibitions raises a further question: given the universal agreement that these knives were dangerous, why not simply ban their possession outright? The answer is two-fold. First, America was a developing nation-state in the nineteenth century. The federal and state governments did not yet possess the maturity, powers, tools, or resources to implement any measure as sweeping as a knife ban, especially since knives are technologically very simple to produce. After all, the front-line administrative entity on which we today relay for law enforcement, the police, barely existed in the way we think of policing today in the early nineteenth century (up to this time policing fell to a haphazard mix of the watch system, constables, militias, and vigilantes). Modern police forces only came in to being in a handful of large cities before the Civil War.[108] Second, the chief remedy enacted by the states to address the problem of knife fighting was far more focused and feasible: to bar the carrying of

---

[108] Chris McNab, *Deadly Force* (Oxford, Great Britain: Osprey Publishing, 2009), 13-24. Boston created a police force in 1838, New York City created a standing police force in 1845, followed by Chicago in 1851, Philadelphia in 1854, and Baltimore in 1857 (23). Jill Lepore, "The Invention of the Police," *The New Yorker,* July 13, 2020, https://www.newyorker.com/magazine/2020/07/20/the-invention-of-the-police. Both McNab and Lepore emphasize the role of slavery and slave suppression as key to the development of policing.

knives, along with the other two categories of weapons that also threatened public safety, clubs and pistols. The fact that all three types of weapons were consistently treated together is conclusive evidence that all were considered so dangerous and inimical to public safety that they were subject to anti-carry laws and bundled together in legislative enactments.

## VII.   HISTORICAL RESTRICTIONS ON CLUBS AND OTHER BLUNT WEAPONS

56.    Among the most widely and ubiquitously regulated harmful implements in U.S. history were various types of clubs and other blunt weapons (see Exhibit H). Most were anti-carry laws, which also generally encompassed pistols and specific types of knives, although some of the laws extended prohibitions to these weapons' manufacture, possession, sale, or use in crime.[109] As Exhibit H shows, at least five distinct types of clubs and blunt objects were regulated in the United States.  Notably, every state in the nation had laws restricting one or more types of clubs. According to a detailed reference book on the subject of these blunt instruments by Robert Escobar, they were considered "objectionable objects, once feared but now forgotten."[110]  Escobar provides what he calls "a family history" of these blunt weapons, but adding that "[i]t's a disreputable family to say the least, black sheep even within the study of weaponry."[111]  They have been described as "wicked, cowardly, 'Soaked in blood and cured in whiskey.'"[112]  Those who carried them (excluding police) "were called vicious, devils and lurking highwaymen."[113]  These club-type blunt objects compose a family of objects used for striking others, and while they vary in name and construction, the categories are "somewhat fluid."[114]

---

[109] E.g. see 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.
[110] Robert Escobar, *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* (Columbus, OH: Gatekeeper Press, 2018), 1.
[111] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[112] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[113] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[114] Escobar, *Saps, Blackjacks and Slungshots,* 1.

57.     Among the five types of clubs regulated in U.S. laws, 15 states barred bludgeon carrying.  A bludgeon is a short stick with a thickened or weighted end used as a weapon.[115]  The earliest state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s and 1800s, and 4 in the early 1900s (as with each of these chronological categories, the state law total exceeds the total number of states because some states enacted the same or similar laws in multiple centuries).

58.     A billy (sometimes spelled billie) club is a heavy, hand-held rigid club,[116] usually made of wood, plastic, or metal,[117] that is traditionally carried by police, often called a nightstick or baton.[118]  Escobar cites an early reference to the billy club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police armed with batons,"[119] a synonym for a billy club.  As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry.  At least 16 states had anti-billy club laws, totaling 46 laws; the earliest law appears to have been enacted in Kansas in 1862,[120] followed by a New York law in 1866.[121]  Fourteen states enacted such laws in the 1800s; 11 states did so in the early

---

[115] https://www.merriam-webster.com/dictionary/bludgeon.

[116] Some versions were made to have some flexibility to increase their striking power. See Escobar, *Saps, Blackjacks and Slungshots*, 118-19.

[117] https://www.merriam-webster.com/dictionary/billy%20club. Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. *Saps, Blackjacks and Slungshots*, 118. One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c." "Local Intelligence," *Delaware Republican*, June 15, 1857, https://bit.ly/3V9nVO7.

[118] Escobar, *Saps, Blackjacks and Slungshots*, 2, 69-70, 105, 113-30.

[119] Escobar, *Saps, Blackjacks and Slungshots*, 105.

[120] C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources, 1862.

[121] Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the

1900s.

59.     At least 14 states barred the carrying of "clubs" more generically, without specifying the type.  The oldest anti-club law was 1664; 7 states enacted these laws in the 1600s-1700s, 7 states in the 1800s, and 2 in the early 1900s.

60.     Anti-slungshot laws were enacted by 43 states, with 71 laws enacted in the 1800s and 12 in the 1900s.  A slungshot (or slung shot), also referred to as "a type of blackjack,"[122] is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s (the first "known use" of slungshot was 1842[123]).  By one account, "[s]lungshots were widely used by criminals and street gang members in the 19th Century.  They had the advantages of being easy to make and conceal, silent, and very effective, particularly against an unsuspecting opponent.  This gave them a dubious reputation, similar to that of switchblade knives in the 1950s, and they were outlawed in most jurisdictions.  Their use as a criminal weapon continued at least up until the early 1920s."[124]  Escobar concurs that slungshots and blackjacks "were a regular part of criminal weaponry. . .and gangsters could be merciless in their use."[125]

61.     In a criminal case considered the most famous of those involving lawyer Abraham Lincoln, the future president defended a man charged with murdering another using a slungshot.  In the 1858 trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's

---

Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources, 1866.

[122] Escobar, *Saps, Blackjacks and Slungshots*, 228.

[123] See https://www.merriam-webster.com/dictionary/slungshot Escobar agrees with this rough date. See *Saps, Blackjacks and Slungshots*, 67.

[124] "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

[125] Escobar, *Saps, Blackjacks and Slungshots*, 86.

acquittal.[126]

62.     These technologically very simple weapons were viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of state laws against carrying them enacted after their development and their spreading use by criminals and as fighting implements. These devices were developed and appeared in society during an identifiable period of time in the mid-nineteenth century, sparking subsequent wide-ranging prohibitions.   The earliest anti-slungshot law was enacted in 1850; 43 states legislated against them in the 1800s (including the District of Columbia), and 11 states in the early 1900s (note this incorporates multiple laws enacted in more than one century by a few states).

63.     Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well.  Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-shaped fabric (although the weight could also be something dense and heavy, like a lock in the end of a sock),[127] their particular appeal was that they could be dispensed with by simply pouring the sand out, leaving nothing more than an empty cloth bag.  (Alternately, they could be made heavier by adding water to the sand.)  The first anti-sandbag law was 1866, with 10 states enacting such laws—7 in the 1800s and 7 in the early 1900s. Only 4 states did not have any prohibitions in any of these categories, but 3 of those 4 (Montana, Ohio, and Washington State) had blanket legislative provisions against the carrying of any concealed/dangerous/deadly weapons.  One state, New

---

[126] Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike the victim with a slung shot at night because of the full moon.  Lincoln used as evidence an Almanac to prove that on the night in question, there was no full moon.  Judson Hale, "When Lincoln Famously Used the Almanac," *Almanac,* May 4, 2022, https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

[127] https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/; Escobar, *Saps, Blackjacks and Slungshots*, 20-22. Escobar dates the earliest reference to sandbags as weapons to the 1600s (22).

Hampshire, may not have enacted such a law during this time but did at some point.[128]

## VIII. CONCLUSION

64.     As the Supreme Court said in *NYSRPA v. Bruen*, "history guide[s] our consideration of modern [firearms] regulations that were unimaginable at the founding."[129] Relying on "analogical reasoning" to proceed under these circumstances, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[130] In the eighteenth and early nineteenth centuries, the establishment of a uniform, consistent system of imprinting serial numbers on firearms was off the radar screens of governmental leaders and society. It was not a remedy that was either feasible or meaningful at a time when firearms made in America were made mostly by hand in decentralized locations, one at a time. When weapons came to pose a threat to public safety and good order, governments responded with legislative remedies appropriate to those problems. Serializing firearms was not such a remedy at the time. But today it is, with respect to ghost guns.

65.     The examples of historical gun laws examined here, including the examples of trap guns, punt/pivot/swivel guns, gunpowder, Bowie knives, and certain types of clubs, are all "consistent with the nation's historical tradition of firearm regulation"[131] as they pertain to modern restrictions on ghost guns. All were subject to wide-ranging and extensive restrictions when the

---

[128] Up to 2010, New Hampshire had this law on the books: "159:16 Carrying or Selling Weapons.  Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife, slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state."  In 2010, the law was amended when it enacted HB 1665 to exclude stilettos, switch knives, daggers, and dirk-knives.  Compare N.H. Rev. Stat. § 159:16 with 2010 New Hampshire Laws Ch. 67 (H.B. 1665). In 1923, New Hampshire enacted an extensive licensing system for handgun carrying: 1923 N.H. Laws 138.
[129] *NYSRPA v. Bruen,* 142 S.Ct. 2111, 2132 (2022).
[130] *NYSRPA v. Bruen,* 2133.
[131] *NYSRPA v. Bruen,* 2130.

weapons entered society and posed a public safety, criminological, or other threat to public order—a description that fits modern ghost guns precisely. The government's requirement that firearms parts not be sold or made available unless they have identifying serial numbers is a far less onerous or restrictive requirement than those set out for the historical weapons discussed in this Declaration.

*[Signature page appears on following page]*

Pursuant to 28 USC §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 28, 2023

Robert J. Spitzer

# Exhibit A

March 2023

## <u>Curriculum Vitae</u>

## Robert J. Spitzer

## Distinguished Service Professor, Emeritus
## SUNY Cortland

<u>Address</u>:     5333 Center St.
Alexandria, VA  23188
(607) 423-1781
Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
https://sites.google.com/site/robertspitzercortland/

<u>Education</u>:     A.B. (Political Science), <u>summa cum laude</u>, SUNY College at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.

<u>Positions Held</u>:

Affiliated Scholar, Government Department, College of William and Mary, 2023-present.
Adjunct Professor, College of William and Mary School of Law, Spring 2023-present.
Department Chair, SUNY Cortland, 2008-2020.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997-2021.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-1990, 1992-2017.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985, 1986, 1988.
Copy Editor, <u>Administrative Science Quarterly</u>, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.
Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

Honors:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.

Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.

Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.

Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.

Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.

Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.

SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.

Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."

Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.

Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.

Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.

Who's Who in the World, 1996.

Dictionary of International Biography, 1995.

Who's Who in the East, 1995-96; 1997-98

Ex officio member, Cortland County Bicentennial Committee, 1987-89.

Chair, SUNY Cortland Bicentennial Committee, 1987-89.

Phi Eta Sigma, SUNY Cortland, 1994.

Phi Kappa Phi, SUNY Cortland, 1990.

Men of Achievement (1986)

Contemporary Authors, vol. 112 (1985) and subsequent updates.

International Authors and Writers Who's Who, 1985-present.

International Who's Who in Education, Winter 1985-86.

Herbert H. Lehman Graduate Fellowship, 1975-79.

Who's Who Among Students in American Universities and Colleges, 1974-75.
Phi Beta Kappa Club, SUNY College at Fredonia, 1975.
Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.


Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.


Publications and Papers:

Books:

The Presidency and Public Policy:  The Four Arenas of Presidential Power (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution:  Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations

3

given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert Spitzer.

President and Congress:  Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021; 9th ed. 2024). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases

4

examining the courts' view of presidential power.

<u>Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning</u> (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

<u>We the People: Essentials Edition</u>, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021).

<u>Gun Control: A Documentary and Reference Guide</u> (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

<u>The Gun Debate: An Encyclopedia of Gun Rights and Gun Control</u>, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

<u>Guns across America: Reconciling Gun Rules and Rights</u> (New York: Oxford University Press, 2015); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

<u>The Gun Dilemma: How History Is Against Expanded Gun Rights</u> (New York: Oxford University Press, 2023). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, <u>Series on American Constitutionalism</u>, SUNY Press, 1996-present. Books include:
> Daniel Hoffman, <u>Our Elusive Constitution</u>, (1997)
> Martin Sheffer, <u>God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment</u>, (1999)
> Daniel Levin, <u>Representing Popular Sovereignty: The Constitution in American Political Culture</u>, (1999)
> Robert Spitzer, ed., <u>Politics and Constitutionalism</u>, (2000)
> Laura Langer, <u>Judicial Review in State Supreme Courts</u> (2002)
> Ian Brodie, <u>Friends of the Court</u> (2002)
> Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2002)

Artemus Ward, <u>Deciding to Leave: The Politics of Retirement from the United States Supreme Court</u> (2003)

James T. McHugh, <u>Ex Uno Plura: State Constitutions and Their Political Cultures</u> (2003)

Stephen Newman, ed., <u>Constitutional Politics in Canada and the United States</u> (2004).

Stephen Kershnar, <u>Justice for the Past</u> (2004).

Timothy R. Johnson, <u>Oral Arguments and Decision Making on the U.S. Supreme Court</u> (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., <u>The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics</u> (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., <u>The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory</u> (2005).

G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform</u> (2006).

Frank P. Grad and Robert F. Williams, <u>State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments</u> (2006).

G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform</u>, 3 vols. (2006).

Cary Federman, <u>The Body and the State: Habeas Corpus and American Jurisprudence</u> (2006).

Christopher S. Kelley, ed., <u>Executing the Constitution: Putting the President Back into the Constitution</u> (2006).

David Fagelson, <u>Justice as Integrity: Tolerance and the Moral Momentum of Law</u> (2006).

Christopher Shortell, <u>Rights, Remedies, and the Impact of State Sovereign Immunity</u> (2008).

Robert Blomquist, <u>The Quotable Judge Posner</u> (2010).

Kirk A. Randazzo, <u>Defenders of Liberty or Champions of Security?</u> (2010).

Pamela Corley, <u>Concurring Opinion Writing on the U.S. Supreme Court</u> (2010).

Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2nd ed. 2010).

Julia R. Azari, et al., eds., <u>The Presidential Leadership Dilemma</u> (2013).

Stephen A. Simon, <u>Universal Rights and the Constitution</u> (2014).

Kirk A. Randazzo and Richard W. Waterman, <u>Checking the Courts</u> (2014).

Anthony Maniscalco, <u>Public Spaces, Marketplaces, and the Constitution</u> (2015).

Goirgi Areshidze et al., eds., <u>Constitutionalism, Executive Power, and the Spirit of Moderation</u> (2016).

Peter J. Galie, et al., eds., <u>New York's Broken Constitution</u> (2016).

Robert J. Hume, <u>Ethics and Accountability on the U.S. Supreme Court</u> (2017).

Michael A. Dichio, <u>The U.S. Supreme Court and the Centralization of Federal Authority</u> (2018).

6

Clyde H. Ray, <u>John Marshall's Constitutionalism</u> (2019).
Daniel P. Franklin, et al., <u>The Politics of Presidential Impeachment</u> (2020).
Robert M. Howard, et al., <u>Power, Constraint, and Policy Change: Courts and Education Finance Reform</u> (2021).
Mark C. Dillon, <u>The First Chief Justice</u> (2022).

Book Series Editor, <u>Presidential Briefing Books</u>, Routledge, 2015-present.
Mary Stuckey, <u>Political Rhetoric</u> (2015)
Michael A. Genovese, <u>Presidential Leadership in an Age of Change</u> (2015)
Christopher Fettweis, <u>Making Foreign Policy Decisions</u> (2016)
Nancy Maveety, <u>Picking Judges</u> (2016)
Richard S. Conley, <u>Presidential Relations with Congress</u> (2017)
Andrew L. Stigler, <u>Governing the Military</u> (2019)
Graham G. Dodds, <u>The Unitary Presidency</u> (2020)

Member, Board of Editors for the <u>Encyclopedia of Guns in American Society</u>, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011-2016.

<u>Book Chapters</u>:

"Third Parties in New York," in <u>Governing New York State</u> (formerly <u>New York State Today</u>), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in <u>Social Regulatory Policy: Recent Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in <u>Inventing the American Presidency: Early Decisions and Critical Precedents</u>, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in Encyclopedia of American Political Parties and Elections, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar, closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, American Government: Freedom and Power (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in Encyclopedia of the American Legislative System, ed. by Joel Silbey (NY:  Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in The Presidency and the Persian Gulf War, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York:  Praeger, 1993).

"Is the Separation of Powers Obsolete?" in The Presidency Reconsidered, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in Understanding the Presidency, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the Encyclopedia of the American Presidency, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the Encyclopedia of the United States Congress, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in The Constitution and the Conduct of American Foreign Policy, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in The Executive Office of the President, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the Oxford Historical Guide to American Government (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the

Constitutional Balance of Power," in <u>Liberty Under Law</u>, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

"Multi-Party Politics in New York," in <u>Multi-Party Politics and American Democracy</u>, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, <u>We the People</u> (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in <u>Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in <u>The Encyclopedia of American Third Parties</u>, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in <u>Prayers in the Precincts</u>, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in <u>The Clinton Scandal and the Future of American Politics</u>, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in <u>Politics and Constitutionalism</u>, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the <u>Encyclopedia of American Political History</u>, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in <u>The Constitution and Its Amendments</u>, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in <u>The Second Amendment in Law and History</u>, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in <u>The Oxford Companion To United States History</u> ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in <u>The Presidency and the Law: The Clinton Legacy</u>, ed. by David Adler and Michael Genovese (Lawrence, KS:

9

University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in <u>Honor and Loyalty: Inside the Politics of the Bush White House</u>, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the <u>Encyclopedia of Guns in American Society</u>, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; 2nd ed. 2011; 3rd ed. 2023): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the <u>Encyclopedia of the American Presidency</u>, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for <u>The Encyclopedia of New York State</u>, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," <u>Transformed By Crisis: The Presidency of George W. Bush and American Politics</u>, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in <u>Debating the Presidency</u>, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in <u>Thinking About the Presidency</u>, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Executing the Constitution</u>, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in <u>Social Issues in America: An Encyclopedia</u>, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," <u>The Presidency and the Challenge of Democracy</u>, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

10

"Right to Bear Arms," <u>Encyclopedia of American Civil Liberties</u>, 4 vols., ed. By Paul Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," <u>Gun Violence: Opposing Viewpoints</u>, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," <u>Presidential Power in America</u>, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," <u>Encyclopedia of American Government and Civics</u> ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," <u>Encyclopedia of Political Communication</u> ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in <u>Leadership at the Crossroads</u>, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in <u>Encyclopedia of Issues in U.S. Public Policy</u>, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in <u>Winning the Presidency 2008</u>, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in <u>Debating Reform: Conflicting Perspectives on How to Fix the American Political System</u>, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in <u>Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi</u>, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" <u>You Asked: 20 Questions About America</u>, U.S. Department of State, 2010.

"Liberals and the Presidency," <u>Contending Approaches to the American Presidency</u>, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" <u>The American Presidency in the 21st Century</u>, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

11

"Gun Control," in <u>Governing America</u>, ed. By Paul Quirk and William Cunion (New York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," <u>Encyclopedia of Applied Ethics</u>, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" <u>Winning the Presidency 2012</u>, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." <u>American Government</u>. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" <u>A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton</u>, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," <u>American Governance</u>, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," <u>American Presidents and the Constitution</u>, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," <u>The George W. Bush Presidency</u>, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns: Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance</u>, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," <u>The 2020 Presidential Election: Key Issues and Regional Dynamics</u>, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," <u>Developments in American Politics 9</u>, Gillian Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"To Brandish or Not to Brandish: The Consequences of Gun Display," <u>New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society</u>, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, forthcoming).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," <u>The Conversation on Guns</u>, James A. Densley, ed. (Baltimore: Johns Hopkins University Press, 2023, forthcoming).

<u>Articles</u>:

"Jamestown:  Anatomy of an All-American City," <u>Sunday Buffalo Courier Express Magazine</u>, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, <u>The Journal of Politics</u>, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," <u>Presidential Studies Quarterly</u>, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," <u>Presidential Studies Quarterly</u>, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," <u>National Civic Review</u>, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," <u>Party Line</u>, 17 (September 1984).

"Shooting Down Gun Myths," <u>America</u>, June 8, 1985, pp. 468-69.  Reprinted in: the <u>Des Moines Register</u>, October 24, 1985; <u>Criminal Justice</u>, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); <u>U.S. News and World Report</u> educational study unit on Gun Control, April/May, 1987; <u>Gun Control</u>, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and <u>The Informed Argument</u>, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," <u>America</u>, June 15, 1985.

"The Item Veto Reconsidered," <u>Presidential Studies Quarterly</u> 15(Summer, 1985): 611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" <u>Policy Studies Journal</u>, 15 (June 1987), 675-89. Reprinted in <u>Public Policy Theories, Models, and Concepts</u>, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module:  The Politics of Abortion," <u>NEWS for Teachers of Political Science</u>, 53 (Spring, 1987).

"But for A Single Vote...," <u>New York Delegate</u>, July, 1987. Abridged version appeared on editorial page of the <u>Rochester Times Union</u>, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", <u>Election Politics</u>, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," <u>Policy Studies Journal</u>, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," <u>Policy Studies Journal</u>, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," <u>PS:  Political Science and Politics</u>, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," <u>PS:  Political Science and Politics</u>, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," <u>Oklahoma City University Law Review</u>, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," <u>Congress and the Presidency</u>, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," <u>Pace Law Review</u>, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" <u>The Spectator</u>, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," <u>Political Science Quarterly</u>, 112 (Summer, 1997): 261-84.

14

"The Item Veto Dispute and the Secular Crisis of the Presidency," <u>Presidential Studies Quarterly</u>, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," <u>PS: Political Science and Politics</u>, 32 (September 1999).

"The Gun Dispute," <u>American Educator</u>, 23 (Summer 1999): 10-15.  Reprinted in <u>Annual Editions: Criminal Justice</u> (Dushkin/McGraw-Hill, 2000); and in <u>Criminology</u> (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," <u>Congress Monthly</u>, September/October 2000.

"Lost and Found: Researching the Second Amendment," <u>Chicago-Kent Law Review</u> 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, <u>Silveira v. Lockyer</u> (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Presidential Studies Quarterly</u> 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson C*ase," <u>St. John's Law Review</u> 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," <u>Focus on Law Studies</u> 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," <u>Fordham Law Review</u> 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," <u>PS: Political Science and Politics</u> 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, <u>The PRG Report</u> 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, <u>American Literary History</u> 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, <u>Injury Prevention</u> 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," <u>Albany Government Law Review</u> 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," <u>Presidential Studies Quarterly</u> 38(June 2008):

15

329-46.

"Still Saving the Constitution from Lawyers: A Response," <u>Gonzaga Law Review</u> 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," <u>Government, Law and Policy Journal</u> 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," <u>Presidential Studies Quarterly</u> 42(September 2012): 637-55.

"Gun Laws," <u>New York State Bar Association Journal</u> 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," <u>Presidents and Executive Politics Report</u> 35(Fall 2012).

"Writing the Gun Debate," <u>Los Angeles Review of Books</u>, February 10, 2013.

"A Historical Look at Gun Control in America," <u>WCNY Magazine</u>, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," <u>PS: Political Science and Politics</u> 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," <u>The Islamic Monthly</u>, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," <u>White House Studies</u> 12(October 2013): 125-46.

"A Look at the 2014 Elections," <u>WNCY Magazine</u>, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," <u>Albany Law Review</u>, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," <u>Social Science Docket</u>, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," <u>The Critique</u> (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," <u>Law and Contemporary Problems</u> 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" <u>Items: Insights from the Social Sciences,</u>

Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," <u>The Regulatory Review</u>, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," <u>Law and Contemporary Problems</u> 83, 3(2020): 231-55.

<u>Op-Ed Articles</u>

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," <u>Des Moines Register</u>, October 24, 1985.

"Gun Control and Pressure Politics," <u>Syracuse Post-Standard</u>, November 30, 1985.

"Pocket Vetoes and Abuse of Power," <u>Rochester Times Union</u>, January 7, 1987.

"But for One Vote, a Different Nation," <u>Rochester Times Union</u>, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," <u>Rochester Times Union</u>, September 14, 1987.

"The Great Gun Fallacy," <u>Syracuse Post-Standard</u>, March 30, 1989.

"Four Cases on Right to Bear Arms," <u>Syracuse Post-Standard</u>, April 22, 1989.

"Don't Start Line-Item Veto," <u>Syracuse Post-Standard</u>, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," <u>Syracuse Post-Standard</u>, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," <u>Los Angeles Times</u>, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" <u>Christian Science Monitor</u>, September 19, 1997.

"Assault Weapons Ban," <u>Christian Science Monitor</u>, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," <u>Syracuse Post-Standard</u>, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," Syracuse Post-Standard, April 20, 1999.

"The Gun Saga in Congress," Intellectual Capital, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" Intellectual Capital, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," Intellectual Capital 5(February 10-17, 2000).

"Gun Control After Columbine," Intellectual Capital 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," The Catholic Review, March 30, 2000.

"Why Would Anyone Want the Job Now?" Chicago Tribune, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," Syracuse Post-Standard, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," Syracuse Post-Standard, June 12, 2001.

"Exposure Erodes Clout of NRA," Columbus Dispatch, April 24, 2003.

"Hazing Scandals," Syracuse Post-Standard, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, Syracuse Post-Standard, February 18, 2004.

"NRA Loses Its Political Firepower," Los Angeles Times, April 12, 2004. Also in the Deseret News.

"A 'Tortured' Interpretation of the President's Vast Powers," Syracuse Post-Standard, June 18, 2004.

"Clearing the Air," Syracuse Post-Standard, August 4, 2004.

"Why Gun Ban Died Quietly," San Jose Mercury News, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the

<u>Ithaca Journal</u>, the <u>Johnstown Breeze</u>, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," <u>Syracuse Post-Standard</u>, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network ([www.hnn.us](http://www.hnn.us)), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" <u>Syracuse Post-Standard</u>, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network ([www.hnn.us](http://www.hnn.us)) January 7, 2008.

"The 'Pocket Veto' Peril," <u>Los Angeles Times</u>, January 8, 2008. Reprinted in the <u>St. Louis Post-Dispatch</u>, <u>St. Paul Pioneer Press</u>, <u>Wilmington Star News</u> (NC), <u>News and Observer</u> (NC), <u>The Morning Call</u> (Pa.), <u>Contra Costa Times</u> (CA), the <u>Sun News</u> (FL), <u>The Vindicator</u>, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, <u>Cleveland Plain Dealer</u>, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge ([www.thefacultylounge.org](http://www.thefacultylounge.org)), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network ([www.hnn.us](http://www.hnn.us)), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network ([www.hnn.us](http://www.hnn.us)), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network ([www.hnn.us](http://www.hnn.us)), January 12, 2009.

"Early Voting for New York Elections," <u>Cortland Standard</u>, May 27, 2009.

"A Better Way to Run Our Elections," <u>Syracuse Post Standard</u>, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post ([www.huffingtonpost.com](http://www.huffingtonpost.com)), posted December 22, 2009.

19

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

22

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com*, September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

25

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.  150

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation,* November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-*

26

*Standard,* November 4, 2022.

"What our past tells us about young people and guns," *The Hill,* March 28, 2023.

"Stand-Your-Ground, the Castle Doctrine, and Public Safety," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 3, 2023.

Testimony, Briefs, and Reports:
"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and <u>Sine Die</u> Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?"  Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

27

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S.

742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market

29

Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.

Papers and Presentations (not including those given on the Cortland campus):

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the <u>Washington Post</u>, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in <u>The Politics of Gun Control</u>," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush

Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes:  The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the

33

Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

34

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C., November 29-December 1, 2022.

"Gun Law History in America," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., February 16, 2023.

"The Obama Presidency and Gun Policy," Paper Presented for Hofstra University's 13th Presidential Conference on The Barack Obama Presidency, Hempstead, NY, April 19-21, 2023.


Panel Participation:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

40

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.

<u>Book Reviews</u>:

<u>The American Presidency</u>, by Richard M. Pious, reviewed in <u>The Journal of Politics</u>, November, 1979.

<u>The Politics of Mistrust</u>, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in <u>Administrative Science Quarterly</u>, December, 1981.

Review essay, <u>The President as Policymaker</u>, by Laurence E. Lynn and David DeF. Whitman, review essay in <u>Administrative Science Quarterly</u>, March, 1982.

<u>PL94-142:  An Act of Congress</u>, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the <u>American Political Science Review</u>, June, 1982.

<u>Pure Politics and Impure Science</u>, by Arthur M. Silverstein, reviewed in <u>Administrative Science Quarterly</u>, June, 1984.

Review essay, <u>The President's Agenda</u>, by Paul Light, reviewed in <u>Administrative Science Quarterly</u>, September, 1984.

<u>The Evolution of American Electoral Systems</u>, by Paul Kleppner, et al., reviewed in the <u>American Political Science Review</u>, December, 1983.

<u>A Case of Third Party Activism</u>, by James Canfield, reviewed in <u>Perspective</u>, July-August, 1984.

<u>Winners and Losers:  Campaigns, Candidates and Congressional Elections</u>, by Stuart Rothenberg, reviewed in the <u>American Political Science Review</u>, December, 1984.

<u>The Political Presidency</u>, by Barbara Kellerman, reviewed in <u>Perspective</u>, January-February, 1985.

<u>Presidents and Promises</u>, by Jeff Fishel, reviewed in the <u>American Political Science Review</u>, December, 1985.

<u>The Elections of 1984</u>, ed. by Michael Nelson, reviewed in <u>Perspective</u>, May/June, 1985.

<u>Economic Conditions and Electoral Outcomes</u>, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in <u>Perspective</u>, May/June, 1986.

<u>Presidential Transitions:  Eisenhower Through Reagan</u>, by Carl M. Brauer, in <u>Perspective</u>, January/February, 1987.

43

<u>Religion and Politics in the United States</u>, by Kenneth D. Wald, in <u>Journal for the Scientific Study of Religion</u>, September, 1988.

<u>Abortion and Divorce in Western Law</u>, by Mary Ann Glendon, in <u>The Annals of the American Academy of Political and Social Science</u>, September, 1988.

<u>The American Political Economy</u>, by Douglas Hibbs, in <u>Perspective</u>, Spring, 1988.

<u>God in the White House</u>, by Richard G. Hutcheson, Jr., in <u>Perspective</u>, Fall, 1988.

<u>The Reagan Legacy</u>, Charles O. Jones, ed., in <u>Social Science Quarterly</u>, June, 1989.

<u>Dilemmas of Presidential Leadership From Washington Through Lincoln</u> by Richard Ellis and Aaron Wildavsky, in <u>Perspective</u>, September, 1989.

<u>Taming the Prince</u> by Harvey Mansfield, Jr., in <u>Governance</u>, April, 1990.

<u>Public Policy and Transit System Management</u>, ed. by George M. Guess, in <u>Perspective</u>, Spring, 1991.

<u>The Myth of Scientific Public Policy</u>, by Robert Formaini, in <u>Perspective</u>, Winter, 1992.

<u>The Bush Presidency: First Appraisals</u>, ed. by Colin Campbell and Bert Rockman in <u>Public Administration Review</u>, May/June, 1992.

<u>The Illusion of a Conservative Reagan Revolution</u>, by Larry Schwab, in <u>Policy Currents</u>, May, 1992.

<u>The Vital South: How Presidents Are Elected</u>, by Earl Black and Merle Black, in <u>Perspective</u>, Fall, 1993.

<u>The Presidential Pulse of Congressional Elections</u>, by James E. Campbell, in <u>The Journal of American History</u>, March, 1995.

<u>Out of Order</u>, by Thomas Patterson, in <u>Presidential Studies Quarterly</u>, Summer, 1994.

<u>Congress, the President, and Policymaking</u>, by Jean Schroedel, in the <u>American Political Science Review</u>, December, 1994.

<u>The President and the Parties</u>, by Sidney Milkis, in <u>Governance</u>, January 1995.

<u>The Myth of the Modern Presidency</u>, by David K. Nichols, <u>PRG Report</u>, Spring, 1995.

44

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans:  The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).


Selected Media Appearances/Quotations:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News";

PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi," "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the <u>New York Times</u>, the <u>Washington Post</u>, <u>Time Magazine</u>, <u>Newsweek</u>, <u>Der Spiegel</u> (Germany), <u>USA Today</u>, the <u>Los Angeles Times</u>, the <u>Wall Street Journal</u>, the <u>Christian Science Monitor</u>, the <u>Boston Globe</u>, the <u>Chicago Tribune</u>, the <u>Philadelphia Inquirer</u>, the <u>Miami Herald</u>, <u>Houston Chronicle</u>, the <u>St. Louis Post-Dispatch</u>, <u>San Francisco Chronicle</u>, the <u>Dallas Morning News</u>, the <u>Baltimore Sun</u>, the <u>Detroit Free Press</u>, the <u>Seattle Post-Intelligencer</u>, <u>Newsday</u>, the <u>Denver Post</u>, <u>Kansas City Star</u>, <u>Dallas News</u>, <u>Pittsburgh Post-Gazette</u>, <u>New Orleans Times Picayune</u>, <u>Orlando Sentinel</u>, <u>Columbus Dispatch</u>, <u>Buffalo News</u>, <u>San Jose Mercury News</u>, <u>Albany Times-Union</u>, <u>St. Petersburg Times</u>, <u>Arkansas Democrat-Gazette</u>, <u>Newark Star-Ledger</u>, <u>Bergen Record</u>, <u>Congress Daily</u>, <u>The Hill</u>, <u>CQ Report</u>, <u>Rolling Stone</u>, <u>The Nation</u>, <u>Ladies Home Journal</u>, the <u>National Journal</u>, <u>The Spectator</u>, <u>Legal Times</u>, <u>Financial Times</u>, <u>Toronto Globe</u>, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.

Professional Associations:

    Scholars Strategy Network.
    American Political Science Association.
    Center for the Study of the Presidency.
    Presidents and Executive Politics Section (formerly the Presidency Research Group),
        APSA; served on Governing Board of PRG, 1991 to 2003.
    New York Political Science Association.
    Pi Sigma Alpha.
    Phi Kappa Phi.

<u>Teaching Areas</u>:

    <u>American Government</u>:  courses taught include Law and Politics, Introduction to

American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy:  courses taught include Politics and Policy, Introduction to Public Policy, Gun Policy.  Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

Teaching-Related Awards:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)

Other Professional Activities

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

49

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, <u>PRG Report</u>, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, <u>American Political Science Review</u>, <u>PS</u>, <u>Comparative Politics</u>, <u>American Journal of Political Science</u>, <u>Policy Studies Journal</u>, <u>Policy Studies Review</u>, <u>Political Science Quarterly</u>, the <u>Journal of Politics</u>, <u>Western Political Quarterly</u>, <u>Polity</u>, <u>Social Science Quarterly</u>, <u>Political Behavior</u>, <u>American Politics Quarterly</u>, <u>Political Communication</u>, <u>Legislative Studies Quarterly</u>, <u>Government and Policy</u>, <u>Congress and the Presidency</u>, <u>Social Science Journal</u>, <u>Journal of Policy History</u>, <u>Political Research Quarterly</u>, <u>Presidential Studies Quarterly</u>, <u>Politics and Policy</u>, and the National Science Foundation.


<u>Selected Community Service</u>

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).

Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's (N.Y.) Odyssey 2010 Project, 1996.

**EXHIBIT B**

**TRAP GUN RESTRICTIONS**

## MARYLAND:

1910 Md. Laws 521, § 16c.
Sensitive Places and Times | Maryland | 1910
§ 16c. That it shall be unlawful for any person to hunt, pursue or kill any of the birds or animals named in Section 12, 13, 14 and 14A of this Act, or any insectivorous birds (excepting English sparrows), in Allegany County on Sunday, or on election days, and it shall be prima facie evidence of a violation of this Act if any person is found in the fields or woods with on a gun on Sunday or on election days, or to hunt or kill in any trap or destroy any of the birds . . .

## MICHIGAN:

1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1.
Dangerous or Unusual Weapons | Michigan | 1875
[I]f any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236.
Dangerous or Unusual Weapons | Michigan | 1931
Setting spring guns, etc.–Any person who shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, shall be guilty of a misdemeanor, punishable by imprisonment in the county jail not more than one year, or by a fine of not more than five hundred dollars, and the killing of any person by the firing of a gun or device so set shall be manslaughter.

1

**MINNESOTA:**

The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota Page 993, Image 287 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1873
Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65.
§ 64. The setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon in this state is hereby prohibited and declared to be unlawful.
§ 65. Any person offending against the foregoing section shall be punished as follows: If no injury results therefrom to any person, the person so offending shall be punished by imprisonment in the county jail of the proper county for a period not less than six months, or by fine not exceeding five hundred dollars, or by both fine and imprisonment, at the discretion of the court. If death results to any human being from the discharge of a weapon so unlawfully set, the person so offending shall, upon conviction thereof, be punished by imprisonment in the state prison for a term not exceeding fifteen nor less than ten years. If any person is injured, but not fatally, by the discharge of any weapon so unlawfully set, the person so offending, upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years, in the discretion of the court.

**MISSOURI:**

"Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891: "Chillicothe, Mo., Feb. 11 – In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[1]

---

[1] See https://bit.ly/3CtZsfk.

## NEW HAMPSHIRE:

1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18.

Dangerous or Unusual Weapons | New Hampshire | 1915

A person who violates a provision of this part is guilty of a misdemeanor and shall be fined as follows . . . [p]rovided, however, that a person violating the prohibition against setting a spring gun the object of which is to discharge a firearm, shall be fined not more than five hundred dollars nor less than fifty dollars, and shall be liable for twice the amount of the damage caused by his act, to be recovered by the person sustaining the injury or loss.

## NEW JERSEY:

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

Dangerous or Unusual Weapons | New Jersey | 1771

And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.

## NEW YORK:

"The Man Trap," The Buffalo Commercial, Nov. 1, 1870: "Coroner Flynn and the jury previously impaneled yesterday morning concluded the inquest on the body of George Tweedle, the burglar, who was shot by the trap-gun in the shop of Joseph J. Agostino . . . . A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow. . . . The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by Joseph D. Agostino. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent

person, the jury censured Agostino.  He will not be released, however, but will be held under $2,000 bail."[2]

1877 N.Y. Laws 434, Chap. 411, 434-39.
CHAP. 411.
AN ACT to further amend chapter seven hundred and twenty-one of the laws of eighteen hundred and seventy.one, entitled "An act to amend and consolidate the several acts relating to the preservation of moose, wild deer, birds and fish." Passed June 5,1877.
§ 1. . . . No person shall, in any part of this state, set any trap, spring-gun, or other device at any artificial salt-lick, or other place, for the purpose of trapping and killing any moose or deer.

1886 N.Y. Laws 361, Chap. 194, 361-62.
Chap. 194.
AN ACT to amend chapter five hundred and thirty-four of' the laws of eighteen hundred and seventy-nine, entitled "An act for the preservation of' moose, wild deer, birds, fish and other game," and to repeal chapter five hundred and fifty-seven of the laws of eighteen hundred and eighty-five, entitled "An act for the better preservation of wild deer." Passed April 24, 1886.
SECTION 1. Section one of chapter five hundred and thirty-four of the laws of eighteen hundred and seventy-nine, entitled "An act for the preservation of moose, wild deer, birds, fish and other game," is hereby amended so as to read as follows:
§ 1. . . .No person shall, in any part of this State, set any trap, spring-gun or other device at any artificial salt lick or other place for the purpose of trapping or killing wild deer.
https://heinonline-org.proxy.wm.edu/HOL/Page?collection=ssl&handle=hein.ssl/ssny0340&id=369&men_tab=srchresults

**NORTH DAKOTA:**

1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1.
Dangerous or Unusual Weapons | North Dakota | 1891
That it shall be unlawful for any person or persons to kill, ensnare or trap in any form or manner, or by any device whatever, or for any purpose, any buffalo, elk, deer, antelope or mountain sheep between the 1st day of January and the 1st day of

---

[2] See https://bit.ly/3yUSGNF.

4

September of each and every year. And it shall be unlawful for any person or persons, at any time, to use or employ any hound or dogs of any kind in running or driving any buffalo, elk, deer, antelope or mountain sheep, or to set any gun or guns or gun trap to be discharged upon or by, any buffalo, elk, deer, antelope or mountain sheep as driven or pursued in any manner whatever.

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1259, Image 1293 (1895) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | North Dakota | 1895
Setting Spring Gun, Trap or Device. Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or other device so set shall be deemed to be manslaughter in the first degree.

## OHIO:

"How a Melon Thief Came to Grief," Wellington Enterprise, Wellington, Ohio, September 21, 1881,
https://www.newspapers.com/image/171228605/?terms=%22trap%20gun%22&match=1
"But whatever the intention, it is a crime to set a trap gun of much greater magnitude than to steal melons, and one that he will not be likely to repeat. We hear that the affair has been settled between the parties and there will be no prosecution." [Huntington, Ohio]

## OREGON:

1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2.
Dangerous or Unusual Weapons | Oregon | 1925
§ 1. It shall be unlawful for any person to place or set any loaded spring-gun or set-gun, or any gun or firearm or other device of any kind designed for containing or firing explosives in any place whatsoever where the same may be fired, exploded or discharged by the contract of any person or animal with any string, wire, rod, stick, spring or other contrivance affixed thereto or connected therewith or with the trigger thereof.

5

§ 2. Any person who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor and shall be punished by a fine of not less than $100 nor more than $500, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment; provided, however, that this act shall not apply to any loaded spring-gun or set-gun or firearm or any device placed for the purpose of destroying gophers, moles or other burrowing rodents.

## PENNSYLVANIA:

The Wrightsville Star, Wrightsville, Pa., March 7, 1873, 3,
https://www.newspapers.com/image/774191522/?terms=%22trap%20gun%22&match=1
"Jesse R. Pennepacker, who shot the colored man Burrell, on Thursday morning last in Columbia [Pa.], by means of a trap gun set for the purpose of preventing his chicken coop from the depredation of thieves, was arrested and taken before Judge Livingston, who released him on bail in the sum of $8,000 for his appearance at court."

## RHODE ISLAND:

1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6;
1892 R.I. Pub. Laws 14, An Act In Amendment Of Chapter 92 Of The Public Statutes, Entitled "Of Firearms And Fireworks, § 6.
Hunting | Rhode Island | 1890, 1892
§ 6. Every person who shall at any time of year, take, kill or destroy any quail or partridge, by means of any trap, snare, net or spring, or who shall construct, erect, set, repair, maintain or tend any trap, snare, net, or spring for the purpose of taking, killing or destroying any quail or patridge, or who shall shoot any water fowl by means or by the use of any battery, swivel, punt or pivot gun, shall be fined for each offence, twenty dollars. Provided, however, that at such seasons as the taking, killing or destroying of such birds is prohibited by this chapter, any person may snare on his own land.

## SOUTH CAROLINA:

Edmund William McGregor Mackey, The Revised Statutes of the State of South Carolina, Prepared by Commissioners under an Act of the General Assembly, Approved March 9, 1869, to Which is Prefixed the Constitution of the United

6

States and the Constitution of South Carolina Page 404, Image 482 (1873) available at The Making of Modern Law: Primary Sources.
Hunting | South Carolina | 1855
Hunting, General Provisions, § 21.
That it shall not be lawful for any non-resident of this State to use a gun, set a trap or decoy, or to employ any other device for killing or taking deer, turkeys, ducks or other game, not to set a trap, seine, or net, or draw or use the same, or any other contrivance for taking or killing fish, within the territorial limits of this State.

1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1.
Dangerous or Unusual Weapons | South Carolina | 1931
Be it enacted by the General Assembly of the State of South Carolina: That it shall be unlawful for any person, firm, or corporation to construct, set, or place a loaded trap gun, spring gun, or any like device in any manner in any building, or in any place within this State, and any violation to the provisions of this Act shall be deemed a misdemeanor and punished by fine of not less than One Hundred ($100.00) Dollars and not more than Five Hundred ($500.00) Dollars, or by imprisonment of not less than thirty (30) days nor more than one (1) year, or by both fine and imprisonment, in the discretion of the Court.

**SOUTH DAKOTA:**

1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22.
Hunting | South Dakota | 1909
§ 21. No person shall at any time catch, take or kill any of the birds or animals mentioned in this chapter in any other manner than by shooting them with a gun held to the shoulder of the person discharging the same.
§ 22. No person shall at any time set, lay or prepare or have in possession, any trap, snare, artificial light, net, bird line, swivel gun or set gun or any contrivance whatever for the purpose of catching, taking or killing any of the same animals or birds in this chapter mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. The use of rifles in the hunting of said birds is prohibited.

**UTAH:**

7

An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866). Sentence Enhancement for Use of Weapon | Utah | 1865

§ 102. If any person maliciously injure, deface or destroy any building or fixture attached thereto, or wilfully and maliciously injure, destroy or secrete any goods, chattels or valuable paper of another, or maliciously, prepare any dead fall, or dig any pit, or set any gun, or arrange any other trap to injure another's person or property, he shall be imprisoned not more than one year, or fined not exceeding five hundred dollars, or both fined and imprisoned at the discretion of the court; and is liable to the party injured in a sum equal to three times the value of the property so destroyed or injured or damage sustained, in a civil action.

1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3. Dangerous or Unusual Weapons | Utah | 1901

§ 1. Infernal machine defined. That an infernal machine is any box, package, contrivance or apparatus, containing or arranged with an explosive or acid or poisonous or inflammable substance, chemical, or compound, or knife, or loaded pistol or gun or other dangerous or harmful weapon or thing constructed, contrived or arranged so as to explode, ignite or throw forth its contents, or to strike with any of its parts, unexpectedly when moved, handled or open, or after the lapse of time, or under conditions, or in a manner calculated to endanger health, life, limb or property.

§ 2. That every person who delivers or causes to be delivered, to any express or railway company or other common carrier to any person any infernal machine, knowing it to be such, without informing such common carrier or person of the nature therof, or sends the same through mail, or throws or places the same on or about the premises or property of another, or in any place where another may be injured thereby, in his person or property, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding twenty-five years.

§ 3. Penalty for constructing or having in possession – That every person who knowingly constructs or contrives any infernal machine, or with intent to injure another in his person or property, has any infernal machine in his possession, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years.

**<u>VERMONT:</u>**

8

1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1
Dangerous or Unusual Weapons | Vermont | 1884
A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. If the person injured dies, his personal representative may have the action, as provided in sections two thousand one hundred and thirty-eight and two thousand one hundred and thirty-nine of the Revised Laws.

Vermont Public Acts, No. 80—An Act Revising, in Amendment of and in Addition to the Fish and Game Laws. pp. 89-90, 1892
Sec. 58. A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such trap, in the civil action, for twice the amount of such damage. If the person injured dies, his personal representative may have the action, as provided in sections 2138 and 2139 of the Revised Laws.
Approved November 22, 1892

1912 Vt. Acts and Resolves 261
Dangerous or Unusual Weapons | Vermont | 1912
. . . and provided further that a person violating the prohibition against setting a spring gun or other device the object of which is to discharge a firearm shall be fined not more than five hundred dollars nor less than fifty dollars, and shall also be liable for twice the amount of the damage caused by his act to be recovered by the person sustaining the injury or loss, in an action on this section.


## WASHINGTON:

1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3.
Dangerous or Unusual Weapons | Washington | 1909
§ 266. Setting Spring Guns. Every person who shall set a so-called trap, spring pistol, rifle, or other deadly weapon, shall be punished as follows: 1. If no injury

9

result therefrom to any human being, by imprisonment in the county jail for not more than one year or by a fine of not more than one thousand dollars, or by both. 2. If injuries not fatal result therefrom to any human being, by imprisonment in the state penitentiary for not more than twenty years. 3. If the death of a human being results therefrom, by imprisonment in the state penitentiary for not more than twenty years.

## WISCONSIN:

David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1964, Image 859 (Vol. 2, 1872) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Wisconsin | 1872
Offenses Cognizable Before Justices, Miscellaneous. § 53. Any person or persons in this State who shall hereafter set any gun, pistol or revolver, or any other firearms, for the purpose of killing deer or any other game, or for any other purpose, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, and shall be imprisoned in the county jail of the proper county for a term of not less than twenty days.

1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals, ch. 530, § 1.
Hunting | Wisconsin | 1921
(29.22)(1) No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game . . . and no person shall carry with him in any automobile any gun or rifle unless the same is unloaded, and knocked down or unloaded and inclosed within a carrying case[.]

*Source: https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT C

# PUNT/PIVOT/SWIVEL GUN LAWS*

## CONNECTICUT

1872 Conn. Acts 108, An Act in Addition to an Act for the Preservation of Game, chap. 115, § 2.
No person shall at any time kill any wild duck, goose or brant with any instrument known as a
punt gun or swivel, or with any other than such guns as are habitually raised at arms' length and
fired from the shoulder, or shall use any instrument or gun other than such guns as aforesaid,
with attempt to capture or kill such wild duck, goose or brant, under a penalty of seven dollars.

J. M. Meech, Charter and Revised Ordinances of the City of Norwich With the Amendments
Thereto, and Statutes of the State Relating to Municipal Corporations, in Force January 1st, 1877
Page 178, Page 185 (1876) available at The Making of Modern Law: Primary Sources.
Connecticut.
Ordinances of Norwich. § 15. No person or persons shall fire any swivel, musket, fowling-piece,
pistol, or other gun of any description within said city at a less distance than fifty rods from any
dwelling house, or public highway, or street without written permission from the Mayor or one
of the aldermen of said city; and every person so offending shall, for every such offence, forfeit
and pay for the use of said city the sum of three dollars: Provided always, that nothing herein
contained shall be construed to extend to the members of any military company when under the
command of any military officer, not to prevent the firing of any gun or guns for the destruction
of any noxious birds or animals by any person or persons upon his or their premises.

## DELAWARE

1911 Del. Laws 324, Of Fish, Oysters and Game, § 8.
That it shall be unlawful to shoot at or kill any birds or animals protected by the laws of this
State with any device, swivel or punt gun, or with any gun other than such as is habitually raised
at arm's length and fired from the shoulder . . . .

## ILLINOIS

1901 Ill. Laws 213, Protection of Game, § 1.
. . . it shall be further unlawful to shoot, kill, or destroy, or shoot at, any wild goose, brant, or
other water fowl, with a swivel gun . . . .

## IOWA

1933 Iowa Acts 47–48, ch. 30, § 24.
. . . No person shall use a swivel gun nor any other firearm, except such as is commonly shot
from the shoulder or hand in the hunting, killing or pursuit of game, and no such gun shall be
larger than number 10 gauge.

## MAINE

1919 Me. Laws 235, Swivel, pivot and set gun added to prohibited devices; penalty for violation increased to $100 and costs and imprisonment for sixty days for possession, ch. 196, § 25
No person shall have in possession at any time when he is upon the wild lands, water or highways, or in the woods or fields of the state, or in any camp, lodge, or place of resort for hunters or fishermen, or in its immediate vicinity, any jacklight or light fitted for use in the hunting of game in the night time, or any swivel, pivot, or set gun…

## MARYLAND

1874 Md. Acts 224, An Act To Protect Wild Fowl in Worcester County, ch. 164, §§ 1-2
§ 1… no person shall, during the hours intervening between twilight at evening and twilight of the following morning, shoot or kill, or shoot at, capture with nets, by fire-light, any wild fowl within the limits of Worcester County. § 2. …no person shall, at any time, kill or shoot at any wild fowl within the limits of Worcester County, with any swivel or pivot gun, or any kind of gun which cannot be conveniently discharged from the shoulder at arms length and without a rest.

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein Page 1379, Image 304 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Wild Fowl. § 280. It shall be lawful to shoot teal ducks, mallards, black ducks, bald pates, and all other ducks known as marsh ducks, in any manner other than by swivel, gun or big gun, from one hour before sunrise until one hour after sunset every day, from the fifteenth day of August to the first day of October of each year, on the waters of the Chesapeake bay, lying and being within the bounds prescribed by section 278.

## MASSACHUSETTS

1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2
"That all cannon, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having in them any gun-powder, shall be liable to be seized by either of the Firewards of the said Town: And upon complaint made by the said Firewards to the Court of Common Pleas, of such cannon, swivels, mortar, or howitzers, being so found, the Court shall proceed to try the merits of such complaint by a jury; and if the jury shall find such complaint supported, such cannon, swivel, mortar, or howitzer, shall be adjudged forfeit, and be sold at public auction.

1783 Mass. Acts 218, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun-Powder Within the Town of Boston, ch.13
The depositing of loaded arms in the houses of the town of Boston is dangerous…That if any person shall take into any dwelling-house, stable, barn, out-house, ware-house, store, shop or other building, within the Town of Boston, any cannon, swivel, mortar, howitzer, or cohorn, or

fire-arm, loaded with, or having gun powder in the same, or shall receive into any dwelling-house, stable, barn, outhouse, store, warehouse, shop, or other building, within the said town, any bomb, grenade, or other iron shell, charged with, or having gun-powder in the same, such person shall forfeit and pay the sum of ten pounds…

Thomas Wetmore, Commissioner, The Charter and Ordinances of the City of Boston: Together with the Acts of the Legislature Relating to the City Page 142-143, Image 142 (1834) available at The Making of Modern Law: Primary Sources. [1783]

An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston. Whereas the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in said town. § 1. Be it enacted by the Senate and House of Representatives in General Court assembled and by the authority of the same, That if any person shall take into any dwelling house, stable, barn, out house, ware house, store, shop or other building within the town of Boston, any cannon, swivel, mortar, howitzer, cohorn, or fire arm, loaded with or having gunpowder in the same, or shall receive into any dwelling house, stable, barn, out house, store, ware house, shop, or other building within said town, any bomb, grenade, or other iron shell, charged with, or having gun powder in the same, such person shall forfeit and pay the sum of ten pounds, to be recovered at the suit of the firewards [duties of Firewards transferred to Engineers,] of the said towns, in an action of debt before any court proper to try the same; one moiety thereof, to the use of said Firewards, and the other moiety to the support of the poor of said town of Boston. § 2. Be it further enacted, That all cannons, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades, and iron shells of any kind, that shall be found in any dwelling house, out house, stable, barn, store, warehouse, shop or other building, charged with or having in them any gunpowder, shall be liable to be seized by either of the Firewards of said town; and upon complaint made by the said Firewards to the Court of Common Pleas, of such cannon, swivels, mortars, or howitzers, being so found, the Court shall proceed to try the merits of such complaint by a jury; and if the jury shall find such complaint supported, such cannon, swivel, mortar or howitzer, shall be adjudged forfeit, and sold at public auction; one half of the proceeds thereof shall be disposed of to the Firewards, and the other half to the use of the poor of the town of Boston. And when any fire arms, or any bomb, grenade, or other shell, shall be found in any house, out house, barn, stable, store, ware house, shop or other building, so charged, or having gun powder in the same, the same shall be liable to be seized in manner aforesaid; and on complaint thereof, made and supported before a Justice of the Peace, shall be sold and disposed of, as is above provided for cannon.

William A. Richardson, Supplement to the General Statutes of the Commonwealth of Massachusetts. Containing the General Laws from the Passage of the General Statutes to the Year 1872, Inclusive, with the Amendments to the Constitutions of the State and the United States Page 836-837, Image 836-837 (Vol. 1, 1873) available at The Making of Modern Law: Primary Sources. [1870]

An Act to Aid in the Preservation of Birds, Birds' Eggs, And Deer. § 6. Whoever, at any season of the year, takes, kills or destroys any game birds by means of traps, snares, nets or springs; or shoots at or kills any water fowl, by the use of any battery, swivel, or pivot gun, shall forfeit for each such offence twenty-five dollars: provided that between the first day of October and the first day of January in any year, any person may on his own premises, or for his own personal

use and not for sale, take or kills by means of traps or snares any of the birds known as ruffed grouse or partridges.

1900 Mass. Acts 150, An Act to Regulate the Shooting of Black Duck, Geese, Brant and Other Aquatic Birds in Plymouth Harbor or Bay, ch. 209, § 1
§ 1. Whoever within the limits of Plymouth harbor or bay, . . . shoots at or kills or pursues a black duck, goose, brant or other aquatic bird, by the use of any sneak boat, raft, floating box or device of like description, not including what is known as an ordinary dory or row boat, or by the use of any pivot gun or swivel gun, or any other firearm not usually held at and discharged from the shoulder, shall be punished by a fine of not less than ten nor more than fifty dollars.

## MICHIGAN

James S. Dewey, The Compiled Laws of the State of Michigan. Compiled and Arranged under an Act of the Legislature, Approved January 25, 1871 Page 680, Image 690 (Vol. 1, 1872) available at The Making of Modern Law: Primary Sources. [1872]
For the Protection of Game and Muskrats. (2096.) § 4. No person or persons shall at any time kill or attempt to kill any wild duck, or other wild fowl, with or by means of a swivel or punt gun, or rob or destroy the nests of any wild ducks or wild geese, or in any manner kill or molest the same whilst they are sitting at night on their nesting places.

1883 Mich. Pub. Acts 6, An Act To Amend . . . Acts Relating To The Protection Of Game, § 4.
No person or persons shall at any time kill or attempt to kill, any wild duck or other wild fowl with or by means of a swivel or punt gun, or by means or use of any battery, sunken boat, or other device similar to a battery, or rob or destroy the nests of any wild duck or wild goose or brant, or in any manner kill or molest the same, at night or at any time, on their nesting places.

1901 Mich. Pub. Acts 336, An Act to Revise and Amend the Laws for the Protection of Game and Birds, § 11.
No person shall injure, kill or destroy by any means whatever, any kind of wild duck, wild goose, brant, snipe, plover, or any kind of wild water fowl, save only from the first day of October to the thirtieth day of November following thereafter, both inclusive, and then only from one-half hour before sunrise until one hour after sunset of each day. No person or persons shall hunt, pursue, worry or kill any wild water fowl by any means whatever during such time as said person or persons are upon any floating device or contrivance propelled by or using as motive power steam, gas, naptha, oil, gasoline or electricity; nor shall any person or persons make use of any swivel or punt gun for the killing of any water fowl, or make use of any battery, sink boat or similar device whatever, save only a gun of not greater size than ten caliber, such gun to be held in the hands at the time firing[.]

## MINNESOTA

1903 Minn. Laws 588-89, An Act for the Preservation, Propogation, Protection, Taking, Use and Transportation of Fish and Game, ch. 336, § 12.
No person shall at any time set, lay, prepare or have in possession any trap, snare, artificial light, net, bird lime, swivel gun or set gun or any contrivance whatever for the purpose of catching,

taking or killing any of the birds in this act mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. Whoever shall offend against any of the provisions of this section shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not less than ten (10) dollars nor more than one hundred (100) dollars, and costs of prosecution, or by imprisonment in the county jail for not less than ten (10) days nor more than ninety (90) days, for each and every offense.

## MISSOURI

1905 Mo. Laws 161, An Act Relating to the Preservation, Propagation and Protection of Game Animals, Birds and Fish, Creating the Office of Game and Fish Warden, Creating a Game Protection Fund, and Appropriating Money Therefrom, § 11.

Any person who, in the pursuit of any wild duck, goose, brant, or other aquatic bird, upon the waters of this state, shall use any sneak boat, or any sail boat, or boat propelled by steam, naptha, electric or other engine or machinery, or any battery, swivel gun or punt gun, or who shall kill or attempt to kill or to pursue, while occupying or using any such boat, any wild geese, duck, brant, or other aquatic bird, or who shall construct or use for the purpose of hunting, upon the ice any fixed or artificial blind or ambush, shall be punished by a fine of not less than $10.00 nor more than $50.00.

## NEBRASKA

1893 Neb. Laws 393, An Act to Amend . . . Section 5666 . . . of Chapter 11 . . . of the Criminal Code of Nebraska . . . and to Repeal Said Sections Amended, ch. 47, § 3.

It shall also be unlawful for any person, at any time, by the aid or use of any swivel, punt gun, big gun (so called), or any other than the common shoulder gun; or by the aid or use of any punt boat, or sneak boat used for carrying such gun, to catch, kill, wound, or destroy, or to pursue after with intent to catch, kill, wound or destroy upon any of the waters, bays, rivers, marshes, mud flats, or any cover to which wild fowl resort within state of Nebraska, any wild goose, wood duck, teal, canvas-back, bluebill, or other wild duck, or to destroy or disturb the eggs of any of the birds above named; and any person offending against any of the provisions of this act shall be fined in any sum not less than two ($2) dollars, nor more than twenty ($20) dollars, for each offense, or be imprisoned in the county jail not more than twenty (20) days.

## NEW HAMPSHIRE

1905 N.H. Laws 515, An Act to Prohibit the Use of Swivel and Punt Guns, ch. 98, § 1.

IF any person shall, at any time, within this state, hunt, pursue, shoot at, or kill any game bird, as defined by section 34 of chapter 79 of the laws of 1901, with any punt gun swivel gun, or other gun not fired from the shoulder, or of larger bore than ten gauge, he shall be fined not more than ten dollars for each offense and shall forfeit all guns and implements with which the offense was committed. And all guns and implements so used shall be seized by any detective, constable or police officer and shall be destroyed by the person seizing them.

## NEW JERSEY

1874 N.J. Laws 137-38, An Act to Amend and Consolidate the Several Acts Relating to Game and Game Fish, ch. 525, § 4.

That no person shall at any time kill any wild duck, brant, or goose with any device or instrument known as a swivel or punt gun, or with any gun other than such guns as are habitually raised at arms [sic] length and fired from the shoulder; or shall use any net, device, instrument, or gun other than such gun as aforesaid with intent to capture or kill any such wild duck or goose, under a penalty of fifty dollars.

## NEW YORK

John Worth Edmonds, Statutes at Large of the State of New York: Containing the General Statutes Passed in the Years 1871, 1872, 1873 and 1874 with a Reference to All the Decisions upon Them. Also, the Constitution of the State of New York as Amended in 1875. 2d ed. Page 188, Image 188 (Vol. 9, 1875) available at The Making of Modern Law: Primary Sources. 1874 An Act to Amend and Consolidate the Several Acts Relating to the Preservation of Moose, Wild Deer, Birds and Fish, § 3. No person shall at any time kill any wild duck, goose are or brant, with any device or instrument known as a swivel or punt gun, or with any gun other than such guns as are habitually raised at arms length and fired from the shoulder, or shall use any net, device or instrument, or gun other than such gun as aforesaid with intent to capture or kill any such wild duck, goose or brant under a penalty of one hundred dollars.

## NORTH DAKOTA

1899 N.D. Laws 124-25, An Act Relating to the Protection of Game and Fish, § 7, pt. 5. Shooting or killing restricted, penalty: Every person who either . . . at any time kills or shoots any wild duck, goose, crane or brant with a swivel gun or other guns except such as is commonly shot from the shoulder, or in hunting such birds makes use of any artificial light or battery . . . Is guilty of a misdemeanor, and upon conviction thereof before any justice of the peace of the county, is punishable by a fine of not exceeding ten dollars for each of the birds mentioned in subdivisions 1, 2, 3, or 4 of this section, so shot or killed or nest or eggs so destroyed[.]

1901 N.D. Laws 133-34, An Act . . . Relating to Game and Fish, ch. 106, § 1, pts. 5, 6. Every person who either . . . 5. Shall at any time catch or kill any of the birds permitted to be killed by this act at any time in any other manner than by shooting them with a gun held ot the shoulder by a person discharging the same; or 6. Shall at any time set, lay or prepare any traps, snare, net, bird line, medicated, drugged or poisoned food or grain, or swivel gun or any contrivance or device whatever with intent to catch, take, or kill any of the birds in this act mentioned, whether the same are caught or not . . . is guilty of a misdemeanor, and upon conviction thereof before any justice of the peace of the county, is punishable by a fine of not exceeding ten dollars . . . for each violation of subdivisions 5 or 6 of this section[.]

## OHIO

Joseph Rockwell Swan. Supplement to the Revised Statutes of the State of Ohio, Embracing All Laws of a General Nature, Passed since the Publication of Swan & Critchfield's Revised

Statutes, 1860. In Force August 1, 1868. With Notes of the Decisions of the Supreme Court Page 13, Image 21 (1868) available at The Making of Modern Law: Primary Sources. [1861]
An Act for the Protection of Certain Birds and Game. (25.) § III. And it shall also be unlawful for any person at any time after the passage of this act, by the aid or use of any swivel, punt gun, big gun (so called), or any gun other than the common shoulder gun or by the aid or use of any punt boat, or sneak boat used for carrying such gun to catch, kill, wound, or destroy, or to pursue after, with intent to catch, kill, wound or destroy, upon any of the waters, bays, rivers, marshes, mud flats, or any cover to which wild fowl resort within the state of Ohio, any wild goose, wood-duck, teal, canvas-back, blue-bill, or other wild duck.

John Riner Sayler, The Statutes of the State of Ohio: In Continuation of Curwen's Statutes at Large and Swan & Critchfield's Revised Statutes, Arranged in Chronological Order, Showing the Acts in Force, Repealed, Obsolete or Superseded with References to the Judicial Decisions Construing the Statutes and a Complete Analytical Index Page 3331, Image 521 (Vol. 4, 1876) available at The Making of Modern Law: Primary Sources. 1874
An Act to Protect Certain Birds and Game, and to Protect Land Owners and Punish Trespassing Upon Improved or Enclosed Land, and to Repeal Certain Statutes Therein Designated. § 2. . .
And it shall be unlawful for any person, by the aid or use of any swivel or punt gun, or any other than the common shoulder gun, or by the aid or use of any push boat or sneak boat, used for carrying such gun, to catch, kill or wound, or destroy or to pursue after, with such intent, upon any of the waters, bays, rivers, marshes, mud flats, or any cover to which wild fowl resort, within the State of Ohio, any wild goose, wild duck, or brant.

1874 Ohio Laws 148, Reg. Sess vol. 71, An Act to Protect Certain Birds and Game, and to Protect Land Owners and Punish Trespassing upon Improved or Enclosed Land, and to Repeal Certain Statutes Therein Designated, § 2.
And it shall be unlawful for any person, by the aid or use of any swivel or punt gun, or any other than the common shoulder gun, or by the aid or use of any push boat or sneak boat, used for carrying such gun, to catch, kill or wound, or destroy or to pursue after, with such intent upon the waters, bays, rivers, marshes, mud flats, or any cover to which wild fowl resort, within the state of Ohio, any wild goose, wild duck, or brant.

1900 Ohio Laws 235, An Act to Amend Section 6961 of the Revised Statutes (Bates' Annotated) of Ohio, § 1.
No person shall, at any time, catch, kill, or injure, or pursue, with such intent any wild duck or wild goose, by the aid or use of any swivel or punt gun, or any other gun but a common shoulder gun.

## OREGON

1895 Or. Laws 95, An Act for the Protection of Game, Fish and Wild Fowl of the State of Oregon, and to Provide for the Appointment of a Fish and Game Warden, § 16.
Every person who shall use any batteries or swivel or pivot-gun, or any other gun than one to be held in the hands and fired from the shoulder, either from the shore or on a boat, raft or other device, on the Columbia river, or on any other lake or river in the state of Oregon, at any time,

for the purpose of shooting wild ducks, geese, swan or other water fowl, shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished as hereinafter provided.

1901 Or. Laws 221, An Act to Provide for the Preservation and Protection of Forests, Game, Wild Fowls, Song Birds, Trout, and Other Game Fish . . . , § 11.
It shall be unlawful to use any battery, swivel or pivot gun, or other gun than one to be held in the hands and fired from the shoulder, either form the shore or on a boat, raft or other device, on the Columbia River, or any lake or river in the State of Oregon, at any time for the purpose of shooting wild ducks, geese, swan or other water fowl.

## PENNSYLVANIA

1876 Pa. Laws 105, An Act To Amend And Consolidate The Several Acts Relating To Game And Game Fish, § 4
No person shall, at any time, kill any wild duck or goose with any device or instrument known as a swivel or punt gun, or with any gun other than such guns as habitually are raised at arm's length and fired from the shoulder or shall use any net, device, instrument, or gun other than such gun as aforesaid, with intent to capture or kill any such wild duck or goose, under a penalty of ten dollars.

1923 Pa. Laws 386, Unlawful Methods of Hunting
. . . It is unlawful to hunt for, or catch or take or kill or wound, or attempt to catch or take or kill or wound, game of any kind, excepting raccoons, through the use of what is commonly known as an automatic gun or an automatic firearm of any kind, or a swivel gun or an air-rifle or the apparatus known as a silencer, or from an automobile or vehicle or boat or craft of any kind propelled by any mechanical power. . .

## RHODE ISLAND

1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6
§ 6. Every person who shall at any time of year, take, kill or destroy any quail or partridge, by means of any trap, snare, net or spring, or who shall construct, erect, set, repair, maintain or tend any trap, snare, net, or spring for the purpose of taking, killing or destroying any quail or patridge, or who shall shoot any water fowl by means or by the use of any battery, swivel, punt or pivot gun, shall be fined for each offence, twenty dollars. Provided, however, that at such seasons as the taking, killing or destroying of such birds is prohibited by this chapter, any person may snare on his own land.

1914 R.I. Pub. Laws 39: § 10.
§ 10. Every person who shall at any time of the year take, kill or destroy any quail or partridge by means of any trap, snare, net or spring, or who shall construct, erect, set, repair, maintain or tend any trap, snare, net or spring, for the purpose of taking, killing or destroying any quail or partridge, who shall shoot any water fowl by means or by use of any battery, swivel, punt, or pivot gun, or who shall take, kill, or pursue with intent to kill any migratory bird or insectivorous bird between sunset and sunrise, shall be fined for each offense twenty dollars.

Charles H. Price, The Compiled Laws of the Territory of Dakota, A. D. 1887. Comprising the Codes and General Statutes in Force at the Conclusion of the Seventeenth Session of the Legislative Assembly Page 523, Image 545 (1887) available at The Making of Modern Law: Primary Sources. (An Entry for this statute exists for **both North and South Dakota** because it was passed during the territorial period.)

Political Code. § 2372. If any person shall kill or shoot any wild duck, goose or brant with any swivel gun, or any kind of gun except such as is commonly shot from the shoulder, or shall use medicated or poisoned food to capture or kill any of the birds named in this act, he shall be deemed guilty of a misdemeanor, and upon conviction shall be fined twenty-five dollars for each offense, and shall stand committed to the county jail for thirty days unless such fine and the costs of prosecution are sooner paid.

## SOUTH DAKOTA

1899 S.D. Sess. Laws 112, An Act For The Protection Of Game And The Appointment Of Wardens, And The Licensing Of Hunters And Prescribing Penalties For The Violation Of Its Provisions, pt. 3

At any time kills or shoots any wild duck, goose or brant with any swivel gun or other gun, except as is commonly shot form the shoulder, or in hunting such birds makes us of any artificial light or battery. . .

1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22.

§ 21. No person shall at any time catch, take or kill any of the birds or animals mentioned in this chapter in any other manner than by shooting them with a gun held to the shoulder of the person discharging the same. § 22. No person shall at any time set, lay or prepare or have in possession, any trap, snare, artificial light, net, bird line, swivel gun or set gun or any contrivance whatever for the purpose of catching, taking or killing any of the same animals or birds in this chapter mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. The use of rifles in the hunting of said birds is prohibited.

## TENNESSEE

1903 Tenn. Pub. Acts 376-77, A Bill for an Act to Be Entitled An Act for the Protection of Game in the State of Tennessee . . . , ch. 169, § 6.

[N]o person or persons shall . . . for the purpose of taking or destroying birds or animals not protected by this Act, use any swivel or punt gun, or gun other than a gun held in the hands and fired from the shoulder, and of the gauge not larger than No. 8[.]

## VERMONT

Act of Incorporation and By-Laws of the Village of Bradford Page 14, Image 15 (1890) available at The Making of Modern Law: Primary Sources. Vermont

[Ordinances of the Village of Bradford] By-laws, Miscellaneous, § 6. Any person who shall fire any cannon, swivel gun, pistol, torpedo, squib, cracker, or throw any fire ball, in any street, alley or lane, except by permission of the trustees, shall be fined five dollars

## WASHINGTON STATE

1883 Wash. Sess. Laws 102 An Act for the Protection of Fish and Game, § 12.
Every person who shall use any sink box on any lake or river, or other waters in Washington Territory, for the purpose of shooting ducks or geese or other water fowls therefrom, or who shall use any batteries or swivel or pivot gun on boats, canvas, rafts or other device at any time, for the purpose of killing any water fowl within the limits of Washington Territory, shall be guilty of a misdemeanor.

1913 Wash. Sess. Laws 90-91, An Act Relating to the Method of Killing Water Fowl . . . , ch. 33, § 1.
§ 1. . . Every person who shall use any sink box or sink boat or sneak boat for the purpose of shooting wild ducks, geese, swan or other water fowl, or who shall use any battery, swivel or pivot gun, or any gun other than one to be held in the hands and fired from the shoulder, at any time, for the purposes of shooting wild ducks, geese, swan, brant or other water fowl . . . shall be guilty of a misdemeanor, and upon conviction thereof shall be punished as hereinafter provided.

## WEST VIRGINIA

1889-1890 W. Va. Acts 173, Extra Sess. 1891, An Act to Amend and Re-Enact Section Eleven of Chapter Sixty-Two of the Code, Relating to the Protection of Birds and Game. 1890
11. . . . And it shall be unlawful for any person by the use of any swivel or pivot gun, or any other than the common shoulder gun, or by the aid of any push boat, or sneak boat, used for carrying such gun, to catch, kill, wound or destroy, or to pursue with such intent upon any of the waters, bogs . . . or any cover to which wild fowl resort within this State, any wild goose, wild duck or brant.

## WISCONSIN

David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1960-1961, Image 855-856 (Vol 2, 1872) available at The Making of Modern Law: Primary Sources. [1871]
Of the Preservation of Fish and Game, § 37. No person shall at any time or at any place within either of said counties, kill any wild duck, brant or wild goose, with or by means of the device, instrument or fire arm known as a punt or swivel gun, or with or by means of any gun or fire arm other than such guns or fire arms as are habitually raised at arm's length and fired from the shoulder, or shall use any such device, instrument or gun other than such shoulder gun as

aforesaid, with intent to kill any wild duck, brant or wild goose, under a penalty of fifty dollars for each and every offense.

1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals,ch. 530, § 1.
(29.22)(1) No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game . . . and no person shall carry with him in any automobile any gun or rifle unless the same is unloaded, and knocked down or unloaded and inclosed within a carrying case[.]

*SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/


https://www.boone-crockett.org/punt-gun-and-race-save-americas-wildlife
"As the poster-child of waterfowl market hunting of the 1800s, the punt gun was a 10-foot long, 100-pound muzzleloading shotgun that might be better categorized as artillery. This gun was typically mounted to the bow of a small boat (or punt), aimed at a mass of migratory waterfowl and then, with the single pull of a trigger, it could annihilate 50-100 birds.

Used in the 1800s and early 1900s, these guns were an efficient and economical way to feed the needs of a nation. Because of that demand—and the market hunters hellbent on meeting it—waterfowl numbers in the U.S. plummeted at the turn of the 20th century. . . ."

SWIVEL GUN:



PUNT GUNS:







**EXHIBIT D**

**TABLE OF GUNPOWDER LAWS**

| STATE | STORAGE LAWS | MANUFACTURING INSPECTION SALE IGNITE | TRANSPORT LAWS |
|---|---|---|---|
| Alabama | 1848, 1887 | | |
| Alaska | | | |
| Arizona | | | 1889 |
| Arkansas | 1887 | 1884 | 1875 |
| California | 1851,1855, 1875 | 1883,1923 | |
| Colorado | 1868,1875, 1886, 1913 | 1911 | |
| Connecticut | 1827,1832, 1832,1859, 1862,1864, 1874, 1901 | 1665,1775, 1836,1923, 1930 | |
| Delaware | 1841,1852, 1865,1885, 1901 | 1845,1911, 1913,1919 | |
| District of Columbia | | | |
| Florida | 1838,1887, 1901 | 1923,1927 | |
| Georgia | 1900 | 1831,1858, 1902 | 1837 |
| Hawaii | 1884,1903, 1933 | | 1933 |
| Idaho | 1863,1897, 1901 | | |
| Illinois | 1855,1869, 1869,1908 | 1851 | |
| Indiana | 1836,1852, 1855,1871, 1879,1895, 1901 | 1847 | |
| Iowa | 1838,1847, 1856,1873, 1907 | 1845 | 1843 |
| Kansas | 1860,1915 | | |
| Kentucky | 1806,1864, 1869,1912 | 1874 | 1898 |
| Louisiana | 1808,1816, 1852,1884, | 1817 | |

| | | | |
|---|---|---|---|
| | 1904 | | |
| Maine | 1821,1821, 1848,1873, 1874 | 1821,1840 | |
| Maryland | 1794,1879, 1900 | 1757 | 1776 |
| Massachusetts | 1715,1719, 1783,1783, 1783,1801, 1847,1870, 1882,1904, 1919 | 1651,1814, 1881,1895, 1898 | |
| Michigan | 1841,1846, 1867,1869, 1879,1901 | 1901 | |
| Minnesota | 1884,1921 | 1858 | |
| Mississippi | 1818,1824 | | |
| Missouri | 1822,1823, 1873,1881, 1887,1909, 1913 | 1921 | |
| Montana | 1887,1903 | | |
| Nebraska | 1867,1897, 1901 | 1869,1895 | |
| Nevada | 1877,1901 | | |
| New Hampshire | 1786,1793, 1854 | 1820,1825, 1891,1913, 1917 | |
| New Jersey | 1811,1837, 1886,1902 | 1639,1776, 1811,1886, 1903,1927, 1927 | 1874 |
| New Mexico | 1851,1909 | 1923 | 1887 |
| New York | 1763,1784, 1799,1877, 1885,1900 | 1652,1664, 1690,1744, 1788,1890, 1911 | 1645, 1763, 1877 |
| North Carolina | 1901 | 1905,1909 | |
| North Dakota | 1895,1905 | 1923 | |
| Ohio | 1832,1833, 1835,1856, 1878,1902 | 1849,1889 | |
| Oklahoma | 1903 | 1890,1890, 1899 | |
| Oregon | 1862,1872, | 1903,1913 | |

| | | | |
|---|---|---|---|
| | 1878,1903 | | |
| Pennsylvania | 1725,1783, 1787,1791, 1816,1847, 1868,1887, 1896,1919 | 1682,1721, 1750,1794, 1795 | 1874 |
| Rhode Island | 1762,1798, 1902 | 1762,1776, 1821,1858, 1885 | |
| South Carolina | 1802,1823 | 1802,1890, 1903 | 1901 |
| South Dakota | 1890,1907 | 1913 | |
| Tennessee | 1850,1855, 1895,1901 | 1867,1899 | 1899 |
| Texas | 1839,1899, 1876,1901 | | |
| Utah | 1864,1875, 1888,1901 | 1901 | |
| Vermont | 1876,1882, 1891,1894, 1895,1900 | 1865,1882, 1919 | |
| Virginia | 1629,1879, 1901 | 1623 | 1887 |
| Washington | 1861,1862, 1867,1881, 1881,1883, 1886,1907 | 1896 | |
| West Virginia | 1875,1899, 1901,1909 | 1925 | |
| Wisconsin | 1883,1883, 1919 | 1888,1911, 1911 | |
| Wyoming | 1884,1893, 1900,1907, 1919 | | |
| TOTAL STATES | 48 | 39 | 14 |
| TOTAL LAWS | 190 | 92 | 16 |

SOURCE: Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT E

# GUNPOWDER STORAGE/USE LAWS

ALABAMA

1848 Ala. Acts 121–22, An Act To Prevent the Storage of Gun-powder in Larger Quantities Than One Hundred Pounds Within the City of Mobile, § 1.
It shall not be lawful for the Corporation of the City of Mobile, or any person or persons, to receive or keep, or have on storage in any building of any kind within three miles of the Mobile River, or Bay, gun-powder or gun-cotton or any explosive material, in larger quantities than one hundred pounds, unless the same be kept on one of the islands in the Mobile river or bay, in the neighborhood of the city of Mobile, but then the same shall not be kept at any point within the distance of one mile of the eastern bank of said river.

Robert C. Brickell, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887; with Such Statutes Passed at the Session of 1886-87, as are Required to Be Incorporated Therein by Act Approved February 21, 1887; and with Citations of the Decisions of the Supreme Court of the State Construing the Statutes Page 93, Image 103 (Vol. 2, 1887) available at The Making of Modern Law: Primary Sources.  1887
Storing Gunpowder in Town Limits, § 4093. Storing Gunpowder in city or town. – Any person who keeps on hand, at any one time, within the limits of any incorporated city or town, for sale or for use, more than fifty pounds of gunpowder, must, on conviction, be fined not less than one hundred dollars.

ARKANSAS

E.W. Rector, Digester, Digest of the Laws and Ordinances of the City of Hot Springs, with the Constitution of the State of Arkansas, General Incorporation Laws of the State and Amendments Thereto, Applicable to the Cities of the First-Class, and in Force on the 1st of January, 1887 Page 61, Image 258 (1887) available at The Making of Modern Law: Primary Sources. 1886 [Ordinances of the] City of Hot Springs, §131. That no person shall carry gun powder, giant powder, dynamite, nitro-glycerine or blasting powder on any vehicle in any part of the city, unless the same shall be secured in kegs, boxes or canisters, sufficiently close to prevent the grains thereof from falling out, and be laid upon or covered over with sheets of canvas or other cloth, and such vehicles shall not be allowed to remain on the streets or sidewalks for more than one hour while containing such gun powder or explosives above mentioned. § 132. That it shall be unlawful to erect or build a powder magazine, or a magazine for any of the explosives mentioned in this ordinance, in the city, within three hundred yards of any other building; and, Provided, That in no case shall it be lawful to build or erect any such magazine in the city unless the same be erected in a safe and secure way, and under permission of the council of the city.

CALIFORNIA

1851 Cal. Stat. 360–61, An Act to Reincorporate the City of San Francisco, § 13.
To regulate the location of slaughter-houses, markets, stables, and houses for the storage of gunpowder and other combustibles.

1855 Cal. Stat. 27, Laws of the State of California, pt. 10.
To provide for the prevention and extinguishment of fires and to organize and establish fire companies.

1875 Cal. Stat. 628, Statutes of California.
[T]o prohibit the establishment and maintenance of such slaughter-houses, or the storage of gunpowder and other combustibles and explosive substances within the incorporated limits of the city.

COLORADO

The Revised Statutes of Colorado: as Passed at the Seventh Session of the Legislative Assembly, Convened on the Second Day of December, A.D. 1867. Also, the Acts of a Public Nature Passed at the Same Session, and the Prior Laws Still in: Together with the Declaration of Independence, the Constitution of the United States, the Organic Act, and the Amendments Thereto Page 606, Image 606 (1868) available at The Making of Modern Law: Primary Sources.  1868
Towns and Cities: Article III. General Powers of Trustees, §1. The board of trustees of every such town shall have control of the finances, and all the property, real and personal, belonging to the corporation; and shall likewise have power within the limits of the town: . . . Seventh, To provide regulations for the prevention and extinguishment of fires; to prevent the erection of wooden buildings within prescribed limits; to regulate the construction of chimneys, furnaces and fire-places; to regulate the storage of gunpowder, gun-cotton, nitro-glycerine, tar, pitch, resin, and other combustible or inflammable materials, and to prescribe the places the places and manner of storing the same.

Thomas M. Patterson, The Charter and Ordinances of the City of Denver, as Adopted Since the Incorporation of the City and Its Organization, November, 1861, to the First Day of February, A.D., 1875, Revised and Amended, Together with an Act of the Legislature of the Territory of Colorado, in Relation to Municipal Corporations Page 135, Image 135 (1875) available at The Making of Modern Law: Primary Sources. 1875
[Ordinances] of the City of Denver, § 12. No person shall keep at his place of business or elsewhere within this city a greater quantity of gunpowder or gun-cotton than twenty-five pounds at one time, and the same shall be kept in tin or copper canisters or cases containing not to exceed five pounds in each and in a situation remote from fires, lighted lamps and candles, and from which they may easily be removed in case of fire; and no person or persons shall sell or weigh any gunpowder or guncotton after the lighting of lamps in the evening unless in sealed canisters or cases; and no person shall be allowed to keep nitro-glycerine in any part of said city. A violation of any of the provisions of this section shall subject the offender to a fine not less than ten dollars nor exceeding one hundred dollars. § 13. It shall be lawful for the Mayor or any member of the City Council, the Chief of Police or police officers or Chief or Assistant Chief Engineer, when any of them shall have cause to suspect that any gunpowder, gun-cotton or nitro glycerine is concealed or kept within the city, in violation of the provisions of this ordinance, to

2

search any place in said city for the purpose of determining whether any gunpowder, gun-cotton or nitro-glycerine is concealed or kept as aforesaid. Any person who shall obstruct or hinder any such officer, making search in the execution of his duties under this section, shall forfeit and pay to said city for each offense a sum not less than ten dollars nor more than one hundred dollars.

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 355, Image 355 (1886) available at The Making of Modern Law: Primary Sources. 1886
Vehicles for Transporting Powder, Sec. 14. No wagon, dray, cart or other vehicle loaded, in whole or in part, with gunpowder or gun-cotton, shall be permitted to stand or remain on any street, alley, highway or place in said city, except when unavoidably detained, and every magazine, safe, box or keg used for storing or transporting, and all vehicles employed in hauling gunpowder or gun-cotton within the city, shall have the word "Powder" painted upon both sides of the same in large letters.

1913 Colo. Sess. Laws 156, To Amend . . . the Revised Statutes of Colorado for 1908, Concerning Powers of Incorporated Towns and Cities, ch. 53, §1.
The city council, or board of trustees in towns, shall have power to regulate or prevent the storage and transportation of gunpowder, tar, pitch . . . or any of the products thereof, and other combustible or explosive material, within the corporate limits, and prescribe the limits within which any such regulations shall apply. Also to regulate the use of lights in stables, shops and other places, and to prevent the building of bonfires; and also to regulate or prevent the storage of gunpowder and other high explosives within the corporate limits and other high explosives within the corporate limits, or within one mile of the outer boundaries thereof. Also, to regulate and restrain the use of fireworks, fire crackers, torpedos, Roman candles, sky-rockets and other pyrotechnic displays.

CONNECTICUT

Charter and By-Laws of the City of New Haven, November, 1848 Page 48-49, Image 48-49 (1848) available at The Making of Modern Law: Primary Sources.  1827
A By-Law Relative to the Storage and Sale of Gunpowder. Be it ordained by the Mayor, Aldermen, and Common Council of the city of New Haven, in Court of Common Council assembled, 1st. That hereafter no person or persons shall, within the limits hereafter described, either directly or indirectly, sell and deliver any gunpowder, or have, store, or keep any quantity of gunpowder greater than one pound weight, without having obtained a license for that purpose from said Court of Common Council, in the manner herein prescribed. Provided, that nothing in this by-law contained shall be construed to prevent any person or persons from having or keeping in his or their possession, a greater quantity of powder than one pound weight, during any military occasion or public celebration, while acting under any military commander, and in obedience to his orders, or under permission and authority therefor, first had and obtained of the Mayor or some one of the Aldermen of said city. Provided also, That any person or persons purchasing gunpowder, shall be allowed between the rising and setting of the sun, sufficient time to transport the same from any place without said limits, through said limits to any place without the same. 2d. The Court of Common Council aforesaid, shall have power, on application to them made, to grant and give any meet person or persons a license to sell gunpowder, and for that purpose to have, store, and keep gunpowder in quantity not exceeding at any one time seven

3

pounds weight, and that well secured in a tin canister or canisters, and at such place or places within said limits and for such term of time, not exceeding one year, as said Court shall deem fit; which license shall be signed by the Clerk of said Court, and shall be in the form following, viz — Whereas the Mayor, Aldermen, and Common Council of the City of New Haven, in Court of Common Council convened, have approved of ___, as a suitable and proper person to keep, store, and sell gunpowder within the City of New Haven: We do therefore give license to said ____, to sell gunpowder at (describe the place) and for the purpose aforesaid, to have, keep, and store in said building any quantity of gunpowder not exceeding at any one time seven pounds weight, until the ___ day of ___. Dated, Signed per order, A.B., Clerk. For which license the person receiving the same shall pay the City Clerk twenty-five cents; and the same shall be by said Clerk recorded at full length. And before any license shall be given as aforesaid, the person or persons receiving the same shall pay to the Clerk aforementioned, for the use of said city, a sum after the rate of five dollars per annum. 3d. Before any shall proceed to sell or to store or keep gun-powder by virtue of any such license so given as aforesaid, such person shall put in a conspicuous place upon the front part of the building in which such powder is to be stored or sold, a sign, with the following words plainly and legibly inscribed thereon, viz., "Licensed to keep Powder," and shall continue the same during the time he shall keep, store, or sell gunpowder in said building. 4th section repealed. 5th. That no person or persons shall put or receive or have any quantity of gunpowder on board of any steamboat, for transportation therein in any of the waters within the limits of said city. 6th. If any person shall sell, keep, or store any gunpowder within the limits aforesaid, contrary to the true intent and spirit of this by-law, or without complying with all the pre-requisites enjoined thereby; or if any person or persons shall put or receive, or have on board of any steamboat for transportation on any of the waters within the limits of said city, any quantity of gunpowder, such person or persons shall forfeit and pay the sum of thirty-four dollars, one half to him who shall give information, and the other half to the use of the city.

Simeon Eben Baldwin, Revision of 1875. The General Statutes of the State of Connecticut, with the Declaration of Independence, the Constitution of the United States, and the Constitution of Connecticut Page 539, Image 590 (1874) available at The Making of Modern Law: Primary Sources. 1832
Qui-Tam Suits and Forfeitures, § 27. Every person, who shall refuse to remove any gun-powder in his charge, when legally requested by the selectmen of the town in which the same is deposited or kept, or who shall not deposit and keep it at the place legally designated by them, shall forfeit fifty dollars.

1832 Conn. Acts 391, An Act Regulating the Mode Of Keeping Of Gunpowder, Chap. 25, § 1-2. § 1 . . . [I]t shall be lawful for the select-men of each and every town within this State, or a majority of them, by their order, in writing, directed to the owners or persons having charge of the same, to cause to be removed to some safe and convenient place within said town, and within such time, as in said order may be prescribed, and quantity of gunpowder so deposited or kept, within the limits of said town, as in the opinion of said select-men, or a majority of them, may endanger the persons or dwellings of any individuals whatsoever. Whereupon it shall become the duty of the persons thus notified, to remove the said gunpowder within the time, and to the place specified in said order. § 2. That in case the said gun powder shall not be removed pursuant to said order, as is hereinbefore prescribed the said select-men, or a majority of them, may remove

4

or cause the same to be removed to such place within said town, as in their opinion shall be deemed safe and convenient. And they shall have and retain a lien upon the said powder for all necessary expenses in removing and keeping the same.

1859 Conn. Acts 62, An Act In Addition To And In Alteration Of "An Act For Forming And Conducting The Military Force," chap. 82, § 7.
It shall be the duty of the quarter-master general, annually, to inspect the armories and gun houses of the several companies, and also the rooms occupied by the regimental bands; and, on or before the first day of November, to make to the adjutant-general a full report of the condition of the same, and what companies are entitled to the allowance for armory rent; for which services he shall be allowed the sum of nine cents for every mile of necessary travel.

1862 Conn. Acts 76, An Act In Addition To "An Act to Provide For the Organization And Equipment Of A Volunteer Militia, And To Provide For the Public Defense," chap. 68, § 34.
It shall be the duty of the brigade inspectors of the respective brigades, annually, in the month of October or November, to carefully inspect the armories and gun houses of the companies belonging to their brigades, and also the rooms occupied by regimental bands; and, on or before the first day of December, to make a full report to the quartermaster general of the condition of the same, and of the number of arms and equipments of the state, deposited in such armories and gun-houses . . . .

1864 Conn. Acts 95, An Act In Addition To And In Alteration Of "An Act Relating To The Militia," chap. 73, § 8.
It shall be the duty of the quartermaster general to provide a suitable armory for each company of active militia, upon a certificate from the adjutant general, that such company has organized according to law, and has made requisition for an armory, through the commanding officer of said company, as a drill room and place to preserve its arms and equipments; and also to provide for the expenses of cleaning and keeping in good repair the said arms and equipments, in such manner as he may prescribe.

Charter and Ordinances of the City of Bridgeport: as Amended and Adopted Page 194 (1874) available at The Making of Modern Law: Primary Sources. 1874
An Ordinance Relative to Gunpowder and Explosive Substances. Be it ordained by the Common Council of the City of Bridgeport, § 1. No person shall have, or keep for sale or for any other purpose, within the limits of this city, any quantity of gunpowder or gun-cotton, exceeding one pound in weight; no person shall have, keep for sale, use, or other purpose, within the city limits, any quantity of nitro-glycerine, or other explosive substances or compounds exceeding six ounces, without special license thereof from the common council. No person shall transport any gunpowder through said city without a permit first had and obtained from the fire marshal, and in accordance with such rules and regulations as may be established by said fire marshal. No person shall, within said city, place, receive, or have any gunpowder on board of any steamboat used for the carrying of passengers, with intent to transport the same therein.

1901 Conn. Pub. Acts 602, § 20.

5

The warden and burgesses, when assembled according to law, shall have power to make, alter, repeal, and enforce such bylaws, orders, ordinances, and enactments as they deem suitable and proper, not inconsistent with this resolution or contrary to the laws of this state or of the United States, for the following purposes: . . . to license, regulate, or prohibit the manufacture, keeping for sale, or use of fireworks, torpedoes, firecrackers, gunpowder, petrolemn, dynamite, or other explosive or inflammable substance, and the conveyance thereof through any portion of the borough . . . .

DELAWARE

1841 Del. Laws 198, A Supplement to the Act Entitled "An Act for Establishing the Boundaries of the Town of Dover, and for Other Purposes Therein Mentioned, § 2.
And be it enacted, That it shall be the duty of the said commissioners, justices and constable to suppress, extinguish and prevent all bonfires from being lighted or kept up on the public square of the said town: and to suppress and prevent the firing of guns, crackers or squibs, by boys or others, within the limits of the said town.

1852 Del. Laws 216, § 27.
to regulate the storage of gunpowder, or any other dangerously combustible matter.

1865 Del. Laws 930, An Act to Prevent the Loading of Gunpowder Within Certain Distances of Railroads, chap. 554, § 1.
That it shall be unlawful for any person or persons to load gunpowder of any kind into cars on any railroad in this State, within one hundred yards of the bed of the regular track used in carrying passengers, and upon conviction of any person engaged in participating in any way in loading or putting gunpowder of any kind into cars standing within one hundred standing within one hundred yards of the regular bed of the railroad engaged in carrying passengers in this State, he shall forfeit and pay to the State a fine of one thousand dollars and be imprisoned for the term of six months, at the discretion of the Court.

W.B. Hvland, Wilmington City Code. The Ordinances of the City of Wilmington, Delaware. Also, the Original Borough Charter, the Charter of the City of Wilmington, and the Acts of the Legislature, Now in Force Relating to the City Page 689, Image 689 (1885) available at The Making of Modern Law: Primary Sources. 1885
[Wilmington] City Ordinances, § 2. For the purpose of supplying retailers of gunpowder within the City of Wilmington, it shall and may be lawful to introduce the same in kegs, containing not more than twenty-five pounds each, carefully enclosed in good bags, or by putting a sheet of canvas under and around the said kegs, sufficient to prevent the gunpowder from scattering from the said carriage, wagon or other vehicle in which it is conveyed, and no one carriage or other vehicle shall contain, at any one time, more than ten of the above described kegs of gunpowder, and if any gunpowder shall be brought into this city, except in the manner and in the quantity herein set forth, and contrary to the provisions of this ordinance, the person or persons owing the said gunpowder, and the person or persons, so conveying the same shall, for each and every such offense, forfeit and pay the sum of five hundred dollars, one moiety to be paid into the city treasury and the other moiety to the person informing and prosecuting the offender to conviction.

Provided, That this section shall not extend to that part of the Christiana river included within the city limits; vessels loaded with powder being free to pass in said river along the city front.

1901 Del. Laws 399, Of Ciries and Towns, § 8.
. . . The council may also pass ordinances to . . . regulate the storage of gunpowder or any other dangerous or combustible materials . . . .

FLORIDA

1838 Fla. Laws 70, An Act To Incorporate the City of Key West, § 8.
Be it further enacted, That the common council of said city shall have power and authority to prevent and remove nuisances . . . to provide safe storage of gunpowder . . . .

1887 Fla. Laws 164-165, An Act to Establish the Municipality of Jacksonville Provide for its Government and Prescribe its Jurisdiction and Powers, chap. 3775, § 4.
The Mayor and City Council shall within the limitations of this act have power by ordinance to . . . regulate the storage of gun-powder, tar, pitch, resin, saltpetre, gun cotton, coat oil, and other combustible, explosive and inflammable material . . . .

1901 Fla. Laws 262, § 33.
That the Council shall have power to prohibit and suppress all gambling houses, bawdy houses and disorderly houses; any exhibition, show, circus, parade or amusement contrary to good morals, and all obscene pictures and literature; to regulate, restrain or prevent the carrying on of manufactories dangerous in increasing or producing fires; to regulate the storage of gunpowder, tar, pitch, rosin, saltpetre, gun-cotton, coal-oil and all other combustibles, explosives and inflammable material . . . .

GEORGIA

1900 Ga. Laws 201, § 15.
Be it further enacted, That the town council of said town shall have power and authority . . . to regulate the keeping and selling of dynamite, gunpowder, kerosene and all other hazardous articles of merchandise.

HAWAII

Lawrence McCully, Compiled Laws of the Hawaiian Kingdom Page 86-87, Image 93 (1884) available at The Making of Modern Law: Primary Sources.  1884
Of the Safe Keeping of Gunpowder, § 354. The Minister of the Interior may make such regulations for the storing, keeping and transportation of gunpowder, in any town of the kingdom, as he may think the public safety requires; and no person shall store, keep, or transport any gunpowder, in any other quantity or manner than is prescribed in such regulations. § 355. Whoever shall violate any such regulations, shall be fined for each offense, not less than twenty, nor more than one hundred dollars. § 356. All gunpowder introduced into, or kept in any town contrary to said regulations, may be seized by any sheriff, or any other officer of police, and the

same shall be forfeited for the benefit of the public treasury. § 357. Any person injured by the explosion of any gunpowder, in the possession of any person contrary to the regulations prescribed by the Minister of the Interior, may have an action for damages against the person having custody or possession of the same, at the time of the explosion, or against the owner of the same, if cognizant of such neglect. § 358. All sheriffs, and other officers of police, shall have authority to enter any building, or place, to search for gunpowder supposed to be concealed there contrary to law; and any Police or District Justice, may grant a search warrant for that purpose. § 359. No regulations for the safe keeping of gunpowder shall take effect until they have been published three weeks successively in some newspaper in the town, or by posting up attested copies of them in three conspicuous places in such town.

1903 Haw. Sess. Laws 55, ch. 8, § 25.
To adopt such rules and regulations within the County with regard to the keeping and storing of gun powder, Hercules powder, giant powder, kerosene or coal oil, benzoin, naptha or other explosive or combustible material, as the safety and protection of the lives and property of individuals may require.

1933 Haw. Sess. Laws 38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 6.
The possession of all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn, or to carriage as merchandise in a wrapper from the place of purchase to the purchaser's home, place of business or place of sojourn, or between these places and a place of repair, or upon change of place of business, abode, or sojourn, except as provided in Sections 5 and 8; provided, however, that no person who has been convicted in this Territory or elsewhere, of having committed or attempted a crime of violence, shall own or have in his possession or under his control a pistol or revolver or ammunition therefor. Any person violating any provision of this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

IDAHO

1863 Id. Sess. Laws 634, To Incorporate the City of Idaho in Boise County, § 5.
Said mayor and common council shall have full power and authority . . . to regulate the storage of gunpowder and other combustible materials . . . .

1897 Id. Sess. Laws 89, § 2, pt. 18.
To regulate the storage and sale of gun powder, or other combustible material, and to prevent by all possible and proper means, danger or risk of injury or damage by fire arising from carelessness, negligence or otherwise.

1901 Id. Sess. Laws 117, 120, § 37.
The Council of Boise City has full power and authority within Boise City . . . To regulate the storage and sale of gunpowder, dynamite, giant powder, nitro-glycerine, oil and other combustible material, and prevent their manufacture in the city, and to prevent by all possible and proper means, danger or risks of injury or damage by fire arising from carelessness, negligence or otherwise.

8

ILLINOIS

1855 Ill. Laws, 25, An Act To Incorporate the Town of Daville, § 16.
[The town council shall have the power] To regulate the storage of tar, pitch, rosin, gun-powder and other combustible materials.

1869 Ill. Laws 17, § 10.
[The Town council shall have power and authority] to regulate the storage of gunpowder and other combustible materials.

Revised Ordinances of the City of Galesburg, the Charter and Amendments, State Laws Relating to the Government of Cities and Appendix Page 122-123, Image 127-128 (1869) available at The Making of Modern Law: Primary Sources. 1869
Revised Ordinances [of Galesburg, Ill.], Gunpowder-Fires, Fire-Arms, § 1. The keeping for sale or selling gunpowder, without a license therefor, is prohibited, and no license shall be issued allowing the keeping in store more than twenty-five pounds of gun powder at any one time, unless kept in some secure magazine or fire-proof powder house, located at least one hundred feet from any other occupied building, and when kept in a store or place for retail it shall be kept in tin or other metallic canisters or cases, and in a part of the building remote from any fire, lamp, candle or burning matter liable to produce explosion, and whoever shall violate this section, or any provision of it, shall be subject to a penalty of twenty dollars. § 2. Each person licensed to sell gunpowder shall keep a sign, with the words "Gunpowder for Sale," in plain letters, in some conspicuous place in the front of the building where such powder is kept. And no sales of gunpowder, except in unopened cans shall be sold after night, and any person convicted of violation of any of the provisions of this section shall be subject to a penalty of ten dollars. § 3. Whoever shall bring or cause to be brought into the city any gunpowder concealed in any box or other package, or in any package marked as containing other articles, in which such powder is contained, shall be subject to a penalty of twenty-five dollars. §4. The carrying gunpowder through the streets or other public places, in a careless or negligent manner, or the remaining with such powder in any place longer than necessary for the transportation of the same from one place to another, shall subject the party offending to a penalty of not less than five dollars. . .

1908 Ill. Laws 40-41, Regulate Storage of Combustibles–Fireworks, ¶1334, pt. 65.
To regulate and prevent storage of gunpowder, tar, pitch, resin, coal oil, benzine, turpentine, hemp, cotton, nitro-glycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bon-fires; also to regulate and restrain the use of fireworks, fire crackers, torpedoes, Roman Candles, sky rockets and other pyrotechnic displays.

INDIANA

1836 Ind. Acts 77, An Act to Prevent Disasters on Steam Boats, § 7. 1836
That when gunpowder is shipped on board a steam boat, which shall at all times by stowed away at as great a distance as possible from the furnace, and written notification thereof shall be placed in three conspicuous parts of the boat; and in the event of such notification not being so

exhibited, then for any loss of property or life for which the powder may be deemed the cause, the owner shall be liable . . . .

The Revised Statutes of the State of Indiana, Passed at the Thirty-Sixth Session of the General Assembly; Also, Sundry Acts, Ordinances, and Public Documents Directed to be Printed Along with the Said Statutes: To Which are Prefixed the Constitution of the United States and of the State of Indiana Page 485-486, Image 499-500 (Vol. 1, 1852) available at The Making of Modern Law: Primary Sources. 1852
Towns, § 22. The board of trustees shall have the following powers, viz: . . .Third. . . to regulate the storage of gun-powder, and other dangerous materials;

W.G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855
Ordinances [of Jeffersonville], § 3, pt. 10. It shall also be a nuisance and unlawful: . . . To keep in any one building more than twenty five pounds of gun powder, except in a powder house or Magazine, or to keep any quantity of gun powder for sale except in some metallic vessel and having the words "gun powder" in letters at least three inches long always affixed in some conspicuous place on the house in which it is kept.

The Charter, General Ordinances, &c., of the City of Evansville Page 230, Image 230 (1871) available at The Making of Modern Law: Primary Sources. 1871
General Ordinances [of the City of Evansville], § 23. It shall not be lawful for any person to keep within the limits of the city any gun or blasting powder, in any quantity greater than twenty-five pounds at one time; and it shall not be lawful to keep twenty-five pounds of such powder, or any less quantity, in any other vessel than a tin canister, with a proper cover or stopper, and labelled with the words "gunpowder;" nor shall it be lawful for any person to sell any such powder after twilight, or by candle or gas light.

1879 Ind. Acts 210, An Act To Amend the Thirtieth Section of an Act Entitled "An Act Granting The Citizens Of The Town Of Evansville, In The County Of Vanderburgh," pt. 9.
To regulate the keeping and conveying of gunpowder, and all other combustible and dangerous materials, and the use of candles and lights in barns and stables.

The General Ordinances of the City of Indianapolis. Containing also, Acts of the Indiana General Assembly so far as they Control Said City, to which Prefixed a Chronological Roster of Officers fro, 1832 to 1895 and Rules Governing the Common Council. Revision of 1895 Page 230, Image 312 (1895) available at The Making of Modern Law: Primary Sources. 1895
Laws and Ordinances [of the City of Indianapolis], § 12. The Chief Fire Engineer is hereby required to search any building standing in a compact portion of the city, and in which there shall be cause to suspect the keeping of gun-powder in a quantity greater than twenty-five pounds; and in case of discovery of the same, in such quantity, it shall be seized by such Engineer and removed to some safe place; and it shall be his duty to prosecute the owner or occupant of the building before the Mayor [Police Judge]; and the defendant, upon being convicted of having committed the offense, shall be fined in any sum not exceeding fifty dollars nor less than five dollars, and he shall also be adjudged to pay the costs of the removal of the powder. § 13. Any person who shall keep, or knowingly suffer to be kept, in any building, any quantity of gun-

10

powder greater than twenty-five pounds, or shall aid in or have knowledge of, such keeping, without giving immediate notice thereof to said Engineer or Marshal [Superintendent of Police], or to some member of said Council on conviction of such offense before the Mayor [Police Judge], shall be fined in any sum not less than one dollar nor more than ten dollars, for every day during which gunpowder shall be stored or kept. § 14. All gunpowder, kept for retail, in quantities less than twenty-five pounds, shall, at all times, be kept in a canister of tin or other metal, securely covered from danger of fire; or, if the same be kept in a cask or other combustible vessel, such cask or vessel shall be enveloped in a close leather bag. Whoever shall keep any gunpowder for retail in said city in any other manner than as prescribed in this section, on conviction of such offense before said Mayor [Police Judge], shall be fined in any sum not less than one dollar nor more than ten dollars, for every day during which the same shall have been so kept. § 15. If any person shall transport gunpowder through the compact portion of said city in a greater quantity than one hundred pounds, or without having the casks containing the same either enveloped in close leather bags or conveyed in a close-covered carriage, on conviction of such offense before the Mayor [Police Judge], he shall be fined in any sum not less than twenty dollars nor more than fifty dollars.

1901 Ind. Acts 206, Public Comfort and Health, § 4077.
For the purpose of this paragraph jurisdiction is given such city four miles form the corporate limits . . . To regulate or prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzene, turpentine, hemp, cotton, nitroglycerine, dynamite, giant powder, petroleum, gasoline or gas, or any product thereof or any other explosive or combustible material or any material which may seem dangerous.

IOWA

1838 Iowa Acts 449, An Act to Prevent Disasters on Steam Boats, Navigating the Waters Within the Jurisdiction of the Territory of Iowa, §§ 11-12.
§ 11. It shall be the duty of the master, and officers, of any steam boat carrying gunpowder, as freight, to store the same in the safest part of the vessel, and separate and apart from articles liable to spontaneous combustion, and where, in discharging the cargo, it will not be necessary to carry any lighted lamp, torch, or candle, and the master and officers failing to comply with the provisions of this section, shall forfeit one hundred dollars each . . . . § 12. It shall not be lawful for any person, or persons, to put, or keep any gun powder on any steam boat, without first giving the master, or officers, notice thereof, and any person, or persons, so offending, shall be liable to pay the sum of one hundred dollars . . . .

Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 72-73, Image 72-73 (1856) available at The Making of Modern Law: Primary Sources.  1847
Burlington City Ordinances, An Ordinance to Regulate the Storage and Sale of Gunpowder in the City of Burlington, § 1. Be it ordained by the city Council of the city of Burlington, That it shall not be lawful for any merchant, trader, or other person, to retail or deliver gun-powder in said city in the night time, under a fine of five dollars. §2. It shall not be lawful for any such person to keep for sale or other purposes in said city, in his place of business, more than twenty-five pounds of gun-powder at any one time, and then only in a safe canister. § 3. It shall not be

11

lawful for any person whatsoever to store away gun-powder for safe keeping, in any quantity whatever, in any ware-house, dwelling house, cellar, or other building or place, within the limits of said city, unless such house or place shall have first been designated by the city Council of said city and by them approbated as a suitable place for that purpose, and then only so long as the same shall from time to time be deemed suitable by the said city Council. § 4. If any person shall violate any of the provisions of the third section of this ordinance he shall forfeit for the use of the corporation all the gun-powder which the person so violating the same may have on hand, and on conviction thereof, shall also pay a fine of one hundred dollars, and the city Marshal shall seize and remove such powder to a secure place and dispose of it by sale, and pay the proceeds, reserving costs and charges, into the city treasury.

Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 159, Image 159 (1856) available at The Making of Modern Law: Primary Sources. 1856
Burlington City Ordinances, [To Prevent Fires,] § 9. The Mayor, wharf master, or either fire warden may give such directions as either of them may think proper, relative to the location of any boat having on board gunpowder, gun cotton, hay or other combustible materials; each of said officers are hereby respectively empowered to put in force any order or direction given under this section. Any person refusing or neglecting to obey such orders or directions shall be liable to the penalty provided in the last section of this Ordinance.

The Code: Containing All the Statutes of the State of Iowa, of a General Nature, Passed at the Adjourned Session of the Fourteenth General Assembly Page 76-77, Image 88-89 (1873) available at The Making of Modern Law: Primary Sources. 1873
Cities and Incorporated Towns, Powers, § 456. They shall have power to prevent injury or annoyance from anything dangerous offensive or unhealthy, and to cause any nuisance to be abated; to regulate the transportation and keeping of gunpowder or other combustible, and to provide or license magazines for the same; to prevent and punish fast or immoderate riding through the streets; to regulated the speed of trains and locomotives on railways running over the streets or through the limits of the city or incorporated town by ordinance, and enforce the same by a fine not exceeding one hundred dollars: to establish and regulate markets; to provide for the measuring or weighing of hay, coal, or any other article of sale; to prevent any riots, noise, disturbance, or disorderly assemblages; to suppress and restrain disorderly houses, houses of ill fame, billiard tables, nine or ten pin alleys, or tables and ball alleys, and to authorize the destruction of all instruments or devices used for purposes of gaming, and to protect the property of the corporation and its inhabitants and to preserve peace and order therein.

1907 Iowa Acts 81, ch. 76, § V(e).
If there be kept, used or allowed on the within described premises benzine, benzole, dynamite, ether, fireworks, gasoline, Greek fire, gunpowder, exceeding twenty-five pounds in quantity, naptha, nitroglycerine, or other explosives, phosphorous, calcium carbide, petroleum or any of its products of greater inflammability than kerosene of lawful standard, which last named article may be used for lights and kept for sale according to law, in quantities not exceeding five barrels.

KANSAS

1860 Kan. Sess. Laws 137, An Act to Amend and Consolidate the Several Act Relating to the City of Lawrence, § 35, pt. 7 1860
To regulate the keeping and conveying of gun powder and other combustible and dangerous materials, and the use of candles and lights in barns and stables.

1915 Kan. Sess. Laws 347, An Act providing for Public Safety by Regulating the Storage Handling and Disposition of Dynamite, Giant Powder, Nitro-glycerine, Gun Cotton and Other Detonating Explosives, Providing Penalties for Violation of this Act and Repealing all Acts in Conflict Herewith, § 1.
Any person, firm or corporation, in this state, who shall sell, give away or otherwise dispose of, any dynamite, giant powder, nitro-glycerine, gun cotton or other detonating explosive, shall keep a record, in a substantially bound book, which record shall set forth the kind and amount of explosives delivered, the time of delivery, the uses and purposes for which same are delivered and the place at which it is to be used . . . .

KENTUCKY

1806 Ky. Acts 122, An Act to Amend the Several Acts for the Better Regulation of the Town of Lexington, § 3.
Be it further enacted, That said trustees are herby authorised [sic] to make such regulations as they may deem necessary and proper, relative to the keeping of gun-powder in the said town of Lexington, and if necessary may prohibit any inhabitants of said town, from keeping in the settled parts thereof, any quantity of gun powder which might in case of fire be dangerous . . . .

Charter of the City of Covington, and Amendments Thereto up to the Year 1864, and Ordinances of Said City, and Amendments Thereto, up to the Same Date Page 148-149, Image 148-149 (1864) available at The Making of Modern Law: Primary Sources. 1864
Ordinances of the City of Covington, An Ordinance Regulating the Sale of Powder in the City of Covington, § 1. Be it ordained by the City Council of Covington, That it shall not be lawful for any person or persons to erect, within the limits of the corporation, any powder magazine, or any other building for the purpose of storing gun powder in greater quantities than is hereinafter specified; and any person violating the provision of this section, shall, on conviction before the Mayor, forfeit and pay a fine of one hundred dollars, and ten dollars for every twenty-four hours said building shall be used or occupied for the storage of more than twenty-five pounds of powder. § 2. Be it further ordained, That it shall not be lawful for any person to keep, in storage or for sale, more than one hundred pounds of powder in any one house in said city, at any one time: and that amount, or any part thereof, shall be securely and carefully kept, and closed up in a good and sufficient safe, so that it can not by any means be exposed. A violation of this section shall subject the person to a fine, on conviction, of five dollars for every offense. § 3. Be it further ordained, That no person or persons shall sell, or keep for sale, in said city, any gun powder without having first obtained a permission so to do from the Mayor of said city, who shall, before said license is granted, be fully assured and satisfied that the applicant has good and sufficient safes to keep powder in, in conformity with the second section of this ordinance; and when the Mayor is satisfied that the license may be granted, without too much risk to the community at large, he shall issue said license to the applicant, upon his paying into the City

13

Treasury the sum of twenty dollars for one year's license, and to the Mayor fifty cents, and to the City Clerk twenty-five cents, for their certificates. Any person who shall sell any gun powder in said city from and after the passage of this ordinance, without having first obtained a license therefor, shall, for each and every offense, forfeit, pay, on conviction, the sum of five dollars and costs.

1869 Ky. Acts 481, An Act to Amend and Reduce into One the Several Acts in Reference to the Town of Princeton, art. V, pt. 14.
To regulate the keeping and conveying of gun-powder and other combustible and dangerous materials.

1912 Ky. Acts 593, Regulate Storage of Explosives and Provide Against Fires, § 17.
To regulate the storage of gunpowder, rosin, tar, pitch, cotton, oil and all other explosives and combustible material, and to appoint some suitable person or persons, at seasonable times, to enter and examine such houses as they may designate, in order to ascertain whether any of such houses are in a dangerous condition with reference to fires, and to cause such as are in a dangerous condition to be immediately put in safe order and condition.

LOUISIANA
Police Code, or Collection of the Ordinances of Police Made by the City Council of New-Orleans. To Which is Prefixed the Act for Incorporating Said City with the Acts Supplementary Thereto Page 114-116, Image 112-114 (1808) available at The Making of Modern Law: Primary Sources. 1808
[Ordinances of the City of New Orleans, An Ordinance for Preventing Fires,] Art. 15. Captains of vessels are obliged, within twenty four hours from their arrival in this port, to deposit the gun-powder they may have on board, in the powder-magazine situate on the right bank of the river, the owner paying to the keeper of the magazine a suitable compensation. All citizens are strictly forbidden to keep in their houses, or elsewhere within the city or suburbs, more than one hundred pounds of gun-powder at a time, and in case of fire, such as live near the place where it is, if they have powder in their houses, shall be obliged to throw into their wells the barrels containing the same. These dispositions must be complied with, under the penalty of a fine, not exceeding fifty dollars, to be levied on every delinquent, who shall moreover be liable to the damage that may result.

1816 La. Acts 92, An Act to Amend the Act Entitled "An Act to Incorporate the city of New Orleans" and the Act Entitled "An act to determine the mode of election of the mayor, recorder and other public officers necessary for the administartion and police of the city of New Orleans and for Other Purposes [sic], § 1.
. . . [T]he mayor and city council of the city of New Orleans shall have full power and authority . . . [T]o prevent gun powder being stowed within the walls and suburbs in such quantity as to endanger the public safety . . . .

Levi Peirce, Commissioner, The Consolidation and Revision of the Statutes of the State, of a General Nature Page 185, Image 193 (1852) available at The Making of Modern Law: Primary Sources. 1852

14

Crimes and Offences, Manslaughter. § 5. When gunpowder is shipped on board of a steamboat, which shall at all times be stowed away at as great a distance as possible from the furnace, a written notification of the fact shall be placed in three conspicuous parts of the boat; and in the event of such notification not being so exhibited , then for any loss of property, or life, for which the powder shall be deemed the cause, the owner shall be liable to the shipper for the full amount of said loss or damage; and the captain, in the event of loss of life being the result of such accident, shall be adjudged guilty of manslaughter. § 6. Any person or persons who shall ship or put on board, or cause to be shipped or put on board of any steamboat, within this State, any gunpowder, without giving notice thereof a the time of making the shipment to the master clerk of said boat, shall be liable to a penalty of two hundred dollars, which may be sued for and recovered before any court of competent jurisdiction by the owner, captain or clerk of said boat, for his or her own use and benefit; and in case of any loss of property in consequence of gunpowder being on board of said boat, the shipper that shall have failed to give due notice, as herein required, shall be liable for all losses of property or damage done thereto, or for any injury done to any person or to their family; and in case of the loss of the life of an individual on board, in consequence of gunpowder being on board, the person of persons who shall have shipped the same, without giving due notice thereof, shall, on conviction thereof, be adjudged guilty of manslaughter, and punished accordingly.

Albert Voorhies, Ex-Justice, Revised Laws of Louisiana, Approved March 14th, 1870, with Copious References to the Acts of the Legislature from and Including the Sessions of 1870, up to and Including the Session of 1882. Second Edition Page 161, Image 171 (1884) available at The Making of Modern Law: Primary Sources. 1884

Crimes and Offences, § 949. When gunpowder is shipped on board of a steamboat it shall be stored away at as great a distance as possible from the furnace, and a written notification of the fact shall be placed in three conspicuous parts of the boat; and in the event of such notification not being so exhibited, then for any loss of property or life for which the powder may be deemed the cause, the owner and captain shall be liable to the penalty provided in the proceeding section. § 950. Any person who shall ship or put on board, or cause to be shipped or put on board of any steamboat within this State, any gunpowder, without giving notice thereof, at the time of making the shipment, to the master or clerk of said boat, shall be liable to a penalty of two hundred dollars , which may be sued for and recovered by the owner, captain or clerk of said boat, for his own use and benefit; and in case of any loss of property in consequence of gunpowder being on board of said boat, the shipper that shall have failed to give due notice as herein required, shall be liable therefor, or for any injury done to any person or to his family; and in the case of loss of life the person who shall have shipped the same without giving due notice thereof, shall, on conviction be adjudged guilty of manslaughter.

1904 La. Acts 20, § 5.

That all forfeitures and fines be imposed by the Board of Fire Commissioners, from time to time, upon any member or members of the fire department force by way of discipline, shall be paid into said pension and relief fund. That all fines imposed by the courts for infractions of City ordinances relative to fire escape, fire wells and hydrants, open hatches, oils, gunpowder, right of way of the fire apparatus through the streets, and all other laws relative to the fire department, be paid over by the City Treasurer to said pension and relief fund.

15

MAINE

Laws of the State of Maine; to Which are Prefixed the Constitution of the U. States and of Said State, in Two Volumes, with an Appendix Page 112-113, Image 183-184 (Vol. 1, 1821) available at The Making of Modern Law: Primary Sources.  1821

An Act for the prevention of damage by Fire, and the safe keeping of Gun Powder. § 1. Be it enacted by the Senate and House of Representatives, in Legislature assembled, That the Selectmen of each town within this State, containing not less than fifteen hundred inhabitants, be, and they hereby, are authorized and empowered to make rules and regulations, from time to time, in conformity with which, all gun powder which is or may be within such town, shall be kept, had or possessed therein; and no person or persons shall have, keep, or possess within such town, any gun powder, in any quantity, manner, form or mode, other than may be prescribed by the rules and regulations aforesaid. § 2. Be it further enacted, That any person or persons who shall keep, have or possess any gun powder, within any town, contrary to the rules and regulations which shall be established by the Selectmen of such town, according to the provisions of this Act, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding one hundred dollars, for each and every offence, to be recovered by action of debt in any Court proper to try the same. § 3. Be it further enacted, That all gun powder which shall be had, kept or possessed, within any town, contrary to the rules and regulations which shall be established by the Selectmen of such town, according to the provisions of this Act, may be seized by any one or more of the Selectmen of such town, and shall within twenty days next after the seizure thereof, be libelled, by filing with any Justice of the Peace in such town, a libel, stating the time, place and cause of seizure, and the time and place when and where trial shall be had before said Justice, and a copy of said libel shall be served by the Sheriff, or his deputy, on the person or persons, in whose possession the said gun powder shall have been seized. . .

1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5.  1821

Be it further enacted, That it shall, and may be lawful for any one or more of the Selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefor according to law.

The Revised Ordinances of the City of Portland, 1848 Page 22, Image 22 (1848) available at The Making of Modern Law: Primary Sources. 1848

[Ordinances of the City of Portland,] Of Gunpowder, § 1. No person not licensed to keep and sell gunpowder shall keep or have in his shop, store, dwelling house or other tenement, at any one time, a larger quantity of gunpowder than one pound. § 2. No person licensed to keep and sell gunpowder shall have or keep in his store, shop, dwelling house or in any other tenement or place whatever at any one time, a larger quantity of gunpowder then twenty-five pounds. § 3. Every person licensed to keep and sell gunpowder shall provide himself with a strongly made copper chest or box with a copper cover well secured, with hinges and a lock of the same material, and the keg or canister in which said powder may be, shall be kept in said copper chest or box, which shall at all times be placed near the outer door of the building in which it is kept,

16

in convenient place to remove in case of fire. § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board a quantity of gunpowder exceeding twenty-five pounds, or receive gunpowder on board exceeding twenty-five pounds, without first having obtained a permit from the mayor and aldermen, and said permit shall designate the wharf at which said powder may be landed, or received on board.

The Charter, Amendments, and Acts of the Legislature Relating to the Municipal Court, and the Ordinances of the City of Lewiston, Together with the Boundaries of the Several Wards, Regulations Respecting Gunpowder, and an Abstract of the Laws Relating to the Powers and Duties of Cities and Towns Page 43, Image 43 (1873) available at The Making of Modern Law: Primary Sources. 1873
Regulations Relating to Gunpowder, § 1. No person shall keep or have in any shop, store, dwelling house or tenement, in the city of Lewiston, at any one time a larger quantity of gun-powder than one pound, unless he is licensed by the mayor and aldermen to keep and sell gunpowder, or except as hereinafter provided. § 2. It shall not be lawful for any person or persons to sell any gunpowder which may at the time be within said city, in any quantity, by wholesale or retail, without having first obtained from the mayor and aldermen a license to sell gunpowder, and every license shall be written or printed, and duly signed by the mayor, on a paper upon which shall be written or printed a copy of the rules and regulations established by the city relative to keeping, selling and transporting gunpowder within said city; and every such license shall be in force one year from the date thereof, unless revoked by the mayor and aldermen; but such license may, prior to its expiration, be renewed by an endorsement thereon by the mayor, for the further term of one year, and so from year to year, provided, always, that it may at any time be rescinded or revoked by the mayor and aldermen, for good and sufficient reasons. § 3. Every person who shall receive a license to sell gunpowder, as aforesaid, shall pay for the same to the treasurer of the city the sum of three dollars, and for each renewal of the same, the sum of one dollar.

A.G. Davis, City Clerk, Charter and Ordinances, and Rules and Orders of the City Council. Revised February 1874 Page 52, Image 53 (1874) available at The Making of Modern Law: Primary Sources. 1874
City Ordinances, § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board more than twenty-five pounds of gun-powder, nor discharge or receive on board exceeding that quantity, without having first obtained from the Mayor a permit therefor, designating the wharf at which said powder may be landed or received on board.

MARYLAND

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 246, Image 239 (1811) available at The Making of Modern Law: Primary Sources. 1794
1794 Md. Laws 246, Art. 32. That if any member of society shall suffer any damage by storing gunpowder in town, or breaming ships or other vessels at the wharfs, occasioned by the act, assent or direction, of such member, the insurance of such member so suffering damage, shall thereupon become void.

17

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 589, Image 598 (1893) available at The Making of Modern Law: Primary Sources. 1879

Fire – Ordinances [of Baltimore], (City Code, (1879,) Art. 20, sec. 53) § 63. All gunpowder brought within the limits of the city by land, or into the port or harbor, in any ship or vessel, other than a ship or vessel of war, shall be stored in the said magazine as aforesaid; if brought by land as aforesaid, within seventeen hours thereafter; if brought into the port or harbor as aforesaid, within forty-eight hours after the ship or other vessel thus bringing it shall have broken bulk; proved the quantity thus brought in shall exceed the weight of one quarter barrel as above defined; or being of such weight and no more, shall be well secured in tin canisters; nor shall it be lawful for any ship or vessel, other than a ship or vessel of war, bringing gunpowder into the port or harbor of Baltimore, or having gunpowder on board, in a greater quantity than the weight of the quarter barrel as aforesaid; or being of such weight and no more, not secured as above provided, to approach, lie at anchor, or moor nearer than two hundred yards to any wharf, or land within the limits of said city, or discharge, land or deliver gunpowder in a greater quantity or otherwise secured than aforesaid, at any place within the said city, than at the wharf of the magazine aforesaid. . .

1900 Md. Laws 287-88, General Powers, § 181.
The Common Council shall have power to pass all such ordinances, not contrary to the Constitution and laws of this State, as it may deem necessary to the good government of the town . . . to regulate or prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzene, turpentine, hemp, cotton, nitro-glycerine, dynamite, giant powder, petroleum, gasoline or gas, or any product thereof, or any other explosive or combustible material or any material which may seem to be dangerous.

MASSACHUSETTS

1715 Mass. Acts 311, An Act in Addition to an Act for Erecting of a Powder-house In Boston.
…That, from and after the publication hereof, any person within the town of Boston, that shall presume to keep, in his house or Warehouse, any powder, above what is by law allowed, shall forfeit and pay, for every half-barrel, the sum of five pounds . . . That any person or persons whosoever, that shall throw any squibs, serpents, or rockets, or perform any other fireworks within the streets, . . (shall be fined).

1719 Mass. Acts 348, An Act In Further Addition To An Act For Erecting A Powder House In Boston, ch. III, § 1
… That, from and after the publication of this Act, no gunpowder shall be kept on board any ship, or other vessel, lying to or grounded at any wharf within the port of Boston. And if any gunpowder shall be found on board such ship or vessel lying aground, as aforesaid, such powder shall be liable to confiscation, and under the same penalty, as if it were found lying in any house

18

or warehouse. And be it further enacted by the authority aforesaid, that no powder be carried through any town upon trucks, under the penalty of ten shillings per barrel for every barrel of powder so conveyed, and so proportionally for smaller cask.

1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2
"That all cannon, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having in them any gun-powder, shall be liable to be seized by either of the Firewards of the said Town: And upon complaint made by the said Firewards to the Court of Common Pleas, of such cannon, swivels, mortar, or howitzers, being so found, the Court shall proceed to try the merits of such complaint by a jury; and if the jury shall find such complaint supported, such cannon, swivel, mortar, or howitzer, shall be adjudged forfeit, and be sold at public auction.

1783 Mass. Acts 218, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun-Powder Within the Town of Boston, ch.13
The depositing of loaded arms in the houses of the town of Boston is dangerous…That if any person shall take into any dwelling-house, stable, barn, out-house, ware-house, store, shop or other building, within the Town of Boston, any cannon, swivel, mortar, howitzer, or cohorn, or fire-arm, loaded with, or having gun powder in the same, or shall receive into any dwelling-house, stable, barn, outhouse, store, warehouse, shop, or other building, within the said town, any bomb, grenade, or other iron shell, charged with, or having gun-powder in the same, such person shall forfeit and pay the sum of ten pounds…

Act of March 1, 1783, ch. 13, 1783 Mass. Acts, p. 218; Thomas Wetmore, Commissioner, The Charter and Ordinances of the City of Boston: Together with the Acts of the Legislature Relating to the City Page 142-143, Image 142 (1834) available at The Making of Modern Law: Primary Sources. 1783
An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston. Whereas the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in said town. § 1. Be it enacted by the Senate and House of Representatives in General Court assembled and by the authority of the same, That if any person shall take into any dwelling house, stable, barn, out house, ware house, store, shop or other building within the town of Boston, any cannon, swivel, mortar, howitzer, cohorn, or fire arm, loaded with or having gunpowder in the same, or shall receive into any dwelling house, stable, barn, out house, store, ware house, shop, or other building within said town, any bomb, grenade, or other iron shell, charged with, or having gun powder in the same, such person shall forfeit and pay the sum of ten pounds, to be recovered at the suit of the firewards [duties of Firewards transferred to Engineers,] of the said towns, in an action of debt before any court proper to try the same; one moiety thereof, to the use of said Firewards, and the other moiety to the support of the poor of said town of Boston. § 2. Be it further enacted, That all cannons, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades, and iron shells of any kind, that shall be found in any dwelling house, out house, stable, barn, store, warehouse, shop or other building, charged with or having in them any gunpowder, shall be liable to be seized by either of the Firewards of said

town; and upon complaint made by the said Firewards to the Court of Common Pleas, of such cannon, swivels, mortars, or howitzers, being so found, the Court shall proceed to try the merits of such complaint by a jury; and if the jury shall find such complaint supported, such cannon, swivel, mortar or howitzer, shall be adjudged forfeit, and sold at public auction; one half of the proceeds thereof shall be disposed of to the Firewards, and the other half to the use of the poor of the town of Boston. And when any fire arms, or any bomb, grenade, or other shell, shall be found in any house, out house, barn, stable, store, ware house, shop or other building, so charged, or having gun powder in the same, the same shall be liable to be seized in manner aforesaid; and on complaint thereof, made and supported before a Justice of the Peace, shall be sold and disposed of, as is above provided for cannon.

1801 Mass. Acts 507, An Act to Provide for the Storing and Safe Keeping of Gun Powder in the Town of Boston, and to Prevent Damage from the Same, ch. XX
§1… That all Gun Powder imported and landed at the port of Boston, shall be brought to and lodged in the Powder House or Magazine in said town, and not elsewhere, on pain of confiscation of all Powder put or kept in any other house or place…

Joseph Barlow Felt Osgood, The Charter and Ordinances of the City of Salem, Together with the Acts of the Legislature Relating to the City: Collated and Revised Pursuant to an Order of the City Council Page 67-68, Image 77-78 (1853) available at The Making of Modern Law: Primary 1847
[Ordinances of Salem,] Fire, § 18. By an act passed March, 6 1847, the inhabitants of any town, and the government of any city in this Commonwealth, may order than no gun-cotton, or other substance prepared, like it, for explosion, shall be kept within the limits of such town or city, excepting under the regulations and penalties that were then applicable by law to gunpowder; and if it shall be considered necessary for public safety, they may restrict the quantity to be so kept to one-fifth of the weight of gunpowder allowed by law in each case provided for. . . § 22. The inhabitants of every town may order, that no gunpowder shall be kept in any place, within the limits of such town, unless the same shall be well secured in tight casks or canisters; and that no gunpowder above the quantity of fifty pounds, shall be kept or deposited in any shop, store, or other building, or in any ship or vessel which shall be within the distance of twenty-five rods from any other building or wharf; that no gunpowder, above the quantity of twenty-five pounds, shall be kept or deposited in any shop, store, or other building, within ten rods of any other building; and that no gunpowder, above the quantity of one pound, shall be kept or deposited in any shop, store, or other building, within ten rods of any other building in such town, unless the same be well secured in copper, tin, or brass canisters, holding not exceeding five pounds each, and closely covered with copper, brass or tin covers.

Municipal Register of the City of Lawrence. 1870 Page 185, Image 185 (1870) available at The Making of Modern Law: Primary Sources. 1870
[Ordinances of Lawrence,] Concerning Fires, § 4. The city council may order that no gunpowder shall be kept within the city, except in tight casks or canisters; that not more than fifty pounds thereof shall be kept in any building within twenty-five rods of any other building, or if within ten rods, then not more than twenty-five pounds; nor more than one pound in any place, unless in copper, tin or brass canisters holding not more than five pounds each, and closely covered.

Simeon Eben Baldwin, The Public Statutes of the Commonwealth of Massachusetts, Enacted November 19, 1881; to take effect February 1, 1882. with the Constitutions of the United States and the Commonwealth, A Schedule of Acts and Resolves and Parts of Acts and Resolves Expressly Repealed, Tables Showing the Disposition of the General Statutes and of Statutes Passed since the General Statutes, Glossary, and Index Page 381, Image 425 (1882) available at The Making of Modern Law: Primary Sources. 1882

Gunpowder, § 29. Gunpowder manufactured in this commonwealth shall be put into strong and tight casks containing twenty-five pounds, fifty pounds, or one hundred pounds each, or well secured in copper, tin, or brass canisters holding not more than five pounds each, and closely covered with copper, brass, or tin covers. § 30. Each cask containing gunpowder manufactured within this commonwealth, or brought into the same by land or by water and landed, shall be marked on the head with black paint in legible characters with the word gunpowder, the name of the manufacturer, the weight of the cask, and the year in which the powder was manufactured; and each canister of gunpowder shall be marked with the word gunpowder. § 31. Whoever knowingly marks a cask of gunpowder with the name of any person other than the manufacturer of the same, or changes gunpowder from a cask marked with the name of one manufacturer into a cask marked with the name of another manufacturer, shall for each offence forfeit a sum not exceeding twenty dollars.

1904 Mass. Acts 310-11, An Act to Authorize the Fire Marshal's Department of the District Police to Make Regulations Relative to Explosives and Inflammable Fluids, ch. 370, §§ 1-2

§ 1. The powers conferred on city councils of cities and selectmen of towns by chapter one hundred and two of the Revised Laws, to regulate the keeping, storage, use, manufacture or sale of gunpowder, dynamite or other explosives and inflammable fluids, shall hereafter be exercised by the fire marshal's department of the district police. § 2. The fire marshal's department of the district police may make regulations for the keeping, storage, use, manufacture or sale of gunpowder, dynamite or other explosives, crude petroleum or any of its products, or other inflammable fluids; and may prescribe the materials and construction of buildings to be used for any of the said purposes.

1919 Mass. Acts 139, An Act Relative to the Issuance of Search Warrants for the Seizure of Firearms, Weapons and Ammunition Kept for Unlawful Purposes, ch. 179, §§ 1-2

§ 1. A court or justice authorized to issue warrants in criminal cases may, upon complaint under oath that the complainant believes that an unreasonable number of rifles, shot guns, pistols, revolvers or other dangerous weapons, or that an unnecessary quantity of ammunition, is kept or concealed for any unlawful purpose in a particular house or place, if satisfied that there is a reasonable cause for such belief, issue a warrant to search such property. § 2. If the court or justice finds that such property is kept for an unlawful purpose, it shall be forfeited and disposed of as the court or justice may by order direct.

MICHIGAN

1841 Mich. Pub. Acts 30, An Act To Amend An Act Entitled "An Act To Incorporate The Village of Ypsilanti, And The Acts Or Acts Amendatory Thereof," §14.

21

And the said common council shall have power . . . relative to the keeping and sale of gunpowder in said village[.]

Sanford Moon Green, The Revised Statutes of the State of Michigan: Passed and Approved May 18, 1846 Page 200-201, Image 216-217 (1846) available at The Making of Modern Law: Primary Sources.
Municipal Regulations of Police, Gunpowder, § 3. The inhabitants of every township or incorporated village may, at any regular meeting, order that no gunpowder shall be kept in any place within the limits of such township or village, unless the same shall be kept in tight casks or canisters; and that no gunpowder above the quantity of fifty pounds, shall be kept or deposited in any shop, store or other building, or in any ship or vessel, which shall be within the distance of twenty-five rods from any other building, or from any wharf; that no gunpowder above the quantity of twenty-five pounds, shall be kept or deposited in any shop, store or other building, within ten rods of any other building; and that no gunpowder above the quantity of one pound, shall be kept or deposited in any shop, store or other building, within ten rods of any other building, unless the same shall be well secured in copper, tin or brass canisters, holding not exceeding five pounds each, and closely covered with copper, brass or tin covers. § 4. Upon complaint being made on oath to any justice of the peace, by any township or village officer, that he has probable cause to suspect that gunpowder is deposited or kept within the limits of the township or village, contrary to any such order, such justice may issue his warrant, directed to any constable of such township, or the marshal of such village, ordering him to enter any shop, store or other building, or vessel specified in said warrant, and there to make diligent search for the gunpowder suspected to have been deposited or kept as aforesaid, and to make return of his doings to such justice forthwith. § 5. If any person shall commit either of the offences mentioned in the two preceding sections, he shall forfeit a sum not exceeding twenty dollars; but the two preceding sections shall not extend to any manufactory of gunpowder, nor in any case prevent the transportation thereof through any township, or from one part of any township to another part thereof.

1867 Mich. Pub. Acts 2d Reg. Sess. 68, An Act To Revise The Charter Of The Village Of Hudson, § 31, pt. 12.
To regulate the buying, selling, and using of gunpowder, fire-crackers and fire-works, and other combustible materials, to regulate and prohibit the exhibition of fire-works, and the discharge of fire-crackers and fire-arms, and to restrain the making or lighting of fires in the streets and other open spaces in said village.

1869 Mich. Pub. Acts 2d Reg. Sess. 158, A Act to Amend An Act Entitled "An Act To Incorporate The Village Of Howell," § 15.
[T]he common council shall have full power and authority to make by laws and ordinances . . . relative to keeping and sale of gunpowder, nitroglycerine, and all other dangerous and explosive articles, or burning fluids.

1879 Mich. Pub. Acts 43-44, Local Acts, An Act To Amend . . . An Act To Incorporate The Village Of Constantine, § 12
The common council shall have full power and authority to . . . regulate the keeping and sale of gunpowder in said village[.]

22

1901 Mich. Pub. Acts Session Laws 154, Local Acts, An Act to Revise and Amend the Charter of the City of Muskegon . . . , tit. 7, § 24, pt. 10.
[T]o direct the location of slaughter houses, markets and buildings for the storing of gunpowder and other combustible and explosive substances[.]

MINNESOTA

W.P. Murray, City Attorney, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 40, Image 46 (1884) available at The Making of Modern Law: Primary Sources. 1884
[Ordinances of the City of Saint Paul, The Common Council – Its General Powers and Duties § 19. To provide for the receipt, storage, transportation, safe keeping and dealing and traffic in gun powder, gun cotton, petroleum, kerosene or other dangerous, explosive or inflammable oils or substances within said city, or within one mile of the corporate limits thereof, and to provide for the summary condemnation or destruction of any of said articles as may be kept, stored, dealt in, transported through or received in said city, contrary to such ordinance s said city may enact for the safety of life and property therein.]

1921 Minn. Laws 742, An Act to Provide for the Incorporation, Organization and Government of Cities of Ten Thousand (10,000) Inhabitants or Less, (Cities of the Fourth Class), ch. 462, § 41, pt. 37.
To regulate and prevent the storage of gunpowder, dry pitch, resin, coal oil, benzene, naptha, gasoline, turpentine, hemp, cotton, nitroglycerine or any products thereof, and other combustible or explosive materials within the city, and the use thereof[.]

MISSISSIPPI

1817-18 Miss. Laws 220, Supplemental To An Act To Erect The Town Of Netchez Into A City To Incorporate The Same, § 2. 1818
That said president and select men, shall and may, from time to time, pass ordinances to regulate the keeping, carting and transporting gun powder or other combustible or dangerous materials[.]

George Poindexter, The Revised Code of the Laws of Mississippi: In Which are Comprised All Such Acts of the General Assembly, of a Public Nature, as were in Force at the End of the Year 1823: with a General Index Page 608, Image 612 (1824) available at The Making of Modern Law: Primary Sources.  1824
Summary of Private and Local Acts[, Port Gibson] . . . . Said president and selectmen may pass ordinances to regulate the keeping, carting and transporting gunpowder, or other combustible or dangerous materials, and, the use of lights in stables, to remove or prevent the construction of any fireplace, hearth or chimney, stoves, ovens, boilers, kettles or apparatus used in any house, building, manufactory or business which may be dangerous in causing or promoting fires; to appoint one or more officers, at reasonable times, to enter into and examine all dwelling houses, lots, yards and buildings, in order to discover whether any of them are in a dangerous state. . .

23

1884 Miss. Laws 412, An Act To Amend And Reduce One Act The Act Incorporating The City Of Columbus And The Several Acts Amendatory Thereto, ch. 390, § 24, pt. 16.
To regulate and prevent the storage of cotton, hay, gun powder, oil or any other combustible, explosive or inflammable [sic] material or substance; or of any material or substance offensive to public comfort or injurious to health.

MISSOURI

1822 Mo. Laws 41-42, An Act To Incorporate Inhabitants Of The Town Of St. Louis, § 12.
The Mayor and Board of Aldermen, shall have power by ordinance, to . . . regulate . . . the storage of gun powder, tar, pitch, rosin, hemp, cotton and other combustible materials[.]

The Acts of Assembly Incorporating the City of St. Louis, and the Ordinances of the City, Which are Now in Force Page 35, Image 35 (1828) available at The Making of Modern Law: Primary Sources.  1823
[Ordinances of the City of St. Louis,] An Ordinance Containing Regulations as to Gun Powder, § 1. Be it ordained by the Mayor and board of Aldermen of the city of St. Louis, That no store or shopkeeper, or other person or persons, shall keep, at the same time, in any house, shop, store, cellar or warehouse, or in any boat, more than thirty pounds of gunpowder, within the limits of the City. § 2. And be it further ordained, That the aforesaid quantity of powder allowed to be kept within the limits of the city, shall be kept in close kegs or canisters, and be kept in a good and safe place. § 3. And be it further ordained, That if any person or persons shall offend against, or violate this ordinance, he, she, or they, so offending, shall, upon conviction thereof, pay a fine of twenty dollars. § 4. And be it further ordained, That no boat owner, shall be allowed to keep more than one keg of powder on board his boat, within three days of his arrival, and shall be liable to the same fine as if the powder had been kept in any store or ware-house. § 5. And be it further ordained, That the Mayor or any Alderman, is hereby authorized, as often as he shall be informed, upon oath, of probable cause to suspect any person or persons whomsoever, of concealing or keeping within the said city, any quantity of gunpowder over and above thirty pounds, as aforesaid, to issue a search warrant to examine into the truth of such allegation or suspicion, and search any place whatever therein.

1873 Mo. Laws 215, An Act To Amend The Charter Of The Town Of Canton . . . , § 10.
The Board of Trustees shall have power and authority to . . . regulate the storage of gunpowder, tar pitch, rosin and other combustible materials[.]

J.H. Johnston, The Revised Charter and Ordinances of the City of Boonville, Mo. Revised and Collated, A.D. 1881 Page 44, Image 44 (1881) available at The Making of Modern Law: Primary Sources. 1881
Ordinances of the City of Boonville, General Powers of the Mayor and Board of Councilmen, § 13. To regulate the storage of gun powder and other combustible materials; and generally provide for the prevention of fires within the city.

M.J. Sullivan, The Revised Ordinance of the City of St. Louis, 1887. To Which are Prefixed the Constitution of the United States, Constitution of the State of Missouri, a Digest of Acts of the

24

General Assembly Relating to the City, the Scheme for the Separation of the Governments of the City and County of St. Louis and the Charter of the City Page 689-690, Image 698-699 (1887) available at The Making of Modern Law: Primary Sources. 1887

Revised Ordinances [of the City of St. Louis], Gunpowder, § 688. Not exceeding five pounds of gunpowder shall be allowed to be kept by any person or persons in any store, dwelling, building, or other place within the city, except that retailers or venders of gunpowder in small quantities may for that purpose keep any quantity not exceeding thirty pounds; provided, that the same shall also be kept in tin or metal canisters or stone jars, with good and closely fitted and well secured covers thereon; provided, also, that those parties now having magazines within the limits of the city are hereby allowed to store in such magazines such quantities of gunpowder as may be necessary for their business; provided, further, that giant powder, dynamite and nitro-glycerine shall not be stored in any place within the limits of the city, except in magazines as now located. § 689. Every retailer of gunpowder, giant powder, dynamite, nitro-glycerine or blasting powder, shall place on the building containing the same, over, or at the side of the front door thereof, a sign with the words "Powder for sale," printed thereon, in letters at least three inches in height, and shall notify the commissioner of public buildings in which portion of said store the said powder or powders are placed, which notice shall be kept of record in the said commissioner's office.

1909 Mo. Laws 165, Cities, Towns and Villages: Cities of the First Class, § 55, pt. 50 (L).
To direct and prohibit the management of houses for the storing of gunpowder and other combustibles and dangerous materials within the city; to regulate the keeping and conveying the same; and the use of candles and other lights in stables and other like houses.

1913 Mo. Laws 437, Municipal Corporations: Cities of the Second Class, § 8, pt. 61.
To regulate the use and storage of explosives – To regulate, restrain and prevent the discharge of firearms, fireworks, rockets or other explosive materials and substances in the city and to regulate the keeping, storage and use of powder, dynamite, guns, guncotton, nitroglycerine, fireworks and other explosive materials and substances in the city, or within two miles of the limits thereof.

MONTANA


1887 Mont. Laws 68, Extraordinary Session, An Act to Amend an Act Entitled An Act Concerning the Storage of Gunpowder, § 2.
No person, company, or corporation shall store, deposit or keep within the limits of any city, town or village, gunpowder, nitroglycerine, guncotton, dynamite, and other dangerous or powerful explosives exceeding fifty pounds, and no magazine or storehouse where such explosives are stored or kept, shall hereafter be located nearer than one-half mile from such city, town or village; Provided, That this act shall not be construed to prevent the keeping of a reasonable supply of powder in any safe place at a mine.


1903 Mont. Laws 135-36, An Act to Amend Section 908 of Chapter I Title VIII Part IV Division I of the Civil Code of Montana, and to Repeal Section 689 of the Penal Code, ch. 66, § 1.

If any railroad corporation within this State shall . . . transport within this State on any of its passenger cars, any oil of vitrol, gun powder, Lucifer matches, nitro glycerine, glynon oil, nytroleum or blasting oil, or nitrates oil, or powder mixed with any such oil, or fiber saturated therewith, or duolin or giant powder, or blasting powder, or any other goods in a dangerous nature . . . shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined for the first offense in the sum of one thousand dollars, and for the second violation of the same provision, two thousand dollars, and for every other and further violation of any provision of which it has been twice before found guilty, a sum not less than five nor more than ten thousand dollars.

NEBRASKA

1867 Neb. Laws 68, An Act to Incorporate Nebraska City, § 25.
The city council shall regulate the keeping and sale of gun-powder within the city[.]

1897 Neb. Laws 162, An Act To Amend . . . Compiled Statutes of 1895 for the Government of Cities, ch. 14, § 24, pt. 38.
To . . . regulate and prevent the transportation of gun powder or other explosives or combustible articles, tar, pitch, rosin, coal, oil, benzine [sic], turpentine, hemp, cotton, nitroglycerine, dynamite, petroleum, or any other productions thereof and other materials of like nature[.]

1901 Neb.Laws 154, An Act, to Incorporate Cities of the First Class, Having Less Than Forty Thousand and More Than Twenty-Five Thousand Inhabitants and Regulating Their Duties, Powers and Governments, ch. 17, § 33.
To regulate or prohibit the transportation and keeping of gun powder, oils or other combustible and explosive articles.

NEVADA

1877 Nev. Stat. 87-88, An Act to Amend an Act Entitled "An Act Entitled An Act To Incorporate The Town Of Gold Hill," Approved February Twenty-one, Eighteen Hundred and Seventy Three, ch 48, § 1, pt. 5.
The Board of Trustees shall have power . . . [t]o regulate the storage of gunpowder and other explosive or other combustible material.

1901 Nev. Stat. 102-03, An Act to Incorporate the Town of Reno, ch. 97, § 17, pt. 6.
The City Council Shall have power . . . [t]o regulate or prohibit the storage of gunpowder and other explosives or combustible materials within the city.

NEW HAMPSHIRE

1786 N.H. Laws 383-84, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town.

That if any person or persons, shall keep in any dwelling-house, store or other buildings, on land, within the limits of said Portsmouth, except the magazine aforesaid, more than ten pounds of gun-powder at any one time, which ten pounds shall be kept in a tin canister properly secured for that purpose, such person or persons shall forfeit the powder so kept, to the firewards of said Portsmouth to be laid out by them in purchasing such utensils as they may judge proper for the extinguishing of the fire; and the said firewards are hereby directed and empowered to seize, and cause the same to be condemned in any Court of Law or Record proper to hear and try the same, to be disposed of for the purchase aforesaid. And the offender shall also forfeit and pay a fine for the use of the poor of said Portsmouth, equal to the value of the powder so kept in any store, dwelling-house, or building; which fine, shall be sued for and recovered by the overseers of the poor of said Portsmouth, for the use of said poor, in any Court of Law proper to try the same.

1793 N.H. Laws 464-65, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town.
That if any person or persons, shall keep in any dwelling-house, store or other building on land, within the limits of said Portsmouth, except the magazine aforesaid, more than ten pounds of gun-powder at any one time, which ten pounds shall be kept in a tin canister, properly secured for the purpose, such person or persons shall forfeit the powder so kept to the firewards of said Portsmouth to be laid out by them in purchasing such utensils as they may judge proper for the extinguishing of the fire; and the said firewards are hereby directed and empowered to seize, and cause the same to be condemned in any court of record proper to hear and try the same, to be disposed of for the purchase aforesaid. And the offender shall also forfeit and pay a fine for the use of the poor of said Portsmouth, equal to the value of the powder so kept in any store, dwelling-house, or building; which fine, shall be sued for and recovered by the overseers of the poor of said Portsmouth, for the use of said poor, in any ourt of law proper to try the same.

Asa Fowler, The General Statutes of the State of New-Hampshire; to Which are Prefixed the Constitutions of the United States and of the State. With a Glossary and Digested Index Page 206, Image 227 (1867) available at The Making of Modern Law: Primary Sources. 1854 Safe-Keeping of Gunpowder, § 1. The board of firewards, if any, or the selectmen of any town, may establish rules and regulations from time to time relative to the times and places at which gunpowder may be brought to or carried from such town, by land or water, and the time when and the manner in which the same may be transported through the same. § 2. Any two firewards, police officers, or selectmen may search any building in the compact part of any town, and any vessel lying in any port, in which they have cause to suspect that gunpowder in a greater quantity than twenty-five pounds is kept or stored; and in case a greater quantity shall be found, shall seize the same as forfeited. § 3. Any person who shall keep or knowingly suffer any quantity of gunpowder greater than twenty-five pounds to be kept or stored in any such building or vessel, or aid or assist in keeping or storing the same, or shall know that the same is so stored or kept, and shall not forthwith inform one of the firewards, police officers, or selectmen thereof, shall forfeit a sum not more than five dollars nor less than one dollar, for every day the same shall be so stored or kept.

NEW JERSEY

Charles Nettleton, Laws of the State of New-Jersey Page 549, Image 576 (1821) available at The Making of Modern Law: Primary Sources. 1811

An Act to Regulate Gun-Powder Manufactories and Magazines within this State. §1. Be it enacted by the Council and General Assembly of this state, and it is hereby enacted by the authority of the same, That from and after the first day of May next, no person or persons whatsoever, shall be permitted within this state to erect or establish, or cause to be erected or established, any manufactory which shall be actually employed in manufacturing gun-powder, either by himself or any other person, either on his own land or the land of another, within the distance of a quarter of a mile from any town or village, or house of public worship; or within the distance of a quarter of a mile from any dwelling-house, barn or out-house, without the consent, under hand and seal, of all and every the owner or owners of such dwelling-house, barn or outhouse, as aforesaid; and any person so offending shall be guilty of a misdemeanor, and on conviction thereof shall be fined any sum not exceeding two thousand dollars: Provided, That nothing in this section shall be so construed as to prevent the completing, rebuilding or repairing any powder-mill now erected or erecting in this state on the site on which the same shall be now erected or erecting. § 2. And be it enacted, That no person or persons hereafter shall be permitted to erect or cause to be erected any powder magazine within this state, either upon his own land or the land of any other person, and actually deposit gun-powder therein, within the distance of half a mile from any town or village, house of public worship, dwelling-house or out-house. And any person so offending shall be guilty of a misdemeanor, and on conviction thereof shall be fined not exceeding the sum of two thousand dollars.

1837 N.J. Laws 373, An Act to Incorporate the City of Trenton, § 24. 1837
That it shall and may be lawful for the common council of the said city, in common council convened, to pass such ordinances as to them shall seem meet . . . for regulating the keeping and transporting of gunpowder or other combustible or dangerous materials.

1886 N.J. Laws 358, An Act to Regulate the Manufacture and Storage of Gun Powder, Dynamite and Other Explosives, § 1. 1886
. . . nothing in this act shall be so construed as to prevent any person or persons from storing in any fire-proof magazines any quantity of gun powder or blasting powder not exceeding in quantity two thousand pounds, within the said distance of one thousand feet of a public road; and provided, further, that the prohibition in this act contained shall not apply to any establishment, storehouse or building heretofore erected and used for the manufacturing, storing or keeping of any of said explosives.

1902 N.J. Laws 294, An Act Relating to, Regulating and Providing for the Government of Cities, ch. 107, § 14, pt. 33.
. . . [T]o regulate or prohibit the manufacture, sale, storage or use of fireworks and the use of firearms in such city; to regulate or prohibit the manufacture, sale, storage, keeping, or conveying of gunpowder, kerosene, benzine [sic], gasoline, burning fluid, nitro-glycerine, dynamite, camphene, coal oil, spirit gas, petroleum and other dangerous or explosive materials, and the use of candles and lights in barns, stables and other buildings[.]

NEW MEXICO

28

1851 N.M. Laws 114, An Act Incorporating the City of Santa Fe, § 7.
The board of common councilors shall have power to pass By-Laws and Ordinances . . . to
prohibit the firing of fire-arms . . . to regulate and prescribe the quantities and places in which
gun-powder or other dangerous combustible[s] may be kept[.]

1909 N.M. Laws 333-34, An Act Providing for the Incorporation of Villages in the Territory of
New Mexico, ch. 117, § 8.
That villages incorporated under this act shall have the power by ordinance, to prevent the
presence within their limits of anything dangerous, offensive, unhealthy or indecent and to cause
any nuisance to be abated; to regulate the transportation, storage and keeping of gun-powder and
other combustibles and explosives, oils, gasoline and other articles which may endanger the
property of such village[.]

NEW YORK

Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor,
Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the
Good Rule and Government of the Inhabitants and Residents of the Said City Page 39, Image 40
(1763) available at The Making of Modern Law: Primary Sources.  1763
A Law for the Better Securing of the City of New York from the Danger of Gun Powder. Be it
therefore ordained by the Mayor, Aldermen and Commonality of the City of New York,
convened in Common Council, and it is hereby ordained by the authority of the same, the from
and after the publication hereof, no person or persons whatsoever inhabiting within the said city,
within two miles of the city-hall of the said city, shall presume to keep in any house, shop, cellar,
store-house, or other place within the said city (his majesty's garrison and magazine only
excepted) any more or greater quantity of gunpowder at one time, than twenty-eight pounds
weight (except in the magazines or powder house aforesaid) under the penalty of ten pounds
current money of New York, for every offense.

1784 N.Y. Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of
Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the
City of New York, or on Board of Vessels within the Harbour Thereof, ch. 28.
. . . [F]rom and after the passing of this act, it shall not be lawfull [sic] for any merchant,
shopkeeper, or retailer, or any other person, or persons whatsoever, to have or keep any quantity
of gun powder exceeding twenty-eight pounds weight, in any one place, less than one mile to the
northward of the city hall of the said city, except in the public magazine at the Fresh-water, and
the said quantity of twenty-eight pounds weight, which shall be lawfull [sic] for any person to
have and keep at any place within this city, shall be seperated [sic] into four stone jugs or tine
canisters, which shall not contain more than seven pounds each, on pain of forfeiting all such
gunpowder, and the sum of fifty pounds for every hundred weight, and in that proportion for a
greater or lesser quantity, and upon pain of forfeiting such quantity which any person may
lawfully keep as aforesaid, and which shall not be seperated [sic] as above directed, with full
costs of suit to any person or persons, who will inform and sue for the same . . . as well for the
recovery of the value of such gun powder in specie, as for the penalty aforesaid, besides costs,
and to award, effectual execution thereon . . .

Meinrad Greiner, Laws and Ordinances, Ordained and Established by the Mayor, Aldermen, and Commonalty, of the City of New-York, in Common Council Convened for the Good Rule and Government of the Inhabitants and Residents of the Said City Second Edition Page 25-26, Image 25-26 (1799) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of New York, To Regulate the Keeping of Gun-powder in the City of New York: Whereas the better to secure the inhabitants of the city of New York from the dangers they have been exposed to by large quantities of gun powder being kept in houses, shops and stores within the said city, a suitable and convenient magazine or powder house is erected and built at Inclemberg in the seventh ward for the reception of all the gunpowder which is or shall be imported into the said city: Therefore, Be it ordained by the Mayor, Aldermen and Commonality of the City of New York in Common council convened, That no person or persons shall keep in any house, shop store house or other place within two miles of the city hall of the said city (Magazines of powder of the United States or of this state only excepted) any more or greater quantity of gun powder at one time than twenty-eight pounds, and that in four separate stone jugs or in tin canisters, each of which shall not contain more than seven pounds weight of gun-powder, under the penalty of twelve dollars and fifty cents for every offense.

William G. Bishop, Charter of the City of Brooklyn, Passed June 28, 1873. As Subsequently Amended. With the Charter of April 17, 1854, and the Amendments Thereto, and Other Laws Relating to Said City. Also, the Ordinances of the Common Council of the City of Brooklyn, as Codified and Revised and Adopted Dec.10, 1877 Page 192, Image 196 (1877) available at The Making of Modern Law: Primary Sources. 1877

[Ordinances of the City of Brooklyn, Miscellaneous Provisions,] § 15. It shall not be lawful for any person to have kegs of gunpowder, or cause to be kept in any store, storehouse, manufactory or other building within the city of Brooklyn, any quantity of gunpowder exceeding twenty-five pounds in weight, under the penalty of the forfeiture of the gun-powder and an additional penalty of fifty dollars; and all gunpowder which may be kept in any building within said city shall be kept in tin canisters, and said canisters shall, at all times, be kept securely closed, except when necessary for its delivery on sale.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 184, Image 185 (1885) available at The Making of Modern Law: Primary Sources. 1885

Ordinances of [the City of Syracuse,] Gunpowder, Etc. § 1. No person except when on military duty in the public service of the United States, or of this State, or in case of public celebration with permission of the mayor or common council, shall have, keep or possess in any building, or carriage, or on any dock, or in any boat or other vessel, or in any other place within the city limits, gun-powder, giant- powder, nitro-glycerine, dynamite or other explosive material, in quantity exceeding one pound, without written permission from the chief engineer of the fire department. Any person violating any of the provisions of this section shall be liable to a fine of not less than ten nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor more than three months, for each offense.

1900 N.Y. Laws 1174, An Act to Amend the Penal Code, Relative to the Manufacture of Gunpowder and Other Explosives, ch. 494, § 1.  1900
Keeping gunpowder unlawfully. – A person who makes or keeps gunpowder, nitro-glycerine, or any other explosive or combustible material, within a city or village, or carries such materials through the streets thereof, in a quantity or manner prohibited by law or by ordinance of the city or village, is guilty of a misdemeanor. A person who manufactures gunpowder, dynamite, nitro-glycerine, liquid or compressed air or gases, except acetylene gas and other gases used for illuminating purposes, naptha, gasoline, benzine [sic] or any explosive articles or compounds or manufactures ammunition, fireworks or other articles of which such substance are component parts in a cellar, room or apartment of a tenement or dwelling house or any building occupied in whole or in party by persons or families for living purposes, is guilty of a misdemeanor. And a person who, by the careless, negligent, or unauthorized use or management of gunpowder or other explosive substance, injures or occasions the injury of the person or property of another, is punishable by imprisonment for not more than two years. Any person or persons who shall knowingly present, attempt to present, or cause to be presented or offered for shipment to any railroad, steamboat, steamship, express or other company engaged as common carrier of passengers or freight, dynamite, nitro-glycerine, powder or other explosives dangerous to life or limb, without revealing the true nature of said explosives or substance so offered or attempted to be offered to the company or carrier to which it shall be presented, shall be guilty of a felony, and upon conviction, shall be fined in any sum not exceeding one thousand dollars and not less than three hundred dollars, or imprisonment in a state prison for not less than one nor more than five years, or be subject to both such fine and imprisonment.

NORTH CAROLINA

1901 N.C. Sess. Laws 338-39, Priv. Laws, An Act to Amend the Charter of the Town of Laurinburg, ch. 124, § 14.
That among the powers conferred upon the Commissioners are the following: . . . to control the manner in which dynamite, blasting powder, gunpowder and other explosives and highly inflammable and dangerous substances may be stored and sold[.]

NORTH DAKOTA

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1289, Image 1323 (1895) available at The Making of Modern Law: Primary Sources. 1895
Keeping Explosives, § 7290. Every person who makes or keeps gunpowder, saltpeter, gun-cotton, nitroglycerine or dynamite or any compound of the same, or any fulminate or substance which is intended to be used by exploding or igniting the same, in order to produce a force to propel missiles or to rend apart substances, within any city, town or village, and any person who carries any of such explosives through the streets thereof, in any quantity or manner prohibited by law or by any ordinance, by law or regulation of said city, town or village, is guilty of a misdemeanor.

1905 N.D. Laws 103, An Act for the Organization and Government of Cities, and to Provide for the Limitation of Actions to Vacate Special Assessments Heretofore Made, ch. 62, art. 4, § 47, pt. 50.

To regulate and prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzine [sic], turpentine, hemp, cotton, nitroglycerine, petroleum or any of the products thereof, and other combustible or explosive material[.]

OHIO

1832 Ohio Laws 194-95, Local Acts vol. 31, An Act to Regulate the Keeping of Gunpowder in the City of Cincinnati, § 1.

It shall not be lawful for any person or persons to deposit or keep in any store, ware house [sic] or other building in the city of Cincinnati any greater quantity than twenty eight pounds of gunpowder at any one time, and all gunpowder which shall be deposited or kept in said city contrary to the provisions of this act or contrary to the provisions of any of the ordinances of said city shall be forfeited to the said city of Cincinnati, and may be seized and disposed of in such a manner as the city council of said city shall by ordinance prescribe.

1833 Ohio Laws 118, Local Acts vol. 32, An Act to Regulate the Keeping of Gunpowder in the County of Hamilton, § 1.

That it shall be the duty of the commissioners of the county of Hamilton, to examine on or before the first day of May next, all buildings wherein any gunpowder may be kept or stored by a greater quantity than one keg within said county and without the corporate limits of the city of Cincinnati[.]

An Act Incorporating the City of Cincinnati: And a Digest of the Ordinances of Said City, of a General Nature, Now in Force, with an Appendix Page 57-58, Image 58-59 (1835) available at The Making of Modern Law: Primary Sources. 1835

Ordinances of the City of Cincinnati, An Ordinance to Regulate the Keeping of Gunpowder, § 1. Be it ordained by the City Council of the City of Cincinnati, That no person or persons in the city of Cincinnati, shall keep, have, or possess, in any house, warehouse, shop, shed, or other building, nor in any street, side walk, lane, alley, passage, way, or yard, nor in any cellar, wagon, cary, or carriage, of any kind whatever; nor in any other place, within said city, Gun Powder, in any way or manner, other than as provided for by this ordinance; nor in any quantity exceeding twenty-five pounds, to be divided into six equal parts. § 2. Be it further ordained, That it shall not be lawful for any person or persons to sell gun powder by retail within said city, without having first obtained a license from the city council for that purpose; and every person obtaining a grant for a license to sell gun powder, shall receive a certificate of such grant from the city clerk, and pay into the city treasury, a sum not exceeding one hundred dollars, nor less than ten dollars; besides fifty cents to the Mayor for issuing the same; Provided that license be granted to not more than four persons in any one ward, and so that they be separated from each other, by at least two entire blocks or squares; and all applications for such license, shall be in writing, stating the situation where such gunpowder is to be kept. § 3. Be it further ordained, That every person who obtains a license as aforesaid to retail gun powder, shall keep the same in tin canisters, well secured with good and sufficient covers; and shall place on the store or building containing the same, a sign with the words, LICENSED TO SELL GUN POWDER, Provided

that nothing in this ordinance shall be so construed to prevent any person from carrying gun powder through the streets in its exportation, or to some place of deposit, without the limits of the corporation, if the same be put up in tight and well secured kegs or vessels. § 4. Be it further ordained, That it shall be the duty of the city marshal and his deputies, and any of the fire wardens, on any day, (Sundays excepted) between sun rising and setting, to enter into any house or building, or any other place within said city, where gun powder is kept or suspected to be kept, and examine the premises, and if they or either of them shall find any gun powder, contrary to the provisions of this ordinance, they or either of them shall seize such powder, together with the vessel containing the same, in the name of the city of Cincinnati; and the officer making such seizure, if he be other than the marshal, shall forthwith report such seizure to the marshal, who shall immediately take charge of the gun powder so seized, as if in case of seizure by himself; and in either case he shall immediately take charge of the gun powder so seized; to be conveyed to some safe place of deposit without the limits of the city. And the marshal shall, moreover, forthwith report such seizure to the mayor, with the name of the person in whose possession such gun powder was seized, or with the name of the owner, if his name be known, whereupon the mayor shall issue a citation against the owner, if known and within his jurisdiction, and if not, then against the person whose possession such gunpowder was seized, citing the defendant to appear on a day to be named in such citation, and show cause, if any he have, why the gun powder so seized should not be forfeited to the city, and a fine imposed agreeably to the provisions of this ordinance; upon which citation proceedings shall be had as in other cases upon the city ordinances, and if a final judgment of forfeiture be pronounced against the gun powder so seized, the marshal shall proceed to sell and dispose of the same for the benefit of said city, after having given three days notice of such sale, by advertisement in at least three public places in the city, and at one of the market houses on market day, to the highest bidder; and the net proceeds thereof shall be credited on the execution against the person fined for keeping the same contrary to the provisions of this ordinance: Provided, that, of any lot of powder seized according to the provisions of this ordinance, not more shall be sold by the marshal than will pay the fine and costs of suit and expense attending the seizure.

W.H. Gaylord, Standing Rules of Order of the Cleveland City Council: With a Catalogue of the Mayors and Councils of the City of Cleveland, from Its Organization, April, 1836, to April, 1871, and Officers of the City Government for 1872 Page 128, Image 152 (1872) available at The Making of Modern Law: Primary Sources.  1856
[Ordinances of the City of Cleveland,] Gunpowder, An Ordinance to Establish a Magazine, and Regulate the Sale of Powder. Be it ordained by the City Council of the city of Cleveland… § 3. No person shall keep within the city, any quantity of gunpowder exceeding twenty-five pounds, or of gun cotton exceeding five pounds, for a longer period than twenty-four hours, except in the powder magazine; and said twenty-five pounds shall be kept in tin or copper canisters, neither of which shall contain over seven pounds and shall be labelled "gunpowder," and be kept near the front or rear entrance of every building in which it is contained. § 4. Any person violating the provisions of this ordinance shall, on conviction thereof, be fined in any sum not exceeding twenty dollars.

1878 Ohio Laws 199, An Act to Amend, Revise, and Consolidate the Statutes Relating to Municipal Corporations, to Be Known as Title Twelve, Part One, of the Act to Revise and Consolidate the General Statutes of Ohio, div. 3, ch. 3, § 1, pt. 14.

To regulate the transportation and keeping of gunpowder, and other explosive and dangerous combustibles, and to provide or license magazines for the same.


1902 Ohio Laws 23, Extraordinary Sess.,  An Act to Provide for the Organization of Cities and Incorporated Villages . . . and to Repeal All Sections of the Revised Statutes Inconsistent Herewith, § 7, pt. 11.
To regulate the transportation, keeping and sale of gunpowder and other explosives or dangerous combustibles and materials and to provide or license magazines for the same.


OKLAHOMA


1903 Okla. Sess. Laws 107, An Act to Amend Sections . . . of the Statutes of Oklahoma, 1893, Relating to Cities[,] Towns and Villages, and for Other Purposes, ch. 7, art. 1, § 4.
The board of trustees shall have the following powers. . . to regulate the storage of gunpowder and other materials[.]


OREGON

1862 Or. Laws 9, An Act to Incorporate the City of Albany, § 6.
[To] regulate the storage of gun powder and other combustible materials, and the use of candles, lamps and other lights in shops, stables and other places[.]

Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations &C. Page 225-227, Image 226-228 (1872) available at The Making of Modern Law: Primary Sources. 1872
Ordinances of the City of Portland, To Regulate the Storage and Sale of Gunpowder, and Other Explosive Materials, § 1. No person shall keep for sale any gunpowder in any building, store or place in the City of Portland, without having first obtained a license therefor. § 2. The license for selling gunpowder shall be five dollars per quarter, to be issued as other licenses are issued under the provisions of Ordinance 984, entitled "An Ordinance to impose and regulate licenses in the City of Portland." § 3. No person shall receive, keep or store, or aid or assist any person in receiving, keeping or storing gunpowder in a larger quantity than five pounds, in or into any building, or upon any premises, unless the person receiving, keeping or storing the same is duly licensed to sell gunpowder. § 4. No person or persons duly authorized to sell gunpowder, as hereinbefore provided, shall keep, store, or have in any one place more than twenty five pounds of powder, which shall be kept in any air-tight metallic vessel marked with the word "Gunpowder," in plain Roman letters, not less than three inches in height, and of proportionate width, which vessel shall be placed or kept at all times, conspicuously in view near the entrance of the premises where kept, and convenient for removal therefrom. § 5. Upon the front of every building or premises where powder is kept in a conspicuous place a sign with the word "gunpowder" painted thereon in Roman letters, not less than three inches in height. § 6. No person shall convey, cause to be conveyed, or assist in conveying in any vehicle and gunpowder, unless the same shall be securely packed in close packages, nor unless such packages shall be securely covered while on the vehicle. § 7. No vessel shall be allowed to remain at any wharf

more than twenty-four hours with gunpowder on board, except such as may be kept for ship's use, and if such vessel shall be at the wharf overnight, a watchman shall be kept on duty on board all night. All gunpowder landed or placed on a wharf, sidewalk, street or public way for forwarding or shipment shall be forwarded or shipped immediately after it shall be so landed or placed. § 8. The provisions of this Ordinance shall be deemed to apply to "giant powder" "gun cotton" or any other explosive substance having an explosive power equal to that of ordinary gunpowder. § 9. Any person or persons violating any of the provisions of this ordinance, shall be deemed guilty of a misdemeanor, and on conviction before the Police Judge, shall be fined not less than ten nor more than one hundred dollars, or by imprisonment in the city jail not less than two nor more than twenty days, or both, at the discretion of the Police Judge. § 10. The officers of the Fire Department and Police are directed to see that the provisions of this Ordinance are enforced, and to make complaint before the Police Judge for the violation of its provisions.

1878 Or. Laws 136, An Act to Incorporate the Town of Independence, in the County of Polk, and State of Oregon, § 4.
[T]o regulate the storage of gunpowder and other combustible material, and the use of candles, lamps and other lights in shops, halls and other places[.]

1903 Or. Laws 31, Reg. Sess., Spec. Laws, An Act to Incorporate the City of Portland . . . ,  art. 4, § 73, pt. 36.
To regulate or prevent the storage, manufacture, and sale of dangerous, explosive, or combustible materials, including gunpowder, dynamite, giant powder, calcium carbide, nitro-glycerine, oil, and gas, and to provide for the inspection of the same; to prevent, by all proper means, all risks of injury or damage by fire arising from negligence, or otherwise[.]

PENNSYLVANIA

1725 Pa. Laws 31, An Act For The Better Securing Of The City Of Philadelphia From The Danger Of Gunpowder, § 2.
No person whatever within the precincts of the city of Philadelphia aforesaid, nor within Two Miles thereof, shall, from and after the Time the Powder Store aforesaid is so erected and finished presume to keep in any House, Shop, Cellar, Store, or Place of the said City, nor within Two Miles thereof, other than the Powder Store aforesaid, any more or greater Quantity, at any one Time, than Twelve Pounds of Gun-powder, under the Penalty of Ten Pounds for every such Offence.

"An Act for the better securing the city of Philadelphia and its liberties from danger of gunpowder" Act of Dec. 6, 1783, chap. 1059, 11 Pa. Stat. 209 (Sections I and II, P.L.) 1783 (Section I, P.L.) Whereas by an act, entitled "An act for the better securing the city of Philadelphia from danger of gunpowder," passed in the year one thousand seven hundred and twenty-four, and a supplement thereto, passed in the year one thousand seven hundred and forty-seven, continuing the said act in force until altered by a future assembly, it was directed that all gun-powder brought into the port of Philadelphia should be deposited in a certain powder house therein described, under the penalty of ten pounds for every offense: And Whereas another powder house or magazine hath been erected in the said city in the public square on the south

35

side of Vine street, between the Sixth and Seventh streets from Delaware at the public expense: And whereas the said penalty of ten pounds is not deemed sufficient to deter persons from storing large quantities of gunpowder in private houses and stores, to the great danger of the inhabitants: [Section I.] (Section II, P.L) Be it therefore enacted and it is hereby enacted by the Representatives of the Freemen of the Commonwealth of Pennsylvania in General Assembly met, and by the authority of the same, That no person whatsoever, within the precincts of Philadelphia, nor within two miles thereof, shall, from and after the passing of this act, presume to keep in any house, shop or cellar, store or place whatsoever, in the said city, nor within two miles thereof, other than in the said public magazine, any more or greater quantity at any one time than thirty pounds weight of gun-powder, under the penalty of forfeiture of the whole quantity so over and above stored, together with a fine of twenty pounds for every such offense.

A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District Page 45-47, Image 48-50 (1832) available at The Making of Modern Law: Primary Sources. 1787 [Ordinances of Kensington, Northern Liberties, An Act for Securing the City of Philadelphia and the Neighborhood Thereof from Damage by Gunpowder (1774), § 2. No person shall keep in any house, store, shop, cellar or other place within the city of Philadelphia, nor the country adjacent, within two miles of the said city, any greater quantity of gunpowder, at one time, than thirty pounds weight thereof, under the penalty of forfeiture of the whole quantity so over and above stored or kept, together with the sum of twenty pounds for every such offense. . . § 5. All gunpowder brought by land into the said city, or the adjacent country, within two miles of the said city, if above thirty pounds weight at one time, shall be immediately carried to the said magazine, and delivered to the superintendent thereof, or his deputy, within the hours hereinafter prescribed for his attendance at the said magazine, under the same penalties as if brought by water, and not delivered, as in such case is herein directed, at the said magazines. . . § 12. Any justice of the peace within the limits of the said city, and the adjacent country within two miles of the said city, on demand made by such superintendent or keeps of the said magazine, showing a reasonable cause, on oath or affirmation, may issue his warrant under his hand and seal empowering such superintendent or keeper of the said magazine to search, in the day time, any house, store, shop, cellar or other place, or any boat, ship or other vessels, for any quantity of gunpowder forbidden by this act to be kept in any place or places, and for that purpose to break open, in the day time, and such house, store, shop, cellar or other places aforesaid, or any boat, ship or other vessel, if there be occasion; and the said superintendent or keeper of the said magazine, on finding such gunpowder, may seize and remove the same, in twelve hours, from any such place or places, boats, ships or vessels, to the said magazine, and therein detain the same, until it be determined in the proper court, whether it be forfeited or not by virtue of this act; and the said superintendent or keeper of the said magazine shall not in the mean time be sued for seizing, keeping and detaining the same, nor shall any writ of replevin issue therefor, until such determination as aforesaid be made, but all such suits are hereby declared to be illegal, erroneous and abated.]

1791 Pa. Laws 105, A Supplement to the Act, Entitled "An Act for Securing the City of Philadelphia and the Neighborhood Thereof from Damage by Gun-powder, § 1.
That it shall and may be lawful for the owners of gun-powder not deposited , or to be deposited, in the said magazine, the square to the south of Vine street, to remove and deposit the same in

the said new magazine; and all gun-powder brought into the city of Philadelphia, from and after the first day of July next, shall be deposited and kept in the said new magazine subject to the regulation contained in the said first recited act.

By-Laws and Ordinances of the City of Pittsburgh, and the Acts of Assembly Relating Thereto; with Notes and References to Judicial Decisions Thereon, and an Appendix, Relating to Several Subjects Connected with the Laws and Police of the City Corporation Page 73, Image 75 (1828) available at The Making of Modern Law: Primary Sources.  1816
[Ordinances of the City of Pittsburgh,] An Ordinance Containing Regulations as to Gun-Powder, § 1. That no shop-keeper or other person or persons, shall keep, at the same time, in any house, shop, cellar or warehouse, or other apartment, or in any boat within the said city, more than thirty pounds weight of gun-powder. § 2. That the aforesaid quantity of gun-powder allowed to be kept within the city, shall be deposited in a place by itself, separate from other goods and commodities, and shall be secured by lock and key, or in some other safe manner. § 3. That no person shall carry or convey in any dray, cart, wagon or other carriage, any greater quantity of gun-powder than thirty pounds weight, at any one time, in or through the city, without securing the same in a good bag or bags, or within a canvas or other safe covering completely around the said powder, sufficient to prevent the same from scattering from the said carriage. §4. That if any person or persons shall offend against or violate any of the sections contained in this ordinance, he, she or they, so offending, shall, upon conviction thereof, pay a fine of fifty dollars.

A Digest of Acts of Assembly, Relating to the Incorporated District of the Northern Liberties; and of the Ordinances for the Government of the District Page 101-102, Image 101-102 (1847) available at The Making of Modern Law: Primary Sources. 1847
Ordinances of the Northern Liberties, Act of March 16, 1847. Whereas an article called gun cotton, with properties of ignition and explosion similar to those of gunpowder, and equally if not more dangerous in towns and cities, has been introduced. Therefore, § 1. That no gun-cotton shall be introduced in Philadelphia, nor placed in storage therein, in greater bulk or quantity in any one place, than is permitted by existing laws, with regard to gunpowder; and that all the fines, penalties and forfeitures imposed by an act entitled "An act for securing the city of Philadelphia, and the neighborhood thereof, from damage by gunpowder," passed on the twenty-eighth day of March, seventeen hundred and eighty seven, and a supplement thereto, passed on the fourteenth day of March, eighteen hundred and eighteen, shall apply and be extended to gun-cotton in the same manner, and with the same effect, as if the word gun-cotton were inserted in the said act.

1868 Pa. Laws 321, An Act Supplementary to an Act to Incorporate the City of Corry . . . , § 2, pt. 6.
To regulate, by ordinances . . . the storage, sale of gun powder, fire works and other inflammable or dangerous articles, and the location of refineries.

A Revised Edition of Acts of Assembly and Ordinances Relating to the Borough of Gettysburg, Together with a Brief History of the Town from Its Foundation to the Present Time, 1887. Revised Edition Page 62-63, Image 63-64 (1887) available at The Making of Modern Law: Primary Sources.  1887

37

Ordinances of the City of Gettysburg, Keeping Powder or Gun Cotton for Sale, § 9. That no person shall keep or have in their possession or cause to be kept within said borough, rock or gun powder, gun or explosive cotton, or other combustible matter likely to prove dangerous, unless the same is preserved carefully and without danger to the citizens in a safe magazine constructed and used solely for that purpose and at a distance of at least 500 feet from any dwelling, and the person offending against this section shall, upon conviction before the burgess or any Justice of the Peace, pay a fine and penalty of twenty dollars. To be collected as all such fines are now by law collectible.

Ordinances of the Borough of Shamokin, Pa. Page 71-72, Image 78-79 (1896) available at The Making of Modern Law: Primary Sources. 1896
Ordinances of the Borough of Shamokin, PA, An Ordinance Regulating the Storage of Coal, Oil, Benzene and Other Inflammable Oils and Regulating the Hauling and Storage of Gun Powder and other Explosives in the Borough of Shamokin, § 3. That no person shall convey or cause to be conveyed through any of the streets, lanes or alleys of the Borough in any cart, wagon or other vehicle, at any one time, any greater quantity of gun powder, blasting powder, or other explosives than twenty five pounds without a sheet of canvass under, around and over the same sufficient to prevent it from being scattered from the said cart, wagon or vehicle, or being ignited by sparks or otherwise under the penalty of forfeiture of the said gun powder, blasting powder or other explosive, and for every such offense the person so offending upon conviction thereof before the Chief Burgess or any Justice of the Peace within the Borough shall pay a fine of not less than One Dollar nor more than Ten Dollars to be collected as penalties of like amount are not by law collectible. § 4. No person or persons, firm or corporation, shall keep, in any house, store, cellar, shop, shed, yard or other place within the borough a greater quantity of gun powder, blasting powder or other explosive at any one time than two kegs thereof under a penalty of not less than One Dollar nor more than Ten Dollars for every keg of powder or other explosive so kept over and above two kegs as above mentioned except in stone buildings erected for that purpose not less than two hundred yards from any other building or public road.

1919 Pa. Laws 710, An Act relating to fires and fire prevention. . .
The department may adopt and enforce rules and regulations governing the having, using, storage, sale and keeping of gasoline, naptha, kerosene, or other substance of like character, blasting powder, gun powder, dynamite, or any other inflammable or combustible chemical products or substances or materials. The department may also adopt and enforce rules and regulations requiring the placing of fire extinguishers in buildings.

RHODE ISLAND

1762 R.I. Pub. Laws 132, An Act of June 1762.
And be it further Enacted by the Authority Aforesaid, That every person who shall import gunpowder into the town of Newport aforesaid shall cause the same to be conveyed immediately to the powder house at the North Easterly part of town, before the vessel in which the said Powder shall be imported, be brought to any Wharf; upon the penalty of paying into the Town-Treasury of the said Town of Newport, a Fine of Ten Shillings Lawful Money, for every cask which shall not be conveyed to the Powder House as aforesaid. That every other person who shall have Gun-powder in his or her Possession and shall neglect or refuse to cause the whole of

the same to be conveyed to the said Powder-House immediately excepting 25lb. which shall be kept in a Tin Powder-Flask, shall pay as a fine into the Town Treasury aforesaid, the Sum of Ten Shillings Lawful Money, for every Cask he or she shall neglect or refuse to cause to be conveyed to the Powder-House as aforesaid, and in Proportion for any less Quantity. That no Vessel of War or other Vessel shall take on board any Powder before they go from the Wharf, upon the Penalty of paying a Fine of Ten Shillings Lawful Money, for every Cask so taken on board. And that the Keeper of the Powder-House be allowed the same Fees as heretofore hath been allowed by Law, for delivering out every Hundred Weight of Powder, and in Proportion for a greater of less quantity.

1798-1813 R.I. Pub. Laws 85, An Act Relative To The Keeping Gun-Powder In The Town Of Providence, §2.  1798

§ 1. Be it therefore enacted by the General Assembly, and by the authority thereof it is hereby enacted, That no person or persons shall hereafter keep or deposit gunpowder, in a greater quantity than twenty-eight pounds, in any shop, building or other place, in the town of Providence, except such place or places as the Town Council of said town shall allow and designate for that purpose. § 2. And be it further enacted, That all and every person and persons whomsoever, who shall hereafter keep or depsoit gunpowder, in a greater quantity than twenty eight pounds, in any shop or shops, building or buildings, or in any other place or places in said town, except only such place or places as the Town-Council of said town shall allow and designate for that purpose, shall forfeit and pay the sume of twenty dollars, for each and every such offence, to be recovered by bill, plaint or information, before one or more of the Justices of the Peace for said town, and for the use of the poor of said town. 3. And be it further enacted, That the said quantity of twenty-eight pounds of gun-powder, shall be kept in tin canisters, and in no other vessels; and if any person or persons, whomsoever, shall keep the same in any vessl or thing, except said tin canisters, the person or persons guilty thereof, shall, for each and every such offence, forfeit and pay the sum of twenty dollars, to be recovered and appropriated as aforesaid.

1902 R.I. Pub. Laws 67, An Act in addition to chapter 40 of the General Laws, Entitled "Of the Town Council": § 1.

Town councils and city councils may from time to time make and ordain all ordinances and regulations for their respective towns, not repugnant to law, which they may deem necessary for the safety of their inhabitants from the manufacture, storage, keeping, having in possession, transportation, sale, or use of gunpowder, gun-cotton, dynamite, nitro-glycerine, nitro-gelatine, lyddite, chlorate of potash, picric acid, sodium calcium carbide, acetylene gas, gasoline gas, and any and all other explosives and explosive chemicals; and may prohibit the manufacture, storage, keeping having in possession, transportation , sale , or use by any and all persons or persons of any or all said substances and gases in their respective towns, unless a license for the same shall be first obtained from the town council or board of aldermen, which license shall be for the term of one years from the date thereof unless sooner revoked by order of said town council or board of aldermen. Any person violating any provision of any such ordinance or regulation, or any such prohibition, shall be fined not less than twenty dollars nor more than one hundred dollars for each such offense.

SOUTH CAROLINA

Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 153, Image 156 (1802) available at The Making of Modern Law: Primary Sources. 1802
Ordinances of Charleston, An Ordinance to Revise and Amend an Ordinance Respecting Fires in the City of Charleston, and for other Purposes Therein Mentioned, § 5. And be it further Ordained by the Authority Aforesaid, That it shall and may be lawful for the fire-masters to enter into the houses, out-houses, stables and yards of every owner or tenant of the same in Charleston, wherever they shall see occasion and enquire, search, and examine if any quantities of gun-powder ,hay, straw, fodder, pitch, tar, rosin, turpentine, hemp, oil, tallow, or other combustible matter, are lodged in any such place within the said city, which may be in danger of taking fire; and if the said fire-masters shall find there is apparent danger that fire may be communicated by such combustibles, they shall admonish the owner or the tenant of such house or houses, to remove the same, and in case such person or persons shall refuse or neglect to remove the same, within twelve hours from such notice being given, the said fire masters are hereby empowered, and directed, to cause the same to be removed and lodged in some more secure place, at the charge of such owner or tenant, and shall issue a warrant, under the hands and seals of any three, or more of them, and levy the expenses of the same and fine of thirty dollars for every such offense.

Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto Page 75-76, Image 75-76 (1823) available at The Making of Modern Law: Primary Sources.  1823
Ordinances of the Town of Columbia, An Ordinance to Prohibit the Keeping of more gun powder in the town of Columbia than a certain quantity, and for other purposes therein mentioned (1820). Be it ordained by the Intendant and Wardens of the town of Columbia, and it is hereby ordained by the authority of the same, That from and after the first day of July next, no merchant, retailer, dealer in powder, or any person or persons whatever, within the said town, shall retain, keep or have in his, her or their possession, at any time, a greater quantity of gunpowder than fifty pounds weight. And be it further ordained by the authority aforesaid, That it shall be the duty , and lawful for the fire-masters, or any two of them, as also for the town marshal, on information given to them, or the same coming to their knowledge, by any means whatever, of a greater quantity of gunpowder than fifty pounds weight, being in the possession of, or within the enclosure of any person or persons whatsoever, to enter into the enclosures of any person or persons whatsoever, to enter into the enclosures house or houses, out-houses, stables, and yards f every owner or tenant of the same within the town of Columbia, and enquire, search and examine if any greater quantity than fifty pounds weight are lodged or contained in any such place within the said town; and, if upon such information, examination or search, the said fire-masters or town marshal shall have just grounds to suspect, or be satisfied that a greater quantity of gunpowder than is allowed by this ordinance, is lodged or contained in any such place or places aforesaid, they are hereby required, immediately thereupon, to give information thereof to the intendant and wardens of the said town. And be it further ordained by the authority aforesaid, That all and every owner or tenant of such house or houses, places or enclosures, after

40

being duly summoned to appear before the intendant and wardens, and upon a conviction of each and every such offence, as is prohibited by this ordinance, shall be subject to a fine not exceeding twenty dollars. Provided nevertheless, That if any person or persons shall erect or build such a building or buildings within the limits of the said town, in which gunpowder may be lodged or deposited, without endangering the said town, or the property of any of the citizens thereof, and to be approved by the said fire-masters and the intendant and wardens, that then such building or buildings shall exempt the proprietors or owners who have gun-powder deposited therein, form the fines by this ordinance imposed, except as before excepted.

SOUTH DAKOTA

1890 S.D. Sess. Laws 72, An Act to Provide for the Incorporation of Cities and Their Classification According to Population, art. 5, § 1, pt. 53.
To regulate and prevent the storage of gun powder, tar, pitch, resin, coal, oil, benzine [sic], turpentine, hemp, cotton, nitro-glycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bonfires; also to regulate and restrain the use of fire works, fire crackers, torpedoes, roman candles, sky rockets, and other pyrotechnic displays.

1907 S.D. Sess. Laws 113-14, An Act Entitled an Act to Provide for the Incorporation of Cities under Commission, ch. 86, § 54, pt. 53.
To regulate and prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzine [sic], turpentine, hemp, cotton, nitro-glycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bonfires, also to regulate and restrain the use of fireworks, fire crackers, torpedoes, roman candles, skyrockets, and other pyrotechnic displays.

TENNESSEE

John M. Lea, The Revised Laws of the City of Nashville, with the Various Acts of Incorporation and Laws Applicable to the Town and City of Nashville, and a List of the Different Boards of Mayor and Aldermen, and Other Officers of Said City from the Year 1806 to 1850, Inclusive Page 49, Image 50 (1850) available at The Making of Modern Law: Primary Sources. 1850 [An Act to Reduce the Several Acts Incorporating the Town of Nashville in one act, and to Amend the Same, § 6. The Mayor and Aldermen shall have power, by ordinance within the city – ]25th. To regulate the storage of gun-powder, tar, pitch, rosin, salt-petre, gun-cotton, and all other combustible material, and the use of lights, candles and stove-pipes in all stables, shops, and other places.

1855-1856 Tenn. Pub. Acts 34, An Act to Amend and Reduce into One, the Acts Relating to the Charter of the Town of Clarkeville, ch. 32, § 2, pt. 20. 1855
To provide for the prevention and extinguishment of fires; to organize, establish and equip fire companies, hose companies, and hook and ladder companies; to regulate, restrain or prohibit the erection of wooden or combustible buildings in any part of the city; to regulate and to prevent the carrying on of manufactories dangerous in causing or producing fires; to regulate the storage of

41

gun powder, tar, pitch, rosin, saltpetre [sic], gun cotton and all other combustible or explosive material[.]


1895 Tenn. Pub. Acts 129-30, An Act to Incorporate the City of South Fulton, in Obion County Tennessee . . . , ch. 85, § 3, pt. 14.
To regulate the storage of gunpowder, tar, pitch, resin, saltpeter, gun cotton, coal oil, and all other combustibles, explosive or inflammable material, and the use of lights, candles, lamps, stove pipes, steam pipes, and chimneys in all storehouses, dwellings, outhouses, shops, stables, and other places, and to regulate and suppress the use and sale of fire crackers or fireworks of all kinds, toy pistols, air guns, or target guns.


1901 Tenn. Pub. Acts. 406, An Act to Incorporate the Town of Carthage, in Smith County, Tennessee, and Conferring and Defining the Corporate Powers Thereof, ch. 186, § 10.
Be it further enacted, That the Council shall have power by ordinance to . . . regulate the storage of gunpowder and other explosives, and noisome or offensive substances. . .

TEXAS

1839 Tex. Gen. Laws 214, An Act To Incorporate The City Of Austin, § 7
That the Mayor and Counsel shall have full power and authority … to prevent gunpowder being stored within the city and suburbs in such quantities as to endanger the public safety. . .

Revised Code of Ordinances of the City of Mckinney. Revised Page 40, Image 41 (1899) available at The Making of Modern Law: Primary Sources. 1899
[Ordinances of the City of McKinney,] Storing of Gun Powder and Other Explosives. Be it ordained by the city council of the city of McKinney: That it shall be unlawful for any person, firm or corporation to have or keep stored within the limits of the city of McKinney, at any one time, more than four kegs either of blasting powder or gun powder nor a greater amount of any other high explosive than is reasonably necessary for one day's business and none of the same shall be kept within the corporate limits of the city of McKinney for wholesale purposes at all. § 2. That any person guilty of a violation of this ordinance shall on conviction be fined in any sum not less than ten dollars nor more than twenty-five dollars for each offense. And further, That each day any person, firm or corporation shall have or keep any amount of such material as is mentioned in section No. 1 stored within the city limits of the city of McKinney in excess of the amounts designated in this ordinance shall constitute a separate offense.

1876 Tex. Gen. Laws 29, An Act To Incorporate The City Of Galveston And to Grant A New Charter, Tit. 7, Art. II, § 108
To direct, control and prohibit the keeping and management of houses, or any building for the storing of gun-powder and other combustible, explosive or dangerous materials, within the city; to regulate the keeping and conveying of the same, and the use of candles and other lights in stables and other like houses.

1901 Texas Gen. Laws 41: §98.

The city council may also regulate or prohibit and prevent the carrying on of work and manufactures that are dangerous in promoting or causing fires, and may prohibit the building or erection of cotton presses and sheds, or may restrict the same to such limits as are prescribed by ordinance; and may regulate or prohibit and prevent the use of fireworks and firearms, or the keeping and management of houses or other structures or places for storing gunpowder, dynamite, or other combustible, explosive, or dangerous material or substances within the city, and may regulate the keeping and conveying of the same.


UTAH

1864-65 Utah Laws 47, To Incorporate The City Of Payson, § 27 1864
To direct or prohibit the location and management of houses for the storing of gunpowder, tar, pitch, resin or other combustible and dangerous materials within the city, and to regulate the conveying of gunpowder.

Revised Ordinances and Resolutions of the City Council of Salt Lake City, in the Territory of Utah, with Congressional and Territorial Laws on Townsites and Great Salt Lake City Charter, and Amendments Page 161-162, Image 196-197 (1875) available at The Making of Modern Law: Primary Sources. 1875
Ordinances of Salt Lake City, Relating to Gunpowder, Gun Cotton and Nitro-Glycerine, § 1. Be it ordained, by the City Council of Salt Lake City, that it shall not be lawful for any person or persons to keep, sell or give away, gunpowder, gun-cotton, or nitro-glycerine, in any quantity without permission of the City Council; Provided, any person may keep, for his own use, not exceeding five pounds of gun powder, one pound of gun cotton, or one ounce of nitro-glycerine. § 2. All permits , when issued , shall be registered by the Recorder, and shall state the name and place of business, and date of permit, and the same shall not be granted for a longer time than one year; and no person to whom any permits may be issued, shall have or keep, at his place of business or elsewhere, within the city, (except in such places as may be approved by the City Council), a greater quantity of gunpowder or guncotton than twenty-five pounds, and the same shall be kept in tin canisters or cases, and nitro-glycerine not to exceed five ounces, and in a situation remote from fires lighted lamps or candles. Nor shall any person sell or weigh gunpowder, gun cotton, or nitro-glycerine, after the lighting of lamps or gas in the evening , unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word gunpowder painted or printed thereon in large letters. § 3. No person shall convey or carry any gunpowder exceeding one pound in quantity through any street or alley in the city, unless the said gunpowder is secured in tight cans, kegs or cases, sufficient to prevent the same from being spilled or scattered , and in no quantity exceeding one hundred pounds, except under the direction of a police officer. § 4. A violation of any clause of this ordinance shall subject the offender to a fine, for each offence, in any sum not exceeding one hundred dollars.

1888 Utah Laws 166, An Act to Establish a Uniform System of County Governments, ch. 50, § 19, pt. 31.
To adopt such rules and regulations within their respective counties, except within municipal corporations, with regard to the keeping and storing of every kind of gun powder, [H]ercules

powder, giant powder, or other combustible material, as the safety and protection of the lives and property of individuals may require.

1901 Utah Laws 139: 60.
To regulate or prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzene, turpentine, nitroglycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bonfires.

VERMONT

1876 Vt. Acts & Resolves 357, An Act in Amendment of An Act to Incorporate the Village of St. Albans, Approved November 18, 1859, and of the Several Amendments Thereof Heretofore Enacted, § 10, pt. 8.
To regulate the manufacture and keeping of gunpowder, ashes and all other dangerous and combustible material.

Barber, Orion M. The Vermont Statutes, 1894: Including the Public Acts of 1894, with the Declaration of Independence, the Articles of Confederation, and the Constitutions of the United States, and the State of Vermont Page 918, Image 935 (1895) available at The Making of Modern Law: Primary Sources. 1882
A person who has in his possession a toy pistol for the explosion of percussion caps or blank cartridges, with intent to sell or give away the same, or sells or gives away, or offers to sell or give away the same, shall be fined not more than ten nor less than five dollars; and shall be liable for all damages resulting from such selling or giving away, to be recovered in an action on the case.

Act of Incorporation and By-Laws of the Village of Bradford. 1890 Page 12-13, Image 13-14 (1891) available at The Making of Modern Law: Primary Sources. 1891
Ordinances of the Village of Bradford, § 11. The Trustees may grant licenses, for one year or less, to keep gun powder or gun cotton or other explosives for sale, if in their opinion the public safety is not endangered thereby. Said gun powder or gun cotton or other explosive shall be kept in close tin canisters which shall only be opened in the day time. § 12. The license shall specify the quantity allowed and the place where such gun powder or gun cotton and other explosives shall be kept, and on every building in which such gunpowder or gun cotton or other explosives is kept for sale shall be placed in a conspicuous position a sign with the words, "Licensed to sell Powder," printed or painted thereon. § 13. The Trustees may also grant licenses to store gun powder and other explosives in larger quantities in places used for no other purpose which they consider at a safe distance from other buildings. § 14. The Trustees may at any time inspect the premises where gun powder, gun cotton and other explosives are kept, in order to satisfy themselves that the regulations are complied with. § 15. Any person who shall without license keep in any building in the Village any nitro-glycerine, or more than half a pound of gun powder or two ounces of gun cotton, which shall be only for his own use, shall be fined five dollars for every day so offending. § 16. All licenses granted by the Trustees by virtue of these by-laws shall be signed by a majority of the Trustees and recorded in the office of the Clerk of the Corporation at the expense of the person licensed and shall not become valid until so recorded. § 17. The Trustees are authorized to revoke any license mentioned in these by-laws, whether

44

granted by themselves or their predecessors in office, whenever in their opinion the public good requires it. Such revocation shall be recorded in the Clerk's office, and shall become operative whenever the Trustees shall deliver a written notice thereof to the person whose license is revoked.

Act of Incorporation and By-Laws of the Village of Northfield Page 19-20, Image 19-20 (1894) available at The Making of Modern Law: Primary Sources. 1894
Regulations for Handling Explosives, Artcle XV., § 1. No person shall at any time keep within the limits of said Village, any powder, or guncotton, without a written license, signed by a majority of the trustees, who shall have discretionary power to grant the same for retailing purposes ; not, however, exceeding twenty pounds shall be kept in any one building at a time, and that to be kept in close metal cans, or flasks, which are not to be opened except in the day time, Said license specify the building, or place where said powder or guncotton shall or may be kept, the quantity such person may keep, and shall be conditional that any Trustee may at any time make inspection of the quantity of powder or gun-cotton kept, and the manner of keeping the same; said license to be in force until revoked by a majority of the Trustees. And it shall be the duty of the person or persons so licensed to procure said license to be recorded in the records of said Village, and to put up, in some conspicuous place on every building within the limits of the Village in which he has powder or guncotton stored, a sign with the words "LICENSED TO SELL GUNPOWDER." Provided, that a majority of the Trustees may grant license for storing or keeping larger quantities, and that any person may keep not over two pounds which shall be kept in a metallic flask or a powder horn. Article XVI. PENALTY FOR VIOLATION OF ABOVE ARTICLE. § 1. If any person shall keep, without a license therefore, or as provided in the XVth article, any powder, or gun cotton, or either of said articles, or shall keep either of said articles in any buildings or places except those mentioned in his license, he shall forfeit and pay to the treasurer of said Village Five dollars for each day said powder or guncotton shall be suffered to remain within the limits of said village.

Quoted in Brief of Amicus Curiae Patrick J. Charles at App. 13, N.Y. State Rifle & Pistol Ass'n, v. City of New York (Ordinances of the City of Barre, Vermont) 1895
CHAPTER 16, SEC. 18. No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any weapon concealed on his person without permission of the mayor or chief of police in writing.

1900 Vt. Acts and Resolves 145, An Act to Amend the Charter of the City of Montpelier, § 42. Said board of fire wardens may inspect the manner of manufacturing and keeping gun powder, lime, ashes, matches, lights, fireworks or combustibles[.]

VIRGINIA

1629 Va. Acts 151, Acts of March 24th, 1629, Act 5,
For the better furtherance and advancement of staple commodities, and more especially that of
potashes and saltpeter, it is thought fit that every master of a family within the several
plantations of this colony shall use their best endeavors to preserve and keep in dry and tight
houses or casks all those ashes that shall proceed and be made by the woo[d] that is burned in
clearing their grounds . . . And that every master of a family shall have a special care, after a
notice thereof given, to preserve and keep all their urine which shall be made in their several
plantations. . .
Available at https://archive.org/details/statutesatlargeb01virg

1879 Va. Acts 104, City Council – Powers, Duties, etc., ch. V, § 19
To direct the location of all buildings for storing gun-powder or other combustible substances; to
regulate the sale and use of gunpowder, fire-crackers, fire-works, kerosene oil, nitroglycerine . . .
the discharge of firearms . . .

1901 Va. Acts 203, An Act to Incorporate the Town of La Crosse, Mecklenburg County,
Virginia, ch. 189, § 13.
The council shall have, subject to the provisions of this act, the control and management of the
fiscal and municipal affairs of the town; of all property, real and personal, belonging to said
town; and may make such ordinances, orders, and by-laws and regulations as it may deem
necessary to carry out the following powers, which are hereby conferred on it . . . to regulate or
prevent the storing of gunpowder . . .

WASHINGTON STATE

1861-1862 Wash. Sess. Laws 22, An Act to Incorporate the City of Walla Walla, art. 5, § 3, pt.
22. 1861
To regulate the storage of gunpowder, pitch, tar, rosin and all other combustible materials, . . . in
shops, stables and other places. To prevent, remove or secure any fire-place, stove, chimney,
oven, boiler, or other apparatus which may be dangerous in causing fire.

1862 Wash. Sess. Laws 48, Local and Priv. Laws, An Act to Incorporate the City of Lewiston,
art. 5, § 3, pt. 22.
To regulate the storage of gunpowder, pitch, tar, rosin, and all other combustible materials, and
the use of candles, lamps, or other lights in shops, stables and other places. To prevent, remove
or secure any fire-place, stove, chimney, oven, boiler, or other apparatus which may be
dangerous in causing fire.

1867 Wash. Sess. Laws 116, An Act to Incorporate the City of Vancouver, ch. 1, § 32, pt. 16.
To regulate the storage and sale of gunpowder, or other combustible material, and to provide, by
all possible and proper means, against danger or risk of damage by fire arising from carelessness,
negligence or otherwise.

1881 Wash. Sess. Laws 121-22, An Act to Incorporate the City of Port Townsend, ch. 2, § 21.

The City of Port Townsend has power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation and keeping of gunpowder, or other combustibles, and to provide or license magazines for the same[.]

1881 Wash. Sess. Laws 93, An Act to Incorporate the City of Dayton, chap. 2, § 20.
The city of Dayton shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation, storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

1883 Wash. Sess. Laws 161, An Act to Incorporate the City of Ellensburgh, ch. 2, § 20.
The city of Ellensburg shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy . . . to regulate the transportation storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

E.W. Rector, Digester, Digest of the Laws and Ordinances of the City of Hot Springs, with the Constitution of the State of Arkansas, General Incorporation Laws of the State and Amendments Thereto, Applicable to the Cities of the First-Class, and in Force on the 1st of January, 1887 Page 61, Image 258 (1887) available at The Making of Modern Law: Primary Sources. 1886 [Ordinances of the] City of Hot Springs, §131. That no person shall carry gun powder, giant powder, dynamite, nitro-glycerine or blasting powder on any vehicle in any part of the city, unless the same shall be secured in kegs, boxes or canisters, sufficiently close to prevent the grains thereof from falling out, and be laid upon or covered over with sheets of canvas or other cloth, and such vehicles shall not be allowed to remain on the streets or sidewalks for more than one hour while containing such gun powder or explosives above mentioned. § 132. That it shall be unlawful to erect or build a powder magazine, or a magazine for any of the explosives mentioned in this ordinance, in the city, within three hundred yards of any other building; and, Provided, That in no case shall it be lawful to build or erect any such magazine in the city unless the same be erected in a safe and secure way, and under permission of the council of the city.

1907 Wash. Sess. Laws 634-636, An Act Relating to Cities of the Second Class and Providing for the Government of Such Cities . . . , ch. 241, § 29, pt. 21.
Powers of Council Enumerated. The city council of such city shall have power and authority: . . . 21. Combustibles; To regulate or prohibit the loading or storage of gunpowder and combustible or explosive materials in the city, or transporting the same through its streets or over its waters.

WEST VIRGINIA

J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 26, Image 26 (1875) available at The Making of Modern Law: Primary Sources. 1875 [Ordinances of Martinsburg, An Ordinance to Prevent Certain Improper Practices Therein Specified,] § 12. It shall not be lawful for any person to keep in any shop, store, warehouse or other house or building within this town, without the special permission or authority from the Council, a greater quantity of gun or rock powder at any one time than twenty-five pounds; and

every person offending against the provision of this section shall forfeit and pay to the town a fine of not less than five nor more than ten dollars.

1899 W.Va. Acts 24, An Act to Amend and Re-Enact and to Reduce into One Act, the Several Acts Incorporating the Town of Sisterville, in the County of Tyler; Defining the Powers Thereof, and Describing the Limits of Said Town; and Incorporating the City of Sisterville, in Said Tyler County, ch. 4, § 28.
[T]o regulate the keeping of gunpowder and other inflammable or dangerous substances[.]

1901 W.Va. Acts 321, An Act to Create the Municipal Corporation of "The City of Morgantown" . . . , ch. 144, § 18.
[T]o regulate the keeping of gun powder and other inflammable or dangerous substances[.]

1909 W.Va. Acts 59, An Act . . . Granting a Charter to the City of Charleston, ch. 2, art. 4, § 7.
[T]o regulate or prohibit the keeping of gun powder and other combustible or dangerous articles[.]

WISCONSIN

1883 Wis. Sess. Laws 315, vol. 2, An Act to Revise, Consolidate and Amend the Charter of the City Of Wausau, ch. 151, tit. 5, § 38.
The powers conferred upon the said council to provide for the abatement or removal of nuisances, shall not bar or hinder suits, prosecutions or proceedings in the courts according of law. Depots, houses or buildings of any kind, wherein more than twenty-five pounds of gun powder are deposited, stored or kept at any one time . . . within the limits of said city are hereby declared and shall be deemed public or common nuisances.

1883 Wis. Sess. Laws 369-70, vol. 2, An Act to Revise, Consolidate and Amend the City Charter of the City of Fond du Lac, ch. 152, ch. [sic] 6, § 8, pt. 16.
To prevent and prohibit the manufacture, keeping or storing of nitro-glycerine, and to regulate the keeping and storing of gunpowder, gun cotton, burning fluids, coal oils and other dangerous explosive materials, in said city, and to provide for the inspection of illuminating oils and fluids.

1919 Wis. Sess. Laws 282, An Act . . . Relating to Powers of Town Meetings, ch. 261, § 1.
To regulate the storage of gunpowder and other dangerous materials[.]

WYOMING

1884 Wyo. Sess. Laws 134, An Act Entitled an Act to Incorporate the Town of Sheridan, ch. 85, § 28, pt. 1.
[T]o regulate the storage of gun-powder, kerosene and other dangerous material[.]

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 96-97, Image 97-98 (1893) available at The Making of Modern Law: Primary Sources. 1893

48

Revised Ordinances of the City of Rawlins, [Precautionary Regulations,] § 13. That no person shall keep at his place of business or elsewhere within the city a greater quantity of gun powder or gun cotton than fifty pounds at one time, and the same shall be kept in tin or copper canisters or cases, containing not to exceed five pounds each, and in a situation remote from fires, lighted lamps and candles; and no person shall sell or weigh any gun powder or gun cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. Any violation of the provisions of this section shall be subject to a fine of not less than ten dollars nor more than one hundred dollars. § 14. It shall be lawful for the mayor, City Trustee, city marshal, police officers or fire-wardens, when any of them shall suspect that any gun powder or gun cotton is concealed or kept within the city in violation of the provisions of this Ordinance, to search any place in said city for the purpose of determining whether any gun powder or gun cotton is kept as aforesaid. Any person who shall obstruct or hinder any such officer making search in the execution of his duties under this section, shall forfeit and pay to said city for each offense a sum not less than ten dollars nor more than one hundred dollars.

Revised Ordinances and Charter of the City of Laramie, Wyo., with Constitutional Provisions and Legislative Enactments Governing the Same Page 200-201, Image 206-207 (1900) available at The Making of Modern Law: Primary Sources. 1900
[Ordinances of Laramie, Gunpowder and Explosives, § 12. No person shall keep at his place of business or elsewhere within this city, a greater quantity of gunpowder, gun-cotton, nitro-glycerine, dynamite, giant powder or other explosives than twenty-five pounds at one time; and the same shall be kept in tin or copper canisters or cases not exceeding five pounds in each, and in a position remote from fires, lighted lamps and candles, and from which they may be easily removed in case of fire; and no person or persons shall weigh or sell any gunpowder or gun cotton on after the lighting of lamps in the evening, unless in sealed canisters or cases; and no person shall be allowed to keep nitro-glycerine in any part of said city. A violation of any of the provisions of this section shall subject the offended to a fine of not less than ten nor exceeding fifty dollars. § 13. It shall be lawful for the chief of the fire department, when he shall have cause to suspect that any gunpowder, gun cotton, nitro-glycerine, dynamite, giant powder or other explosives is concealed or kept within the city, in violation of the provisions of this ordinance, to search any place in said city for the purpose of determining whether any gunpowder, gun-cotton, nitro-glycerine, dynamite, giant powder or other explosives are concealed or kept as aforesaid. Any person who shall obstruct or hinder such officer making search in the execution of his duties under this section, shall forfeit and pay to said city for each offense a sum no tless than ten dollars, nor more than fifty dollars.]

1907 Wyo. Sess. Laws 96, An Act Prescribing Additional Duties and Powers for the Regulation and Government of Cities of the First Class . . . , ch. 71, § 14, pt. 41.
To regulate and prevent the transportation and storage of gunpowder or other explosive or combustible articles. . .

1919 Wyo. Sess. Laws 17, An Act . . . Relating to the Storage of Explosives, ch. 17, § 1.
. . . It shall be unlawful for any person or company to store any gunpowder or any other explosive material at a less distance than one thousand feet from any house or habitation, when more than fifty pounds are at the same place; but it shall be unlawful to place or to keep any

powder or other explosive material, in any house or building occupied as a residence, or in any outbuilding pertaining thereto.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT F

## GUNPOWDER/GUN MANUFACTURING/INSPECTION/SALE/IGNITE

ARKANSAS

William W. Mansfield, A Digest of the Statutes of Arkansas: Embracing All Laws of a General and Permanent Character in Force at the Close of the Session of the General Assembly of One Thousand Eight Hundred and Eighty-three Page 490, Image 506 (Vol. 1, 1884) available at The Making of Modern Law: Primary Sources. 1884
Carrying Weapons, § 1909. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person, any dirk or bowie knife, or a sword or spear in a cane, brass or metal knucks, or any pistol of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol or any kind of cartridges for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

CALIFORNIA

1883 Cal. Stat. 156, § 153.
The Municipal Council shall provide by ordinance, for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also all fines collected in the police court for violations of fire ordinances.

1923 Cal. Stat. 695, 696-97, 701
Sec. 9. Every person in the business of selling, leasing or otherwise transferring a pistol, revolver or other firearm, of a size capable of being concealed upon the person, whether such seller, lessor or transferrer is a retail dealer, pawnbroker or otherwise, except as hereinafter provided, shall keep a register in which shall be entered the time of sale, the date of sale, the name of the salesman making the sale, the place where sold, the make, model, manufacturer's number, caliber or other marks of identification on such pistol, revolver or other firearm. Such register shall be prepared by and obtained from the state printer and shall be furnished by the state printer to said dealers on application tit a cost of three dollars per one hundred leaves in duplicate and shall be in the form hereinafter provided. The purchaser of any firearm, capable of being concealed upon the person shall sign, and the dealer shall require him to sign his name and affix his address to said register in duplicate and the salesman shall affix his signature in duplicate as a witness to the signatures of the purchaser. Any person signing a fictitious name or address is guilty of a misdemeanor. The duplicate sheet of such register shall on the evening of the day of sale, be placed in he mail. postage prepaid and properly addressed to the board of police commissioners, chief of police, city marshal, town marshal or other head of the police department of the city, city and county, town or other municipal corporation wherein the sale was made: provided, that where the sale is made in a district where there is no municipal police

department, said duplicate sheet shall be mailed to the county clerk of the county wherein the sale is made. A violation of any of the provisions or this section by any person engaged in the business of selling, leasing or otherwise transferring such firearm is a misdemeanor. This section shall not apply to wholesale dealers in their business intercourse with retail dealers, nor to wholesale or retail dealers in the regular or ordinary transportation of unloaded firearms as merchandise by mail, expres4 or other mode of shipment, to points outside of the city, city and county, town or municipal corporation wherein they are situated. The register provided for in this act shall be substantially in the following form:  [Form of Register included]

COLORADO

1911 Colo. Sess. Laws 408
Section 3. Every individual, firm or corporation engaged, within this commonwealth, in the-retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and., if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record- book shall be open at all times to the inspection of any duly authorized police officer.
Section 4. Every individual, firm or corporation failing to keep the record provided for in the first section of this act, or who shall refuse to exhibit such record when requested by a police officer, and any purchaser, lessee or exchanger of a pistol or revolver, who shall, in connection with the making of such record, give false information, shall be guilty of a Misdemeanor, and shall, upon conviction, be punished by a fine of not less than twenty-five, nor more than one hundred dollars, or by imprisonment in the county jail for a term not exceeding one year, or by both such fine and imprisonment.

CONNECTICUT

The Public Records Of The Colony Of Connecticut, Prior To The Union With New Haven Colony, May, 1665 Page 79, Image 91 (1850) available at The Making of Modern Law: Primary Sources.
It is ordered, that no man within this Jurisdiction shall directly or indirectly amend, repair, or cause to be amended or repaired, any gun small or great belonging to any Indian, nor shall endure the same, nor shall sell or give to any Indian, directly or indirectly, any such gun or gunpowder, or shot, or lead, or mold, or military weapons, or armor, nor shall make any arrow heads, upon pain of a ten pound fine for every offense at least, nor sell nor barter any guns, powder, bullets or lead, whereby this order might be evaded, to any person inhabiting out of this Jurisdiction, without license of this or the particular court, or some two magistrates, upon pain of ten pound for every gun, five pound for every pound of powder, 40s for every pound of bullets or lead, and so proportionately for any greater or lesser quantity.

The Public Records Of The Colony Of Connecticut. Hartford, 1890 Page 190-192, Image 194-196, available at The Making of Modern Law: Primary Sources. 1775

An Act for Encouraging the Manufacture of Salt Petre and Gun Powder. . .Be it enacted, That no salt petre, nitre or gun-powder made and manufactured, or that shall be made and manufactured in this Colony, shall be exported out of the same by land or water without the license of the General Assembly or his Honor the Governor and Committee of Safety, under the penalty of twenty pounds for every hundred weight of such salt petre, ntire or gun-powder, and proportionately for a greater or lesser quantity so without license exported; to be recovered by bill, plaint, or information, in any court of record in this Colony by law proper to take cognizance thereof. . . Be it further enacted by the authority aforesaid, That no powder-mill shall be erected in this Colony for the manufacture of gun-powder without the license of the general assembly, or in their recess the Governor and Council, first had and obtained under the penalty of thirty pounds for every such offence; to be recovered as the other forgoing personalities in this act are above directed to be recovered.

1836 Conn. Acts 105, An Act Incorporating The Cities of Hartford, New Haven, New London, Norwich and Middletown, chap. 1, § 20.

. . . relative to prohibiting and regulating the bringing in, and conveying out, or storing of gunpowder in said cities . . . .

1923 Conn. Pub. Acts 3707, 3707-10

Sec. 5. No sale of any pistol or revolver shall be made except in the room, store or place described in the permit for the sale of pistols and revolvers, and such permit or a copy thereof certified by the authority issuing the same shall be exposed to view within the room, store or place where pistols or revolvers shall be sold or offered or exposed for sale, and no sale or delivery of any pistol or revolver shall be made unless the purchaser or person to whom the same is to be delivered shall be personally known to the vendor of such pistol or revolver or the person making delivery thereof or unless the person making such purchase or to whom delivery thereof is to lic made shall provide evidence of his identity. The vendor of any pistol or revolver shall keep a record of every pistol or revolver sold in a book kept for that purpose, which record shall be in such form as shall be prescribed by the superintendent, of state police and shall include the date of the sale, the caliber, make, model and manufacturer's number of such pistol or revolver and the name, address and occupation of the purchaser thereof, which record shall be signed by the purchaser and by the person making the sale, each in the presence of the other, and shall be preserved by the vendor of such pistol or revolver for a period of at least six years.

Sec. 7. No person, firm or corporation shall sell at retail, deliver or otherwise transfer any pistol or revolver to any alien, nor shall any person deliver any pistol or revolver at retail except upon written application therefor and no sale or delivery of any pistol or revolver shall be mode upon the date of the filing or receipt of any written application for the purchase thereof, and when any pistol or revolver shall b delivered in connection with the sale or purchase, such pistol or revolver shall be enclosed in a package, the paper or wrapping of which shall be securely fastened, and no pistol or revolver when delivered on tiny sale or purchase shall be loaded or contain therein any gunpowder or other explosive or any bullet, ball or shell. Upon the delivery of any pistol or revolver the purchaser shall sign in triplicate a receipt for such pistol or revolver which shall contain the name, address and occupation of such purchaser, the date of sale, caliber, make, model and manufacturer's number and a general description thereof. One of such triplicate

receipts shall, within twenty-four hours thereafter, be forwarded by the vendor of such pistol or revolver to the superintendent of state police and one to the authority issuing the permit for the sale of such pistol or revolver and the other shall be retained by such vendor for at least six years. Sec. 8. No person shall make any false statement or give any false information connected with any purchase, sale or delivery of any pistol or revolver, and no person shall sell, barter, hire, lend, give or deliver to any minor under the age of eighteen years any pistol or revolver.

1930 Conn. Stat. 903, Dealing in Explosives; License., ch. 147, § 2644. 1909
No person shall manufacture, store, sell, or deal in gunpowder or any material or compound . . . unless he shall first obtain from the commissioner of state police or the fire marshal of the town where such business is conducted a written license therefor . . . which license shall specify the building where such business is to be carried on or such material deposited or used.


DELAWARE

1845 Del. Laws 10, A Supplement To The Act Entitled "An Act To Survey, Lay Out And Regulate the Streets Of Smyrna and for Other Purposes," ch. 12, § 2.
That it shall be the duty of the said commissioners, justice of the peace and constable to suppress, extinguish and prevent all bonfires from being lighted or kept up in any of the streets, lanes or alleys of the said town, and to suppress and prevent the firing of guns, pistols crackers or squibs, or the making or throwing of fire-balls by boys or others within the limits of said town.

Vol. 26 Del. Laws 28, 28- 29 (1911)
Section 1. That from and after the first day of June, in the year of our Lord, one thousand nine hundred and eleven, it shall be unlawful for any person or persons, firm, company or corporation, to sell, or expose to sale, any pistol or revolver, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made especially for the defense of one's person, without first having obtained a license therefor, which license shall be known as "Special License to Sell Deadly Weapons;" provided, however, that this provision shall not relate to toy pistols, pocket knives, or knives used in the domestic household, or surgical instruments or tools of any kind.
Section 2. Any person or persons, firm, company or corporation, desiring to engage in the business of selling revolvers, pistols, or revolver or pistol cartridges, stilettos, steel or brass knuckles, or other weapons made for the defense of one's person, shall, after the above mentioned date, apply to the Clerk of the Peace of the County in which it is desired to conduct such business and shall obtain a license therefor, for which he, they, or it shall pay the sum of twenty-five dollars, which said license shall entitle the holder thereof to conduct said business for the term of one year from its date.
Section 3. It shall be unlawful for any person or per- sons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.
section 4. It shall be the duty of any person or persons, firm, company or corporation, desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times, a book which shall be furnished him by the Clerk of the Peace of the County wherein he does

business in which said book he shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the color of the person so purchasing the same, and the apparent age of the purchaser; and no sale shall be made weapon, etc. until the purchaser has been positively identified. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

1913 Del. Laws 439, § 18.
No child under the age of fifteen years shall be employed, permitted or suffered to work . . . in or about establishments wherein nitroglycerine, dynamite, dualin, guncotton, gunpowder or other high or dangerous explosives are manufactured, compounded or stored; unless said establishment are insured under the approval of the board of insurance underwriters of the district where said establishment is situated.

Vol. 30 Del. Laws 55, 55-56 (1919)
Section 222. It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made for the defense of one's person.
It shall be the duty of any person or persons, firm, company or corporation desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business, in which said book lie shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the color of the person so purchasing the same, and the apparent age of the purchaser, and the names and addresses of at least two freeholders resident in the County wherein the sale is made, who shall positively identify the purchaser before the sale can be made; Provided, that no clerk, employee or other person associated with the seller shall act as one of the identifying freeholders. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.


FLORIDA

1923 Fla. Laws 431-32, An Act for the Protection of Person Who Use Shot-guns in the Pursuit of Game and for Sport . . ., ch. 9340, § 1.
That from and after the passage of this Act it shall be unlawful for any person, firm or corporation to offer for sale or sell in the state of Florida any loaded shot-gun shells which have been divested of their interstate character unless such loaded shot-gun shell shall be plainly printed on the box or carton in which they are sold, and also printed plainly, or stamped, on the top and outside with words and figures plainly indicating the character, quality and quantity of powder contained in such shell.

1927 (vol II) Fla. Laws 212, pt. 15.

The City Council shall have the power to pass ordinances on the following subjects as it deems necessary . . to prohibit or regulate the sale of firearms, cartridges, gun shells or other ammunition for firearms.

GEORGIA

Oliver H. Prince, A Digest of the Laws of the State of Georgia: Containing all Statutes and the Substance of all Resolutions of a General and Public Nature, and now in Force, which have been Passed in this State, Previous to the Session of the General Assembly of Dec. 1837 Page 619, Image 619 (1837) available at The Making of Modern Law: Primary Sources.  1831
An Act to Regulate the transportation of gunpowder and to authorize the forfeiture of such as shall be transported in violation of the provisions of this act (1831) #20, § 1. From and after the passage of this act, it shall be the duty of all owners, agents and others, who may or shall have any gunpowder, exceeding in quantity five pounds, transported upon the waters or within the limits of this State, to have the word gunpowder marked in large letters upon each and every package which may or shall be transported. § 2. All gunpowder exceeding five pounds in quantity which shall hereafter be transported or engaged for transportation upon any of the waters or within the limits of this State, without being marked as directed in the first section of this act, shall be liable to seizure and forfeiture – one half to the informer, the other for the use of the volunteer companies most convenient or contiguous to the place of seizure or forfeiture.

A Compilation of the Acts of the Legislature Incorporating the City of Macon, Georgia, and of the Ordinances, Passed by the City Council of Macon, to the 14th February, 1858, Now of Force Page 48, Image 48 (1858) available at The Making of Modern Law: Primary Sources. 1858 Ordinances. § 5. It shall not be lawful for any person to fire a gun, pistol, or any other fire arms, within three hundred yards of any house, except in cases of military parade; nor shall any person burn rockets, crackers, or any kind of fireworks within the limits of the city. Any person so offending shall be fined in a sum not exceeding twenty dollars.

1902 Ga. Laws 434-35, § 16.
Be it further enacted by the authority aforesaid, That the mayor and aldermen of the said city of Forsyth shall have full power to license, regulate and control by ordinance all . . . gun shops, dealers in guns or pistols . . . .

ILLINOIS

George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources.  1851
Ordinances of the City of Chicago: Regulating the Keeping and Conveying Gun Powder and Gun Cotton; § I. (Be it ordained by the Common Council of the city of Chicago) That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing, signed by the mayor and clerk and sealed with the corporate seal, under a penalty of twenty-five dollars for every offence. § II. All applications for permits shall be addressed to the common council or mayor in writing, signed by the applicant.

Not exceeding four permits shall be granted in any block. When the number of applications in any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot. When issued the clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business and date of permit. Persons to whom permits may be issued shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gun powder or gun cotton than fifty pounds at one time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gun powder or gun cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business with the words "gun powder and gun cotton" painted or printed theron in large letters. A violation of any clause of this section shall subject the offender to a fine of not less than ten dollars nor exceeding one hundred dollars. § III. No person shall convey or carry any gun or carry any gun powder or gun cotton, (exceeding one pound in quantity), through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the gun powder or gun cotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a leather bag or case, sufficient to prevent such gun powder or gun cotton from being spilled or scattered under a penalty of one hundred dollars. IV. No vessel, laden in whole or in part with gun powder or gun cotton, shall land at, or make fast to any dock or wharf upon the Chicago river, or either branch thereof, between the south line of the school section and Chicago avenue, or to discharge such gun powder or gun cotton within said limits. If any master, or owner of any vessel, or other person shall violate any provision of this section, he shall be subject to a fine of not less then twenty-five dollars and not exceeding one hundred dollars. § V. The mayor shall have power to cause any vessel to be removed form the limits mentioned in the previous section, to any place beyond the same, by a written order, which shall be executed by the marshal or some other member of the police. If any person shall neglect or refuse to obey such order, or shall resist any officer in the execution of the same, he shall be subject to a penalty of one hundred dollars. § VI. Al permissions granted under this ordinance shall expire on the tenth day of June each year. And no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit so issued. § VII. It shall be the duty of the officers of the police department, fire-wardens, and firemen, to report all violations of this ordinance which may come to the knowledge of the city attorney for prosecution.

Egbert Jamieson, The Municipal Code of Chicago: Comprising the Laws of Illinois Relating to the City of Chicago, and the Ordinances of the City Council; Codified and Revised Page 301-304, Image 309-312 (1881) available at The Making of Modern Law: Primary Sources. 1881 Ordinances of Chicago, § 1264. No person shall keep, sell or give away any gunpowder or gun-cotton in any quantity, without permission in writing, signed by the mayor and city clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: Provided, any person may keep for his own use a quantity of gunpowder or guncotton not exceeding one pound. . . § 1271. It shall be unlawful for any person or persons to carry or convey any gunpowder or guncotton (exceeding fifty pounds in quantity) through any street, alley, highway or road in the city, or within one miles of the limits thereof, in any cart, carriage, wagon, dray or

wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a good tight and substantial leather bag sufficient to prevent the same from being spilled or scattered or unless the same is put into a well covered and perfectly water tight box, the bottom and sides which shall be completely covered with zinc, or unless such gunpowder or guncotton be secured in water tight patent metallic cases or kegs. . . § 1275. Any person or persons, corporation or corporations, violating any of the provisions of sections (storage, manufacturing and sale §§) shall be subject to a fine of not less than fifty dollars, and not exceeding two hundred dollars, for each and every offense, and each and every day that gunpowder or guncotton shall be kept in any place contrary to any provision of this article shall constitute a violation thereof. § 1276. No vessel laden in whole or in part with gunpowder or guncotton shall land or make fast to any dock or wharf upon the Chicago river, or either branch thereof between the south line of the school section and Chicago avenue, or discharge such gunpowder or guncotton within said limits. If any master or owner of any vessel or other person shall violate any provision of this section he shall be subject to a fine of not less than twenty dollars, and not exceeding one hundred dollars.

INDIANA

1847 Ind. Acts 93, An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory Thereto Into One Act, and to Amend the Same, chap 61, § 8, pt. 4.
To regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder and other explosive compounds . . . .

IOWA

1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12
That the said city council shall have power, and it is hereby made their duty to make and publish from time to time, all such ordinances as shall be necessary to secure said city and the inhabitants thereof . . . to impose fines, forfeitures and penalties on all persons offending against the laws and ordinances of said city, and provide for the prosecution, recovery and collection thereof, and shall have power to regulate by ordinance the keeping and sale of gun-powder within the city.

KENTUCKY

1874 Ky. Acts 327, An Act to Revise and Amend the Charter of the City of Newport, § 6.
To prohibit the manufacture of gunpowder or other explosive, dangerous, or noxious compounds or substances in said city, and to regulate their sale and storage by license.

LOUISIANA

Ordinances Ordained and Established by the Mayor & City Council of the City of New Orleans. New Orleans, 1817.The Making of Modern Law: Primary Sources. Web. 24 October 2019. 1817 Art. 10. It shall not be lawful for any person to have or keep within the city and suburbs, or within two miles of the same (except the public magazine, or place of depot appointed for that purpose) any quantity of gunpowder, at any one time, exceeding one hundred pounds weight, in any one place, house, store or out-house, which said quantity of one hundred pounds shall be

separated in several stone jugs or tin canisters, each of which shall not contain more than ten pounds of powder, and shall be provided with a safe and sufficient stopple; and if any person or person shall keep any greater quantity of gunpowder at any one time than one hundred pounds, in any one place, house, store or out-house, or if the same gunpowder, so kept as aforesaid, shall not be separated in the manner herein above directed, he, she, or they shall forfeit all such gunpowder so kept contrary to the true intent and meaning of this ordinance, or so permitted to be kept, and which shall not be separated as aforesaid, and shall also forfeit and pay a fine not less than twenty-five, nor more than one hundred dollars, to be recovered with costs of suit, by the Mayor or any other competent magistrate; one half to the informer, and the other half for the use of the city

MAINE

Laws of the State of Maine; to Which are Prefixed the Constitution of the U. States and of Said State, in Two Volumes, with an Appendix Page 685-686; Image 272-273 (Vol. 2, 1821) available at The Making of Modern Law: Primary Sources.  1821
An Act to Provide for the Proof of Firearms, § 1. Be it enacted by the Senate and House of Representatives, in Legislature assembled, That the Governor, by and with the consent of the Council, be, and he hereby is empowered to appoint suitable persons, to be provers of barrels of all new, or unused fire arms; and it shall be the duty of each person so appointed, to prove and try the strength of the barrels of all fire arms which shall be offered him for that purpose, and in such manner as to satisfy himself of the strength of the same; and shall in a permanent manner, mark and number every barrel by him so proved, and make and deliver to the person applying to have the same proved, a certificate for each barrel proved and found good in the form following: I certify that on this ___ day f ___ A.D. 18___ I proved for ____, a musket, pistol, or rifle barrel, (as the case may be) and which is numbered and marked as in the margin, and that the same is good and strong. A.B. Prover of fire arms. § 2. Be it further enacted, That each prover shall be entitled to receive from the person applying to have such barrel proved, twenty five cents, in addition to the expense of the powder necessary for that purpose for each barrel so proved; whether the same shall stand the proof and be marked or not. § 3. Be it further enacted, That if any person shall sell or offer for sale within this State, any new, or unused musket, rifle, or pistol barrel, without having the same first proved, marked, and certified according to the provisions of this Act, he shall forfeit for each barrel so sold the sum of ten dollars, to be recovered by an action of debt before any Court proper to try the same; to the use of any person who shall sue for and recover the same, or by indictment to the use of the state. § 4. Be it further enacted, That if any person shall falsely alter the stamp or mark on the certificate of any prover of fire arms, appointed as aforesaid, and be convicted thereof before any Court proper to try the same, he shall forfeit and pay a fine of not more than one hundred dollars, nor less than twenty dollars according to the nature and aggravation of the offence, for the use of the State.

The Revised Statutes of the State of Maine Passed October 22, 1840 to Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 697, Image 713 (1841) available at The Making of Modern Law: Primary Sources.  1834
Section 4. If any person shall carry on the business of manufacturing gun powder, or of mixing or grinding the composition therefor, in any building within eighty rods from any valuable

building, erected at the time when such business may be commenced the building, in which such business may be carried on as aforesaid, shall be deemed a public nuisance; and such person shall be liable to be prosecuted and indicted accordingly.

MARYLAND

1757-68 Md. Acts 53, An Act for Prohibiting all Trade with the Indians, for the Time Therein Mentioned, ch. 4, § 3.  1760-1769
That it shall not be lawful for any Person or Persons within this Province, to sell or give to any Indian Woman or Child, any Gun-powder, Shot, or Lead, whatsoever, nor to any Indian Man within this Province, more than the Quantity of one Pound of Gun-powder, and Six Pounds of Shot or Lead, at any one Time, and not those, or lesser Quantities of Powder or Lead oftener than once in Six Months, under the Penalty of Five Pounds Current Money, for every pound of gunpowder. . .

MASSACHUSETTS

William Henry Whitmore, The Colonial Laws of Massachusetts: Reprinted From the Edition of 1672, with the Supplements Through 1686: Containing Also, a Bibliographical Preface and Introduction, Treating of All the Printed Laws From 1649 to 1686: Together with the Body of Liberties of 1641, and the Records of the Court of Assistants, 1641-1644 Page 126, Image 330 (1890) available at The Making of Modern Law: Primary Sources.  1651
Prescriptions, (1651) § 2. And it is further ordered; that no person (except for the defence of themselves and their vessels at Sea) shall transport any gunpowder out of this jurisdiction, without license first obtained from some two of the Magistrates, upon penalty of forfeiting all such powder as shall be transporting or transported, or the value thereof.

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1.
…from and after the passing of this act, all musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . with a charge of powder equal in weight to the ball which fits the bore of the barrel to be proved . . . § 2. That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act to which this is an addition . . .

Charles Allen, Report of the Commissioners on the Revision of the Statutes Page 333, Image 30 (Vol. 2, 1881) available at The Making of Modern Law: Primary Sources.  1881
Fire Arms, § 18. There shall be in each county, where the manufacture of fire-arms is carried on, provers of fire-arms, not more than six in number, appointed by the governor with the advice and consent of the council, who shall prove all musket barrels and pistol barrels which, being sufficiently ground, bored and breeched, are offered to them to be proved. § 19. All musket barrels and pistol barrels manufactured in this commonwealth shall, before they are sold or

stocked, be proved by one of the provers with a ball suited to the bore of the barrel and with a charge of powder equal in weight to the ball. The powder used in such proof shall be such that one ounce thereof in a howitzer of four and a half inch caliber at elevation of forty-five degrees shall be of sufficient power to carry a twelve-pound shot one hundred and thirty yards; or that one ounce therof in a howitzer of five and a half inch caliber at an elevation of forty-five degrees shall be sufficient to carry a twenty-four pound shot eighty yards.

Revised Ordinances of 1892, of the City of Boston, and the Revised Regulations of 1892, of the Board of Aldermen of the City of Boston, Being the Eleventh Revision, Third Edition, Containing All Ordinances Passed Between March 3, 1892, and February 1, 1895, and All Regulations of the Board of Aldermen Passed Between July 22, 1892, and February 1, 1895 Page 115, Image 129 (1895) available at The Making of Modern Law: Primary Sources. 1895 Ordinances of Boston, Prohibitions and Penalties, § 91. No person shall manufacture or sell, or expose for sale, any guncotton, nitro-glycerine, or any compounds of the same, nor any fulminate or substance, except gunpowder, intended to be used by exploding or igniting it, in order to produce a force to propel missiles, or to rend substances apart, except in accordance with a permit from the board of fire commissioners; nor shall any person send or carry through the public streets any such substance, except in the manner and in the quantities allowed by statute or ordinance.

Revised Ordinances of the City of Woburn. Revised Woburn, Massachusetts Page 91 Image 91 (1898) available at The Making of Modern Law: Primary Sources.  1898
License to Sell Gunpowder in the City of Woburn. No person shall sell any gunpowder within the city, without such license. Every license shall be in force one year from the date thereof; provided, that any license may be rescinded by the City Council, at their discretion. § 3. Every person so licensed shall keep a sign over and outside of the principal entrance from the street of the building in which the powder is kept, in which shall be printed in capitals the words: "License to keep and sell gunpowder" § 4. The city clerk shall keep a record of all licenses, and of the places designated therein, which places shall not be changed, unless by consent of the City Council, in writing. Every person who receives a license shall sign his name to a copy of the rules prescribed in this chapter, as evidence of his assent thereto. §5. The provisions of the foregoing four sections shall not apply or extend to the keeping or storing of metallic cartridges in fire proof magazines, nor to cartridge manufacturers, so long as they shall keep their powder in canisters, as prescribed in section one, and in fire proof magazines, located and built to the satisfaction of the City Council so long as such manufacturers allow no more than one hundred pounds of gunpowder in any magazine, or five pounds of gunpowder not made into cartrdiges, in any workshop at any one time.


MICHIGAN

1901 Mich. Pub. Acts 154, Local Acts, An Act to Revise and Amend the Charter of the City of Muskegon . . . , tit.7, § 24, pt. 11.
To regulate, restrain and prohibit the buying, carrying and selling gunpowder, fire crackers [sic] or fireworks manufactured and prepared therefrom, or other combustible materials, the

exhibition of fireworks and the discharge of firearms, and lights in barns, stables and other buildings, and to restrain the making of bonfires in streets, yards and public grounds[.]

## MINNESOTA

The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858

Ordinances of the City of St. Paul, An Ordinance to Regulate the Sale of Gunpowder, § 1. No person shall keep, sell or give away gunpowder or guncotton in any quantity without first having paid into the City Treasurer the sum of five dollars, and obtain from the Common Council a permission in writing, signed by the Mayor and Clerk, and sealed with the corporate seal, under a penalty not exceeding fifty dollars, for every offence, provided any person may keep for his own use not exceeding one pound of powder or one pound of gun cotton, at one and the same time. § 2. All applications for permits shall be addressed to the Common Council, in writing, signed by the applicant. Not exceeding four permits shall be granted in any one block; when the number of applications in any block shall at any time exceed the numbers to be granted, the requisite number shall by chosen by ballot. When issued, the Clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business, and date of permits. Persons to whom permits may be issued, shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gunpowder or guncotton than fifty pounds at one time, and the same shall be kept in tin canisters or cans, or kegs securely looped and headed, containing not to exceed twenty-five pounds each and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor Nor shall any person sell or weigh any gunpowder or guncotton, after the lighting of lamps in the evening, unless in sealed canisters or cans. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word "gunpowder" painted or printed thereon in large letters. Any person violating any clause of this section, shall, upon conviction therof be punished by a fine of not less than ten, nor more than one hundred dollars. § 3. No person shall convey or carry any gunpowder or guncotton, exceeding (one pound in quantity) through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cans or kegs well headed and hooped, sufficient to prevent such gunpowder or guncotton from being spilled or scattered, under a penalty of fifty dollars. § 4. All permissions granted under this ordinance shall expire on the second Tuesday of May in each year; and no permit shall be granted to any retailer of intoxicating liquors, or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit which may be issued.

## MISSOURI

1921 Mo. Laws 691, 692

Section 1. Pistol, revolver or firearms to be plainly marked. No wholesaler or dealer therein shall have in his possession for the purpose of sale, or shall sell, any pistol, revolver, or other firearm of a size which may be concealed upon the person, which does not have plainly and permanently stamped ,upon the metallic portion thereof, the trademark or name of the maker, the model and the serial factory number thereof, which number shall not be the same as that of any other such

weapon of the same model made by the same maker, and the maker, and no wholesale or retail dealer therein shall have in his possession for the purpose of sale, or shall sell, any such weapon unless he keep a full and complete record of such description of such weapon, the name and address of the person from whom purchased and to whom sold, the date of such purchase or sale, and in the' case of retailers the date of the permit and the name of the circuit clerk granting the same, which record shall be open to inspection at all times by any police officer or other peace officer of this state.

Sec. 2. Shall secure permit to acquire weapon.-No person, other than a manufacturer or wholesaler thereof to or from a wholesale or retail dealer therein, for the purposes of commerce, shall directly or indirectly buy, sell, borrow, loan, give away, trade, barter; deliver or receive, in this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, unless the buyer, borrower or person receiving such weapon shall first obtain and deliver to, and the same be demanded and received by, the seller, loaner, or person delivering such weapon, within thirty days after the issuance thereof, a permit authorizing such person to acquire such weapon. Such permit shall be issued by the circuit clerk of the county in which the applicant for a permit resides in this state, if the sheriff be satisfied that the person applying for the same is of good moral character and of lawful age, and that the granting of the same will not endanger the public safety. The permit shall recite the date of the issuance thereof and that the same is invalid after thirty days after the said date, the -name and address of the person to whom granted and of the person from whom such weapon is to be acquired, the nature of the transaction, and a full description of such weapon, and shall be countersigned by the person to whom granted in the presence of the circuit clerk. The circuit clerk shall receive therefor a fee of $0.50. If the permit be used, the person receiving the same shall return it to the circuit clerk within thirty days after its expiration, with a notation thereon showing the date and manner of the disposition of such weapon. The circuit clerk shall keep a record of all applications for such permits and his action thereon, and shall preserve all returned permits. No person shall in any manner transfer, alter or change any such permit or make a false notation thereon or obtain the same upon any false representation to the circuit clerk granting the same, or use or attempt to use a permit granted to another.

Sec. 3. Weapons must be stamped.-No person within this state shall lease, buy or in anywise procure the possession from any person, firm or corporation within or without the state, of any pistol, revolver or other firearm of a size which may be concealed upon the person, that is not stamped as required by section 1 of this act; and no person shall buy or otherwise acquire the possession of any such article unless he shall have first procured a written permit so to do from the circuit clerk of the county in which such person resides, in the manner as provided in section 2 of this act.

Sec. 4. Manufacture not prohibited.-Nothing herein contained shall be considered or construed as forbidding or making it unlawful for a dealer in or manufacturer of pistols, revolvers or other firearms of a size which may be concealed upon the person, located in this state, to ship into other states or foreign countries, any such articles whether stamped as required by this act or not so stamped.

NEBRASKA

1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

The City Council shall have power to license all . . . vendors of gunpowder[.]

1895 Neb. Laws 233, Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XXV, § 17.

No person shall keep, sell, or give away any gunpowder or guncotton in any quantity without permission in writing signed by the Chief of Fire Department and City Clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: Provided, any person may keep for his own defense a quantity of gunpowder or guncotton not exceeding one pound.

## NEW HAMPSHIRE

1820 N.H. Laws 274-76, An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, ch. 25, §§ 1-9.

§ 1. [T]he Governor . . . is hereby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state, and such other places as may by him thought to be necessary[.] § 2. [F]rom and after the first day of July next, all gunpowder which shall be manufactured within this state shall be composed of the following proportions and quality of materials . . . § 3. It shall be the duty of each of said inspectors to inspect, examine and prove all gunpowder which after the first day of July shall not be deposited at any publick [sic] powder magazine, or manufactory of this state . . . § 4. [N]o gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in a chamber of a four and an half inch howitzer, with the howitzer elevated so as to form an angle of forty-five degrees with the horizon, will, upon being fired throw a twelve pound shot seventy-five yards at the least. § 5. [W]henever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured or which is composed of impure materials . . . the inspector in such case, shall mark each cask containing such impure, ill manufactured, or deficient gunpowder, with the word "Condemned" on both heads of the cask . . . § 6. [I]f any person shall knowingly sell any condemned gunpowder . . . every such person, so offending, shall forfeit and pay not less than two hundred nor more than five hundred dollars . . . § 7. [E]ach inspector . . . be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gunpowder, by him examined, inspected and proved . . . to be paid by the owner or owners of the gunpowder. § 8. [I]f any manufacturer of gunpowder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export or cause to be exported withou the limits of this state, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act. § 9. [I]f any person with within this state . . shall knowingly sell, expose, or offer for sale, within this state, any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be composed of the proof herein before required, shall forfeit and pay not less than five dollars nor more than fifty dollars for each and every offence, to be recovered in the manner provided in the sixth section of this act.

1825 N.H. Laws 74, An Act to Regulate the Keeping and Selling and Transporting of Gunpowder, ch. 61, § 5.

[I]f any person or persons shall sell or offer for sale by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common, such person so offending shall forfeit and pay for each and every offence a sum not more than five dollars nor less than one dollar, to be recovered and applied as aforesaid.

1891 N.H. Laws 332, Safe-keeping of Gunpowder and Other Explosives, ch. 117, § 7.

If any person shall carry from town to town, or from place to place, any gunpowder for the purpose of peddling or selling it by retail in quantities less than twenty-five pounds, or shall sell, or offer to sell, by retail, any gunpowder in any highway or street, or on any wharf, parade, or common, or if any person shall sell or deal out any gunpowder in the night time, between sunset and sunrise, he shall forfeit for each offense a sum not more than five dollars.

1913 N.H. Laws 639, An Act to Regulate the Transportation of Dynamite, Gunpowder and Explosives, ch. 128, § 1.

It shall be unlawful to transport, carry, or convey from one place in this state to another place in this state, any dynamite, gunpowder, or other explosive on any vessel or vehicle of any description operated by a common carrier, which vessel or vehicle is carrying passengers for hire: Provided, that it shall be lawful to transport on any such vessel or vehicle small arms ammunition in any quantity, and such fuses, torpedoes, rockets, or other signal devices, as may be essential to promote safety in operation; and properly packed and marked samples of explosives for laboratory examination, not exceeding a net weight of one-half pound each, and not exceeding twenty samples at one time in a single vessel or vehicle; but such samples shall not be carried in that part of a vessel or vehicle which is intended for transportation of passengers for hire: Provided further, that nothing in this section shall be construed to prevent the transportation of military or naval forces with their accompanying munitions of war on passenger equipment vessels or vehicles.

1917 N.H. Laws 727-28, An Act for the Regulation of the Sale and Use of Explosives and Firearms, ch. 185, §§ 1-3.

§ 1. No person shall manufacture, sell, or deal in firearms or in gunpowder, dynamite, nitro-glycerine, or other form of high explosive, unless he shall first obtain, from the selectmen of the town or the chief of police of the city where such business is to be conducted, a written license therefor, and no person shall conduct such business within the state but outside the limits of any organized town or city, unless he shall first obtain such license from the county commissioners of the county in which such business is to be conducted; which license shall specify the building where such business is to be carried on or material deposited or used. § 2. No such licensed person shall sell or deliver firearms to any person not a citizen of the United States, unless he shall have legally declared his intention of becoming a citizen, or any such explosive material or compound to any person, except upon presentation of a permit such as is hereinafter provided for, nor unless satisfied that the same is to be used for a lawful purpose. § 3. Every person so licensed shall keep, on blanks to be furnished by the secretary of state, a record of the names and residences of all persons to whom he shall sell or deliver firearms or any such explosive material or compound, the purpose of which the same is to be used, the date of sale, the amount paid, the date of the purchaser's permit, the name and title of the person by whom the permit was issued,

and, within five days after such sale or delivery, shall file such record thereof with the clerk of the city or town wherein he sale or delivery was made, or with the county commissioners in case of sales or deliveries within the state, but outside the limits of any organized city or town. The records thus filed shall at all times be open to the inspection of the police departments, or other public authorities. He shall also affix to the receptacle containing such explosive material or compound a label with the name of the compound, his own name, and the date of sale.

NEW JERSEY

1639 N.J. Laws 18, Ordinance of the Director and Council of New Netherland, Prohibiting the Sale of Firearms, etc. to Indians . . .
Whereas the Director General and Council of New Netherland have observed that many persons, both Servants of the Company and Inhabitants, have contrary to the orders and commands of their High Mightiness the Lords States General and the Incorporated West India Company, presumed to sell to the Indians in these parts, Guns, Powder and Lead, which hath already caused much mischief, and if no means be adopted by Us here to prevent the same would hereafter entail nothing else than greater evil; Therefore every inhabitant of New Netherland, be his state, quality or condition what it may, is most expressely forbidden to sell any Guns, Powder or Lead to the Indians on pain of being punished by Death, and if any one shall inform against any person who shall violate this law, he shall receive a reward of Fifty guilders. . .

1776-1777 N.J. Laws 6, An Act for the Inspection of Gunpowder, ch. 6, § 1.  1776
That any Person who, from and after the Publication of this Act, shall offer any Gun-Powder for Sale, without being previously inspected and marked as is herein after directed, shall forfeit, for every such Offence, the Sum of Five Shillings a Pound for every Pound weight so offered for Sale, and so in Proportion for greater or lesser quantity[.]

1811 N.J. Laws 300, An Act to Regulate Gun Powder Manufactories and Magazines within this State, § 1.
. . . [N]o person or persons whatsoever, shall be permitted within this state to erect or establish, or cause to be erected or established, any manufactory which shall be actually employed in manufacturing gun-powder, either by himself or any other person, either on his own land or another, within the distance of a quarter of a mile from any town or village or house of public worship; or within the distance of a quarter of a mile from any dwelling house, barn or out house, without the consent under hand and seal of all and every the owner or owners of such dwelling house, barn, or out house as aforesaid; and any person so offending shall be guilty of a misdemeanor, and on conviction thereof shall be fined any sum not exceeding two thousand dollars: Provided, that nothing in this section shall be so construed as to prevent the completing, rebuilding or repairing any powder mill now erected or erecting in this state on the site on which the same shall be now erected or erecting.

1886 N.J. Laws 358, An Act to Regulate the Manufacture and Storage of Gun Powder, Dynamite and Other Explosive, ch. 250, § 1.
That no person or persons or corporations shall after the passage of this act, be permitted within this state to erect, have or maintain, or cause to be erected, had or maintained any establishment, storehouse or building in which in which shall be manufactured, stored or kept any gun powder,

blasting powder, dualin, dynamite, forcite, giant powder, nitro-glycerine, or any powder or materials of which nitro-glycerine is an essential ingredient or forms a component part, or any other explosive within the distance of one thousand feet from any public road; and every person or corporation offending against the provisions of this act shall be guilty of a misdemeanor, and, on conviction thereof, shall be liable to a fine not exceeding two thousand dollars[.]

1903 N.J. Laws 671, An Act Concerning Railroads, ch. 257, § 49.
No person shall be entitled to carry or require any company to carry on any railroad any aqua fortis, oil or vitriol, gunpowder, nitro-glycerine, matches, or other goods of a dangerous nature¸ and if any person sends by the railway any such goods without distinctly marking their nature on the outside of the package containing the same, or otherwise giving notice in writing to the agent of the company with whom the same are left at the time of so sending, he shall forfeit to the company twenty dollars for every such offense, and be besides liable to all damage that may occur therefrom, and the company may refuse to take any parcel that they may suspect to contain goods of a dangerous nature or may require the same to be opened to ascertain the fact.

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.
1. No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 742
    No retail dealer shall sell or expose for sale, or have in his possession with intent to use, any of the firearms or instruments enumerated in section one hereof without being licensed as hereafter provided. The Common Pleas judge of any court of this State, by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political-division, pistols or revolvers, subject to the follow-ing conditions, for breach of any of which the license shall be subject to forfeiture:
1. The business shall be carried on only in the building or buildings designated in the license.
2. The license or a copy thereof certified by the issuing authority shall be displayed in a conspicuous place on the premises where it can be easily read.
3. No pistol or revolver, or imitation thereof, or placard advertising the sale thereof, shall be placed in any window or in any part of said premises where it can be readily seen from the outside.
4. No pistol or revolver shall be delivered (a) unless the purchaser shall hve obtained a permit to purchase days shall have elapsed after the application for the permit; (c) unless the purchaser either is personally known to the seller or shall present evidence of his identity; (d) unless the pistol or revolver shall be unloaded and securely wrapped; provided, however, a permit to cover a pistol or revolver shall, for the purposes of this section and of section nine of this act, be equivalent to a permit to purchase a pistol or revolver. 5. A true record of every pistol shall be made in a book kept for the purpose, the form of which shall be prescribed by the Secretary of State and shall be personally signed by the person effecting the sale, and shall contain the date of

the sale, the calibre, make, model, and manufacturer's number of the weapon, and the name, address and permit number of the purchaser.

Any person who shall knowingly sell any of the firearms or instruments enumerated in section one here- of to a minor under the age of eighteen years, or to a person not of sound mind, or to a drug addict, or to a person who has been convicted of committing or attempting to commit any of the crimes enumerated in section two hereof when armed with any of the firearms or instruments enumerated in section one hereof, shall he guilty of misdemeanor.

No person shall sell a pistol or revolver to another person unless the purchaser has first secured a permit to purchase or carry a pistol or revolver. No person of good character and who is of good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in other sections of this act, shall be denied a permit to purchase a pistol or revolver. The judge of any court within this State (except, however, justices of the peace), the sheriff of a county or the chief of police of a city, town or municipality shall upon application issue-to any person qualified under the provisions of this section a permit to purchase a pistol or revolver, and the Secretary of State shall have concurrent jurisdiction to issue such permit in any case, notwithstanding it has been refused by any other licensing official, if in his opinion the applicant is qualified.

Applications for such permits shall be in form as prescribed by the Secretary of State and shall set forth the name, residence, place of business, age, occupation, sex, color, and physical description of the applicant, and shall state whether the applicant is a citizen, and whether he has ever been convicted of any of the crimes enumerated in section two hereof as defined in this act. Such application shall he signed by the applicant and shall contain as reference the names and addresses of two reputable citizens personally acquainted with him. Application blanks shall be obtainable from the Secretary of State and from any other officers authorized to grant such permit.. and may be obtained from licensed retail dealers. The application, together with a fee of fifty cents. shall be delivered or forwarded to the licensing authority who shall investigate the same, and unless food cause for the denial thereof shall appear, shall rant said permit within seven days from the date of the receipt of the application. The permit shall be in form prescribed by the Secretary of State and shall be issued to the applicant in triplicate. The applicant shall deliver to the seller the permit in triplicate and the seller shall indorse on the back of each copy the make, model, calibre and serial number of the pistol or revolver, sold tinder the permit. One copy shall then be returned to the purchaser with the pistol or revolver, one copy shall be kept by the seller as a permanent record, and the third copy shall be forwarded by the seller within three days to the Secretary of State. If the permit is not granted, the fee shall be returned to the applicant.

All fees for permits shall be paid into the general fund of the State if the permit be issued by the Secretary of State; to the municipality if the permit be issued by a municipal officer; in all other instances to the general fund of the county wherein the officer acts or the licensee resides or does business.

A person shall not be restricted as to the number of pistols or revolvers he may purchase, if he applies for and obtains permits to purchase the same, but only one pistol or revolver shall be purchased or delivered on each permit.


NEW MEXICO

1923 N.M. Laws 179, An Act Making It a Felony to Transport or Place a Bomb, Dynamite or Other High Explosive in or upon Any Public Service Passenger Coach or Passenger Train, or to Maliciously Use or Handle Dynamite or Other Explosive, ch. 115, § 1.
Any person who knowingly transports or takes into or upon any public service passenger car or passenger coach in the State of New Mexico, any bomb, dynamite, nitro-glycerine, vigorite, Giant or Hercules powder, gunpowder or other chemical compound or explosive shall be guilty of a felony and upon conviction thereof shall be punished by imprisonment for a term of not less than three years nor more than five years.


NEW YORK


1652 N.Y. Laws 128 Ordinance of the Director and Council of New Netherland Against Illegal Trade In Powder, Lead And Guns In New Netherland By Private Persons
An act prohibited the Illegal Trade in Powder, Lead and Guns, however the exact text has been lost to history.

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 40-41, Image 62-63 (1896) available at The Making of Modern Law: Primary Sources. 1650-1699 Laws of the Colony of New York, Indians. No person shall sell, give or barter directly or indirectly any gun or guns, powder, bullet, shot, lead nor any vessel or burthen, or row boat, canoes only excepted without license first had and obtained under the governors hand and seal to any Indian whatsoever, nor to any person inhabiting out of this Government, nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapon, vessel, or boat so sold given or bartered, five pounds for every for every pound of powder, and forty shillings for every pound of shot or lead and proportionately for any greater or lesser quantity.

The Documentary History Of The State Of New – York Page 222-223, Image 228-229 (1849) available at The Making of Modern Law: Primary Sources. 1650-1699: 1690
[By the Court of Albany, etc. (1690) Whereas diverse persons daily waste powder which is of such necessary use for defense of this City and County of Albany, and although many have been advertised thereof yet persist in the same: These are in his majesty's name to prohibit all persons whatsoever within the same city and county to burn any powder unless to kill provision, or for his majesty's service and benefit of the place aforesaid, upon pain of paying for every shot or discharging of gun or pistol (contrary to the intent of this order) six shillings current money of this province of New York, or corporal punishment at discretion.]

Documents Relative To The Colonial History Of The State Of New-York Page 254-255, Image 274-275 (1855) available at The Making of Modern Law: Primary Sources.  1744
A letter from Governor Clinton to the Lords of Trade. . . . I have taken every other precaution in my power to guard against my surprise by sending circular orders to the respective Colonels of

Militia and to the Captains of his Majesty's Companies posted in this province to inspect the Arms and Accoutrements of their men, and see that they are in good order and fit for immediate service, and that as often as conveniently may be they do exercise the men in arms keeping strict discipline, whereby they may be able not only to repel the French Forces , if this Province should be attacked by them, but to be also in condition if necessary, to attack them, pursuant to Mr. Stones letter to me of 3rd September last by order of their Excellency's the Lords Justices, for which end I have issued the enclosed proclamation to forbid the exportation of gun powder, or the applying the French with any kind of provisions warlike stores, or merchandise.

N.Y., N.Y. Ordinance Ordained and Established by the Mayor, Aldermen and Commonality of the City of New-York, image 118-119 (1793). 1788
(IV) And be it further enacted by the authority aforesaid, that it shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever, within the limits aforesaid, or in any ship or other vessel, within forty-eight hours after her arrival in the harbor, or at any time after such ship or other vessal shall and may have hauled along side any wharf, pier or key, within the limits aforesaid: And that upon any such search it shall be lawful for the persons finding any such gun powder, immediately to sieze, and at any time within twelve hours after such seizure, to convey the same to one of the magazines aforesaid; and the same gun powder so removed, to detain and keep, until it shall be determined by the Mayor or Recorder and any two Aldermen of the said city, whether the same is forfeited by virtue of this Act: And the person or persons so detaining the same, shall not be subject or liable to any action or suit for the detention thereof. Provided always, that nothing in this clause of this Act contained, shall be construed to authorize any person having such warrant to take advantage of the same for serving any civil process of any kind whatsoever. Provided also, that nothing in this Act contained shall extend to ships of war, or packets in the service of the United States or any of them, or of any foreign Prince or State; nor to authorise the searching for gun powder on board of any such ship or vessel while laying in the stream, and upwards of one hundred yards from the wharf or shore.

Mark Ash, The New York City Consolidation Act, as in Force in 1891: With Notes Indicating the Statutory Sources, References to Judicial Decisions, and All Laws Relating to New York City, Passed Since January 1, 1882, Together with an Appendix of the Royal English Colonial Charters of New York City Page 209, Image 233 (Vol. 1, 1891) available at The Making of Modern Law: Primary Sources.  1890
Ordinances of the City of New York, § 455. No person shall manufacture, have, keep, sell, or give away any gunpowder, blasting powder, gun-cotton, niro-glycerine, dualin, or any explosive oils or compounds, within the corporate limits of the city of New York, except in the quantities limited, in the manner, and upon the conditions herein provided, and under such regulations as the board of fire commissioners shall prescribe : and said board shall make suitable provision for the storage and safe keeping of gunpowder and other dangerous and explosive compounds or articles enumerated under this title, beyond the interior line of low water-mark in the city and county of New York. The said board may issue licenses to persons desiring to sell gunpowder or

any of the articles mentioned under this section at retail, at a particular place in said city to be named in said license (provided that the same shall not be in a building used in any part thereof as a dwelling unless specially authorized by said license), and persons so licensed may on their premises, if actually kept for sale, persons so licensed may have on their premises, if actually kept for sale, a quantity not exceeding at any one time, of nitro-glycerine, five pounds; of gun-cotton, five pounds of gunpowder, fourteen pounds; blasting powder, twenty-five pounds. . .

1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.
Such chapter is hereby amended . . . § 1914. Sale of pistols, revolvers and other firearms. Every person selling a pistol, revolver or other firearm of a size which may be concealed upon the person whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register in which shall be entered at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre [sic], make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm. Such person shall also, before delivering the same to the purchaser, require such purchaser to produce a permit for possessing or carrying the same as required by law, and shall also enter in such register the date of such permit, the number thereon, if any, and the name of the magistrate or other officer by whom the same was issued. Every person who shall fail to keep a register and enter therein the facts required by this section, or who shall fail to exact the production of a permit to possess or carry such pistol, revolver or other firearm, if such permit is required by law, shall be guilty of a misdemeanor. Such register shall be open at all reasonable hours for the inspection of any peace officer. Every person becoming the lawful possessor of such pistol, revolver or other firearm, who shall sell, give or transfer the same to another person without first notifying the police authorities, shall be guilty of a misdemeanor. This section shall not apply to wholesale dealers.


NORTH CAROLINA

1905 N.C. Sess. Laws 547, Priv. Laws, An Act to Amend the Charter of the Town of Pine Bluff, in Moore County, ch. 188, § 6.
That the commissioners of said town shall have authority to pass all necessary by-laws and ordinances for the proper government of the town, and to enforce the same by means of suitable fines and penalties. Among the powers specifically conferred upon the commissioners are the following: . . . to prescribe conditions under which may be sold and used fire-arms of all kinds including toy guns and pistols and air-guns, brass knuckles, loaded canes, dirks, bowie and other knives used as weapons, ammunition and fire-works, not inconsistent with the general laws of the State[.]


1909 N.C. Sess. Laws 777, Priv. Laws, An Act for a New Charter for the City of Southport, North Carolina, ch. 345, § 23, pt. 14.
[O]n dealers in pistols, guns, dirks, bowie knives, sling shots, brass or metal knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars; on

dealers in firecrackers, Roman candles, skyrockets, toy pistols or fireworks of any kind, a tax not exceeding fifty dollars.


NORTH DAKOTA

1923 N.D. Laws 379, 380-82

Sec. 10. SALES REGULATED. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof, nor in any event shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward by registered mail one copy thereof to the Secretary of State, and one copy thereof to the chief of police of the city or town, or the sheriff of the county of which the seller is a resident, and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not less than $100 or imprisonment for not less than one year, or by both such fine and imprisonment.

Sec. 11. DEALERS TO BE LICENSED. Whoever, without being licensed as hereinafter provided, sells, or otherwise transfers, advertises, or exposes for sale, or transfers or has in his possession with intent to sell, or otherwise transfer, pistols or revolvers, shall be punished by imprisonment for not less than two years.

Sec. 12. DEALERS' LICENSES: By WHOM GRANTED, AND CONDmoNs THEREOF.) The duly constituted licensing authorities of any city, town or subdivision of this state, may grant licenses in form prescribed by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

   The business shall be carried on only in the building designated in the license.

   The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

   No pistol or revolver shall be delivered-

(a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor

(c) If the seller has reasonable cause to believe that the purchaser either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof.

   A true record, in triplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Secretary of

State, and shall be personally signed by the purchaser and by the person affecting the sale, each in the presence of the other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, occupation, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded by registered mail to the Secretary of State and one copy thereof to the chief of police of the city or town or the sheriff of the county of which the seller is a resident, and the other copy retained for six years.

No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

OHIO

1849 Ohio Laws 407-08, Local Acts vol. 48, An Act to Incorporate the Town of Ripley in the County of Brown, § 4.
That the said town council of Ripley shall have power to ordain and establish laws and ordinances . . . to regulate the sale of gunpowder therein[.]

1889 Ohio Laws 164, An Act to Amend Section 2669 of the Revised Statutes, as Amended April 22, 1885, § 1.
The council of the city or village may provide by ordinance for licensing all exhibiters of shows or performances of any kind, not prohibited by law, hawkers, peddlers, auctioneers of horses and other animals on the highways or public grounds of the corporation, venders [sic] of gun powder and other explosives, taverns and houses of public entertainment, and hucksters in the public streets or markets, and in granting such license, may extract and receive such sum of money as it may think reasonable[.]

OKLAHOMA

1890 Okla. Sess. Laws 447-48, Crime and Punishment: Homicide, ch. 25, art. 17, § 24.
Every person guilty of making or keeping gunpowder or saltpeter within any city or village, in any quantity of manner such as is prohibited by law or by any ordinance of said city or village, in consequence whereof any explosion occurs whereby any human being is killed, is guilty of manslaughter in the second degree.

1890 Okla. Sess. Laws 474, Crime and Punishment: Of Crimes against the Public Health and Safety, ch. 25, art. 38, § 4.
Every person who makes or keeps gunpowder or saltpeter within any city or village, and every person who carries gunpowder through the streets thereof, in any quantity or manner such as is prohibited by law, or by any ordinance of such city or village, is guilty of a misdemeanor.

Dorset Carter, Annotated Statutes of the Indian Territory: Embracing All Laws of a General and Permanent Character in Force at the Close of the Second Session of the Fifty-fifth Congress Page 757, Image 841 (1899) available at The Making of Modern Law: Primary Sources. 1899 Indian Territory, § 4345 Every person other than an Indian, who within the Indian country, purchases or receives of any Indian in the way of barter, trade or pledge, a gun, trap or other

article commonly used in hunting, any instrument of husbandry, or cooking utensils of the kind commonly obtained by the Indians in the intercourse with the white people, or any article of clothing except skins or furs, shall be liable to penalty of fifty dollars.

OREGON

1903 Or. Laws 106, Spec. Sess., An Act to Incorporate the City of North Bend, and to Provide a Charter Therefor . . . , § 27, pt. 23.
To regulate the transfer of gunpowder, dynamite, nitro-glycerine, and other combustibles and explosives through the streets  or alleys of the city[.]

1913 Or. Laws 497
Section 1. It shall be unlawful for any person, firm or corporation to display for sale at retail any pocket pistol or revolver or to sell at retail, barter, give away or dispose of the same to any person whomsoever, excepting a policeman, member of the militia or peace officer of the State of Oregon, unless the purchaser or person attempting to procure the same shall have a permit for the purpose of procuring such pocket pistol or revolver signed by the municipal judge or city recorder of the city or county judge or a justice of the peace of the county wherein such person resides.
Section 2. Provided, that no judge, city recorder or justice of the peace shall issue such permit until said applicant has furnished him with an affidavit from at least two reputable freeholders as to the applicant's good moral character.
Section 3. All persons, firms or corporations engaged in the retail sale of pocket pistols or revolvers shall keep a record of the sale of such pocket pistols or revolvers by registering the name of the person or persons and the number of the pocket pistol or revolver and shall transmit same to the sheriff of the county in which purchase is made on the 1st and 15th day of each calendar month.

PENNSYLVANIA

Charter To William Penn, And Laws Of The Province Of Pennsylvania, Passed Between The Years 1682 And 1700 Page 32, Image 37 (1879) available at The Making of Modern Law: Primary Sources.  1650-1699
Laws of the Duke of York, Indians (1676). No person shall sell give or barter directly or indirectly any gun or guns powder, bullet, shot, lead nor any vessel of burthen, or row boat canoes only excepted without license first had and obtained under the Governor's hand and Seal, to any Indian whatsoever, nor to any person inhabiting out of this government nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapons, vessel or boat, so sold given or bartered, five pounds for every pound of shot or lead and proportionally for any greater or lesser quantity.

Act of 26th August 1721
    1700-1729
[An Act of 9th of February, 1750-51, § 1. If any person or persons whatsoever, within any county, town or within any other town or borough in this province, already built and settled, or hereafter to be built and settled , not hitherto restricted nor provided for by our laws, shall set on

fire their chimneys to cleanse them, or shall suffer them or any of them to take fire, and blaze out at the top, or shall fire any gun or other fire arm, or shall make or cause to be made, or sell or utter, or offer to expose to sale, and squibs, rockets, or other fire works, or shall cast, throw or fire any squibs, rockets, or other fire works within any of the said towns or boroughs without the governor's special license for the same, every such person or persons so offending shall be subject to the like penalties and forfeitures, and be recovered in like manner, as in and by an act, passed in the eighth year of the reign of king George the first, entitled 'An act for preventing accidents that may happen by fire are directed to be levied and recovered.]

John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources.  1700-1729
[An Act for Preventing Accidents that may Happen by Fire, § IV. And whereas much mischief may happen by shooting of guns, throwing casting and firing of squibs, serpents, rockets, and other fire-works, within the city of Philadelphia, if not speedily prevented: Be it therefore enacted, That if any person or persons, of what sex, age, degree or quality soever, from and after publication hereof, shall fire any gun or other fire-arms, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other fire works, or shall cast, throw or or fire, any squibs, rockets, or other fire works, within the city of Philadelphia, without the governor's special license for the same, of which license due notice shall first be given to the mayor of the said city, such person or persons so offending, and being thereof convicted before any one justice of the peace of the said city, either by confession of the party so offending, or by the view of any of the said justices, or by the oath or affirmation of one or more witnesses, shall for every such offence forfeit and pay the sum of five shillings; one half to the use of the poor of the said city, and the other half to the use of him or them who shall prosecute, and cause such offender to be as aforesaid convicted; which forfeitures shall be levied by distress and sale of the offenders goods as aforesaid; and for want of such distress, if the offender refuse to pay the said forfeiture, he shall be committed to prison, for every such offence the space of two days without bail or main-prize; Provided, that such conviction be made within ten days after such offence committed [ and if such offender be a negro or Indian slave, he shall instead of imprisonment be publically whipped, at the discretion of the magistrate.]

1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries
That if any persons or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled . .. shall fire any gun or other fire-arm, or shall make or cause to be made, or sell or utter, or offer or expose for sale, any squibs, rockets or other fire-works, … within any of the said towns or boroughs without the Governor's special license for the same, every such person or persons, so offending shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

1794 Pa. Laws 764, An Act Providing For The Inspection Of Gunpowder chap. 337

Whereas gun-powder imported from abroad, and manufactured within this state, have frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use: And whereas the modes heretofore used to prove the force thereof have been found uncertain and variable; and whereas Joseph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch-pall, by which it is conceived that the force of gunpowder may be proved by experiment, and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection, and the purchaser and consumer protected against fraud and imposition. § 1. . . That from and after the first day of October next, all gun-powder manufactured within this state, with intent to sell the same within the city or county of Philadelphia, shall be put in good and tight kegs or casks of twenty-five, fifty, or one hundred pounds neat weight, each made of well seasoned timber, bound together with at least twelve hoops, and having a hole bored in each head, of the diameter of one fourth part of an inch, well stopped with corks, and having the tare weight to each cask marked thereon, and that all such gun powder, and all other gun-powder, wheresoever manufactured, imorted into the port of Philadelphia, or brought into the city or county of Philadelphia for sale, shall be deposited forthwith on such importation or bringing by land or by water, in the public magazine in the said city, and delivered to the care of the keeper of the same, who shall give his receipt for the same, deliverable to the order of him or them who shall so deposit the same. § 2. And be it further enacted by the authority aforesaid, That David Rittenhouse, Francis Gurney and Thomas Procter be, and they are hereby, appointed Commissioners, to procure at least two pendulum powder proofs, upon the construction invented by the said Joseph Leacock, as nearly uniform in the length of the radius and weight of the pendulum, and in length of caliber and weight of the pistol, as they can procure the same, and therewith make experiments of the respective strenght or force of of the several species of gun-power imported from abroad, and manufactured within this state, sufficient in number to assertain the quality and force of three different degrees of strength in explosion, and marking the number of degrees on the graduated arch of the said engine, to which equal quantities be weight of the said three species of gun-powder, rammed with equal force into the pistol, shall elevate the said pendulum; and the powder which shall be barely capable of raising the said pendulum to the lowest rate of elevation, shall be standard for the state of Pennsylvania for gun powder of the first or lowest proof; and the powder which shall be capable of raising the said pendulum to the highest rate of elevation, shall be the standard of gun-powder for the State of Pennsylvania for the third or highest proof; and the middle or second proof standard of gun-powder shall be ascertained by the number of degrees of the said graduated arch, to which the same quantity of weight in equal moieties of the first and third proof powder shall be capable of raising the said pendulum; and the said standard being fixed and ascertained, the said Commissioners shall make report thereof in writing, by indentures under their hands and seals, on part thereof, together with one of the said pendulum powder proofs, and as accurate a draft and description thereof as can be made shall be returned to the Governor, to be filed and remain in the office of the Secretary of the Commonwealth, on other part shall be returned to the master of the Rolls, to be recorded in his office, and filied among the laws of the state and the otehr part together with the other pendulum powder proofs, shall be delivered to the first inspector of gun powder to be appointed in pursuance of this act, and by him, and his successors in office, to his and their succesors, as often as another officer shall be appointed.

Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred, to the Twentieth Day of March, One Thousand Eight Hundred and Ten Page 240-244, Image 284-288 (1810) available at The Making of Modern Law: Primary Sources.  1795

An Act providing for the inspection of Gun-powder. Whereas gun-powder imported from abroad and manufactured within this state, hath frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use: and whereas the modes heretofore used to prove the force thereof have been found uncertain and variable: and whereas Joseph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch-pall, by which it is conceived that the force of gun-powder may be proved by experiment and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection , and the purchaser and consumer protected against fraud and imposition: § 1. Be it enacted by the Senate and House of Representatives of the commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same, That from and after the first day of October next, all gun-powder manufactured within this state, with intent to sell the same within the city or county of Philadelphia, shall be put in good and tight kegs or casks of twenty-five, fifty, or one hundred pounds neat weight , each made of well seasoned timber, bound together with at least twelve loops, and having a hole bored in each head with the diameter of one fourth part of an inch, well stopped with corks and having the tare weight (weight of the actual keg or cask) of each cask marked thereon, and that all such gun-powder, and all other gun-powder, wheresoever manufactured imported into the port of Philadelphia, or brought into the city or county of Philadelphia for sale, shall be deposited, forthwith on such importation or bringing by land or by water, in the public magazine in in the said city, and delivered to the care of the keeper the same, who shall give his receipt for the same, deliverable to the order of him or them who shall deposit the same. § 2. And be it further enacted by the authority aforesaid, That David Rittenhouse, Francis Gurney, and Thomas Procter be, and they are hereby, appointed commissioners, to procure at least two pendulum powder proofs, upon the construction invented by the said Joseph Leacock, as nearly uniform in length and radius and weight of pendulum, and in length of caliber and weight of the pistol, as they can procure the same, and therewith make experiments of the respective strength or force of the several species of gun-powder imported from abroad and manufactured within this state, sufficient in number to ascertain the quality and force of three different degrees of strength in explosion, and marking the number of degrees on the graduated arch of the said engine, to which equal quantities of weight of the said three species of gunpowder, rammed with equal force into the pistol, shall elevate the said pendulum; and the power which shall be barely capable of raising the said pendulum to the lowest rate of elevation, shall be the standard for the state of Pennsylvania for gun-powder of the first or lowest proof; and the powder which shall be capable of raising the said pendulum to the highest rate of elevation, shall be the standard of gunpowder for the state of Pennsylvania of the third or highest proof; and the middle or second proof standard of gun-powder shall be ascertained by the number of degrees on the said graduated arch, to which the same quantity by weight in equal moieties of the first and third proof powder shall be capable of raising the said pendulum; and ht said standard being so fixed and ascertained, the said commissioners shall make report thereof in writing, by indentures under their hands and seals, one part thereof, together with one of the said two pendulum powder proofs, as accurate a draft

and description thereof as can be made shall be returned to the Governor, to be file and remain the office of the Secretary of the commonwealth; and one other part shall be returned to the Master of Rolls, to be recorded in his office, and filed among the laws of the state; and the other part, together with the other pendulum powder proofs, shall be delivered to the first Inspector of gun-powder to be appointed in pursuance of this act, and by him, and his successors in office, to his and their successors, as often as another officer shall be appointed. . . § 6. And by it further enacted by the authority aforesaid, That it shall be the duty of the inspector of gunpowder so to be appointed, for the time being, to attend at the aid public magazine, and his office so to be built, as often as shall be necessary, to inspect and examine all gunpowder there to be deposited, to draw samples form each cask of powder which shall be so as aforesaid bored, and to open or otherwise get samples of casks of powder not bored as aforesaid, and removing such samples to his office, there to prove the same b the pendulum proof aforesaid, and note the standard quality of each cask, to provide himself with cedar plugs stamped on the outer end with the letters S.P. and the figures number one, number two, and number three, so designate the first, second and third proofs of standard gunpowder of the state of Pennsylvania, and another stamped with letters S.P. to designate condemned gun-powder, and therewith carefully to plug up the holes opened or made for the purpose with such marked plugs, as the proof quality of the powder in each cask respectively contained, and occasionally to weight the said casks; and if upon weighing the same suspicion shall arise that he casks are false tared, or do not contain the quantity herein above mentioned for each cask, to empty the same, and weigh the cask and powder separately, to ascertain the deficiency, if any, in the neath weight, and to fill the same to its due weight out of the other cask belonging to the same person, marking the weight taken on the ullage casks , and keeping an exact account in the books thereof, and of the names of the owners and persons bringing and depositing the same. . . §10. And be it further enacted by the authority aforesaid That if any person, from and after the first day of October next, importing or bringing into the port or city, or county of Philadelphia, any quantity of gun-powder exceeding twenty-five pounds, with intent to sell the same, shall neglect to deposit the same for inspection in the magazine aforesaid, or shall sell the same before it be inspected and marked as aforesaid, or shall sell any gun-powder that shall be condemned as aforesaid as and for merchantable gun-powder every person so offending shall forfeit all such gunpowder as aforesaid. § 11. And be it further enacted by the authority aforesaid, That the inspector shall be entitled to demand and receive of and from the owner and possessor of all gun-powder deposited in the said magazine, and by him or his Deputy examine, proved and plugged, as aforesaid, the following sums or rates, whether the same be approved or condemned, paid or secured before the same shall be removed from the magazine; if the Inspector shall so require; for every cask of powder, manufactured in this state, or any of the United States, bored, and stopped with corks by the manufacturer, containing twenty-five pounds neat weight, seven cents; for every like cask containing fifty pounds, eight cents; for every like cask containing one hundred pounds, nine cents; and fore very cask of foreign powder, or powder manufactured in the United States, not bored and stopped with corks as aforesaid, double the said price or rates; and for every cask which shall find deficient one per cent. In weight and shall fill up, fifty cents. § 12. And be it further enacted by the authority aforesaid, that if any dispute should arise between the owner, possessor or consignee of any such powder and the Inspector, touching the proof or condemnation thereof, or the goodness of the materials and manner in which the casks are made, upon application by the owner, possessor or consignee of such powder to one of the Magistrates of the city or county of Philadelphia, where the dispute shall arise, the said Magistrate shall issue this warrant to three indifferent judicious

persons to be triers thereof, one of them to be named by the said owner, possessor or consignee, of by the said Inspector, and the third of the said Magistrate shall thereupon give his judgment agreeably to the report of the said triers, or any two of them; a'd in case the said Magistrate shall on such reports adjudge the powder not to be merchantable, he shall award the owner, possessor or consignee thereof, to pay all costs; but in the case the said powder shall be found merchantable, the Inspector shall be adjudged to pay all costs, which may have accrued, and shall thereupon cause the powder to be marked as the standard to eb directed by the said triers.


RHODE ISLAND


1762 R.I. Pub. Laws 132
And be it further Enacted by the Authority aforesaid, That no person whatsoever shall fire a gun or other fireworks within one hundred yards of the said powder house, upon the penalty of paying a fine of ten shillings lawful money, for every such offence, to be recovered by the Town Treasurer, for the use of the said Town.

Records Of The State Of Rhode Island And Providence Plantations In New England.Providence Page 18-19, Image 20-21 (1863) available at The Making of Modern Law: Primary Sources. 1776
An Act for the Inspection of Gunpowder, Manufactured within this State (1776). Be it enacted by this General Assembly, and by the authority thereof, it is enacted, that if any person or persons, within this state, shall vend or expose to sale any gunpowder, manufactured within the same, unless said gunpowder be packed in a good dry cask, marked with the two first letters of the manufacturer's name, and hath been examined and approved by the inspector of gunpowder, for said state, and by him marked with the letters U.S.A., and such other marks as are necessary to distinguish the several sorts of gunpowder: the person or persons so offending shall forfeit and pay £6 lawful money, for every cask so exposed to sale; to be recovered by bill, plaint or information, upon conviction before any court of record within this state; which forfeiture shall one moiety thereof be given to the informer, and the other be paid in to the general treasury of the state. And be it further enacted by the authority, aforesaid, that the said inspector be paid out of the general treasury nine-pence, lawful money, for every cask so marked and inspected by him.

The Charter and Ordinances of the City of Providence, Together with the Acts of the General Assembly Relating to the City Page 89-96, Image 89-96 (1854) Available at The Making of Modern Law: Primary Sources. 1821
An Act Regulating the Storage, Safe Keeping and Transportation of Gunpowder in the Town of Providence, (1821) § 2. And be it further enacted, That is shall not be lawful for any person or persons to sell any gunpowder which may at the time be within the town of Providence in any quantity, by wholesale or retail, without first having obtained from the town council of said town a license to sell gunpowder; and every such license shall be written or printed, and signed by the president of said council or their clerk, on a paper upon which shall be written or printed a copy of this act; and every such license shall be in force for one year from the date thereof, unless annulled by said council, and no longer; but such license may, prior to the expiration of that time,

be renewed, by endorsement thereon, for a further term of one year, and so from year to year: provided, always, that the said town council may annul any such license, if in their opinion the person or persons licensed have forfeited the right of using the same by any violation of the law relative thereto; and every person who shall receive a license as aforesaid shall pay therefor the sum of five dollars, and on having the same renewed shall pay therefor the sum of one dollar, which shall be paid to the clerk of said council, for their use, for the purpose of defraying the expense of carrying this act into execution. § 3. And be it further enacted, That any person or persons who shall keep, have, possess or transport any gunpowder within the town of Providence, contrary to the provisions of this act, or who shall sell any gunpowder therein, without having a license therefor, then in force, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding five hundred dollars, for each and every offence; and if any gunpowder kept contrary to the provisions of this act shall explode in any shop, store, dwelling-house, ware-house or other building, or in any place in said town, the occupant, tenant or owner of which has not a license in force to keep and sell gunpowder therein, or which gunpowder shall have been kept in a manner contrary to the terms and conditions of such license, such occupant tenant or owner shall forfeit and pay a fine of not less than twenty dollars nor more than five hundred dollars. . . § 6. And be it further enacted, That the said firewards, or any of them, may enter the store or place of any person or persons licensed to sell gunpowder, to examine and ascertain whether the laws relating thereto are strictly observed; and also whenever there may be an alarm or fire; and in such last case may cause the powder there deposited to be removed to a place of safety, or to be destroyed by wetting or otherwise, as the exigency of the case may require; and it shall be lawful for any one or more of the firewards aforesaid to enter any dwelling house, store, building or other place in said town to search for gunpowder which may have reason to suspect to be concealed or unlawfully kept therein; first having obtained from some justice of the peace of said town a search warrant therefor; which warrant any one of the justices of said town is hereby respectively authorized to issue, upon the complaint of such fireward or firewards, supported by his or their oath or affirmation. . . And be it further enacted, That all persons who wish have a license to keep and sell gunpowder within the town shall make application to the town council in writing, stating the place of business and whether they wish to sell by wholesale or retail, or both; and to each person or firm who may be approbated, a certificate of license shall be granted, on payment of the fee established by law. § 14. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by retail, shall be allowed to keep in the place or building designated in the license, twenty-five pounds of gunpowder, and no more, at one time, which shall always be kept in tin or copper canisters, capable of containing no more than twelve and a half pounds each with a small aperture at the top, and a tin or copper cover thereto. § 15. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by wholesale, shall provide and keep a tine or copper chest, with two handles and a tight cover, furnished with a hinge, and secured with a padlock, all of tin or copper chest, with two handles and a tight cover furnished with a hinge and secured padlock, all of tin or copper; such chest shall always be kept on the lower floor, on the right side of and close to the principal door or entrance from the street into the building so licensed, except when otherwise designated by the council and shall always be kept locked, except when powder is put in or taken out; and such person or firm, so licensed shall be allowed to deposit and keep, in such tin or copper chest, a quantity of gunpowder not exceeding four casks of twenty-five pounds each; the heads of each cask not to be opened, and each cask to be kept in a strong leather bag, closely tied and marked as aforesaid. § 16. And be it further enacted, that every

person or firm licensed to keep and sell gunpowder as aforesaid, by wholesale or retail, shall have and keep a signboard placed over the door or building in which such powder is kept, on which shall be painted in Roman capitals the words "Licensed to sell Gunpowder"


Newport (R.I.). Charter of the City of Newport, R.I., And the Special State Laws Relating Thereto, Together With the Ordinances for the Government of the City. Newport, 1858. Newport RI 1858 Sec. 11. And be it further enacted, That no person whosoever shall fire a gun or other fire-works within one hundred yards of the said powder-house, upon the penalty of two dollars for every such offense, to be recovered by the town treasurer for the use of said town. Sec. 12. And be it further enacted, That no ship or vessel having more than five barrels of gunpowder on board, shall come to anchor in the harbor of Newport, anywhere to the eastward of Goat Island, and lie there more than twenty-four hours, after notice and warning shall be given by the president of the town council . . .


1885 R.I. Pub. Laws 6, An Act In Amendment Of And in Addition To Chapter 242 Of The Public Statutes, Entitles "Of Offenses Against Private Property." § 1
§ 1. Every person who shall knowingly deliver or cause to be delivered to any person or carrier any box, can or other package of nitro-glycerine, gunpowder, naptha or other equally explosive material, not marked with a plain and legible label describing its contents, or who shall remove or cause to be removed any such label or mark shall be fined not more than ten thousand dollars or imprisoned not more than five years.


SOUTH CAROLINA

Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802
[Ordinances of the City of Charleston, An Ordinance for Appointing Commissioners of the Streets, Defining their Powers, and for other Purposes therein Mentioned, § 8. And be it further ordained by the authority aforesaid, That no person or persons, shall fire any squibs, crackers, or other fireworks, except at times of public rejoicing, and at such places as the intendant for the time being may permit, by license under his hand; nor burn any chips, shavings, or other combustible matters, in any of the streets, lanes, wharves, alleys, or open or enclosed lots of the city, nor fire any gun, pistol, or fire arms, within the limits of the city, except on occasion of some military parade, and then by the order of some officer having the command, under the penalty of ten dollars, for every such offense; nor shall any person or persons, raise or fly any paper or other kite, within the said city, under the said penalty of ten dollars.]


John E. Breazeale, The Revised Statutes of South Carolina, Containing the Code of Civil Procedure, and the Criminal Statutes. Also The Constitutions of the United States and of the State, and the Rules of the Supreme and of the Circuit Courts of the State Page 431, Image 529 (Vol. 2, 1894) available at The Making of Modern Law: Primary Sources. 1890
Chapter XXVIII Violations of the License Laws by Insurance and Other Companies, Emigrant Agents, owners or shows, etc., Persons Selling Pistols, etc. §490. No person or corporation

within the limits of this State shall sell or offer for sale any pistol, rifle, cartridge or pistol cartridge less than .45 caliber, or metal knuckles, without first obtaining a license from the county in which such person or corporation is doing business so to do. The County Board of Commissioners of the several Counties of this State are authorized to issue licenses in their respective Counties for the sale of pistols and pistol and rifle cartridges of less than .45 caliber, and metal knuckles, upon the payment to the County Treasurer by the person or corporation so applying for said license of the sum of twenty-five dollars annually; and any person who shall sell or offer for sale any pistol, or pistol or rifle cartridge of less than .45 caliber, or metal knuckles, without having obtained the license provided in this Section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding one year, or both, at the discretion of the court.

1903 S.C. Acts 124, An Act to Protect Fish by the Regulation of the Sale of Dynamite and Other Similar Explosives: § 1.
§ 1. Be it enacted by the General Assembly of the State of South Carolina, That no person shall sell, deliver or dispose of dynamite or similar powerful explosives, except ordinary gunpowder, unless such person knows the purchaser or the party to receive the same and is satisfied that the explosive is not to be used for killing fish, and then only upon a written application from party desiring to purchase, stating the purpose for which he desires to use the said explosives; and a person selling, delivering or disposing of such explosives, shall keep a book in which shall be recorded the name of the purchaser or party to whom the explosive is delivered, the quantity so sold or delivered, and the date of such sale or delivery.


SOUTH DAKOTA

1913 S.D. Sess. Laws 292, An Act to Regulate the Sale of Dynamite or Other High Explosives, and to Provide a Penalty for the Violation Thereof, § 1.
No person, firm, or corporation shall sell any dynamite or other high explosive, except ordinary gun powder in the state of South Dakota, to any person unknown to the seller, unless introduced by some person known to the seller, and on every sale the seller shall before delivery, make entry on a book kept for that purpose stating the date of sale, the name and address of the purchaser, the name and quantity of the article sold, the purpose for which it is required and the name of the person, if any, who introduced them. Any person failing to comply with the requirements of this section shall be deemed guilty of a misdemeanor.

TENNESSEE

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 52, Image 52 (1867) available at The Making of Modern Law: Primary Sources. 1867
Ordinances of the City of Memphis, Nuisance and Abatement Thereof, It is a public nuisance. — § 5 To carry on the business of manufacturing gun-powder or of mixing or grinding the materials therefor, in any building within eighty rods of any valuable building erected at the time such business may be commenced.

1899 Tenn. Pub. Acts 327, An Act to Repeal the Charter of the Town of Waverly, in Humphreys County, and to Incorporate Said Town and Define Its Rights, Powers, etc.,  ch. 174, § 11, pt. 10. [The Town has power] To regulate, restrain, or prevent the carrying on of manufactories dangerous in causing or producing fires, and to prevent and suppress the sale of firearms, fireworks, Roman candles, crackers, sky rockets, etc., and toy pistols.

UTAH

1901 Utah Laws 76, An Act Relating to the Marketing of Explosives, Inflammable Substances or Dangerous Acids, Chemicals and Compounds for Storage or Transportation, and Providing Penalties for the Violation of This Act, ch. 77, § 1.
Penalty for delivering dangerous explosive for storage or transportation. That every person who knowingly leave with or delivers to another, or to any express or railway company or other common carrier, or to any warehouse or storehouse any package containing nitro-glycerine, dynamite, guncotton, gunpowder, or other highly explosive compound, or any benzine [sic], gasoline, phosphorus, or other highly inflammable substance or any vitriol, . . . or other dangerous acid . . . to be handled, stored, shipped or transported, without plainly marking and indicating on such package the name and nature of the contents thereof, is guilty of a misdemeanor, and punishable by a fine not exceeding three hundred dollars, or by imprisonment in the county jail not exceeding six months.

VERMONT

1865 Vt. Acts & Resolves 213, An Act to Amend an Act Entitled "An Act to Incorporate the Village of Rutland," Approved November 15, 1847, § 10.
. . . and said fire wardens may inspect the manner of manufacturing and keeping gun-powder, lime, ashes, matches, lights, fire-works of all kinds, and other combustibles, . . . and a majority of said fire-wardens may, if they deem the same to be dangerous, order the persons manufacturing and keeping such gun powder . . . in what manner to manufacture and keep the same[.]

Barber, Orion M. The Vermont Statutes, 1894: Including the Public Acts of 1894, with the Declaration of Independence, the Articles of Confederation, and the Constitutions of the United States, and the State of Vermont Page 918, Image 935 (1895) available at The Making of Modern Law: Primary Sources.  1882
A person who has in his possession a toy pistol for the explosion of percussion caps or blank cartridges, with intent to sell or give away the same, or sells or gives away, or offers to sell or give away the same, shall be fined not more than ten nor less than five dollars; and shall be liable for all damages resulting from such selling or giving away, to be recovered in an action on the case.

1919 Vt. Acts and Resolves 136, An Act to Regulate the Transportation of Dynamite, Gunpowder and Other Explosives by Common Carriers, § 1.
It shall be unlawful to transport, carry or convey from one place in this state to another place in this state, any dynamite, gunpowder, or other explosive on any vessel or vehicle of any

description operated by a common carrier, which vessel or vehicle is carrying passengers for hire[.]

VIRGINIA

That no commander of any plantation do either himselfe or suffer others to spend powder unnecessarily in drinking or entertainments, &c.
The Laws of Virginia, Vol. 1, 1623, 127.
https://archive.org/details/statutesatlargeb01virg/page/126/mode/2up?view=theater

WASHINGTON STATE

Edward D. McLaughlin, The Revised Statutes and Codes of the State of Washington Page 686, Image 738 (1896) available at the Making of Modern Law: Primary Sources.  1896
Public Nuisance, § 3910 – Certain Defined. It is a public nuisance—5. To carry on the business of manufacturing gun powder, nitroglycerine or other highly explosive substance, or mixing or grinding the materials therefor, in any building within fifty rods of any valuable building, erected at the time such business may be commenced.

WEST VIRGINIA

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b.
It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

WISCONSIN

Charter and Ordinances of the City of La Crosse, with the Rules of the Common Council Page 239-242, Image 242-245 (1888) available at The Making of Modern Law: Primary Sources. Ordinances of La Crosse, An Ordinance to Provide for Licensing Vendors of Gunpowder and Other Explosive Substances and to Regulate the Storing, Keeping and Conveying of all Dangerous and Explosive Materials and Substances within the City of La Crosse, and in relation to the Storage and Sale of Lime Therein, § 1. It shall be unlawful for any person to keep for sale, sell or give away any gunpowder, giant powder, nitro-glycerine, gun-cotton, dynamite or any other explosive substance of like nature or use without having first obtained a license therefor from the city of La Crosse in the manner hereinafter provided. Any person convicted of a violation of this section shall be punished by a fine of twenty-five dollars for each offense. . . § 3. It shall be unlawful for any person licensed pursuant to the foregoing sections of this ordinance

to have or keep at his or her place of business an amount of gunpowder or other explosive material greater in the aggregate than fifty pounds at any one time, or to keep the same in any other than cases or canisters made of tin, or other metal holding not to exceed ten pounds each. Such gunpowder or other explosive materials shall be kept in places remote from fires and lighted lamps or candles, and where the same may be easily accessible so as to be removed in case of fire. No person shall sell any gunpowder or other explosive material after the lighting of lamps in the evening unless in sealed canisters or cases; and all places where business is carried on under any such license shall have a sign put up in a conspicuous place at or near the front door thereof with the word "gunpowder" painted thereon in large letters. Any person violating any provision of this section shall, upon conviction, be punished by a fine of not less than five dollars nor more than fifty dollars for each offense; and upon any such conviction the common council may at its discretion by resolution duly passed revoke the license of the person so convicted. This ordinance shall not be construed as to prevent persons who are not vendors of the articles mentioned in the title thereof from keeping gunpowder in quantities not exceeding one pound for their own use.

1911 Wis. Sess. Laws 227-28, An Act . . . Relating to the Regulation of the Manufacture and Storage of Gunpowder and Black Blasting Powder, and Providing a Penalty, ch. 223, § 1.
§ 1. . . § 4393a-1. It shall be unlawful for any person, firm, or corporation to manufacture gunpowder or black blasting powder in any quantity whatsoever within the corporate limits of any city or village or within one hundred rods of any occupied dwelling house or any church, schoolhouse, town hall, depot or other place in which people are accustomed to assemble. § 4393a-2. It shall be unlawful for any person, firm or corporation engaged in the manufacture of gunpowder or black blasting powder to store, or permit to be stored on the land or premises where gunpowder or black blasting powder is manufactured, any dynamite or explosive other than that manufactured at such gunpowder or black blasting powder manufacturing plant or within one mile of any plant where gunpowder of black blasting powder is manufactured. § 4393a-3. It shall be unlawful for any person, firm, or corporation engaged in the manufacture of gunpowder or black blasting powder, to store or to keep in storage or permit to be stored or kept in storage, at any plant where gunpowder or black blasting powder is manufactured, more than one hundred twenty-five thousand pounds of gunpowder or black blasting powder in any building or storage magazine at such plant[.]

1911 Wis. Sess. Laws 572, An Act . . . Relating to Child Labor, ch 479, §4.
§ 1728f. 1. No child under the age of eighteen years shall be employed . . . in or about establishments where nitroglycerine, dynamite, dualin, guncotton, gunpowder or other high or dangerous explosive is manufactured, compounded or stored[.]

SOURCE: Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT G

# GUNPOWDER/GUN TRANSPORTATION LAWS

ARIZONA

Act of Mar. 18, 1889, 1889 Ariz. Sess. Laws 16–17.  1889
Sec. 1. If any person within any settlement, town, village or city within the Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which he is convicted, the weapon or weapons so carried.
Sec. 2. The preceding article shall not apply to a person in actual service as a militiaman, nor as a peace officer or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.
Sec. 3. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sol for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.
Sec. 4. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.. . .
Sec. 6. Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.


ARKANSAS

Act of Feb. 16, 1875,1874-75 Ark. Acts 156. 1875
Sec. 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-

give nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

GEORGIA

Oliver H. Prince, A Digest of the Laws of the State of Georgia: Containing all Statutes and the Substance of all Resolutions of a General and Public Nature, and now in Force, which have been Passed in this State, Previous to the Session of the General Assembly of Dec. 1837 Page 619, Image 619 (1837) available at The Making of Modern Law: Primary Sources. 1837
An Act to Regulate the transportation of gunpowder and to authorize the forfeiture of such as shall be transported in violation of the provisions of this act (1831) #20, § 1. From and after the passage of this act, it shall be the duty of all owners, agents and others, who may or shall have any gunpowder, exceeding in quantity five pounds, transported upon the waters or within the limits of this State, to have the word gunpowder marked in large letters upon each and every package which may or shall be transported. § 2. All gunpowder exceeding five pounds in quantity which shall hereafter be transported or engaged for transportation upon any of the waters or within the limits of this State, without being marked as directed in the first section of this act, shall be liable to seizure and forfeiture – one half to the informer, the other for the use of the volunteer companies most convenient or contiguous to the place of seizure or forfeiture.

HAWAII

1933 Haw. Sess. Laws 38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 6.
The possession of all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn, or to carriage as merchandise in a wrapper from the place of purchase to the purchaser's home, place of business or place of sojourn, or between these places and a place of repair, or upon change of place of business, abode, or sojourn, except as provided in Sections 5 and 8; provided, however, that no person who has been convicted in this Territory or elsewhere, of having committed or attempted a crime of violence, shall own or have in his possession or under his control a pistol or revolver or ammunition therefor. Any person violating any provision of this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

IOWA

An Act Defining Crime and Punishments, Ch. 49, Sec. 72, in Revised Statutes of the Territory of Iowa (Reprint 1911)  1843

SEC. 72. If any person shall aid or assist a prisoner, lawfully committed or detained in any jail, for any offense against this territory, or who shall be lawfully confined by virue of any civil process, to make his or her escape from jail, though no escape be actually made, or if an), person shall convey or cause to be delivered to such prisoner any disguise, instrument or arms, proper to facilitate the escape of such prisoner, any person so offending, although no escape or attempt to escape be actually made, shall, on conviction, be punished by fine not exceeding five hundred dollars nor les than one hundred dollars, and imprisonment in the penitentiary, at hard labor, for a term not exceeding two years.


KENTUCKY

Kentucky Statutes Containing All General Laws including Those Passed at Session of 1898, p. 547 Sec. 1259. 1898

Hunting or fishing on another's land. Any person who shall enter upon the inclosed lands of another for the purpose of shooting, hunting, or fishing, without the consent of the owner or occupant of said lands, shall be fined not less than five nor more than twenty-five dollars. (See further, sec. 1252.)

MARYLAND

Proceedings of the Conventions of the Province of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776 Page 147, Image 147 (1836) available at The Making of Modern Law: Primary Sources.  1776

[1776 Md. Laws 146.Resolved, that no muskets or rifles, except by the owner thereof on his removal to reside out of this province, or any gun barrels, gun locks, or bayonets, be carried out of his province, without the leave of the council of safety for the time being.]


NEW JERSEY

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 263, Image 309 (1877) available at The Making of Modern Law: Primary Sources. 1874

Crimes, An Act Relating to the Transportation of Explosive and Dangerous Material, § 1. That if any person shall deliver, or cause to be delivered, to any canal, railroad, steamboat, or other transportation company, or to any persons, firm, or corporation engaged in the business of transportation, any nitroglycerine, dualin, dynamite, gunpowder, mining or blasting powder, gun-cotton, phosphorous, friction matches, or other explosive or dangerous material of any nature whatsoever, under any false or deceptive invoice or description, or without previously informing such person, firm or corporation, in writing, of the true nature of such article, and without having the box, keg, barrel, can or package containing the same plainly marked with the name of the explosive or dangerous material therein contained, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to imprisonment for thirty days, and to pay a fine

of one hundred dollars, and shall be responsible for all damages to persons or property directly or indirectly resulting from the explosion of any such article. § 2. That it shall and may be lawful for any officer or agent of any person, firm, or corporation, engaged in the business of transportation to require any package tendered for transportation, believed to contain explosive material, to be opened by the person delivering the same, and to refuse to receive any such package unless such requirements be complied with; and if such package be opened and found to contain such explosive or dangerous material, the said package and its contents shall be forthwith removed to any lawful place for the storing of gun-powder, and after conviction of the offender, or after three months from such removal, the said package, with its contents, shall be sold at public sale, after the expiration of ten days from notice of the time and place of such sale, published in one newspaper in the county where such seizure shall have been made; and the proceeds of such sale, after deducting therefrom the expenses of removal, storage, advertisement, and sale, shall be paid into the treasury of the said county; provided, however, that nothing in this act contained shall be construed to require common carriers to transport any such explosive or dangerous articles against their consent, nor to transport them otherwise than at such times, and under such regulations for safety to persons and property, as they may from time to time prescribe in relation thereto

## NEW MEXICO

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887).  1887

Sec. 1. That any person who shall hereafter carry a deadly weapon, either concealed or otherwise, on or about the settlements of this territory, except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family or property, the same being then and there threatened with danger, or except such carrying be done by legal authority, upon conviction thereof shall be punished by a fine of not less than fifty dollars, nor more than three hundred, or by imprisonment not less than sixty days, nor more than six months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

Sec. 2. Any person who shall draw a deadly weapon or another, or who shall handle a deadly weapon in a threatening manner, at or towards another, in any part of this territory, except it be in the lawful defense of himself, his family or his property, or under legal authority, upon conviction thereof, shall be fined in any sum not less than one hundred dollars, nor more than five hundred dollars, or by imprisonment at hard labor in the county fail or territorial penitentiary not less than three months nor more than eighteen months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

Sec. 3. Any person who shall unlawfully assault or strike at another with a deadly weapon, upon conviction thereof shall be punished by a fine not exceeding one thousand dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary, not exceeding three years, in the discretion of the court or jury trying the same.

Sec. 4. Any person who shall unlawfully draw, flourish or discharge a rifle, gun or pistol within the limits of any settlement in this territory, or within any saloon, store, public hall, dance hall or hotel, in this territory, except the same be done by lawful authority, or in the lawful defense of himself, his family or his property, upon conviction thereof shall be punished by a fine of not

more than one thousand dollars, or by imprisonment for a term of not more than three years, or by both such fine and imprisonment, in the discretion of the court or jury trying the same. The word "settlement," as used in this act, shall be construed to mean any point within three hundred yards of any inhabited house, in the territory of New Mexico.

Sec. 5. Any person being armed with a deadly weapon, who shall, by words, or in any other manner, insult or assault another, upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, not more than three hundred dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary for not less than three months, nor more than one year, or by both such fine and imprisonment, in the discretion of the court or jury trying the same. . . .

Sec. 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted.

Sec. 9. Persons traveling may carry arms for their own protection while actually prosecuting their journey and may pass through settlements on their road without disarming; but if such travelers shall stop at any settlement for a longer time than fifteen minutes they shall remove all arms from their person or persons, and not resume the same until upon eve of departure.

Sec. 10. Sheriffs and constables of the various counties, and marshals and police of cities and towns, in this territory, and their lawfully appointed deputies, may carry weapons, in the legal discharge of the duties of their respective offices, when the same may be necessary, but it shall be for the court or the jury to decide from the evidence whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons as punished, for the violation of the preceding sections of this act.


NEW YORK


1645 N.Y. Laws 47, By The Director And council Of New Netherland Further Prohibiting The Sale Of Firearms, etc., To Indians

Whereas the Director General and Council of New Netherland having long ere this noticed the dangerous practice of selling Guns, Powder and Lead to the Indians, and moreover published at the time an Ordinance prohibiting the same on pain of Death, notwithstanding which some persons have yet undertaken to barter all sorts of ammunition among the Heathen, purchasing the same secretly here and then transporting it up the River and elsewhere, to the serious injury of this Country, the strengthening of the Indians and the destruction of the Christians, as We are now, also, informed with certainty, that our enemies are better provided with Powder than we, which they contrive to obtain through other Barbarians, our friends. . .There, we must expressly forbid, as we hereby do, all persons from this time forth from daring to trade any munitions of War with the Indians, or under any pretense whatsoever, to transport them from here without express permission, on pain of being punished by Death, and having the vessel confiscated in which the same shall be found laden or to have been put on board. Let everyone be warned hereby and save himself from difficulty.

Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City Page 20, Image 21 (1763) available at The Making of Modern Law: Primary Sources. 1763

§ XVI. And whereas the present store-keeper of the magazine with the consent of the corporation, for the more safe conveying of gun-powder to and from the said magazine, hath provided leather bags, or covers, in order to cover all casks of gun powder to and form the said magazine, be it ordained by the authority aforesaid that from and after the publication hereof, no cart-man, or other person whatsoever, do presume to carry any gun powder to or from the said Magazine, or through any part of this city, but what shall be covered with leather bags as aforesaid, under the penalty of forty shillings, for every offense; the one half thereof to the informer, and the other half to the church wardens of this city for the time being, for the use of the poor thereof.

William G. Bishop, Charter of the City of Brooklyn, Passed June 28, 1873. As Subsequently Amended. With the Charter of April 17, 1854, and the Amendments Thereto, and Other Laws Relating to Said City. Also, the Ordinances of the Common Council of the City of Brooklyn, as Codified and Revised and Adopted Dec.10, 1877 Page 192, Image 196 (1877) available at The Making of Modern Law: Primary Sources. 1877

Ordinances of the [City of Brooklyn, Miscellaneous Provisions,] § 16. No person shall carry, or cause to be carried, any gunpowder through any street, lane or alley in the city, unless the same be secured in tight casks, kegs or cases, well headed and hooped; and said casks, kegs or cases shall be put into and entirely covered with a bag or case sufficiently to prevent any said gunpowder from being spilled or scattered, under the penalty of forfeiture of the gunpowder and a fine of fifty dollars for every violation of the provisions of this act.

PENNSYLVANIA

Frederick Charles Brightly, Brightly's Annual Digest for 1873 to 1878. Annual Digest of the Laws of Pennsylvania for the Years 1873 to 1878 Together with Some laws of Older Date Inadvertently Omitted in Purdon's Digest Completing Brightly Purdon's Digest to the Present Date Page 1835, Image 65 (1878) available at The Making of Modern Law: Primary Sources. 1874

[Digested Laws 1873-78,] Common Carriers, 1. Carriers of explosive materials regulated. Penalties. 2. Power to open packages. Removal and sale. § 1. If any person shall knowingly deliver, or cause to be delivered to any canal, railroad, steamboat or other transportation company, or to any person, firm or corporation engaged in the business of transportation, any nitro-glycerine, dualin, dynamite, gunpowder, mining or blasting powder, gun-cotton, phosphorus, or other explosive material adapted for blasting, or for any other purpose for which the articles before mentioned, or any of them, may be used, under any false or deceptive invoice or description, or without informing such person, firm or corporation, in writing, at or before the time when such delivery is made, of the true nature of such, and without having the keg, barrel, can or package containing the same plainly marked with the name of the explosive material therein contained, together with the word "dangerous" article, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to imprisonment for thirty days, and to pay a fine of one hundred dollars; and shall be responsible for all damages to persons or

property, directly or indirectly resulting from the explosion or combustion of any such article. § 2. It shall and may be lawful for any officer or agent of any person, firm or corporation engaged in the business of transportation, upon affidavit made of the fact that any package tendered for transportation, not in compliance with the provisions of the first section hereof, is believed to contain explosive material such as aforesaid, to require such package to be opened, and to refuse to receive any such package unless such requirement be complied with; and if such package be opened, and found to contain any explosive material, the said package and its contents shall be forthwith removed to any lawful place for the storing of gunpowder; and after conviction of the offender, or after three months from such removal, the said package, with its contents, shall be sold at public sale, after the expiration of ten days from notice of the time and place of such sale, published in one newspaper in the county where such seizure shall have been made; and the proceeds of such sale, after deducting therefrom the expenses of removal, storage, advertisement and sale, shall be paid into the treasury of the said county.


SOUTH CAROLINA

Act of Feb. 20, 1901, ch. 435, §1, 1901 S.C. Acts 748. 1901
Sec. 1. Be it enacted by the General Assembly of the State of South Carolina: That from and after the first day of July 1902 it shall be unlawful for any one to carry about the person whether concealed or not any pistol less than 20 inches long and 3 pounds in weight. And it shall be unlawful for any person, firm or corporation to manufacture, sell or offer for sale, or transport for sale or use into this State, any pistol of less length and weight. Any violation of this Section shall be punished by a fine of not more than one hundred dollars, or imprisonment for not more than thirty days and in case of a violation by a firm or corporation it shall forfeit the sum of one hundred dollars to and for the use of the school fund of the County wherein the violation takes place to be recovered as other fines and forfeitures: Provided, this Act shall not apply to peace officers in the actual discharge of their duties, or to persons while on their own premises. . . .
Sec. 3. In case it shall appear to the satisfaction of the presiding Judge or Magistrate before whom such offender is tried that the defendant had good reason to fear injury to the person or property and carried said weapon to protect himself or property he may in his discretion suspend sentence.

TENNESSEE

1899 Tenn. Session Laws 780
Provided however, That it shall be lawful for any person to hunt quail or partridges in said counties with a gun, between the first day of November and the first day of January of each year. But it is further provided, that it shall not be lawful to hunt upon the inclosed lands of another with a gun, as above mentioned, until written permission is first obtained from the owner or owners of such inclosed lands.

VIRGINIA

Thomas D. Davis, The Code of the City of Lynchburg, Va., Containing the Charter of 1880, with the Amendments of 1884, 1886 and 1887, and the General Ordinances in Force July 1st, 1887,

Also a Digest of Acts of Assembly and of Ordinances Affecting the Rights and Interests of the City of Lynchburg and its Citizens, Together with a Brief Sketch, Historical and Statistical Page 117, Image 128 (1887) available at The Making of Modern Law: Primary Sources. 1887 [Ordinances of Lynchburg,] Public Safety, § 19. No person shall carry gunpowder, blasting powder, dynamite or other explosives on a vehicle in any part of the city unless the same shall be secured in kegs, boxes, or canisters, so that no part thereof can fall out or escape.


SOURCE: Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository/

**EXHIBIT H**

**DANGEROUS WEAPONS RESTRICTIONS**
**(YEARS OF ENACTMENT)**

| STATE | BOWIE KNIVES | Bludgeon | Billy/Billie Clubs | Clubs | Slung Shot | Sand Bag Sand Club | Pistols | Any Concealed /Deadly/Dangerous Weapon |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1837,1839, 1841,1867, 1876,1877, 1879,1892 | | | 1805 | 1873 | | 1839, 1841 | |
| Alaska | 1896[†] | | | | 1896-99 | | 1896 | 1896 |
| Arizona | 1867,1889, 1901 | | | | 1873, 1889 1893, 1901 | | 1889 | 1867 |
| Arkansas | 1871,1875, 1881 | | | 1835 | 1871 | | 1820, 1837 | |
| California | 1855, 1896 | 1849, 1853, 1876 | 1917, 1923 | | 1864, 1923 | 1917, 1923 | 1850, 1864 | 1849 |
| Colorado | 1862,1867, 1877, 1881 | 1876 | | | 1886 | | 1862 | 1862 |
| Connecticut | 1890[†] | | | | 1890 | | 1890, 1923 | |
| Delaware | 1881[†] | | | 1797 | | | 1852 | |
| District of Columbia | 1858,1871, 1892 | | | | 1871 | | 1857, 1871 | |
| Florida | 1835,[†]1838 ,1847,1868 ,1893[†] | | 1888 | | 1868, 1888 | | 1887 | |
| Georgia | 1837,1860, 1873 | 1816 | | | 1860 | | 1837 | |

| State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Hawaii | 1852, 1913 | | | | 1852, 1913 | | 1913 | |
| Idaho | 1864†1875, 1879, 1909 | 1875 | | | 1879 | | 1909 | 1864 |
| Illinois | 1876, 1881 | 1845 | | | 1881, 1893 | | 1881 | |
| Indiana | 1859 | | | 1804, 1855, 1881, 1905 | 1875, 1905 | | 1820 | 1831 |
| Iowa | 1882,1887, 1900 | | 1882 | | 1882 | 1887, 1900 | 1882, 1887, 1897, 1929 | |
| Kansas | 1862,1863 1868,1883, 1887 | | 1862, 1887 | | 1883, 1887, 1899 | | 1901 | |
| Kentucky | 1859 | | | 1798 | 1859 | | 1812, 1813 | |
| Louisiana | 1870 | | | | | | 1813 | 1813, 1842, 1870 |
| Maine | 1840,1841, 1884† | | | 1786 | | | 1840 | 1841 |
| Maryland | 1872,1886, 1888, 1890 | 1809, 1874, 1886 | 1872, 1874 1884, 1886 1890, 1927 | | 1886 | 1890 | 1872 | |
| Massachusetts | 1836† | | | 1750 | 1850, 1927 | | 1751 | |
| Michigan | 1891 | 1927, 1929 | 1887, 1891, 1927, 1929 | 1913 | 1887, 1891, 1929 | 1887, 1891, 1927, 1929 | 1887 | |
| Minnesota | 1882 | | | | 1882, 1888 | 1888 | 1881 | 1882 |
| Mississippi | 1837,1838, 1878 | | | 1799, 1804 | 1878 | | 1838,1878 | |
| Missouri | 1871,1897, 1917, 1923 | | 1871, 1897, 1923 | 1818,1923 | 1883, 1888, 1897, 1917 | | 1873 | |
| Montana | 1864,1879, 1885 | 1887 | | | | | 1864, 1865 | 1888 |
| Nebraska | 1877,1890, 1899 | 1858 | 1872, 1890, 1899 | | 1890 | | 1881 | |
| Nevada | 1873 | 1872 | | | 1881 | | 1881, 1925 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| New Hampshire | | | | | | | 1923 | |
| New Jersey | 1871,1895, 1905 | 1799, 1877, 1927 | 1871, 1927 | | 1871, 1873, 1927 | 1871, 1927 | 1686 | |
| New Mexico | 1852†1853, 1859,1864 1887 | 1887 | | | 1853, 1859, 1869, 1887 | | 1852, 1853 | |
| New York | 1866,1885, 1911† | 1911, 1913, 1931 | 1866, 1881, 1884, 1885, 1900, 1911, 1913, 1931 | 1664 | 1866 | 1866, 1881, 1900, 1911, 1913, 1931 | 1891 | |
| North Carolina | 1840,1856, 1858,1860, 1879 | | | | 1879 | | 1792, 1840 | |
| North Dakota | 1895,1915† | 1915 | 1915 | | 1895 | 1915 | 1895 | |
| Ohio | 1859,1880, 1890 | | | | | | 1859 | 1788, 1859, 1880 |
| Oklahoma | 1890,1891, 1903 | | 1890, 1891 | | 1890, 1891, 1903 | 1890 | 1890 | |
| Oregon | 1885† | | 1898, 1917 | | 1885, 1917 | 1917 | 1853 | |
| Pennsylvania | 1897 | | 1897 | | 1851 | | 1851 | |
| Rhode Island | 1893,1896, 1908 | | 1893, 1908 | | 1893, 1896 | | 1893 | |
| South Carolina | 1880, 1923 | | | | 1880 | | 1880 | |
| South Dakota | 1903† | | | | 1877, 1903 | | 1877 | |
| Tennessee | 1838,1856, 1863,1867, 1871,1881, 1893 | | | | 1879, 1882, 1893 | | 1821 | |
| Texas | 1856,1871, 1879,1897 | | | 1899 | 1871, 1879, 1889, 1897, 1899 | | 1870 | |
| Utah | 1877 | | | | | | 1877, 1888 | |

3

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Vermont | 1892,1895† | | | | 1895 | | 1895, 1897 | |
| Virginia | 1838,1887 | | | 1792 | 1887 | | 1794 | |
| Washington State | 1854, 1859 1869 | | | | | | 1881 | 1854, 1859, 1869, 1881, 1883, 1892, 1896, 1897 |
| West Virginia | 1870,1882, 1891, 1925 | | 1870, 1882, 1891, 1925 | | 1891 | | 1870 | |
| Wisconsin | 1883, 1896 | | | | 1883, 1888 | | 1858 | 1883 |
| Wyoming | 1884,1890 1899,1925 | 1876, 1893 | | | 1884, 1890, 1899 | | 1876 | |
| TOTAL STATES | 50 (inc. D.C.) | 15 | 16 | 13 | 43 | 10 | 50 | 13 |
| TOTAL LAWS | 136 | 25 | 44 | 17 | 79 | 21 | 66 | 24 |

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

† States that prosecuted/regulated/barred knives more generally without specifically mentioning Bowie knives.

4

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREARMS POLICY COALITION, INC. , | : : : : | |
| Plaintiffs, | : : | C.A. No. 1:21-cv-01523-MN |
| v. | : : | |
| KATHY JENNINGS, Attorney General of Delaware, et al. | : : : | |
| Defendants. | : | |

## <u>DECLARATION OF BRIAN DELAY</u>

I, Brian DeLay, the undersigned, declare as follows:

### BACKGROUND AND QUALIFICATIONS

1.      I am an Associate Professor of History and the Preston Hotchkis Chair in the History of the United States at the University of California, Berkeley.  I received my B.A. from the University of Colorado, Boulder (1994), and my M.A. (1998) and Ph.D. (2004) from Harvard University.  My first book, *War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War* (Yale University Press, 2008), underwent blind peer-review before publication and won best book prizes from several scholarly organizations.  Since 2008, I have been working on three interrelated projects about the historic arms trade: a monograph about the arms trade in the era of American Revolutions (under contract with W.W. Norton and scheduled to be published in 2025); a second monograph about guns, freedom, and domination in the Americas from 1800-1945 (also under contract with W.W. Norton); and a database tracking the global trade in arms and ammunition between the end of the Napoleonic Wars and start of World War I.  These

1

projects are grounded in primary-source research in archives in the United States, England, Spain, and Mexico.

2.      I have delivered around three dozen invited presentations on firearms history at academic conferences and universities in the U.S. and abroad, including Harvard University, the University of Chicago, Stanford University, Oxford University, Cambridge University, the University of Melbourne, Doshisha University in Kyoto, Japan, and the Zentrum für Interdisziplinäre Forschung (ZIF), in Bielefeld, Germany.  I have given a number of interviews on the history of firearms and the gun business for the British Broadcasting Service (BBC), as well as for the Australian Broadcasting Corporation (ABC), and public radio stations in the United States. In September 2023, my 21,000-word article "The Arms Trade & American Revolutions" was published in the *American Historical Review*, the flagship journal of the history discipline. In addition to scrutiny from the journal's editor and members of the board of editors (all prominent academic historians), this article underwent two rounds of double-blind peer review where it was critiqued by seven experts in the field before being accepted for publication. This is my second article published in the *AHR*.

3.      My research on the history of firearms has been supported by grants from the American Philosophical Society, the British Academy, the American Council of Learned Societies (twice), and the Stanford Humanities Center, among other organizations.  In 2019, I was awarded a Guggenheim fellowship.

4.      In addition to my work on this case, I've served as an expert witness in *Hanson v. District of Columbia*, 22-cv-02256 (D.D.C.); *Arnold v. Tina Kotek, et al.*, No. 22CV41008 (Harney Cty. Cir. Ct.); *Oregon Firearms Federation, et al., v. Tina Kotek, et. al.*, 22-cv-01815

(D. Ore.)[1]; *Harrel v. Raoul*, 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); *Kenneally v. Raoul, et al.*, 23-cv-50039 (N.D. Ill.); *William Wiese, et al., v. Rob Bonta, et al.,* 2:17-cv-00903 (E.D. Cal); *Gabriella Sullivan, et al., v. Bob Ferguson, et al.,* 3:22-cv-05403 (W.D. Wash); *Rocky Mountain Gun Owners et al., v. The Town of Superior et al.*, 22-cv-2680 (D. Col.); *Association Of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Platkin et al.*, 3:18-cv-10507 (D.N.J.); *Cheeseman et al. v. Platkin et al.*, 1:22-cv-04360 (D.N.J.); and *Ellman et al. v. Platkin et al.*, 3:22-cv-04397 (D.N.J.).

5.    A true and correct copy of my curriculum vitae is attached as Exhibit A to this report. I am being compensated at a rate of $250/hour for research, consultation, and writing, and $400/hour for deposition and testimony.

**SUMMARY OF OPINIONS**

**I.    Self-made arms are not a part of American history or tradition**

6.    Major arms manufacturers began stamping serial numbers on firearms as early as the mid-nineteenth century. Finding industry serialization useful in investigating crime, states began incorporating these numbers into firearms law in the early twentieth century. The federal government first required serial numbers in 1958,[2] and these rules were elaborated in the landmark 1968 Gun Control Act. Still in force today, the GCA requires producers and importers of firearms to obtain Federal Firearms Licenses, and to stamp serial numbers and other markings on their guns' frames or receivers (the "primary structural component of a firearm to which fire control is

---

[1] *Oregon Firearms Federation et al., v. Tina Kotek et. al.*, has been consolidated with three other actions: *Fitz v. Rosenblum et al.*, 3:22-cv-01859 (D. Ore.), *Eyre v. Rosenblum et al.*, 3:22-cv-01862 (D. Ore.), and *Azzopardi v. Rosenblum et al.*, 3:22-cv-01869 (D. Ore.).
[2] Interstate Traffic in Firearms and Ammunition, 26 CFR 79.

attached").[3] Finished frames or receivers are treated as firearms by the GCA, and subject to this same requirement. In the years since, these regulations have become essential tools for federal, state, and local authorities investigating gun crime.[4]

7.      The GCA contained an exemption for hobbyists who made their own firearms for personal use.  Some began purchasing partially finished steel frames and receivers, which, unlike the fully finished versions, are not legally regarded as firearms or required to bear serial numbers. Most such consumers had to employ a machinist or gunsmith to finish these parts before they could be used to assemble a working firearm.[5] Over the past fifteen years or so, however, advances in polymers, small-batch parts manufacturing, compact control milling devices, and, most recently, 3D-printing and computer-aided design (CAD) files have helped firearms entrepreneurs turn the GCA's hobbyist exception into a dynamic sub-industry. Their products enable unskilled buyers to easily assemble their own guns without professional assistance and often without specialized tools.[6]

8.      Fully functional semi-automatic pistols and rifles can now be rapidly assembled at home with kits purchased online or in stores. For instance, 80% Arms, a prominent online vendor, offers an array of unfinished frames and receivers. They sell kits that include the other parts necessary to assemble a working firearm (none of which are regulated by the GCA, so they can be sold finished). The kit for a GST-9 pistol (modeled after a Glock-19) also comes with an Allen wrench, two drill bits, a cutting tool, and a one-page, color-coded instruction sheet.[7] Customers

---

[3]     Codified    as    18    U.S.C.§§    921–934.    For    A.T.F.    definition,    see https://www.federalregister.gov/documents/2021/05/21/2021-10058/definition-of-frame-or-receiver-and-identification-of-firearms, last accessed July 30, 2023. On pistols this component is called a frame, and on semi-automatic rifles it is called a receiver.

[4] William J. Krouse, *Privately Made Firearms: A Growing Source of Unmarked, Untraceable 'Ghost Guns'?* CONGRESSIONAL RESEARCH SERVICE REPORT IF11810, April 8, 2021.

[5] *Id.*

[6] *Id.*

[7] https://www.80percentarms.com/products/gst-9-80-pistol-build-kit/, last accessed July 31, 2023

simply place the unfinished frame in a jig that guides them as they drill three holes on each side of the polymer frame, remove four small tabs with cutting pliers, and grind out one final piece of the frame with the cutting tool.[8] They now have a finished frame, and can quickly assemble the rest of the components with the help of an array of online instructional videos.[9]

9.     In most of the country, consumers can buy gun kits like these without passing a background check, meeting minimum age requirements, or enduring waiting periods, and then, with no specialized experience or unusual tools, quickly assemble a reliable, un-serialized firearm. Such "ghost-guns" have provoked concerns over trafficking[10] and extremist violence,[11] and alarm over the ease with which teenagers are purchasing them.[12] They are also increasingly prominent in gun crime, which presents significant challenges to law enforcement precisely because they are so difficult to trace. The number of "privately-made firearms" submitted for tracing to the bureau of Alcohol, Tobacco, and Firearms increased by more than 1000% between 2017 and 2021.[13] In late 2021, the *New York Times* reported that they accounted for a quarter to half of all guns recovered at crime scenes in Los Angeles, San Diego, Oakland, and San Francisco.[14]

---

[8] https://www.80percentarms.com/content/GST9%20MANUAL%20FINAL%20V2.pdf, last accessed July 31, 2023

[9] https://odysee.com/@80PercentArms:0/, last accessed July 31, 2023.

[10] See for example, the Drug Enforcement Administration's press release *Ghost Gun and Narcotics Trafficking Ring Shut Down in NYC*, DEA.GOV (Mar. 15, 2023), https://www.dea.gov/press-releases/2023/03/15/ghost-gun-and-narcotics-trafficking-ring-shut-down-nyc.

[11] Alain Stephens, *The Feds Are Increasingly Worried about Extremists Acquiring Ghost Guns, Leaked Report Shows*, THE TRACE (Aug. 6, 2021), https://www.thetrace.org/2021/08/ghost-gun-government-report-3d-print-extremism-terrorism/.

[12] Tom Jackman and Emily Davies, *Teens Buying 'Ghost Guns' Online, with Deadly Consequences*, THE WASH. POST (July 12, 2023).

[13] U.S. DEPT. OF JUSTICE, NATIONAL FIREARMS IN COMMERCE AND TRAFFICKING ASSESSMENT, VOL. TWO: CRIME GUNS; PART III: CRIME GUNS RECOVERED AND TRACED WITHIN THE UNITED STATES AND ITS TERRITORIES 5 (2022), *available at* https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.

[14] Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic of Violence*, NY TIMES (Nov. 14, 2021), https://www.nytimes.com/2021/11/14/us/ghost-guns-homemade-firearms.html.

10.     In response to these unprecedented societal concerns, as of July 2023 twelve states and the District of Columbia have enacted legislation to regulate the sale and manufacture of ghost guns.[15]

11.     Opponents of these efforts to hold ghost guns to some of the same regulatory standards as professionally-made guns are conjuring a false historic continuity in order to challenge the laws in court. Joseph Greenlee, a lawyer and gun-rights activist with the Heartland Institute and the Firearms Policy Coalition, elaborated the thesis in a 2023 article in the *Saint Mary's Law Journal*.[16] As its title suggests, "The American Tradition of Self-Made Arms" argues that today's printers and assemblers of ghost guns are part of a venerable national tradition of "at-home arms production," one that stretches back into the colonial era.[17] Similar claims were made before a Congressional committee on ghost guns in 2021.[18] The historical argument, in brief, is that (1) private citizens have been making their own arms since the founding era; (2) the founders did nothing about it; (3) therefore we can do nothing about it, either.

12.     This argument is already finding its way into legal challenges.[19] For example, Defense Distributed, a Texas-based nonprofit that helped pioneer 3D-printed guns and describes itself as the "first private defense contractor in service of the general public,"[20] recently brought suit against California's regulation of privately-made arms. The organization's complaint cites

---

[15] The states are California, Illinois, Colorado, Hawaii, Nevada, Delaware, Maryland, Connecticut, New Jersey, New York, Washington, and Rhode Island. Virginia and Massachusetts have regulations against plastic guns undetectable by metal detectors. *Which States Regulate Ghost Guns?*, EVERYTOWN FOR GUN SAFETY, https://everytownresearch.org/rankings/law/ghost-guns-regulated/ (last visited July 31, 2023).

[16] Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35 (2023).

[17] *Id.* at 50.

[18] Testimony of Ashley Hlebinsky, United States Senate, Subcommittee on the Constitution, Committee on the Judiciary, Stop Gun Violence: Ghost Guns, May 11, 2021, https://www.judiciary.senate.gov/imo/media/doc/Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf

[19] See for example Greenlee's expert declaration in Roger Palmer et al., v. Stephen Sisolak et al., No. 3:21-cv-00268 (D. Nev.).

[20] *See* Defense Distributed's website: *About*, DEFENSE DISTRIBUTED, https://defdist.org/ (last visited June 16, 2023).

Greenlee to argue that "the unregulated self-manufacture of firearms was common in the American colonies;"[21] that during the Revolution, "Americans manufactured their own arms and gunpowder to survive,"[22] and that the widespread tradition of gun-making "extended to pioneers, mountain men, and explorers whose need to make and repair firearms was a necessity to survive."[23]

13.    How accurate are these claims? Are ghost guns really consistent with American tradition?

### A.  Glock, Ikea-Style

14.    The self-made-arms-narrative deploys three kinds of categorical confusion in order to conjure a tradition out of the historical record. First, to expand the terrain within which useful historical analogues might be located, it defines "arms-making" to include an implausibly huge range of activities. Pursuits as dissimilar as manufacturing high-quality firearms from scratch, performing minor repairs, and even filling paper cartridges with a measure of gunpowder and a lead ball all constitute "arms-making" according to this analysis.[24]

15.    Second, the narrative conflates amateurs with professionals. No one doubts that there has long been an arms industry in the United States, or that the industry has long employed professionals with specialized skills in firearms production. Ghost gun kits are not aimed at professionals. They are explicitly designed for and marketed to amateurs. On its website, for instance, 80% Arms assures customers that its AR-15 and .308 jigs make it "ridiculously easy for a non-machinist to finish their 80% lower in under one hour with no drill press required."[25] The

---

[21] *See* Complaint for Declaratory and Injunctive Relief at 6, Defense Distributed et al., v. Rob Bonta et al., No. 2:22-cv-06200-CAS-AGR (C.D. Cal.).

[22] *Id.* at 7.

[23] *Id.* at 8.

[24] For the equation of cartridge-making with "the convenience of at-home arms production," see Greenlee, *supra* note 16, at 50.

[25] See the tab "Ridiculously Easy" on HTTPS://WWW.80PERCENTARMS.COM/, last accessed July 30, 2023.

relevant historical issue, then, concerns *amateur* arms production. Gun-rights advocates could not substantiate a longstanding tradition of "amateur-made arms," however. Hence the sleight-of-hand made possible by the phrase "self-made," which is roomy and abstract enough for them to link today's consumers of ghost-gun kits with Samuel Colt, Benjamin Tyler Henry, John Browning, and others of the nation's most accomplished professional gunsmiths.[26]

16.     Finally, the self-*made*-arms narrative mischaracterizes what it is that consumers are actually doing with ghost-gun kits and 3D-printers. They are not making guns, but rather *assembling* them. Here gun-rights activists owe a debt to the federal government and its unfortunate adoption of the label "privately-made firearm" (PMF) for the category to which guns from kits and printers belong.[27] The distinction between making and assembling bears upon the constitutional question at stake in these cases. The conceit that consumers are using kits to "make" arms is critical to the argument that these amateurs belong to a "long and storied tradition in America," as the president for the National Association of Gun Rights recently put it.[28] But what if amateurs are merely availing themselves of a novel product that enables them to "assemble" arms? Consider a familiar comparison. Several years ago, I purchased a dining table and a set of chairs from Ikea. Everything came disassembled and packed in boxes. It took me a few hours and some basic tools to assemble the pieces. My table and chairs have held up well. But no one I have had over for dinner in the years since consider me a "furniture maker." There is a proud tradition of furniture making in this country stretching back into the colonial era. No one seriously thinks I am part of that tradition.

---

[26] Greenlee, *supra* note 16, at 73-76. The overwhelming majority of examples Greenlee offers in his article concern professional gun-makers.

[27] See https://www.atf.gov/rules-and-regulations/qa/what-privately-made-firearm-pmf, last accessed July 31, 2023.

[28] Quoted in Jackman and Davies, *supra* note 12.

17.    The operative question, then, is whether there is a venerable American tradition of amateurs assembling firearms? The answer is no. Explaining why requires an examination of how firearms were built before the nineteenth century; where they were built, by whom, and why; and the nature of firearms production in early America.

### B. Europe's Early-Modern Dominance of Global Arms Production

18.    Europeans manufactured and distributed the vast majority of the eighteenth-century world's firearms. While gunpowder and gunpowder weapons originated in China, Europe became the global center of firearm innovation starting in the late seventeenth century. As European gun-making became more sophisticated, specialized, and efficient, most of the rest of the world chose to import guns than try and compete through domestic manufacturing. While quality arms production persisted in the Ottoman Empire, China, and some polities of South and Southeast Asia, it often involved European advisors and usually supplemented rather than replaced imports from Europe.[29] The dominance of western European manufacturers meant that they were the ones equipping Europe's huge armies, navies, coast guards, sheriffs, and militias; supplying the continent's domestic firearms markets; arming its vast merchant marine and the huge trading companies that extracted so much wealth from the rest of the world; outfitting European allies and mercenaries in wartime; and shipping hundreds of thousands of inexpensive guns annually to Africa by mid-century, as fuel for the inferno of the Atlantic slave trade.[30]

---

[29] As Peter Lorge puts it, Asia "became part of the European arms trading system" starting in the sixteenth century. PETER A. LORGE, THE ASIAN MILITARY REVOLUTION: FROM GUNPOWDER TO THE BOMB 17, 89–90 (2008). For production in South Asia, see PRIYA SATIA, EMPIRE OF GUNS: THE VIOLENT MAKING OF THE INDUSTRIAL REVOLUTION 176–80, 285–99 (2019); EMRYS CHEW, ARMING THE PERIPHERY: THE ARMS TRADE IN THE INDIAN OCEAN DURING THE AGE OF GLOBAL EMPIRE 28–36 (2012). Kenneth Chase argues that Europe's advantages in designing and producing firearms primarily followed from the fact that Europe was threatened by infantries (which firearms are effective against), rather than nomads (which they are less effective against). *See* KENNETH CHASE, FIREARMS: A GLOBAL HISTORY TO 1700 (2003).

[30] For a sweeping overview of the history of arms making and power, see McNeill, THE PURSUIT OF POWER: TECHNOLOGY, ARMED FORCE, AND SOCIETY SINCE A.D. 1000 233-34 (1982). For Africa, see J.E. Inikori, *The Import of Firearms into West Africa 1750-1807: A Quantitative Analysis*, 18 J. AFR. HIST. 339, 343–49 (1977).

19.    Europeans gunmakers were also responsible for all but a tiny percentage of the firearm that anyone ever laid eyes on in the colonial Americas. To understand why so few of America's guns were made even by gunsmiths in America, let alone by nonexperts, we have to understand how firearms worked and how they were manufactured.

*1. How Muskets Worked*

20.    Firearms were the most technologically complex objects the majority of people ever encountered in the eighteenth century. With a primed, loaded, and cocked musket pressed against the shoulder, a simple squeeze of the index finger unleashed a kind of magic. That squeeze initiated a series of movements inside the lock mechanism. The pulled trigger rotated small iron wedge called a sear, which held a gear called a tumbler in place. With the sear released, the tumbler rotated forwar—-propelled by a spring that had been tensed when the shooter first cocked the gun. The cock (or hammer), connected to the tumbler, also rotated forward, with force. Atop the cock a simple vice gripped a sharpened piece of flint, and as it rotated downward the flint skidded into a concave, serrated steel plate called a frizzen.[31]

21.    Flint is one of nature's hardest materials; hard enough that when it hits iron or steel with enough force and at the right angle some of the metal gives way, showering off in a glowing spray of super-heated flakes. Thanks to the elegant design of the flintlock mechanism, when the cock and flint fell forward the frizzen was shoved backward on its pin, exposing a little pan full of fine, black gunpowder. That is when human energy traveling through levers and springs unleashed chemical energy. The cascading metal sparks ignited this powder, and a tongue of flame darted down from the pan through a small touch-hole into the barrel of the musket, where the shooter had

---

[31] Many books offer lucid explanations of the workings of flintlock firearms. See for example M. L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY: 1492-1792 68-79 (1980); and W. Y. CARMAN, A HISTORY OF FIREARMS: FROM EARLIEST TIMES TO 1914 100-04 (1955).

earlier packed in a larger charge of gunpowder. That charge ignited. Trapped by the barrel's walls and the breech-plug at the rear, the explosion traveled the only direction it could, forward. In so doing it drove before it an obstacle, the musket ball, a lead sphere that clanged and screamed down the length of the barrel, took to the air, and flew.[32]

22.     The remarkable tool that made all this happen had four basic components: a wooden stock, a lock (ignition) mechanism made of iron and steel, an iron barrel, and a group of metal parts (usually brass) called "furniture," including a butt-plate, trigger guard, and ramrod pipe. Carpenters could make serviceable stocks, and blacksmiths could cast, file, and polish brass furniture. Reliable barrels and locks, however, were very difficult to produce and extraordinarily difficult to produce in quantity.

### 2.   Making Gun Barrels

23.     The barrels of eighteenth-century firearms were made from wrought iron – nearly pure iron that is repeatedly heated and worked into shape with tools. Low carbon content made wrought iron softer and much more ductile than the most common alternative, cast iron (an iron alloy with a lower melting temperature that was used in molds). Wrought iron's relative pliability meant it could withstand the extreme pressures of repeated gunpowder explosions.[33] That is, wrought-iron gun barrels could withstand these pressures *if* they were well made. Barrel-makers from the era heated iron slabs and then laboriously hammered them into shape and welded them together around a tapered iron rod called a mandrel. The mandrel's diameter would be slightly narrower than the intended bore of the firearm. The iron wrapped around the mandrel was repeatedly heated and hammered on an anvil cut with grooves corresponding to the desired shape

---

[32] *Id.*
[33] ROBERT B. GORDON, AMERICAN IRON, 1607-1900 7-11 (2020).

11

of the barrel. Eventually, the iron took the form of a tube with an open seam, thicker at one end so that the breech of the gun would be able to endure the shock of the charge.[34]

24.     Great care had to be taken in closing the seam, lest the barrel burst upon firing. Once the seam had been sealed, the interior had to be bored. A steel bit affixed to a hand-turned drill was twisted into the barrel, scraping out a thin layer of iron with each pass. This difficult process would be repeated over and over, each time with a slightly larger bit, until the diameter of the bore reached the desired caliber. At this point the breech had to be closed, either by screwing in a threaded iron plug, or by heating and hammering in a plug without threads. Then the touch-hole would be drilled or punched at the breech, and the rough exterior of the barrel would be ground down to a pre-determined thickness and filed smooth.[35] Untreated iron oxidizes (rusts) when exposed to air or, especially, moisture. Once begun, this process will not stop on its own; it will continue until the integrity of the iron object has been totally compromised. Barrel makers learned to treat barrels with chemicals that artificially accelerate and then arrest the oxidization process.[36] Finally, barrel loops would be braised onto the underside and a stud braised on the top, near the muzzle, to act as a sight and (for military arms) as a stop for a socket bayonet.[37]

25.     Badly made or poorly maintained barrels could fail, laming or even killing the shooter. Henry Knox, one of George Washington's top lieutenants during the Revolution and the nation's first Secretary of War, had two fingers blown off his left hand when the breech of his fowling piece burst.[38] He got off easy. Given how one has to cradle a longarm in order to shoot it, the explosive shards of iron from the burst barrel could just as easily have gone into his eyes, chest,

---

[34] For barrels, see BROWN, *supra* note 31, at 17–20; DE WITT BAILEY, SMALL ARMS OF THE BRITISH FORCES IN AMERICA: 1664-1815 95-97 (2009).

[35] *Id*.

[36] For barrel "browning," see GREENER, W. W. GREENER, THE GUN AND ITS DEVELOPMENT 279-81 (9th ed. 1910).

[37] BAILEY, *supra* note 34, at 95.

[38] BROWN, *supra* note 31, at 299.

or throat. With the stakes of inferior craftsmanship literally a matter of life-and-death, the major arms-producing states of Europe required finished gun barrels to undergo rigorous inspection. Barrels would be "viewed" (their bore measured with a rod gauge; the muzzle diameter checked with a socket gauge; and the soundness of the braising confirmed), and then be "proved" (charged with twice the standard load of powder, fired, left to sit for forty-eight hours, and then closely examined for the tell-tale signs of rust that would betray any stress fractures).[39] In the mid-eighteenth century, fully a quarter of the musket barrels made for the French military typically failed proof. It was not easy to work slabs of iron into a quality barrel, in other words, even for craftsmen paid to do nothing else.[40]

### 3. Making Gun Locks

26.     It was more challenging still to make quality gunlocks. Flintlock mechanisms consisted of more than a dozen separate parts, some fixed and others moveable, all required to operate in symmetry in order to produce the intended effect. Engravings published in 1770 as a supplement to the *Encyclopédie*, Enlightenment France's great monument to knowledge, provide precise views of the finished lock mechanism (Fig. 1) and its constituent parts (Fig. 2). Lock makers in eighteenth-century Europe generally used hardened dies to make the larger pieces. Small, red-hot bars of iron would be pounded into dies cut in the shape of the lock-plate, cock, hammer, tumbler, bridle, sear, frizzen, and trigger. It usually took multiple firings before a component part was properly forged to shape, which made the metal brittle. Lock-makers therefore had to soften (anneal) it with controlled reheating and cooling it in powdered charcoal inside cast-iron chests.[41] Some parts required additional steps. The tumbler (see fig. 17, in Fig. 2), for example,

---

[39] BAILEY, *supra* note 35, at 95–97.
[40] KEN ALDER, ENGINEERING THE REVOLUTION: ARMS AND ENLIGHTENMENT IN FRANCE: 1763-1815 174 (1997).
[41] See MERRITT ROE SMITH, HARPERS FERRY ARMORY AND THE NEW TECHNOLOGY: THE CHALLENGE OF CHANGE 86-89 (1977).

which transmitted the main spring's energy to the hammer, featured graded notches that had to be filed with near-precision for the lock mechanism to function correctly.[42]



*Fig. 1: Views of a mid-18th-century French flintlock mechanism, lock screws, cock/hammer, frizzen/battery, muskets, false breech, pistol, and breech plug, from Diderot's* L'encyclopédie, ou Dictionnaire Raisonné des Sciences, des Arts et des Métiers: Recueil de Planches sur les Sciences et les Arts *(Paris, 1770), vol. 1, Plate V. Note the outline of the trigger, below f. 2.*

---

[42] *Id.*, at 90.

14



Fig. 2: Trigger guard and constituent parts of a French flintlock mechanism, from multiple vantage points. From Diderot's L'encyclopédie, ou Dictionnaire Raisonné des Sciences, des Arts et des Métiers: Recueil de Planches sur les Sciences et les Arts

27.     Once properly formed and cooled, the pieces would be knocked out of the dies and excess metal cut and filed off to ready them for assembly. Screws of various lengths and diameters had to be cut to size, to affix the smaller parts to the lock plate and the lock plate to the stock. Threads for metal screws would be cut on a steel screw plate, and those for wood on a lathe.[43] The hammer and frizzen had to be hardened before these parts could endure their constant collisions without quickly wearing down. They were "case-hardened" by being heated with charcoal inside a sealed box in order to import carbon to their surface, creating a hard skin, or "case."[44]

---

[43] *Id.* For gunlock making (and a deeper engagement with the ENCYCLOPÉDIE), see also BROWN, *supra* note 31, at 68–79, 200–207; BAILEY, *supra* note 34, at 95–96.
[44] For case hardening, see GORDON, *supra* note 33, at 255.

28.     The most finicky parts of a gunlock were its three delicate springs. The battery spring (Fig. 2, #21) held the frizzen in place, so that the pan cover (attached to the frizzen) kept the priming charge covered until firing. The sear spring (Fig 2, #18), smallest of the three springs, imparted tension to the trigger. The mainspring (Fig. 2, #19) the largest and most important, absorbed energy when the shooter cocked the gun and then released that energy to power the cock's descent after the trigger was pulled.[45]

29.     While case hardening sufficed for hammers and frizzens, that was insufficient for springs. Springs had to be made from steel, otherwise they would not return to their original shape after repeatedly coming under stress. This requirement introduced still more technical difficulties into the gun-making process, because quality steel was extremely challenging to produce. Steel is an alloy of iron and around 1-1.5% carbon. Though it could be made by reducing the carbon (and other impurities) from cast iron, more typically steelmakers produced it by boosting the carbon content of wrought iron. They tightly packed iron and charcoal dust in chests made of stone, sealed them fast with clay and sand, and fired the chests red-hot in a furnace for several days so that the carbon could diffuse not just into the skin but throughout the iron. Success yielded something called blister steel, on account of the surface blisters left behind from the escaping carbon monoxide gases produced in firing.[46]

30.     But success was far from guaranteed. Overheating or inadequate seals were two of the more common missteps that could ruin the process. And even when all tasks were performed correctly, furnaces would not produce blister steel without pure iron. Though the chemistry would not be understood for decades, only iron low in phosphorus could be made into steel because phosphorus inhibits the carbon diffusion process. Even with the right process and materials, the

---

[45] For the evolution of lock designs and the critical role of springs, see BROWN, *supra* note 31, at 68-79.
[46] GORDON, *supra* note 33, at 173-76.

quality of blister steel varied considerably.[47] In the mid-eighteenth century, Sheffield watchmaker Benjamin Huntsman set about trying to improve upon the mediocre steel available for his watch springs. He eventually pioneered the crucible method of purifying blister steel into something far more consistent and useful. It relied on exceptionally pure Swedish iron, and on crucibles made from Stourbridge Clay found in England's West Midlands. This unusual clay was strong enough to bear the weight and the heat of molten steel, but sufficiently free from any of the chemicals that would corrupt the carbon diffusion process. The great superiority of Huntsman's method, and the great difficulty of replicating it or its materials anywhere else, meant that steel-makers in and around Sheffield would dominate the international industry well past the mid-nineteenth century.[48]

### 4. Europe's Competitive Advantage

31.     Given the technical and material challenges involved in making quality firearms, dominant producers were those with regular access to high-quality materials, and who could sustain economies of scale while reliably policing quality. It is unsurprising, then, that the vast majority of firearms built in the eighteenth-century came from London and Birmingham, England; Liège, Belgium; Placencia, Spain; Saint-Etienne, France, and a few other European cities where the regional economies had for decades been oriented around arms production. These were the manufacturing centers that armed Europe's armies, navies, coast guards, sheriffs, and militias; that supplied its domestic firearms markets; that equipped its vast merchant marine and the huge, parasitic trading companies that extracted so much wealth from the rest of the world; that outfitted European allies and mercenaries in wartime; that shipped nearly four hundred thousand inexpensive guns annually to Africa by mid-century, as fuel for the inferno of the Atlantic slave

---

[47] The problem with phosphorus is a recurring topic in *id*.
[48] *Id.* at 171–84.

trade; and that manufactured nearly every firearm that anyone ever laid eyes on in the colonial Americas.[49]

32.     A visitor to Saint-Etienne, where the Manufacture Royale turned out more than a quarter million muskets in 1772 alone, likened the city to an ants' nest. "You cannot have any idea of the number of forges and their activity," he reported to his fiancée. The city and its environs choked with gloom, "perpetually shrouded in coal smoke which penetrates everywhere." The visitor marveled at Saint-Etienne's thousands of armorers, metalworkers, and ironmongers, with their "white eyes that stare at passers-by even as they busily continue working." It seemed as if nearly all of the area's thirty-thousand inhabitants – not just men, but also women and children with their wiry forearms and soot-black faces – were heaving, sweating, and clanging away at gun-work. "These are the true dens of Vulcan."[50]

33.     The great gun-making centers were organized in different ways. By the 1770s France had come to embrace mechanization to a far greater extent than Britain, for example. But all of Europe's major arms producers employed a complex division of labor. Rather than tens of thousands of gun-makers producing firearms from scratch, there were tens of thousands of specialists responsible for a particular component or process. More than two-dozen sub-trades went into making a musket at Saint-Etienne. Merely producing a quality barrel involved four supervisors overseeing thirteen armorers.[51] Elsewhere one would find rough-stockers and woodcarvers; barrel-forgers, barrel-borers, barrel-straighteners, and barrel-browners; lock-makers who either employed or sub-contracted out to others who specialized in forging lock-parts, or case-hardening and polishing, or making steel springs, or producing pins and screws. Then there were

---

[49] Inikori, *supra* note 30, at 343–49.
[50] For Saint-Etienne, see the masterful book by ALDER, *supra* note 40, at 163–201.
[51] *Id*., at 176, 201.

the filers, furniture casters, sight-fitters, engravers, and, finally, the finishers whose job it was to put everything together.[52]

34.     This complex division of labor improved quality and uniformity, as well as profitability and productive capacity. During the Seven Years' War (1756-1763), for example, the forty craftsmen working for London stocker Richard Waller were able to produce more than two hundred and fifty thousand musket stocks for the British Ordnance office. With fewer than three dozen filers and fitters working under him, the finisher John Hirst turned out nearly three hundred thousand muskets in the same short period.[53] Artisans in the dozens of specializations that went into the gun trade spent perhaps a decade developing their skills with a master. Guilds gave coherence, structure, and collective influence to individual professions. The state enforced demanding regulations and quality tests, and steady contracts from great monarchs and powerful merchants nursed the entire enterprise.[54]

35.     Nothing remotely comparable existed anywhere in colonial America. What, then, are we to make of all the *gunsmiths* in the colonies?

### C.  *"Gunsmiths," vs. "Gunsmiths," vs. "Gunsmiths" before the Revolution*

36.     As of 2020, there were nearly eight million registered automobiles in the state of Florida.[55] There are no vehicle production or assembly plants in the state, so Floridians drive automobiles made in other states or countries.[56] Most Floridians have easy access to service

---

[52] BAILEY, *supra* note 34, at 95-99.

[53] For Waller and Hirst, see BROWN, *supra* note 31, at 235–36.

[54] Exemplary studies of gun-making centers include DE WITT BAILEY AND DOUGLAS A. NIE, ENGLISH GUNMAKERS: THE BIRMINGHAM AND PROVINCIAL GUN TRADE IN THE 18TH AND 19TH CENTURY (1978);  CLAUDE GAIER, FOUR CENTURIES OF LIÈGE GUNMAKING (1985); ALDER, *supra* note 40.

[55] 7,853,979 registrations in 2021, according to Statista. *Automobile Registrations in the United States in 2021, by State*, STATISTA (Sept. 28, 2023), https://www.statista.com/statistics/196010/total-number-of-registered-automobiles-in-the-us-by-state/.

[56] *See* Anh Bui, P. Slowik, and N. Lutsey, *Power Play: Evaluating the US Position in the Global Electric Vehicle Transition*, INTERNATIONAL COUNCIL ON CLEAN TRANSPORTATION 17 (2021), *available at* https://theicct.org/wp-content/uploads/2021/12/us-position-global-ev-jun2021-1.pdf.

stations and oil change shops for routine maintenance. In the event of damage or malfunction beyond the routine, Floridians turn to one of the nearly thirty thousand auto mechanics or body shops in the state for repairs.[57] Some of Florida's professional mechanics and hobbyists have the requisite skill and experience to build cars from imported parts. But thanks to the transparency of modern industrial statistics, the distinction the English language makes between auto *manufacturing*, auto *maintenance*, and auto *repair*, and the fact that there are no legal, ideological, or corporate incentives to claim that Floridians make the cars they drive, we can all agree that while the state has a lot of cars, a lot of maintenance and repair shops, and individuals with mechanical skill, the state's population nonetheless imports its millions of vehicles.

37.    Things are quite different when it comes to guns and gunsmiths in early America. Gunsmiths are easy enough to find in the archives of individual colonies, and routinely advertised their services in colonial newspapers. For example, Henry Deabarear informed his customers in Pennsylvania that "he follows his usual business, such as gun work and spring lancet making, likewise cupping spring and teeth instruments."[58] Thomas Tew, in his shop on Broad Street in Newport, boasted that he "cleans and repairs GUNS, and GUN-LOCK in the best and most expeditious manner."[59] In New York, Gilbert Forbes made and sold "all Sorts of GUNS, in the neatest and best Manner, on the lowest Terms."[60] Nathaniel and Joseph Cranch, "Ironmongers & Gunsmiths" located in south Boston, sold imported arms, barrels, and locks, and advertised "Guns and Pistols repair'd and clean'd."[61] John Page, who moved from London to Preston, Connecticut,

---

[57] According to IBIS World, in 2022 there were 22,265 auto mechanic businesses in Florida, IBISWORLD, https://www.ibisworld.com/industry-statistics/number-of-businesses/auto-mechanics-in-florida-united-states (last visited Oct. 25, 2022), and 7119 auto body businesses in Florida, IBISWORLD, https://www.ibisworld.com/us/industry/florida/car-body-shops/12653/ (last visited Oct. 25, 2022).
[58] PENNSYLVANIA GAZETTE (Sept. 15, 1773).
[59] NEWPORT MERCURY (June 26, 1775).
[60] NEW YORK JOURNAL (May 25, 1775).
[61] BOSTON GAZETTE (Nov. 29, 1773).

let New Englanders know that he "makes and repairs all Kinds of Pistols, Muskets, and Blunderbuses, in the most neat and durable Manner, upon the most reasonable Terms." Page also made braces, "for those afflicted with Ruptures."[62]

38.    While anecdotal evidence of gunsmithing is common, assessing the role colonial gunsmiths played in arming British North America is a challenge. For one thing, historians disagree about the number of gunsmiths active in the colonies. Experts have advanced wildly diverging estimates, ranging from 175[63] to nearly 2000[64] working in the thirteen colonies on the eve of the Revolution.

39.    Impoverished terminology presents an even bigger challenge. As the advertisements above suggest, a single term covered a wide range of expertise. Though this varying expertise existed across a spectrum, it clustered into three basic groups. Those able to repair firearms were called "gunsmiths." Those capable of not just repairing but also building firearms from a mix of self-made and imported parts were known as "gunsmiths." And those with the skills, tools, materials, and inclination necessary to actually manufacture guns entirely from components of their own making were called "gunsmiths."

40.    The looseness of the term is both an obstacle to genuine understanding and a helpful screen for the motivated argument that early America had a widespread tradition of self-made arms. A closer consideration of each of the three, overlapping sub-groups of gunsmiths makes it plain, though, that only a small percentage of them were in the business of making their own arms.

---

[62] NORWICH PACKET (Mar. 23, 1775).

[63] ROBERT F. SMITH, MANUFACTURING INDEPENDENCE: INDUSTRIAL INNOVATION IN THE AMERICAN REVOLUTION 12 (2016).

[64] BROWN, *supra* note 31, at 404–09. Brown's appendix lists the names of approximately 500 people involved in manufacturing war material for the revolutionary war effort, though this number includes many who made musket balls, bayonets, wire brushes, etc. Brown estimates the total number of gunsmiths active during the Revolution to be less than two thousand. *Id.* at 347.

41.     The first group, repairers of firearms, vastly outnumbered the rest. Given that guns were so common, so important, and so easily damaged or worn out, and given the impracticality of sending defective arms back to Europe to be fixed, artisans capable of repairing arms had a steady clientele throughout the colonies. Many things could go wrong with muskets; all the more so with the relatively light and inexpensive firearms that predominated in early America.[65] Nearly any component of a firearm could need repairing or replacing after a few years of hard use or inattention.  Inventories of guns stored by colonial governments frequently listed as many as a quarter, a third, or even higher fractions out of repair.[66]

42.     For one unusually-well documented gunsmith in eighteenth century North America, the most common work was replacing or repairing (case-hardening) frizzens and hammers that had grown too soft through overuse. Missing screws also needed attending to, barrels straightened, cracked butts restoked, broken breech plugs refashioned, and springs replaced.[67] Any of these mishaps or a dozen others could render a firearm into little more than an expensive club. As one observer put it in regard to Indian trade guns, "the breaking a Spring or a gunlock etc. may be the means of destroying a whole Seasons Hunt and of distressing and Starving a numerous Family."[68] Late-eighteenth century gunsmith John Anderson from Williamsburg, Virginia, seems to have been typical. His account books reflect a craft business oriented almost entirely to repairs, and they contain no evidence that he made even a single firearm prior to the American

---

[65] The Creek leader Alexander McGillivray offered a glimpse into the expected durability of lighter firearms in 1789 when he requested "English Trading Guns which are Good and will last more than two Years in Constant Use." *See* Letter from Alexander McGillivray to William Panton, Little Tallassie (Feb. 1, 1789), *in* JOHN WALTON CAUGHEY, MCGILLIVRAY OF THE CREEKS 215–20 (1938).

[66] BAILEY, *supra* note 34, at 105–06.

[67] Kevin Paul Jones, *An Examination of Flintlock Components at Fort St. Joseph (20BE23), Niles, Michigan* 17, 29–30 (2019) (unpublished M.A. thesis, Western Michigan University).

[68] *Plan of Robert Rogers, 1767*, *in* WILLIAM JOHNSON, THE PAPERS OF SIR WILLIAM JOHNSON, VOL. 13, 453 (Alexander C. Flick ed., 1921).

Revolution.[69] Greenlee lists numerous examples of early Americans in other craft professions working part-time as "gunsmiths" for extra income.[70] The intended implication here is that the craft was not only very widespread but also relatively easy to learn. But insofar as the farmers, carpenters, cutlers, stone masons, and attorneys (yes, attorneys) he mentions actually moonlighted with gunsmithing, they almost certainly were dabbling in this first, largest, and least-skilled category of "gunsmith" focused on repairs.

43.     A second, smaller cohort of gunsmiths had experience making firearms with a mix of self-made components and imported locks and/or barrels. Colonial newspapers routinely note the importation of locks[71] and barrels.[72] It is hardly surprising that colonial gunsmiths would welcome the outsourcing of the most technically complex and consequential parts of a firearm. Most would have worked with imported locks and/or barrels because they lacked the expertise to make them, or at least make them well. Others with the requisite skill often relied on imported parts because it was more economical to do so, or because essential tools or materials were lacking. Steel for the springs in gun-locks was particularly difficult to produce in early America and only imported at great expense.[73]

44.     Even the era's most distinctive and developed American arms-making tradition – production of the American long rifle (also known as the Kentucky-, Lancaster-, or Pennsylvania-

---

[69] HAROLD B GILL, THE GUNSMITH IN COLONIAL VIRGINIA 22–27, 64–68 (1974). Cited in the Expert Report and Declaration of Kevin M. Sweeney at 6 n.10, Nguyen et al., v. Bonta et al., No. 3:20-cv-02470-WQH-BGS (S.D. Cal.).

[70] Greenlee, *supra* note 16, at 66-68.

[71] During the 1750s and 1760s in the *Pennsylvania Gazette* alone, merchants advertised gunlocks on July 16, 1752; May 10, 1753; Feb. 11, 1755; Feb. 5, 1756; March 11, 1756; Jan 5, 1758; March 8, 1759; Jan. 3, 1760; Jan. 9, 1766; and July 20, 1769.

[72] Consider the following examples from a ten-year period in a single colony: NEW YORK GAZETTE (Nov. 8, 1762), NEW YORK GAZETTE (Mar. 4, 1765), NEW YORK JOURNAL (Nov. 27, 1766), NEW YORK GAZETTE OR WEEKLY POST-BOY (Oct. 24, 1768), NEW YORK GAZETTE AND WEEKLY MERCURY (Mar. 16, 1772), NEW YORK JOURNAL OR THE GENERAL ADVERTISER (June 11, 1772).

[73] On the scarcity of steel for gun-springs as a particular impediment to the colonial arms industry, see BROWN, *supra* note 31, at 243-44.

rifle), usually relied on imported English or German locks.[74] American-rifles were prized for their well-made barrels, and specialists in that tradition were using increasingly sophisticated production methods by the second half of the eighteenth century.[75] But as for typical fowling pieces or muskets, consumers would have more confidence in the integrity of imports because, unlike those made in America, imported barrels had been manufactured under a demanding system of regulations and had almost always undergone proof.[76]

45.     How analogous were these imported locks and barrels to the components and kits used to assemble ghost guns in our own times? Consider the distance the new eighteenth-century owner of a lock and barrel would have to travel before they would have a reliable firearm to shoot. A functional wooden stock would have to be made, a task requiring woodworking tools and expertise. Numerous additional parts would have to be made or purchased, including a butt-plate, side-plate, trigger, trigger guard, trigger plate, trigger pivot, escutcheon, ramrod, ramrod pipes, furniture-fastening cross-pins, and a variety of metal and wood screws.[77] There were no parts kits in early America, so all of this would have to have been made or acquired *à la carte*. One of the reasons there were no parts kits is that firearms were not yet built with interchangeable parts. Quite unlike the "incredibly precise" machine-made interchangeable parts advertised by today's ghost-gun entrepreneurs, eighteenth-century components were almost all made by hand.[78] The resulting variability in the size, shape, thickness, and quality of individual parts required significant time and skill on the part of the person charged with turning them into a reliable firearm. Parts often had to be filed, fitted, re-filed, and re-fitted before they could be put into harmony with one another,

---

[74] *Id.* at 268.
[75] Carlton O. Wittlinger, *The Small Arms Industry of Lancaster County: 1710-1840*, 24 PENNSYLVANIA HISTORY: A JOURNAL OF MID-ATLANTIC STUDIES 121, 135–36 (1957).
[76] BROWN, *supra* note 31, at 150.
[77] BAILEY, *supra* note 34, at 95-96.
[78] See the tab "incredibly precise" at HTTPS://WWW.80PERCENTARMS.COM/, last accessed Sept. 28, 2023.

and particular care had to be taken mounting the barrel and the lock to the stock.[79] Needless to say, all of this had to be done without PDF instructions or how-to videos. This was not the work of amateurs. Gunsmiths capable of building firearms with imported locks and/or barrels were skilled professionals, and were compensated as such.

46.    Colonial Americans who made their own firearms from scratch belonged to the third and smallest cohort of gunsmiths. Unlike the European system characterized by complex division of labor, gun-makers in the colonies usually worked alone or in pairs in small shops. That meant that in addition to an unusually wide range of skills, such producers needed an unusually large collection of materials and tools. They needed iron, copper, and steel; bellows, forges, anvils, and sledges; hammers and mallets of different shapes, materials, and sizes; a remarkable array of files (one eighteenth-century gunsmith's inventory includes twenty-nine types); rasps, saws, planes, hand- and table-vices, wrenches, swedges, screwdrivers, piers, pincers, tongs, drills, chisels, gouges, screw-plates, augers, drawing knives, and sandpaper; and mortars, pestles, and the necessary components for browning chemicals, among other necessities.[80]

47.    Mobilizing the requisite skills and equipped with these and other requisite materials and tools, it would have taken an early American gunsmith around a week of work to produce a basic, utilitarian longarm from scratch.[81] Anything elaborate or ornate would have taken considerably longer. Evidence from the time suggests that even those capable of building guns from scratch seldom did so. John Partridge Bull of Deerfield, Massachusetts, was one of those unusual gunsmiths who knew how to make firearms from scratch and had the materials, facilities, and tools to do so. Bull is even more unusual because he left behind a detailed account book

---

[79] BAILEY, *supra* note 34, at 96-98. See also Jones, *supra* note 67 at 15.
[80] For tools, see BROWN, *supra* note 31, at 244–57; JAMES B. WHISKER, THE GUNSMITH'S TRADE 180–85 (1992).
[81] SMITH, *supra* note 41, at 11.

recording the work he did over two decades as a gunsmith, 1768-1788. It reveals that he made just three new guns during those twenty years.[82]

48.     In sum, early America had a minor, low-productivity tradition of firearms manufacturing, one executed by a small number of experts. Sometimes these experts made firearms for their own private use. Everyone else used guns made by experts, overwhelmingly by Europeans. The vast majority of guns in the colonies came from Europe; repairs consumed the vast majority of work done by American gunsmiths; and of those firearms built in America, the vast majority featured European locks and barrels.

49.     Still, some might concede these basic facts and still insist upon a "tradition of self-made arms" in the colonies. Maybe this was a tradition of significant latent potential, potential kept slumbering by the competitive advantage of European manufacturing. So long as Europe turned out huge quantities of quality, affordable barrels and locks, one could argue, American gunsmiths rarely had cause to make them at home – *but they could have, if need be*. That is certainly what one would expect if, as Greenlee insists, there had been a robust American tradition of self-made arms.

50.     The trouble with this interpretation is that the colonies did sometimes find themselves under-armed at moments of crisis, and yet domestic manufacturing consistently failed them. Consider "the great arms crisis" of 1758, during the Seven Years' War.[83] Early that year, London had called for 20,000 men from the colonies to be mobilized for the coming campaign against French forces and their Indigenous allies in North America. Secretary of State William Pitt had vaguely promised that the metropole would equip all these men, too few of whom were able

---

[82] Susan McGowan, *Agreeable to His Genius: John Partridge Bull (1731-1813), Deerfield, Massachusetts* 5, 39–40, 74–75 (1988) (unpublished M.A. thesis, Trinity College). I thank Kevin Sweeney for alerting me to this source.

[83] BAILEY, *supra* note 34, at 121.

or willing to supply their own arms.[84] But it soon became clear that only 10,000 muskets could be shipped across the Atlantic in time for the campaign, and that even these might not arrive in time. This set off a frantic scramble for firearms throughout British North America. General James Abercromby, responsible for the coming campaign, spent all spring and early summer imploring, cajoling, and bullying colonial governors to secure guns for the new recruits. With varying degrees of enthusiasm and sincerity, the governors attempted to comply. They grudgingly loaned out arms from public magazines, appealed to loyal subjects to contribute to the cause, and recruited the help of Thomas Hancock and other prominent merchants. These merchants eventually managed to purchase guns from market-savvy colleagues who had placed bulk orders with English gun dealers at the start of the war in anticipation of reaping handsome profits (foresight that was well-rewarded).[85] What no one seems to have seriously attempted, or even to have to have imagined would be worth attempting, was mobilizing British North America's "tradition of self-made arms" to manufacture the guns the recruits required. Insofar as American gunsmiths helped solve the crisis, it was through repairs - making defective arms fit for service.[86] Delayed six weeks by the maddening search for firearms, Abercromby arrived too late at Ticonderoga and suffered one of Britain's most humiliating defeats of the war.[87]

51.     Or consider "Lord Dunmore's War" in 1774. In the fall of that year, Virginia's royal governor led militiamen from the colony's western counties in a war of conquest against the Shawnee in the Ohio Country. Though relatively small-scale (battles involving hundreds rather than thousands of combatants), this little-known event was enormously consequential. By forcing

---

[84] John A. Schutz, *The Disaster of Fort Ticonderoga: The Shortage of Muskets during the Mobilization of 1758*, 14 HUNTINGTON LIB. Q. 307–09 (1951).

[85] *Id.* at 309–12. *See also* BAILEY, *supra* note 34, at 121–23.

[86] SCHUTZ, *supra* note 84, at 314.

[87] Schutz argues that lack of muskets was "the most important cause of the defeat." *Id.* at 307. For the defeat in context, see FRED ANDERSON, CRUCIBLE OF WAR: THE SEVEN YEARS' WAR AND THE FATE OF EMPIRE IN BRITISH NORTH AMERICA: 1754–1766 (2000).

the defeated Shawnee to surrender their claim on Kentucky, Dunmore and his forces dramatically accelerated the colonization of the trans-Appalachian West.[88] Settlers eagerly volunteered for militia duty, out of a mix of anxious dislike of the Shawnee, expectation of plunder, and hope of receiving land bounties. Where would their guns come from? Reading Greenlee, one would conclude that these resourceful backcountry folk simply made their own guns. As for the "pioneers, mountain men, and other explorers essential to the expansion of the American empire from sea to shining sea," he tells us, "they had to know how to build and repair arms themselves to survive."[89] The frontier leaders tasked with organizing militias understood the situation better. As one local recruiter put it, "most of these men is bad off for arms and ammunition and I believe Cannot get them."[90] Facility with basic repairs was obviously a welcome skill. But a little reflection on the great difficulties involved in building firearms even in well-supplied eastern seaports ought to be enough to disabuse anyone of the notion that the average western settler had the necessary materials, facilities, tools, and skills to make his own musket. Dunmore's forces won a narrow victory over Shawnees not because of a tradition of self-made arms, but because the state had provided English-made guns (and ammunition) for unarmed militiamen from the governor's palace and colonial magazine in Williamsburg.[91]

52.     The scale and logistical challenge of Abercromby's or Dunmore's campaigns obviously paled in comparison to what the colonies would soon be facing in the Revolutionary

---

[88] For Lord Dunmore's War, see RICHARD WHITE, THE MIDDLE GROUND: INDIANS, EMPIRES, AND REPUBLICS IN THE GREAT LAKES REGION: 1650-1815 362–65 (1991); ROB HARPER, UNSETTLING THE WEST: VIOLENCE AND STATE BUILDING IN THE OHIO VALLEY 46–66 (2018); JAMES CORBETT DAVID, DUNMORE'S NEW WORLD: THE EXTRAORDINARY LIFE OF A ROYAL GOVERNOR IN REVOLUTIONARY AMERICA—WITH JACOBITES, COUNTERFEITERS, LAND SCHEMES, SHIPWRECKS, SCALPING, AND TWO ILLEGAL ROYAL WEDDINGS 73–93 (2013).

[89] Greenlee, *supra* note 16, at 68.

[90] Letter from Michael Woods to William Preston (May 29, 1774), *in* DOCUMENTARY HISTORY OF DUNMORE'S WAR: 1774 397–98 (Reuben Gold Thwaites & Louise Phelps Kellogg eds., 1905), 397–98.

[91] For guns and ammunition sent from the mansion and magazine, see JOURNALS OF THE HOUSE OF BURGESSES OF VIRGINIA 1773-1776, INCLUDING THE RECORDS OF THE COMMITTEE OF CORRESPONDENCE 223 (John Pendleton Kennedy ed., 1905).

War. Indeed, the revolution represented the perfect natural experiment to test the proposition that early Americans nurtured a robust tradition of self-made arms. War with Britain would make it existentially necessary for insurgents to acquire many tens of thousands of additional firearms. Would "the American tradition of self-made arms" be up to the challenge?

### D. American Gun-Making in the Revolution

53.     At the end of 1774, before Lexington and Concord made war with Great Britain a reality rather than a frightening possibility, one informed skeptic asked his more pugilistic American contemporaries an urgent question: "is it possible that a people without arms, ammunition, money, or navy, should dare to brave a nation, dreaded and respected by all the powers on earth?"[92] Possible, yes. But how? How could an American insurgency arm itself against such a mighty enemy?

54.     Greenlee's surprising answer is domestic production. "To sustain themselves against a large and well-supplied British military throughout the eight-year war," he writes, "the Americans relied on gunsmiths, individuals with knowhow from working on their own arms, and Americans who were willing to learn the art of arms manufacturing."[93] Indeed, he insists that during the Revolutionary War "Americans needed to build their own arms to survive."[94] This answer is surprising because it is at odds with what most professional historians know about the war. The evidence makes it clear that American arms makers were not remotely up to the challenge of equipping a war against Great Britain. Were it not for massive imports of firearms (and gun parts, and saltpeter, among many other things) from continental Europe, the insurgency against Great Britain would have been a spectacular failure.

---

[92] Extract of a letter from Newport (Dec. 14, 1774), published in the NEW YORK GAZETTEER (Dec. 29, 1774), *in* NAVAL DOCUMENTS OF THE AMERICAN REVOLUTION, VOL. 1, 20 (William Bell Clark ed., 1964).
[93] Greenlee, *supra* note 16, at 51.
[94] *Id.* at 48.

55.     Patriot leaders hoped things would be otherwise at the dawn of the rebellion, and confidently boasted that they could build their way out of their arms shortage. Benjamin Franklin wrote that with the right incentives "arms may be made as good and as cheap in America as in any Part of the World."[95] John Adams claimed that his country had "many manufacturers of firearms now, whose arms are as good as any in the world."[96] John Hancock believed that the colonies' gunsmiths would "soon be able to provide" the necessary firepower.[97] And Thomas Paine informed readers of *Common Sense* of canon cast "at pleasure" and American small arms "equal to any in the world."[98] Richard Penn, a former lieutenant governor of Pennsylvania and the man whom the Continental Congress entrusted to deliver the "olive-branch petition" to the King in the summer of 1775, warned parliament that the colonies made small arms "in great numbers, and very complete."[99] Another correspondent from Philadelphia went even further, assuring parliament that there were gunsmiths in his province could "make one hundred thousand stand of Arms in one year."[100]

56.     Even accounting for optimistic bravado and a degree of menacing boastfulness, it is clear that American officials had ambitious, sincere hopes for domestic arms production. Provincial congresses from around the colonies passed legislation and issued appeals in hopes of recruiting gunsmiths and would-be gunsmiths to public service. Greenlee devotes several pages of

---

[95]     Letter   from   Benjamin   Franklin   to   Silas   Deane   (Aug.   27,   1775),   *available   at* https://founders.archives.gov/?q=joseph%20belton&s=1111311111%20&sa=&r=1&sr= (last visited Jan. 25, 2023)
[96] John Adams, *Novanglus III* (Feb. 6, 1775), *in* PAPERS OF JOHN ADAMS, VOL 2 243–55, 252 (Robert J Taylor et al., eds., 1977).
[97] Letter from John Hancock to George Washington (Mar. 6, 1776), *in* THE PAPERS OF GEORGE WASHINGTON DIGITAL EDITION (Theodore J. Crackel, ed., 2008).
[98] THOMAS PAINE, RIGHTS OF MAN, COMMON SENSE, AND OTHER POLITICAL WRITINGS 41 (Mark Philp ed., 1998).
[99] Penn's testimony is in WILLIAM COBBETT, THE PARLIAMENTARY HISTORY OF ENGLAND FROM THE EARLIEST PERIOD TO THE YEAR 1803: FROM WHICH LAST-MENTIONED EPOCH IT IS CONTINUED DOWNWARDS IN THE WORK ENTITLED "THE PARLIAMENTARY DEBATES," VOL 18, 913 (1814).
[100] Quoted in Greenlee, *supra* note 16, at 55.

his article to quoting these sources,[101] much like counterparts writing about the history of large-capacity firearms detail example after example of exotic historic weapons. But just as those authors seldom tell us about the safety, price, production numbers, or distribution of the unusual guns they highlight (that is, about context), Greenlee has almost nothing to say about the *results* of revolutionary-era appeals for domestic production of firearms.[102] The silence is understandable, because those results were deeply underwhelming.

57.     Take Massachusetts, which budgeted nearly $100,000 to pay for domestically-produced war material early in the conflict. Colonial craftsmen lacked the capacity to meet this surging demand, and much of that appropriation went unspent.[103] Authorities in Maryland likewise worked to encourage domestic arms production. They set a relatively modest goal of producing 240 a month, and failed to achieve it.[104] New York offered a bounty of $444 to anyone willing to start a gunlock factory in the colony; that substantial bounty went unclaimed and the colony was reduced to sending George Washington unarmed recruits.[105] Virginians had high hopes for domestic firearms production, but even after sending agents in search of gunsmiths far beyond their colony's borders they were unable to secure the arms they needed.[106] Wealthy Pennsylvania organized the most ambitious arms-making program of the individual colonies. It spent more than other colonies, and tried to centralize production in a new, $100,000 state-run armory inspired by

---

[101] *Id.* at 55-60.

[102] Greenlee claims that it is difficult to assess the scale of domestic firearms production during the war because, fearful of British retaliation, American gunsmiths did not sign their creations. *Id.* at 60. This is incorrect. In the first instance, archival evidence can tell us more about the scale of manufacturing than can examination of weapons that have survived the centuries. Second, some of the surviving guns do bear makers' signatures or insignia. Indeed, authorities sometimes required gunmakers to sign the firearms they produced under contract. *See* BROWN, *supra* note 31, at 325; NEIL LONGLEY YORK, MECHANICAL METAMORPHOSIS: TECHNOLOGICAL CHANGE IN REVOLUTIONARY AMERICA 65 (1985).

[103] SMITH, *supra* note 63, at 9–10.

[104] *Id.* at 10.

[105] *Id.*

[106] *Id.*

European methods of mass production. Yet even with their lucrative incentives and state-supported infrastructure, Pennsylvania's wartime gunsmiths only managed to produce around eighty-four muskets a month on average. Each one cost the state about twice as much as a new musket fetched on the open market.[107]

58.     In frustration, individual colonies looked to the Continental Congress to equip their fighting men. Though it took time to cohere, Congress eventually organized a very impressive system of wartime production. State intervention was crucial, because only the government could overcome systemic obstacles inhibiting production. Even in peacetime, private manufacturers struggled to obtain working capital, master unfamiliar technical skills, source and arrange for the timely transportation of raw materials, and recruit experienced labor. Wartime mobilization, disruption, scarcity, and inflation made all of these routine problems dramatically worse.[108] The Department of the Commissary General of Military Stores (DCGMS) had solutions. It provided cash advances, raw materials, transportation, and technical consulting to private manufacturers working under contract. More consequentially, the DCGMS centralized production at three main national arsenals, at Springfield Massachusetts, Carlisle Pennsylvania, and Philadelphia.[109]

59.     State contractors and master craftsmen at these arsenals coordinated specialists in multiple trades to mass-produce necessary military supplies. For some vital supplies, the results were remarkable. Among other items, they made large quantities of cartridge boxes, ramrods, bayonets, and cartridge paper. They produced hundreds of wagons, ammunition carts, and iron cannon.[110] The cast tens of thousands of pieces of shot and artillery shells in a wide range of

---

[107] *Id.* at 15, 222 n.41. For the efforts of individual colonies, see also YORK, *supra* note 102, at 65–70.
[108] *See* BROWN, *supra* note 31, at 310.
[109] SMITH, *supra* note 63, at 142–71.
[110] *Id.* at 122, 193.

sizes.[111] And, relying overwhelmingly on imported gunpowder or domestic powder made with imported saltpeter, the mostly female labor force at the ammunition laboratory in Philadelphia produced an astonishing 4.2 million musket cartridges.[112]

60.    What the DCGMS could not do, it became clear, was manufacture new firearms at anywhere near the scale that the war demanded. The most recent expert estimate suggests that on the eve of the revolution there were only around 175 gunsmiths in the colonies capable of doing this work.[113] Perhaps partly for this reason, of the three arsenals only the one in Philadelphia was tasked with producing arms. Departmental procurement records from the time make it difficult to say with confidence how many new firearms the facility turned out. One expert suggests that fifteen thousand "was not out of the question" during its years of operation, which, if accurate, would be an impressive figure given the challenges of the day.[114]

61.    But the large majority of these American-made firearms produced during the revolution relied on European locks and barrels. War planners understood from the beginning that it would have to be so. In September 1775, for example, Congress authorized the foreign purchase and importation of ten thousand muskets and *twenty* thousand musket locks.[115] The firearms historian George Moller found evidence for at least 40,000 locks imported during the Revolution, along with comparable quantities of musket barrels (including nearly 30,000 in a single shipment in May of 1777).[116] The scale of these parts imports suggest that the expert gunsmiths employed by government seldom made firearms from scratch. Indeed, after extensive research, Moller

---

[111] *Id.* at 123–26, 209.

[112] *Id.* at 82–88. Government facilities made eleven million musket cartridges overall. *Id.* at 209.

[113] *Id.* at 12.

[114] *Id.* at 96.

[115] *See* resolutions of Monday, Sept. 18, 1775, in UNITED STATES CONTINENTAL CONGRESS, JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789, EDITED FROM THE ORIGINAL RECORDS IN THE LIBRARY OF CONGRESS, VOL. 2 253-54 (Worthington Chauncey Ford ed., 1904).

[116] GEORGE D. MOLLER, AMERICAN MILITARY SHOULDER ARMS I: COLONIAL AND REVOLUTIONARY WAR ARMS, 141-42 (2011).

himself was "unable to establish a single instance where a continental armorer was employed in the fabrication of entirely new arms."[117]

62.     Even while relying almost entirely on imports for the most critical components, it is doubtful whether domestic producers made even a tenth of the firearms used by American forces during the war. Around three hundred thousand Americans bore arms in the Revolution, either as Continentals or militiamen.[118] Some of them entered the service with their own firearm (the great majority of which had been made entirely in Europe or built with European locks and barrels), and some served with arms taken from the enemy.[119] But, as Greenlee briefly acknowledges,[120] most fought with arms imported from continental Europe, particularly arms from France. Moller's careful inventory records more than 150,000 muskets imported between 1776-1781, and he suspects the actual total exceeded 200,000.[121]

63.     In other words, it was not "domestic arms production [that] maintained the colonies through the arms shortage during the war."[122] What maintained the colonies through the arms shortage during the war was a remarkable state-run engagement with the international arms trade and, especially, the patronage of European empires. Colonial gunsmiths contributed meaningfully to the war effort, primarily by repairing many thousands of arms.[123] When they did manufacture guns, they almost always relied on imported locks and barrels. As had been true throughout the

---

[117] *Id.* at 147.

[118] According to historian John Ferling, around 100,000 served in the Continental Army over the course of the war, and around 200,000 soldiered in colonial militias. *See* John Ferling, *Myths of the American Revolution*, SMITHSONIAN MAGAZINE 48 (2010).

[119] For more on both points, see Brian DeLay, *The Arms Trade and American Revolutions*, 128:3 AM. HIST. REV. 1144-1181 (Sept. 2023).

[120] Greenlee, *supra* note 16, at 54.

[121] MOLLER, *supra* note 116, at 195. The 150,00 figure begins with his list of 117,661 "total known imports" from 1776-1883, adds an additional 40,000 sent for Massachusetts and subtracts a shipment of 6,266 in 1783, after the North American fighting had ended. *Id.* appendix 5, at 484–85.

[122] Greenlee, *supra* note 16, at 61.

[123] MOLLER, *supra* note 116, at 146-53.

colonial era, and as would be true for Haitians and Spanish Americans fighting for their own independence in the coming decades, American revolutionaries obtained their guns (and ammunition) not through a "tradition of self-made arms," but rather from government and markets.[124]

### E. The State Conjures the U.S. Arms Industry in the Early Republic

64. In the decade after Independence, prominent nationalists argued that the new republic's future security and prosperity would require the construction of a viable domestic arms industry. In 1783, a report from the Continental Congress warned that "every country ought to endeavor to have within itself all the means essential to its own preservation, as to depend on the casualties of foreign supplies is to render its own security precarious."[125] Secretary of War Benjamin Lincoln called it "idle for a people to talk of Independence who were indebted for the means of their existence to any nation on Earth."[126] In Washington's first inaugural, he argued that a free people's "safety and interest require that they should promote such manufactories as tend to render them independent on others, for essential, particularly for military supplies."[127] And in his landmark "Report on the Subject of Manufacters," Treasury Secretary Alexander Hamilton advocated for state-supported arms production. "The extreme embarrassments of the United States during the late War, from an incapacity of supplying themselves," he reminded a Congress full of men that did not need reminding, "are still matter of keen recollection."[128]

---

[124] I argue that the international arms trade connected the American Revolution, the Haitian Revolution, and the Spanish-American Wars for Independence in DeLay, *supra* note 119.

[125] Andrew Beardsley Fagal, *The Political Economy of War in the Early American Republic: 1774–1821* 89 (2013) (unpublished Ph.D. dissertation, State University of New York at Binghamton).

[126] *Id.* at 70–71.

[127] Letter from George Washington to the United States Senate and House of Representatives (Jan. 8, 1790), *available at* https://founders.archives.gov/?q=From%20George%20Washington%20to%20the%20United%20States%20Senate%20and%20House%20of%20Representatives%2C%208%20January%201790&s=1111311111&sa=&r=5&sr=   (last visited June 20, 2023).

[128] Alexander Hamilton's Final Version of the Report on the Subject of Manufactures (Dec. 5, 1791), available at

65.     Government penury and the broader postwar depression meant that these and similar calls to action long went unanswered. Not only did the newly-independent nation lack the resources to fund domestic arms production; it lacked the funds even to properly store what was already on hand. Lamenting the unavoidable necessity, the war department auctioned off much of the war material left over from the Revolutionary War.[129] Knox insisted that a "sound national policy" would secure at least 100,000 muskets in national arsenals.[130] But by the end of 1793 he reported that the arsenals contained fewer than half than number, and that a third of those needed repair.[131]

66.     As had been true throughout the colonial era, the opportunities and threats that attended slavery, settler colonialism, and inter-imperial conflict pushed government to overcome obstacles and arm the nation. Increasingly anxious over a surging enslaved population, southern states wondered where they would obtain the arms necessary to keep them in bondage. Asking "[a]re we not weakened by the population of those whom we hold in slavery?" the governor of Virginia argued for example that his state would have to depend on the federal government for firearms.[132] In the Ohio country, a dynamic coalition of Indigenous nations armed with British guns and ammunition inflicted a series of shocking defeats on U.S. armed forces during the late 1780s and early 1790s.[133] News in late 1791 that Native warriors had killed or wounded two-thirds of an 1400-man army led by General Arthur St. Clair was particularly humiliating for the

---

http://founders.archives.gov/documents/Hamilton/01-10-02-0001-0007 (last visited June 20, 2023).

[129] *See, e.g.*, Letter from Henry Knox to the President of Congress, War Office (Aug. 1, 1786), *in* UNITED STATES CONTINENTAL CONGRESS, *supra* note 115, VOL. 31 457–58.

[130] Letter from Henry Knox to George Washington (Dec. 14, 1793), available at https://founders.archives.gov/documents/Washington/05-14-02-0342 (last visited June 20, 2023.

[131] Henry Knox, *Return of Ordnance, Arms, and Military Stores* (Dec. 14, 1793), *in* AMERICAN STATE PAPERS: MILITARY AFFAIRS, VOL. 1 44–60 (1832).

[132] Speech of Gov. Randolph (June 16, 1788), *in* JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION VOL. 3 72 (1888).

[133] *See* COLIN G. CALLOWAY, THE VICTORY WITH NO NAME: THE NATIVE AMERICAN DEFEAT OF THE FIRST AMERICAN ARMY (2014).

Washington administration.[134] But the scandal gave the president and his allies leverage they needed to finally secure congressional funding to initiate an arms production program.[135] When the U.S. drifted into the "Quasi-War" with France a few years later, funding for that program increased significantly.[136]

67.     Though it took longer than nationalists had hoped, by the late 1790s the infant U.S. arms industry was increasingly productive. The federal government itself was making firearms at two national armories, at Springfield Massachusetts and Harper's Ferry, Virginia. Springfield used the French Model 1766 musket (easily the most common weapon in government arsenals) as a prototype.[137] Springfield especially became an innovative center for machine production and standardized parts. The War Department also contracted out with private manufacturers. Some of these contractors made component parts for the arsenals, while Eli Whitney and others made muskets, pistols, and rifles to government specification.[138] When the Jeffersonians came to power after the 1800 election, they put more of the emphasis (and the budget) on funding private manufacturers.[139] In addition to lucrative contracts, the federal government extended startup capital;[140] shared patterns, gauges, dies, tools, and technical advice from arsenal staff;[141] and took steps to protect domestic manufacturers with high tariffs on arms imports[142] and, eventually, robust patent laws to reward innovation.[143]

---

[134] *Id.* at 129–39.

[135] Fagal, *supra* note 125, at 144–52.

[136] For instance, on May 4, 1798, Congress appropriated $800,000 for the procurement of cannon, arms, and ammunition. See The Public Statues at Large of the United States of America 1:555 (1845).

[137] GEORGE D. MOLLER, AMERICAN MILITARY SHOULDER ARMS II: FROM THE 1790S TO THE END OF THE FLINTLOCK PERIOD 33 (2011).

[138] LINDSAY SCHAKENBACH REGELE, MANUFACTURING ADVANTAGE: WAR, THE STATE, AND THE ORIGINS OF AMERICAN INDUSTRY, 1776-1848 53-56 (2019).

[139] Fagal, *supra* note 125, at 189–247.

[140] *Id.* at 232–33.

[141] GARAVAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST: 1803-1865, 20 (1998).

[142] Debate over tariffs and protection for domestic manufacturers is a major theme throughout Fagal, *supra* note 125.

[143] REGELE, *supra* note 138, at 24-25, 30-32.

68.     Together, private contractors and national arsenals proved to be synergistic, innovative, and productive. By 1812, when the United States again went to war with Great Britain and its Indigenous allies, domestic contractors and the federal armories were producing around 60,000 firearms between them each year. [144] Still modest compared to the productive capacity of Europe's great gun-making centers, this nonetheless meant that the U.S. had become an arms producer of significance. And its timing was excellent. The nation had an innovative, growing, state-supported arms industry in place right when firearms technology was about to enter the revolutionary sprint described above in Part II, where new ideas and designs combined with the industrial revolution to produce waves of transformation through the early twentieth century.[145]

69.     As president, James Madison instructed his Secretary of War to "lean to the indulgent side" when dealing with the nation's arms manufacturers.[146] The federal government has hewed to this advice ever since. Settler colonialism and wars of conquest against Native nations, the task of keeping millions of people enslaved, and the U.S.-Mexican War all helped nurse the industry to a point of maturity by the mid-nineteenth century.[147] Then the Civil War supercharged it and helped make it one of the most productive and inventive in the world. Ever since, the U.S. arms industry has been thoroughly entangled with war-making and government contracts – even as the gun lobby has spun the ingenious illusion that the federal government is the industry's enemy rather than its indispensable historic patron.[148]

70.     In sum, after centuries of depending upon European imports, Americans in the early republic finally managed to become largely self-sufficient in arms production. They did so through

---

[144] Fagal, *supra* note 125, at 245.

[145] For a classic study, see SMITH, *supra* note 41.

[146] Fagal, *supra* note 125, at 241–42.

[147] See Brian DeLay, *The American Public Has Power Over the Gun Business. Why Doesn't it Use it?*, THE CONVERSATION (Feb. 16, 2018), *available at* https://theconversation.com/the-american-public-has-power-over-the-gun-business-why-doesnt-it-use-it-92005.

[148] *Id.*

federal patronage of production at national arsenals and through federal contracts to private manufacturers. The individuals who worked at arsenals or under contract were not exponents of an "American tradition of self-made arms" or the forbears of today's amateurs with gun kits trying to evade state regulation. They were professionals or professionals-in-training, working in an industry intimately connected to the state. They were the forebears of those employed today by firms like Glock, Sig Sauer, and Smith & Wesson to make arms for the state and for the market, and who are obliged by law to stamp federal serial numbers on their products.

71.    3D-printed guns and kits enable consumers with no skill, experience, or special tools to quickly assemble high-quality firearms. Nothing like that has ever existed before in American life. The dramatic technological changes that have given birth to this sub-industry have provoked unprecedented societal consequences. As those consequences accelerate, we are witnessing the nation's tradition of regulatory response iterate in real time. When Greenlee drafted his article about self-made arms, six states regulated ghost guns.[149] Today, twice as many do so.[150] These laws are consistent with our nation's history of firearms regulation. In no sense are the entrepreneurs who sell parts and kits or their customers part of a historic tradition of "self-made arms" that should shield them from the serialization requirements that for more than half a century have applied to other firearms.  As with regulating high-capacity magazines, then, treating ghost guns like any other firearm (that is, requiring serial numbers and background checks) should be found constitutional under *Bruen*'s framework.

*[Signature page appears on following page]*

---

[149] Greenlee, *supra* note 16, at 80.
[150] Everytown for Gun Safety, *supra* note 15.

Pursuant to 28 USC §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 29, 2023

Brian DeLay

40

# Exhibit A

# Brian DeLay

University of California
3229 Dwinelle Hall
Berkeley, CA 94720-2550
https://history.berkeley.edu/brian-delay
delay@berkeley.edu

## ACADEMIC POSITIONS
- Preston Hotchkis Chair in the History of the United States, UC Berkeley:          2016-Present
- Associate Professor of History, University of California, Berkeley:          Fall 2010 - Present
- Assistant Professor of History, University of California, Berkeley:     Fall 2009 – Spring 2010
- Assistant Professor of History, University of Colorado, Boulder:     Fall 2004 – Spring 2009
- Lecturer in History, Harvard University:          Spring 2004

## EDUCATION
-Ph.D., Harvard University, Cambridge, MA:          March, 2004
-MA, Harvard University:          June, 1998
-B.A., University of Colorado, Boulder, *summa cum laude:*          December, 1994

## WORK IN PROGRESS:
- "The Myth of Continuity in American Gun Culture," working paper at SSRN, Aug. 2023.
- "Aim at Empire: American Revolutions through the Barrel of a Gun, 1750-1825," book project under contract with W.W. Norton. 167k words drafted as of 6/22.
- "Means of Destruction: Guns, Freedom, and Domination in the Americas before World War II," book manuscript under contract with W.W. Norton. Research nearly complete.
- "PATH: The Project on Arms Trade History." Since 2008, I have been working with student research assistants to quantify the global arms trade, from the Napoleonic Wars to WWI. We have been extracting detailed import and export data from manuscript sources and, especially, from annual customs reports published by the main arms-exporting states: The United Kingdom, the United States, Belgium, and France (Germany and Spain still underway). We are nearly finished locating sources and doing the laborious work of data entry. Our relational database now has nearly 112,000 entries capturing the global movement of all kinds of war material, from percussion caps to artillery, from 1815-1915. We will soon shift to data analysis and begin applying for external funding to turn the dataset into an online tool freely available to researchers around the world.

## PUBLICATIONS AND RESEARCH
### Refereed Publications
- "The Arms Trade & American Revolutions," *The American Historical Review* 128:3 (Sept. 2023), 1144-1181.
- "Foreign Relations between Indigenous Polities, 1820-1900," in Kristin Hoganson and Jay Sexton, eds., *The Cambridge History of America and the World*, Vol 2: 1812-1900 (Cambridge University Press, 2022), 387-411.
- "Indian Polities, Empire, and Nineteenth-Century American Foreign Relations" *Diplomatic History* 39:5 (December 2015), 927-42.

**Refereed Publications (cont.)**

- "Watson and the Shark," chapter in Brooke Blower and Mark Philip Bradley, eds., *The Familiar Made Strange: American Icons and Artifacts after the Transnational Turn* (Ithaca: Cornell University Press, 2015).
- "Blood Talk: Violence and Belonging in the Navajo-New Mexican Borderland," in Juliana Barr and Edward Countryman, eds., *Contested Spaces of Early America*, University of Pennsylvania Press, 2014, pp. 229-256.
- Editor, *North American Borderlands*. Routledge, 2012.
- *War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War*. New Haven: Yale University Press, 2008 [paperback, 2009].
- "The Wider World of the Handsome Man: Southern Plains Indians Invade Mexico, 1830-1846," *Journal of the Early Republic* 27 (March, 2007), 83-113
- "Independent Indians and the U.S.-Mexican War," *American Historical Review* 112 (Feb., 2007), 35-68.

**Other Publications:**

- "American Guns, Mexico's Trials," *Bulletin of the American Academy of Arts and Sciences*, Spring, 2020
- "A Misfire on the Second Amendment," extended review of Roxanne Dunbar-Ortiz, *Loaded: A Disarming History of the Second Amendment* for *Reviews in American History* 47:3, Sept. 2019
- Co-author with James West Davidson, William E. Gienapp, Christine Leigh Heyrman, Mark H. Lytle, and Michael B. Stoff, *Experience History: Interpreting America's Past* [Formerly *Nation of Nations: A Narrative History of the American Republic*], McGraw-Hill (9th ed., 2019). *Concise version: *US/A History* (9th ed., 2022).
- "How the U.S. Government Created and Coddled the Arms Industry," *The Conversation*, October 2017
- "How Not to Arm a State: American Guns and the Crisis Of Governance In Mexico, Nineteenth and Twenty-First Centuries" [24th Annual W.P. Whitsett Lecture], *Southern California Quarterly* 95:1 (Spring 2013), pp. 5-23.
- "Oportunismo, ansiedad, idealismo: los impulsos Estadunidenses durante la intervención Francesa en México," in Jean Meyer, ed., *Memorias del Simposio Internacional 5 de Mayo*, El Colegio de Puebla, 2013, pp 269-288.
- "Comanches in the Cast: Remembering Mexico's 'Eminently National War,'" in Charles Faulhaber, ed., *The Bancroft Library at 150: A Sesquicentennial Symposium*, Berkeley: University of California Press, 2011.
- "How Indians Shaped the Era of the U.S.-Mexican War," abbreviated version of Independent Indians and the U.S.-Mexican War," in Pekka Hämäläinen and Benjamin H. Johnson, eds., *Major Problems in the History of North American Borderlands*, Wadsworth, 2011.
- Response to Daniel Walker Howe, Andrés Reséndez, Ned Blackhawk, and Leonard Sadosky's essays in H-SHEAR roundtable on *War of a Thousand Deserts*, Nov. 2010.

**Other Publications (cont.)**
- Top Young Historian essay, Historians News Network, October 2010.
- "Forgotten Foes," *Berkeley Review of Latin American Studies* (Fall 2010), 14-19.
- "James Madison and the Scolds," Review of J. C. A. Stagg, *Borderlines in the Borderlands: James Madison and the Spanish American Frontier, 1776-1821*, *Passport* 40:3 (January 2010).
- "Why Mexico Fought," review of Timothy J. Henderson, *A Glorious Defeat: Mexico and its War with the United States*, *Diplomatic History* 33:1 (January 2010).
- "19th Century Lessons for Today's Drug War Policies," *The Chronicle Review*, Tuesday, July 28, 2009,
- "It's Time We Remembered the Role of Indians in the U.S.-Mexican War," *History News Network*, 3/9/2009
- "War of a Thousand Deserts," on *The Page 99 Test*,
- "Navajo," "Popé," and "Pueblo Indians," in Billy G. Smith, ed. *Colonization and Settlement (1585-1763)*, Volume 2 in the 10-volume *Facts on File Encyclopedia of American History* (2003)
- "Narrative Style and Indian Actors in the Seven Years' War," *Common-Place: The Interactive Journal of Early American History*, 1 (1), September 2000.

## PRIZES, HONORS, & AWARDS
- Visiting Scholar, University of Melbourne, October 2017
- Fulbright Distinguished Lecturer, Doshisha American Studies Seminar (Kyoto), 2014
- Bryce Wood Book Award for the outstanding book on Latin America in the social sciences and humanities published in English, Latin American Studies Association, 2010
- HNN "Top Young Historian," November 2010
- W. Turrentine Jackson (biennial) Award for best first book on any aspect of the history of the American West, Western History Association, 2009
- Robert M. Utley Award for best book published on the military history of the frontier and western North America, Western History Association, 2009
- Southwest Book Award, sponsored by the Border Regional Library Association, 2009
- James Broussard Best 1st book prize, Society for Historians of the Early American Republic, 2008
- Norris and Carol Hundley Best Book Award, Pacific Coast Branch of the AHA, 2008
- The Sons of the Republic of Texas Summerfield G. Roberts Best Book Award, 2008
- Finalist, Francis Parkman Prize from the Society of American Historians, 2008
- Finalist for the Clements Prize for the Best Nonfiction Book on Southwestern Americana, 2008
- Honorable Mention, TSHA Kate Broocks Bates Award for Historical Research, 2008
- Finalist for the PROSE Award in the U.S. History and Biography/Autobiography category, sponsored by the Association of American Publishers, 2008
- Organization of American Historians Distinguished Lecturer, 2008-2011
- Bolton-Cutter Award for best borderlands article, Western History Association, 2008
- Robert F. Heizer Prize for the best article in the field of ethnohistory, 2008

**PRIZES, HONORS, & AWARDS (cont.)**
- CLAH Article Prize, Conference on Latin American History, 2008
- Stuart Bernath Article Prize, Society for Historians of American Foreign Relations, 2008
- Phi Alpha Theta/Westerners International Prize for Best Dissertation, 2005
- Harold K. Gross Prize from Harvard University for the dissertation "demonstrating the greatest promise of a distinguished career in historical research," 2004
- University of Colorado Residence Life Academic Teaching Award, 2005
- Derek Bok Center Awards for Excellence in Teaching, Spring 1999 and Fall 1999

**GRANTS AND FELLOWSHIPS**
- John Simon Guggenheim Foundation Fellowship, 2019-2020
- Marta Sutton Weeks Fellow, Stanford Humanities Center, 2019-2020
- Center for Advanced Studies in Behavioral Sciences Fellowship, 2019-2020 (declined)
- American Council of Learned Societies Fellowship, 2017-2018
- Harry Frank Guggenheim Foundation Fellowship, 2013-14'
- UC Humanities Research Fellowship Grant, 2013-14'
- UC Berkeley CORE Research Bridging Grant, 2012-14'
- Charles A. Ryskamp Research Fellowship, American Council of Learned Societies, 2010-2011
- Donald T. Harrington Fellowship, UT Austin, 2009-2010 (Declined).
- University of Colorado Graduate Committee on the Arts and Humanities Research Grant, 2008.
- American Philosophical Society / British Academy Fellowship, 2008.
- Junior Faculty Development Award, University of Colorado, 2007.
- Bill and Rita Clements Research Fellowship for the Study of Southwestern Americana, Full Year, Clements Center, Southern Methodist University, Dallas, TX, 2005-2006.
- Postdoctoral Fellowship, Full Year, Huntington Library, San Marino, CA, 2005-2006 (Declined)
- Postdoctoral Fellowship, Full Year, Newberry Library, Chicago, IL, 2005-2006 (Declined)
- Packard Foundation Dissertation Finishing Grant, 2002-2003
- American Philosophical Society, Philips Fund Grant for Native American Research, 2001
- David Rockefeller Center for Latin American Studies Summer Grant 2001
- Department of Education Foreign Language Area Studies Grant, 2000-01
- Mellon Summer Field Research Travel Grants, 1999, 2000, 2001
- Harvard History Department Summer Travel Grant, 2000, 2001
- Graduate Society Term Time Research Fellowship, Spring 2000
- Harvard Graduate Student Council Summer Travel Grant, 1999
- The Charles Warren Center Fellowships for Summer Research, 1998, 1999
- The Graduate Society's Summer Fellowship, Harvard University, 1998
- General Artemas Ward Fellowship, Harvard University, 1996-97, 1997-98

## BOOK REVIEWS

- Review of Jonathan Grant, *Between Depression and Disarmament: The International Armaments Business, 1919-1939*, in the *American Historical Review* 25:3, June 2020
- Review of David J. Silverman, *Thundersticks: Firearms and the Violent Transformation of Native America*, in the *American Historical Review*, Oct. 2017
- Review of Rachel St. John, *Line in the Sand: A History of the Western U.S.-Mexico Border*, in the *Pacific Historical Review*, Aug. 2012.
- Review of *Bridging National Borders in North America: Transnational and Comparative Histories*, Edited by Benjamin H. Johnson and Andrew R. Graybill, *Hispanic American Historical Review*, Feb. 2012.
- Review of *Fiasco: George Clinton Gardner's Correspondence from the U.S.-Mexico Boundary Survey, 1849-1854*. Edited David J. Weber and Jane Lenz Elder, *New Mexico Historical Review* 86:3, Summer 2011, 526-28.
- Review of Juliana Barr's *Peace Came in the Form of a Woman: Indians and Spaniards in the Texas Borderlands*, for the *American Historical Review* 113 (June 2008), 878-79.
- Review of Samuel Truett's *Fugitive Landscapes: The Forgotten History of the U.S.-Mexican Borderlands*, for *Labor: Studies of Working-Class History of the Americas* 4:4 (2007), 130-32.
- Review of Gary Clayton Anderson's *The Conquest of Texas: Ethnic Cleansing in the Promised Land, 1820-1875*, for the *Journal of American History* 93:2 (2006), 530-31.
- Review of Samuel Truett and Elliott Young, eds., *Continental Crossroads: Remapping U.S.-Mexican Borderlands History*, for the *Hispanic American Historical Review* 86:4 (2006), 864-65.
- Review of Rosemary King's *Border Confluences: Borderland Narratives from the Mexican War to the Present*, for *New Mexico Historical Review*, Fall 2005.
- Review of Edward A. Goodall, *Sketches of Amerindian Tribes, 1841-1843,* for *Itinerario: The European Journal of Overseas History*, Fall 2004 (28:3).
- Combined review of Alex D. Krieger's *We Came Naked and Barefoot: The Journey of Cabeza de Vaca Across North America* and Rolena Adorno's and Patrick Charles Pautz's *The Narrative of Cabeza de Vaca* for the *Southwestern Historical Quarterly,* April 2004.
- Review of Richard Flint's *"Great Cruelties Have Been Reported:" The 1544 Investigation of the Coronado Expedition*, for the *Southwestern Historical Quarterly,* October 2003.
- Review of Allen G. Hatley's *The Indian Wars in Stephen F. Austin's Texas Colony*, 1822-1835, for the *Southwestern Historical Quarterly*, October 2001.

## PRESENTATIONS & INVITED TALKS

- "What a Junk-Shop Musket has to say about the American Revolution," presentation at Approaching American Revolutions Symposium, USC, May 2023
- "Why Dragging Canoe Sold Kentucky," paper presentation at the Western History Association Conference, San Antonio, TX Oct. 2022
- Roundtable participant for "After 1800: Rethinking Revolution and Counter-Revolution in the Atlantic World," USC/Écoles des Hautes Études en Sciences Sociales, June 2022

**PRESENTATIONS & INVITED TALKS (cont.)**

- Roundtable participant for "Empire and U.S. Foreign Relations," Society for Historians of American Foreign Relations, June 2022
- "Tribe and Nation in North America," comment for roundtable on Sumit Guha's *Tribe and State in Asia through Twenty-Five Centuries*, Institute for Historical Studies, UT Austin, November 2021.
- "What is History Now," Roundtable participant at UC Berkeley History Colloquium, October 2021
- "Tsiyu Gansini's Predicament: Guns, Ammunition, & Cherokee Choices before the Revolution," Rocky Mountain Seminar in Early American History, Oct., 2021
- "Aim at Empire," talk at the UC Berkeley Institute for International Studies, Sept. 2021
- Roundtable participant in "the U.S.-Mexican Borderlands" for Janet Napolitano and Daniel Sargent's class "Intro to Security Policy," GSP, Berkeley, Sept. 2021
- "Arms Trading and American Revolutions," paper for roundtable on Transnational Revolutionary History, Society for Historians of the Early American Republic, July 2021
- Roundtable on Armed Conflict and Military History, Society for Historians of American Foreign Relations annual conference, June 2021.
- "Guns Across Borders," presentation at Revolutions Across Borders symposium, Newberry Library, June, 2021.
- "Indigenous Agency, Whiggish History, and 'the Conquest of Mexico,'" American Historical Association, Jan. 2021
- "Arms Trading and the Fates of American Revolutions," invited paper given in the Cambridge University American History Seminar, March 1, 2021
- "Indigenous Agency, Whiggish History, and 'the Conquest of Mexico,'" Conference on Latin American History, Jan. 2021
- "Aim at Empire," presentation at the Stanford Humanities Center, December 2019
- "America's Guns, Mexico's Trials," Morton Mandel Public Lecture given at the invitation of the American Academy of Arts and Sciences, Berkeley, CA, Nov. 20, 2019
- "Arms Trading & New World Decolonization," paper presented at University College, London, May 2019.
- "The Texas Gun Frontier & the Travails of Mexican History," keynote at the 1st Biennial Symposium on Borderlands & Borders, Texas A&M University, San Antonio, April 2019
- "Guns and Revolution: The Arms Trade and the First Global Wave of Decolonization," Boston College, September 2018
- "Migration and the History of Immigration Enforcement on the U.S.-Mexican Border," at conference on Borders, Borderlands, and Migration, Institute of Slavic, East European, and Eurasian Studies and the Central European University, UC Berkeley, Sept. 2018
- "Shoot the State," roundtable presentation at the Western History Association, Nov. 2017
- "The Texas Gun Frontier and the Travails of Mexican History," Gary L. Nall Lecture, West Texas A&M, October 2017
- "Guns and Revolution: The Arms Trade and the Making of American Revolutions, 1774-1825," University of Melbourne, October 2017

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Dam-Breaking: How the Arms Trade Enabled the First Global Wave of Decolonization, 1775-1825," New York University, September 2017
- "The Most Dangerous Man You've Never Heard Of," invited presentation at symposium "Small Arms, Big Business: Trading Arms - Political, Cultural and Ethical Dimensions in Historical and Global Perspectives," Zentrum für Interdisziplinäre Forschung (ZIF), Bielefeld, Germany, June 2017.
- Organizer/chair and presenter for roundtable "Arsenal to the World: The Missing History of the American Arms Trade," OAH April 2017
- "The Ungovernable Rio Grande," Cal History Homecoming talk, February 2017
- "The Texas Gun Frontier and the Travails of Mexican History, or, No More Weapons! (Unless they're for Us)," CENFAD Colloquium, Temple University, January 2017
- "The Texas Gun Frontier and the Travails of Mexican History, or, No More Weapons! (Unless they're for Us)," University of Connecticut, October, 2016
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Harvard University, October 2016
- "How Transimperial Arms Bazaars Stabilized Instability in the Greater Caribbean," Rothermere Institute, Oxford University, May 2016
- "The International Arms Trade and the Brittle State in Mexico, 1810-1920," University of Chicago Latin American Seminar, December 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Northwestern University, December 2015
- "Guns and the Making of the Modern Americas," Stanford University, November 2015
- "The Texas Gun Frontier and the Travails of Mexican History," UT Austin, November 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," University of Cincinnati, September 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Society for Historians of American Foreign Relations, Conference Keynote, June 2015
- "War of a Thousand Deserts," San Jacinto Symposium, Houston, TX, April 2015
- "Dambreaking: Guns, Mercantilism, and the Demolition of Europe's America," the James P. Jones endowed lecture, Florida State University, March 2015
- "Dambreaking: Mercantilism, Armaments, and the Demolition of Europe's America," Indiana University, October 10, 2014
- "Gotham's Gun Barons: New York City Arms the Americas, 1865-1934," Doshisha University, Kyoto, Japan, July 25, 2014
- "How Borderland Indians Shaped the Era of the U.S.-Mexcan War," Keynote address for the 2014 Doshisha American Studies Seminar, Kyoto, July 26, 2014
- "War and Trade," Roundtable on new histories of trade, Society for Historians of American Foreign Relations, Lexington, June 2014
- "Gotham's Gun Barons: New York City Arms the Americas, 1865-1934," Cambridge University, November 25, 2013
- "A Protest of Arms: Guns and the Brittle State in Mexico, 1810-1920," Cambridge University Borderlands Workshop, November 11, 2013

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Gotham's Gun Barons: New York City Arms the Americas," Oxford University, Oct 2013
- "Marcellus Hartley: The Most Dangerous Man You've Never Heard Of," OAH April 2013
- "A Good Story," invited presentation to admitted students at Cal Day, April 20, 2013
- "Beware the Metanarrative; or, How I Acquired My Resistance to Resistance," Kaplan Lecture, University of Pennsylvania, March 2013
- "Domestic Dependent Notions: American Indians and the First Few Pages of American Empire," American Studies Association meeting, San Juan, Nov. 2013
- "Indian History and the History of American Foreign Relations," Society for Historians of American Foreign Relations annual conference, June 2012
- "How Not to Arm a State: American Guns and the Mexican National Project, 1810-1920," Society for Historians of American Foreign Relations annual conference, June 2012
- "Opportunism, Anxiety, and Idealism: U.S. Impulses during the French Intervention in Mexico," invited paper at el Simposio Internacional 5 de Mayo de Mexico, Biblioteca Palafoxiana, Puebla, Mexico, May 2012.
- "How Not to Arm a State: American Guns and the Mexican National Project, 1810-1920," Organization of American Historians annual conference, April 2012
- Chair, roundtable on the state of the field in U.S.-Mexico Borderlands History, Organization of American Historians annual conference, April 2012
- "So Far From God, So Close to the Gun Store: Borderlands Arms Trading and the Travails of Mexican History," 26th Annual W.P. Whitsett Lecture, CSU Northridge, March 2012
- "War of a Thousand Deserts," at the Tattered Cover Bookstore, Denver, CO, March 2012
- "Frontiers, Borderlands, and Transnational History," Huntington Library symposium on the Significance of the Frontier in an Age of Transnational History, Feb. 2012 [Audio in file#2]
- "Sailing Backwards on Mexico's 'Iron River of Guns': The Political Economy of the Arms Trade in the 19th and 21st Century's, Harvard Kennedy School, Feb. 2012
- "The Drug War and Borderlands History," Cal Alumni Day, Oct. 2011.
- "Blood Talk: Violence and Belonging in the Navajo-New Mexican Borderland," invited presentation at Stanford University's Comparative Wests Seminar, April 2011
- "Blood Talk: Violence and Belonging in the Navajo-New Mexican Borderland," invited talk for round two of Contested Spaces in Early America symposium, Clements Center for Southwest Studies, Southern Methodist University, Dallas, TX, April, 2011
- "Blood Talk: People and Peoples in the Navajo-New Mexican Borderland," invited talk at UCLA's American Indian Studies Center, March 2011
- "Blood Talk: People and Peoples in the Navajo-New Mexican Borderland," invited talk presentation the USC-Huntington Early Modern Studies Institute and the Autry Museum of Western Heritage, March 2011
- "People and Peoples in Borderland Relations: Blood Talk in New Mexico," invited talk for Contested Spaces in Early America symposium, McNeil Center for Early American Studies, University of Pennsylvania, Philadelphia, PA October 2010
- "How Indians Shaped the U.S.-Mexican War," invited talk for the Bay Area Latin America Forum, Berkeley, CA September 2010
- "Indians and the U.S.-Mexican War," invited talk at University of North Texas, Sept. 2010

## PRESENTATIONS & INVITED TALKS (cont.)

- "Patterns of Violence in Navajo-New Mexican Relations," Pacific Coast Branch of the American Historical Association annual meeting, Santa Clara CA, August 2010
- "States and Stateless Peoples in George Herring's *From Colony to Superpower*," Society for Historians of American Foreign Relations annual meeting, Madison, WI, June 2010
- "Indians, Politics, and 19th-Century American Empire," UC Berkeley-Stanford-UC Davis faculty dinner, April 2010
- "War of a Thousand Deserts," invited Keynote Address to the James Rawley Conference in the Humanities, University of Nebraska, Lincoln, April 2010
- "19th Century Lessons for Today's Drug War Policies," History as a Resource for Decision Making, UC Berkeley, March 2010
- "Comanches in the Cast: Recovering Mexico's 'Eminently National War, 1830-1846," Bancroft Sesquicentennial Symposium, Berkeley, CA, March 2010.
- "Mexico, Native Polities, and the Continuous 19th Century American Empire," invited talk for the Harvard Symposium on 19th Century Empire, Cambridge, MA April 2009
- "War of a Thousand Deserts: How Indians Shaped the Era of the U.S.-Mexican War," paper presented to the El Paso History Museum, February 2009
- "War of a Thousand Deserts: How Indians Shaped the Era of the U.S.-Mexican War," paper presented at the Texas Community College Teachers Association Conference, Austin, Feb. 2009
- "Putting Indians into the U.S.-Mexican War," paper presented at the Organization of American Historians annual meeting, New York, March 2008.
- "Military History and Non-State Peoples," roundtable paper presented at the American Historical Association conference, Washington D.C., Jan. 2008.
- "The French and Indian War," public talk for the High Plains Chautauqua, Greeley, CO, Aug. 8, 2007
- "The Comanche Lens: Seeing Nation States through Tribes on the U.S.-Mexican Borderlands," invited talk at the University of San Diego Trans-Border Institute, April. 2007.
- "The Comanche Lens: Seeing Nation States through Tribes on the U.S.-Mexican Borderlands," invited talk at the George and Anne Richards Civil War Era Center, Penn State University, Jan. 2007.
- "Independent Indians, the U.S.-Mexican War, and the Reshaping of North America," paper presented at the American Historical Association conference, Atlanta, GA, Jan. 2007 (*Panel organizer*)
- "Opportunity Costs: Southern Comanches between Mexico and Texas, 1836-1846," paper presented at the Filson Institute's Comparative Borderlands Conference, Louisville, KT, Oct. 2006.
- "The War of a Thousand Deserts: Indians, the U.S.-Mexican War, and the Reshaping of North America," Clements Center Brown Bag series, Southern Methodist University, Feb. 2006.
- "Independent Indians and Borderlands Scholarship in the Americas" roundtable presentation at the Conference on Latin American History, Philadelphia, PN, Jan. 2006.

DeLay CV    9

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Comanches in the Cast: Remembering Mexico's 'Eminently National War,' 1830-1846," paper at the Latin American Studies Association Conference, Los Vegas, NV Oct. 2004
- Invited comment on Marie Duggan's "Franciscan Missions as Institutions of Economic Development: The Case of California, 1769-1832," at the Boston Area Latin American Seminar, Dec. 2003
- Invited comment on David J. Weber's "Spaniards and their Savages in the Age of Enlightenment," at the Boston Area Latin American Seminar, Oct. 2002.
- "Mexicans, Indians, and Anglo-Americans: Ethnic Conflict and Territorial Expansion, 1776-1854," paper presented at the Harvard Ethnic Studies Conference, Cambridge, MA, Feb. 2002.
- "Americans Watching: Savage Indians, Suffering Mexicans, and Manifest Failures, 1835-1854," paper presented at the American Historical Association conference, San Francisco, Jan. 2002.
- "The War of a Thousand Deserts: Indian Power & the Contest for Mexico, 1835-1854," paper presented at the Conference on Latin American History, San Francisco, Jan. 2002
- "Indian Power and the Fragmentation of Northern Mexico, 1835-1846," paper presented at the Western History Association Conference, San Diego, CA, Oct. 2001. (*Panel organizer*).
- "Americans Watching: Savage Indians, Suffering Mexicans, and Manifest Failures, 1835-1854," paper presented at Global America: The New International History Conference, Harvard, April 2001.
- Commentator at roundtable discussion of Fred Anderson's *Crucible of War* at the Charles Warren Center for Studies in American History, Harvard University, Feb. 2000.

**CONSULTING**

- Washington D.C.
  - Submitted declaration for the Attorney General's Office of Washington D.C. in defense of district law limiting high-capacity gun magazines in Hanson et al., v. District of Columbia, Case No. 22-cv-02256 (D.D.C.), Nov. 2022.
- Oregon
  - Submitted declaration as expert witness for the Attorney General's Office of the State of Oregon in defense of state law limiting high-capacity gun magazines in Joseph Arnold et al., v. Tina Kotek, et al., No. 22CV41008 (Harney Cnty. Cir. Ct.), Dec. 2022. Testified remotely in preliminary injunction trial, Dec. 2022.
  - Submitted declaration for Attorney General's Office of the State of Oregon in defense of state law limiting high-capacity gun magazines in *Oregon Firearms Federation et al. v. Tina Kotek et. al.*, 2:22-cv-01815-IM (D. Ore.) (lead case); Mark Fitz, et al., v. Ellen F. Rosenblum, et al., 3:22-cv-01859-IM (D. Ore.) (trailing case); Katerina B. Eyre, et al., v. Ellen F. Rosenblum et al., 3:22-cv-01862-IM (D. Ore.) (trailing case); and Daniel Azzopardi, et al., v. Ellen F. Rosenblum, et al., 3:22-cv-01869-IM (D. Ore.) (trailing case). Feb. 2023. Deposed March 14, 2023. Testified in Federal District Court trial in Portland, June 2013.

DeLay CV  10

**CONSULTING, cont.**

- Illinois
  - o Submitted declaration for Attorney General's Office of the State of Illinois in defense of its law limiting assault weapons and high-capacity magazines in Harrel v. Raoul, Case No. 23-cv-141-SPM (S.D. Ill.); Langley v. Kelly, Case No. 23-cv-192-NJR (S.D. Ill.); Barnett v. Raoul, 23-cv-209-RJD (S.D. Ill.); Federal Firearms Licensees of Illinois v. Pritzker, 23-cv-215-NJR (S.D. Ill.); Herrera v. Raoul, 23-cv-532 (N.D. Ill.); and *Kenneally v. Raoul, et al.*, 23-cv-50039 (N.D. Ill.). March, 2023.
- California
  - o Submitted declaration for Attorney General's Office of the State of California in defense of its law limiting high-capacity magazines in William Wiese, et al., v. Rob Bonta, et al., 2:17-cv-00903-WBA-KJN (E.D. Cal.), May 2023.
- Washington (state)
  - o Submitted declaration for Attorney General's Office of the State of Washington in defense of its law limiting high-capacity magazines in Gabriella Sullivan, et al., v. Bob Ferguson, et al., (W.D. Wash.), 3:22-cv-05403, May 2023.
- Colorado
  - o Submitted expert report for the Town of Superior, Cities of Superior and Boulder, and Board of County Commissioners of Boulder County in defense of their laws limiting certain firearms and high-capacity magazines in Rocky Mountain Gun Owners et al., v. the Town of Superior et al., (D. Colo.), 22-cv-2680, May 2023.
- New Jersey
  - o Submitted expert report for Attorney General's office of the State of New Jersey in defense of its laws regulating assault weapons and high-capacity magazines in Association Of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Platkin et al., 3:18-cv-10507; Cheeseman et al. v. Platkin et al., 1:22-cv-04360; Ellman et al. v. Platkin et al., 3:22-cv-04397, July 2023.
- Supreme Court
  - o Contributor and signatory to Brief for Amici Curiae Professors of History and Law in Support of Petitioner, United States of America v. Zackey Rahimi, 2023.

**TEACHING**

**Classes Offered at UC Berkeley**

- HIST 7a: Lower-division lecture – *North America through Reconstruction,* 2011, 2012, 2015, 2018, 2020, 2021 (always in fall)
- HIST 100: Upper-Division Lecture - *American Encounters,* Fall 2009
- HIST 101: Undergraduate Research Seminar - *Senior Thesis Seminar* Spring 2010; Spring 2012, Spring 2013, Fall 2014, Spring 2022, Spring 2023
- HIST 103: Undergraduate Reading Seminars:
  - o *Borderlands in North America*, Fall 2009
  - o *The U.S. and Latin America in the 19th C.*, Spring 2012
  - o *The Border* (reading seminar), Fall 2016
- HIST 104: Undergrad lecture/seminar- *The Craft of History*, Spring 2015, Spring 2017

**Classes Offered at UC Berkeley, cont.**

- HIST 135B: Upper-division lecture - *Encounter and Conquest in Indigenous America*, Spring 2019, Spring 2022, Spring 2023, Fall 2023
- HIST 280: Graduate Reading Seminars:
  - *Borderlands in World History,* Fall 2011
  - *The Making of the Modern World, through the Age of Revolutions* (Sem.), Fall 2014 (co-taught with Daniel Sargent)
  - *The Making of the Modern World, since the Age of Revolutions* (Sem.) Spring 2015 (co-taught with Daniel Sargent)
  - *Borderlands in North America* (reading seminar), Spring 2015
  - *Native North American History* (reading seminar), Spring 2021
- HIST 285: Graduate Research Seminars:
  - *American History before 1900*, Spring 2013, Fall 2015
  - *Topics in American History*, Fall 2018
- HIST 375: Graduate Sem: *Teaching History at the University* (pedagogy), Spring 2021

**Classes Offered at the University of Colorado**

- HIST 1015*: Lower-Division lecture - *U.S. History to 1865*, Fall 07', Fall 08'
- HIST 1035*: Lower-Division lecture - *Honors: United States History to 1865*, Fall 04'
- HIST 2015*: Lower-Division lecture - *Early America,* Fall 06'
- HIST 3050: Undergraduate seminar - *The Arms Trade in World History,* Spring 09'
- HIST 3317*: UG sem. - *Interethnic Borderlands in the American West*, Fall 04', Fall 07
- HIST 4115: Upper-Div. lec – *Natives & Newcomers in the Americas,* Fall 06', Spring 08'
- HIST 4327*: Upper-Division lecture - *Novelty, Conflict, and Adaptation in the American Southwest,* Spring 05', Spring 08'
- HIST 4617*: Upper-Division lecture - *Native North American History: Origins to 1815*, Spring 05', Spring 07', Spring 09'
- HIST 5106: Graduate Reading seminar - *Colloquium: U.S. History to 1865,* Fall 08'
- HIST 6030: Grad. Reading sem - *Frontiers and Borderlands in the Americas*, Spring 07'

**PhD Students** (1) = advisor/co-advisor; (2) 2nd reader

- **Current Students:**
  - Russ Weber
    - Dissertation: Emotions and the political history of the early republic.
  - Kyle Jackson (1)
    - Dissertation: New Orleans and Pan-Americanism before WWI
  - Noah Ramage (1)
    - Dissertation: The Cherokee Nation in the late 19th Century
  - Annabel LaBrecque (1)
    - "Deep Histories of Salt in North America"
  - Julia Frankenbach (1)
    - Livestock Production, Gender, and Power in the Greater Indigenous Bay Area
  - Lissett Bastidas (2)
    - Colonialism and Resistance in Mexican-Ear California

- **Former PhD Students:**
  - Ariel Ron (2), Glenn M. Linden Associate Professor of the U.S. Civil War Era, Southern Methodist University
    - Dissertation: "Developing the Country: 'Scientific Agriculture' and the Roots of the Republican Party" (2012)
  - Mattie Harper, Grantmaking Officer, Bush Foundation
    - Dissertation (Ethnic Studies): "French Africans in Ojibwe Country: Negotiating Marriage, Identity, and Race, 1780-1890" (2012)
  - Melisa Galván (2), Associate Professor, California State University, Northridge
    - Dissertation: "From Contraband Capital to Border City: Matamoros, 1746-1848," (2013)
  - Allie McLafferty, History Instructor, St. Stephens Episcopal School, Austin, TX
    - Dissertation: "'A Plumb Craving for the Other Color': White Men, Non-White Women, and the Sexual Crisis in Antebellum America," (2013)
  - Jennifer Carlson, Associate Professor of Sociology and Government & Public Policy, University of Arizona
    - Dissertation (Sociology): "Clinging to their Guns?: The New Politics of Gun Carry in Everyday Life," 2013
  - Delia Hagen (1), Founding Director Hagen Historical Consulting, Missoula, Montana
    - Diss: "Northern Plains Borders and the People In Between, 1860-1940" 2015
  - Bathsheba Demuth (2), Dean's Associate Professor of History and Environment & Society, Brown University
    - Dissertation: "The Power of Place: Ideology and Ecology in the Bering Strait, 1848-1988" (2016)
  - Alberto Garcia (2), Assistant Professor, San José State University
    - Dissertation: "The Politics of Bracero Migration" (2016)
  - Robert Lee (2), University Lecturer, Cambridge University
    - Dissertation: "Louisiana Purchases: The U.S.-Indian Treaty System in the Missouri River Valley" (2017)
  - Erica Lee (1), Management and Program Analyst at FDIC, Washington, D.C.
    - Dissertation: "Sanctuaries into Fortresses: Refugees and the Limits of Obligation in Progressive-Era America" (2017)
  - Javier Cikota (2), Assistant Professor, Bowdoin College
    - Dissertation: "Frontier Justice: State, Law, and Society in Patagonia, 1880-1940" (2017)
  - David Tamayo (2), Assistant Professor, University of Michigan
    - Dissertation: "Serving the Nation: Rotary and Lions Clubs, the Mexican Middle Classes, and the Post-Revolutionary State, 1920s-1960s" (2018)
  - Julia Lewandowski (1), Assistant Professor, California State University, San Marcos
    - Dissertation: "Small Victories: Indigenous Proprietors Across Empires in North America" (2019)
  - Franklin Sammons (1), Assistant Professor, Washington & Lee
    - Dissertation: "Yazoo's Settlement: Finance, Law, and Dispossession in the Southeastern Borderlands, 1789-1820

- Sophie FitzMaurice (1)
  - Dissertation: "The Material Telegraph: An Environmental History of the Technology that Wired America, c. 1848-1920."
- J.T. Jamieson (2)
  - Dissertation: "'A Mere Change of Location': Migration and Reform in America, 1787-1861."

**SERVICE**
**University of California, Berkeley History Department**
- Search Committees:
  - Native North American History Search Committee, 2021-22'
  - US West Search Committee, 2018-19'
  - 20th Century Latin America Search Committee, 2014-15'
  - U.S. History Search Committee (Chair), 2012-13'
**University of California, Berkeley History Department Service, Cont.**
  - Latin America Search Committee, 2011-12'
- Endowed Chairs Committee, 2021-22'
- AC-5 Grad Admissions Committee, 2020-21', 2022-23'
- Governance Task Force Committee, 2014-15'
- Committee on the History Undergraduate Major,
  - 2011-12' (chair, spring 2012); 2015-16';  2016-17' (chair)
- Honors Committee, 2009-10'
- Admissions Committee, US Field, 2009-10'
- Reentry and Disabled Student Advisor, 2009-10'
- Faculty co-sponsor, with Daniel Sargent, of the Berkeley International and Global History Conference (BIG-H), 2011-2017
- Co-founder (with Daniel Sargent) and co-organizer (since 2021 with Rebecca Herman) of the Berkeley Global History Seminar, 2010-Present.

**University of California, Berkeley, Campus Service**
- Senate Liaison for external review of UC Berkeley Department of Ethnic Studies, 2021
- Letters & Sciences Executive Committee, 2020-2023
  - L&S Executive Committee Liaison for the external review of UC Berkeley Department of Slavic Languages & Literatures, 2022
- Berkeley Institute for International Studies (IIS)
  - IIS Directorship Search Committee, 2021
  - IIS Faculty Board, 2020-present
  - IIS Simpson Award Committee, 2012; 2013; 2015 (chair); 2016-2019.
- Bancroft Library
  - Friends of the Bancroft Library Council, 2021-present
  - Bancroft Library Prize Committee, 2015, 2016, 2017, 2019, 2020
- Academic Senate Committee on Committees, 2015 – 2017
- American Cultures Senate Subcommittee, 2011-12'

**SERVICE, cont.**

**University of Colorado History Department**
- Departmental Undergraduate Studies Committee, 2007-08'
- Departmental Executive Committee, 2006-07'
- Robert G. Athearn Lecture organizer, 2006
- Judge for Colorado History Day, Spring 2005
- History Department Graduate Studies Committee, 2004-05', 2008-09'
- Phi Alpha Theta/History Club Advisor, Fall 2004

**Professional Service, Memberships, K-12 and Public Outreach**
- Professional Service:
  - Series Editor with Steven Hahn and Amy Dru Stanley for University of Pennsylvania Press book series, "America in the Nineteenth Century", 2014-present. Within the series, I have had served as faculty editor for the following books, working closely with their authors throughout the process:
    - William Kiser, *Borderlands of Slavery: The Struggle Over Captivity and Peonage in the American Southwest* (2017)
    - Noelani Arista, *The Kingdom and the Republic: Sovereign Hawai'i and the Early United States* (2019)
    - Katherine Bjork, *Prairie Imperialists: The Indian Country Origins of American Empire* (2019)
    - Alaina Roberts, *I've been Here All the While: Black Freedom on Native Land* (2021)
    - Paul Conrad, *The Apache Diaspora: Four Centuries of Displacement and Survival* (2021)
    - William Kiser, *Illusions of Empire: The Civil War and Reconstruction in the U.S.-Mexico Borderlands* (2021)
    - William Kiser, *Illusions of Empire: The Civil War and Reconstruction in the U.S.-Mexican Borderlands* (2021)
    - Sarah Keyes, *American Burial Ground: A New History of the Overland Trail* (2023)
  - Editorial Board Service:
    - *Reviews in American History*, 2019-2022
    - *Journal of the Early Republic*, 2020-2022
    - *Journal of the Civil War Era*, 2016-2018
    - *Pacific Historical Review*, 2012-2015
    - *Ethnohistory*, 2009-2012
  - Prize Committees:
    - Robert M. Utley Award Com., Western History Association, 2022-2025
    - Ray Allen Billington Prize Committee, Organization of American Historians, 2017-2019.
    - David J. Weber-Clements Center Prize Committee, Western History Association, 2016-2018.

- o **Prize Committees, cont.**
  - ▪ Bernath Lecture Prize Committee, Society for Historians of American Foreign Relations, 2015-2018.
  - ▪ Louis Knott Koontz Memorial Award committee, Pacific Coast Branch of the American Historical Association, 2012-15
  - ▪ CLAH Article Prize Committee (Chair), Conference on Latin American History, 2012
  - ▪ John Ewers Book Prize Committee, Western History Association, 2012
  - ▪ Sons of the Republic of Texas, Summerfield G. Roberts Book Award Committee, 2010-2012
  - ▪ Western History Association's Huntington-WHA Ridge Prize Committee, 2009-2011.
- o Conference Committees:
  - ▪ Conference Planning Committee, Society for Historians of the Early American Republic, 2021
  - ▪ Society for Historians of American Foreign Relations, Conference Planning Committee, 2012 and 2013
  - ▪ Organization of American Historians, Conference Planning Com., 2012
  - ▪ Society for Historians of the Early Republic, Conference Planning Committee, 2012
  - ▪ Local Arrangements Committee, Western History Association Annual Conference, Denver, 2009
  - ▪ American Society for Ethnohistory, Conference Planning Com., 2005
- o Manuscript Reviewer for *American Historical Review*, *Ethnohistory, Western Historical Quarterly*, the *Journal of American History*, *Modern American History*, *Law and History Review*, *Economics and Human Biology*, *History: the Journal of the Historical Association*, *Journal of the Early Republic*; *Enterprise & Society*; *William & Mary Quarterly*; *the Southwestern Historical Quarterly*; Oxford University Press, Harvard University Press, Princeton University Press, University of Pennsylvania Press, University of California Press, University of Arizona Press, Basic Books, Yale University Press, University of Colorado Press, University of Kansas Press, Cornell University Press, Palgrave & Macmillan; University of North Carolina Press, Duke University Press, University of Virginia Press, University of Tennessee Press, Texas A&M University Press; University of Nebraska Press, Blackwell Publishing, and Rourke Publishing.
- o Other Professional Service:
  - ▪ Co-Chair, Taskforce on Conference Conduct and Sexual Harassment, 2019, Society for Historians of American Foreign Relations
  - ▪ Nominating Committee, Western History Association, 2019-2021
  - ▪ External Reviewer for UC Davis Undergraduate Program Review, 2017
  - ▪ Secretary and then Chair, Borderlands & Frontiers Studies Committee, Conference on Latin American History, 2011-2012
  - ▪ Grant/Fellowship reviews for: National Science Foundation; Comisión Nacional de Investigación científica y tecnológica (Chile)
  - ▪ Evaluations and nominations for the MacArthur Fellowship Program

**Professional Service and Public Outreach, cont.**

- Member: American Historical Association; Org. of American Historians; Conference on Latin American History; Society for Historians of American Foreign Relations; Society for Historians of the Early American Republic; Western History Association.
- K-12 and Public Outreach:
  - Academic Advisor, Teaching American History Grant "American Democracy in Word and Deed," Mt. Diablo School District, CA, 2009-2013.
  - Presenter at Teaching American History Grant workshops in Oakland, CA, Dec. 2009, May 2010, and Oct. 2010.
  - Lead Presenter at Teaching American History or Gilder-Lehrman workshops for primary-school teachers in:
    - Hartford, Delaware, June 2012
    - New Orleans / San Antonio, June 2012
    - Chicago, IL (June 2011)
    - Deer Valley, AZ (Feb., 2010)
    - Crescent City, CA (Jan., 2009 and April, 2010);
    - Eureka, CA (Jan., 2009);
    - Huntsville, Alabama (June 2008 and June 2009)
- Media:
  - Hour-long interview with the History of California Podcast, Oct. 2020
  - On-air interview for BBC News World Service on gun law following the massacres in Gilroy, El Paso, and Dayton, August 10, 2019
  - On-air interview for extended program "The American Gun Industry: A Billion Dollar Business," Australian Broadcasting Corp., March, 2018
  - On-air interview for BBC Newsday on Remington's bankruptcy, March 27, 2018
  - On-air interview for "City Visions," KALW San Francisco, on youth protests against gun violence, March 26, 2018
  - On-air interview, BBC Radio 5 on America's gun business, Feb. 26, 2018
  - On-air interview for "The Attitude," Pacifica Network, on America's gun business, February 20, 2018
  - "Gotham's Gun Baron," Spoken essay for BBC Radio Three program *The Essay*, January 2017
  - On-screen consultant for German documentary on the U.S. presidency, "Die US-Präsidenten und der Krieg," produced by Westdeutscher Rundfunk and aired nationally in Germany in November 2016.
  - "Guns, Capitalism, and Revolution in the Americas," 2015 SHAFR keynote address filmed and broadcast on CSPAN's American History TV, (first aired August 1, 2015).
  - Interview with Deborah Lawrence and Jon Lawrence for Contesting the Borderlands: Interviews on the Early Southwest (University of Oklahoma Press, 2016), 182-200.
  - Guest of NPR's Backstory, with the American History Guys, January 17, 2014

**Media, cont.**

o   Invited essay for the *New York Times*' Room for Debate feature, July 2, 2013

o   Guest on NPR's "On Point with Tom Ashbrook," Nov. 7, 2012.

o   Guest on PRI's "The World," April 12, 2011

o   On-screen consultant for "The Mexican-American War," Oct. 29, 2006, History Channel

o   KERA "Think" radio interview on *War of a Thousand Deserts*, 2008.