**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREARMS POLICY COALITION, INC.,<br><br>                Plaintiffs,<br><br>                v.<br><br>KATHY JENNINGS, Attorney General of Delaware,<br><br>                Defendants. | C.A. No. 1:21-cv-01523 (MN) |

**OPENING BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Dated: March 25, 2024

Bradley P. Lehman (No. 5921)
GELLERT SCALI BUSENKELL & BROWN LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
P: (302) 425-5800
E: blehman@gsbblaw.com

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
P: (910) 713-8804
E: law.rmd@gmail.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

PROCEDURAL HISTORY ........................................................................................... 1

STANDARD OF REVIEW ........................................................................................... 2

BACKGROUND ........................................................................................................... 2

   I.   Delaware House Bill 125 (HB 125) ................................................................. 2

      A.   The New Definitions Created by HB 125 ................................................ 2

      B.   HB 125 Prohibits Ordinary Individuals from Possessing, Transporting, Shipping, Transferring, or Selling Non-Firearm Objects (the NFO Ban). .............................................. 3

      C.   HB 125 Prohibits the Construction, Sale, or Transfer of Self-Manufactured Firearms (the SMF Ban). ................................................................................................. 4

      D.   HB 125 Prohibits Individuals from Distributing Computer Files to Program a Three-Dimensional Printer to Manufacture or Produce a Firearm, Firearm Receiver, or Major Component of a Firearm (the Instructions Ban). ................................................................ 4

   II.   Impact on Plaintiffs ....................................................................................... 4

ARGUMENT ................................................................................................................ 5

   I.   Plaintiffs Succeed on the Merits of their Second Amendment Claims. ........... 5

      A.   The NFO Ban and the SMF Ban are Categorically Unconstitutional Prohibitions Against the Right to Self-Manufacture and Possess Arms in Common Use. ......................... 5

         1.   The NFO Ban Unconstitutionally Infringes the Right of Delawareans to Self-Manufacture Firearms for Lawful Purposes. ...................................................... 6

         2.   The SMF Ban Unconstitutionally Infringes the Right of Ordinary Delawareans to Possess Constitutionally Protected Arms. .................................................... 8

      B.   Defendant's Evidence Can Only Bolster Plaintiffs' Motion for Summary Judgment in Underscoring the Unconstitutionality of the Bans Under *Bruen.* ........................... 11

   II.   Plaintiffs Succeed on the Merits of their First Amendment Claims. ............... 15

   III.   Plaintiffs Succeed on Their Fifth and Fourteenth Amendment Claims. ......... 18

   IV.   Plaintiffs Will Suffer Irreparable Harm Absent a Permanent Injunction. ...... 19

   V.   The Balance of the Equities Favors the Grant of Permanent Injunctive Relief. ............... 20

CONCLUSION ............................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 255 (2002) ........................................17

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013)..........................................................................................20

*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) ....................................................................................20

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001).....................................................................................................17

*Bernstein v. U.S. Dep't of State*,
    922 F. Supp. 1426 (N.D. Cal. 1996) ..........................................................................15

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969) (per curiam)...............................................................................17

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) (Alito, J., concurring) ...........................................................9, 10

*Cedar Point Nursery v. Hassid*,
    594 U.S. 139 (2021)................................................................................................18, 19

*City of Houston, Tex. v. Hill*,
    482 U.S. 451 (1987).....................................................................................................17

*Connection Distrib. Co. v. Reno*,
    154 F.3d 281 (6th Cir. 1998) ......................................................................................20

*Defense Distributed v. Grewal*,
    971 F.3d 485 (5th Cir. 2020) ......................................................................................18

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)............................................................................................ *passim*

*Drummond v. Robinson Township*,
    9 F.4th 217 (3d Cir. 2021) ............................................................................................6

*Elrod v. Burns*,
    427 U.S. 347 (1976).....................................................................................................19

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ......................................................................................20

*Free Speech Coalition, Inc. v. AG of the United States*,
    677 F.3d 519 (3d Cir. 2012)........................................................16

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) ...............................................10, 11

*Goldstein v. Repossessors Inc.*,
    815 F.3d 142 (3d Cir. 2016)........................................................2

*Horne v. Dep't of Agric.*,
    576 U.S. 351 (2015)...................................................................19

*Junger v. Daley*,
    209 F.3d 481 (6th Cir. 2000) ....................................................15

*Lewis v. Kugler*,
    446 F.2d 1343 (3d Cir. 1971).....................................................20

*Lingle v. Chevron, U.S.A. Inc.*,
    544 U.S. 528 (2005)...................................................................19

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)...............................................................5, 12

*Miller v. Bonta*,
    __ F. Supp. 3d __ (S.D. Cal. Oct. 19, 2023), 2023 WL 6929336 (appeal filed) .........10, 11, 13

*New York Rifle & Pistol Assn. v. Bruen*,
    597 U.S. 1 (2022)................................................................ *passim*

*Orsatti v. New Jersey State Police*,
    71 F.3d 480 (3d Cir. 1995)..........................................................2

