## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOHN RIGBY, ALAN KNIGHT, and
FIREARMS POLICY COALITION,
INC.,

         Plaintiffs,

         v.

KATHY JENNINGS, Attorney General of
Delaware,

         Defendants.

C.A. No. 1:21-cv-01523 (MN)

## PLAINTIFFS' BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Bradley P. Lehman (No. 5921)
GELLERT SCALI BUSENKELL & BROWN LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
P: (302) 425-5800
E: blehman@gsbblaw.com

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
P: (910) 713-8804
E: law.rmd@gmail.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

   I.   Defendant's Motion Only Bolsters Plaintiffs' Second Amendment Claim....................... 2

     A.   Defendant Makes No Effort to Legitimately Defend the NFO Ban. ............................ 2

     B.   Defendant's Spurious Defenses of the SMF Ban Underscore Why It Cannot Stand. .... 5

       1.   Defendant Tries to Shift Away *Her* Burden Because She Cannot Carry It............... 6

       2.   The Bans Unquestionably Target Arms in Common Use for Lawful Purposes......... 8

       3.   Defendant's Other Claims Further Undermine Her Own Position.......................... 10

       4.   Defendant's Historical Arguments Only Further Prove Plaintiffs' Point................ 13

   II.   Defendant's Motion Also Can Only Bolster Plaintiffs' First Amendment Claim............ 17

   III.   Plaintiffs Prevail on Their Fifth and Fourteenth Amendment Claims.............................. 19

   IV.   The Irreparable Harm and Balance of the Equities Stand Unrefuted. .............................. 20

CONCLUSION...................................................................................................................... 20

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002)..................................................................................................18

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001)..................................................................................................18

*Bernstein v. U.S. Dep't of State*,
    922 F. Supp. 1426 (N.D. Cal. 1996) .......................................................................17

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) (Alito, J., concurring) .............................................................8

*Defense Distributed v. Grewal*,
    971 F.3d 485 (5th Cir. 2020) ...................................................................................19

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).......................................................................................... *passim*

*Downey v. Pa. Dep't of Corr.*,
    968 F.3d 299 (3d Cir. 2020)......................................................................................6

*Drummond v. Robinson Township*,
    9 F.4th 217 (3d Cir. 2021) ........................................................................................3

*Free Speech Coalition, Inc. v. AG of the United States*,
    677 F.3d 519 (3d Cir. 2012).....................................................................................18

*Friedman v. City of Highland Park, Ill*,
    577 U.S. 1039 (2015) (Thomas, J., dissenting from denial of certiorari)................9

*Gamble v. United States*,
    587 U.S. 678 (2019)..................................................................................................16

*Junger v. Daley*,
    209 F.3d 481 (6th Cir. 2000) ..............................................................................17, 18

*Khan v. State Oil Co.*,
    93 F.3d 1358 (7th Cir. 1996), *vacated by State Oil Co. v. Khan*, 522 U.S. 3
    (1997)........................................................................................................................16

*McDonald v. Chicago*,
    561 U.S. 742 (2010)................................................................................16

*Miller v. Bonta*,
    __ F. Supp. 3d __ (S.D. Cal. Oct. 19, 2023), 2023 WL 6929336 (appeal filed) .................8, 9

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    597 U.S. 1 (2022)......................................................................... *passim*

*Rigby v. Jennings*,
    630 F.Supp.3d 602 (D. Del. 2022).............................................3, 12, 13

*Sheetz v. County of El Dorado*,
    __ U.S. __, No. 22-1074 (April 12, 2024), Slip.....................................20

*Smith v. State*,
    913 A.2d 1197 (Del. 2006) .....................................................................12

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)................................................................................17

*Staples v. United States*,
    511 U.S. 600 (1994)...................................................................10, 11, 19

*Teixeira v. County of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ...................................................................3

*Teter v. Lopez*,
    76 F.4th 938 (9th Cir. 2023) .....................................................................7

*United States v. Aguilar*,
    515 U.S. 593 (1995)................................................................................19

*United States v. Stevens*,
    559 U.S. 460 (2010)................................................................................18

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001)...................................................................17

**Constitutions, Statutes, and Rules**

U.S. CONST. amend. II ............................................................... *passim*

Cal. Penal Code § 29180 (b)(1) ...............................................................13

**Other Authorities**

Alcohol, Tobacco, Firearms, and Explosives, *What is ATF doing in regards to people making their own firearms* (May 14, 2015), https://bit.ly/4a85mB0 ...........................5

iii

Joseph Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S
L.J.35, 36 (2023)..........................................................................................................5

Law Dictionary, https://thelawdictionary.org/homicide/ .............................................12

Mark W. Smith, *"Not All History Is Created Equal": In the Post-*Bruen *World,
the Critical Period for Historical Analogues Is When the Second Amendment
Was Ratified in 1791, and Not 1868* (Oct. 1, 2022), https://bit.ly/3CMSKjw........................15

