IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREARMS POLICY COALITION, INC., <br><br>   Plaintiffs, <br><br>   v. <br><br>KATHY JENNINGS, Attorney General of Delaware, <br><br>   Defendant. | C.A. No. 1:21-cv-01523 (MN) |

**PLAINTIFFS' BRIEF IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Bradley P. Lehman (No. 5921)
GELLERT SEITZ BUSENKELL & BROWN LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
P: (302) 425-5800
E: blehman@gsbblaw.com

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
P: (910) 713-8804
E: law.rmd@gmail.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 1

    I.    Plaintiffs Are Entitled to Summary Judgment on Their Second Amendment Claims. ...... 1

        A.    The Plain Text Unquestionably *Covers* the Banned Course of Conduct........................ 1

            1.    Defendant's "Textual" Arguments Seal the Fate of the NFO Ban. ........................... 2

            2.    Defendant's Arguments Compel a Similar Fate for the SMF Ban. ........................... 3

            3.    Defendant Does Not and Cannot Refute "Common Use." ........................................ 5

            4.    Defendant's Other Efforts to Avoid Coverage Are Meritless. .................................. 5

        B.    Any Further Historical Analysis Can Only Nail the Coffin Shut on These Bans........... 6

    II.    Under a Proper First Amendment Analysis, the Instructions Ban Also Must Fall............. 8

    III.    The Fifth and Fourteenth Amendment Claims Likewise Resolve in Plaintiffs' Favor. ..... 9

    IV.    The Irreparable Harm and Balance of the Equities Compel Relief for Plaintiffs............. 10

CONCLUSION.................................................................................................................... 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
   710 F.3d 99 (3d Cir. 2013)..................................................................................................10

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001)..............................................................................................................9

*District of Columbia v. Heller*,
   554 U.S. 570 (2008).........................................................................................................4, 6

*Downey v. Pa. Dep't of Corr.*,
   968 F.3d 299 (3d Cir. 2020)..................................................................................................4

*Drummond v. Robinson Township*,
   9 F.4th 217 (3d Cir. 2021) ....................................................................................................2

*Elrod v. Burns*,
   427 U.S. 347 (1976)............................................................................................................10

*Junger v. Daley*,
   209 F.3d 481 (6th Cir. 2000) ................................................................................................8

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   597 U.S. 1 (2022)......................................................................................................... passim

*Rigby v. Jennings*,
   630 F.Supp.3d 602 (D. Del. 2022).........................................................................................2

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)..............................................................................................................8

*Teixeira v. County of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ................................................................................................2

*Teter v. Lopez*,
   76 F.4th 938 (9th Cir. 2023) ...........................................................................................4, 11

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001)..................................................................................................8

**Constitutions, Statutes and Rules**

U.S. CONST. amend. II ................................................................................................... *passim*

Fed. R. Evid. 201 ....................................................................................................................11

**Other Authorities**

Joseph Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's
   L.J.35, 36 (2023) ................................................................................................................3

## INTRODUCTION

Defendant's opposition to Plaintiffs' motion for summary judgment (Opp. to P-MSJ) is essentially a mirror reflection of Defendant's motion for summary judgment (D-MSJ), the merits of which Plaintiffs have exhaustively addressed and refuted in their opposition to Defendant's motion (Opp. to D-MSJ). Consequently, Defendant's opposition can only underscore the need for immediate and permanent injunctive relief against HB 125's blatantly unconstitutional bans.

## ARGUMENT

**I.    Plaintiffs Are Entitled to Summary Judgment on Their Second Amendment Claims.**

**A.    The Plain Text Unquestionably *Covers* the Banned Course of Conduct.**

Defendant pursues the same fundamentally distorted "textual" argument: she concedes that "the Court must first determine if the plain text of the Second Amendment covers the individual's conduct," Opp. to P-MSJ at 3, and that, "[i]f the conduct is covered under the Second Amendment," the burden shifts to the government to " 'then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation,' " *id.* (quoting *New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1, 24 (2022)), *but* Defendant ignores "the plain text" that covers the conduct at issue and immediately shifts the burden to the Plaintiffs. The ploy here is to obfuscate the impact of the actual analysis under the textual prong by annexing a quasi-historical component requiring that "Plaintiffs show that Ghost Guns and Ghost Frames are in common use for self-defense to even gain Second Amendment protection." Opp. to P-MSJ at 5. Defendant uses this artificial construct to purportedly shut down the entire Second Amendment claim by arguing that Plaintiffs cannot show the arms at issue are "in common use for self-defense" and, even so, their proposed course of conduct is still "not covered by the Second Amendment" because the Bans do not prohibit them from *purchasing* firearms and/or *pre-*

