IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN RIGBY, ALAN KNIGHT, and FIREARMS POLICY COALITION, INC., | ) | |
| Plaintiffs, | ) | C.A. No. 21-1523 (MN) |
| v. | ) | |
| KATHY JENNINGS, Attorney General of Delaware, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Bradley P. Lehman, GELLERT SCALI BUSENKELL & BROWN LLC, Wilmington, DE; Raymond M. DiGuiseppe, THE DIGUISEPPE LAW FIRM, P.C., Southport, NC - Attorneys for Plaintiffs

Patricia A. Davis, Kenneth L. Wan, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE - Attorneys for Defendant

September 10, 2026
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**

This case asks how the current First and Second Amendment analytical landscapes apply to Delaware's attempts to ban ghost guns. Like the outcomes of many constitutional inquiries, the results here are mixed: some of Delaware's proposed measures are constitutional, others are not.

## I. BACKGROUND

### A. The Challenged Delaware Laws

The focus of this case is House Bill 125 ("H.B. 125"). *See* An Act To Amend Title 11 Of The Delaware Code Relating To Firearms, H.B. 125, 151st Gen. Assemb. (Del. 2021) (codified at 11 Del. C. §§ 222, 1459, 1459A, 1462, 1463). Broadly speaking, H.B. 125 criminalizes the distribution, possession, and manufacture of unserialized firearms (including 3-D printed firearms) and unfinished firearm components. *Id.* It also bans distributing computer files used to create 3-D printed guns. *Id.*

As to distribution, H.B. 125 adds 11 Del. C. § 1459A(a) and § 1463(b). Section 1459A(a) prohibits "knowingly transport[ing], ship[ping], transfer[ring], or sell[ing] an unfinished firearm frame or receiver[1]" unless "(1) [t]he person is a federally-licensed gun dealer or manufacturer," "(2) [t]he name of the manufacturer and an individual serial number are conspicuously placed on the unfinished firearm frame or receiver," and "(3) [t]he person maintains records for the unfinished firearm frame or receiver in accordance" with federal law. Among other things,

1 11 Del. C. § 222(35) defines "unfinished firearm frame or receiver" as "a firearm frame or receiver that requires further machining or molding in order to be used as part of a functional firearm, and which is designed and intended to be used in the assembly of a functional firearm."

§ 1463(b) prohibits "sell[ing] or transfer[ring] an untraceable firearm.[2]" Collectively, the Court refers to these provisions as the "Distribution Ban."

As to possession, H.B. 125 adds 11 Del. C. § 1459A(b) and § 1463(a). Section 1459A(b) prohibits "possess[ing] an unfinished firearm frame or receiver that does not have the name of the manufacturer and individual serial number conspicuously placed on it or on a major component[3] of the firearm into which the unfinished firearm frame or receiver will be housed." Section 1463(a) prohibits knowingly "possessing an untraceable firearm." Collectively, the Court refers to these provisions as the "Possession Ban."

As to manufacturing, H.B. 125 adds 11 Del. C. § 1463(b) and (c). Among other things, section 1463(b) prohibits "knowingly manufactur[ing]" or "assemb[ing]" "an untraceable firearm" and causing an untraceable firearm to be manufactured or assembled. Section 1463(c) prohibits "[using] a 3-dimensional printer or similar device to manufacture or produce a firearm,[4] firearm

2 11 Del. C. § 222(4) defines "untraceable firearm" as "a firearm for which the sale or distribution chain from a licensed retailer to the point of its first retail sale cannot be traced by law-enforcement officials," excluding "[f]irearms manufactured prior to 1968," "[m]uzzle-loading firearms designed to use black powder or its equivalent," and "[f]irearms which are designed as replicas of antique firearms originally manufactured prior to 1898."

3 11 Del. C. § 222(19) defines "major component of a firearm" as "the slide, barrel, cylinder, trigger group, or receiver of a firearm."

4 When Delaware passed the challenged regulations, the word "firearm" was defined to include "any weapon from which a shot, projectile or other object may be discharged by force of combustion, explosive, gas and/or mechanical means, whether operable or inoperable, loaded or unloaded. It does not include a BB gun." Delaware amended the definition of "firearm" in November 2024, and it is now defined to "mean[] all of the following: a. A weapon from which a shot, projectile, or other object is designed or may readily be converted to be discharged by force of an explosive, whether operable or inoperable, loaded or unloaded. b. A firearm frame or receiver." An Act to Amend Title 6, Title 10, Title 11, and Title 24 of the Delaware Code Relating to Weapons, H.B. 357, 152nd Gen. Assemb. (Del. 2024) (codified at 11 Del. C. §§ 222). Neither party has suggested that this change in definition alters the analysis here.

receiver, or major firearm component when not licensed as a manufacturer." Collectively, the Court refers to these provisions as the "Manufacturing and Assembly Ban."

Finally, H.B. 125 adds § 1463(c)(2), which prohibits distributing "instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a 3-dimensional printer[5] to manufacture or produce a firearm, firearm receiver[6] or major component of a firearm." The Court refers to this provision as the "Instructions Ban."

### B. <u>The Parties</u>

Plaintiffs John Rigby and Alan Knight are United States citizens who live in Delaware. (D.I. 61 ¶¶ 4-5). Both Rigby and Knight have concealed carry permits from multiple states, and they are members of the Firearms Policy Coalition, a 501(c)(4) nonprofit that joined this case as a plaintiff. (D.I. 61 ¶¶ 6, 14, 16, 30, 32).

By all accounts, Rigby and Knight are law-abiding citizens who want to do things they believe are protected by the First and Second Amendment. (*Id.* ¶¶ 13, 29). Rigby owns a self-manufactured Glock-compatible handgun, which he wishes to use "for self-defense in the home and other lawful purposes." (D.I. 61 ¶¶ 17, 18). He had to get rid of that handgun because it qualifies as an "untraceable firearm" under the challenged statutes (even though he lawfully possessed it previously). (*Id.*). Rigby also owns parts that can be used to construct a firearm, which he is prohibited from possessing under Delaware's legislation because they constitute

---

5 A "three-dimensional printer" is "a computer or computer-driven machine of [sic] device capable of producing a three-dimensional object from a digital model." 11 Del. C. § 222(33).

