2026 WL 2577367
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

UNITED STATES of America
v.
Joseph Paul BERGER, Appellant

No. 24-2125
|
Argued: July 8, 2025
|
Filed: Sept. 1, 2026

**Synopsis**
**Background:** After the United States District Court for the Eastern District of Pennsylvania, Joseph F. Leeson, J., 715 F.Supp.3d 676, denied his motion to dismiss indictment, defendant pled guilty to possessing machine gun and possessing unregistered silencer. Defendant appealed.

**Holdings:** The Court of Appeals, Bibas, Circuit Judge, held that:

[1] federal statute barring possession of machine guns did not violate Second Amendment, and

[2] as matter of first impression, National Firearms Act's silencer-registration requirement did not violate Second Amendment as applied.

Affirmed.

Chung, Circuit Judge, concurred in part and concurred in judgment.

**Procedural Posture(s):** Appellate Review; Pre-Trial Hearing Motion.

West Headnotes (13)

[1] **Criminal Law**—Review De Novo
Court of Appeals reviews pure issues of law de novo.

[2] **Weapons**—What guns are allowed
Second Amendment's scope is limited to guns in common use, not dangerous and unusual weapons. U.S. Const. Amend. 2.

[3] **Weapons**—Violation of right to bear arms
Courts confronting Second Amendment challenges to proceed in two steps: (1) decide whether Second Amendment's text applies to person and his proposed conduct, and, if it does, (2) shift burden to government to prove that its firearms regulation is part of historical tradition that delimits outer bounds of right to keep and bear arms. U.S. Const. Amend. 2.

[4] **Weapons**—Violation of right to bear arms
**Weapons**—Automatic or semi-automatic weapons
Federal statute barring possession of machine guns did not violate Second Amendment; machine guns were not commonly used for self-defense or other lawful purposes, because they could cause unusual amounts of damage, they were used mostly for criminal purposes, and statute comported with historical tradition of prohibiting carrying of dangerous and unusual weapons. U.S. Const. Amend. 2; 18 U.S.C.A. § 922(o).

[5] **Weapons**—What guns are allowed
Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes. U.S. Const. Amend. 2.

[6] **Weapons**—Right to bear arms in general
Second Amendment right to bear arms for individual self-defense extends both inside and outside home. U.S. Const. Amend. 2.

[7] **Weapons**—Violation of right to bear arms
To show that firearm regulation comports with Nation's regulatory tradition, as required by Second Amendment, government does not need historical twin, but only well-established and representative historical analogue. U.S. Const. Amend. 2.

[8] Weapons—Violation of right to bear arms
Firearm regulations that are objective, minimally burdensome, and aimed at ensuring orderly exercise of right to bear arms do not violate Second Amendment. U.S. Const. Amend. 2.

[9] Weapons—Right to bear arms in general
Second Amendment protects right to possess and carry weapons in case of confrontation against infringement. U.S. Const. Amend. 2.

[10] Weapons—Violation of right to bear arms
Conditions and qualifications on commercial sale of arms are presumptively lawful under Second Amendment. U.S. Const. Amend. 2.

[11] Weapons—Violation of right to bear arms
Minimal, objective regulations that are part of process of buying and selling guns do not infringe Second Amendment. U.S. Const. Amend. 2.

[12] Weapons—Violation of right to bear arms
Weapons—Registration of guns
National Firearms Act's silencer-registration requirement imposed only incidental burden on right to bear arms, and thus did not violate Second Amendment as applied to defendant, absent showing of lengthy wait times, subjective proper-cause standards, or exorbitant registration fee. U.S. Const. Amend. 2; 26 U.S.C.A. §§ 5811, 5812(a), 5822, 5841; 27 C.F.R. § 479.62.

[13] Weapons—What guns are allowed
Instrument falls within Second Amendment's text and protection only if it is necessary for gun to function as intended. U.S. Const. Amend. 2.

On Appeal from the U.S. District Court, Eastern District of Pennsylvania, Judge Joseph F. Leeson, No. 5:22-cr-00033-002

**Attorneys and Law Firms**

Counsel for Appellant, Susan M. Lin [ARGUED], Kairys Rudovsky Messing Feinberg & Lin, Philadelphia, PA

Counsel for Appellee, Anthony J. Carissimi, Robert A. Zauzmer [ARGUED], U.S. Attorney's Office, Philadelphia, PA
Before: Restrepo, Bibas, and Chung, Circuit Judges

Opinion of the Court

Bibas, Circuit Judge.