*Pa. Coal Co. v. Mahon*,
    260 U.S. 393 (1922)...................................................................19

*Rigby v. Jennings*,
    630 F. Supp. 3d 602 (D. Del. 2022)........................................ *passim*

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020)....................................................................20

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)...................................................................15

*Staples v. United States*,
    511 U.S. 600 (1994)..............................................................11, 17

*Teixeira v. County of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ................................................................................6

*Teter v. Lopez*,
   76 F.4th 938 (9th Cir. 2023) .................................................................................9

*United States v. Aguilar*,
   515 U.S. 593 (1995)...........................................................................................18

*United States v. Stevens*,
   559 U.S. 460 (2010)...........................................................................................17

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001)...............................................................................15

*Wrenn v. Dist. of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017) ...........................................................................20

**Constitutions, Statutes, and Rules**

<u>United States Constitution</u>

U.S. CONST. amend. I................................................................................5, 6, 14, 15

U.S. CONST. amend. II ..................................................................................... *passim*

<u>United States Code</u>

18 U.S.C. § 922(a)(1)(a) .........................................................................................7

18 U.S.C. § 923(i).................................................................................................3, 8

18 U.S.C. § 923(g) ...................................................................................................3

<u>Code of Federal Regulations</u>

27 C.F.R. § 478.92 ...................................................................................................8

<u>Federal Register</u>

87 Fed. Reg. 24652, 24670 (April 26, 2022) (effective August 24, 2022)................8

<u>Delaware Code</u>

11 Del. C. § 222 ......................................................................................................2

11 Del. C. § 1459A(a)..............................................................................................3

11 Del. C. § 1459A(b)..............................................................................................4

11 Del. C. § 4205(b)(4) ........................................................................................................3

11 Del. C. § 4205(b)(5) ........................................................................................................4

**Other Authorities**

7 THE WRITINGS OF THOMAS JEFFERSON 325 (Paul Ford ed., 1904) .............................................7

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, *What is ATF doing
    in regards to people making their own firearms* (May 14, 2015),
    https://bit.ly/4a85mB0 ................................................................................................7

JOSEPH GREENLEE, *The American Tradition of Self-Made Arms*, St. Mary's Law
    Journal, Vol. 54 (2023), No. 1, Art. 2 ....................................................................7, 13

NATIONAL INSITUTE OF JUSTICE, *The Science Behind Firearm and Tool Mark
    Examination* (December 1, 2014) https://bit.ly/3x8keRB .........................................16

WILLIAM J. KROUSE, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong.
    Res. Serv. Insight, 2 (Aug. 22, 2018), https://bit.ly/4a9lEcW ...................................7

MARK W. SMITH, *What part of "in common use" don't you understand?: How
    courts have defied Heller in Arms-Ban-Cases—Again, Per Curiam,* HARV.
    J.L. & PUB. POL'Y (Sept. 27, 2023) ............................................................................9

## INTRODUCTION

House Bill 125 ("HB 125" or the "Bill") bans: (a) the possession, transportation, shipping, transfer, or sale of non-firearm objects ("NFOs")—*i.e.*, various items and materials, that, while not themselves firearms, may be used in the manufacture of a firearm (the "NFO Ban"), (b) the possession of self-manufactured firearms ("SMFs")—self-made firearms that do not bear a federally licensed firearm manufacturer's serial number—as well as, prospectively, the use of three-dimensional printers ("3D Printers") to manufacture such firearms (the "SMF Ban"), and (c) the distribution by any means of any instructions in the form of computer files or code that may be used to program a 3D Printer to manufacture or produce a firearm, firearm receiver, or major component of a firearm (the "Instructions Ban," – together with the NFO Ban and SMF Ban, "Delaware's Bans" or the "Bans"). The Bans are unconstitutional and cannot stand. Plaintiffs John Rigby ("Rigby") and Alan Knight ("Knight"), both Delaware citizens and members of Plaintiff Firearms Policy Coalition, Inc. ("FPC"), together with similarly situated Delaware-resident FPC members, face imminent and irreparable harm as a result of the Bans. Plaintiffs respectfully seek summary judgment and a permanent injunction barring enforcement of the Bans.

## PROCEDURAL HISTORY

Plaintiffs filed their complaint on October 27, 2021 (the "Complaint"; Dkt. No. 1). Plaintiffs brought a Motion for Preliminary and Permanent Injunction (the "MPI"; Dkt. Nos. 5 & 6) on November 2, 2021, while Defendants[1] filed a Motion to Dismiss on December 9, 2021 (Dkt. Nos. 19 & 20. On July 1, 2022, the parties submitted additional briefing regarding the opinion in *New York Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022) (Dkt. Nos. 36, 37). On September 23,

---

[1] Governor John Carney was initially named as a defendant in this action but was dismissed by stipulation of the parties on January 3, 2022. *See* Dkt. Nos. 23, 24.

1

2022, the Court issued its Memorandum Opinion (Dkt. No. 38) and implementing order (Dkt. No. 39) granting the MPI in part, denying the MPI in part, and denying Defendants' Motion to Dismiss.