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How
Courts Have Defied Heller In Arms-ban Cases—Again* (June 18, 2023),
https://bit.ly/3PTEiP1................................................................................................6

Mark W. Smith, *What part of "in common use" don't you understand?: How
courts have defied Heller in Arms-Ban-Cases—Again, Per Curiam,* HARV.
J.L. & PUB. POL'Y (Sept. 27, 2023)............................................................................8

**INTRODUCTION**

As Plaintiffs explained in their motion for summary judgment ("P-MSJ"), and as Defendant Jennings readily concedes in both her cross-motion for summary judgment ("D-MSJ") and the joint stipulation of undisputed material facts ("JSUMF"), House Bill 125 ("HB 125") imposes against Plaintiffs Rigby and Knight and similarly situated Delaware-resident members of Plaintiff Firearms Policy Coalition ("FPC") flat bans prohibiting: (a) the possession, transportation, shipping, transfer, or sale of non-firearm objects ("NFOs") that may be used in the manufacture of a firearm ("NFO Ban"), (b) the possession of self-manufactured firearms ("SMFs")—self-made firearms that do not bear a federally licensed firearm manufacturer's serial number—as well as any further self-manufacturing of firearms, including through the use of three-dimensional printers ("3D Printers") to manufacture firearms or "major firearm components" ("SMF Ban"), and (c) any distribution of instructions in the form of computer files or code that may be used to program a 3D Printer to manufacture or produce a firearm, firearm receiver, or major component of a firearm (the "Instructions Ban") (collectively the "Bans"). D-MSJ at 2-3, 9-12; JSUMF ¶¶ 1-49.

Defendant's motion for summary judgment in the face of these flat bans is based on the theory that the "banned items" are "not entitled to protection" under the Second Amendment and, even so, the bans are "consistent with this Nation's historical tradition of firearm regulation." D-MSJ at 1, 9. At the outset, Defendant largely ignores the impact of the NFO and SMF Bans in prohibiting the constitutionally protected activity of *self-manufacturing* firearms for lawful purposes, attempting to sweep it aside with the claim that self-manufacturing firearms is "not a part of American history or tradition," *id.* at 4-6, which is not only entirely incorrect but also fundamentally distorts the legal analysis. In defending the prohibitions against the SMFs and NFOs targeted by the Bans, Defendant distorts the facts and law even further by arguing "Plaintiffs have

1

failed to demonstrate the banned items are covered under the Second Amendment" because "there is no record evidence that these items are in common use for lawful purposes" and instead, the evidence shows that "[g]host guns are primarily used for illegal purposes." *Id.* at 3-4, 10-12. The distortion continues with Defendant's purported historical analysis, where she claims that "[e]ven if the Bans implicate the Second Amendment," they survive scrutiny simply because the State perceives them as "presenting a particular threat to society from violence and crime" and "pos[ing] too high of a risk to public safety," like governments of yesteryear did in placing restrictions on certain weapons they "viewed as a concern for violence and crime" at the time. *Id.* at 12-15.

Defendant's fundamentally distorted analysis of the Second Amendment claim serves as the foundation for her brushing off the claims under the Fifth and Fourteenth Amendments, as she argues they necessarily must fail because the Bans are otherwise "valid" and "constitutional." D-MSJ at 9, 20. Her defense of the Instructions Ban under the First Amendment rests on her claim that HB 125 does not regulate speech, but she herself characterizes the Ban as concerned with "the spread of ideas about 3D printing of firearms" because it is designed to suppress "the means to easily do so." *Id.* at 17-18. Defendant's self-evidently fallacious position hardly warrants judgment in her favor. Rather, all it does is bolster Plaintiffs' position that the Bans unconstitutionally prohibit protected conduct and protected activity, compelling judgment in their favor.

## ARGUMENT

### I.   Defendant's Motion Only Bolsters Plaintiffs' Second Amendment Claim.

#### A.   Defendant Makes No Effort to Legitimately Defend the NFO Ban.

In sweeping aside the aspect of the Second Amendment claim concerning the ability of law-abiding citizens like Plaintiffs to self-manufacture arms, Defendant makes no effort to even claim this conduct is *not* covered under the plain text of the Second Amendment. Again, "[i]n

keeping with *Heller*," "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1, 17 (2022); *id.* at 24. The Second Amendment plainly declares: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II. The Second Amendment protects " 'the ability to acquire arms' " as an ancillary right necessary to the exercise of the right to "possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (quoting *Ezell* at 704 (italics added) (This " 'implies a corresponding *right to acquire* and maintain proficiency' with common weapons.")). Certainly nothing within the plain text of the Second Amendment *limits* the manner of arms acquisition to the purchase or acquisition from a third party, and Defendant makes no claim otherwise. Instead, as this Court previously held, "the right to keep and bear arms implies a corresponding right to manufacture arms." *Rigby v. Jennings*, 630 F.Supp.3d 602, 615 (D. Del. 2022); *see also Teixeira*, 873 F.3d at 679 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)) (the right "to keep" arms "necessarily involves" the right to " 'keep them in a state of efficiency for use' " and " 'to keep them in repair,' " which implies the right to *self*-repair).