1

*manufactured* frames or receivers with serial numbers. *Id.* at 6-9. Textual coverage is undeniable.

1. **Defendant's "Textual" Arguments Seal the Fate of the NFO Ban.**

Once again, Defendant walks right past the key aspect of the Second Amendment claim concerning the ability of law-abiding citizens like Plaintiffs to *self-manufacture* arms, which the State has effectively blocked through its ban on the possession, transportation, shipping, transfer, or sale of non-firearm objects ("NFOs") used in the manufacturing of a firearm ("NFO Ban"). As in her motion for summary judgment, Defendant makes no textual argument at all in defense of the NFO Ban. Instead, she merely claims that self-manufacturing firearms was a historical "rarity" during the Founding era, cites her expert for the proposition that "there is no historical tradition of amateur self-made firearms," and then uses that as a proxy for arguing the State is free to ban the activity without even implicating the Second Amendment. Opp. to P-MSJ at 11. But again, at the outset, any such claim is irrelevant to the issue of *textual coverage*. As its plain text makes clear, the Second Amendment in no way *limits* the manner of arms acquisition to the purchase or acquisition from a third party. The Second Amendment right to keep and bear arms " 'implies a corresponding *right to acquire* and maintain proficiency' with common weapons." *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)). Indeed, it "implies a corresponding right to manufacture arms." *Rigby v. Jennings*, 630 F.Supp.3d 602, 615 (D. Del. 2022); *Teixeira v. County of Alameda*, 873 F.3d 670, 679 (9th Cir. 2017) (the right "to keep" arms "necessarily involves" the right to " 'keep them in a state of efficiency for use' " and " 'to keep them in repair,' " which implies the right to *self*-repair). Textual coverage is clear, shifting the burden to Defendant to justify the regulation, because what matters is that this Nation has no history or tradition of *regulating*—much less banning—the self-manufacturing of firearms for lawful purposes, as it is undisputed that the first such regulations

2

appeared in very recent years. *Bruen*, 597 U.S. at 17 (italics added) ("To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm *regulation*.").

And while Defendant has it exactly backwards in focusing on whether or the extent to which ordinary people have traditionally engaged in self-manufacturing arms, she is also wrong in her claim that no such tradition exists. "Since the earliest colonial days, Americans have been busily manufacturing and repairing arms." Joseph Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J.35, 36 (2023); *see, e.g.*, Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 The Writings Of Thomas Jefferson 325, 326 (Paul Ford ed., 1904) ("Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."). Ultimately, no history or precedent exists for government *regulations* restricting the ability of law-abiding citizens to self-manufacture firearms for lawful purposes—much less for imposing an absolute ban on the activity and the possession of the parts that may be used to engage in it—and Defendant hasn't even attempted to demonstrate otherwise, which is her burden to do because the conduct is protected under the plain text of the Second Amendment. Therefore, the NFO Ban must fall.

        **2.**        **Defendant's Arguments Compel a Similar Fate for the SMF Ban.**

Continuing with this strategy of ignoring the effect of the plain text, Defendant still raises no textual defense for the ban against the possession of self-manufactured firearms that do not bear a federally licensed firearm manufacturer's serial number ("SMF Ban") or, in particular, as to any of the SMFs that Plaintiffs seek to possess for self-defense or other lawful purposes—semiautomatic handguns and AR-15-style rifles, Rigby Decl. at ¶¶ 10, 12, 15; Knight Decl. at ¶¶ 9-10. They are "arms," and Defendant does not claim otherwise. Equally damning to her position