6 11 Del. C. § 222(14) defines "firearm frame or receiver" as "the part of the firearm that provides housing for the firearm's internal components, and includes the hammer, bolt or breecH.B.lock, action, and firing mechanism."

"unfinished frames or receivers" (even though he lawfully acquired those components before Delaware enacted the legislation at issue here). (*Id.* ⁋ 19).[7] Rigby also owns a 3-D printer, and he would like to use that 3-D printer to print firearms and firearm components[8] and disseminate computer files that can be used to program a 3-D printer to produce a firearm or firearm components. (*Id.* ⁋⁋ 26, 27, 28). To avoid prosecution under the challenged statutes, he has not. (*Id.*).

Knight is similarly situated to Rigby. Knight previously lawfully acquired firearm components that Delaware law would prohibit him from possessing because they qualify as "unfinished frames or receivers." (D.I. 61 ⁋ 33). He got rid of those items to avoid criminal prosecution, but he would like to repossess them. (*Id.* ⁋⁋ 34, 35). Knight would also like to acquire additional firearm components to self-manufacture operable firearms (handguns and rifles) "for self-defense and other lawful purposes," but the challenged laws preclude that too. (*Id.* ⁋⁋ 36-38).

The final plaintiff, Firearms Policy Coalition, is a membership organization that "serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs." (*Id.* ⁋ 39). Firearms Policy Coalition has members in Delaware (including Rigby and Knight), and at least some of its members lawfully acquired firearms and firearm components that would be banned under the challenged statutes. (*Id.* ⁋ 42). Its members also want to acquire additional firearm components (now banned by

---

7 Rigby asserts he no longer possesses his self-manufactured Glock-compatible handgun or the components that qualify as an "unfinished frames or receivers" to avoid criminal prosecution under the challenged statutes. (D.I. 61 ⁋⁋ 17-19, 21). He does however, wish to repossess those items and acquire others that would be banned under the challenged statutes. (D.I. 61 ⁋⁋ 21, 24).

8 The Court understands that Rigby would also like to take those printed components and assemble a firearm out of them.

Delaware law) to self-manufacture and assemble firearms for self-defense and other lawful purposes. (*Id.* ⁋ 44). Some Firearms Policy Coalition members have 3-D printers (like Rigby) and would like to use those 3-D printers to print firearms and firearm components and disseminate computer files that can be used to program a 3-D printer to produce a firearm or firearm components. (*Id.* ⁋⁋ 45, 46). But like Rigby, they have not for fear of prosecution under the challenged statutes. (*Id.* ⁋ 47).

Defendant Kathy Jennings is Delaware's Attorney General. (*Id.* ⁋ 7).

### C. **Procedural History**

The procedural history here is straightforward. After Plaintiffs filed the complaint, they moved for a preliminary and permanent injunction. (D.I. 5). Around the same time, Defendant moved to dismiss.[9] (D.I. 19). The Court denied Defendant's motion to dismiss and Plaintiffs' motion for a permanent injunction. *Rigby v. Jennings*, 630 F. Supp. 3d 602, 619-20 (D. Del. 2022). The Court did, however, grant-in-part and deny-in-part the preliminary injunction. *Id*. The Court preliminarily enjoined the Possession Ban, finding it reasonably probable that the Possession Ban burdens the right to keep and bear arms and Defendant failed to show that it was "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 613-15 (quoting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022)). Similarly, the Court enjoined the Manufacturing and Assembly Ban, finding it reasonably probable that the Manufacturing and Assembly Ban likewise burdened the Second Amendment right to keep and bear arms, and Defendant offered no evidence that those provisions were consistent with the Nation's historical

---

[9] Defendant also moved to dismiss the Governor of Delaware as a named defendant, but that was mooted when the parties stipulated to dismissing the Governor as a defendant. (D.I. 24).

tradition of firearm regulation. *Id.* at 615. The Court denied the preliminary injunction motion as to the Distribution and Instructions Bans. *Id.* at 612-13, 615-18.

The parties then purported to proceed through discovery and cross moved for summary judgment. (D.I. 57, 59). The summary judgment briefing is complete, although it bears noting how lacking this record is. (D.I. 58, 60, 62, 63, 64, 65). It appears that Plaintiffs provided no discovery, and the only things exchanged in discovery were the three expert declarations that Defendant attached to its summary judgment briefing. (D.I. 58 at 1).

Since the Court issued its preliminary injunction opinion, the First and Second Amendment landscape has developed somewhat. On the First Amendment front, the Third Circuit recently issued its opinion in *Defense Distributed v. Attorney General of New Jersey*, which addressed a New Jersey statute that, like the Delaware statute here, prohibited distribution of computer files and code that can be used to program 3-D printers to manufacture guns. 167 F.4th 65 (3d Cir. 2026). Ultimately, the Third Circuit found that the New Jersey statute did not implicate First Amendment concerns. *Id.* at 84-85. On the Second Amendment front, there have been a few developments, including the Supreme Court's opinion in *United States v. Rahimi*, 602 U.S. 680 (2024) which clarified the contours of the *Bruen* framework and *United States v. Hemani*, 146 S. Ct. 1677 (2026), in which the Supreme Court addressed § 922(g)(3)'s constitutionality. Most recently, the Supreme Court rejected (on Second Amendment grounds) Hawaii's attempt to flip the default rule that law-abiding citizens are permitted to carry firearms on private property open to the public. *Wolford v. Lopez*, 146 S. Ct. 2032 (2026). The Third Circuit followed with two Second Amendment opinions of its own. *See United States v. Clerfe*, Case No. 24-2116, 2026 WL 2294460, at *3 (3d Cir. Aug. 10, 2026) (rejecting argument that laws criminalizing exporting firearms violate the Second Amendment); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y*

*Gen. New Jersey ("ANJRPC 2026")*, 183 F.4th 211, 238-39, 247-50 (3d Cir.) (en banc) (finding that possessing assault rifles and large capacity magazines is protected by the Second Amendment).