***1** Gun bans are strong medicine. But occasionally, they are just what the doctor ordered. History teaches that governments may ban weapons when they are commonly used principally for crime. Machine guns fit that mold.

Joseph Berger was convicted of possessing machine guns and unregistered silencers at home. He argues that the Second Amendment protects his right to own them, but it does not. Machine guns are not in common use for lawful purposes. And the federal registration requirement for silencers does not infringe his Second Amendment right. It is a minimal, objective hoop that buyers must jump through—just the sort of hoop that the Supreme Court has suggested does not infringe on the right. So we will affirm Berger's convictions.

## I. Berger's Unregistered Machine Guns and Silencers

Berger, a decorated Navy veteran, lives with his father in Bethlehem, Pennsylvania. Nearly five years ago, federal agents intercepted a package of three silencers sent from China to Berger's house. So agents got a search warrant for the house and searched it. There, they found more than five dozen guns, of which thirteen were fully automatic (mostly variants of the AK-47), plus a dozen silencers. Agents also discovered evidence that the father and son had bought parts used to convert semi-automatic guns into machine guns.

A "machinegun" is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). Semiautomatics, like most AK-47 variants, can be converted

into machine guns. These converted guns qualify, too. *See id.* (including "any combination of parts from which a machinegun can be assembled"). So Berger's thirteen guns are machine guns. Because his guns were neither registered before 1986 nor owned by law enforcement, possessing them was a federal crime. 18 U.S.C. § 922(*o*).

"Silencer" is a misnomer; these attachments do not silence gunshots, but just muffle them. *See* 18 U.S.C. § 921(a)(25) (defining silencer as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer"). Possessing silencers is not a crime, but failing to register them is. 26 U.S.C. §§ 5845(a)(7), 5861(d).

Berger was indicted for possessing a machinegun, possessing an unregistered machinegun, and possessing an unregistered silencer, in violation of 18 U.S.C. § 922(*o*) and 26 U.S.C. §§ 5845(a)(6)–(7), (b), 5861(d), and 5871. The District Court denied his as-applied Second Amendment challenge, holding that machine guns "are not in common use today for self-defense" and instead count as "dangerous and unusual weapons." JA 26, 28. It also held that silencers are not "bearable arm[s]" protected by the Second Amendment. JA 36.

[1] Berger pleaded guilty to possessing a machinegun and an unregistered silencer. In return, the government dismissed the charge of possessing an unregistered machine gun. As part of his plea agreement, Berger reserved the right to appeal the denial of his Second Amendment challenge. We held his appeal pending the resolution of *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General of New Jersey*, 183 F.4th 211 (3d Cir. 2026) (en banc) (*ANJRPC*). Because this challenge turns on pure issues of law, we review de novo. *United States v. Moore*, 111 F.4th 266, 268 n.1 (3d Cir. 2024).

## II. Machine Guns Are Not in Common Use for Lawful Purposes

***2** [2] The Second Amendment is not boundless. *Heller* recognized that the scope of the Second Amendment is limited to guns "in common use," not "dangerous and unusual weapons." *District of Columbia v. Heller*, 554 U.S. 570, 626–27, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (internal quotation marks omitted). Thus, Justice Scalia suggested it "would be a startling reading of" our Second Amendment jurisprudence to construe it to protect possessing machine guns. *Id.* at 624, 128 S.Ct. 2783. So ten years ago our Court held that, under *Heller*, machine guns are unprotected because they are "exceedingly dangerous" and "not in common use for lawful purposes." *United States v. One Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 142 (3d Cir. 2016).

[3] But *Heller* is not the last word. Since then, the Supreme Court has decided *Bruen* and other cases. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022); *United States v. Rahimi*, 602 U.S. 680, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024); *United States v. Hemani*, ––– U.S. ––––, 146 S. Ct. 1677, 225 L.Ed.2d 314 (2026); *Wolford v. Lopez*, ––– U.S. ––––, 146 S. Ct. 2032, 225 L.Ed.2d 494 (2026). *Bruen* requires courts confronting Second Amendment challenges to proceed in two steps: (1) "decide whether the text of the Second Amendment applies to a person and his proposed conduct," and, if it does, (2) shift the burden to the government to " 'prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.' " *Range v. Att'y Gen. of the United States*, 124 F.4th 218, 225 (3d Cir. 2024) (en banc) (quoting *Bruen*, 597 U.S. at 19, 142 S.Ct. 2111). And *Bruen* affirmed that "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.' " *Bruen*, 597 U.S. at 47, 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 627, 128 S.Ct. 2783).