## STANDARD OF REVIEW

"In a motion for summary judgment, it is initially the moving party's burden to 'demonstrate the absence of a genuine [dispute] of material fact.' " *Goldstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (citation omitted). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding a motion for summary judgment, the judge's function is "to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995). It follows that " 'where a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.' " *Goldstein*, 815 F.3d at 146 (citation omitted).

"To obtain a permanent injunction, a plaintiff must show actual success on the merits rather than a likelihood of success on the merits." *Rigby v. Jennings*, 630 F. Supp. 3d 602, 611 (D. Del. 2022). The remaining factors required for the entry of a permanent injunction are that "the moving party will suffer irreparable harm if an injunction is not granted," "the balance of equities tips in favor of the moving party," and "an injunction is in the public interest." *Id.*

## BACKGROUND

### I.   Delaware House Bill 125 (HB 125)

#### A.   The New Definitions Created by HB 125

Section 1 of the Bill amends 11 Del. C. § 222, by creating, in pertinent part, the following

definitions (italics and underline in all definitions added): (i) "*Firearm frame or receiver*": "the part of the firearm that provides housing for the firearm's internal components, and includes the hammer, bolt or breechblock, action, and firing mechanism"; (ii) "*Major component of a firearm*": "the slide, barrel, cylinder, trigger group, or receiver of a firearm"; (iii) "*Three-dimensional printer*": "a computer or computer-driven machine of [sic] device capable of producing a three-dimensional object from a digital model"; (iv) "*Unfinished firearm frame or receiver*": "a firearm frame or receiver that requires further machining or molding in order to be used as part of a functional firearm, and which is designed and intended to be used in the assembly of a functional firearm"; (v) "*Untraceable firearm*": "a firearm for which the sale or distribution chain from a licensed retailer to the point of its first retail sale cannot be traced by law enforcement officials."

**B. HB 125 Prohibits Ordinary Individuals from Possessing, Transporting, Shipping, Transferring, or Selling Non-Firearm Objects (the NFO Ban).**

Section 2 of the Bill amends Title 11 to create § 1459A, making it a Class D felony[2] for anyone in Delaware to "knowingly transport, ship, transfer, or sell an unfinished frame or receiver" unless (1) "[t]he person is a federally licensed gun dealer or manufacturer," (2) "[t]he name of the manufacturer and an individual serial number are conspicuously placed on the unfinished firearm frame or receiver in accordance with the procedures for the serialization of a firearm in 18 U.S.C. § 923(i)," *and* (3) "[t]he person maintains records for the unfinished firearm frame or receiver in accordance with the requirements for maintenance of records in 18 U.S.C. § 923(g)." 11 Del. C. § 1459A(a). It is a Class D felony to "knowingly possess an unfinished firearm frame or receiver that does not have the name of the manufacturer and serial number conspicuously placed on it or on a major component of the firearm into which the unfinished firearm frame or receiver will be

---

[2] A Class D felony is punishable by up to 8 years in prison. 11 Del. C. § 4205(b)(4).

housed." 11 Del. C. § 1459A(b).

### C. HB 125 Prohibits the Construction, Sale, or Transfer of Self-Manufactured Firearms (the SMF Ban).

The Bill amends Title 11 to create § 1463, the SMF Ban. It is a Class E felony[3] to "knowingly possesses an untraceable firearm" (§§ 1463(a), (d)), a Class D felony to "knowingly manufacture[], assemble[], cause[] to be manufactured or assembled, sell[], or transfer[] an untraceable firearm" (§§ 1463(b), (e)), and a Class D felony to "[u]se[] a three-dimensional printer or similar device to manufacture or produce a firearm, firearm receiver, or major firearm component when not licensed as a manufacturer" (§§ 1463(c)(1), (e)).

### D. HB 125 Prohibits Individuals from Distributing Computer Files to Program a Three-Dimensional Printer to Manufacture or Produce a Firearm, Firearm Receiver, or Major Component of a Firearm (the Instructions Ban).

The new § 1463 also contains the Instructions Ban. It is a Class D Felony to "[d]istribute[] by any means, including the internet, to a person who is not licensed as a manufacturer, instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver or major component of a firearm." (§§ 1463(c)(2), (e)).

## II.    Impact on Plaintiffs

Defendant's enforcement of the provisions at issue in HB 125 inflicts irreparable harm upon Rigby and Knight and FPC's similarly situated Delaware-resident members because: (i) the SMF Ban infringes their Second Amendment protected right to possess arms, most notably those in common use for lawful purposes, (ii) the NFO Ban infringes their Second Amendment protected

---

[3] A Class E felony is punishable by up to 5 years in prison. 11 Del. C. § 4205(b)(5).

right to self-manufacture such arms for lawful purposes, (iii) the Instructions Ban infringes their First Amendment protected rights to exercise constitutionally protected speech in disseminating, receiving, and utilizing digital information containing any instructions for a three-dimensional printer that facilitate the manufacture or production of a firearm, and (iv) the ban against the mere possession of the targeted arms and NFOs infringes their Fifth and Fourteenth Amendment rights against compelled dispossession or physical appropriation of property without just compensation.