This right to self-manufacture "wouldn't mean much" without the right to own, possess, and use items and materials necessary to engage in such activity, such as the NFOs that the State bans. *See Teixeira*, 873 F.3d at 677 (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (the Second Amendment right to keep and bear arms " 'wouldn't mean much' without the ability to acquire arms"). What little Defendant says about HB 125's ban on the activity of self-manufacturing arms is not a textual argument at all. Instead, she inserts in

3

the background discussion of her opening brief a section titled, "SMFs are not a part of American history or tradition," where she claims that there is no history or tradition of self-manufacturing arms by ordinary law-abiding people. D-MSJ at 4-6. Not only does this have nothing to do with the threshold question of whether the activity is presumptively protected based on the plain language of the Second Amendment—which it is—but Defendant gets the historical analysis exactly backwards: the focus is not whether or the extent to which ordinary people have traditionally engaged in self-manufacturing arms, but whether or the extent to which the government has *regulated* such conduct so as to *limit or prohibit* it. *Bruen*, 597 U.S. at 17 (italics added). ("To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm *regulation*."). The fact is, this Nation has no history or tradition of regulating—much less *banning*—the self-manufacturing of firearms for lawful purposes, as it is undisputed that the first such regulations appeared in very recent years, long after the relevant historical period. *Id.* at 34 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634–635 (2008) (" 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' "); *id.* at 37 ("[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.").

What matters is that self-manufacturing of firearms was entirely unregulated during our Colonial and Founding Eras, with no restrictions on who could be a gunsmith or manufacture arms. *See, e.g*., Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 The Writings Of Thomas Jefferson 325, 326 (Paul Ford ed., 1904) ("Our citizens have always been free to make, vend, and export arms."). And, contrary to the claim of Defendant's expert, this activity was woven into the fabric of society during these eras. *See id.*

("It is the constant occupation and livelihood of some of them."). "Since the earliest colonial days, Americans have been busily manufacturing and repairing arms." Joseph Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J.35, 36 (2023). "Meanwhile, restrictions on self-made arms have been rare throughout American history." *Id.* In fact, "[a]ll restrictions on arms built for personal use have emerged within the last decade, and from only a few states." *Id.* And again, to this day, the federal government has never prohibited the ability of law-abiding citizens to self-manufacture firearms for personal use. *See* Bureau of Alcohol, Tobacco, Firearms, and Explosives, *What is ATF doing in regards to people making their own firearms*, (May 14, 2015), https://bit.ly/4a85mB0 ("An individual may generally make a firearm for personal use.").

Simply put, no history or precedent exists for government *regulations* restricting the ability of law-abiding citizens to self-manufacture firearms for lawful purposes—much less for imposing an absolute ban on the activity and the possession of the parts that may be used to engage in it. Defendant hasn't even attempted to demonstrate otherwise, which is her burden to do because the conduct is protected under the plain text of the Second Amendment. *Bruen*, 597 U.S. at 17 ("[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "[t]o justify its regulation," "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."). Therefore, the prohibition against self-manufacturing under the NFO Ban is necessarily unconstitutional.

**B.      Defendant's Spurious Defenses of the SMF Ban Underscore Why It Cannot Stand.**

In defending the SMF Ban as purportedly constitutional under the Second Amendment, Defendant also makes no effort to claim the self-manufactured arms that Plaintiffs seek to possess for self-defense and other lawful purposes—semiautomatic handguns and AR-15-style rifles,

Rigby Decl. at ¶¶ 10, 12, 15; Knight Decl. at ¶¶ 9-10—are *not* "arms." Nor could this be disputed: " 'Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.' " *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582). In fact, the entire analysis here is very simple: binding Supreme Court precedent has already established the relevant contours of the historical tradition that a court must examine when determining the constitutionality of a ban on arms. The *only* way the government can "justify its regulation . . . [as] consistent with this Nation's historical tradition" is by demonstrating that the banned arms are "dangerous and unusual" and thus fall outside the Second Amendment's protection of "the possession and use of weapons that are in common use at the time." *Id.* at 2126, 2128. If the government cannot make that showing because the firearms at issue are in common use, any further examination of history and tradition is not necessary or appropriate, because the Supreme Court has already done the analysis, and its conclusions are binding. *See Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 308 n.8 (3d Cir. 2020). Because the State cannot make that showing here, the SMF Ban is unconstitutional, period. *See* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied Heller In Arms-ban Cases—Again* (June 18, 2023), https://bit.ly/3PTEiP1.