3

is that she never even claims, much less seeks to prove with any evidence, that the arms targeted by the Bans are "dangerous and unusual." Notably, nowhere in her brief does she even *mention* this concept, and yet it is at the core of the constitutional analysis: in fact, the *only* way the government can "justify its regulation . . . [as] consistent with this Nation's historical tradition" is by demonstrating that the banned arms are "dangerous and unusual" and thus fall outside the Second Amendment's protection of "the possession and use of weapons that are in common use at the time." *Bruen*, 597 U.S. at 21, 47. If the government cannot make that showing because the firearms at issue are in common use, any further examination of history and tradition is not necessary or appropriate, because the Supreme Court has already done the analysis, and its conclusions are binding. *See Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 308 n.8 (3d Cir. 2020). Defendant does not actually contest this fundamental legal principle either. Instead, her game is to punt on "common use," argue *Plaintiffs* can't show the targeted arms "are in common use for self-defense," and then rest on the claim that the arms are not "covered by the Second Amendment." Opp. to P-MSJ at 5-6.

The burden rests squarely on *the government* to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, and this includes "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008), such that it *falls to the state* to show the arms it has banned are "unusual," and thus *not* "in common use at the time," *id.*; *see also Teter v. Lopez*, 76 F.4th 938, 949–50 (9th Cir. 2023) (quoting *Heller*, 554 U.S. at 627 (vacated after rehearing en banc) (*Heller* itself made clear that the issue of whether the banned arms are " 'dangerous and unusual' is a contention as to which [the state] bears the burden of proof in the second prong of the *Bruen* analysis"). Consequently, the SMF Ban is simply doomed if Defendant

4

fails to show that the arms at issue are not in common use, and she surely does fail there.

### 3. Defendant Does Not and Cannot Refute "Common Use."

On the question of common use, given her improper burden-shifting, Defendant makes no effort to demonstrate the targeted arms are *not* "in common use at the time," and she also makes no effort to refute any of the indisputable data amassed through the case law that Plaintiffs have detailed, *see* Opp. to D-MSJ at 8-10. All she does here is claim that this is "unavailing because [the data] lack a critical distinction: they do not establish that *unserialized* handguns and AR-15s are in common use for self-defense." Opp. to P-MSJ at 6. But again, even Defendant's own expert contradicts such an argument in admitting that "[t]he presence or absence of serial numbers on firearms has no effect on their functionality…." Spitzer Decl. ¶ 11. There is no *constitutionally relevant* difference between a commercially manufactured semiautomatic handgun or AR-15 style rifle and a self-manufactured version of the same firearm bearing no serial number. They are common in all relevant respects: (1) categorically, as they are all functionally semiautomatic in their operation; (2) characteristically, as they are all popular configurations of arms (e.g., rifles, shotguns, handguns) with varying barrel lengths and common characteristics like pistol grips and the like; and (3) jurisdictionally, as they are lawful to possess and use in the vast majority of states now and throughout relevant history for a wide variety of lawful purposes including self-defense.

Because Defendant has not and cannot show the targeted arms are not in common use, that is the end of the analysis and the SMF Ban must fall along with the NFO Ban.

### 4. Defendant's Other Efforts to Avoid Coverage Are Meritless.

Defendant presses further to avoid any "coverage" under the Second Amendment, reiterating her claim that the alternative of *purchasing* firearms and/or *pre-manufactured* frames or receivers bearing serial numbers means the banned arms "are not covered under the Second

Amendment." Opp. to P-MSJ at 6-7. Again, Defendant's rationale that the Second Amendment is not even implicated " 'because a person can defend themselves just as effectively with a serialized or deserialized firearm,' " *id.* at 7 (quoting *United States v. Dangleben*, 2023 WL 6441977, at *5 (D.V.I. Oct. 3, 2023)), was debunked long ago in *Heller*, 554 U.S. 570 (2008); *id.* at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."). That "Plaintiffs are not *completely* prohibiting [*sic*] from obtaining firearms or firearm frames or receivers," Opp. to P-MSJ at 7-8, misses the point entirely. Indeed, such an argument starkly illustrates the danger of Defendant's rationale here, taking this Court down a slippery slope to a test that, at bottom, would uphold any ban on any right recognized under the Second Amendment so long as the government has not cut off *all* possible means or modes of keeping or bearing firearms. And that would be even worse than the interest-balancing analyses that *Bruen* took pains to scrub out of the Second Amendment jurisprudence. *Bruen*, 597 U.S. at 22-23 (internal quotations and citations omitted) (counseling that "*Heller* and *McDonald* expressly rejected the application of any judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests."). Defendant invites the Court to engage in such interest-balancing as well, with her arguments focused on the State's claimed "goals" of addressing "the dangers associated with ghost guns and ghost frames" by "keeping firearms out of the hands of those forbidden to possess them." Opp. to P-MSJ at 12, 19. That is why the true test is simply whether the targeted arms are "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625. The Bans flunk the true test. That is the end of the analysis and the end of the Bans.