## II. **<u>LEGAL STANDARD</u>**

### A. **<u>Summary Judgment</u>**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Material" facts are those that "could affect the outcome of the case." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (citation omitted). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the moving party] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)-(B).

The court must view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014). "If there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (cleaned up).

If the non-moving party would carry the burden of persuasion at trial, then the moving party may satisfy its burden of production by pointing to an absence of evidence supporting the non-moving party's case, after which the non-movant must come forward with specific facts to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). When, as here, "both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citation omitted).

### B. Permanent Injunction

After prevailing on the merits, a party is entitled to a permanent injunction if it can show "(1) it will suffer irreparable injury, (2) no remedy available at law could adequately remedy that injury, (3) the balance of hardships tips in its favor, and (4) an injunction would not disserve the public interest." *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## III. DISCUSSION

### A. First Amendment Claims

Plaintiffs challenge the Instructions Ban under the First Amendment. To prevail, Plaintiffs need to make the threshold showing that § 1463(c)(2) implicates speech covered by the First Amendment. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."); *Def. Distributed*, 167 F.4th at 79. According to Plaintiffs, that threshold showing is satisfied because § 1463(c)(2) prohibits disseminating "digital

firearms information,"[10] which Plaintiffs seem to claim is *per se* protected by the First Amendment because it includes computer code. (D.I. 60 at 15-16).

After the parties completed their briefing here, the Third Circuit rejected that argument in a case evaluating a New Jersey regulation similar to § 1463(c)(2).[11] *See Def. Distributed*, 167 F.4th 65, 70-71. Despite acknowledging that "computer code ***can*** be covered by the First Amendment" in certain situations, the Third Circuit recognized that "coverage cannot be assumed because code is inherently functional." *Id.* at 82; *id.* ("Purely functional code with no expressive purpose, use, or intent is simply not covered by the First Amendment."). Instead of a bright-line rule, the Third Circuit adopted a "fact-based and context-specific analysis" for determining "whether code enjoys First Amendment protection." *Id.* at 83-84. That analysis appears to be a totality-of-the-code analysis that requires looking at "the technical nature of the code (e.g., source code or object code), how that code is used in context (e.g., precisely how the writer or user of the code might interact with the code), who is communicating through the code and the intended recipient of the communication (e.g., programmer-to-human communication, human-to-machine communication, and so forth), for what purpose or purposes the computer code operates (e.g., to perform a function, to express an idea, or some combination thereof), and what, if anything, the code communicates." *Id.* at 84.

---

10 Plaintiffs do not define what they mean by "digital firearms information," and the Court does not know what would be encompassed under that term.

11 The New Jersey Statute prohibited distribution of "digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component." *Def. Distributed*, 167 F.4th at 70-71 (quoting N.J. Stat. Ann. § 2C:39-9(*l*)(1)-(2)).

In *Defense Distributed*, the Third Circuit affirmed dismissal of the Plaintiffs' First Amendment claim because the "operative complaint lack[ed] the information necessary to determine whether the coded computer files Defense Distributed seeks to distribute are expressive or functional and, consequently, whether it implicates the First Amendment." *Def. Distributed*, 167 F.4th at 84.

That reasoning applies here. The entirety of Plaintiffs' threshold showing that the Instructions Ban implicates the First Amendment is:

> "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). "Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment." *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."), *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("For the purposes of First Amendment analysis, this court finds that source code is speech."). The First Amendment thus applies to the type of speech impacted by the Instructions Ban—digital firearms information, which Rigby and others similarly situated would disseminate but for their reasonable fear of criminal sanction. Rigby Decl. at ¶ 17.

(D.I. 60 at 15-16). That falls short of identifying anything in the record showing that code burdened by § 1463(c)(2) "involves the expression or communication of ideas[.]" *Def. Distributed*, 167 F.4th at 82. And that may very well be because § 1463(c)(2) is framed in functional terms, *i.e.*, it is limited to computer files or code "***that may be used to program*** a 3-dimensional printer to manufacture or produce a firearm, firearm receiver or major component of a firearm." 11 Del. C. § 1463(c)(2) (emphasis added). Regardless, for Plaintiffs' First Amendment claim to survive, Plaintiffs needed to explain what "digital firearms information" is and what ideas

or expressions it communicates.[12] They didn't. All Plaintiffs offered is the conclusory statement that the First Amendment is implicated because § 1463(c)(2) regulates computer code. (D.I. 60 at 15-16). So, like the complaint in *Defense Distributed*, the summary judgment record here "lacks the information necessary to determine whether the coded computer files [Plaintiffs] seek[] to distribute are expressive or functional and, consequently, whether it implicates the First Amendment." 167 F.4th at 84. Thus, Plaintiffs have failed to make the threshold showing that the Instructions Ban implicates the First Amendment, and their First Amendment claim fails.