[4] But it was not clear where the *Bruen* court wanted the common-use inquiry to fall in its two-step framework. Our en banc court has now held that it belongs at *Bruen*'s second step. *ANJRPC*, 183 F.4th at 236–238. With the benefit of that teaching, we now hold that the government may ban possession of machine guns.

At step one, machine guns are firearms, so they are "Arms" protected by the text of the Second Amendment. *Id.* at 239; *Heller*, 554 U.S. at 581, 128 S.Ct. 2783. So we focus on step two: The government can ban machine guns only if doing so is "consistent with the principles that underpin our regulatory tradition," looking to "[w]hy and

how the regulation burdens the right." Rahimi, 602 U.S. at 692, 144 S.Ct. 1889. At Bruen's second step, machine guns are not commonly used for lawful purposes, and history supports banning them.

**A. Machine guns are not commonly used for self-defense**

[5] The Second Amendment protects weapons commonly used for self-defense and other legal purposes. Conversely, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." Heller, 554 U.S. at 625, 128 S.Ct. 2783. This traditional principle "accords with the historical understanding of the scope of the right." *Id.* To support the common-use principle, Heller relied on "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 627, 128 S.Ct. 2783 (citing 4 William Blackstone, *Commentaries* *148–49). Bruen likewise acknowledged that colonial legislatures had enacted these bans. 597 U.S. at 47, 142 S.Ct. 2111.

Machine guns are not in common use for lawful purposes. That means they are dangerous and unusual. ANJRPC, 183 F.4th at 233–234. They are indiscriminate weapons of war and crime, not self-defense ones. And because they can cause unusual amounts of damage, they are used mostly for criminal purposes.

***3** [6] Guns that are well-suited for "traditionally lawful purposes" like self-defense or hunting are more likely to be in common use for lawful purposes. Heller, 554 U.S. at 577, 128 S.Ct. 2783. The Supreme Court has repeatedly stressed that "individual self-defense is the *central component* of the Second Amendment right." Bruen, 597 U.S. at 29, 142 S.Ct. 2111 (internal quotation marks omitted); *accord* Heller, 554 U.S. at 599, 628, 128 S.Ct. 2783. That right extends both inside and outside the home. Bruen, 597 U.S. at 33, 47, 142 S.Ct. 2111. So we can "examine a weapon's features to determine whether a weapon is in common use for lawful purposes." ANJRPC, 183 F.4th at 242.

Machine guns are not well-suited for lawful purposes. To be sure, they are excellent weapons of war. Heller, 554 U.S. at 627, 128 S.Ct. 2783. They were first widely used in World War I. *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (citing John Ellis, *The Social History of the Machine Gun* (1986)). Modern machine guns can fire more than 1,000 rounds in one minute, killing dozens of enemies in seconds. *Id.*

But the very trait that makes machine guns excellent combat weapons also makes them unsuited to self-defense. Their high rate of fire makes them inaccurate, risking collateral damage. The U.S. Army thus trains soldiers to use them only when "the need for precise fires, although desired, is not as important. Automatic or burst fires *drastically decrease the probability of hit* due to the rapid succession of recoil impulses and the inability of the Soldier to maintain proper sight alignment and sight picture on the target." U.S. Army Field Manual 3-22.9, at 8-6 (May 2016) (emphasis added). Thus, the Senate Report to the bill that banned machine guns, the Gun Control Act of 1968, specifically found that "machineguns ... are p[r]imarily weapons of war and have no appropriate sporting use or use for personal protection. ... This finding and declaration is fully supported by the investigations of the committee and by the evidence presented at the hearings before the committee." S. Rep. No. 90-1501, at 28 (1968).