## ARGUMENT

I.      **Plaintiffs Succeed on the Merits of their Second Amendment Claims.**

A.      **The NFO Ban and the SMF Ban are Categorically Unconstitutional Prohibitions Against the Right to Self-Manufacture and Possess Arms in Common Use.**

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Amendment guarantees "an individual right to keep and bear arms," which is "a fundamental constitutional right guaranteed to the people." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). The Second Amendment's protections are applicable against the states via the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). Indeed, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 597 U.S. at 17. To be sure, the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in

the 18th century.' " *Id.* at 28 (quoting *Heller*, 554 U.S. at 582). " 'Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.' " *Id*. (citations omitted).

1.    **The NFO Ban Unconstitutionally Infringes the Right of Delawareans to Self-Manufacture Firearms for Lawful Purposes.**

The Second Amendment protects ancillary rights that are necessary to the exercise of the individual right to "possess a firearm for self-defense" including " 'the ability to acquire arms.' " *Teixeira v. County of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (quoting *Ezell* at 704 (italics added) (This " 'implies a corresponding *right to acquire* and maintain proficiency' with common weapons.")). Certainly nothing within the plain text of the Second Amendment *limits* the manner of arms acquisition—i.e., limiting it to the purchase or acquisition from a third party. As this Court previously held, "the right to keep and bear arms implies a corresponding right to manufacture arms." *Rigby v. Jennings*, 630 F.Supp.3d 602, 615 (D. Del. 2022); *see also Teixeira* 873 F.3d at 679 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)) (the right "to keep" arms "necessarily involves" the right to " 'keep them in a state of efficiency for use' " and " 'to keep them in repair,' " which implies the right to *self*-repair). This right to self-manufacture "wouldn't mean much" without the right to own, possess, and use the items and materials necessary to engage in such activity—and, of course, the firearms ultimately produced, so long as such firearms are themselves protected by the Second Amendment and not subject to prohibition.

The possession and use of NFOs to self-manufacture is certainly nothing new.  In fact, they have been commonly possessed and used by law-abiding citizens for such purposes, including the

self-manufacture of arms for self-defense, *throughout* American history. Manufacturing of firearms was not just common, but was entirely unregulated during our Colonial and Founding Eras, and there were no restrictions on who could be a gunsmith or manufacture arms. *See, e.g.*, Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904) ("Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."). "Since the earliest colonial days, Americans have been busily manufacturing and repairing arms." JOSEPH GREENLEE, *The American Tradition of Self-Made Arms*, St. Mary's Law Journal, Vol. 54 (2023), No. 1, Art. 2, at 36. "Meanwhile, restrictions on self-made arms have been rare throughout American history." *Id.* In fact, "[a]ll restrictions on arms built for personal use have emerged within the last decade, and from only a few states." *Id.*

Notably, to this day, the federal government has never blocked the ability of law-abiding citizens to self-manufacture firearms for personal use. This is true even if the firearm is built using an NFO, a 3D-printed frame or receiver, machined from a block of raw materials, or stamped from a piece of sheet metal. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES , *What is ATF doing in regards to people making their own firearms*, (May 14, 2015), https://bit.ly/4a85mB0 ("An individual may generally make a firearm for personal use."); WILLIAM J. KROUSE, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018), https://bit.ly/4a9lEcW ("In short, unfinished receivers and the components needed to build fully functional AR-15s and other firearms are legally available on the U.S. civilian gun market and can be purchased without a background check under federal law."); *see also, e.g.*, 18 U.S.C. § 922(a)(1)(a); Final Rule, Definition of "Frame or Receiver" and Identification of

Firearms, 87 Fed. Reg. 24652, 24670 (April 26, 2022) (effective August 24, 2022) ("In sum, this rule does not impose any new requirements on law-abiding gun owners.").

Federal law also does not require NFOs, or the SMFs manufactured from them, to be serialized. 87 Fed. Reg. at 24670 ("There are also no recordkeeping requirements imposed by the GCA [Gun Control Act] or the proposed or final rule upon unlicensed persons who make their own firearms, but only upon licensees who choose to take PMFs [Privately Made Firearms] into inventory."). Federal law only requires that "*[l]icensed importers and licensed manufacturers* shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon . . . each firearm imported or manufactured by such importer or manufacturer." 18 U.S.C. § 923(i) (emphasis added); *see also* 27 C.F.R. § 478.92 (similar). No history or precedent exists for extinguishing law-abiding citizens' ability to self-manufacture firearms for lawful purposes, or for prohibiting law-abiding citizens from possessing NFOs to that end. The Second Amendment's text as informed by history firmly establishes the right to self-manufacture firearms and to possess and use the items and materials necessary to construct such arms for lawful purposes. Accordingly, the NFO Ban unconstitutionally infringes the right of law-abiding Delawareans to self-manufacture firearms for lawful purposes and it must be enjoined.