1.     **Defendant Tries to Shift Away *Her* Burden Because She Cannot Carry It.**

Defendant's strategy, instead, is to claim the banned arms are "not entitled to protection" because *Plaintiffs* have failed to demonstrate that the arms they seek to possess are in common use for self-defense or other lawful purposes—i.e., Defendant argues the question of "common use" is a component of the *textual* analysis on which Plaintiffs bear the burden. D-MSJ at 10-11. However, the textual prong of the analysis focuses solely on the "plain text" of the Second Amendment, as

*Bruen* made clear: "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17; *id.* at 24. Following the methodology later made explicit in *Bruen*, *Heller* began by analyzing the scope of the text of the Second Amendment. *See Heller*, 554 U.S. at 576–600. It construed the term "arms" to embrace "all instruments that constitute bearable arms," without regard to commonality. *Id.* at 582. *Heller* then analyzed the history of firearm regulation to assess potential limits on the right and held that *history* disclosed an "important limitation on the right to keep and carry arms," namely, that "*the historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons' " showed "the sorts of weapons protected were those 'in common use.' " *Id.* at 627 (emphasis added). Thus, this was a rule developed from "*the historical understanding* of the scope of the right." *Id.* at 625 (emphasis added). And the *Bruen* Court stated plainly that the conclusion that firearms "in common use" are protected by the Second Amendment was "[d]raw[n] from . . . *historical tradition*" and comported with the colonial legislative enactments that the court analyzed in its own historical review. 597 U.S. at 47 (emphasis added).

Thus, it is clear that the burden rests squarely on *the government* to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24—including "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627, such that it *falls to the state* to show the arms it has banned are "unusual," and thus *not* "in common use at the time." *See also Teter v. Lopez*, 76 F.4th 938, 949–50 (9th Cir. 2023) (vacated after rehearing en banc) ("*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons,' " 554 U.S. at 627, and thus, whether the banned arms are " 'dangerous and unusual' is a contention as to which [the state] bears the

7

burden of proof in the second prong of the *Bruen* analysis").[1] That is, because the Second Amendment right necessarily encompasses firearms "typically possessed by law-abiding citizens for lawful purposes . . . ," *Heller*, 554 U.S. at 625; *see also* Mark W. Smith*, What part of "in common use" don't you understand?: How courts have defied Heller in Arms-Ban-Cases—Again, Per Curiam,* HARV. J.L. & PUB. POL'Y (Sept. 27, 2023), https://bit.ly/4avsZ6j, the government may only ban weapons that are both dangerous *and* unusual, *i.e.*, weapons that are *not* in common use. *Id*. at 627; *see also Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring) ("A weapon may not be banned unless it is *both* dangerous *and* unusual.") (emphasis in original).

And because it is a *conjunctive* test, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class [*sic*] arms commonly used for lawful purposes," *Caetano*, 577 U.S. at 417, for it enough that the arm is "commonly possessed by law-abiding citizens for lawful purposes *today*," *id*. at 420 (Alito, J., concurring) (emphasis in original). Ultimately, *Heller* and *Bruen* make clear that "every law-abiding responsible individual citizen has a constitutionally protected right to keep and bear firearms commonly owned and kept for lawful purposes." *Miller v. Bonta*, __ F. Supp. 3d __ (S.D. Cal. Oct. 19, 2023), 2023 WL 6929336 at *39 (appeal filed).

**2.      The Bans Unquestionably Target Arms in Common Use for Lawful Purposes.**

There can be no dispute that the arms at issue are typically possessed and commonly owned by law-abiding citizens for lawful purposes such as self-defense and therefore cannot be banned.

---

[1]      Defendant attempts to find support for her burden-shifting argument in the aspect of *Bruen* where the court noted that the parties there did not dispute that "handguns are weapons 'in common use' today for self-defense" before "turn[ing] to whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense." D-MSJ at 11 (citing *Bruen*, 597 U.S. at 31-32. However, the court's reference to "common use" there was clearly limited to simply explaining there was no dispute that the *arms themselves* were fully protected because the case did not involve an arms *ban*; the issue was whether the *conduct* of carrying these arms outside the home was a protected activity.

Again, the stipulated and undisputed facts establish: Plaintiff Rigby lawfully owned a self-manufactured a Glock-compatible[2] handgun, which he completed from a Polymer80 NFO before enactment of the Bans and which he has since removed from the State due to his reasonable fear of criminal sanction, but which he would otherwise retain for self-defense and other lawful purposes within the State, JSUMF ¶¶ 17-18, 21-22; Rigby Decl. at ¶¶ 8, 9; both Plaintiff Rigby and Plaintiff Knight lawfully acquired NFOs before the NFO Ban, for purposes of self-manufacturing other semi-automatic handguns and rifles, of which they have dispossessed themselves due to their reasonable fear of criminal sanction, but which they would otherwise continue to possess and use for those lawful purposes, JSUMF ¶¶ 19-21, 23-24, 33-38; the NFOs that Plaintiffs Rigby and Knight owned could be used specifically to manufacture a common AR-15-style rifle, Rigby Decl. at ¶ 12; Knight Decl. at ¶ 10; and Plaintiff FPC represents its Delaware-resident members who include Plaintiffs Rigby and Knight and who are and have been similarly impacted by the prohibitions of the State's Bans, JSUMF ¶¶ 16, 32, 40-44, 48-49.