      **B.**      **Any Further Historical Analysis Can Only Nail the Coffin Shut on These Bans.**

6

Moving into the further (albeit unnecessary) analysis of the historical analogues that Defendant has proffered, at the outset, Defendant claims that Plaintiffs challenge her purported analogues "solely by attempting to discredit A.G. Jennings's experts." Opp. to P-MSJ at 8. While there is certainly much to discredit there, as detailed in Plaintiffs' opposition to Defendant's motion, that is surely not the *only* problem. Instead, as Plaintiffs pointed out: (1) Defendant makes the cardinal error of justifying the Bans by "simply posit[ing] that the regulation promotes an important interest," *Bruen*, 597 U.S. at 17; (2) she improperly focuses on the specter that these arms "present[] a particular threat to society from violence and crime" and argues that the State is responding with appropriate legislative action like the governments of yesteryear did in targeting weapons that, in their view, "posed too high a risk to the safety of the general public," D-MSJ at 12-15; (3) the weapons regulations that Defendant cites were enacted too late in time and, in any event, are not "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *Bruen*, 597 U.S. at 30; and (4) Defendant seeks some sort of special leniency "given the unprecedented societal concerns and dramatic technological changes associated with ghost guns and the like," D-MSJ at 13. Opp. to D-MSJ at 13-17.

Plaintiffs have already explained in detail why these points demolish Defendant's attempt to justify the Bans under *Bruen*—apart from the credibility problems with the expert evidence. Indeed, Defendant continues to plea for "nuance" in this Court's review of the Bans, implicitly recognizing that the Bans cannot satisfy the clear historically rooted elements of the actual test. As outlined in the opposition, Opp. to D-MSJ at 11, 14-15, no "unprecedented societal concerns" or "dramatic technological changes" are in play so as to invoke a "more nuanced approach" and, in any event, *Bruen* made clear that the existence of any such circumstances does not untether the analysis from the required analogical inquiry, particularly since this concept was discussed in the

7

context of explaining the *expansive* reach of the Second Amendment's protection, not to *shrink* its protective scope. *Bruen*, 597 U.S. at 28-29. Instead, in this same context, the court reiterated that, to carry its burden, the government must "identify a well-established and representative historical *analogue*" to the modern regulation it seeks to uphold, based on the metrics of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 30.

While Defendant reiterates her claim that "numerous historical analogues" demonstrate that the Bans are "consistent with this Nation's historical tradition of firearms regulation," Opp. to P-MSJ at 12, that's simply untrue. Again, she fails to show that the various weapons targeted by these late-day regulations were actually in common use for lawful purposes and, regardless, even if any of them *were* considered "dangerous and unusual" during the relevant time period, that could not justify the regulations on the arms at issue here because they *are* "in common use *today*" and thus are *not* dangerous and unusual so as to be subject to a flat ban. *Bruen*, 597 U.S. at 47.