**B. <u>Second Amendment Claims</u>**

Now to the Second Amendment claims. The Second Amendment protects one of the "fundamental rights necessary to our system of ordered liberty," the right to "keep and bear arms." *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010). It was not drafted in a vacuum, but rather against the backdrop of a revolution, one in which the British sought to disarm would-be revolutionaries. *United States v. Rahimi*, 602 U.S. 680, 690 (2024). And it was incorporated against the states in the aftermath of the Civil War. *Id.* Despite its historical roots, the Second Amendment's protection is not limited to "only those arms in existence in the 18th century." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). Quite the opposite. "Just as the First Amendment protects modern forms of communications, *e.g., Reno v. American Civil Liberties Union,* 521 U.S. 844, 849 (1997), and the Fourth Amendment applies to modern forms of search, *e.g., Kyllo v. United States,* 533 U.S. 27, 35-36 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. That is why the Second Amendment protects the

---

[12] It is important to note that § 1463(c)(2) does not prohibit discussing, explaining or providing instructions on how to manufacture firearms. *See Rigby*, 630 F. Supp. 3d at 616 n.15.

right to keep and bear operable handguns for self-defense at home and in public even though handguns, with their modern capability, did not exist at the time of the founding. *Heller*, 554 U.S. at 636; *Bruen*, 597 U.S. at 70-71; *see also Wolford v. Lopez*, 146 S. Ct. 2032, 2041 (2026) (stating that the Second Amendment protects "the right of Americans to carry arms for self-defense as they go about their daily lives"); *ANJRPC 2026*, 183 F.4th at 238-39, 247-50 (finding that possessing assault rifles and large capacity magazines is protected by the Second Amendment).

Still, the Second Amendment's reach is bounded; it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. And certain firearm regulations are presumptively valid, such as "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *D.C. v. Heller*, 554 U.S. at 626-27; *see also Bruen*, 597 U.S. at 38 n.9 ("To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].'" (quoting *Drake v. Filko*, 724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, J., dissenting))).

So how do district courts analyze whether a regulation impermissibly treads on the Second Amendment? With what appears to be a two-step analysis.[13] First, the Court asks whether "the Second Amendment's plain text covers an individual's conduct," *i.e.*, whether the challenged law burdens Second Amendment-protected conduct. *Bruen*, 597 U.S. at 17; *ANJRPC 2026*, 183 F.4th at 229. This inquiry has three subsidiary questions: (1) does the law apply to "all members of the

[13] This, of course, notwithstanding the abandonment of the old two-part approach because it was "one step too many." *Bruen*, 597 U.S. at 19.

political community," (2) does the law "concern any form of 'Arms,' *i.e.*, any weapon customarily used for offensive or defensive purposes," and (3) "does the law place any restrictions on either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying) of arms?" *Wolford*, 146 S. Ct. at 2043-44 (2026). If the regulation burdens Second Amendment-protected conduct, "the Constitution presumptively protects that conduct," and the court moves to the next step. *Bruen*, 597 U.S. at 24.

At this point, the burden shifts to the government to show the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id*. Here, "the appropriate analysis involves considering whether the challenged regulation is consistent with the ***principles*** that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (emphasis added). This is done by analogizing the modern-day regulation to historical restrictions on arms-bearing conduct and asking whether the banned arms are "in common use" in modern times. *See*, *e.g.*, *United States v. Hemani*, 146 S. Ct. 1677, 1685-86 (2026); *ANJRPC 2026*, 183 F.4th at 233-34.

Although the government need not identify a "historical twin" in the historical tradition analysis, it must identify a "relevantly similar" historical analog. *Rahimi*, 602 U.S. at 692. In certain cases, it may be easy to identify a relevantly similar historical analog. In other cases, particularly those "implicating unprecedented societal concerns or dramatic technological changes" (like some of the restrictions here), "a more nuanced approach" is necessary. *Bruen*, 597 U.S. at 27.[14] The government can prove relevant similarity by showing that "why" the historical analog was enacted and "how" it burdens the Second Amendment-protected conduct are comparable to the why and how for the modern-day statute. *Id.*; *Harris*, 144 F.4th at 158 ("A

[14] As the Third Circuit recently recognized, "[t]o date, however, the Supreme Court has not had occasion to apply that nuanced approach," so this Court wades into not fully charted waters on some of the restrictions here. *ANJRPC 2026*, 2026 WL 2075513, at *9.

historical law is a fitting analogue for a modern one if it burdens Second Amendment rights for comparable reasons (the 'why') using comparable means (the 'how')."). Courts do not conduct this historical analysis in a vacuum; instead, courts "decide cases 'based on the historical record' and arguments 'compiled by the parties.'" *Hemani*, 146 S. Ct. at 1687.

Generally, when conducting this historical analysis, principles underlying founding era laws are most persuasive. *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) ("[T]he constitutional right to keep and bear arms should be understood according to its public meaning in 1791[.]"). "[L]aws enacted in the late-19th century 'do not provide as much insight into' the original meaning of the right to keep and bear arms as do earlier sources." *Lara*, 125 F.4th at 441 (quoting *Bruen*, 597 U.S. at 36). That is not to say that 19th century laws are irrelevant, but rather, they are relevant to the extent they do not conflict with what founding-era laws teach. *Bruen*, 597 U.S. at 37. Similarly, laws that significantly pre-date the founding era may be of limited use. *Id.* at 35 ("Sometimes, in interpreting our own Constitution, 'it [is] better not to go too far back into antiquity for the best securities of our liberties,' [] unless evidence shows that medieval law survived to become our Founders' law." (quoting *Funk v. United States*, 290 U.S. 371, 382 (1933))).

With these principles in mind, the Court now turns to the challenged statutes here.