This "lack of controllability" helps explain why police and civilians were reluctant to buy the first widely available machine gun, the Thompson. *Bianchi v. Brown*, 111 F.4th 438, 469 (4th Cir. 2024) (en banc) (citing William J. Helmer, *The Gun that Made the Twenties Roar* 61–62 (1969)). "As a criminal's weapon, the Tommygun was an unqualified success." *Id.* (quoting Helmer, *supra*, at 126). But "[a]s a police weapon, it was ... a flop." *Id.* (quoting Helmer, *supra*, at 126). As one police chief testified to Congress, "It is not possible for a police officer to open a machine gun up on a crowded street. The thieves don't care how many innocent people are killed. Police officers don't dare to open a machine gun up on the street and turn it loose, because you are going to kill possibly 10 innocent people to 1 criminal." 1 *Investigation of So-Called Rackets: Hearings before a Subcomm. of the Comm. on Commerce, U.S. Senate, 73rd Cong., 2d Sess., Oct. 23 & 24, 1933*, pt. 3, at 293 (1934). It was popular "with criminals, especially bootleggers," but never caught on with the law-abiding public. Bianchi, 111 F. 4th at 469 (quoting David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 287 n.490 (2024)).

That impression did not change over time. To explain why it was banning machine guns, Congress described them (and silencers) as "gangster-type weapons." H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Comm. Rep. to the Gun Control Act of 1968), *reprinted in* 1968 U.S.C.C.A.N. 4426, 4434. Congress criminalized them because they are "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime." H.R. Rep. No. 99-495, at 4 (1986). And when we faced this question ten years ago, we remarked that "[s]hort of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns." *Palmetto State*, 822 F.3d at 142 (quoting *Henry*, 688 F.3d at 640). Like those weapons, machine guns are neither designed for nor typically used in self-defense or hunting.

***4** Though we apply *Bruen* today, we reach the same result. Machine guns are not commonly used for lawful purposes like self-defense. *United States v. Bridges*, 150 F.4th 517, 528 (6th Cir. 2025); *United States v. Morgan*, 150 F.4th 1339, 1348–50 (10th Cir. 2025); *Henry*, 688 F.3d at 640; *see also* *Heller*, 554 U.S. at 627, 128 S.Ct. 2783 (noting that "weapons that are most useful in military service—M-16 rifles and the like—may be banned"). As part of *Bruen*'s step two, that shows that machine-gun bans are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889.

### B. Machine-gun bans fit our tradition of banning weapons commonly used for crime, not lawful purposes

[7] To recap, at *Bruen*'s second step, the government must prove that machine-gun restrictions fit with our Nation's regulatory tradition. *Bruen*, 597 U.S. at 19, 142 S.Ct. 2111. It does not need a "historical *twin*," but only a "well-established and representative historical *analogue*." *Id.* at 30, 142 S.Ct. 2111 (emphases in original). This means that a modern gun regulation must be " 'relevantly similar' to [Founding-era gun regulations] in both why and how it burdens the Second Amendment right." *Rahimi*, 602 U.S. at 698, 144 S.Ct. 1889 (quoting *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111). So we look to "the principles underlying the Second Amendment" and "our regulatory tradition." *Id.* at 692, 144 S.Ct. 1889.

But we do not write on a blank slate. The Supreme Court has already done the work of distilling the key principle from history, noting "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Heller*, 554 U.S. at 627, 128 S.Ct. 2783 (citing many sources, including 4 William Blackstone, *Commentaries* *148–49). Thus, rather than overruling its precedent in *Miller*, *Heller* confirmed it "to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625, 128 S.Ct. 2783 (discussing *United States v. Miller*, 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)).

Machine guns are commonly used for crime or war, not for lawful civilian purposes. As noted, criminals loved the Tommygun. But law-abiding citizens hated it. Regulators took note. Between 1925 and 1934, at least twenty-nine states, plus Congress (for the District of Columbia), banned possession of machine guns. *Bianchi*, 111 F.4th at 470 & n.14 (collecting citations). (We note these laws not as evidence of a tradition of banning automatic weapons, since "the primary time period for the analogical inquiry is the Founding era," but rather to show the rapid consensus that these new weapons were, and are, dangerous. *ANJRPC*, 183 F.4th at 244.)

In short, weapons that were particularly dangerous to others and commonly associated only with crime could be outlawed. The machine gun fits into that small category. Plus, the Supreme Court has treated owning machine guns as more suspect than owning semi-automatic weapons. *ANJRPC*, 183 F.4th at 242 n.30 (following *Staples v. United States*, 511 U.S. 600, 611–12, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)). Thus, Berger's as-applied challenge to his machine-gun conviction fails.