**2.      The SMF Ban Unconstitutionally Infringes the Right of Ordinary Delawareans to Possess Constitutionally Protected Arms.**

It is clear that "the Second Amendment protects the possession and use of weapons that are " 'in common use at the time.' " *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627). Given that the firearms that Plaintiffs' desire to manufacture are merely semiautomatic handguns which *Heller* recognized are the most popular firearms in the nation, the Government could not possibly show Delaware's law functions to prohibit firearms that are "dangerous and unusual." *Id*. at 21; *Heller*, 554 U.S. at 625. *Heller* and *Bruen* establish the historical rule of decision for all arms-ban

cases: arms that are "in common use" are absolutely protected and cannot be banned, a conclusion that is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *See Heller*, 554 U.S. at 627.

Because "common use" is part of the historical test, the State bears the burden to show the banned arms are not in common use. *See Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627) ("we found it 'fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.' "). It has failed to even attempt to do so. *See Teter v. Lopez*, 76 F.4th 938, 949–50 (9th Cir. 2023) (vacated after rehearing en banc) ("*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons,' " 554 U.S. at 627, and thus, whether the banned arms are " 'dangerous and unusual' is a contention as to which [the State] bears the burden of proof in the second prong of the *Bruen* analysis").

Consistent with historical tradition, the Second Amendment right necessarily encompasses firearms "typically possessed by law-abiding citizens for lawful purposes . . . ." *Heller*, 554 U.S. at 625; *see also* MARK W. SMITH, *What part of "in common use" don't you understand?: How courts have defied Heller in Arms-Ban-Cases—Again, Per Curiam,* HARV. J.L. & PUB. POL'Y (Sept. 27, 2023), https://bit.ly/4avsZ6j. The government may only ban weapons that are both dangerous *and* unusual, *i.e.*, weapons that are *not* in common use. *Id.* at 627; *see also Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring) ("A weapon may not be banned unless it is *both* dangerous *and* unusual.") (emphasis in original). "[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class [sic] arms commonly used for lawful purposes." *Caetano*, 577 U.S. at 417. An arm is not "unusual" so as to fall outside the ambit of

this protection so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Id*. at 420 (Alito, J., concurring) (emphasis in original); *see also Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (If "the banned weapons are commonly owned . . . then they are not unusual."). "[E]very law-abiding responsible individual citizen has a constitutionally protected right to keep and bear firearms commonly owned and kept for lawful purposes." *Miller v. Bonta*, __ F. Supp. 3d __ (S.D. Cal. Oct. 19, 2023), 2023 WL 6929336 at *39 (appeal filed).

Thus, so long as the firearms subject to the SMF Ban are "arms" "in common use" for lawful purposes, they are protected by the Second Amendment's " 'unqualified command.' " *Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10) ("Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' "). Because *Bruen* squarely places the burden on *the government* to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," 597 U.S. at 24— including "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627—it *falls to the State* to show that the arms it has banned are "unusual," and thus *not* "in common use at the time."

The targeted SMFs are typically possessed and commonly owned by law-abiding citizens for lawful purposes such as self-defense and therefore cannot be banned because they are *not* unusual. For example, Rigby lawfully owned a self-manufactured Glock-compatible[4] handgun,

---

[4] *See, e.g.*, https://www.polymer80.com/PF940v2-80-Full-Size-Frame-Kit-_2 ("The PF940v2™ is compatible with components for 3-pin 9mm [Glock®] G17, 34, 17L; .40S&W G22, 35, 24; and .357Sig G31."). These Glock-platform handguns are some of the most common in the United States, and *Heller*'s test is not limited to the original designer or a specific manufacturer.

which he completed from a Polymer80[5] NFO before enactment of Delaware's Bans, and which he has removed to a location outside of Delaware in a legal manner due to his reasonable fear of criminal sanction. Declaration of Rigby ("Rigby Decl."; Dkt. No 7) at ¶¶ 8, 9. Rigby desires to manufacture additional SMFs, including handguns, using the 3D Printer that he owns, and Knight also desires to manufacture SMFs, including semiautomatic handguns. Rigby Decl. at ¶¶ 10, 15; Declaration of Knight ("Knight Decl."; Dkt. No. 8) at ¶ 9. Handguns are recognized as "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629. Rigby and Knight also both owned NFOs that can be used to manufacture a common AR-15-style rifle, which fall within the NFO Ban. Rigby Decl. at ¶ 12; Knight Decl. at ¶ 10. AR-15-style rifles, and their components, are also commonly owned by law-abiding citizens. *Miller*, 2023 WL 6929336 at *35; *see also Friedman*, 136 S. Ct. at 449 (Thomas, J., dissenting from denial of certiorari) (reasoning that "citizens . . . have a right under the Second Amendment to keep" "AR-style semiautomatic rifles" because "roughly five million Americans own" them and "the overwhelming majority . . . do so for lawful purposes"); *Staples v. United States*, 511 U.S. 600, 612 (1994) (identifying an AR-15 as a type of semiautomatic firearms that "traditionally ha[d] been widely accepted as lawful possessions"). These principles are determinative and render the SMF Ban flatly unconstitutional.