Handguns are unquestionably in common use, having been recognized as "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629. Similarly, there cannot be and has not been any dispute that AR-15-style rifles and their components are commonly owned by law-abiding citizens. *See Miller*, 2023 WL 6929336 at *35 (observing that even if the State was right that 7.9 million Americans have owned AR-15-type rifles, instead of the 24.4 million reflected in the data, 7.9 million "is still a large number of citizens choosing to own AR-15 type firearms" and, indeed, "[w]hen the Supreme Court vacated Caetano's conviction for mere possession of a stun gun, 200,000 owners of stun guns was all it took"); *see also Friedman*

---

[2] *See, e.g.*, https://www.polymer80.com/PF940v2-80-Full-Size-Frame-Kit-_2 ("The PF940v2™ is compatible with components for 3-pin 9mm [Glock®] G17, 34, 17L; .40S&W G22, 35, 24; and .357Sig G31.") (last accessed April 15, 2024).

*v. City of Highland Park, Ill*, 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting from denial of certiorari) (reasoning that "citizens . . . have a right under the Second Amendment to keep" "AR-style semiautomatic rifles" because "[r]oughly 5 million Americans own" them and "the overwhelming majority . . . do so for lawful purposes"); *Staples v. United States*, 511 U.S. 600, 612 (1994) (identifying an AR-15 as a type of semiautomatic firearms that "traditionally ha[d] been widely accepted as lawful possessions"). This alone seals the fate of the SMF Ban.

### 3.  Defendant's Other Claims Further Undermine Her Own Position.

It is nevertheless worth noting just how misguided Defendant is in her attempts to defend the Bans with the claims that "ghost guns are primarily used for illegal purposes" and that Plaintiffs cannot carry their (non-existent) burden because the Bans do not prohibit them from *purchasing* firearms and/or *pre-manufactured* frames or receivers bearing serial numbers. D-MSJ at 3-4, 11.

Defendant again gets it entirely backwards in focusing on the potential for criminal misuse of the banned arms. Of course, *all* firearms possess such potential—as they must in order to serve their core purpose of facilitating *armed* self-defense—and *Heller's* primary analysis of the Second Amendment already took account for the main concerns about the misuse of firearms in society. *See* 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution."). In fact, Justice Breyer spilled considerable ink writing about these potentialities in much the same light as the State does here. *See id.* at 682 (Breyer, J., dissenting) (defending the District of Columbia's handgun ban on the basis that handguns "are specially linked to urban gun deaths and injuries, and which are the overwhelmingly favorite weapon of armed criminals"); *id.* at 694–95 (pressing the District of Columbia's statistics that "guns were 'responsible for 69 deaths in this country each day,' for a total of '[a]pproximately 25,000 gun-

deaths . . . each year,' along with an additional 200,000 gun-related injuries," and " '[a] crime committed with a pistol,' the [House] Committee [on the District of Columbia] reported, 'is 7 times more likely to be lethal than a crime committed with any other weapon' "). A central idea behind the District of Columbia's handgun ban, stressed in Justice Breyer's dissent, was in fact " 'to reduce the potentiality for gun-related violence.' " *Id.* at 695.

In the face of this, the *Heller* majority noted that "[u]ndoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem." 554 U.S. at 636. Yet, the majority was unshaken in its adherence to "the true meaning of the right to keep and bear arms," *id.* at 624, and in its resolve that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table," including "the absolute prohibition of handguns held and used for self-defense in the home," *id.* at 636. Thus, the *Heller* majority considered the essential public safety concerns that the State presses here. But the Court found them irrelevant to whether the arms at issue were protected, because that does not turn on whether arms are misused by criminals; it turns, *inter alia*, on whether law-abiding citizens commonly own and use them for lawful purposes, and it was enough in *Heller* to secure constitutional protection that handguns are *typically* possessed for lawful purposes. 544 U.S. at 624–25.

"[A]s Members of the Court have already explained, '[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications.' " *Bruen*, 597 U.S. at 17 n.3 (quoting *McDonald v. Chicago*, 561 U.S. 742, 783 (2010)). In fact, justifying the Bans based on interests in combating such risks runs afoul of the clear mandate that courts must abandon any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's

salutary effects upon other important governmental interests.' " *Id.* at 22 (quoting *Heller*, 554 U.S. at 634).