## II. Under a Proper First Amendment Analysis, the Instructions Ban Also Must Fall.

Rehashing her defense of the Instructions Ban under the First Amendment, Defendant continues to ignore the case authority affirming that the type of speech impacted by the Instructions Ban—digital firearms information—is protected under the First Amendment. *See e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."); *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000) ("computer source code is an expressive means for the exchange of information and ideas about computer programming" that is "protected by the First Amendment"); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."). In fact, while Defendant claims it is "not protected," she admits that the dissemination of the information

8

constitutes "speech" in this context, Opp. to P-MSJ at 13, and she also continues to characterize the Ban as concerned with "the spread of ideas about 3D printing of firearms" because it is designed to suppress "the means to easily do so," *id.* at 14. Moreover, the whole basis of Defendant's claim that this ban survives even intermediate scrutiny—truth be told, strict scrutiny should apply as Plaintiffs have maintained—is the supposed evidence that "unserialized firearms are linked to illegal gun possession, criminality, and violence." Opp. to P-MSJ at 15. But the actual data cited in support of this notion devolves into nothing more than a possible correlative relationship between "ghost guns" and crime, without any evidence of a causal connection—much less one showing that a majority or even a substantial percentage of such arms are used in crime.

And this speaks to the overbreadth problem: Defendant defends the breadth of the Ban on the basis that "the number of valid applications far outweigh impermissible applications" because "there is a significant state interest in keeping firearms out of the hands of prohibited individuals and having traceable arms" given the evidence that "untraceable firearms are linked with violence and criminality." Opp. to P-MSJ at 16. But absent any concrete evidence of such a "link"—much less evidence that these arms are mostly or even more commonly used in crime than they are for lawful purposes—the reality is directly the opposite of what Defendant claims it is, as the " 'likely frequency of conceivably impermissible applications' " is great. *Id.* (quoting *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 226 (3d Cir. 2004). Once again, "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law abiding third party," *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001), and yet that is the *primary* goal of the Instructions Ban as Defendant readily admits.

### III. The Fifth and Fourteenth Amendment Claims Likewise Resolve in Plaintiffs' Favor.

9

Defendant has nothing new to say about the claims under the Fifth and Fourteenth Amendments; she just restates the same conclusory arguments that no Fifth Amendment taking has occurred because the property at issue was banned through "valid legislation" and that Plaintiffs have no recourse under the Fourteenth Amendment because the case must be resolved against them under their other constitutional claims. Opp. to P-MSJ at 2, 17. Plaintiffs need not say anything more either; the battle lines have been drawn for the Court's resolution of the issue.

### IV. The Irreparable Harm and Balance of the Equities Compel Relief for Plaintiffs.

After ignoring both issues in her motion for summary judgment, Defendant now claims that the questions of irreparable harm and the balance of the equities readily resolve in her favor. But her argument is that Plaintiffs "provide no evidence of actual irreparable harm" because they "merely assert" the existence of a constitutional deprivation. Opp. to P-MSJ at 18. Certainly, such a deprivation, "for even minimal periods of time," *does* matter. *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976). Further, each day Defendant's Bans remain in force, they risk felony prosecution, incarceration, and permanent loss of their First and Second Amendment rights because they are prohibited from engaging in the constitutionally protected self-manufacturing and speech activities that the Bans outlaw on pain of criminal penalty. And the balance of equities can lean in only one direction because "the enforcement of an unconstitutional law vindicates no public interest." *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013).

### CONCLUSION

Plaintiffs are entitled to summary judgment and an order permanently enjoining the Bans.[1]

---

[1] At a number of points in her brief, Defendant characterizes Plaintiffs' reliance on *legislative facts* as an effort to circumvent the normal rules of evidence. Opp. to P-MS at 6, 9, 13. However, the rules of evidence do not apply to such facts. *See* Fed. R. Evid. 201, advis. comm. note (1972 proposed rules). And reliance on such facts is entirely proper. *Teter*, 76 F.4th at 946-47.

10

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: April 26, 2024 | GELLERT SEITZ BUSENKELL & BROWN LLC |
|  | */s/ Bradley P. Lehman*<br>Bradley P. Lehman (No. 5921)<br>1201 N. Orange Street, Suite 300<br>Wilmington, Delaware 19801<br>P: (302) 425-5800<br>E: blehman@gsbblaw.com |
|  | *Attorneys for Plaintiffs* |
| OF COUNSEL:<br><br>Raymond M. DiGuiseppe<br>The DiGuiseppe Law Firm, P.C.<br>116 N. Howe Street, Suite A<br>Southport, NC 28461<br>P: (910) 713-8804<br>E: law.rmd@gmail.com<br>*Admitted Pro Hac Vice* |  |

11