**1. Step One**

**a. Possession Ban**[15]

The Possession Ban fails at *Bruen*'s first step. The main dispute here is at *Wolford*'s second subsidiary question, *i.e.*, whether the Possession Ban concerns "Arms" as that term is understood

15 The parties broadly argue that the challenged statutes are constitutional or unconstitutional without giving much analysis to the differing behaviors that the challenged statutes regulate. As the Court did at the preliminary injunction stage, the Court still believes that

under the Second Amendment.[16] Under the Second Amendment "Arms" means "any weapon customarily used for offensive or defensive purposes." *Wolford*, 146 S. Ct. at 2043; *Heller*, 554 U.S. at 581 (defining "arms" as "[w]eapons of offence, or armour of defence."). When dealing with firearms in the Third Circuit, "Arms" encompasses not only the fully assembled firearm, but also anything "necessary for [] a gun to function as intended." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey ("ANJRPC 2018")*, 910 F.3d 106, 116 (3d Cir. 2018). For example, because a magazine holding ammunition is necessary for a firearm to work as intended, magazines are considered "Arms" under the Second Amendment. *Id.*

Here, the Possession Ban targets (1) untraceable firearms and (2) firearm frames or receivers that do not have the manufacturer's name and an individualized serial number on them or on a major component of the firearm into which the frame or receiver will be housed. 11 Del. C. §§ 1459A(b), 1463(a). An untraceable firearm is an Arm under the Second Amendment. It is, after all, a firearm, and even under the narrowest reading of "Arms," "all firearms constitute[] 'arms,'" whether serialized or not. *Heller*, 554 U.S. at 582. Moreover, the evidence here shows that untraceable firearms are customarily used for offensive or defensive purposes such as self-defense.[17] (D.I. 61 ¶¶ 21-24, 35-36, 44).

---

the possession, distribution, and manufacturing and assembly portions of the challenged statutes each implicate different Second Amendment concerns and analyzes them as such.

16 There is no dispute that the Possession Ban applies to "the people" or that it prohibits "keeping" specific items. The only dispute is whether those items constitute "Arms."

17 The Court does not question Defendant's assertion that untraceable firearms are also used by criminals (D.I. 58 at 3-4), but that does not change the analysis here. Presumably most, if not all, types of guns are used by criminals to some degree but that does not relieve them of constitutional protection. Moreover, Delaware's argument about criminals using untraceable firearms seems more directed to whether firearms are in common use for lawful purposes, which is better addressed at *Bruen*'s second step. *ANJRPC 2026*, 2026 WL 2075513, at *11-13.

Firearm frames and receivers are likewise "Arms" under the Second Amendment. To start, under federal law, the term "'firearm' includes [] 'the frame or receiver'" of any gun. *Bondi v. VanDerStok*, 604 U.S. 458, 462-63 (2025) (citing 18 U.S.C. § 921(a)(3)). That indicates that unfinished frames and receivers are not functionally different from firearms and enjoy the same Second Amendment protections. Moreover, a frame or receiver is "necessary for [] a gun to function as intended," so in this Circuit, a frame or receiver constitutes an "Arm" under the Second Amendment. *ANJRPC 2018*, 910 F.3d at 116. Indeed, just as "[t]he possession of arms also implie[s] the possession of ammunition," the possession of arms implies the possession of firearm frames and receivers because firearm frames and receivers are necessary for firearms to function as intended. *United States v. Miller*, 307 U.S. 174, 180 (1939). And just as "[t]he text of the Second Amendment covers all magazines, not just magazines that New Jersey considers 'standard capacity,'" the text of the Second Amendment covers all firearm frames and receivers, not just ones with a manufacturer's label or serial number. *ANJRPC 2026*, 183 F.4th at 247. So the Possession Ban regulates "Arms."

Delaware's argument to the contrary is that untraceable firearms and unfinished firearm frames or receivers with no serial numbers are not in common use and therefore do not constitute "Arms." (D.I. 58 at 11-12; D.I. 63 at 6). The Third Circuit, however, has foreclosed that argument, by making clear that the "common use" argument is addressed at *Bruen*'s second step. *ANJRPC 2026*, 183 F.4th at 233-34. Moreover, the fact that Delaware's law focuses on unserialized firearms and firearm components while allowing access to "firearms or components that have a serial number" does not matter because the constitutional understanding of "Arms" does not turn on serialization; it turns on whether something is used customarily for offensive or defensive purposes. (D.I. 58 at 12); *ANJRPC 2026*, 183 F.4th at 239. Here, the evidence shows that law-

abiding citizens customarily use untraceable firearms and unserialized firearm components for constitutionally protected purposes, *i.e.*, self-defense. (D.I. 61 ¶¶ 21-24, 35-36, 44).

At bottom, the challenged statutes regulate firearms, including handguns, which, as the Supreme Court stated in *Heller*, are "the most popular weapon chosen by Americans for self-defense in the home." 554 U.S. at 629; *id.* at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."); *see also ANJRPC 2026*, 183 F.4th at 239 ("The Constitution thus 'presumptively protects' individuals' right to keep and bear semi-automatic rifles."). With that, the Possession Ban concerns "Arms," and because it prohibits keeping arms and applies to all members of the political community, it is presumptively unconstitutional at *Bruen*'s first step. *Wolford*, 146 S. Ct. 2043-44.

**b. <u>Distribution Ban</u>**

The Distribution Ban is different because it does not place "any restrictions on either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying) of arms[.]" *Wolford*, 146 S. Ct. at 2043. Instead, it ensures that those wishing to commercially distribute unfinished firearm frames or receivers are federally licensed and comply with federal serialization requirements. 11 Del. C. § 1459A(a). It also ensures that firearms sold are traceable. 11 Del. C. § 1463(b). At best, the Distribution Ban is one of those "presumptively lawful" "laws imposing conditions and qualifications on the commercial sale of arms" but does not prohibit keeping or bearing firearms. *Heller*, 554 U.S. at 626-27 n.26; *see also United States v. Clerfe*, Case No. 24-2116, 2026 WL 2294460, at *3 (3d Cir. Aug. 10, 2026) (rejecting argument that the Second Amendment protects "the ability to sell, trade, and export arms"). If anything, the Distribution Ban seems to regulate "*dis*possessing [] firearms" which "is fatal to [the Plaintiffs'] *Bruen* step-one argument." *Clerfe*, 2026 WL 2294460, at *3. Proving the point, if Delaware had passed the Distribution Ban and no

other bans, nothing would have prevented Plaintiffs Rigby or Knight from possessing their self-manufactured and unserialized firearms.