## III. The Silencer Registration Requirement Is Constitutional

In addition to machine guns, Berger had unregistered silencers. The National Firearms Act requires citizens to submit an application, register their silencers, undergo a background check, and (at the time) pay a $200 tax per silencer. 26 U.S.C. §§ 5811 (2024), 5812(a), 5822, 5841.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

[8] The parties now agree that silencers are "Arms." We need not decide that question. Even if they are, registration requirements are permissible. Regulations that are objective, minimally burdensome, and aimed at ensuring orderly exercise of the right do not "infringe," so they do not violate the Amendment.

***5** [9] [10] The Second Amendment protects the right "to possess and carry weapons in case of confrontation" against infringement. *Heller*, 554 U.S. at 592, 128 S.Ct. 2783. But not every gun law counts as an infringement. "[C]onditions and qualifications on the commercial sale of arms" are "presumptively lawful"; they do not necessarily rise to the level of infringements. *Id.* at 627 & n.26, 128 S.Ct. 2783.

In *Bruen*, the Supreme Court repeated that insight. It again distinguished infringements from making gun buyers or sellers jump through minimal, generally applicable, objective hoops. "To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of ... 'shall-issue' licensing regimes," including required "background check[s] or ... firearms safety course[s]," which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 597 U.S. at 38 n.9, 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 635, 128 S.Ct. 2783). Such licensing regimes, which contain only "narrow, objective, and definite standards," are presumptively constitutional, though they may be challenged if "lengthy wait times ... or exorbitant fees deny ordinary citizens their right to public carry." *Id.*; *accord* *id.* at 80, 142 S.Ct. 2111 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice."). In short, the Court has repeatedly endorsed shall-issue permitting rules.

The best way to understand the Court's presumptive endorsement of these rules is at *Bruen*'s step one, as a reading of the Second Amendment's text. *Cf.* *ANJRPC*, 183 F.4th at 249 (holding that magazines are covered by the text and "presumptively entitled to constitutional protection"). Once a challenger gets to step two, courts must presume regulations *un*constitutional, making the government bear the burden of showing that any restriction "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. But neither *Heller* nor *Bruen* relied on a historical tradition of permitting. Their discussions of licensing thus make sense as glosses on the meaning of "infringe[ment]" at step one.

A regulation "infringe[s]" the Second Amendment right only if it destroys or illegitimately restricts the right. *See* Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381, 396–441 (2025) (canvassing legal and political usage from the Magna Carta through the early nineteenth century). One can infringe a right by "violat[ing]," "break[ing]," "destroy[ing]," "hinder[ing]," "intrud[ing], or invad[ing]" it. 1 Samuel Johnson, *Infringe, in A Dictionary of the English Language* (4th ed. 1773) (quotations 1–4); Daniel Bellamy, *Infringe, in A New, Complete, and Universal English Dictionary* (4th ed. 1764) (quotations 1, 5 & 6).

Blackstone likewise distinguished "restraint[s]" upon rights that are "wanton and causeless" from "those points wherein the public good requires some direction or restraint." 1 William Blackstone, *Commentaries* *122. So he treated the right to keep and bear arms as subject to "due restrictions." 1 *id.* at *139.

Early American case law tracks this distinction between infringements and incidental burdens. For instance, Kentucky's highest court explained that even though citizens retain their natural "right of defence" under the social contract, "society may curtail this right, and no doubt does restrain its exercise in many important particulars." *Gray v. Combs*, 30 Ky. 478, 484 (1832). And the Arkansas Supreme Court held that "the right to keep and bear arms" is not infringed by some "legal control or regulation" for "the general interests of the community." *State v. Buzzard*, 4 Ark. 18, 21 (1842) (opinion of Ringo, C.J.). True, one state court did at first "void" all laws "which diminish or impair" the right to keep and bear arms, but that "outlier decision" "was universally condemned." *Bliss v. Commonwealth*, 12 Ky. 90, 92 (1822) (first two quotations); William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1474 (2024) (third and fourth ones; also collecting cases).

***6** [11] In short, minimal, objective regulations that are part of the process of buying and selling guns do not infringe. They comport with the "normal ... rule" allowing "incidental burden[s]" on constitutional rights. *Luis v. United States*, 578 U.S. 5, 33–34, 136 S.Ct. 1083, 194 L.Ed.2d 256 (2016) (Thomas, J., concurring in the judgment) (discussing Sixth

Amendment and other criminal-procedure rights as well as the First Amendment); *see also* *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (time-place-and-manner restrictions on speech); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 205, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (Scalia, J., concurring in the judgment) (ID requirements for voting). Because minimal, objective buying-and-selling regulations are not infringements, they are outside the scope of the Second Amendment.