> **B. Defendant's Evidence Can Only Bolster Plaintiffs' Motion for Summary Judgment in Underscoring the Unconstitutionality of the Bans Under *Bruen*.**

---

[5] "About Polymer80," online at https://www.polymer80.com/about-us: "Polymer80, Inc. designs and develops innovative firearms and after-market accessories that provide ways for our customer to participate in the build process, while expressing their right to bear arms. This provides a fun learning experience and a greater sense of pride in their completed firearm, strengthening our brand loyalty. We summarize this with our motto of 'Engage Your Freedom.'"

The declarations of Defendant's expert witnesses do not alter the inescapable conclusion that the SMF and NFO Bans violate the Second Amendment protected rights of Delawareans. In several instances, these declarations actually support Plaintiffs' case. Preliminarily, the Court can entirely disregard the declaration of Professor Daniel W. Webster. Professor Webster's declaration contains nothing but assertions which, even if they were all true, could only be of value in the sort of means-end, interest-balancing analysis expressly forbidden by the Supreme Court in *Bruen*. *See Bruen*, 597 U.S. at 22 (noting that *Heller* and *McDonald* expressly rejected any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.' "). Moreover, while Professor Webster asserts that "unserialized privately-made firearms" have been encountered with increasing frequency by law enforcement in recent years, this Court has already recognized that the pertinent inquiry is not whether "untraceable firearms are at times used by criminals" but instead "whether the prohibited untraceable firearms and unfinished firearm components are 'not typically possessed by law-abiding citizens for lawful purposes.' " *Rigby*, 630 F. Supp. 3d at 614. Defendant has done nothing to meet her burden of showing the prohibitions enacted by the Bans are at all consistent with the Nation's tradition of firearms regulation—and it is clear she cannot.

Professor Robert J. Spitzer admits early in his declaration that "[t]he presence or absence of serial numbers on firearms has no effect on their functionality…." Spitzer Decl. ¶ 11. Indeed, there is no constitutionally relevant difference between a commercially manufactured Glock semiautomatic pistol bearing a serial number and a self-manufactured version of the same firearm bearing no serial number. And, as this Court has already astutely observed, what matters is that "Sections 1459A(b) and 1463(a) criminalize the possession of unserialized finished firearm frames

and untraceable firearms without providing any way for Plaintiffs to keep firearms they lawfully manufactured." *Rigby*, 630 F. Supp. 3d at 613. In other words, "Delaware is criminalizing the possession of once-lawfully possessed firearms without giving Plaintiffs any opportunity to maintain possession of their firearms by applying for a serial number." *Id.* at 613 n.12. Professor Spitzer goes on to list a battery of historical regulations, such as bans on trap guns ("contraptions rigged in such a way as to fire when the owner was not present to operate the gun"), laws restricting the use of punt/pivot/swivel guns for unsportsmanlike hunting practices that decimated wild game populations, laws regarding safe storage of gunpowder and firing guns within town limits "at a time when most structures were made of wood or other highly flammable materials," laws regulating the concealed carry (in almost all cases) and criminal misuse of Bowie knives, and laws regulating certain types of clubs that Professor Spitzer does not claim were ever in common use for lawful purposes. Spitzer Decl. ¶¶ 19, 25–29, 31–43, 44–55, 56–63. None of the historical regulations cited by Professor Spitzer are "relevantly similar" to the Bans as "a well-established and representative historical *analogue*," *Bruen*, 597 U.S. at 30 (emphasis added), and he certainly has not shown any historical tradition of banning arms that are in common use for lawful purposes or of banning the self-manufacturing of such arms. To the contrary, "every law-abiding responsible individual citizen has a constitutionally protected right to keep and bear firearms commonly owned and kept for lawful purposes." *Miller v. Bonta*, 2023 WL 6929336 at *39. Likewise, no historical precedent exists for banning the self-manufacture of such arms. GREENLEE, *The American Tradition of Self-Made Arms*, St. Mary's Law Journal, Vol. 54, No. 1, Art. 2, at 36.

The declaration of Professor Brian DeLay recounts an entirely irrelevant history of colonial gunsmithing and impermissibly seeks to shift the State's historical burden to Plaintiffs. Contrary to Professor DeLay's nonsensical suggestion that the "operative question" here is "whether there

is a venerable American tradition of amateurs assembling firearms," DeLay Decl. ¶ 17, or that Plaintiffs must show a "widespread tradition of self-made arms" in early America, DeLay Decl. ¶ 40, the burden is on the *Defendant* to demonstrate that the Bans comport with the nation's historical tradition of firearm regulation, *Bruen*, 597 U.S. at 22-23. As this Court has already recognized in its earlier opinion, "[i]t is Defendant's burden to justify a Second Amendment burden as longstanding." *Rigby*, 630 F.Supp.3d at 616. Defendant has utterly failed to meet that burden.