Moreover, the data Defendant cites—a study of "ghost gun usage in Oakland, California" and a national survey of prisoners—does not even support the claim that "ghost guns are *primarily* used for illegal purposes." At most, it merely suggests that *some* portion of "ghost guns" are used in crime with no evidence or indication that this comprises a substantial percentage, and a possible *correlation* between a supposed increase in the number of "recovered" "privately manufactured firearms" and an increase in the number of "firearm homicides"[3] over a four-year period with no evidence or indication of a *causal* connection. D-MSJ at 3-4. The prisoner survey is even more attenuated, as it was based on the unverified, self-reported responses of convicted criminals concerning their firearms-related *crimes*—a world removed from the subject of this action concerning law-abiding citizens seeking to lawfully exercise their Second Amendment rights.

As this Court previously observed, all this is beside the point: even if "untraceable firearms are at times used by criminals," "firearms unquestionably protected by the Second Amendment are also sometimes used by criminals," and "[w]hat is important is whether the prohibited untraceable firearms and unfinished firearm components are 'not typically possessed by law-abiding citizens for lawful purposes.' " *Rigby*, 630 F.Supp.3d at 614. And it is perverse for Defendant to complain in this context how this data supposedly underscores that "background checks and other regulations are imperative to prevent firearm use in crimes." D-MSJ at 4. "Sections 1459A(b) and 1463(a) criminalize the possession of unserialized finished firearm frames and untraceable firearms without providing any way for Plaintiffs to keep firearms they lawfully

---

[3]     The term "homicide" merely means the killing of a human being and is by itself neutral as to culpability. The Law Dictionary, https://thelawdictionary.org/homicide/. A homicide can be lawful when justified by self-defense. *Smith v. State*, 913 A.2d 1197, 1212 n.10 (Del. 2006).

manufactured." *Rigby*, 630 F. Supp. 3d at 613. That is, "Delaware is criminalizing the possession of once-lawfully possessed firearms without giving Plaintiffs any opportunity to maintain possession of their firearms by applying for a serial number." *Id.* at 613 n.12 ("California, for example, permits individuals to '[a]pply to the Department of Justice for a unique serial number or other mark of identification' " for their firearms. Cal. Penal Code § 29180 (b)(1).").

Defendant also looks through the wrong end of the telescope in arguing that Plaintiffs retain the ability to obtain the banned arms through means other than self-manufacturing, such as purchasing completed arms or pre-manufactured components of the arms. D-MSJ at 11. The State must justify eliminating the channels for the exercise of the right it has cut off; it cannot simply point to the existence of the channels it has not cut off (yet). *Heller* made this clear in rejecting the District of Columbia's claim that "it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed," saying that was "no answer" in attempting to justify the handgun ban. 554 U.S. at 629. It is no answer to the Bans here either. Instead, as in *Heller*, it is enough that the targeted arms are "typically possessed by law-abiding citizens for lawful purposes" to compel the striking down of this law. *Id.* at 625.

### 4.    Defendant's Historical Arguments Only Further Prove Plaintiffs' Point.

In pursuing her further argument that "[e]ven if the Bans implicate the Second Amendment, they are constitutional because they are consistent with this Nation's historical tradition of firearm regulation," Defendant makes the further cardinal error of justifying the Bans by "simply posit[ing] that the regulation promotes an important interest." *Bruen*, 597 U.S. at 17. She focuses on the specter that these arms "present[] a particular threat to society from violence and crime" and argues that the State is simply responding to this threat with appropriate legislative action like the governments of yesteryear did in targeting weapons that, in their view, "posed too high a risk to

13

the safety of the general public." D-MSJ at 12-15. Defendant then points to various weapons regulations—primarily enacted by states between the mid-1800s and the early 1900s—as representing the sort of "relevantly similar" analogues required under *Bruen*. *Id.* at 13-15. She makes the further appeal that her purported analogues should be accepted as such "especially given the unprecedented societal concerns and dramatic technological changes associated with ghost guns and the like," as if the state of the art should afford Delaware more leniency. *Id.* at 13.

At the outset, any argument based on the notion of dramatic-technological-changes-resulting-in-unprecedented-societal-concerns is a non-starter. The Supreme Court's Second Amendment doctrine *embraces* relevant technological change to *ensure the protection* of modern arms in common use even if they may differ considerably from arms of old. Indeed, in explaining why "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," the court cited its recognition in *Heller* that "the Second Amendment's historically fixed meaning applies to new circumstances" and specifically that, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28. In other words, the Court's own illustration of this "more nuanced approach" was applied to further explain the holding in *Heller* that " 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.' " *Id.* (quoting *Heller*, 554 U.S. at 582). So, the concept was discussed in explaining the *expansive* reach of the Second Amendment's protection, not to *shrink* its protective scope.

For the same reason, the Supreme Court certainly did not suggest that the existence of any "unprecedented societal concerns or dramatic technological changes" would untether the analysis from the required analogical inquiry. To the contrary, when the court went on to discuss in this

14

very context the process of "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," it reaffirmed that doing so "requires a determination of whether the two regulations are 'relevantly similar,' " just the same as any other regulation. *Bruen*, 597 U.S. at 28-29. Just as speech is no less protected today when it can be transmitted instantly over the Internet rather than written out and carried by a courier on horseback to its destination, a firearm in common use for lawful purposes is no less protected today when it can be assembled using a 3D printer instead of rudimentary hand tools. And to justify a firearms regulation under this standard, the government must "identify a well-established and representative historical *analogue*" to the modern regulation it seeks to uphold, based on the metrics of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 30.