Plaintiffs disagree, saying that the Distribution Ban treads on the "right to self-manufacture and to possess and use the items and materials necessary to construct such arms for lawful purposes." (D.I. 60 at 6, 8). The problem there is that the Distribution Ban does not regulate self-manufacturing firearms and Plaintiffs have offered no evidence that any of these regulations limit their access to the items and materials necessary to self-manufacture firearms; all they provided was attorney argument. *See Rigby*, 630 F. Supp. 3d at 614 ("Attorney argument is not evidence."). The Distribution Ban passes under *Bruen*'s first step.

**c. <u>Manufacturing and Assembly Ban</u>**

Now to the Manufacturing and Assembly Ban, which is perhaps the most difficult aspect of the challenged laws. The Manufacturing and Assembly Ban prohibits manufacturing or assembling an untraceable firearm and using a 3-dimensional printer (or similar device) to manufacture a firearm or firearm parts. 11 Del. C. §§ 1463(b)-(c). There is no real dispute that the Manufacturing and Assembly Ban applies to all people, and it concerns Arms for the same reasons that the Possession Ban concerns Arms. The remaining dispute focuses on the scope of the Second Amendment's plain text, *i.e.*, whether the Manufacturing and Assembly Ban "place[s] any restrictions on either the 'keep[ing]' (*i.e.,* possession) or the 'bear[ing]' (*i.e.*, carrying) of arms." *Wolford*, 146 S. Ct. at 2043.

Superficially, it may seem that the Manufacturing and Assembly Ban does not place any restrictions on keeping or bearing arms. After all, it simply prohibits manufacturing or assembling untraceable firearms or using a 3-D printer to do the same; nothing in the Manufacturing and Assembly Ban expressly prohibits possessing or carrying any type of firearm. That seems, however, to read the Second Amendment too narrowly.

The Second Amendment explicitly protects the right to "keep and bear Arms." U.S. Const. amend. II. That does not mean the Second Amendment's protections are limited to keeping and bearing arms because when "a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 96 (2012). A predicate act necessary to keeping and bearing firearms is acquiring firearms – if one cannot acquire a firearm, how could one possess a firearm? So the Second Amendment protects acquiring firearms. *See e.g.*, *Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring) ("Without protection for these closely related rights, the Second Amendment would be toothless."); *Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025) ("[T]he right to 'keep and bear arms' surely implies the right to purchase them."); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *see also* Jacob D. Charles, *Ancillary Rights*, 173 U. Pa. L. Rev. 1269, 1302 (collecting cases and stating that "[b]ecause the Constitution protects the right to keep a weapon, the ability to acquire that weapon must be an implicit, ancillary right."). Indeed, the Third Circuit recently put any doubt about that to rest when it "agree[d] with those authorities" stating that the Second Amendment implies a right to acquire firearms. *Clerfe*, 2026 WL 2294460, at *3 (collecting cases).

Based on this record it appears there are two ways to acquire firearms: self-manufacture or acquisition of a firearm manufactured by someone else (*e.g.*, purchasing a firearm from a gun store). The Manufacturing and Assembly Ban cuts off one avenue of acquiring firearms (self-

manufacturing), and thus places restrictions on conduct protected by the Second Amendment.[18] And because it applies to all people, concerns arms, and places at least some restrictions on keeping and bearing arms, it fails at *Bruen*'s first step. *Wolford*, 146 S. Ct. at 2043.

There is another reason the Manufacturing and Assembly Ban fails at *Bruen*'s first step. *Heller* guides that the Second Amendment protects possessing an operable firearm for self-defense at home. *Heller*, 554 U.S. at 635 ("In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."). As Plaintiffs argue, by protecting the right to possess operable firearms, the Second Amendment necessarily protects the ancillary right to ensure firearms remain operable, *i.e.*, to repair firearms. (D.I. 60 at 6). That requires disassembling, cleaning, and, relevant here, re-assembling the firearm. But because Delaware's law prohibits that re-assembly,[19] Delawareans who lawfully own firearms for self-defense could be prevented from ensuring that those firearms remain operable, restricting their ability to retain operable firearms for self-defense at home.

---

18 Had this case arisen in another circuit, there may have been a nontrivial argument that prohibiting self-manufacturing passes *Bruen*'s first step because it does not place a "meaningful" restriction on acquiring and keeping firearms. *See e.g.*, *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024). This Circuit has not adopted that standard. Regardless, whether the restriction is meaningful or not appears irrelevant post-*Wolford* because the question is whether the law places "***any*** restrictions," not meaningful restrictions, on keeping and bearing arms. *Wolford*, 146 S. Ct. at 2043. That is why Delaware's argument that these regulations are permissible because they "do not 'prohibit people legally entitled to bear arms from purchasing a firearm or, for that matter, from buying unfinished frames and receivers and then making them into fully functional firearms'" misses the mark. (D.I. 63 at 6-7 (quoting *New York v. Arm or Ally, LLC*, 2024 WL 756474, at *13 (S.D.N.Y. Feb. 23, 2024))). The question is not whether there are other ways to exercise Second Amendment rights, the question is whether the challenged law places restrictions on exercising those rights.

19 11 Del. C. § 1463(b) ("A person is guilty of manufacturing an untraceable firearm when the person knowingly manufactures, ***assembles***, . . . .") (emphasis added).