The silencer-registration requirement imposes only an incidental burden. Registering a silencer under the National Firearms Act is an "objective and definite" process "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Bruen*, 597 U.S. at 38 n.9, 142 S.Ct. 2111 (comma and internal quotation marks omitted). Berger made some of the silencers at home and bought others. So he had to submit an application with his personal information, fingerprints, photograph, and description of the silencer. 26 U.S.C. § 5822; 27 C.F.R. § 479.62. He had to notify the chief law enforcement officer in his area and pay a (then) $200 tax for each silencer. *Id.* Berger also had to register his silencers and mark them with serial numbers. 26 U.S.C. §§ 5841(b), 5842(a).

[12] These clear, narrow standards ensure that only law-abiding citizens own silencers. The applications "shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law." 26 U.S.C. § 5822. They do not give the government discretion or erect real barriers to owning silencers. In sum, the Act sets up a "shall-issue" regime just like the ones *Bruen* blessed. *Compare* 26 U.S.C. § 5861(d) *and* 27 C.F.R. § 479.62, *with* Del. Code, tit. 11, § 1441 (West 2022) (cited with approval in *Bruen*, 597 U.S. at 13 n.1, 142 S.Ct. 2111). In so holding, we join all circuits that have addressed the Act's registration requirement. *United States v. Peterson*, 161 F.4th 331, 341 (5th Cir. 2025), *cert. denied*, —— U.S. ——, 146 S.Ct. 2558, 224 L.Ed.2d 501 (2026); *United States v. Speed*, 175 F.4th 272, 286 (4th Cir. 2026).

*Heller*'s presumption of constitutionality can be overcome, but Berger has not overcome it. He offers no evidence that the Act imposes anything other than "narrow, objective, and definite standards" in a "shall-issue licensing regime[ ]." *Bruen*, 597 U.S. at 38 n.9, 142 S.Ct. 2111 (internal quotation marks omitted). We see no evidence of "lengthy wait times" or subjective "proper-cause standards." *Id.* Nor has Berger argued that the $200 tax was "exorbitant" or functionally denied him the right to buy and keep silencers. *Id.* So the silencer-registration requirement is constitutional as applied.

* * * * *

[13] The Second Amendment—like every other constitutional right—has limits. Machine guns are commonly used for crime, not self-defense. So they can be banned. And reasonable registration requirements are not infringements. We will thus affirm Berger's conviction and sentence.[*]

## All Citations

--- F.4th ----, 2026 WL 2577367

United States v. Berger, --- F.4th ---- (2026)
2026 WLs 2577367

## Footnotes

* Judge Chung does not join Part III, as the government did not argue that the regulation does not "infringe" the Second Amendment, but instead argued that the regulation is consistent with history and tradition at *Bruen*'s step-two inquiry. Dkt. No. 47 ¶ 3; Dkt. No. 48, attachment at 7–14. Before concluding that a *de minimis* burden on an "arm" does not suffice to satisfy *Bruen*'s step one, Judge Chung would consider the parties' and amici's views, as she perceives some tension between this approach and the Supreme Court's rejection of means-end scrutiny and interest balancing. *Bruen*, 597 U.S. at 22–24, 142 S.Ct. 2111 (discussing weaknesses of test that assesses "extent" of burden against salutary effect); *id.* at 103, 106, 142 S.Ct. 2111 (Breyer, J., dissenting) (noting that, in free-exercise cases, courts apply strict scrutiny to laws that are "not neutral and generally applicable"); *supra* pp. —— – ––—, —— (reasoning that a regulation does not infringe when it imposes "minimal, generally applicable, objective hoops").

Judge Chung joins in the judgment because the requirement that an owner register a silencer, an accessory, does not place "any restrictions on either the keeping (*i.e.*, possession) or the bearing (*i.e.*, carrying) of arms." *Wolford*, 146 S. Ct. at 2043 (cleaned up); *see also* Appellee's Original Br. 34–38 (same). An instrument falls within the Second Amendment's text and protection only if it "is necessary for ... a gun to function as intended." *ANJRPC*, 183 F.4th at 247 (cleaned up) (holding that, under that definition, large-capacity magazines are arms); *Duncan v. Bonta*, 133 F.4th 852, 868 (9th Cir. 2025); *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). *Contra* *United States v. Comeaux*, 179 F.4th 297, 301–02 (5th Cir. 2026).

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.