Professor DeLay concedes that "[g]unsmiths are easy enough to find in the archives of individual colonies, and routinely advertised their services in colonial newspapers," DeLay Decl. ¶ 37, which actually bolsters Plaintiffs' argument regarding the lack of historical regulation of self-manufacturing arms. He, however, muddies the waters by drawing immaterial distinctions between "professionals or professionals-in-training" and amateurs, DeLay Decl. ¶ 70, as well as between "making" guns and "assembling" them, DeLay Decl. ¶ 16, but he never cites a law which regulated the self-manufacture of firearms based upon those newly invented distinctions. Moreover, the term "gunsmith" is not limited to licensed manufacturers or commercial retailers, so as to exclude the ordinary person, as DeLay suggests. Rather, as Thomas Jefferson observed during the relevant period, "*[o]ur citizens* have always been free to make, vend, and export arms." 7 The Writings Of Thomas Jefferson at 326 (Paul Ford ed., 1904) (italics added).

Professor DeLay also suggests more generally throughout his declaration that manufacturing a firearm from scratch or putting one together using foreign parts was time-consuming and difficult in early America but that the situation today should be viewed differently because the process of manufacturing firearms is now faster and easier. This is irrelevant and at odds with the rationale of *Bruen* and *Heller*. *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582) (" 'Just as the First Amendment protects modern forms of communications, and the Fourth

14

Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.' "). Just as speech is no less protected today when it can be transmitted instantly over the Internet rather than written out and carried by a courier on horseback to its destination, a firearm in common use for lawful purposes is no less protected today when it can be assembled using a 3D printer or CNC machine instead of hand tools. For the same reason, when the Court in *Bruen* referred to "dramatic technological changes," it quite obviously did not mean to *exclude* from the Second Amendment's purview developments or innovations in the technology of arms manufacturing, contrary to what Professor Delay suggests. DeLay Decl. ¶ 71. Rather, the *Bruen* Court made it a point to emphasize that " 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding,' " *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582), and the Second Amendment's general definition of "arms" "covers modern instruments that facilitate armed self-defense," *id.*

## II. Plaintiffs Succeed on the Merits of their First Amendment Claims.

"[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). "Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment." *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."), *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("For the purposes of First Amendment analysis, this court finds that source code is speech."). The First Amendment thus applies to the type of speech impacted by the Instructions

Ban—digital firearms information, which Rigby and others similarly situated would disseminate but for their reasonable fear of criminal sanction. Rigby Decl. at ¶ 17.

Plaintiffs maintain that strict scrutiny should apply to the Instructions Ban, but it cannot stand in any event because it cannot even survive intermediate scrutiny. Defendant cannot meet this burden because she has not shown that the Instructions Ban advances a substantial government interest and does not burden substantially more speech than is necessary—i.e., that it is narrowly tailored *and* leaves open ample alternative channels for communication. *See Free Speech Coalition, Inc. v. AG of the United States*, 677 F.3d 519, 535 (3d Cir. 2012). While public safety may certainly be considered a legitimate government interest, Defendant has failed to produce evidence that the Instructions Ban advances such an interest in any meaningful sense. Although it may be true that police officers have encountered more self-manufactured firearms in recent years or that more have been submitted to federal tracing programs, Defendant has not shown that 3D-printed firearms present any greater threat to public safety than their commercially manufactured counterparts. Defendant muddies the waters with references to self-manufactured arms as being "untraceable," but she ignores the fact that ballistics data from a self-manufactured firearm can be used to connect it with a violent crime in the very same way that is routinely done with commercially manufactured firearms (i.e., by examining the unique pattern that each firearm barrel leaves on a bullet that has been fired from it). *See, e.g.*, NATIONAL INSTITUTE OF JUSTICE, *The Science Behind Firearm and Tool Mark Examination* (December 1, 2014) https://bit.ly/3x8keRB. Defendant has never provided evidence demonstrating how or why being able to "trace" a firearm using a serial number actually advances an interest in public safety.

Additionally, upholding the Instructions Ban while enjoining the NFO and SMF Bans would create a peculiar and untenable result where the activity of self-manufacturing firearms and

16

possession of the resulting products are recognized as constitutionally protected, but the distribution of computer source code simply to facilitate the exercise of this constitutionally protected activity to produce this constitutionally protected property is not.

Further, the overbreadth doctrine "prohibits the Government from banning [the] unprotected speech" where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 255 (2002); *see also City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987). The Instructions Ban violates this doctrine in at least two ways. The Instructions Ban criminalizes speech regardless of its relationship to illegal conduct. The government may "suppress speech for advocating the use of force or a violation of law only if 'such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action,' " and it may "not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.' " *Ashcroft*, 535 U.S. at 253–54 (quoting *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)). In this context, states can only prohibit speech to prevent illegal conduct when the speech is "integral to criminal conduct." *United States v. Stevens*, 559 U.S. 460, 468 (2010). But speech cannot be "integral to criminal conduct" if it has only a "contingent and indirect" relationship to that conduct. *Ashcroft*, 535 U.S. at 250. It is not enough for Delaware to allege that there is "some unquantified potential for subsequent criminal acts." *Id*. Indeed, the Supreme Court has recognized that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law abiding third party." *Bartnicki v. Vopper*, 532 U.S. 514, 529–30 (2001). Virtually all the speech covered by the Instructions Ban falls squarely on the protected side of *Brandenburg* and *Ashcroft's* line, either because the recipient commits no illegal act at all or because, even so, the causal link is

17

merely contingent and indirect. *Cf. Staples v. United States*, 511 U.S. 600, 610 (1994) ("[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country."). Yet the Instructions Ban still criminalizes *every* instance of "distribut[ion]." Any connection of the speech criminalized by the Instructions Ban with any illegal conduct is tenuous at best, particularly since the NFO and SMF Bans unconstitutionally restrict protected Second Amendment conduct.