Another important limitation on historical analogues that Defendant overlooks is the relevant time period. As the high court has explained, "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34. Foremost, " '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.' " *Id.* (quoting *Heller*, 554 U.S. at 634-35). While "[s]trictly speaking," the States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment," adopted in 1868, "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37. The standard established in *Bruen* "requires judges to apply faithfully the balance struck *by the founding generation* to modern circumstances" as to Second Amendment claims. *Id.* at 29 n.7 (emphasis added); *see also* Mark W. Smith, *"Not All History Is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and Not 1868* (Oct. 1, 2022), https://bit.ly/3CMSKjw.

What is more, while *Bruen* flagged this scholarly debate for possible future Supreme Court consideration, lower courts are bound to look to 1791 given the Court's repeated holdings that (1) 1791 is the key date for interpreting the Bill of Rights against the federal government, *see, e.g.*, *Gamble v. United States*, 587 U.S. 678, 702 (2019); and (2) that incorporated provisions of the Bill of Rights have the same meaning when applied against the states as applied against the federal government, *see, e.g.*, *McDonald*, 561 U.S. at 765. *See also*, *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996), *vacated by State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (overruling precedent but making clear that the "Court of Appeals was correct in applying [*stare decisis*] . . . for it is this Court's prerogative alone to overrule one of its precedents"). And while "there is an ongoing scholarly debate" over whether the understanding of the Second Amendment in 1791 or 1868 should be considered primary, that issue need not be resolved when "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to" the rights at stake. *Bruen*, 597 U.S. at 38. That is the case here, concerning the outright ban on arms in common use, for the Supreme Court has already resolved the historical question by establishing that only "dangerous and unusual" arms could be banned historically and thus the rule of decision here that arms "in common use" for lawful purposes today cannot be banned.

That same rule readily sets aside the whole swath of late-game weapons restrictions to which Defendant points because her evidence fails to show that any of the weapons at issue—Bowie knives, trap guns, punt/pivot/swivel guns, certain types of clubs—were actually in common use for lawful purposes and, regardless, even if any of them *were* considered "dangerous and unusual" during the relevant time period, that could not justify the regulations on the arms at issue here because they *are* "in common use *today*" and thus are *not* dangerous and unusual. *Bruen*, 597 U.S. at 47. Again, simply put, they cannot be banned. *See id.* (even if the colonial laws to which

16

New York cited as purported analogues "prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today").[4]

## II.   Defendant's Motion Also Can Only Bolster Plaintiffs' First Amendment Claim.

In arguing that "the Instructions Ban does not implicate Plaintiffs' First Amendment rights because it does not target speech, and even if it did, the statute is lawful," D-MSJ at 9, Defendant conveniently ignores the case authority directly on point here: "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). "Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment." *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."); *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("For the purposes of First Amendment analysis, this court finds that source code is speech."). The First Amendment thus applies to the type of speech impacted by the Instructions Ban—digital firearms information, which Plaintiffs Rigby and similarly situated members of Plaintiff FPC would disseminate but for their reasonable fear of criminal sanction. JSUMF ¶¶ 28, 47-48. As noted, Defendant herself characterizes the Ban as concerned with "the spread of ideas about 3D printing of firearms" because it is designed to

---

[4]      Defendant's reliance on (largely late-game) gunpowder storage regulations, D-MSJ at 14, is nothing more than grasping at straws. Her claim to relevant similarity is that such regulations concerned how people stored gunpowder "to address safety concerns of fire and explosion." *Id.* Clearly, regulations on the storage of gunpowder to reduce the incidence of fires and explosions from stockpiles generally housed in and around wooden buildings hardly serve as "a well-established and representative historical *analogue*" to a ban against arms in common use for lawful purpose based on the mere potential for their misuse when they fall into the hands of wrongdoers.

suppress "the means to easily do so," D-MSJ at 17-18, undermining the foundation of her argument. Indeed, the entire basis for Defendant's claim that the Instructions Ban survives intermediate scrutiny is that it is "unrelated to the suppression of free expression," *id.* at 18, even while she admits the essential purpose of this ban to *suppress* this "expressive means for the exchange of information and ideas" about self-manufacturing firearms. *Junger*, 209 F.3d at 482.