Finally, the Manufacturing and Assembly Ban places restrictions on possessing firearms because it prevents law-abiding citizens from acquiring their self-defense firearm of choice. Take Rigby for example. The parties stipulated that he "is a peaceable citizen not disqualified from exercising his Second Amendment protected right to possess firearms and ammunition." (D.I. 61 ⁋ 13). He owns a 3-D printer, which he would like to use to manufacture his own firearms. (D.I. 61 ⁋⁋ 26-27). He also "lawfully owned a self-manufactured [] Glock-compatible handgun," and he would like to self-manufacture firearms "for self-defense and other lawful purposes." (D.I. 61 ⁋⁋ 17, 24). Put together, Rigby's firearm of choice for self-defense is a self-manufactured firearm. The Manufacturing and Assembly Ban, however, prevents him from making that firearm, so it de facto prevents Rigby from acquiring (and by extension, possessing) his firearm of choice.[20]

Although Delaware's regulations fail *Bruen*'s first step today, none of this should be read to say that this Court believes regulations on untraceable firearms and self-manufacturing firearms will always fail at the first step. Indeed, the notion that the Second Amendment protects a "right to 'self-manufacture firearms . . . free from any major regulation whatsoever'" is a "novelty." *Def. Distributed v. Att'y Gen. of New Jersey*, 167 F.4th 65, 76 (3d Cir. 2026). For example, had Delaware implemented a serialization process that required all currently owned self-manufactured firearms to be serialized with the state, that might pass constitutional muster. In addition, had Delaware required all future self-manufactured firearms to be serialized with the state within a certain timeframe after manufacturing, that too may be ok because in that situation Delaware would not be depriving Delawareans of access to their choice of firearm for self-defense. Indeed, Delaware may even be able to regulate the type of material that 3-D printed firearms can be made

[20] Here it is important to note that Rigby wants to make handguns and rifles, firearms that are protected under the Second Amendment in this Circuit. *ANJRPC 2026*, 2026 WL 2075513, at *21.

out of to ensure that 3-D printed firearms are reliable and not dangerous for the user. None of those regulations seem to place a restriction on keeping or bearing firearms. But prohibiting possession of firearms that are currently lawfully owned or future manufacturing and assembly of the same does place restrictions on keeping and bearing firearms. So the Possession and Manufacturing and Assembly Bans fail at *Bruen*'s first step.

### 2. ***Bruen* Step Two**

Now *Bruen*'s second step. Here, Delaware must show the Possession Ban and Manufacturing and Assembly Ban are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 34; *Rahimi*, 602 U.S. at 692. At this step Delaware points to three categories of laws: (1) laws restricting clubs, bludgeons, fighting knives, and slungshots; (2) laws restricting trap, punt, pivot, and swivel guns; and (3) laws about gunpowder storage. (D.I. 58 at 12-15). The first problem for Delaware is that the Third Circuit recently rejected relying on each of these regulations at *Bruen*'s second step. *ANJRPC 2026*, 183 F.4th at 243-45. Laws restricting access to clubs, bludgeons, fighting knives, and slungshots are not relevantly similar because "[t]hey are too late in time, and none enacted an outright ban on a class of weapons in common use for lawful purposes." *Id.* at 244. Laws restricting trap guns are not analogous because "the 'how' of the trap gun regulations is not analogous, because individuals were not restricted from owning firearms – they simply could not rig those firearms to engage in automatic and indiscriminate shooting outside of their presence." *Id.* at n.34. Finally, laws about gunpowder storage are "not apt comparators because the 'why' is not analogous. The gunpowder laws were enacted as fire-safety measures, where as none of the challenged regulations here were enacted as fire-safety measures. *Id.* at 243.

The evidence compiled in this case points to the same result. First, consider why Delaware's laws were enacted. Delaware says the laws were enacted to address concerns about

"weapons connected with violent crime and criminality." (D.I. 58 at 14). That framing, however, analogizes at "such a high level of generality" that it risks "water[ing] down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). Indeed, at some level, firearms have always been weapons connected with violent crime and criminality, yet nobody seriously thinks an outright ban on firearms would pass constitutional muster. *Heller*, 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country . . . . But the enshrinement of constitutional rights necessarily takes certain policy choices off the table."). Instead, the more apt "why" in this case turns on the traceability of ghost guns versus serialized guns because functionally ghost guns are no different than serialized guns. (D.I. 58, Ex. B ⁋ 11). The correct "why" here seems to be ensuring that law enforcement can trace weapons used in connection with a crime to the owner. (D.I. 58, at 4 (Delaware arguing that ghost guns are problematic because "individuals who commit violent crimes with firearms prefer to obtain [them] without background checks and recordkeeping that would allow law enforcement to link them to a particular firearm.")).

Now to "how" Delaware's laws achieve that end. The Possession Ban acts as an outright prohibition on owning a class of firearms (unserialized firearms). 11 Del. C. §§ 1459A(b), 1463(a). The Manufacturing and Assembly Ban prevents manufacturing firearms and using 3-D printers to manufacture firearms. 11 Del. C. § 1463(b)-(c). There are no exceptions to either of these provisions, and anyone who lawfully possessed a self-manufactured or unserialized firearm before these bans were enacted suddenly finds themselves breaking the law. Moreover, it appears that these firearms are in common use for lawful purposes because the Plaintiffs have provided evidence that unserialized and self-manufactured firearms are used for self-defense. (D.I. 61 ⁋⁋ 21-24, 35-36, 44).

Next is Delaware's historical evidence. The regulations on "clubs, bludgeons, fighting knives, and slungshots" come from the 19th and 20th century, so, like the evidence in *ANJRPC 20206*, it too is "too late in time." (D.I. 58, Ex. B ⁋⁋ 45-63); *ANJRPC 2026*, 183 F.4th at 244. For example, the Bowie knife regulations Delaware points to come from between "the 1830s [and] the start of the twentieth century." (*Id.* ⁋⁋ 45, 53). But no evidence "from the Founding era 'evinces a comparable tradition of regulation.'" *ANJRPC 2026*, 183 F.4th at 244 (citing *Bruen*, 597 U.S. at 27). There is another problem with Delaware's reliance on regulations on clubs, bludgeons, fighting knives, and slungshots. The "why" does not match up because there is no evidence that the historical regulations on Bowie knives (or any other weapon for that matter) were enacted so that law enforcement could trace a weapon used in a crime to the perpetrator.