The Instructions Ban is also overbroad because it fails to distinguish between information that has, and has not, been committed to the public domain. Digital firearms information is already freely circulating in the public domain because of publications that took place well before this law was enacted. *See Defense Distributed v. Grewal*, 971 F.3d 485, 493 n.7 (5th Cir. 2020) (such information "can be located with a simple Google search" and has been "downloaded 'hundreds of thousands of times.' "). "[T]he Government may not . . . restrict individuals from disclosing information that lawfully comes into their hands in the absence of a 'state interest of the highest order.' " *United States v. Aguilar*, 515 U.S. 593, 605 (1995). This Ban, however, draws no distinction between truly novel "instructions" and those that anyone has been able to obtain with simple Google searches for years. Indeed, the Instructions Ban makes it a felony to lawfully download information from an Internet source and then e-mail it to a fellow hobbyist friend. This is a general restriction on the disclosure of information rather than a restriction designed only to prevent disclosure motivated by improper purposes. It cannot stand.

## III.   Plaintiffs Succeed on Their Fifth and Fourteenth Amendment Claims.

The law is clear: the government must provide just compensation for any "physical invasion" of private property interests. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 152 (2021) ("[G]overnment-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation[.]"). This is true whether the

invasion involves a classic exercise of eminent domain powers, an occupation or possession (even temporarily or intermittently), or "a regulation [that] results in a physical appropriation of property." *Id.* at 149. A regulation has this impact when it effectively deprives the owner of " 'all economically beneficial us[e]' of [their] property." *Lingle v. Chevron, U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)). Such a "regulatory" taking is no different than a "physical" taking, as it requires compensation *per se*. *Cedar Point*, 594 U.S. at 2072 (the "regulatory taking" label "can mislead" in this context because the more lenient *Penn Central* test for less invasive regulations "has no place").

Delaware's Bans mandate that its citizens destroy or dispossess themselves of their NFOs and SMFs, or face arrest and involuntary surrender of this property to law enforcement, while making no provision for just compensation. "When it comes to physical appropriations, people do not expect their property, real or *personal*, to be . . . taken away." *Horne v. Dep't of Agric.*, 576 U.S. 351, 352 (2015). Such appropriation gives "rise to a *per se* taking." *Id.* at 360. This holds true for firearms and firearms components, and the NFO Ban and SMF Ban are *per se* unconstitutional takings under the Fifth and Fourteenth Amendments. Because Defendant has failed to demonstrate that the challenged Bans mandating destruction or dispossession of Plaintiffs' personal property are valid, even a provision for just compensation (which is not present here) cannot save the Bans. A government regulation is plainly "onerous" and "goes too far" when it impermissibly infringes on constitutionally protected rights, *see Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922), as the Delaware Bans do in trampling on the Second Amendment protected rights of its citizens.

## IV.    Plaintiffs Will Suffer Irreparable Harm Absent a Permanent Injunction.

It is settled that the deprivation of a constitutionally protected right "for even minimal periods of time" constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976); *accord*

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971). This is equally true for the rights secured by the Second Amendment. *Ezell*, 651 F.3d at 699; *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). Here, Plaintiffs face ongoing deprivations of their rights secured by the First, Second, Fifth, and Fourteenth Amendments. Each day Defendant's unconstitutional NFO Ban, SMF Ban, and Instructions Ban continue in force, Rigby, Knight, and similarly situated Delaware-resident members of FPC risk felony prosecution, incarceration, and permanent loss of their First and Second Amendment rights because they are prohibited from engaging in the constitutionally protected self-manufacturing and speech activities that the Bans outlaw on pain of criminal penalty. And these injuries cannot be compensated through money damages. *See* Rigby Decl. at ¶¶ 11, 13-15, 17, 18; Knight Decl. at ¶¶ 9, 11-12, 14.

## V.     The Balance of the Equities Favors the Grant of Permanent Injunctive Relief.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights" (*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)), for "the enforcement of an unconstitutional law vindicates no public interest," *K.A. ex rel. Ayers*, 710 F.3d at 114; *see also Wrenn v. Dist. of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017). Moreover, *Heller* and *Bruen* prohibit interest-balancing in Second Amendment challenges, so the unconstitutional Bans cannot stand regardless of the nature or significance of any interest the Defendant may claim in the enforcement of the Bans.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment and enter an order permanently enjoining enforcement of the Bans created by H.B. 125.

Respectfully submitted,

Dated: March 25, 2024

GELLERT SCALI BUSENKELL & BROWN LLC

*/s/ Bradley P. Lehman*
Bradley P. Lehman (No. 5921)
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
P: (302) 425-5800
E: blehman@gsbblaw.com