While Plaintiffs maintain that strict scrutiny should apply to the Instructions Ban, it cannot even survive intermediate scrutiny because Defendant cannot show that ban advances a substantial government interest without burdening substantially more speech than is necessary—i.e., that it is narrowly tailored *and* leaves open ample alternative channels for communication. *See Free Speech Coalition, Inc. v. AG of the United States*, 677 F.3d 519, 535 (3d Cir. 2012). Again, public safety may be considered a legitimate government interest, but Defendant has failed to produce evidence that the Instructions Ban advances such an interest in any meaningful sense. As the unreliable sources for her claim that "Ghost guns are primarily used for illegal purposes" highlight, Defendant has not shown and cannot show that 3D-printed firearms present any greater threat to public safety than their commercially manufactured counterparts. And Defendant's reliance on an unsubstantiated threat to public threat proves this ban is, in fact, overbroad. Once again, states can only prohibit speech to prevent illegal conduct when the speech is "integral to criminal conduct." *United States v. Stevens*, 559 U.S. 460, 468 (2010). Speech is not "integral to criminal conduct" if it has only a "contingent and indirect" relationship to that conduct. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 250 (2002). It is not enough for Delaware to allege that there is "some unquantified potential for subsequent criminal acts." *Id*. Indeed, the Supreme Court has recognized that "it would be quite remarkable to hold that speech by a law-abiding possessor of information

18

can be suppressed in order to deter conduct by a non-law abiding third party." *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001).

Virtually all the speech covered by the Instructions Ban falls squarely on the protected side of *Brandenburg* and *Ashcroft's* line, either because the recipient commits no illegal act at all or because, even so, the causal link is merely contingent and indirect. *Cf. Staples v. United States*, 511 U.S. 600, 610 (1994) ("[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country."). Yet the Instructions Ban still criminalizes *every* instance of distribution. Any connection of the speech criminalized by the Instructions Ban with any illegal conduct is tenuous at best, particularly since the NFO and SMF Bans unconstitutionally restrict protected Second Amendment conduct. Defendant also ignores the additional dimension of the ban's overbreadth: "[T]he Government may not . . . restrict individuals from disclosing information that lawfully comes into their hands in the absence of a 'state interest of the highest order.' " *United States v. Aguilar*, 515 U.S. 593, 605 (1995). Digital firearms information is already freely circulating in the public domain because of publications that took place well before this law was enacted. *See Defense Distributed v. Grewal*, 971 F.3d 485, 493 n.7 (5th Cir. 2020). This ban, however, draws no distinction between truly novel "instructions" and those that anyone has been able to obtain with simple Google searches for years. The Instructions Ban makes it a felony to lawfully download information from an Internet source and then e-mail it to a fellow hobbyist friend. This is a general restriction on the disclosure of information rather than a restriction designed only to prevent disclosure motivated by improper purposes. Again, it cannot stand.

## III.   Plaintiffs Prevail on Their Fifth and Fourteenth Amendment Claims.

Defendant stands on her claim that the Bans are otherwise entirely constitutional as the basis for her position on the remaining constitutional claims: she makes the conclusory arguments

that no compensable taking has occurred under the Fifth Amendment because the property at issue was banned through "valid legislation" and that Plaintiffs have no recourse under the Fourteenth Amendment either because the case must be resolved against them under their other constitutional claims. D-MSJ at 15-16, 20. Because Defendant has failed to credibly contest Plaintiffs' position and supporting authorities, Plaintiffs simply reiterate that the NFO Ban and SMF Ban are *per se* unconstitutional takings under the Fifth and Fourteenth Amendments as outlined in their opening brief. *See* P-MSJ at 18-20; *see also Sheetz v. County of El Dorado*, __ U.S. __, No. 22-1074 (April 12, 2024), Slip Opn. at 4, http://bit.ly/4aB3QYn (quoting *Armstrong v. United States*, 364 U. S. 40, 49 (1960)) ("By requiring the government to pay for what it takes, the Takings Clause saves individual property owners from bearing "public burdens which, in all fairness and justice, should be borne by the public as a whole.").

## IV.    The Irreparable Harm and Balance of the Equities Stand Unrefuted.

Notably, Defendant does not refute or even address Plaintiffs' contention that they will suffer irreparable harm absent a permanent injunction or that the balance of the equities favors granting permanent injunctive relief. Therefore, Plaintiffs reiterate their otherwise unrefuted points and authorities demonstrating the need for immediate and permanent injunctive relief.

### CONCLUSION

The Court should deny Defendant's motion for summary judgment, grant Plaintiffs' motion for summary judgment, and enter an order permanently enjoining enforcement of the Bans.

Respectfully submitted,

Dated: April 15, 2024                    GELLERT SCALI BUSENKELL & BROWN LLC

                                         */s/ Bradley P. Lehman*
                                         Bradley P. Lehman (No. 5921)
                                         1201 N. Orange Street, Suite 300
                                         Wilmington, Delaware 19801
                                         P: (302) 425-5800
                                         E: blehman@gsbblaw.com

                                         *Attorneys for Plaintiffs*

OF COUNSEL:

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
P: (910) 713-8804
E: law.rmd@gmail.com
*Admitted Pro Hac Vice*