Laws about trap, punt, pivot, and swivel guns also do not support Delaware's regulations here. Creating a trap gun required rigging a normal firearm "in such a way as to fire when the owner was not present to operate the gun." (D.I. 58, Ex. B ⁋ 19). Trap guns would often be set to defend "places of business, properties, or possessions" from criminals. (*Id.* ⁋ 23). But they had the unintended consequence of "hurting or killing innocents." (*Id.* ⁋⁋ 23-24). Indeed, in one example, a farmer set a trap gun in a corn crib to catch a thief but ended up killing his wife when she was the first person to enter the corn crib. (*Id.* ⁋ 24). Even assuming that laws prohibiting trap guns were widespread, the historical record before the Court suggests those laws were enacted because they transformed normal firearms into a booby trap that killed indiscriminately. Put differently, trap guns were outlawed because they presented significant dangers that normal firearms did not. There is no evidence that the firearms at issue here suffer the same problems. If anything, even Delaware's evidence indicates that the firearms targeted by the challenged laws are functionally the same as any other firearm on the market. (*Id.* ⁋ 11).

As for punt, pivot, and swivel guns, Delaware concedes that those firearms were banned because they were "dangerous and unusual weapons." (D.I. 58 at 15). Indeed, as Delaware's evidence states, "punt guns, pivot guns, and swivel guns, were various similar types of large firearms that also included what might be considered small cannons . . . . [A] single discharge from a punt gun 'could annihilate 50-100 birds.'" (D.I. 58, Ex. B ⁋ 25). Those guns were outlawed because they were markedly more dangerous than other guns at the time. (*Id.*). And although Delaware says "[g]host guns and unserialized unfinished frames and receivers are no different," it cites to no record evidence to back up that assertion. (D.I. 58 at 15). As the Court stated at the preliminary injunction stage, "[a]ttorney argument is not evidence." *Rigby*, 630 F. Supp. 3d at 614. Indeed, there is no record evidence here that untraceable or self-manufactured guns pose any danger that serialized or traditionally manufactured guns do not. (*See e.g.*, D.I. 58, Ex. B ⁋ 11 ("The presence or absence of serial numbers on firearms has no effect on their functionality . . . ."). If anything, the evidence tends to show that law-abiding citizens commonly use these types of firearms for self-defense. (D.I. 61 ⁋⁋ 21-24, 35-36, 44).

Historical gunpowder regulations fail because the "why" is not relevantly similar. Gunpowder regulations were enacted "in particular" due to "fear of the devastating effects of fires and explosions." (D.I. 58, Ex. B ⁋ 33); *see also ANJRPC 2026*, 183 F.4th at 243 ("[T]he Founding-era gunpowder aggregation laws that New Jersey points to are not apt comparators because the 'why' is not analogous. The gunpowder laws were enacted as fire-safety measures, not to address firearm violence.). There is no indication that the challenged laws here were enacted to combat the devastating effects of fires and explosions.

At bottom, none of the historical regulations Delaware points to are relevantly similar in how and why they were enacted when compared against the laws challenged here. Delaware has not carried its burden at *Bruen* step two.

### C. Whether the Challenged Regulations Are Facially Invalid

Now the final question: whether the regulations on which Delaware failed to carry its step two burden are invalid facially or as applied. Although Plaintiffs brought both facial and as-applied challenges (*see* D.I. 1 at Count One), neither party briefed the facial vs. as-applied distinction. At a minimum that seems like an implicit concession that the nature of Plaintiffs' challenge makes little difference in the analysis or outcome. Indeed, neither side pointed to any particular situation where the challenged laws would be constitutional, so the Court accepts the parties' presentation and concludes that the Possession and Manufacturing and Assembly Bans are facially unconstitutional and unconstitutional as applied to the plaintiffs here.

### D. Fifth Amendment Claims

Plaintiffs challenge §§ 1459A(b) and 1463(a) as unconstitutional under the Takings Clause of the Fifth Amendment, claiming that Delaware's regulations "mandate that its citizens destroy or dispossess themselves" of unserialized and self-manufactured firearms that they currently own. (D.I. 60 at 19). Because, however, the Court has already found that Possession and Manufacturing and Assembly Bans are unconstitutional violations of the Second Amendment, it need not address the merits of Plaintiffs' Fifth Amendment claims.[21]

---

[21] Plaintiffs do not articulate any separate Fourteenth Amendment arguments. The only mention of the Fourteenth Amendment is in Plaintiffs' Fifth Amendment discussion. (D.I. 60 at 12). "If a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (citation omitted). The Court finds that Plaintiffs do not have separate remaining Fourteenth Amendment

**E. <u>Remaining Permanent Injunction Factors</u>**

Having succeeded on its Second Amendment claims against the Possession and Manufacturing and Assembly Bans, Plaintiffs must now show (1) it will suffer irreparable injury, (2) no remedy available at law could adequately remedy that injury, (3) the balance of hardships tips in its favor, and (4) an injunction would not disserve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Here, the irreparable injury factor weighs in favor of an injunction. Plaintiffs have been forced to dispossess themselves of firearms they lawfully owned before Delaware passed the Possession and Manufacturing and Assembly Bans. Now the only thing preventing them from exercising their Second Amendment rights to repossess those firearms is an unconstitutional statute. That deprivation, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (plurality opinion)). For the same reason there is no adequate remedy at law; nothing can compensate Plaintiffs for the deprivation of their constitutional rights.

Balance of the hardships tip in Plaintiffs' favor as well because Delaware will suffer no hardship in not enforcing an unconstitutional law whereas Plaintiffs would suffer hardship by being barred from exercising their constitutional rights. Finally, an injunction serves the public interest because the public has an interest in ensuring that law-abiding citizens can exercise their constitutional rights whereas the government has no countervailing interest in enforcing an unconstitutional statute. *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("[N]either the

---

claims, and instead Plaintiffs mentioned the Fourteenth Amendment because the Fifth Amendment is incorporated against the states through the Fourteenth Amendment.

Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.”).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs’ Motion for Summary Judgment is GRANTED-IN-PART and DENIED-IN-PART. The same goes for Defendant’s cross motion for summary judgment. An appropriate order will follow.